**Sebastian Tapia**, OSB No. 043761
*stapia@cityofsalem.net*
City of Salem Legal Department
555 Liberty St. SE, Room 225
Salem, OR 97301
    Telephone: (503) 588-6003
    Fax: (503) 361-2202
       Attorney for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>    Plaintiff,<br><br>    v.<br><br>NATHAN BUSH and CITY OF SALEM, a municipal corporation,<br><br>    Defendants. | Case No. 6:22-cv-00684-MK<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>***REQUEST FOR ORAL ARGUMENT*** |

## TABLE OF CONTENTS

**LOCAL RULE 7-1 CERTIFICATION** ................................................................................ 1

**MOTION** ................................................................................................................................ 1

**MEMORANDUM** ................................................................................................................. 1

1. Background Facts ................................................................................................................. 1

    A.    Facts Concerning Entry into the Residence ........................................................ 2

    B.    Facts Concerning Self Defense and Defense of Others .................................... 3

C.    Facts Concerning Policy and Practice .................................................................... 5

2. Authorities Concerning Summary Judgment ................................................................ 7

3. Fourth Amendment - Unlawful Entry ........................................................................... 8

    A.    Authority Concerning Entry into the Residence ................................................. 8

    B.    Argument Concerning Entry into the Residence ................................................. 9

4. Fourth Amendment Violation – Unlawful Force; State Law Battery ....................... 10

    A.    Authorities Concerning Self Defense and Defense of Others ........................... 11

    B.    Arguments Concerning Defense of Self and Others .......................................... 12

5. *Monell* – Policy and Practice of Deliberate Indifference of Violations of the Fourth
    Amendment ................................................................................................................. 13

    A.    Laws Concerning Policy and Practice ............................................................... 13

    B.    Arguments Concerning Policy and Practice ...................................................... 15

6. Qualified Immunity ...................................................................................................... 16

    A.    Laws Concerning Qualified Immunity .............................................................. 16

    B.    Argument for Qualified Immunity ..................................................................... 17

7. Wrongful Death – Negligence ...................................................................................... 18

    A.    Laws Concerning Wrongful Death Negligence ................................................. 19

    B.    Arguments about Wrongful Death Negligence .................................................. 20

**CONCLUSION** .................................................................................................................. 21

**TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................................................... 7

*Bd. of Cty. Comm'rs of Bryan Cnty., v. Brown*
  Bd. of Cty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626
  (1997) ........................................................................................................................ 14

*Billington v. Smith*,
  292 F.3d 1177 (9th Cir. 2002) ........................................................................................ 20

*Castro v. County of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) ........................................................................................ 14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ....................... 7, 13

*Connick v. Thompson*,
  563 U.S. 51, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) ...................................................... 14

*Daniels v. Williams*,
  474 U.S. 327 (1986) ...................................................................................................... 20

*Denton v. Arnstein*,
  197 Or 28 (1952) .......................................................................................................... 20

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) .......................................................................................... 14

*Floyd v. Laws*,
  929 F.2d 1390 (9th Cir. 1991) ........................................................................................ 17

*Forrester v. City of San Diego*
  25 F.3d 804, 807 (9th Cir. 1994) .................................................................................... 11

*Georgia v. Randolph*,
  547 U.S. 103 (2006) ....................................................................................................... 9

*Graham v. Connor*,
  490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) .................................................... 11

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ...................................................................................................... 16

*Hayes v. City of San Diego*,
  736 F.3d 1223 (9th Cir. 2013) (en banc) .......................................................................... 11

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ........................................................................................ 7, 8

*Kasnick v. Cooke*,
  116 Or App 580 (1992) .................................................................................................. 20

*Kisela v. Hughes*,
   138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018) ....................................................................... 17, 18

*Lifestyle Ventures, LLC v. Cty. of Clackamas, No. 3:15-CV-1291-SB*,
   2016 WL 11394982 (D. Or. May 18, 2016) ........................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ....................................................... 8

*Mendez v. Cty of L.A.*,
   897 F.3d 1067 (9th Cir. 2018) ........................................................................................... 8, 9

*Metropolitan Life Ins. Co. v. Kelley*,
   890 F. Supp. 746 (N.D. Ill. 1995) .......................................................................................... 11

*Michigan v. Clifford*,
   464 U.S. 287, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984) ...................................................... 8,9

*Monell v. Dep't of Soc. Servs. of N.Y.*,
   436 U.S. 658 (1978) ....................................................................................................... 13, 14

*Navarro v. Block*,
   72 F.3d 712 (9th Cir. 1995) .................................................................................................... 15

*Ohio v. Harris*,
   489 U.S. 378 (1989) ............................................................................................................... 15

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) ........................................................................................... 8, 13

*Pearson v. Callahan*,
   555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ...................................................... 16

*Rico v. Ducart*,
   980 F.3d 1292 (9th Cir. 2020) ............................................................................................... 17

*Saucier v. Katz*,
   533 U.S. 194, 121 S. Ct. 2151 (2001) .............................................................................. 16, 17

*Smith v. City of Hemet*,
   394 F.3d 689, 702 (9th Cir. 2005).......................................................................................... 11

*Trevino v. Gates*,
   99 F.3d 911 (9th Cir. 1996) .................................................................................................... 14

*United States v. Basher*,
   629 F.3d 1161 (9th Cir. 2011) ................................................................................................. 9

*United States v. Desinor*,
   525 F.3d 193 (2d Cir. 2008) ............................................................................................ 12, 16

*United States v. Lindsey*,
   877 F.2d 777 (9th Cir. 1989) (en banc) ............................................................................. 9, 14

*Vos v. City of Newport Beach*,
   892 F.3d 1024 (9th Cir. 2018) ................................................................................... 18

## STATUTES AND LAWS

42 U.S.C. § 1983 ........................................................................................ 13, 14, 15, 18

ORS 133.055 ....................................................................................................... 12

ORS 161.233 [2020 s.s.2 c.3 §7] ................................................................... 12, 13

ORS 161.242 ....................................................................................................... 12

ORS 181A.790 ................................................................................................. 5, 6, 7

## RULES

Fed. R. Civ. P. 56 ............................................................................................... 7, 8

## LOCAL RULE 7-1 CERTIFICATION

In compliance with LR 7-1(a), the parties have conferred on this motion, and it is opposed by Plaintiff.

## MOTION

Defendants move the Court for Summary Judgement in favor of Defendants in that Defendant Nathan Bush's use of lethal force was justified as self-defense and defense of others. This Motion is supported by this Memorandum, the Declarations of Sebastian Tapia, Nathan Bush, Brandon Ditto, and the exhibits attached thereto.

## MEMORANDUM

### 1. Background Facts

The heart of the dispute in this case is whether Officer Nathan Bush was justified in shooting and killing Arcadio Castillo III ("Castillo III"). Tapia Decl. ¶ 2. Specifically, the parties are in dispute as to whether Castillo III made aggressive moves toward Office Bush while wielding a large butcher knife. Tapia Decl. ¶ 3. Plaintiff also claims that Officer Bush's entry into the Castillo's house was unreasonable and a violation of Castillo III's Fourth Amendment rights. Second Amend. Compl. ¶ 26.

It is undisputed that Castillo III's mother, Misty Castillo, called 911 for help with Plaintiff, who had been assaulting family members and was armed with a knife. Second Amend. Compl. ¶ 11. It is undisputed that Castillo III still held the knife when Officer Bush arrived. Second Amend. Compl. ¶ 15. It is undisputed that Officer Bush instructed Castillo III to put down the knife. *Id*. It is undisputed that Castillo III continued to hold the knife when Officer Bush shot Plaintiff. *Id*.

PAGE 1 –DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges Castillo III took no aggressive actions towards Officer Bush, but this allegation is not born out by the objective evidence. Second Amend. Compl. ¶ 16. See section 1.B. for analysis of the objective evidence.

### A.    Facts Concerning Entry into the Residence

Plaintiff claims "Defendant Bush violated Castillo's Fourth Amendment rights by entering his home without a warrant . . .." Second Amend. Compl. ¶ 28.

Mrs. Castillo told 911 dispatch, that her son, Castillo III, "is mentally ill and assaulting us." Tapia Decl. Ex 1 at 00:20-00:23 (911 Call). She also said that Castillo III had a knife and had threatened her with it. *Id*. at 01:31-1:42. Mrs. Castillo can be heard saying, "Don't touch me," and then screaming loudly. *Id*. at 02:23-02:59. Just before the call ended, a male voice can be heard referring to Mrs. Castillo as Mom. *Id*. Officer Bush arrived shortly afterward and spoke with Mrs. Castillo. Tapia Decl. Ex. 2 (Grand Jury Transcript 59:8-16). Mrs. Castillo told Officer Bush to *"go help"* her husband, who was inside the house. *Id*. at 59:22-60:4. (Emphasis added). Officer Bush remembers the communication similarly. Officer Bush said Mrs. Castillo told him, "[He] needed to go in and help her husband." Tapia Decl. Ex. 3 (Bush Dep. 62:6-10). Prior to Officer Bush's arrival, Castillo III's father let Castillo III inside the house and locked the door because he knew that the police were arriving and wanted to calm him. Tapia Decl. Ex. 4 (Castillo Jr. Dep. 34:3-9). Shortly afterwards, Castillo III's father acknowledged unlocking the door for Officer Bush. Castillo III's father also claims that although he unlocked the door and started opening it for Officer Bush, Officer Bush opened the door the rest of the way without his permission. *Id*. at 34:12-18. Officer Bush said that prior to entering the residence he had probable cause to arrest Castillo III for "Assault 4, Menacing, Unlawful Use of a Weapon." Tapia Decl. Ex. 3 (Bush Dep. 83:7-8).

PAGE 2 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

B.      **Facts Concerning Self Defense and Defense of Others**

Officer Bush explains the events that occurred after opening the front door to the home as follows.  "As it opens, the first thing I saw was Arcadio Castillo, Jr. off to my left, and then I opened farther and I saw Castillo, III, in front of me." Tapia Decl. Ex. 3 (Bush Dep. 79:19-22). Officer Bush described Castillo III's position as Officer Bush opened the door.  "He was standing in front of me directly at the other end, essentially, of the couch, and he was standing facing me and he was holding a large knife in his right hand." *Id*. at 85:21-24.  Castillo III's shoulders were square to Officer Bush and held a large knife was in his right hand. *Id*. at 86:1-7.  Officer Bush pointed his gun at Castillo III and said, "Drop the knife." *Id*. at 86:18-19.  Initially, Castillo III's knife was "down by his side." *Id*. at 87:4-5.  At this point, Castillo III was eleven feet five and a half inches from Officer Bush.  Bush Decl. ¶ 6. "Initially when I told him to 'drop the knife,' he began walking towards me, took approximately two steps, a couple feet towards me, and then stopped, turned around, and started walking away." Tapia Decl. Ex. 3 (Bush Dep. 89:21-90:10). See also Tapia Decl. Ex. 5 (Nest Audio Enhanced[1]) (Defendant Bush advised Plaintiff to drop the knife at 01:48 and again 01:54). "I took one step through the doorway, and I took my left hand off my pistol.  I reached out towards Arcadio, Jr. to try to tell him to come to me so I could pull him out of the house so he could get way from the problem, and then at that point, Arcadio III, spun to his left, his weight shifted forward, and he charged at me with the knife raised near his right shoulder." Tapia Decl. Ex. 3 (Bush Dep. 90:2-10).  "He had the knife up and pointed towards me." *Id*. at 92:17-18.  "Up, like, in a stabbing motion.  Like his thumb side, the knife is up and he's leaning forward and runs straight towards me." *Id*. at 92:20-22.  "Q.  Okay.  So that arm is

---

[1] Defendant Bush can be heard saying "drop the knife" at time stamp 1:48 and 1:54.

up out to his right?  A.  It's out to his right, yes."  *Id*. at 92:23-25, Bush Decl. ¶ 17, Ex. 1.  Officer Bush fired the first shot shortly after Castillo III started running towards him.  Tapia Decl. Ex. 2 (Grand Jury Tr. 130:7-14).  At this time, Castillo III was seven feet and nine and a half inches from Officer Bush.  Bush Decl.¶ 14.  At its closest distance in which Castillo III held the knife, the tip of its blade was thirty-eight inches from Officer Bush.  Bush Decl. ¶ 12.

Officer Bush explained why he did not choose to use his Taser.  "Well, through training I know that a knife is a deadly weapon and causes serious injury."  Tapia Decl. Ex. 3 (Bush Dep. 72:5-6).  He also explained that he was alone, and Tasers don't always work.  *Id*. at 72:14-19.

Misty Castillo was asked what Officer Bush did wrong.  Mrs. Castillo responded, "I believe he shot my son and that was wrong.  He could have shot him anywhere.  He didn't have to shoot him in the heart.  He could have incapacitated him in any other way."  Tapia Decl. Ex. 6 (Misty Castillo Dep. 215:2-13).

Defendants retained Englert Forensic Consultants, an expert forensic reconstruction team, to analyze the entry and exit wounds found on Castillo III's body.  Tapia Decl. ¶ 5, Ex. 7 (Forensic Expert Report), Ex. 8 (Autopsy Report).  Englert Forensic Consultants formed the following conclusions to a reasonable degree of scientific probability.  Tapia Decl. Ex. 7 at p. 48.

- There were a total of four 9mm rounds fired by Officer Bush during this shooting incident. *Id.* at p. 49.

- Four 9mm cartridge cases were recovered. *Id.* at p. 49.

- Two bullets were recovered from Castillo's body and two were not. *Id.* at p. 49.

- All four shots were clustered, occurring within close proximity (approximately 10 inch cluster) to one another when the body is bent forward at the waist and twisted slightly counter-clockwise. *Id.* at p. 50.

- The wound to Castillo's mid chest, referenced as GSWI, is indicative of Plaintiff being "slightly bent forward at the waist and beginning a quick turn to the left during this shot."

- The bullet that entered at Castillo's left chest and exited axillary, re-entered the left upper arm and re-exited the left upper arm in a downward trajectory is referenced as GSWII. The entry and exit wounds show that Castillo was "slightly bent forward over his abdomen and turning slightly counterclockwise." *Id.* at p. 51.

- The next set of wounds, referenced as GSWIII, shows that Castillo was slightly bent forward at the waist with his right arm raised. *Id.* at p. 51. The body position of this set of wounds is consistent with Officer Bush's statement that Castillo raised his right arm at approximately shoulder height with a large knife in his right hand and pointed toward Officer Bush. *Id.* at p. 52. This set of wounds is inconsistent with Plaintiff's explanation that Castillo's hand was down at his side at all times prior to being shot. *Id.* at p. 52.

- The fourth set of wounds, referenced as GSW IV, shows that Castillo was bent forward at the waist in a more exaggerated position as compared to the other three shots. *Id.* at p. 51.

### C.    Facts Concerning Policy and Practice

Pursuant to Salem Police Department ("SPD") Policy 4.01, XV, Directive 4.14, and ORS 181A.790(5)(a), the SPD routinely delegates the investigation of officer-involved shootings to an outside agency. A relevant policy explains the basis in which an officer might have to use deadly force. "It is rarely possible for the officer to direct the use of deadly force to a nonfatal area of the target. The goal in using deadly force is neither to kill nor to wound without killing; it is simply and exclusively to incapacitate the target to produce voluntary surrender or render that person incapable of continuing the dangerous conduct which justified the use of deadly force in the first place." Ditto Decl. Ex. 1 (Policy 4.01 XV. (A)(2)). The policy further discusses the justification

for the use of deadly force.  "An officer may use deadly physical force only when, based on the officer's knowledge and observations at the time, the officer reasonably believes that no reasonable alternative will accomplish the objective in one or more of the following situations: (1) The defense of the officer or another person from what the officer reasonably believes to be the imminent infliction of serious injury or death."  *Id.*  Policy 4.01. XV(C).

SPD Directive 4.14. (IV)(H) discusses the three separate and parallel investigations of an officer involved shooting.  "The incident will be investigated by an outside law enforcement agency determined by the District Attorney in accordance with SB 111 protocols."  Ditto Decl. Ex. 2 (Directive 4.14. (IV)(H)(1)(a)).  "The investigating agency and CIS (Criminal Investigations Section) personnel will coordinate retention of all evidence from the incident and will be responsible for its processing, with exception of evidence collected specifically for an internal investigation."  *Id.* Directive 4.14. (IV)(H)(1)(d).  "The investigating agency will have first access to the involved officer . . .. A detailed statement should be taken within 48 hours after the incident."  *Id.* Directive 4.14. (IV)(H)(1)(e).  "A critical incident review board (CIRB) will meet after the traumatic incident debrief and exit within 60 days of the conclusion of grand jury.  The board is designed to critically examine the incident relative to: officer safety disciplines . . . , supervisory input and performance, identified training needs, policy and procedure issues, . . . and investigative issues relative to other governmental agencies . . .."  *Id.* Directive 4.14. (IX)(B)(1).  The CIRB members consist of three SPD Deputy Chiefs, two officers designated by the Union, one lieutenant from the outside investigating agency, the Support Division Lieutenant (as the non-voting chair), and board advisors including an attorney from the City Attorney's Office and a RISK representative.  *Id.*  Directive 4.14. (IX)(B)(2).  "The involved officer's lieutenant shall attend the entire review."  *Id.* Directive, 4.14. (IX)(B)(3).  "At the conclusion of the board, the chair will have

PAGE 6 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

15 days to write a summary report outlining the board members findings. The report will detail *any areas of concern* generated from the review, to include but not limited to training needs identified from the incident, and specific assignments for necessary changes, including the person assigned to those duties." *Id.* Directive 4.14. (IX)(B)(5). (Emphasis added).

ORS 181A.790 reads in part, "A law enforcement agency employing an involved officer (a police officer whose official conduct was a cause in fact of the death of a person) shall include at least one police officer from a different law enforcement agency in the investigation of the incident in which the involved officer was involved." ORS 181A.790 (1)(a), (5)(a). SPD has done so for more than 10 (ten) years. Ditto Decl. ¶ 7. In the present case, the Oregon State Police ("OSP") investigated the shooting. The facts and evidence collected in the case were presented to the Critical Incident Review Board, which is an inter-agency work group that includes several high-ranking managers within SPD. Ditto Decl. ¶ 6

**2.      Authorities Concerning Summary Judgment**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *Id.* at 250-51.

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, after adequate time for discovery and upon motion, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 322-23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id*. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

**3.      Fourth Amendment - Unlawful Entry**

**A.      Authority Concerning Entry into the Residence**

The Fourth Amendment is often thought to impose a "warrant requirement." See *Patel v. City of Los Angeles*, 738 F.3d 1058, 1071 (9th Cir. 2013).  Contrary to that term, the Fourth Amendment does not require a warrant to enter a residence.  It only prohibits peace officers from conducting "unreasonable searches and seizures." *Mendez v. Cty of L.A.*, 897 F.3d 1067, 1075 (9th Cir. 2018).  "[A]ny official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances." *Michigan v. Clifford*, 464 U.S. 287, 293, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984).  "Officers can also enter with consent, or under certain emergency or exigent circumstances." *Mendez*, 867 F.3d at 1075.

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Consent can be express or implied but must be "unequivocal and specific." *United States v. Basher*, 629 F.3d 1161, 1167-68 (9th Cir. 2011).

Exigent circumstances are defined to include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir. 1989) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) [**16] (en banc), cert. denied, 469 U.S. 824, 105 S. Ct. 101, 83 L. Ed. 2d 46 (1984)).

**B.     Argument Concerning Entry into the Residence**

Misty Castillo gave her voluntary consent for Officer Bush to "go help (her) husband," who was inside the residence. Tapia Decl. Ex. 2 (Grand Jury Transcript 60:1-4). This could not be accomplished without going inside the residence. This statement by an occupant who shares authority over the common area was unambiguous. It did not require consensus with Arcadio Jr. or Arcadio III.

Arcadio Jr. gave voluntary consent by unlocking the door when Officer Bush announced his presence. He previously locked the door because he wanted to exclude any police officers but later unlocked the door when he was aware that Officer Bush was at the doorway. Tapia Decl. Ex. 4 (Castillo Jr. Dep. 34:12-18). This unambiguous action indicates that Arcadio Jr. wanted to permit Officer Bush into the residence.

Even if neither co-occupant had permitted Officer Bush to enter the residence, Officer Bush would still have been permitted to enter the residence due to exigent circumstances. Officer Bush knew that Arcadio III had recently assaulted Misty Castillo. Officer Bush knew that Arcadio III was wielding a large knife upon his arrival. Second Amend. Compl. ¶ 15. Misty Castillo demonstrated her concern for her husband's safety when she told Officer Bush to go help her husband who was inside the house with Arcadio III. Tapia Decl. Ex. 2 (Grand Jury Transcript 59:22-60: 4). Officer Bush's perception that Misty Castillo feared Arcadio III could cause harm to Arcadio Castillo, Jr. was reasonable and justified. Misty Castillo told the Oregon State Police, "I think he could have killed me. I think he could have killed himself. I, I didn't, I was scared of him. I've been scared of him for a long time, actually." Tapia Decl. Ex. 9 (OSP Interview at 42:05-42:17), Ex. 10 (OSP Transcript (38:33-36)). Officer Bush reasonably believed that he needed to enter the residence to avoid the risk of Arcadio III causing imminent, serious injury to Arcadio Jr. because Plaintiff had assaulted Misty Castillo minutes before Officer Bush arrived, he was still holding a large knife, and Misty Castillo asked him to help her husband. Because Plaintiff had just assaulted a family member, was in a locked house with another family member, and was wielding a large knife, Officer Bush was permitted to enter the house under exigent circumstances.

4.      **Fourth Amendment Violation – Unlawful Force; State Law Battery**

Plaintiff claims Defendant Bush violated Castillo III's Fourth Amendment rights by "intentionally shooting Arcadio without an objectively reasonable belief that Arcadio presented an immediate threat of serious bodily harm to defendant Bush or any other person and without providing Arcadio reasonable time to comply with his commands nor fair warning of his intention to use deadly force." Second Amend. Compl. ¶ 28.

Plaintiff also alleges that City of Salem should be found liable for Wrongful Death/Battery in her Second Claim and Wrongful Death/Negligence in her Third Claim. Second Amend. Compl. ¶¶ 32-36.

## A. Authorities Concerning Self Defense and Defense of Others

Objective reasonableness in Fourth Amendment claims requires that the "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). The Court may "only consider the circumstances of which [the officers] were aware when they employed deadly force." *Hayes v. City of San Diego*, 736 F.3d 1223, 1232-33 (9th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); and *Glenn v. Washington Cnty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011). The Court may also consider, "under the totality of the circumstances, the 'quantum of force' used, the availability of less severe alternatives, and the suspect's mental and emotional state." *Hayes*, 736 F.3d at 1232 (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007); and citing *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001)). The "most important" factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Officers are not "required to use the least intrusive degree of force possible" as long as the amount of force used is reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

Under federal common law, to prevail on a claim of self-defense, a defendant must show that "she acted with a reasonable amount of force in response to an imminent, perceived threat." *Metropolitan Life Ins. Co. v. Kelley*, 890 F. Supp. 746, 749 (N.D. Ill. 1995). "Because the law

pertaining to self-defense is a matter of federal common law," the court may also "look to state court decisions for guidance...." *United States v. Desinor*, 525 F.3d 193, 199 (2d Cir. 2008).

Two Oregon statutes must be considered in the context of an officer who is investigating an act of domestic violence in which the suspect is wielding a weapon. ORS 133.055(2)(a) directs peace officers to arrest suspected perpetrators of domestic violence. Also, ORS 161.242 authorizes police officers to use deadly force in certain circumstances, including in self-defense and defense of others as follows:

> (1) A peace officer may use deadly force upon another person only when it is objectively reasonable, under the totality of circumstances known to the peace officer, to believe that the person poses an imminent threat of death or serious physical injury to the peace officer or to a third person and the use of deadly physical force is necessary to:
> . . .
> (b) Defend the peace officer or a third person from the imminent threat of death or serious physical injury;
> . . .
> (2) Prior to using deadly physical force upon another person, if the peace officer has a reasonable opportunity to do so, the peace officer shall:
> (a) Consider alternatives such as verbal de-escalation, waiting or using other available resources and techniques if reasonable, safe and feasible; and
> (b) Give a verbal warning to the person that physical force may be used and provide the person with a reasonable opportunity to comply.

ORS 161.233 [2020 s.s.2 c.3 §7]

**B. Arguments Concerning Defense of Self and Others**

Castillo III had a knife in his hand when Officer Bush entered the residence. Second Amend. Compl. ¶ 15. The objective evidence and Plaintiff's admissions shows that Officer Bush advised Castillo III to drop the weapon twice before shots were fired. Tapia Decl. Ex. 5 (Nest Audio Enhanced) at 01:48 and 01:54. This supports Officer Bush's reasonable apprehension of imminent danger by Castillo III. The cluster of wounds, especially GSWIII, demonstrates that Castillo III did not have his knife down at his side when that bullet was fired. Tapia Decl. Ex. 7

(Forensic Expert Report p. 51). Rather, the entry and exit wounds are consistent with Officer Bush's explanation that Castillo III had the knife raised and pointed at Officer Bush at that moment. *Id*. at p. 52. Each of the additional clusters of wounds show that his body position was not upright as claimed by Plaintiff. Each of those wound clusters show Castillo III bent forward in a leaning body position, consistent with a quick sprint as Officer Bush explained.

Officers are trained that edged weapons can cause fatal wounds. Ditto Decl. ¶ 2. In the hands of an attacker, an eight-inch edged weapon can be used to stab or slash an officer, even when the officer is wearing protective equipment, such as a ballistic vest. *Id*. Officers are also trained in perception-response times, knowing the threat of harm posed by an attacker is significantly greater in a time compressed environment, such as when an officer may only have fewer than one second to respond to the attack. *Id*. When an attacker is fewer than eight feet from the officer, the officer is in imminent danger of sustaining a fatal injury. *Id*. This distance would be considered striking distance. *Id*.

5.    *Monell* – **Policy and Practice of Deliberate Indifference of Violations of the Fourth Amendment**

Plaintiff alleges that the City of Salem maintains policies or practices that are deliberately indifferent to rights such as unlawful searches and foreseeable and recurring situations involving the use of deadly force. Second Amend. Compl. ¶¶ 23, 29.

A.  **Laws Concerning Policy and Practice**

Generally, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents as the Supreme Court has rejected respondeat superior as a basis of liability under § 1983. A municipality "may be held liable under section 1983 if its deliberate policy caused the violation alleged." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)). The Supreme Court explained that "it is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Soc. Services*, 436 U.S. 658, 694 (1978).  There are three theories of § 1983 liability against a governmental entity:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local government entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policymaking authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policymaking authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *cert denied*, 520 U.S. 1117 (1997), c*iting Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992), *cert denied*, 510 U.S. 932 (1993).

The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016) (citation omitted). "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

The plaintiff must also prove that defendant City of Salem acted with deliberate indifference.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Unless there is a single violation with a "highly predictable consequence," *Id*. at 398, there must be a pattern of similar constitutional violations to demonstrate deliberate indifference, *Connick v.*

*Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (citing *Bryan County*, 520 U.S. at 409). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Ohio v. Harris*, 489 U.S. 378, 389 (1989).  Liability exists when "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can be said to have been deliberately indifferent to the need." *Id*. at 388-89.

**B.  Arguments Concerning Policy and Practice**

Plaintiff does not allege that City of Salem has policies to support *Monell* liability, but rather argues that COS has a *pattern and practice* of unconstitutional conduct.  Plaintiff cannot offer any evidence to support her allegations regarding the City's alleged pattern and practice of unconstitutional conduct.  Proof of random acts or isolated events are insufficient to establish a § 1983 claim against a municipality.  *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).  Here, plaintiff fails to offer any evidence to support her *Monell* allegations.

In this instance, the Salem Police Department utilized the Oregon State Police ("OSP") as its outside agency to investigate the officer involved shooting.  Ditto Decl. ¶ 6.  Defendant Salem Police Department considered OSP's interview as part of its Critical Incident Review Board ("CIRB") process, which is primarily comprised of Salem Police Department officers, to review the evidence.  Tapia Decl., Ex. 11. (Womack Dep. 24:4–25:18); Ex. 12. (Diede Dep. 56:5-17). The CIRB is an interagency board that reviews the investigating agency's findings.  Ex. 12. (Diede Dep. 56:5-17); Ex. 11. (Womack Dep 24:4-25:18).  This process is independent of the Grand Jury

findings. Ditto Decl. ¶ 7. Defendant Salem Police Department has utilized the CIRB to review officer involved shootings for at least the last ten (10) years. *Id.*

Officer Bush knew that he would be interviewed by an outside law enforcement agency. Bush Decl. ¶ 18. Officer Bush knew that he would be required to testify at the grand jury to determine whether his actions were justified. *Id.* He knew that separate from the grand jury process, a panel (the CIRB) would review his statements and the evidence collected, and discipline could have resulted if the panel had decided that his actions were not justified or violated policy. *Id.* Even if there had been a policy or practice of unconstitutional conduct, Officer Bush disproves that it was the moving force in his decision-making process.

**6.    Qualified Immunity**

**A.    Laws Concerning Qualified Immunity**

Under the doctrine of qualified immunity, police officers "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether qualified immunity applies, the Court considers whether the plaintiff alleged facts sufficient to establish the violation of a constitutional right and whether the constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Qualified immunity is an entitlement not to go to trial, not merely a defense from liability. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Analysis of the qualified immunity defense is a two-prong inquiry. The court asks

whether, on the facts alleged, a constitutional right has been violated.  If no such right has been violated, the plaintiff cannot prevail. *Id*. at 200-01.

The Court must also consider whether that right was "clearly established." "Clearly established" means the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 201 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201. "While we do not require a case on all fours, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). "[T]he proper fact-specific inquiry under Anderson is not whether the law is settled, but whether, in light of clearly established law and the information available to him, a reasonable person in [the defendant's] position could have objectively believed his actions to be proper." *Floyd v. Laws*, 929 F.2d 1390, 1394 (9th Cir. 1991) (citing *Anderson*, 483 U.S. at 641).

## B.    Argument for Qualified Immunity

The objective facts support the conclusion that Arcadio Castillo III had an eight-inch bladed knife in his right hand.  Tapia Decl. Ex. 7 (Forensic Expert Report p. 30).  The entry and exit wounds show that Castillo III's right arm was raised to his side with the tip of the knife pointed toward Officer Bush.  *Id*. at p.51-52.  The entry and exit wounds show that Arcadio Castillo III was in a forward leaning position during each of the four shots fired.  *Id*. at p. 50-51.  The distance between Plaintiff and Officer Bush was less than eight feet.  Bush Decl. ¶ 14.  Eight-foot distance is striking distance with an edged weapon.  Ditto Decl. ¶ 2.

In *Kisela v. Hughes*, 138 S. Ct. 1148, 1154, 200 L. Ed. 2d 449 (2018), the Supreme Court held that qualified immunity protected an officer who shot a suspect who "was armed with a large knife; was within striking distance of [a bystander]; ignored the officers' orders to drop the weapon;

and the situation unfolded in less than a minute." The Court stated that these circumstances were "far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the bystander] would violate the Fourth Amendment." *Id*. at 1153.

In *Vos v. City of Newport Beach*, 892 F.3d 1024, 1029-30 (9th Cir. 2018), the Ninth Circuit considered a case in which *Vos*, while located in a convenience store, made statements such as "kill me already, dog", was brandishing a pair of scissors, and had injured a customer prior to the officer's arrival at the scene. Police officers opened the store's door and *Vos* ran toward the officers with a metal object raised above his head, which the officer believed to be a pair of scissors. When *Vos* was within 20 feet of the officers, the first shot was fired. The Ninth Circuit reasoned that although a jury could reasonably find that deadly force was excessive in these circumstances, the officers were still entitled to qualified immunity. The court found that because the suspect had, among other things, acted aggressively with a deadly, sharp object, it was not clearly established that the officer's use of force was unlawful. *Id*. at 1035.

Similar to *Kisela*, Officer Bush was faced with a person who was armed with a large knife, ignored the officer's commands to drop the knife, and was within striking distance of another person, namely, Officer Bush. Similar to *V*os, Castillo III held his knife in a threatening position, as revealed by the bullet's entry and exit wounds. Castillo III also acted aggressively just moments before the officer arrived. Castillo III's forward body leaning body position during each of the shots suggests that Castillo III was charging toward Officer Bush, similarly to *Vos*. Castillo III was less than half the distance to Officer Bush as *Vos* was to the officers in that case. Because the relevant case decisions supported either summary judgment of qualified immunity to those officers, Officer Bush is also entitled to qualified immunity.

7.    **Wrongful Death – Negligence**

Plaintiff alleges facts in support of his claim that Defendant City of Salem is liable for Plaintiff's death due to Officer Bush's alleged negligent decisions. Second Amended Compl. ¶

36. Defendants note that these factors appear to be the same as what Plaintiff alleged in his § 1983 claim for Unlawful Use of Force.

### A.    Laws Concerning Wrongful Death Negligence

The plaintiff has made a claim for negligence against defendant City of Salem. This requires the plaintiff to prove each of the following:

(1)    The defendant's conduct was negligent;

(2)    The defendant's negligent conduct was a cause of harm to the plaintiff; and

(3)    The harm was reasonably foreseeable.

UCJI 20.01

Courts in the District interpreting Oregon law agree that "it is settled law in this district that 'a state common-law claim of negligence may be maintained separately from a § 1983 claim only when the negligence claim is based on facts that are different from the facts on which the § 1983 claims are based.'" *Lifestyle Ventures, LLC v. Cty. of Clackamas*, No. 3:15-CV-1291-SB, 2016 WL 11394982, at *5 (D. Or. May 18, 2016) (emphasis added) (quoting *Whitfield v. TriMetro. Transp. Dist.*, No. 06-1655-HA, 2009 WL 839484, at *11 (D. Or. Mar. 30, 2009) (summary judgment motion granted on negligence claim because it was based on the same operative facts as the § 1983 claims); see also *Rodrigues v. Jackson Cnty*, No. 1:13-CV-01589-CL, 2015 WL 404577, at *4 (D. Or. Jan. 29, 2015) (dismissing negligence claim because it "rests on the same alleged facts as his section 1983 claim"); *Gregory v. City of Newberg*, No. 3:15–CV–00473–BR, 2015 WL 5577755, at *7–8 (D. Or. Sept. 21, 2015) ("[A]s a matter of principle, the court recognizes that a plaintiff may allege negligence as a basis for recovery separate from § 1983 for acts arising in the Fourth Amendment search and seizure context. The negligence claim, however, should not be founded on the same facts that give rise to the § 1983 claim."); *Woods v. Gutierrez*, No. 3:11-CV-01082-BR, 2012 WL 6203170, at *12 (D. Or. Dec. 12, 2012) (a "claim for negligence, which is based on the same conduct as [plaintiff's] claims under § 1983 . . . cannot be maintained at summary judgment"); *Saberi v. City of Portland*, No. CV 04-1396-MO, 2006 WL

2707995, at *4 (D. Or. Sept. 18, 2006) (dismissing negligence claim after bench trial because "the negligence claim is based on the same operative facts as the § 1983 claim" and "is therefore not a proper basis for a separate negligence claim"); *Shilo v. City of Portland*, No. CV 04-130-MO, 2005 WL 3157563, at *2 (D. Or. Nov. 22, 2005) (negligence claim dismissed on summary judgment because "plaintiffs reallege the very same facts that were used to make out [their constitutional] claims").

This is because a constitutional violation requires intentional conduct which is categorically not negligence. See *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002), abrogated on other grounds by *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017); *Kasnick v. Cooke*, 116 Or App 580, 582-583 (1992) (holding "deliberate, combative" conduct is categorically not negligence as a matter of law). "As a matter of law and fact, there is no such thing as a negligent fist fight." *Id*. A plaintiff cannot "recover for what can only be intentional misconduct by pleading and proving only negligence." *Id*. "An assault and battery is not negligence." *Denton v. Arnstein*, 197 Or 28, 45 (1952). "The former is intentional and willful; the latter unintentional." *Id*. (holding that the Court properly refused to allow the Plaintiff to pursue both theories, because assault and battery could not support a negligence claim as a matter of law).

## B.    Arguments about Wrongful Death Negligence

Plaintiff re-alleges facts in support of his negligence claim that he used to demonstrate why Officer Bush's use of force violated Castillo III's Fourth Amendment rights.  That makes the negligence claim void as a matter of law.  Notwithstanding the argument that Plaintiff's negligence claim is invalid as a matter of law, Defendant City of Salem also argues that none of Plaintiff's claims are supported by the evidence presented here.  Plaintiff alleges that the City of Salem is liable for Officer Bush's negligence in failing to perform certain tasks.  The list of tasks Plaintiff relies on falls in two categories.  First is the allegation that Officer Bush made an unlawful entry or that the Salem Police Department had a policy/practice of officers making illegal entry into

homes.  This issue was addressed above.  Second is a list of allegations that amount to acting too quickly.  Plaintiff's premise supporting the second category is that Castillo III was not an immediate threat to Castillo Jr. or Officer Bush.  The allegations in the second category are contradicted by the facts that Misty Castillo told the investigating agency that she feared Castillo III could kill her husband; that Castillo III assaulted Misty Castillo minutes earlier; that Castillo III refused to drop the knife after at least two verbal orders; that Castillo held the knife in a raised position; and that Castillo was within striking distance when Officer Bush shot Castillo III.

**CONCLUSION**

Viewing the facts, 911 call, Nest camera audio, forensic report, grand jury transcript, SPD Policies and deposition transcripts, and drawing all reasonable inferences in Plaintiff's favor, there remains no genuine dispute of material fact that Officer Bush's use of deadly force against Arcadio Castillo III was reasonable under the unfortunate circumstances he faced.  For that reason and all the reasons discussed above, Plaintiff's claims should be dismissed.  Defendants respectively request an Order granting summary judgment in their favor.

DATED this 19th day of December, 2023.

*s/Sebastian Tapia*
Sebastian Tapia, OSB No. 043761
stapia@cityofsalem.net
Attorney for Defendants