IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


MISTY L. CASTILLO, as Personal )No. 6:22-CV-00684-MK

Representative of the ESTATE OF)

ARCADIO CASTILLO, III,          )

              Plaintiff,        )

   v.                           )

NATHAN BUSH and CITY OF SALEM, )

a municipal corporation,        )

              Defendants.       )


DEPOSITION OF NATHAN BUSH

May 29, 2023

Monday

10:00 A.M.


     THE VIDEO-RECORDED DEPOSITION OF NATHAN BUSH was taken at Montoya Law, LLC, 350 Mission Street SE, Suite 202, Salem, Oregon, before Sara Fahey Wilson, CSR/CCR Certified Shorthand Reporter in and for the State of Oregon and Washington.

Tapia Declaration Exhibit 3
Page 1 of 12

Nathan Bush

62

And so explain -- nonverbally you think you informed her that you intended to enter her house?

A.    Yes.

Q.    Okay.

How did you do that?

A.    She told me that I needed to go in and help her husband, and I moved directly to the door and when she started following me I told her to stay in the driveway.

Q.    Do you recall there being a gate there?

A.    I don't recall.

Q.    Between the driveway and the yard that approached the front door do you recall there being a gate?

A.    I don't recall.

Q.    Okay.

When you approached the front of the house, the front door, did you walk right up to it, or did you take your time and, you know -- and see what was in the area surrounding the front door?

A.    I tried to look through the windows, and then I walked right up to the door to listen.

Q.    Okay.

When you tried to look through the

Tapia Declaration Exhibit 3
Page 2 of 12

Nathan Bush

72

door?

A.    Yes.

Q.    Okay.

      Tell me how it influenced that.

A.    Well, through training I know that a knife is a deadly weapon and causes serious injury.

Q.    Are you trained not to use your Taser against a person that is in possession of a knife?

A.    Trained not to, no.

Q.    Okay.

      So a Taser is an option for a person armed with an edged weapon, isn't it?

A.    An option, yes.

Q.    Okay.

      And so in this case why did you select your firearm over your Taser?

A.    Because I was alone and Tasers don't always work.

Q.    Okay.

      So back to the question of how the training in defensive tactics against edged weapons influenced your decision to draw your firearm and not your Taser, is the sole reason that the Taser don't always work?

A.    No.

Tapia Declaration Exhibit 3
Page 3 of 12

to your weapon?

A.    At some point, yes.

Q.    Okay.

Immediately?

A.    I don't know.

Q.    Okay.

So the door opens.  Can you describe -- did you push it hard?  Did it stay open?  What's your memory about that door?

A.    I remember that it opened.

Q.    Okay.

Do you remember it hitting something and bouncing back, or did it just swing open and stay there?

A.    I don't recall.

Q.    Okay.

When the door opens, what can you see on the inside?

A.    As it opens, the first thing I saw was Arcadio Castillo, Junior, off to my left, and then I opened farther and I saw Castillo, III, in front of me.

Q.    Okay.

So is the room lit?

A.    I don't recall.

Tapia Declaration Exhibit 3
Page 4 of 12

had developed probable cause of some kind of crime having occurred before you arrived?

A. Yes.

Q. Okay.

Tell me what crime you believed you had probable cause for.

A. Assault 4 Menacing, Unlawful Use of a Weapon.

Q. Okay.

Are any of those felonies?

A. Yes.

Q. Okay.

Which one is a felony?

A. Unlawful Use of a Weapon is a felony, and domestic crimes can rise to a felony if there's prior convictions.

Q. Okay.

So you believed you had probable cause to arrest A. C. -- Arcadio Castillo, III, for a felony?

A. Yes.

Q. Okay.

Putting yourself at the moment you hear the audible click on the door and you're pushing the door open, did you have an expectation of what you would see inside?

Q.    Before Arcadio Castillo, III, is shot, has Arcadio, Junior, said anything to you?

A.    Not that I recall, no.

Q.    Okay.

And have you said anything to Junior?

A.    No.

Q.    Okay.

So Arcadio, Junior, when the door swings open, is off to your left, and is he facing you, or do you know?

A.    He's facing the general direction, but I don't know exactly if he's right towards me or right towards his son.

Q.    So basically the door opens, it's a quick glimpse that you see of him and that you're looking for Arcadio, III.  Correct?

A.    Yes.

Q.    All right.

So you're -- as that door swings open you see Arcadio, III.  Describe what you see.

A.    He was standing in front of me directly at the other end, essentially, of the couch, and he was standing facing me and he was holding a large knife in his right hand.

Q.    Okay.

Tapia Declaration Exhibit 3
Page 6 of 12

Q.    So facing you, that means -- are shoulders square to you?

A.    Yes.

Q.    Okay.

And the large knife in his right hand?

Okay.  Did he have anything in his left hand?

A.    No.

Q.    Okay.

Can you tell me anything about the knife in his right hand other than it was large?  Was there a color to it?  Is it a -- is there a handle? Is there anything notable about it that sticks out other than its size?

A.    I don't recall the color of it, no.

Q.    So in the moment that you see Arcadio standing there shoulders square to you facing the front door, what happens next?

A.    I point my gun at him.  Confront him. Tell him to, "Drop the knife."

Q.    Okay.

And do you say, Could you put the knife down, please?  Or do you use your command voice and say, "Drop the knife.  Drop the knife"?

A.    I use command voice.

Q.    Okay.

Tapia Declaration Exhibit 3
Page 7 of 12

And the knife in his right hand, is it pointed down at the ground?  Is it up at his waist?  Is it in front of him?  What's he doing with it?

A.    At initial contact it was down by his side.

Q.    So just holding it?

A.    Yes.

Q.    Okay.

It wasn't being waved around?  He was just still?  He was facing the door?

A.    At that time, yes.

Q.    Okay.

Would you agree with me that if Arcadio, III, was just holding the knife and not doing anything with it, just standing there, you'd have no right to shoot him?

A.    Yes.

Q.    Okay.

And would you agree with me that after you command him to drop the knife if he just continued to stay there with it at his side you would still have no right to shoot him?

A.    Yes.

Q.    Okay.

So you would agree you can't shoot him

Tapia Declaration Exhibit 3
Page 8 of 12

Q.    What caused you to point your gun at Arcadio, III, was the fact that he was holding a knife.  Correct?

A.    And I had probable cause to arrest him for a felony.

Q.    So you would have pointed your gun at him anyway even if he didn't have a knife in his hand?

A.    No.

Q.    Okay.

So what caused you to point your gun at him is the fact that you saw the knife in his hand?

A.    Yes.

MR. MONTOYA:  Objection.  It's been asked and answered.

BY MR. PARK:

Q.    So can you describe the actions of Arcadio, III, after the door opened that caused you to shoot him?

A.    Yes.

Q.    Okay.  Please describe those for me.

A.    Initially when I told him to "drop the knife," he began walking towards me, took approximately two steps, a couple feet towards me, and then stopped, turned around, and started walking away.  I stopped talking to him hoping he would walk

Tapia Declaration Exhibit 3
Page 9 of 12

back into the house, because my goal at that point was to get his dad out of the house. I took one step through the doorway, and I took my left hand off my pistol. I reached out towards Arcadio, Junior, to try to tell him to come to me so I could pull him out of the house so he could get away from the problem, and then at that point Arcadio, III, spun to his left, his weight shifted forward, and he charged at me with the knife raised near his right shoulder.

Q. So you stepped inside the house?

A. I stepped into the threshold.

Q. Okay.

So there's like a linoleum little square entrance?

A. I don't recall what's on the floor.

Q. When you stepped through the threshold, that's -- you'd come up a step from the porch. Correct?

A. A small step, yes.

Q. Right. Like a half step?

A. I believe so.

Q. Right.

So did you get both feet inside the house?

A. No.

Tapia Declaration Exhibit 3
Page 10 of 12

continues to turn to bring that left arm around to face you again.  Is that what you're describing?  I want to understand what you mean by "spun to his left"?

A.    He was walking away from me.  He turned to his -- towards his left with the knife in his right hand until he did another 180 to face me before he ran at me.

Q.    Okay.  Okay.  Yeah, I thought that's what you meant but I wanted to be clear on it.

And so when he spins to his left and turns -- does the 180 to face you -- is he squared up to you again, to the front door?

A.    He's running directly towards me.

Q.    Right.  He -- he spun and he has the knife where?

A.    He has the knife up and pointed towards me.

Q.    Like this (indicating)?

A.    Up, like, in a stabbing motion.  Like, his thumb side, the knife is up and he's leaning forward and he runs straight towards me.

Q.    Okay.

So that arm is up out to his right?

A.    It's out to his right, yes.

Tapia Declaration Exhibit 3
Page 11 of 12

117

State of Oregon    )
                   )        ss.
County of Lane     )


    I, Sara Fahey Wilson, CSR, a Certified Shorthand Reporter for the State of Oregon, certify that the witness was sworn and the transcript is a true record of the testimony given by the witness; that at said time and place I reported all testimony and other oral proceedings had in the foregoing matter; that the foregoing transcript consisting of 116 pages contains a full, true and correct transcript of said proceedings reported by me to the best of my ability on said date.

    If any of the parties or the witness requested review of the transcript at the time of the proceedings, such correction pages are attached.

    IN WITNESS WHEREOF, I have set my hand this 12th day of June 2023, in the City of Eugene, County of Lane, State of Oregon.

Sara Fahey Wilson, CSR

CSR No. 06-0400

Expiration Date:  March 31st, 2026