**Policy 4.01 - Rev.  10-21-09**

## POLICY 4.01   LAW ENFORCEMENT OPERATIONS

I.      THE NATURE OF THE TASK

Law enforcement operations consist of many diverse activities which are directed toward the attainment of department objectives.  Activities such as patrolling, conducting field interviews, and issuing traffic citations are not objectives in themselves; rather, they are methods of achieving the real objectives of preventing and deterring crime, arresting criminal offenders, and preventing traffic accidents.

Decisions in law enforcement operations frequently must be made in an instant, and the lives of officers and others may depend upon the quality of those decisions.  An officer is confronted in stress situations with both criminal and noncriminal behavior, and he must be capable of making a reasonable response in both cases.  An officer must base his conduct and action in each instance upon the facts of the situation as they reasonably appear, relying upon his experience, training, and judgment to guide him toward morally justified and lawful decisions and actions.

II.     POLICE ACTION BASED ON LEGAL JUSTIFICATION

What is reasonable in terms of appropriate police action or what constitutes probable cause varies with each situation, and different facts may justify either an investigation, a detention, a search, an arrest, or no action at all.  The requirement that legal justification be present imposes a limitation on an officer's action.  In every case, an officer must act reasonably within the limits of his authority as defined by statute and judicial interpretation, thereby ensuring that the rights of both the individual and the public are protected.

III.    ALTERNATIVES TO PHYSICAL ARREST, BOOKING, OR CONTINUED DETENTION

Once a violator has been identified, it is the function of the department to initiate the criminal process; however, there are circumstances when a crime may occur and the department will not make a physical arrest.  There may be a report written and an application for a complaint made; or, in some cases when the offense is of a minor nature, a verbal warning or other direction may be given.  The decision not to make an arrest will be guided by department policy and the factual situation involved, not by the personal feelings of the officer.  An arrest does not dictate a booking, and a booking does not dictate continued detention.  When circumstances so indicate, an arrestee should be released without being booked and, if booked, should be released from further detention.

IV.  CALLED FOR SERVICES

A.      Professional Standard of Service

The department cannot be aware of each circumstance in the city where police action or assistance may be required.   The department is dependent upon members of the community for such information.  The people, in return, expect the department to respond to requests for police service within a reasonable time and to satisfactorily perform the necessary service.  A person calling for police assistance expects, as a matter of right, to be provided with a service.  As a practical matter, the extent of the

**COS 005410**

service may necessarily be limited; but regardless of its extent, a professional quality of service must be rendered in all cases.

B.    Priority of Handling Calls for Service

It is not always possible for the department to respond to every call for service; therefore, the department must organize available resources to give the highest level of efficient service possible. Priority of call assignment depends on many factors, and it is normally the responsibility of the Communications Unit personnel to make such assignments; however, an officer in the field may be required to decide whether to continue on an assigned call or handle a citizen's complaint or other observed event and cause his call to be reassigned. Such determination should be based upon the comparative urgency and the risk to life and property of the assigned call and the intervening incident. When it is impossible for an officer to handle a citizen's complaint or an observed event, he should, if circumstances permit, either give directions for obtaining such assistance or initiate the necessary notifications himself.

V.    PRELIMINARY INVESTIGATION

The success of an investigation depends greatly on the initial observations and actions of the first officer to arrive. Preliminary investigation begins when the first officer arrives at the scene, and continues until that officer is relieved. The transfer of the case to the follow-up officer must not jeopardize successful completion of the investigation.

While the circumstances of the particular case will naturally govern the actions taken by the officers, the Patrol Section will generally be responsible for conducting all initial investigations.

VI.    FOLLOW-UP INVESTIGATION

A.    Investigation of Reported Crimes

Follow-up investigation consists of efforts to interview victims and witnesses; locate, identify, and preserve physical evidence; recover stolen property; identify, locate, interview, and arrest suspects; present the case to the prosecutor; and cooperate in the prosecution of the defendant. Such investigations are conducted to produce evidence relating to the guilt or innocence of any suspect and to recover property.

B.    Allocation of Resources to Follow-up Investigations

As it is not feasible to expend equal time and energy in the investigation of all reported crimes, priority of investigation and allocation of resources must be based upon the relative seriousness of each reported crime. However, reported crimes will be investigated to the fullest extent possible without regard to the status of the victims or the areas of the city in which the crimes occur.

VII.    COURTESY CRIME REPORTS

When a crime has occurred in another jurisdiction, a courtesy report may be made at the request of a resident of Salem and a copy forwarded to the appropriate jurisdiction. When the

crime is extremely serious or the travel distance is not great, a person requesting to make a report should be referred to the proper agency.

VIII.    <u>CIVIL DISPUTES/CITIZEN ARREST</u>

Officers are frequently called to the scene of civil disputes.  Civil standby is restricted to those situations where there are special circumstances which create a clear and present danger of violence which the presence of uniformed officers may prevent.  Officers should avoid becoming unnecessarily involved in civil disputes and may advise the parties to seek the advice of counsel.  When it becomes apparent that no crime has been committed and there is no clear and present danger of violence, the officer will terminate the contact.  Unless required by the situation, officers should not encourage private persons' arrests; however, should such an arrest be made, officers are required to accept the prisoner unless it reasonably appears that the arrest is unlawful.

IX.    <u>SUPERVISION</u>

Since emergency situations occur without warning and their duration is often brief, officers must frequently make critical decisions without benefit of on-the-scene direction.  In most police operations, however, supervision is available and necessary to provide guidance and training.  Supervision gives coherence to the police task and directs the energies of the department into an organized effort.  Proper supervision is essential to maintain a professional level of competence in law enforcement operations.

Personnel having the following job classification titles or who work out of classification in one of these positions are considered to be supervisors: Police Captain, Police Lieutenant, Police Sergeant, Division Commander, Communications Center Supervisor, Communications Shift Supervisor, Police Records Supervisor, Police Records Shift Supervisor, Crime Prevention Coordinator, and Police Property Supervisor.

X.    <u>COMMAND RESPONSIBILITY AT POLICE SITUATIONS</u>

Command of department resources at a police situation rests with the field supervisor or assigned senior officer.  Such person has the authority to direct the operation and is responsible for its outcome.  A supervisor is not required to assume direct command at every situation; however, may be held accountable for unfavorable developments which he could have prevented by assuming control.

XI.    <u>INFORMANTS</u>

A.    Use of Informants

Often, information from confidential sources is the investigative lead which solves a case and without which there could be no prosecution.  Information is received by the department regarding criminal activities and suspects from persons in all walks of life. Many people who give information have been victims or witnesses of crimes or they may have a strong desire to aid law enforcement.  There are others motivated purely by selfish interests.  However, regardless of their motivation, the use of informants is a basic weapon in the fight against crime; and they are a judicially recognized source of

**COS 005412**

information.  An informant's motivation should be carefully evaluated in determining the extent upon which the information can be relied.

B.    Informant's Immunity from Prosecution

Informants will sometimes offer to exchange information for immunity or for their release.  Such immunity may properly be granted by a judge in a judicial proceeding; however, neither the department nor any of its members may grant any person immunity from prosecution.

C.    Individual Investigator's Informant Responsibilities

Officers shall keep their supervisors informed of their relations and activities involving informants.

## XII.    CONDUCT OF UNDERCOVER OFFICERS

In order to obtain information and evidence regarding criminal activities, it may be necessary that the department utilize undercover operators.  Such operators shall not become "Agents Provocateurs" or engage in entrapment.  The officers shall not commit any act or fail to perform any duty imposed by law which constitutes a crime.

## XIII.    DEPARTMENT RESPONSE TO IMPENDING RIOT

When the city is confronted with a situation which may escalate into a riot, the department must establish control of the situation by reacting quickly and committing sufficient resources to control the situation. Control must be established in all parts of the involved area so that there are no areas into which the department cannot go.  Law violators must be arrested and their prosecution sought.   Finally, the department must remain in the affected area with adequate personnel and equipment for a sufficient period of time after order is restored to convince all concerned that additional outbreaks will not be tolerated.

## XIV.    POLICE ACTION ON SCHOOL CAMPUSES

It is neither the intention nor the desire of the department to suppress or restrain lawful activity, either on or off campuses.  The department will expend whatever resources are necessary to protect the rights of any person or group to conduct a peaceful and lawful demonstration at any location within the city.  However, unlawful activity, whatever its guise, requires prompt and effective action by the department.  The department will take appropriate legal steps to discourage unlawful acts.

The tactics employed by dissidents engaged in disruptive activities frequently include efforts to draw the police and other public officials into responses likely to produce violence and injury to participants and thus garner support for their cause.  It is, therefore, incumbent upon the department to cope with disruptive situations in a professional manner which will minimize the potential for violent confrontations.

**Policy 4.01 - Rev.  10-21-09**

XV.    <u>USE OF FORCE</u>

A.    Use of Force, Generally

Because a police officer's duties often present situations in which the use of force, or even deadly force, may be necessary, the law and department policy authorize the use of such force in certain circumstances and require that the officer be armed while on regular duty.  It is the policy of this department that use of force by its members be:

1.    Justified under applicable state law;
2.    Consistent with the more specific policies which follow;
3.    Professionally accomplished according to approved training and with approved equipment;
4.    In all cases employed to accomplish a legitimate tactical objective;
5.    Limited to that degree and duration which the officer reasonable believes neces-sary to accomplish that objective; and
6.    Applied by the officer and reviewed by the department based upon those facts which are reasonable believed by the officer at the time, applying legal require-ments, department policy, and approved training to those facts.  Facts later discovered, but unknown to the officer at the time, can neither justify nor condemn an officer's decision to use force.

B.    Minimizing Risk of Death or Serious Injury

1.    Non-deadly Force:

Every use of force carries the risk that some injury or even death may result, even though the type of force used is not categorized as "deadly" force.  The goal in every use of non-deadly force is to gain control over the action of the person in order to take and maintain custody, overcome resistance to arrest, prevent the immediate commission of dangerous or criminal acts, or a combination of those objectives.  Once the goal is achieved, further use of physical force must be discontinued.  Until that goal is achieved, the level and extent of force used must be limited to that which is reasonably believed neces-sary by the officer to achieve the goal.

**       (Added 3-21-90)
The use of excessive force by law enforcement agencies against any individuals engaged in nonviolent civil rights demonstrations is prohibited.

2.    Deadly Force:

When circumstances justify the use of deadly force, the unavoidable risk is that someone will be killed or seriously injured.  Although an officer has no specific intent or desire to kill the person, death may be the result.  Circumstances justifying the use of deadly force often happen quickly in circumstances of great physical and mental stress.  It is rarely possible for the officer to direct the use of deadly force to a nonfatal area of the target.  The goal in using deadly force is

**COS 005414**

neither to kill nor to wound without killing; it is simply and exclusively to inca-pacitate the target to produce voluntary surrender or render that person incapable of continuing the dangerous conduct which justified the use of deadly force in the first place.  Where deadly force is justified, an officer may continue its use until satisfied that the goal has been achieved, and then must discontinue its use.  Officer safety and the safety of persons other than the target must be a continuing consideration to the officer using deadly force.

C.    Justification for Use of Deadly Force

An officer may use deadly physical force only when, based on the officer's knowledge and observations at the time, the officer reasonably believes that no reasonable alter-native will accomplish the objective in one or more of the following situations:

The defense of the officer or another person from what the officer reasonably believes to be the imminent infliction of serious injury or death.

2.    The apprehension of a person whom the officer has probable cause to arrest for the commission of a crime, when the officer reasonably believes that delayed apprehension poses a clear and present danger of serious injury to the officer or others.

3.    The prevention of the escape of a person from custody where the officer reasonably believes that the person has used, or will use force risking serious injury or death as a means of accomplishing escape or preventing recapture.

4.    As defined by Oregon Revised Statute 161.239.

D.    Deadly Force - Warning

Wherever practical under the circumstances, an officer shall give some warning before using deadly force.  Warning shots shall not be fired.


XVI.    HOSTAGES

Criminals who use hostages to effect their escape are desperate individuals who, if allowed to escape, will pose a continuing threat to their hostage and to the public at large.  Assurance that a hostage will be released unharmed is a meaningless promise.  The department does not have the ability to protect the safety of a hostage who is allowed to be removed from the presence of officers.  The safety of hostages can be best assured by keeping them in the presence of officers and by preventing their removal by the suspect.  Officers should use every verbal and tactical tool at their disposal to secure the arrest of the suspect without harming the hostage.  However, officers should realize that exceptional situations could arise where considered judgment might dictate allowing removal of a hostage, such as where there is imminent and probable danger to a large group of persons.

XVII.    OFFICERS SURRENDERING WEAPON

An officer(s) may be at the mercy of an armed suspect who has the advantage, but experience has shown that the danger to an officer is not reduced by his giving up his gun upon demand.

Surrendering his weapon might mean giving away his only chance for survival; therefore, an officer should use every tactical tool at his disposal to avoid surrendering his weapon.

XVIII. BARRICADED SUSPECTS

Tactical Plan

A barricaded suspect poses an extreme danger not only to officers who seek to arrest him but to other persons as well.  Good judgment demands that a tactical plan be developed rather than immediately rushing a barricaded suspect.

Officers should seal avenues of escape and call for assistance.  Once the suspect is isolated, time is to the benefit of the officers; and the full resources of the department are available to assist officers in removing the suspect from his location.  To minimize the possibility of injury to officers and others, appropriate special equipment and trained personnel should be requested as needed.  If possible, an effort should be made to contact the suspect in an attempt to persuade him to voluntarily surrender before force is used.

XIX.    USE OF CHEMICAL AGENTS (OLEORESIN CAPSICUM SPRAY EXCLUDED)

To minimize injury to suspects, officers, and others or to avoid property damage, the use of a chemical agent such as tear gas may be necessary in circumstances where a serious danger to life and property exists and other methods of control or apprehension would be ineffective or more dangerous.

The field supervisor has the responsibility for determining the need for the use of a chemical agent and the authority to direct its deployment.  In no event, however, can authorization for the use of a chemical agent be given by an officer below the rank of sergeant.  The use of a chemical agent for crowd or riot control must be authorized by an officer of the rank of lieutenant or higher.

XX.    DEPLOYMENT IN ANTICIPATION OF THE COMMISSION OF A CRIME

The purpose of deploying officers at the scene of an anticipated crime is to arrest the perpetrator of the attempted or consummated crime; however, since that objective is subordinate to the protection of life, officers should not subject themselves or other innocent persons to unreasonable risks.

XXI.    TRAFFIC ENFORCEMENT

A.    Traffic Enforcement Objective
The traffic enforcement objective of the department is to reduce traffic accidents and injuries and to facilitate the safe and expeditious flow of vehicular and pedestrian traffic through the public's voluntary compliance with traffic regulations.  The department seeks to achieve this objective through a combination of education and enforcement.

The department seeks to educate the public regarding traffic regulations through programs aimed at exposing specific problems, by publishing traffic accident and injury

statistics, and by giving notice and warnings of changes in regulations prior to taking enforcement action.

The department will take enforcement action upon the detection of an illegal and potentially hazardous act without regard for such factors as attitude, intent, or frivolous excuse.  Enforcement action may consist of a warning, citation, or physical arrest.

B.    Violator Contact

Traffic violation enforcement is one of the many routine tasks performed by officers; but for violators, it frequently is an emotionally traumatic experience.  In many cases, this is the only contact that a person has with our department.  Officers should be aware of these conditions and should strive to make each contact educational and to leave the violator with the impression that the officer has performed a necessary task in a professional and friendly manner.

C.    Nonresident Violators

Since the Uniform Vehicle Code is now being followed by a majority of the states, including Oregon, nonresidents are rarely subjected to unfamiliar traffic signs or inconsistent regulations.  Therefore, unless the traffic regulation violated is one unique to the Salem area, no immunity should be granted because a person in a nonresident.

D.   Enforcement of Parking Regulations

Street parking is restricted in various areas of the city to ensure fair access to parking and to expedite the flow of vehicular traffic.  All existing parking regulations will be enforced with reasonableness and impartiality in all areas of the city.

E.    Deployment for Traffic Enforcement

1.    Selective Enforcement

The department conducts statistical and visual surveys to determine by location, time, and day of week which violations are causing accidents.  Based upon the information thus obtained, the department deploys its personnel to those specific areas to observe violations and to take enforcement action.  In addition, when the department receives complaints of a specific traffic problem in a particular area, it specifically assigns personnel to investigate and take necessary en-forcement action.

2.    Visible Patrol

Any tendency of motorists knowingly to violate traffic laws is deterred by open and visible patrol, and the number of traffic accidents is correspondingly reduced.  However, when there is an unusual or continuing enforcement problem at a particular location, officers may park in a conspicuous location and observe traffic.

**COS 005417**

**Policy 4.01 - Rev.  10-21-09**

F.    Accident Investigation

The investigation of traffic accidents is necessary, not only to determine traffic law violations but also to obtain engineering data, to protect the rights of the individuals involved, and to assist in traffic education.

XXII.  VICE ENFORCEMENT

The people through their elected representatives have decided that criminal sanctions should be imposed against certain behavior which has been traditionally labeled as "vice".  The department is charged with the enforcement of all criminal statutes including those defining vice offenses.  Where vice conditions are allowed to continue, they are soon exploited by organized crime and the money thus obtained is often used to finance other criminal ventures or attempts to corrupt public officials.  To prevent the spread of vice conditions, the department will take aggressive enforcement action against all commercialized vice activities, against those vice activities which have been complained of, and against conspicuous vice conditions which appear on the streets and in the public places of the city.

XXIII.  NARCOTIC ENFORCEMENT

It is the objective of the department to enforce all local, state, and federal statutes which prohibit the possession, use, or traffic in narcotics, nonprescription drugs, and other restricted or prohibited substances.  Through a combination of aggressive enforcement and public education, the department seeks to prevent and deter the use, possession, and traffic in all such substances within the city.  In so doing, the department may also conduct investigations outside the city in cooperation with appropriate law enforcement agencies to prevent the flow of such illegal substances into the city.

To prevent the spreading use of narcotics and other dangerous substances, the department engages in public education programs to inform people about the effects and hazards of drug abuse.  Additionally, the department provides the public with factual information with which to make decisions regarding the use of drugs and to assist members of the public in recognizing symptoms and indications of drug use in others.  An understanding and appreciation of the full effect and extent of drug abuse is essential for success in overcoming its threat.  By working with and through the community, the department seeks to engage the people in a cooperative attack on this critical problem.

XXIV.  TRAUMATIC INCIDENT POLICY

Severe emotional trauma can occur when a police employee is seriously injured, is forced to seriously injure or kill someone else, or is witness to one of these incidents.

Because of the nature of the police profession, employees involved frequently turn to other employees for support and understanding.

Employees previously involved in traumatic incidents tend to more readily relate to and understand the trauma being experienced by the affected employee.

**Policy 4.01 - Rev.  10-21-09**

To enable employees involved in traumatic incidents to cope more effectively, to regain their emotional stability, retain their dignity and self-respect and to return to duty as a productive individual as soon as possible, the Salem Police Department supports the formation, training, and utilization of a traumatic incident team.  This trauma team will exist to support and provide assistance to employees involved in traumatic incidents, their families, and the Salem Police department staff.

Each traumatic incident is different and has its own uniqueness.  In an effort to thoroughly investigate each such incident, a combination of or all of the following may occur intra-departmentally as a result of a traumatic incident:

1)    City liability investigation
2)    An internal affairs investigation
3)    A Board of Inquiry
4)    An operational critique; and/or
5)    An Accident Review Board

Additionally, some of the following, but not limited to, will or may occur outside the department as the result of a traumatic incident:

1)    Media exposure
2)    Public inquest or grand jury hearing
3)    Civil litigation; and/or
4)    Investigations by other agencies

This department, in conjunction with and through the efforts of its trauma team, will do everything possible to provide for the support and facilitate the recovery of employees involved in traumatic incidents.

C:\Program Files (x86)\HiRUS\Convert\Temp\445f374d-ed10-4ce1-8d2c-ba15882513ef.doc

**COS 005419**