David D. Park, OSB #803358
ELLIOTT & PARK, P.C.
Abernethy House
324 S. Abernethy Street
Portland, OR 97239-8529
Telephone:     (503) 227-1690
Facsimile:     (503) 274-8384
E-mail:  dave@elliott-park.com

Ron L. Sayer, OSB #951910
James M. Healy, OSB #123403
The Gatti Law Firm
235 Front St., SE, Ste. 200
Salem, OR 97301
Telephone: (503) 363-3443
Facsimile: (503) 371-2482
E-mail: rsayer@gattilaw.com
        jhealy@gattilaw.com

        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MISTY CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>Plaintiff,<br><br>v.<br><br>NATHAN BUSH and CITY OF SALEM, a municipal corporation,<br><br>Defendants. | Case No. 6:22-cv-00684-MK<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**[WARNING:  MOTION DOCUMENTS CONTAIN GRAPHIC IMAGES OF VIOLENCE AND AUTOPSY PHOTOS]** |

Page 1 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **LOCAL RULE 7-1 CERTIFICATION** | | **2** |
| **MOTION** | | **2** |
| **ARGUMENT** | | **2** |
| I. | **Introduction** | **2** |
| II. | **Legal Standard** | **3** |
| III. | **Statement of Facts** | **4** |
| | A. **Pre-shooting actions of Defendant Bush** | **5** |
| | B. **Bush's Version of Events Precipitating Use of Deadly Force** | **6** |
| | C. **Controverting Physical Evidence** | **8** |
| |    1. **Audio/video visualization and analysis by Fat Pencil Studio/Joel Newman** | **8** |
| |    2. **Crime Scene Reconstruction Analysis** | **10** |
| |       a. **Gunshot Wound Number 3** | **13** |
| |       b. **Gunshot Wounds Number 2, Number 1, And Number 4** | **15** |
| |       c. **The Stainless-steel Knife** | **17** |
| IV. | **Legal Analysis** | **19** |
| | A. **Bush Violated Castillo III's Fourth Amendment Rights** | **19** |
| |    1 **Castillo III did not pose an Immediate Threat to the Safety of Bush or Others** | **20** |
| |    2. **Castillo III's Crimes were not Severe** | **21** |
| |    3. **Castillo III was not Resisting Arrest of Attempting To Flee** | **21** |

**4.** **Bush is Liable for Violating Castillo III's Fourth Amendment Right not to be subjected to Excessive Deadly Force**   **21**

**B. Salem is Liable for Bush's Battery of Castillo III**   **22**

**CONCLUSION**   **22**

## TABLE OF AUTHORITIES

### CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 23 L.Ed.2d 142 (1970)     3

*Bakker v. Baza'r, Inc.*, 275 Or 245, 551 P2d 1269 (1976)     22

*Cameron v. Goree*, 182 Or 581 (1948)     4

*Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 293 P2d 717 (1956)     22

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001)     20

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)     20

*Graham v. Connor*, 490 U.S. 386 (1989)     19

*Granat v. Schoepski*, 272 F.2d 814 (9th Cir. 1959)     4

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997)     20

*Jordan vs. City of Eugene*, 2006 U.S. Dist LEXIS 38839 (D. Or. 2006)     22

*Kan. City Pub. Serv. Co. v. Shephard*, 184 F.2d 945 (10th Cir. 1950)     4

*Linkhart v. Savely*, 190 Or 484, 227 P2d 187 (1951)     22

*Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017)     20

*Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995)     20

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011)     20

*Peck v. Montoya*, 51 F.4[th] 877 (9th Cir 2022)     20

*Reed v. City of Modesto*, 122 F.Supp.3d 967 (E.D. Cal. 2015)     20

*Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005)     3

*Saucier v. Katz*, 533 U.S. 194 (2001)     19

*Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)     3,4,19

*Silfast v. Matheny*, 171 Or 1, 136 P2d 260 (1943)     22

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)     21

**CASES (continued)**

*Tennessee v. Garner*, 471 U.S. 1 (1985)                                      20

*Wood v. United States*, 342 F.2d 708 (8th Cir. 1965)              4,19


**STATUTES AND LAWS**

42 U.S.C. Section 1983                                                          3,22

Fourth Amendment                                                          19,22,23

ORS 163.160                                                                        21

ORS 163.190                                                                        21


**RULES**

Fed.R.Civ.P. 56                                                                      2,3

## CERTIFICATION

Pursuant to LR 7-1, the undersigned attorney for plaintiff certifies that he made a good faith effort through telephone conference with counsel for defendants to resolve the issue raised by plaintiff's motion for partial summary judgment and have been unable to do so.

## MOTION

Pursuant to Fed. Rule Civ. Proc. 56, plaintiff moves the Court for partial summary judgment on the following issues:

1.      Defendant Nathan Bush's liability for use of excessive deadly force in violation of decedent Arcadio Castillo, III's Fourth Amendment rights (First Claim for Relief); and

2.      Defendant City of Salem's liability for battery (Second Claim for Relief).

There are no genuine disputes of material fact concerning the respective defendants' liability and the plaintiff is entitled to partial summary judgment in its favor as a matter of law.

## ARGUMENT

## I.      Introduction

In the investigation that followed defendant Bush's killing of Arcadio Castillo, III, physical evidence was collected at the shooting scene, from security cameras located on neighboring properties and by autopsy conducted by the Medical Examiner.  Several significant items of evidence were not analyzed in any report produced by the major crimes team investigators nor by any professional standards or command level staff who conducted the City of Salem's internal administrative review.

Defendant Nathan Bush's stated justification for his decision to use deadly force against Arcadio Castillo, III is that Castillo III charged him holding a butcher knife in his right hand raised to shoulder level and pointed in Bush's direction.  Bush dep. 89:16-90:10; 92:9-25; 94:5-7.

Page 2 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Bush admits, and it is not subject to reasonable dispute under clearly established 9th Circuit case law, that if Castillo III was simply standing in place holding the knife, defendant Bush's shooting of Castillo III would be unlawful. Bush dep. 87:13-23. The previously ignored physical evidence demonstrates that Castillo III was standing with the right side of his body perpendicular to defendant Bush, his arms at his sides and rotating to his right when Bush commenced firing and renders defendant Bush's testimony about Castillo III's actions "impossible". Declaration of Michael Howard (plaintiff's crime scene reconstruction expert).

Because no jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, defendant Bush's testimony must be rejected by this court and partial summary judgment entered in favor of plaintiff on the issues of defendant Bush's liability under Section 1983 and defendant City's liability for Bush's common law battery.

## II.    Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Normally, in making that determination a court must view the evidence "in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 23 L.Ed.2d 142 (1970). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Just as when a videotape captures the events in question a court must view the facts in the light depicted in the videotape, *id*. at 378-381, when the physical evidence gathered at a crime scene allows for only one reasonable conclusion about the events in question the court must view the facts in the light dictated by the physical evidence.  This is sometimes referred to as the 'physical facts' rule.  *See Wood v. United States*, 342 F.2d 708, 713-14 (8th Cir. 1965) ("Where undisputed physical facts are entirely inconsistent with and opposed to testimony necessary to make a case for [a party], the physical facts must control.  No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established.").  "The 'physical facts' rule is restricted to those situation[s] in which the testimony of the witnesses relied upon was virtually impossible on the uncontradicted physical facts."  *Granat v. Schoepski*, 272 F.2d 814, 815 (9th Cir. 1959) (citing *Kan. City Pub. Serv. Co. v. Shephard*, 184 F.2d 945, 947 (10th Cir. 1950).  When the court applies the physical facts rule "it is not necessary to find that the witness was of a mendacious type.  If it is obvious that his testimony cannot be true, it is rejected; the character and the motive of the witness are immaterial."  *Cameron v. Goree*, 182 Or 581, 604 (1948).

## III.    Statement of Facts

On July 9, 2021, Arcadio Castillo, III, age 23 ("Castillo III"), the only son of Misty Castillo and Arcadio Castillo, Jr., was shot and killed by City of Salem police officer Nathan Bush.  ECF 53, Answer to Second Amended Complaint, ¶¶ 4, 13 (hereinafter "Answer").  At the time of the shooting, defendant Bush was acting within the course and scope of his employment and acting under color of law.  Answer, ¶ 3. The killing occurred at 3796 June Avenue NE, Salem, the family's residence, at approximately 11:25 p.m.  Answer, ¶¶ 4, 19.

///

Page 4 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The red balloon on the following Google aerial image of June Avenue NE identifies 3796 June Avenue NE (the "Castillo residence").



A.    Pre-shooting actions of Defendant Bush

Defendant Bush self-dispatched to the Castillo residence in response to the 9-1-1 call of Misty Castillo, reporting that her son was mentally ill, intoxicated, under the influence of marijuana, assaulting family members and armed with a knife.  Answer, ¶ 7.  As Bush was enroute to a different call he saw the dispatch of a domestic disturbance near his location and the details reported to the dispatcher by Misty Castillo on the mobile computer screen in his patrol car.  Bush dep. 36:7-14; 38:21 to 39:9.

Defendant Bush was the first officer to arrive.  He parked his patrol vehicle on June Avenue, 150 feet or less west of the Castillo residence and approached on foot.  Bush dep. 47:9 to 48:12.[1]  As Bush approached, he saw Misty Castillo standing in the driveway. Bush dep. 49:4-

---

[1]    A Nest security video was obtained by Keizer Police Department Detective Roland Farrens on July 12, 2021 from Humberto Diaz, whose residence is located at 3727 June Avenue NE.  Report of Det. Farrens, Exhibit 8 to Park Declaration (the "NEST" video).  The NEST video contains visual and audio data. It captures Bush's patrol vehicle pulling to a stop across the street from the Diaz residence with the

Page 5 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

8, 50:1-9 (location marked on deposition Exhibit 24 with a circle and an "M"), and Castillo III standing on the porch in front of the house (location marked on Exhibit 24 with a circle and an "ACIII"). Bush dep. 51:7-16.  He called out to Castillo III.  Bush dep. 52:14 to 53:21. Castillo III did not verbally respond, but upon seeing Bush turned around, entered his home and closed the front door. *Id.*, 54:19-21.  Bush was looking to see if Castillo III was holding a knife but did not see a knife.  Bush dep. 55:3-11.

Bush had a short conversation with Misty Castillo in the driveway, Bush dep. 58:5-11, 59:3-6, then approached the front door with his gun drawn. Bush dep. 68:20 to 69:24; Bush dep. Exh. 1, page 9, lines 42-47.   As he was at or near the front door he heard voices, Bush dep. 65:13-22, tried the knob to the door, turned it one direction and found it locked, turned it the opposite direction, heard an audible "click" and pushed the door open. Bush dep. 74:21 to 75:5, 75:23 to 76:6; Bush dep. Exh. 1, page 9, lines 52-54.[2]

B.    Bush's Version of Events Precipitating Use of Deadly Force

On July 14, 2021, defendant Bush, with his lawyer Mark Staropoli present, was interviewed by Oregon State Police Detective Kimberly Long about the circumstances surrounding his killing of Arcadio Castillo, III.  Defendant Bush admitted in deposition that the

---

(continued) driver's door just out of camera view.  A human shadow appears on the back of the patrol car and disappears with the sound of a car door closing, marking the beginning of Bush's approach. Newman Declaration, ¶ 5, at page 5.

[2]    Security videos from the Village East Shopping Center were obtained by Marion County Sheriff's Office Detective Bob Evarts on July 14, 2021.  Some of the security cameras are pointed in the direction of the intersection of June Avenue and Coral Avenue, capturing the front of the Castillo residence, and the La Tapatia security cameras record audio as well as video.  These videos were logged into evidence files by Det. Evarts, produced to plaintiff's counsel in response to a subpoena and submitted by plaintiff's counsel to Fat Pencil Studio for analysis. Park Declaration, ¶ 8 and Exhibit 7; Newman Declaration, ¶¶ 4, 5.  There is sufficient visual data (appearance of light in living room window) to determine the moment within +/- 0.27 seconds of accuracy that the front door to the Castillo residence is opened by defendant Bush.  Newman Declaration, ¶¶ 5, 6 and Exhibit 2.

Page 6 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

transcript of that interview, marked as Exhibit 1 to his deposition, accurately reflects what he

told Detective Long about the shooting and represents his complete memory of events. Bush dep.

11:18 to 12:12. Defendant Bush described the events precipitating his use of deadly force as

follows:

> When I swung the door open, the hinge side is to my right, and it, uh, so the door swung around this way. I saw dad several feet off to my left. Uh, as I scanned through the room, I saw the suspect, uh, directly in front of me. Um, I estimate maybe 12 feet. It was, uh, near – so, the living room, there's, there's a wall, uh, and then there's, uh, kind of an entrance to a hallway. Okay. So, he was back – so this is the front door, correct? Okay. So, I was at, at this door. He was, there's a wall here, and then this goes back. He was in front of this wall. He was, he was about here when I first saw him. [Bush marks Castillo III's location on diagram provided by Det. Long. See, Transcript of July 14, 2021, Interview, page 15, lines 39-40; page 16, lines 5-16. This diagram is marked Bush deposition Exhibit 3. Bush dep. 12:17 to 13:5.] Uh, he's standing there with his arms down. I scanned down, uh, to check his hands, and I notice, uh, a real big like butcher knife, uh, one of the bigger, bigger knives that you'd see like in a kitchen butcher block. Un, he's holding it down by his side, uh, and he's just looking at me. *I pick up my, my handgun, and I point it at him. I tell him to drop the knife. He then takes, starts taking slow steps towards me with the knife still down. I think maybe two steps, and then he, and I, so I tell him multiple more times, I'm yelling, drop the knife, drop the knife. He then, he, he doesn't say anything. He turns around and starts walking to the back of the, uh, towards the back of the house. So, he walks up about here, and then he turns around, and he starts walking away from me,* and I think he's gonna walk farther into the house. Uh, *I stopped engaging him,* uh, *I took a step through the doorway and took my left hand off my, my support hand off of my handgun* 'cause I wanted to get dad out of the location. … Uh, before I could address dad at all, uh, *the suspect spins around to his left, very quickly. Uh, he charges at me, lifts, lifts the knife up, uh, around shoulder like this and points it in my direction, and he, he's charging.* I see his, his weight shift forward, and *he's closing distance* extremely fast. Uh, *at that time, I slid back.* I thought I yelled to stop. I don't know if it came out or not, and *he continued advancing, and I fired, uh, several shots. That's when I fired.* Uh, his momentum stopped. He was, at that time, *he was maybe 5 to 6 feet away from me,* in front of me. Uh, he stopped. He stood up. I'm telling him to drop the knife, get down, get down. I have my other hand on. I can't see if his hands are down by his side, um. He *then kinda steps, stumbles backwards, turns to his right, falls to his knees and collapses to the ground.*

Page 7 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Bush dep. Exhibit 1 (transcript of July 14, 2021, Interview, page 9, line 54, to page 10, line 51) (emphasis added).

Defendant Bush's deposition testimony provided a few additional important details: Castillo III was holding the knife in his right hand, Bush dep. 85:19-24. Castillo III had nothing in his left hand. *Id*., 86:6-7. The moment Bush saw Castillo III, he pointed his gun at him and used his command voice to instruct Arcadio III to drop the knife, *id*., 86:15-24, and "drop the knife" was the only statement Bush made to Arcadio III. *Id*., 88:4-6. Bush fired his first shot "[s]hortly after he start[ed] running towards me." *Id*., 94:5-7. Bush fired his gun from the front porch (outside the front door) of the Castillo residence. *Id*. 94:17 to 95:17.

C.    Controverting Physical Evidence

1.    Audio/video visualization and analysis by Fat Pencil Studio/Joel Newman

Plaintiff employed the graphic arts firm, Fat Pencil Studio, and Senior Designer, Joel Newman, to assist with three-dimensional visualization of the shooting scene, scale diagram preparation and review and analysis of the security camera footage collected by major crimes team detectives that captured visual and audio information about the shooting. Park Declaration, ¶¶ 8-10; Declaration of Joel Newman, ¶¶ 3, 4. The security videos contain sufficient visual and audio evidence to document that defendant Bush shot Castillo III 60.2 seconds from the moment he arrived on June Avenue and began his approach, and 4.1 seconds from the moment he opened the front door. Newman Declaration, ¶¶ 4-6; Exhibits 2 and 3 to Newman Declaration.

Exhibit 2 to the Newman Declaration is a compilation of synchronized security video combined with an animated timeline of defendant Bush's movements between the moment he leaves his stopped patrol car, and the moment shots are fired. Video from the Village East Shopping Center ("Knightscope") captures the movements of Bush's flashlight and objects

Page 8 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

illuminated by his flashlight as he is walking toward the Castillo residence, as he pauses to interact with Misty Castillo, as he walks past Misty Castillo to approach the front entrance vestibule of the house and as he stands at the front door to the residence.   A light in the living room window of the Castillo residence, most probably from Bush's flashlight after the door is opened, first appears emanating from the Castillo's living room window a moment before the sound of Bush's commands "put the knife down, put the knife down" and the sounds of 4 gunshots are heard.

Exhibit 3 to the Newman Declaration is a static version of the running timeline that appears in Exhibit 2.  Newman Declaration, ¶ 5.  The elapsed times for each event noted on the timeline are accurate to within +/- 0.27 seconds.  *Id*., ¶ 6.

Based on this video evidence – physical evidence – there is insufficient time – it is impossible -- for all of the events that defendant Bush testified to have occurred after the door opens and preliminary to the shooting (Castillo III taking two "slow" steps toward Bush, Bush yelling multiple times "drop the knife", Castillo III turning around, walking away, and a verbal pause – "I stopped engaging him") to have occurred.   Indeed, the audio portion of Exhibit 2 documents the uncontestable fact that there is no pause between Bush's commands to 'drop the knife' and the sound of four gunshots.

The brevity of the time between when the front door is opened, and shots are fired, is corroborated by witness Gary Keidatz.  Mr. Keidatz and his wife Jan reside at 3797 June Avenue NE, the residence directly across June Avenue from the Castillo residence.  Mr. and Mrs. Keidatz gave an audio recorded statement about what they observed of the shooting to Keizer

Page 9 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Police Department Detective Arsen Avetisyan in the early morning hours of July 10, 2021.[3]  A

true copy of Detective Avetisyan's Report of his interview of Gary and Jan Keidatz is attached as

Exhibit 10 to the Park Declaration, and excerpts from the certified transcript of the audio

recorded statement of Gary and Jan Keidatz ("Keidatz Tr.") are attached as Exhibit 11 to the

Park Declaration.  The bedroom window of the Keidatz residence faces June Avenue and

provides a full view of the front of the Castillo residence.  Keidatz Tr. 3:9-25.  Mr. Keidatz

provided Detective Avetisyan the following description of what he saw:

> Detective Avetisyan:  So were you able to see the officer walk up to the door?
> Gary Keidatz:  Uh-huh.  Yeah.  I seen all that.
> Detective Avetisyan:  Can you -- can you tell me what you saw as when he was walking up and –
> Gary Keidatz:  Yes.  Just Walking up to the door.  I mean –
> Detective Avetisyan:  Was the door open or closed?
> Gary Keidatz:  No it was closed.
> Detective Avetisyan:  And then what happened?
> Gary Keidatz:  Then he – the door opened and the shooting started.
> Detective Avetisyan:  Okay. Were you able to see who – who opened the door?
> Gary Keidatz:  No.  No.
> Jan Keidatz:   Didn't you say it was just open a little bit?
> Gary Keidatz:  Yeah, it wasn't – yeah, it wasn't open –
> Jan Keidatz:    Yeah.
> Gary Keidatz:  -- very far.

Keidatz Tr. 11:6 to 12:3.

    2.    Crime Scene Reconstruction Analysis

Plaintiff employed forensic scientist Michael Howard to review the physical evidence

related to the shooting death of Arcadio III and render expert opinions concerning Castillo III's

location within his residence when he was shot, his body position relative to the shooter, the

---

[3]     Counsel for the parties have stipulated to taking a perpetuation deposition of this witness on December 27, 2023.  Plaintiff will supplement the record with relevant excerpts from his deposition testimony.

Page 10 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

order in which the bullets struck his body and whether any of Castillo III's wounds are consistent with Mr. Castillo charging forward in the direction of a fired bullet with his right arm raised in the stabbing posture demonstrated by defendant Bush in the video of his deposition.  Howard Declaration, ¶ 2.

Mr. Howard's qualifications:  he was employed as a Criminalist with the Oregon State Police for 24 years, from 1975 to 1999, during which time he processed over 1000 crime scenes. From 1983 to 1999 he was the Laboratory Director for the Oregon State Police Forensic Laboratory in Bend, Oregon.  Since 1999 he has been self employed as a forensic scientist, has investigated and reconstructed hundreds more crime scenes and has qualified as an expert witness in state and federal courts in Oregon, Washington, Idaho and Montana.

Mr. Howard's opinion:

> The physical evidence demonstrates that it *is impossible* for Castillo III to have been charging forward with a right arm raised out to the side in the manner demonstrated by Officer Bush in Exhibit 2 at the time the shots were fired.   The physical evidence conclusively places Castillo III in a standing position with his right side perpendicular to the front door entrance in the area behind the green couch shown in Exhibit 3 when the shots were fired.

Howard Declaration, ¶ 11 (emphasis added).  Exhibit 12 to the Howard Declaration provides a visual illustration of Castillo III's approximate location and body position when struck by the first bullet:

Page 11 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**



The uncontested evidence underlying Howard's opinion is addressed in the following order:  (a) evidence associated with the bullet that entered Castillo III's right bicep (labeled gunshot wound "3" in the autopsy report)[4] and the presence and location of aspirated blood spatter on the couch, Howard Declaration, ¶¶ 5 and 7, (b) evidence associated with gunshot wounds "2", "1" and "4" and the presence of large "arterial spurt" bloodstains on the arm, seat and front of the overstuffed chair, Howard Declaration, ¶¶ 6, 8 and 9; and (c) evidence associated with the blood-spattered stainless-steel knife, Howard Declaration, ¶ 10.

///

---

[4] The deposition of Clifford C. Nelson, MD, the Medical Examiner who performed the autopsy of Castillo III, is provided in its entirety as Exhibits 1 (transcript and deposition exhibits 30-43) and 2 (video file) to the Park Declaration.  The autopsy report is marked exhibit 31 to the Nelson deposition.  The numbers assigned and the order in which the gunshot wounds are described in the autopsy report does not constitute Dr. Nelson's opinion of the order in which the gunshot wounds were inflicted.  Nelson dep. 12:9-16.

Page 12 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

a.      <u>Gunshot Wound Number 3</u>.

Dr. Nelson described the path through Castillo III's body of the bullet associated with gunshot wound number 3 as "*right to left*, front to back, and slightly downward," Nelson dep. 17:13-14 (emphasis added).  That bullet: "perforated his right biceps muscle, then went through the right axillary muscles and soft tissues. Perforated the right fifth rib and perforated the superior portion of the right lung. It lacerated or tore his aorta.  It perforated the lower lobe of the left lung, perforated the left fifth intercostal space, and then was recovered in the area shown in the pictures [deposition exhibit 33]. … [the] left chest wall." *Id.*, 17:14-25.  Dr. Nelson endorsed the illustrations of this bullet path in deposition exhibits 32 and 33 to be accurate, *id*., 18:1-7, and confirmed that, for Castillo III to receive this wound, his right side would need to be facing the direction from which the bullet was fired.  *Id*., 20:6-11.

The crime scene investigation report of OSP Detective Yoder, Exhibit 6 to Park Declaration, page 4, documented "[a] bullet strike to the door … midway up the door with an entrance in the front of the door near the edge and an exit through the edge of the door."  A photo of the bullet strike to Castillo's front door, exhibit 35 to Dr. Nelson's deposition, shows splintering of the wood at the exit location.



Page 13 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

No other bullet strikes to the front door, interior walls or other objects within the Castillo residence were noted in Detective Yoder's investigation report. Because the front door opened to Bush's right, the presence of a bullet hole through the edge of the door as shown in Nelson deposition exhibit 35 is inconsistent with Bush aiming at a target that is directly in front of him. Rather, it supports Howard's opinion that Castillo III is in the hallway behind the couch, slightly to Bush's right as shown in the illustration, exhibit 12, to Howard's Declaration, when the bullet that causes gunshot wound 3 is fired.

Red marks immediately above the entrance wound and further down Castillo III's right arm shown in deposition exhibit 32 were caused by debris from the bullet having passed through another object before striking Castillo III. Nelson dep. 19:12-22. In addition, the "ragged" shape of the entrance wound, *id.*, 19:23 to 20:5, and the condition of the recovered bullet make it more likely than not that the bullet passed through another object before it struck Castillo III. *Id.*, 24:8-20. Dr. Nelson confirmed that the condition of the bullet he recovered from Castillo III's left chest wall could have been caused by it having first passed through the front door. *Id.*, 24:23 to 25:12. It is Howard's opinion that this bullet did strike the front door before striking Castillo III. Howard Declaration, ¶¶ 5 and 7.

It is probable that after Castillo III was struck by this bullet, he would have been expectorating blood from his nose and/or mouth as he continued to breathe. Nelson dep. 21:8-15; Howard Declaration, ¶ 5. Crime scene photos confirm the presence of expectorated blood on the end of the couch that is the farthest distance from the front door, as well as on the floor behind the couch. Howard Declaration, ¶ 5 and Exhibits 4a-4e. *See, also*, the scale illustration showing the locations of the collected evidence and blood spatter, Exhibit 6 to Newman Declaration, reproduced here:

Page 14 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**



The presence and location of expectorated blood places Castillo III behind the couch and chair at the time he was shot. Howard Declaration, ¶ 5. This location corresponds to the same general location that both Bush and Castillo, Jr. place Castillo III when the front door opens. *Id*.; Exhibit 3 to Bush deposition; Castillo, Jr. dep. 36:21 to 41:12 and deposition exhibit 109. Expectorated blood on the couch supports Howard's opinion that Castillo III was first shot with his right shoulder perpendicular to the front door entrance but in motion rotating to his right. Castillo III's rotation to his right is also consistent with any person's natural response or reaction to the opening of the front door.

      b.      <u>Gunshot Wounds Number 2, Number 1 and Number 4</u>.

Defendant Bush fired four times over the course of 1 second. Exhibit 2 to Newman Declaration, at 0:02:05-06 ("Bush Fires"); Howard Declaration, ¶ 6. The time between the first and last shots permits limited body movement. Howard Declaration, ¶ 6. When considered within this very brief time span, the bullet paths of gunshot wounds 3, 2 and 1 demonstrate

Page 15 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Castillo III's body movement to be rotational, with Castillo III's body rotating *in place* to his right.  Howard Declaration, ¶¶ 8, 9.

The bullet which caused gunshot wound 2 entered Castillo III's left chest, moving from *right to left*, front to back and downward, exiting the left axilla, re-entering the medial left bicep, passing right to left, front to back and slightly downward through Castillo III's left arm and exiting the posterior left tricep muscle.  Autopsy report, Exhibit 31 to Nelson deposition, pp. 4-5.  To receive the entrance wound, Mr. Castillo would have to be turned with his right side forward in the direction from which the bullet was fired and be bending forward.  Nelson dep. 26:21 to 27:7.  Nelson deposition exhibits 36, 37 and 38 accurately illustrate this bullet path.  Nelson dep. 26:11-16.

The bullet which caused gunshot wound 1 entered Castillo III's mid-left chest, moving from front to back, slightly *right to left* and downward, perforating the sternum at the level of the fourth ribs, the right ventricle of the heart, the interventricular septum of the heart, the left ventricle of the heart, the posterior left 10th intercostal space, and coming to rest in the subcutaneous tissues of the left back.  Autopsy report, Exhibit 31 to Nelson deposition, p. 4.  To receive this wound Castillo III must be mostly facing the shooter but bent forward.  Nelson dep. 29:7-17.  Nelson deposition exhibits 39 and 40 accurately illustrate this bullet path.  Nelson dep. 29:1-6.

The bullet which caused gunshot wound 4 entered Castillo III's mid-left abdomen at a downward angle, perforating the abdominal wall fatty tissues and coursing slightly *right to left*, exiting the lower left abdomen, re-entering the anterior lateral upper left hip, coursing above to below, right to left, front to back and exiting the superior and lateral left hip.  Nelson dep. 32:5 to

Page 16 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

33:1; deposition exhibit 31, page 6. Nelson deposition exhibits 42 and 43 accurately illustrate the bullet path of gunshot wound 4. Nelson dep. 33:9-15.

Each of gunshot wounds 2, 1 and 4 course right to left, supporting Howard's opinion that Castillo III is rotating from his left to his right (turning towards the door) as the shots are fired. Howard Declaration, ¶ 9. Because Bush is shooting from the front porch, a platform that is 4 to 5 inches lower than the elevation of the floor on which Castillo III is standing, the bullet paths of these gunshot wounds also support Howard's opinion that Castillo III is in a forward bending motion as shots are fired. *Id.*[5]

The wound to the heart caused by the bullet associated with gunshot wound number 1 can cause blood to be pumped forward and out of the body. Nelson dep. 35:15-20. The large bloodstains on the arm, seat and front of the overstuffed chair depicted in the crime scene photo attached as Exhibit 8 to the Howard Declaration are this type of "arterial spurt" bloodstains. Howard Declaration, ¶ 9. The presence and location of these bloodstains support Howard's opinion that Castillo III is behind the couch and chair when he is shot. *Id*.

c.      The Stainless-steel Knife.

On the night of the shooting Misty Castillo was asked to describe the knife her son had been holding and told investigating officers that it was "a butcher knife" that was "all steel." Misty Castillo Interview Transcript, pp. 14-15, Exhibit 12 to Park Declaration. A blood-spattered stainless-steel knife was "found behind brown recliner" during the post-shooting investigation. Report of Oregon State Police Det. Caleb Yoder, Exhibit 6 to Park Declaration,

---

[5] Dr. Nelson confirmed that Castillo III was "bent forward or buckled forward at the waist" when receiving gunshot wound 4. Nelson dep. 33:16-24.

page 2.  The following photograph of the location and condition of the knife at the crime scene is attached as Exhibit 10 to the Howard Declaration:



Because the top back of the overstuffed chair was against the wall, exhibit 9 to Howard Declaration, the knife could not have been tossed to the location it came to rest from a position above or forward of the chair.  Howard Declaration, ¶ 10.  The only way for the knife to come to rest in the location it was found is if Castillo III had been holding the knife in his right hand at an elevation lower than the chair back and roughly perpendicular to the opening between the wall and the chair back and bent over significantly at the waist.  *Id*.  This evidence places Castillo III behind the couch when he is shot and supports Howard's opinion that he was rotating in place to his right and bending forward as he was being struck by the bullets.

The blood spatter on the blade of the knife documented in the photos attached as Exhibits 11a, 11b and 11c to the Howard Declaration show that the knife was being held in a downward pointed direction prior to landing beneath the chair.  *Id*.

Page 18 - **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The foregoing uncontestable physical evidence demonstrates that it is impossible for Castillo III to have been charging forward with his right arm raised out to his side in the manner demonstrated and at the location claimed by defendant Bush when Bush fired the shots that killed Castillo III.  The physical evidence blatantly contradicts Bush's story. It places Castillo III standing in the hallway behind the couch with his right shoulder facing the door, knife down by his side, rotating to his right, when he is shot by defendant Bush.  This evidence allows for only one reasonable conclusion about the events in question – Castillo III was merely in possession of a knife and was not threatening anyone when Bush fired the shots that killed him.  Under the rules of evidence recognized in *Scott v. Harris, supra*, and *Wood v. United States, supra*, defendant Bush's testimony must be rejected, and the court must rely for its decision exclusively on the facts dictated by the physical evidence.

IV.    **Legal Analysis**

A.    Bush Violated Castillo III's Fourth Amendment Rights

Fourth Amendment claims for excessive force are analyzed under the reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Such claims "are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). The reasonableness standard is a flexible, objective, totality of the circumstances test judged from the perspective of a reasonable officer on the scene, which requires paying "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Important factors to consider include but are not limited to: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others", and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. Among these considerations, the second factor of whether the

Page 19 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

suspect poses an immediate threat is the most important. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). An officer's use of deadly force is not justified unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). A "simple statement by the officer that he fears for his safety or the safety of other is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

1.    Castillo III Did Not Pose an Immediate Threat to the Safety of Bush or Others

Under clearly established law, Castillo III's possession of a knife is not dispositive of the "immediate threat" factor; otherwise, "that a person was armed would always end the inquiry." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). "[O]fficers may not kill suspects simply because they are behaving erratically, nor may they 'kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.'" *Peck v. Montoya*, 51 F.4th 877, 887-88 (9th Cir 2022) (quoting *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). This principle is clearly established in the 9th Circuit and applies to a person holding any weapon, including a firearm. *Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017). "In order to justify use of deadly force, it is not enough that a person armed with a knife takes 'dangerous, threatening, or aggressive actions;' their actions must 'pose[] a threat of serious physical harm.'" *Reed v. City of Modesto*, 122 F.Supp.3d 967, 980 (E.D. Cal. 2015) (quoting *Ludwig v. Anderson*, 54 F.3d 465, 473 (8th Cir. 1995) and collecting multiple cases).[6]

---

[6]    In *Reed* the trial court denied defendant's motion for *jnov* following return of verdict for the plaintiff for excessive force where officers shot a knife-wielding suspect who had been physically struggling with

2.    Castillo III's Crimes Were Not Severe.

The only crimes Bush had probable cause to believe Castillo III may have committed prior to opening the front door are Assault 4, ORS 163.160, and Menacing, ORS 163.190, both of which are misdemeanors. Bush admits that when he opened the front door Castillo III was not threatening his father. Bush dep. 88:11-14. From the moment Bush arrived on scene, there is no evidence that any crime was in progress. Under clearly established law, the nature of the crimes Castillo III may have committed prior to Bush's arrival will not support an inference that Bush's immediate resort to use of deadly force was objectively reasonable. *See, e.g., Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005) (holding, where suspect had physically assaulted his wife but was standing alone on his porch when officers arrived, "the nature of the crime at issue provid[ed] little, if any basis" for the use of force).

3.    Castillo III Was Not Resisting Arrest or Attempting to Flee.

Castillo III's location within his home and physical orientation to Bush when shot, in conjunction with the short period of time the shooting occurred after the front door opened conclusively controvert an objectively reasonable inference that Castillo III was either resisting arrest or attempting to flee.

4.    Bush is Liable For Violating Castillo III's Fourth Amendment Right Not To Be Subjected To Excessive Deadly Force.

The same uncontested evidence which renders "impossible" Bush's testimony of Castillo III's actions, conclusively establishes that, at the moment Bush shot Castillo III, Castillo III did not pose a significant threat of death or serious injury to anyone. Rather, the evidence

---

a victim before the shooting, who did not comply with orders, and who moved his foot but did not advance on the officers.

Page 21 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

demonstrates that Castillo III was simply standing in the position and at the general location

inside his home illustrated in Exhibit 12 to the Howard Declaration.   Under clearly established

law, Bush's use of deadly force in that circumstance is objectively unreasonable and violates

Castillo III's Fourth Amendment rights.  Defendant Bush concedes as much. Bush dep. 87:13 to

88:3.

> B.    Salem is Liable for Bush's Battery of Castillo III

> "'A battery is an intentional harmful or offensive contact with another.' *Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 48-49, 293 P2d 717 (1956). To prove a battery, plaintiff must show that 'the conduct which brings about the harm [was] an act of volition on the actor's part, and [that] the actor . . . intended to bring about a harmful or offensive contact or put the other party in apprehension thereof.' *Bakker v. Baza'r, Inc.*, 275 Or 245, 249, 551 P2d 1269 (1976)."

*Jordan vs. City of Eugene*, 2006 U.S. Dist LEXIS 38839 (D. Or. 2006).

The fact that Bush intended to shoot Castillo III is not disputed.  The fact that the shots

fired by Bush killed Castillo III is not disputed.  The only potential issue under plaintiff's battery

claim is whether there is any evidence to support the existence of a common law defense.  The

common law defenses to battery are defense of oneself, *Silfast v. Matheny*, 171 Or 1, 136 P2d

260 (1943), and defense of a third person, *Linkhart v. Savely*, 190 Or 484, 227 P2d 187 (1951).

Because Bush admits Castillo III was not posing an immediate threat to his father, and because

the physical facts render Bush's version of events precipitating his decision to shoot Castillo III

impossible, there is no evidence that would create an issue of fact on either of these defenses.

**Conclusion**

For the reasons set forth above, plaintiff is entitled to partial summary judgment in her

favor on her claim against defendant Bush under Section 1983 for violation of Castillo III's

Page 22 **- PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Fourth Amendment rights and claim against the City of Salem for its *respondeat superior*

liability for Bush's common law battery of Castillo III.

DATED:       December 21, 2023

ELLIOTT & PARK, P.C.

By:      s/ David D. Park
_____
David D. Park, OSB #803358
(Mr./he/him)
E-mail:  dave@elliott-park.com

Ron L. Sayer, OSB #951910
E-mail: rsayer@gattilaw.com
James M. Healy, OSB #123403
E-mail: jhealy@gattilaw.com
The Gatti Law Firm

Attorneys for Plaintiff