**Sebastian Tapia**, OSB No. 043761
*stapia@cityofsalem.net*
City of Salem Legal Department
555 Liberty St. SE, Room 225
Salem, OR 97301
      Telephone: (503) 588-6003
      Fax: (503) 361-2202
           Attorney for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III, <br><br> Plaintiff, <br><br> v. <br><br> NATHAN BUSH and CITY OF SALEM, a municipal corporation, <br><br> Defendants. | Case No. 6:22-cv-00684-MK <br><br><br> **DECLARATION OF ROD ENGLERT IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, Rod Englert, declare:

1.      I make this declaration from my personal knowledge, from my review of documents produced through discovery in this case, from a forensic reconstruction of the incident on October 13, 2023, from the work product of members of my team, and from discussion with other experts and sources upon whom I, and others in my profession, ordinarily rely.

2.      In the instant case, I serve as the Defendants' forensic reconstruction, ballistics, and blood interpretation expert in connection with the subject incident that occurred on July 9, 2021, in Salem, Oregon.

PAGE 1 – DECLARATION OF ROD ENGLERT IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S
       MOTION FOR PARTIAL SUMMARY JUDGMENT

3.     I have served as a forensic expert in over 580 criminal and civil cases throughout the United States, with special emphasis in crime scene reconstruction, wound ballistics firearm (including bullet provenance and trajectory) ballistics and blood pattern interpretation.

4.     I am qualified in the area of homicidal reconstruction. Homicide reconstructions utilize many specialized skills in the area of forensic science, including ballistics, blood pattern analysis, identification of rim of abrasion. I have testified over 400 times in twenty-eight states and have never been excluded to testify in a trial. As a leader of Englert Forensic Consultants ("EFC") I am currently in good standing with the American Academy of Forensics Sciences (fellow), the Association of Crime Scene Reconstructionist (Past President), Internal Association of Blood Pattern Analysts (Past President) and Certified in Force Science training. I remain active in training conferences, and personally lecture throughout the USA regarding crime scene reconstruction and blood pattern analysis.

5.     Contrary to what Plaintiff's experts contend, our reconstruction of a shooting scene involves applying the scientific method in order to determine out of a range of possibilities the most probable outcome of what occurred. Interpretation of the event analysis is based upon the evidence in the case and the education, training, and experience of the parties doing the reconstruction. A reconstructionist reviews all materials and expert opinions, if any. A reconstructionist is not an expert in many fields but has a knowledge base of all pertinent resources, i.e., forensic pathology, ballistics, DNA, and blood patterns, among a few, that allow putting pieces of an active event together.

6.     As part of my service as an expert in this case, I reviewed the Declaration of Michael A. Howard in support of Plaintiff's Motion for Partial Summary Judgment, filed on December 21, 2023 (Dkt. 67), as well as the exhibits attached thereto. In reviewing Michael A. Howard's declaration, I make the following observations regarding statements that are inaccurate or misleading, and in contradiction of the facts that are supported by physical evidence:

a. Paragraph No. 5 - There is no physical evidence that places Castillo in the short hallway for all GSWs, as supported by the following facts:

    i. Howard claims that expectorated blood was on the couch and supports Castillo was in the hallway when shot. These bloodstains are in the living room area, not in the hallway and due to their presence on a fabric substrate that was not collected and able to be examined, these bloodstains cannot be characterized as expectorated blood and should be defined as spatter stains.

    ii. Howard claims that expectorated blood was on the overstuffed chair in the living room and on the front surfaces. Due to their presence on a fabric substrate that was not collected and able to be examined, these bloodstains cannot be characterized as expectorated blood and should be defined as spatter stains. Expectorated blood was present on the knife located on the chair, however, the blankets and chair were not examined.

    iii. The projected (arterial spurt) stains on the arm, seat, and front of the overstuffed chair, impacted the chair from a source in the living room, not in the hallway, as they originate from a source in front of the chair.

    iv. I did not locate any photographs or documentation depicting the bloodstains on the tile next to the chair, allowing the determination that these are one type of spatter stain over another. No significant and conclusive physical characteristics were observed in these stains to form a conclusion that they occurred due to expiration.

    v. It is unclear how it was determined that the shot that caused damage to Castillo III's lungs was the first shot that hit him.

b. Projected bloodstain patterns were located on the front door and entryway of the residence. Blood drops were photographed on the linoleum flooring in the

entry way. Having examined those photographs, I am sure, to a certainty, that those blood drops hit the linoleum floor at 90-degrees, vertically. Attached and marked as Exhibit 2, is a true and accurate crime scene photo depicting the linoleum in the entry way, as well as the blood drops. Meaning, Castillo III was physically present at the location of those blood drops, which establishes conclusively that Castillo III had advanced forward at least to the linoleum entry way, where he dropped blood straight down onto the floor. In addition, there is a large amount of blood present on the linoleum floor with a smear in it, as though a person stepped in the blood and slipped. See Exhibit 2. However, there are no boot marks or shoe print marks, which would be present had the smear been caused by police officers or first responders. Photographs I have examined of Castillo III show that he was barefooted during this encounter and that he had blood on the bottom of his feet. Attached and marked as Exhibit 3 is a true and accurate crime scene photo depicting the bottom of Castillo III's foot with blood visible This evidence physically corroborates the conclusion that Castillo III moved forward, toward the door to the residence where he deposited a substantial amount of blood and stepped in it. Finally, I examined photographs showing a blood pattern on the inside of the door. I conclude that the blood on the inside of the door was projected downward, toward the opened core/latch side and on the outer face side of the door. The only way for such blood pattern to be present on the door is if the bleeding person was very close door with his feet on the linoleum floor. These blood patterns would be impossible if Castillo III remained in the area near the hallway behind the couch.

c.  Paragraph No. 6 – Howard states that the elapsed time permits limited body movement between the first and last shots. Howard fails to take into consideration that:

i.  The 10-inch span between the GSWs while Castillo III is bent forward and twisted requires very limited body movement, therefore, supporting his claim of limited body movement between the first and last shots.

ii.  The blood patterns on the furniture and floor exhibit significant movement within the living room, including projected bloodstains at the entry that would require Castillo III's presence within the vicinity.

iii.  The projected bloodstain patterns on the front of the chair transition from right to left if facing the chair and does not support that these stains originated from a source in the hallway.

The bloodstains on the floor transition from the right to the left (if facing the front door) indicating Castillo III was close to the front door prior to turning to his left toward the coach and then the chair.

d.  Paragraph No. 7 - The evidence contradicts Howard's statement that the GSW to the upper right arm (GSW III) places Castillo III in an erect standing position perpendicular to the front door entrance to the residence with his right side facing the entrance, his arms down at his sides and his right arm slightly outward from, in line with the right side of the body.

i.  During this shot, Castillo III's right side of his body was bladed toward the front entrance of the residence, this conclusion is not disputed.

ii.  Howard fails to take into consideration the rim of abrasion to the entrance wound, which puts the bullet entering the arm at an acute upward angle through the arm, placing the arm/elbow further out from the body.

iii. Howard also fails to take into consideration the downward angle of the bullet trajectory through the front door, which would place Castillo III close to the front door during this GSW.

iv. The defect to the front door was documented with the Faro Scan at approximately three feet up from the floor and traveling in a downward trajectory, which would continue to travel downward along that bullet path. It is not consistent that GSW III could impact Castillo III positioned in the hallway in the erect position (standing 5'8" tall) and over approximately eight feet away from the doorway given there is a downward trajectory through the front door.

v. Howard does not consider if pseudo-stippling would have been created by the door traveling over 8 feet. A tight cluster of pseudo stippling surrounding the entry wound to the upper right arm was caused by wood projectiles created from a bullet traveling through the wooden door prior to impacting Castillo III's upper right arm. In order to create such pseudo stippling the arm must have been very close, likely less than 12 inches, to the door, otherwise the wood projectiles would have spread out and lost the necessary velocity to damage the skin.

vi. The pseudo stippling wound pattern to the arm is tight and close to the GSW entrance. I would not anticipate seeing such a tight wound pattern as the impact site (arm) moves farther away from the source of the wooden projectiles. In my experience, I have not seen such a tight pseudo stippling pattern from wood missiles when the source was located over 12 inches from the origination of the wooden missiles.

e. Paragraph No. 9 – Howard states that GSW I & IV are the last two shots to strike Castillo III. It is unclear how this determination is made.

f.  Paragraph No. 10 – Howard's statements regarding the knife that was held by Castillo III are contradicted by the following:

   i.  The bloodstain patterns on this knife exhibit flow in multiple directions, primarily from the top side of the blade toward the sharp side of the blade, not from the handle to the tip. This supports that the knife was held in a horizontal pointed direction at some point before being located on the ground behind the chair. The bloodstains on this knife are consistent with Officer Bush's observations that the knife was held out in a horizontal manner.

   ii.  Howard has failed to consider the dynamic nature of such an event when considering the final location of the knife at PM9, and that various factors could have resulted in the knife being located behind the chair. Post-incident factors such as law enforcement, family, EMTs, etc., cannot be ignored as a possible source of movement. However, it is apparent that the blood on the knife had already dried prior to being deposited behind the chair and a time interval between blood deposition and movement could have occurred.

   iii.  The knife and bloodstain patterns on the black-handled knife in the hallway were never addressed by Howard.

g.  Paragraph No. 11 - Howard's statement that it is impossible for Castillo III to be charging forward with right arm raised out to the side is contradicted by the following:

   i.  Howard does not address the projected bloodstain patterns in the living room/doorway and on the door itself, which directly places Castillo III in the living room and within approximately 3+/- feet from the front entry. See Exhibit 2.

ii.  No physical evidence places Castillo III in the hallway, only in the living room, front door entry side. Even the bloodstain patterns referenced by Howard originate from the living room, not the hallway.

iii. The downward trajectory through the door places Castillo III closer to the front door and in a lowered position during the shot through the right arm, not in a fully upright position.

iv.  The bullet trajectory through the right upper arm positions the right arm outward from the torso and in a raised position, not slightly outward from the right torso.

**I hereby declare under penalty of perjury that the foregoing is true and correct.**

DATED this 1st day of February, 2024.

_____
Rod Englert