**Sebastian Tapia**, OSB No. 043761
*stapia@cityofsalem.net*
City of Salem Legal Department
555 Liberty St. SE, Room 225
Salem, OR 97301
    Telephone: (503) 588-6003
    Fax: (503) 361-2202
        Attorney for Defendants

**Andrew D. Campbell**, OSB No.  022647
Andrew@Heltzel.com
Heltzel Williams, P.C.
P.O. Box 1048
Salem, OR 97308
        Telephone: (503) 585-4422
        Fax: (503) 370-4302
        Attorney for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>        Plaintiff,<br><br>        v.<br><br>NATHAN BUSH and CITY OF SALEM, a municipal corporation,<br><br>        Defendants. | Case No. 6:22-cv-00684-MK<br><br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Defendants oppose Plaintiff's Motion for Partial Summary Judgment in that it relies on inadmissible evidence and opinions from individuals who are not qualified to render those expert opinions.  Plaintiff's arguments are based on conspiracy theories, at best, and not supported by testimony or objective evidence.

PAGE 1 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1. **Objection: Plaintiff relied on opinions from individuals who are not qualified to render such opinions.**

Defendants certify that they conferred with opposing counsel in good faith regarding this objection and that the parties were unable to reach an agreement.

Pursuant to Fed. R. Civ. Pro. Rule 56(c)(2) and LR 56-1(b), Defendants object to the proffered expert testimony from Michael Howard. While Mr. Howard may have expertise in certain criminology fields (e.g., Intoxilyzer machines or body fluid collection/analysis) he is not qualified to testify about bullet provenance and trajectory, nor is he qualified to testify about biomechanics. Finally, Plaintiff's filings do not explain the methodology used by Mr. Howard to conclude which gunshot wounds were first, second, third or fourth; rendering such conclusions unreliable and inadmissible.

Pursuant Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," provided: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a gatekeeper and determines whether expert testimony has "a reliable basis in the knowledge and experience of the *relevant discipline*" by the preponderance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993) (emphasis added). The proponent of expert testimony bears the burden of showing that the proposed testimony is admissible under Rule 702. *Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir. 2007). "District judges play an active and important role as gatekeepers examining the full picture of the

experts' methodology and preventing shoddy expert testimony and junk science from reaching the jury." *Murray v. Southern Route Maritime SA,* 870 F.3d 915, 923 (9th Cir. 2017).

The first problem relates to Mr. Howard's insufficient credentials to qualify as an expert regarding bullet trajectory analysis. An examination of his *curriculum vitea* (ECF# 67-1) lists absolutely no formal training in bullet trajectory analysis; not one, single course on bullet trajectory appears there. "[B]ullet trajectory analysis is [a] highly technical area, subject to peer-reviewed research, and some degree of standardization. Ballistics testimony requires specialized expertise." *Krause v. County of Mohave,* 459 F. Supp. 3d 1258, 1265-66 (2020) (and collecting cases); *see also, Plaintiff's Memorandum in Opposition to Defendants' Motion for Leave* (ECF# 75), at 3 (same).  Mr. Howard has a lengthy history in criminology, but *bullet trajectory analysis* is unique and by force of precedent, it requires specialized training or expertise. Given Mr. Howard's lengthy supervisory experience with Oregon State Police forensics, it is likely that he worked with criminologists who had specialized bullet trajectory training–in fact, it is likely that he supervised them–nonetheless, *his* CV reveals that *he* never obtained technical or vocational training in this specialized field. In addition to the absence of vocational training on bullet trajectory analysis, the CV also demonstrates a lack of scientific or academic study relating to ballistics and bullet trajectory. For example, Mr. Howard has not published, nor has he contributed to, any peer reviewed articles, books or studies regarding bullet trajectory analysis. Risking redundancy, there is no bullet trajectory training, either vocationally or academically, listed on Mr. Howard's CV, he is therefore not qualified to opine about bullet trajectory in this case.

The second problem relates to Mr. Howard's insufficient training about biomechanics, a topic that forms an integral part of his proffered testimony. For example, Mr. Howard posits that

"[w]hen [Mr. Castillo III] was struck with this bullet he had started to rotate slightly to his right and bend forward at the waist, but his right side was still perpendicular to the entrance and his left arm was down by his side." Howard Declaration, ¶ 8. Mr. Howard describes this as his "opinion" and offers, as the sole basis, an interpretation of a report authored by forensic pathologist Cliff Nelson, MD. *Id.* However, "[r]eading a coroner's report does not transform a police practices expert into an expert on bullet trajectory analysis." *Dominguez v. City of Los Angeles,* 2018 WL 6164278, at *8 (C.D. Cal. Oct. 9, 2018). In the same way, asking someone like Mr. Howard, who is not a board-certified physician and has absolutely no biomechanics training or education, to read a medical examiner's report and, based on that, render a scientific opinion about how/why a body was moving as it was injured is unreliable and inadmissible. The Court would no more allow this testimony than it would allow a wallpaper hanger to read a doctor's report and, based on that reading, testify as an "expert" about the biomechanics of a soft tissue injury in car crash case. Mr. Howard simply is not qualified to explain to a jury how Mr. Castillo III's body physically moved/was positioned in conjunction to different injuries; someone who has specialized training in biomechanics (like a forensic pathologist) is required for this type of testimony.

The third, and perhaps most significant problem, is the lack of scientific methodology for Mr. Howard's conclusions about the order of gunshot wounds to the deceased. First, Mr. Howard asserts that "[t]he gunshot wound of the right upper arm and chest labeled with the Roman numeral III in the autopsy report is the *first* bullet to strike Castillo III." Howard Dec., ¶ 7 (emphasis added). For this critical conclusion, Mr. Howard fails to cite anything. Mr. Howard does not offer any measurements, guides, recordings, eye-witness statements, scene schematics, scientific studies or any other source as the basis to conclude that this particular gunshot wound

represents the *first* wound suffered by Castillo III.[1] Next, Mr. Howard opines that the wound on "the left chest and left arm labeled with the Roman numeral II in the autopsy report is the *second* bullet to strike Castillo III." Howard Dec., ¶ 8 (emphasis added). As with paragraph 7, Mr. Howard does not cite any scientific or factual basis for asserting that this shot was the second wound inflicted on Castillo III. Finally, Mr. Howard opines that the wound "of the mid-chest labeled with the Roman numeral I in the autopsy report and gunshot wound of the left abdomen labeled with the Roman numeral IV *** are *the last two* shots to strike Castillo III." Howard Dec., ¶ 9 (emphasis added). Again, there is no basis offered for Mr. Howard's ordering of these wounds and, consequently, Officer Bush's shots.

Hence, Mr. Howard's attempt to testify about the order of gunshot wounds in this case must be rejected because there is no valid, scientifically reliable method for his conclusions. Instead, his conclusions appear haphazard. "The question of reliability probes 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Murray,* 870 F.3d at 922. In offering Mr. Howard as an expert, Plaintiff bore the burden of establishing that the proffered testimony was sufficiently reliable. *Cooper,* 510 F.3d at 942. By failing to disclose what method (if any) Mr. Howard used to determine the order of wounds to Castillo III, Plaintiff has simply failed to establish that there is any "scientifically valid" methodology at work. Instead of an objective, testable, repeatable method, Mr. Howard's conclusions about the order of wounds appears to be pulled from thin air. This failure renders the proffered testimony inadmissible; as the Ninth Circuit put it, it is "shoddy expert testimony and junk science" that trial courts must keep from triers of fact. *Murray,* 870 F.3d at 923.

---

[1] Mr. Howard does cite evidence about the path of the bullet once it struck Castillo III, and that the bullet may have passed through a door before contacting Mr. Castillo III, but he cites absolutely *nothing* indicating the wound was the first wound suffered by Castillo III.

### 2. Response to Plaintiff's Partial Motion for Summary Judgment

#### a. Plaintiff's Motion is built upon evidence viewed in the light most favorable to Plaintiff

Mr. Howard relies on Ex. 5 to establish where Castillo III was located when Officer Bush opened the door to the house, by using a series of inferences all drawn in favor of Plaintiff's motion. Mr. Howard relies on "point 4," which is identified as the "location of suspect when Officer Bush opened the front door." However, the relevant question is where Castillo III was located when the first shot was fired. Mr. Howard accepts as truth Plaintiff's own witnesses' statements that Castillo III did not move while ignoring Defendant Bush's statement concerning point 6, which is where Castillo III fell. Plaintiff's analysis should have been based on the facts as favorable to the non-moving party (Defendants). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

First, Mr. Howard assumes that the stainless steel knife is the one that Castillo III held in his right hand during his encounter with Defendant Bush. However, that assumption is contrary to the evidence, which creates a question of fact. Plaintiff simply assumes that the knife that Castillo III held while assaulting Misty Castillo was the same one that he held when confronting Defendant Bush. As a result, he relies on Misty Castillo's description of the knife and blankly assumes that Castillo III did not pick up a different knife before Officer Bush arrived. But in doing so, Mr. Howard ignores the undisputed fact that after assaulting/menacing Misty Castillo with a stainless steel knife outside of the home, Castillo III went inside the residence where he remained until Officer Bush confronted him. All of this to say, simply because Castillo III used a stainless steel knife on Misty Castillo, it does not necessarily follow that the knife observed by

Officer Bush was the same stainless steel knife that ended up behind the recliner. Defendants maintain that the knife with the plastic handle was the knife Castillo III held, Plaintiffs contend (based on pure conjecture) that Castillo III held the stainless steel knife.

In addition, Defendant Bush testified that he "kicked the knife back toward the back of the house." Grand Jury Tr. 13:18-19. The location of the large, black handled knife is depicted in the computer scene recreation incorporated into Plaintiff's Motion for Partial Summary Judgment (ECF# 66), page 19. It was also photographed in its location. Tapia Dec., Ex. 7, at page 10 ("image 6"). Mr. Howard does not explain why the stainless steel knife, which was recovered behind the recliner, *must* be the knife that Castillo III brandished at Officer Bush. Nor does Mr. Howard explain why the black handled knife could *not* have been the knife brandished at Officer Bush. It appears that Mr. Howard simply picked one of the knives, the one most advantageous to Plaintiff's theory of the case, and designated that knife as "the" knife. In other words, at best, there is a question of fact on this point; and since this point anchors Plaintiffs' expert conclusion about where Castillo III was when he was shot, this question of fact defeats the rest of Plaintiff's argument. It all boils down to Mr. Howard's questionable, baseless, assumptions.

That question of fact, however, is not "genuine" because, as detailed in Defendants' motion for summary judgment, contrary to Mr. Howard's assumptions, the evidence *objectively* indicates that the black handled knife was the knife in Castillo III's hand when he was shot. The blood patterns found on the knife with the black handle correspond with Defendant Bush's description of the knife the kicked back toward the back of the house. Tapia Dec., Ex. 7, at p. 31 ("image 39"). The small air bubbles observable on the black handled knife indicates the presence of arterial blood. Englert also demonstrates that the blood pattern on the black handled knife

indicates motion between the knife and another surface while the blood was still wet, which is objectively consistent with the knife being kicked across the ground. Tapia Dec., Ex. 7, at p. 31 ("image 41");  ECF 32, p. 30, 31.  No similar swipe patterns are found on the silver handled knife. ECF 32, p. 32.

In addition, the parties agree that Castillo III was struck by 4 bullets. The parties further agree that one bullet, labelled Gunshot Wound Number III by Dr. Nelson, passed through Castillo III right-to-left. Deposition of Cliff Nelson (ECF# 70-1), 17:13-21. Regarding this wound, the parties agree that it was only possible if Castillo III's right side facing was Officer Bush at the time of the shot. *Id*., 20:6-17.

The parties also agree about "Gunshot Wound Number I" (again, as labelled by Dr. Nelson). This gunshot wound hit Castillo III almost square in the chest: "path goes from front to back, *very* slightly right to left, and downward." Nelson Depo., 28:23-35 (emphasis added).  The parties agree that to receive this bullet wound, Castillo III would have been "more or less facing the shooter." *Id.,* 29:8-9.

Plaintiff simply assumes that Gunshot Wound Number III was the first shot by Officer Bush; hence, according to Plaintiff, given the trajectory of that bullet, that Castillo III was not facing, nor charging, Officer Bush when he was shot. Instead, according to Plaintiff, Castillo III was benignly facing toward the hallway, perpendicular to Officer Bush. Based on this pure assumption, Plaintiff prays for summary judgment. However, if Gunshot Wound *Number I* was in fact the first shot fired by Officer Bush, at the time of the shooting Castillo III was indisputably facing/charging Officer Bush, just as he explained. If this was the case, the three rapid follow-up shots came as Castillo III contorted as he reacted to being shot.

In sum, Plaintiff is not entitled to summary judgment because a reasonable juror could easily conclude, and likely will conclude, that Castillo III was facing Officer Bush and armed with a large knife that he refused to drop and advanced toward the officer. A reasonable juror could easily conclude, and likely will conclude, that Castillo III, knife in hand, moved toward the officer and that Officer Bush responded with 4 very rapid shots: initially striking Castillo III almost square in the chest, and then 3 other rapid shots as Castillo III turned and crumpled. A reasonable juror will conclude that this scenario explains the various wounds to Castillo III and is not a violation of any constitutional rights.

**b.  Genuine Questions of Fact remain regarding the Stainless Steel Knife**

Assuming purely for sake of argument that the stainless steel knife was the knife Castillo III was holding when shot, Plaintiff asserts that "[t]he *only* way for the knife" to have come to rest at its location (behind the recliner) is if Castillo III was holding the knife down low, near the crack between the recliner and wall when he dropped it. ECF# 66, at 22 (emphasis added). But this is a glaring example of Plaintiff presenting the evidence in a way that awards herself–the moving party–all inferences, contrary to Rule 56.

For her movant-friendly assertion, Plaintiff relies solely on Mr. Howard's conclusion that the recliner was pushed up tight against the wall such that a knife could not have been dropped from shoulder-level and slipped between the back of the recliner and the wall. Howard Dec., ¶ 10. Mr. Howard, in turn, relies exclusively on a single photo, submitted as Exhibit 9 (ECF# 67-7), for this proposition. However, Exhibit 9 is far from indisputable evidence. Examination of that photograph does not lead to the indisputable conclusion that the tan recliner is so tight against the wall that it would have been impossible for a knife, dropped from approximately shoulder level, to slip between the over-stuffed recliner and the wall. In fact, upon close

inspection of Exhibit 9 there appears to be a crack, or gap, between the back of the over-stuffed recliner and the wall behind it. In sum, a reasonable juror could disagree with Mr. Howard about "the *only* way" for the stainless steel knife to have ended up behind the tan recliner. A reasonable juror could look at Exhibit 9 and conclude that it is possible, indeed quite likely, that a heavy, stainless steel knife, dropped suddenly from shoulder-height, would naturally and easily slip behind the recliner and come to rest on the floor.

Further counseling against Mr. Howard's "only way" conclusion about the stainless steel knife's location is Mr. Englert's common sense observation that the knife could have easily been kicked or displaced by family members, emergency medical responders or even police officials in their rush to assess Castilo III. *See,* Declaration of Rod Englert, ¶ 7(e)(ii).  Furthermore, the dried blood on the blade of the knife is flows "primarily from the top side of the blade toward the sharp side of the blade, not from the handle to the tip." Englert Dec., ¶7(e)(i). Again, the common sense conclusion is that when the large amount of blood was deposited onto the knife, it was being held horizontally, or in a pointing position, just as Officer Bush explained; not down at Castillo III's side, as Mr. Howard concludes.

    c.   **There is no *genuine* question of fact: Castillo III closed the distance between himself and Officer Bush.**

The conclusions of Mr. Englert are scientific and are not genuinely in dispute. Plaintiff may hypothetically disagree and may harbor hope that a jury might also disagree, but such metaphysical doubt cannot overcome Defendants' Motion. *Matsushita Elect. Ind. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  A scientific review of the evidence at the scene by a qualified expert indicates that Castillo III advanced on Officer Bush.

The linoleum floor of the entry way of the house had blood drops that fell vertically and contacted the ground at or near 90-degrees. Declaration of Rod Englet in Support of Defendant's Response to Plaintiff's Motion for Partial Summary Judgment (hereafter "Englert Dec. II"), ¶ 6(b). As a simple matter of common sense, the only possible way for the blood drops to be at that location is if the bleeder (Castillo III) was there and the blood fell from him. This evidence alone proves conclusively that Castillo III advanced on Officer Bush.

Yet, the blood drops are not the only physical evidence that corroborates Officer Bush's account. In addition, Mr. Englert identified a smear in the blood on the linoleum floor. *Id.* Mr. Englert concludes that the smear is not from police, EMT's or fire fighters because there is no boot mark or shoe imprint present in the smear itself nor leading away from it. *Id.* Moreover, Mr. Castillo III was barefooted and the bottom of his feet have blood on them, further corroborating Officer Bush's account that Castillo III advanced all the way to the entry way, where his bare feet smeared the blood.

In addition, the fact that blood smear, striking in a downward direction, appear on the door establish, conclusively, that Castillo III approached Officer Bush. As Mr. Englert explains, it would be physically impossible for that blood to be at that location if, as Plaintiff posits, Castillo III remained near the back of the house.

A final piece of objective evidence corroborates Officer Bush's account: the pseudo stippling present around GSW III on Castillo III. Forensic pathologist Dr. Nelson identified the pseudo stippling in his autopsy of Castillo III. Dr. Neslon testified that these markings indicate "that something else struck his skin besides the bullet immediately above the bullet hole." Nelson Depo., (ECF#70-1) 19:15-17. Dr. Nelson agreed that the markings were likely "debris associated with that bullet having passed through another object." *Id.,* 19:18-20. Dr. Nelson also agreed that

bullet associated with GSW III likely passed through the door of the house. *Id.,* 25:10-12. On this point the parties agree. *See, Plaintiff's Motion* (ECF#66), at 18.

In order for Dr. Nelson's stated explanation to be true (and neither party disputes Dr. Nelson's conclusions), the pseudo stippling were the result of tiny pieces of wood that became projectiles due to the bullet piercing the door. Englert Dec., II, ¶ 6(d)(v). If Castillo III was any further than approximately 12 inches from the door, the wood could not have caused the marks observed by Dr. Nelson.

In sum, the physical, observable and scientifically verifiable evidence from the scene of the shooting indicates, indisputably, that Castillo III approached Officer Bush.

<u>Plaintiff's Application of *Graham v. Connor*</u>

Plaintiff's application of the *Graham v. Connor*, 490 U.S. 386 (1989) factors misses the mark, however, with that said, Defendants agree that Plaintiff has properly set forth those factors.

1. <u>Immediate Threat</u>

The "'most important' factor under Graham is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) *citing George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Plaintiff observes, and Defendants do assert otherwise, that a person lawfully holding a weapon–even a lethal one– cannot be subjected to lethal force by police simply for possessing the weapon. *Plaintiff's Motion* (ECF# 66) at 24. However, "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George,* 736 F.3d at 838. This is particularly true in cases like the one at bar, involving close quarters where a knife or other edged weapon is involved.

For example, in *Blanford v. Sacramento County,* police encountered Blanford walking down the street with a sword. 406 F.3d 1110, 1112 (9th Cir. 2005). While no one was near Blanford, police were "extremely concerned that Blanford posed a significant danger to any individual who *might* come near him or to [themselves] *if* he turned and charged." *Id.* (emphasis added). Eventually, after orders to drop the sword went ignored, the officers shot Blanford multiple times, despite no one in his proximity and despite the lack of any physical aggressiveness toward the officers, as he attempted to enter a residence. *Id.,* 1113-1114. In short, the Ninth Circuit held that the officers' belief about the *potential* imminent danger, even if later proven incorrect in a courtroom, justified the use of deadly force. *Id.,* 1119.

Hence, Plaintiff's presentation of the law on this point is misleading. While it is true that simply holding a weapon is not justification for the application of lethal force, it is equally true that an "imminent threat" does not require an actual, or attempted, physical attack, strike or lunge. Instead, as *Blanchard* holds, if a person possesses a lethal weapon (as Castillo III did), ignores orders police orders (as Castillo III did), acts unpredictably, threateningly or furtively (as Castillo III did), lethal force is justified *even if* the officers' assessment of the "imminent threat" is later picked apart and discredited in the relative calmness of a courtroom with the benefit of hindsight and lawyers.

The court must be mindful about "officers [who] were placed in a high-stress, rapidly developing situation involving a person who had reportedly assaulted [family members] and threatened others, and who was violently resisting the officers and assaulting them in an enclosed area." *Smith v. Agbeppa,* 81 F.4th 994, 1004 (9th Cir. 2023). *See, Plaintiff's Motion* (ECF#66) at 9 (conceding that the report to Officer Bush that initiated the contact was that Castillo III was "assaulting family members and armed with a knife.")

At bottom, Plaintiff's possession of a knife alone is not the basis for lethal force in this case. Instead, it is the totality of the circumstances that created–in Officer's Bush's mind during the few precious seconds he had to process what was happening[2]–an objectively reasonable perception of imminent danger to himself or others. This "most important" factor weighs in favor of the use of deadly force.

2. Castillo III's Criminal Activity

Again, Plaintiff's assessment of the law here is correct but misleading. Plaintiff is correct that in *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005), the court did state, in dicta: "[a]lthough we are mindful of the seriousness and reprehensibility of domestic abuse, the circumstances are not such in this case as to warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." The discord between the court's "acknowledgment" of the seriousness of domestic violence crimes and its eagerness to, in the same breath, ignore that seriousness is unsettling. Fortunately, it is only dicta. Also fortunately, District Courts in this District have a firmer grasp on the seriousness of domestic abuse. *See McCrae v. Larned,* 2022 WL 4451844, at *8 (D. Or. July 14, 2022) *recommendation adopted* 2022 WL 4447486 (Sept. 23, 2022) (holding assaultive felonies justify an elevated use of force and collecting cases).

Plaintiff's assertion of Castillo III's criminal activity is only partially correct. Plaitniff states that "the only" crimes Castillo III "may have committed" are Assault IV, ORS 163.160 and Menacing, ORS 163.190. Based on this, Plaintiff surmises that Castillo III was a mere misdemeanant. It is true that Castillo III committed the very serious domestic violence crimes of Assault in the Fourth Degree and Menacing, but it is not true that those are all the crimes he

---

[2] *Graham,* 490 U.S. at 396 (use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.)

committed. Castillo III took the phone away from Misty Castillo when she tried to call 911, that interference constitutes the additional crime of Interfering with Making a Report, ORS 165.572. Deposition of Misty Castillo, 186:2-187:7. More importantly, Castillo III was reportedly threatening his mother and father with the knife. Misty Castillo Depo., 191:12. Such conduct constitutes Unlawful Use of a Weapon, ORS 166.220.[3] All of these crimes qualify as "persons crimes" under Oregon law; but Unlawful Use of a Weapon is a person crime and it is felony offense. Hence, like the conduct at issue in *McCrae, supra,* Castillo III committed heinous, violent, felonious crimes.

This factor weighs in favor of the government's interest in using force. *McCrae,* 2022 WL 4451844, at *8.

3. Attempt to Resist or Flee

Plaintiff concedes that when Officer Bush "called out" to Castillo III, he turned, walked away, entered the house and closed the door. *Plaintiff's Motion* (ECF#66), at 10. At no time, event viewing the evidence in a light favorable to Plaintiff, did Castillo III comply with police commands. While Plaintiff may not have been "fleeing" or actively attempting to leave the scene, he was armed and indisputably uncooperative. Hence, this factor also weighs in favor of the government's interest in using force.

////

////

////

////

---

[3] In fact, Castillo III likely also committed Kidnapping in the Second Degree, ORS 163.225, or at least the inchoate crime of Attempted Kidnapping in the Second Degree, for attempting to forcibly move Misty Castillo from the relative safety of her public driveway back inside the house against her will.

**Conclusion**

Plaintiff is not entitled to Partial Summary Judgment. At best for Plaintiff, material questions of fact remain; at worst the evidence uniformly supports Officer Bush's version of events.

DATED this 6th day of February, 2024.

*s/Sebastian Tapia*
Sebastian Tapia, OSB No. 043761
stapia@cityofsalem.net
Attorney for Defendants

Andrew D. Campbell, OSB No.  022647
Andrew@Heltzel.com
Attorney for Defendants