David D. Park, OSB #803358
ELLIOTT & PARK, P.C.
Abernethy House
324 S. Abernethy Street
Portland, OR 97239-8529
Telephone:    (503) 227-1690
Facsimile:    (503) 274-8384
E-mail:  dave@elliott-park.com

Ron L. Sayer, OSB #951910
James M. Healy, OSB #123403
The Gatti Law Firm
235 Front St., SE, Ste. 200
Salem, OR 97301
Telephone: (503) 363-3443
Facsimile: (503) 371-2482
E-mail: rsayer@gattilaw.com
          jhealy@gattilaw.com

        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MISTY CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>                    Plaintiff,<br><br>      v.<br><br>NATHAN BUSH and CITY OF SALEM, a municipal corporation,<br><br>                    Defendants. | Case No. 6:22-cv-00684-MK<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

<u>Page</u>

**INTRODUCTION** ......................................................................................... 1

**SUMMARY JUDGMENT STANDARD** ................................................. 2

**SUPPLEMENTAL STATEMENT OF FACTS** ..................................... 4

**OBJECTIONS TO EVIDENCE** ............................................................. 5

    I.    <u>All of Rod Englert's Expert Opinions Should be Excluded</u> .......... 5

        A.    <u>Legal Standard for Admission of Expert Testimony</u> ........ 5

        B.    <u>Mr. Englert lacks the qualifications to opine on body positions and shot sequence.</u> ............................................. 7

        C.    <u>Mr. Englert's reconstruction of the shooting is not based on reliable principles and methods.</u> ........................... 9

        D.    <u>Numerous of Mr. Englert's opinions and statements concern matters that are not relevant, not helpful and invade the province of the jury.</u> ........................................ 14

**ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT** ......... 16

    I.    <u>Defendants are not entitled to summary judgment on plaintiff's claim that defendant Bush unlawfully entered the Castillo residence.</u> ........ 16

        A.    <u>Circumstances known to Bush prior to entry of Castillo residence.</u> 16

        B.    <u>Consent to enter the Castillo residence was not given. Alternatively, facts material to the issue of consent are in dispute.</u> ........ 19

        C.    <u>Emergent circumstances were not present.</u> ...................... 22

            1.    <u>There are triable issues whether Arcadio Jr. was in immediate need of protection from harm.</u> .......... 23

            2.    <u>The manner and timing of entry were unreasonable</u> ... 25

            3.    <u>Bush is not entitled to qualified immunity</u> ............... 26

**Page**

II.    Defendants are not entitled to summary judgment on plaintiff's claims     27
that defendant Bush's use of deadly force was excessive under the Fourth
Amendment and a battery state law.

III.   Salem ratified Bush's unlawful entry and use of deadly force     28

   A.    Evidence of ratification     29

IV.    Defendants are not entitled to summary judgment on plaintiff's *Monell*     30
theory that SPD maintained a longstanding custom and practice of failure
to conduct *bona fide* internal review of OIS events.

   A.    The Internal Review Standards Necessary to Detect and Prevent     33
Use of Unconstitutional Deadly Force

   B.    Salem's Longstanding Methodology for Conducting Internal     34
Review of OIS Events Was Inadequate to Detect and Prevent
Use of Unconstitutional Deadly Force

      1.    Inadequate Policy Directives     34

      2.    Reliance on Criminal Investigation     35

      3.    No Interview of Involved Officer     39

   C.    The Internal Review of Bush's OIS Demonstrates Salem's     40
Ongoing Deliberate Indifference to the Substantial Risk that
its Internal Review Policy is Inadequate to Detect and
Prevent Unconstitutional Uses of Deadly Force.

   D.    Plaintiff's Expert's Examination of Salem's Internal Reviews     47
of OIS from 2011 to 2021 Shows a Recurring Practice of
Conducting Substandard Investigations of which Salem
knew or should have known and for which no corrective action
was taken.

V.     Defendants Are Not Entitled to Summary Judgment on Plaintiff's     49
Negligence Claim


**CONCLUSION**     52

**TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE**

*Abdul-Jabbar v. General Motors Corp.,* 85 F.3d 407 (9th Cir.1996)          3

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)                          3

*Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624 (9th Cir. 2022)    28

*Alves v. Riverside County*, Case EDCV 19-2083 JGB, 2023 WL 2983583,       7,15
    *10-*12 (C.D. Cal. Mar. 13, 2023)

*Estate of Barabin v. Asten Johnson, Inc.*, 740 F.3d 457 (9th Cir 2014)    6,9

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996)                   32

*Bratcher v. Polk County*, No. 3:20-cv-02056-SB, 2022 WL 17184419,         4,49,50
    at *18 (D. Or. Sept. 1, 2022) and 2022 WL 17178266, at *1
    (D. Or. Nov. 23, 2022)

*L.K. by and through Brown v. City of Stockton*, 2020 WL 4043017           32
    (E.D. Cal., July 17, 2020)

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019)                             7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)                            3

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999)                          29

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)   35

*Claar v. Burlington Northern R. Co.*, 29 F.3d 499 (9th Cir 1994)          9

*Dasho v. City of Federal Way*, 101 F.Supp.3d 1025 (W.D. Wash. 2015)       13,14

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)               6,14

*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311 (9th Cir. 1995)             6,7

*Dold v. v. Snohomish County*, 649 F.Supp.3d 1084 (W.D. Wash. 2022)        16

*Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *8 (C.D. Cal. Oct. 9, 2018)   8

*Dorger v. City of Napa,* No. 12-440, 2012 WL 3791447, at *5 (N.D.Cal. Aug. 31, 2012)   28

*Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)                             4

**CASES (continued)**                                                                          **PAGE**

*Felder v. Casey,* 487 U.S. 131 (1988)                                                            4

*Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir 1995)                                          28

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512,                                           9
    1339 L.Ed.2d 508 (1997)

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013)                                                  27

*Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006)                  19,20,27

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175 (9th Cir. 2002), *overruled on other*                 30
    *grounds* in *Castro v. Cnty. of Los Angeles,* 833 F.3d 1060 (9th Cir. 2016)

*Gilbert v. Delmore*, 979 F.2d 1342 (9th Cir. 1992)                                               29

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)                                        23

*Guaranty Trust Co. v. York,* 326 U.S. 99 (1945)                                                   4

*Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008)                                    30

*Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013)                                      27

*Henry v. Cnty. of Shasta,* 132 F.3d 512 (9th Cir.1997)                                           28

*Hopkins v. Bonivicino*, 573 F.3d 752 (9th Cir. 2009)                                             22

*Hunt v. Cromartie,* 526 U.S. 541 (1999)                                                           3

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014)                                                 30

*Johns v. City of Eugene*, No. 6:16-cv-00907-AA, 2018 WL 634519,                            3,4,49,50
    at *11 (D. Or. Jan. 30, 2018), *rev'd on other grounds and*
    *remanded*, 771 F.App'x 739 (9th Cir. 2019)

*Krause v. County of Mohave*, 459 F.Supp.3d 1258 (D. Az. 2020)                                     8

*Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999) *amended*, 319 F.3d 1073                      6
    (9th Cir 2003) *overruled on other grounds*

*Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991)                                      28

*Mendez v. County of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018)                                  26

**CASES (continued)**                                                      **PAGE**

*Mukhtar v. Cal. State. Univ.*, 299 F.3d 1053 (9th Cir. 2002), *amended*,       6
    319 F.3d 1073 (9th Cir 2003)

*Pavao v. Pagay*, 307 F.3d 915 (9th Cir 2002)                                  20

*Peck v. Montoya*, 51 F.4[th] 877 (9th Cir. 2022)                              2,26,27

*Primiano v. Cook*, 598 F.3d 558 (9th Cir 2010)                                  6

*Randolf* in *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018)     20,22,23,27

*Richards v. Wisconsin*, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997)    25,27

*Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005)                      9

*Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142 (9th Cir 2005)                   3

*Rodriquez v. Cty. Of Los Angeles*, 891 F.3d 776 (9th Cir. 2018)              32

*Sankovich v. Life Insurance Co. of North Carolina,* 638 F.2d 136 (91h Cir 1981)  3

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)  20

*Son v. Ashland Cmty. Healthcare Servs.*, 244 P.3d 835 (Or Ct. App. 2010)        51

*T W Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626          3
    (9th Cir. 1987)

*Taybron v. City & County of San Francisco,* 341 F.3d 957 (9th Cir. 2003)      3

*Tolan v. Cotton*, 572 U.S. 650, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014)         26
    (*per curium*)

*Trevino v. Gates,* 99 F.3d 911 (9th Cir. 1996)                                  28

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)                   30,31

*Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968 (9th Cir. 2002)        30

*United States v. Albrektsen*, 151 F.3d 951 (9th Cir. 1998)                    22

*US v. Barnard*, 490 F.2d 907 (9th Cir 1973)                                     14

*US v. Binder*, 769 F.2d 595 (9th Cir 1985) *overruled on other grounds by*      14
    *US v. Morales*, 108 F.3d 1031 (9th Cir 1997) (*en banc*)

| CASES (continued) | PAGE |
|---|---|
| *United States v. Black*, 482 F.3d 1035 (9th Cir. 2007) | 16 |
| *United States v. Ramirez*, 523 U.S. 65, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) | 25 |
| *U.S. v. Russell*, 436 F.3d 1086 (9th Cir. 2006) | 24,25 |
| *United States v. Shaibu*, 920 F.2d 1423 (9th Cir. 1990) | 20,22 |
| *United States v. Snipe*, 515 F.3d 947 (9th Cir. 2008) | 22,25 |
| *U.S. v. Zermeno*, 66 F.3d 1058 (9th Cr. 1995) | 25,51 |
| *Velazquez v. City of Long Beach*, 793 F.3d 1010 (9th Cir. 2015) | 32 |

**STATUTES AND LAWS**

| | |
|---|---|
| 18 U.S.C. Section 3109 | 25,51 |
| 42 U.S.C. Section 1983 | 3,49,50,52 |
| Fourth Amendment | 19,23,25,27,50 |

**RULES**

| | |
|---|---|
| Fed.R.Civ.P. 56 | 2 |
| FRE 201 | 36 |
| FRE 702 | 5,6,9,14 |
| LR 56-1(b) | 5 |

**OTHER SOURCES**

| | |
|---|---|
| Websters New World Dictionary, 3d College Ed. (1988) | 8 |

**David D. Park, OSB #803358**
dave@elliott-park.com
Elliott & Park, PC
Abernethy House
324 S. Abernethy Street
Portland, OR 97239-8529
Telephone: 503-227-1690
Facsimile: 203-274-8384

**Ron L. Sayer, OSB #951910**
rsayer@gattilaw.com
**James M. Healy, OSB #123403**
jhealy@gattilaw.com
The Gatti Law Firm
235 Front St. SE, Ste. 200
Salem, Oregon, 97301
Telephone: 503-363-3443
Fax: 503-697-0841

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>Plaintiff,<br><br>v.<br><br>NATHAN BUSH and CITY OF SALEM, A municipal corporation<br><br>Defendants. | Case No. 6:22-cv-00684-MK<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff's Motion for Partial Summary Judgment argues that the physical evidence allows

for only one possible explanation why defendant Bush shot and killed Arcadio Castillo, III – Bush

saw a knife in his hand and in the 4.1 seconds it took Bush to twice say "drop the knife," he fired.

**Page | 1 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
           SUMMARY JUDGMENT**

The extremely brief interval of time between the opening of the door and the shooting, alone, places the credibility of defendant Bush's claim that Castillo III was charging him with knife raised in dispute. But there is also forensic evidence from the crime scene and witness testimony. If that additional evidence does not render Bush's account of the shooting contrary to the physical facts (impossible) as plaintiff's motion argues, it most certainly creates a triable issue whether Castillo III posed an immediate threat and requires the denial of summary judgment to defendants on plaintiff's excessive deadly force and battery claims. *Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022).

There are two catalysts for this tragedy, defendant Bush's decision to open the front door of the Castillo residence when and in the manner that he did, the subject of plaintiff's claims for unlawful entry and negligence, and Salem's longstanding custom and practice of not conducting *bona fide* internal review of officer-involved shooting ("OIS") events and ratification of unconstitutional acts by express approval of those internal reviews, the subject of plaintiff's *Monell* claims against the City of Salem. Material issues of fact surrounding the objective reasonableness of Bush's belief that Castillo III posed an immediate threat to Castillo Jr. and the manner and timing of his entry require denial of summary judgment to defendants on the entry claim. Plaintiff's evidence that Salem's Chief of Police, Trevor Womack, ratified Bush's unconstitutional acts and that he and his predecessors were deliberately indifferent to the risk that Salem's methodology for conducting internal review of OIS events was inadequate to detect and prevent unconstitutional uses of deadly force require denial of summary judgment to defendant Salem on the *Monell* claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must first show an absence of an issue of

**Page | 2 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The substantive law governing a claim or defense determines whether a fact is material. *T W Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).  An issue is "genuine" if a reasonable jury could return a verdict in fact of the non-moving party.  *Rivera v. Phillip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir 2005).  In making that determination, a court must view the evidence "in the light most favorable to the party opposing the motion."  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970). Thus, reasonable doubts about the existence of a factual issue are to be resolved against the moving party. *Id.* at 330-31. Even when the facts are not in dispute, summary judgment is improper when competing inferences can be drawn from undisputed facts on material issues. *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999); *Sankovich v. Life Insurance Co. of North Carolina,* 638 F.2d 136, 140 (9th Cir. 1981).

In a summary judgment determination, the role of the jury is to be preserved with respect to determining credibility, weighing the evidence, and drawing legitimate inferences from the facts. *Abdul-Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996); *see Taybron v. City & County of San Francisco,* 341 F.3d 957, 959 n 2 (9th Cir. 2003) (at the summary judgment stage, the court erred in "weighing ... the evidence and making findings rather than focusing on whether genuine issues of material fact are in dispute.").

With regard to plaintiff's negligence claim, plaintiff acknowledges that Oregon district courts have historically dismissed negligence claims at the summary judgment stage when those claims are based on the same set of facts as civil rights claim brought pursuant to Section 1983.  Here, plaintiff's negligence claim for wrongful death is based on substantially the same set of facts as plaintiff's unlawful entry claim.  Recent rulings from two Oregon district court judges have reconsidered this practice and allowed the negligence claims to proceed, *Johns v. City of Eugene*, No. 6:16-cv-00907-AA, 2018 WL 634519, at *11 (D. Or. Jan. 30, 2018), *rev'd on other grounds and*

**Page | 3 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
          SUMMARY JUDGMENT**

*remanded*, 771 F. App'x 739 (9ᵗʰ Cir. 2019), and *Bratcher v. Polk County*, No. 3:20-cv-02056-SB, 2022 WL 17184419, at *18 (D. Or. Sept. 1, 2022) and 2022 WL 17178266, at *1 (D. Or. Nov. 23, 2022) (J. Hernandez, Order adopting Findings & Recommendations). Plaintiff urges this court to adopt the reasoning of *Johns* and *Bratcher*.[1]

## SUPPLEMENTAL STATEMENT OF FACTS

For efficiency and clarity, plaintiff will incorporate her supplemental statements of fact in her claim-specific responses and arguments in opposition to summary judgment. As set forth in plaintiff's response arguments below, the record evidence presents the following genuine issues of material fact:

1.      Whether defendant Bush held an objectively reasonable belief that Arcadio Castillo, Jr. was in imminent danger.

2.      Whether the manner and timing of defendant Bush's entry into the Castillo residence was objectively reasonable and/or unreasonably created a foreseeable risk of a need to use deadly force.

3.      Whether defendant Bush used deadly force against Castillo simply because he saw that Castillo III was holding a knife.

4.      Whether Salem was deliberately indifferent to the risk that its long-standing custom or practice of not conducting *bona fide* internal investigations of officer-involved shooting ("OIS") events would lead to an unlawful use of deadly force.

---

[1] The *Felder* doctrine would also appear to weigh heavily against acceptance of Oregon district courts' historical practice. *"Under Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938), when a federal court exercises diversity or pendent jurisdiction over state law claims, 'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'" *Felder v. Casey,* 487 U.S. 131, 152 (1988) (quoting *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945)).

**Page | 4 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**                    SUMMARY JUDGMENT**

5.     Whether Salem, acting through its Chief of Police, Trevor Womack, ratified defendant Bush's actions.

<b>OBJECTIONS TO EVIDENCE</b>

**I.     <u>All of Rod Englert's Expert Opinions Should be Excluded</u>**

Plaintiff's counsel certifies that he has conferred with defense counsel regarding plaintiff's evidentiary objections to the expert witness report of Rod Englert as required by LR 56-1(b).  *See* Declaration of David D. Park in Opposition to Defendants' Motion for Leave to File Supplemental Declaration, ECF 76.

Plaintiff objects and moves to strike the expert testimony, opinions and conclusions of Rod Englert contained in the Expert's Reconstruction Report ("Englert Report"), ECF 62-1, and in the Supplemental Declaration of Rod Englert in Support of Defendants' Motion for Summary Judgment ("Englert Decl."), ECF 82, regarding Castillo III's location within his residence when struck by bullets, the sequencing of gunshot wounds and the location and positioning of Castillo III's body during and immediately after the shooting.

A.     <u>Legal Standard for Admission of Expert Testimony</u>

On December 1, 2023, the new amendments to FRE 702 went into effect.  Rule 702 now reads (new language in bold):

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form an opinion or otherwise **if the proponent demonstrates to the court that it is more likely than not that:**
> (a) The expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert's opinion **reflects a reliable application of** the principles and methods to the facts of the case.

The commentary states:

**Page | 5 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The new language is intended to clarify rather than substantively change Rule 702. The advisory committee found that courts were incorrectly presuming that expert testimony was admissible and that two of the requirements in Rule 702 – that an expert rely on sufficient facts or data and has reliably applied a reliable methodology – went to weight, not admissibility. The amendments emphasize the judge's role as gatekeeper of what expert testimony should be admitted for the trier of fact to consider.

The Ninth Circuit has explained the countervailing interests at play when a district judge is exercising the responsibility of a *Daubert* gatekeeper. A trial court's gatekeeping obligation to admit only expert testimony that is both reliable and relevant is especially important "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *Mukhtar v. Cal. State. Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002), *amended*, 319 F.3d 1073 (9th Cir 2003) *overruled on other grounds Estate of Barabin v. Asten Johnson, Inc.*, 740 F.3d 457 (9th Cir 2014). Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

The trial court is accorded wide discretion when acting as gatekeeper. *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151-52 (1999). As an initial matter, the court must determine if a witness has the required expertise, whether it be "scientific, technical or other specialized knowledge" under Rule 702(a). Next, the court must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993). The expert must employ methods that exhibit the same "intellectual rigor" that would be expected of other individuals in the same field. *Mukhtar*, 299 F.3d at 1063 (quoting *Kumho Tire*, 526 U.S. at 152). Opinions based on unsubstantiated generalizations or opinions not derived by the scientific method must be excluded. *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311,

1316 (9th Cir. 1995). As discussed below, Mr. Englert's proposed testimony does not pass muster under *Daubert*.

  B.  <u>Mr. Englert lacks the qualifications to opine on body positions and shot sequence.</u>

As a threshold matter, Mr. Englert has lied about his qualifications in his Supplemental Declaration of Rod Englert in Support of Defendants' Motion for Summary Judgment. Mr. Englert states at paragraph 4, page 2 that, "In the instant case *I serve as the Defendants'* forensic reconstruction, *ballistic* and blood interpretation *expert* in connection with the subject incident that occurred on July 9, 2021." On August 16, 2022, Mr. Englert was deposed in *Barbosa v. Shasta County*, U.S. District Court, Eastern District of California, Case No. 2:20-cv-02298, Mr. Englert testified, under oath, "I'm not a ballistics expert." Park Decl., Exh.6, Englert dep. 26:16-17.

Paragraph 5, page 2, of the Englert Decl. states, "I have testified approximately 400 times in twenty-eight states and have never been excluded to testify in a trial." Less than one year ago, in *Alves v. Riverside County*, Case EDCV 19-2083 JGB, 2023 WL 2983583, *10-*12 (C.D. Cal. Mar. 13, 2023), the district court excluded Mr. Englert's testimony in its entirety.

Mr. Englert was a principal defendant in *Camm v. Faith*, 937 F.3d 1096, 1106 (7th Cir. 2019), which arose in substantial part from misrepresentations and omissions he was alleged to have made about the professional qualifications one of his subordinates, Robert Stites, after Englert Forensics was employed to evaluate blood evidence collected from the scene of a murder.[2] The U.S. Court of Appeals for the Seventh Circuit had this to say about Mr. Englert, "there is a wealth of evidence here that Stites, Englert, Faith and Clemons contributed false statements and withheld crucial information, either intentionally or with reckless disregard for the truth."

---

[2] The plaintiff was wrongfully convicted for the triple murder of his wife and children and spent 13 years in prison for a crime he did not commit.

**Page | 7 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
     **SUMMARY JUDGMENT**

Here, Mr. Englert's ultimate opinion that "the physical evidence presented does not contradict Officer Bush's recollection of the incident" is principally founded upon his reconstruction of the trajectories of the bullets fired by defendant Bush and the movements and anatomic positions of Castillo III during the interval those bullets were fired. *See*, Englert Decl. ¶7b. ii. Defendant Bush asserts Castillo III was in rapid forward motion towards him when he fired.[3] To scientifically test whether defendant Bush's claim that he was being charged by Castillo III with a knife a) can be determined by bullet trajectory analysis, and if so, b) whether the results of a process applying scientifically reliable principles and methods are consistent with Bush's claim, requires education in the hard sciences and specialized expertise. Mr. Englert has no degrees in any of the hard sciences nor the requisite specialized expertise.

Biomechanics is "the application of the principles and techniques of mechanics to the structure, functions and capabilities of living organisms." Websters New World Dictionary, 3d College Ed. (1988).

> Biomechanics applies principles from physics and engineering to study the mechanical behavior of biological systems, including the human body. In the context of crime scene analysis, biomechanics aids investigators in understanding how injuries occurred, the positions and movements of individuals involved, and the potential sequence of events.

Sun, X, *The Role of Biomechanics in Crime Scene Reconstruction*, Journal of Forensic Biomechanics, Vol. 14, Iss. 4, No. 1000445 (2023). Park Decl., Ex. 7. Thus, courts have held that reconstruction of bullet trajectories through a human body in motion requires specialized expertise. *See, Krause v. County of Mohave*, 459 F.Supp.3d 1258, 1265-66 (D. Az. 2020) ("Forensic ballistics and bullet trajectory analysis is highly technical area, subject to peer-

---

[3] "[He] charges at me, lifts, lifts the knife up, uh, around shoulder like this and points it in my direction, and he, and he's charging. I see his, his weight shift forward, and he's closing distance extremely fast." Bush OSP Tr. 10, lines 43-45, Park PSJ Decl., Ex. 4, page 38 of 42.

**Page | 8 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

reviewed research and some degree of standardization."); *Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *8 (C.D. Cal. Oct. 9, 2018) ("reading a coroner's report does not transform a police practices expert into an expert on bullet trajectory analysis").  For an example of a shooting reconstruction report involving bullet trajectory and biomechanical analysis prepared by an expert with the necessary qualifications, *see* Desmoulin, G Application of Biomechanical Modelling to Police Shooting Reconstruction, Int. Journal of Forensic Engineering, Vol. 4, No. 3, 2019.  Park Decl., Ex. 8.

C.      Mr. Englert's reconstruction of the shooting is not based on reliable principles and methods.

In determining reliability, the court must rule not on the correctness of the expert's opinions but on the soundness of the methodology, *Estate of Barabin*, 740 F.3d 457, 463 (9th Cir. 2014), and the analytical connection between the data, the methodology and the expert's conclusions. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 1339 L.Ed.2d 508 (1997).  Rule 702 prohibits experts from conveniently ignoring inconvenient facts.  When analyzing the soundness of an expert's methodology, the court may inquire into whether an expert made any effort to rule out other possible explanations to be averred from the facts upon which an expert relies.  *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir 1994). In evaluating the reliability of an expert's method, courts may properly consider whether the expert's methodology has been contrived to reach a particular result.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 (11th Cir. 2005).  Ultimately, the court must be able to determine from the information in the record whether the expert's opinions are reliable, or alternatively, whether the expert has engaged in unreliable conjecture and speculation.  *Estate of Barabin*, 740 F.3d at 463.

Plaintiff requested that her retained forensic expert, Michael Howard, review and comment on the scientific reliability and validity of Mr. Englert's analysis.  Second Decl. of Michael A.

**Page | 9 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Howard (hereinafter "Howard 2d Decl."), Ex. 1, page 1.  Mr. Howard found Mr. Englert's reconstruction methods unreliable and invalid for the following reasons:

Mr. Englert's opinion of the direction of Castillo III's rotational movement ("counterclockwise") during and immediately after shots are fired is "consistent" with only one (the newest) of two conflicting recollections of defendant Bush.

Bush recollection before Englert's reconstruction:

From Bush OSP Tr. 10, "He then kinda steps, stumbles backwards, *turns to his right*, falls to his knees and collapses on the ground." Park Decl., ECF 70-3, at 38 of 42.

From Bush GJ Tr. 139:8-12, "[H]e was in front of that recliner.  And his head was – *his right side was along that recliner*.  So his – he had stumbled backwards and then he dropped to his knees in front of that recliner.  And then slumped with *his head* kind of in dad's direction *towards that east wall*." Park Decl. in Opposition to Defs' Motion for Summary Judgment, Ex. 5, at page 5 of 6.

Bush recollection during Englert's reconstruction:

From page 43 of Englert's Report, "PHASE E – Officer Bush testified that Castillo went down toward the front door prior to standing back up and leaning forward while bleeding heavily.  Castillo *then turned left* (counterclockwise), stumbled backward, and went down to the ground in front of the recliner chair in the living room, in a yoga-type position with his *head pointed west*." Tapia Decl., Ex. 1, ECF 62-1, page 43 of 63.

From Bush Decl., ¶ 15, "The fifth significant spot, which the team designated Phase E, was after Arcadio Castillo III dropped to the ground and stood up momentarily, *then turned left* and went to the ground again." ECF 63.

As observed by Mr. Howard, "Mr. Englert does not explain how the physical evidence supported the probable accuracy of the recollection described in his report" nor "explain why the physical evidence eliminated the probable accuracy of Bush's prior conflicting recollection." Howard 2d Decl., Ex. 1, page 2.  Castillo III's turning to his left would appear to be critical to Mr. Englert's sequencing of the shots in a manner that is "consistent" with Bush's preferred "recollection."  However, Mr. Englert offers no explanation and no methodology by which he answered the question why Castillo III would rotate to his left when shot while charging forward.

**Page | 10 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
        SUMMARY JUDGMENT**

Mr. Englert's simulated "scene" was not representative of the actual scene – it failed to incorporate the difference in elevation between the porch (the platform from which Bush was shooting) and the interior floor of the Castillo residence. Howard 2d Decl., Ex. 1, page 6. *See, also*, Second Newman Declaration documenting 3.5 inch to 6.0-inch difference in elevation. As a result, every measurement or reconstruction of Castillo III's anatomic position based on the angle of entry of a bullet into his body is invalid. Howard 2d Decl., page 6.

Mr. Englert's reconstruction of Castillo III's anatomic position when struck by the bullet which passed through the door is founded on the scientifically invalid assumption that it would do so in a straight line. Howard 2d Decl., Ex. 1, pages 6-7, n. 13.

Mr. Englert's bloodstain analysis avoids comment on several items of physical evidence highly relevant to forming reliable opinions of Castillo III's physical location the moment he is shot, and his movements afterward that support inferences and conclusions inconsistent with his opinions. Howard 2d Decl., Ex 1, pages 3-5. Specifically, Mr. Howard notes that the presence of expired blood behind the recliner, the presence of the stainless-steel knife with expired blood beneath the back left (as one is facing) corner of the recliner, and the directionality of projected pattern bloodstaining across the arm, back, footrest and carpet in front of the recliner, all place Castillo III slightly south (behind) and west of the west (right, as one is facing) side of the recliner at the moment he is shot. *Id*., page 4. The directionality of blood spatter on the stainless-steel knife also shows the knife was pointed tip down when the blood was deposited on it, a fact inconsistent with the knife being held at shoulder height. *Id*.[4] The swipe bloodstain pattern on the linoleum

---

[4] The Englert Decl., ¶7b(i) identifies as "important for reconstruction" two knives recovered from the scene." Bush could not identify the knife Castillo III was holding, Bush dep. 86:5-14, and did not see Castillo III drop the knife after shots were fired, Bush GJ Tr. 138:2-13. However, Englert simply ignores the question of which knife Castillo III was holding when he was shot.

**Page | 11 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

floor at the entrance combined with the presence of projected pattern blood to the west of the open door shown in the crime scene photos is inconsistent with the inference that Castillo III was near the front entrance when he was shot. *Id.*, page 5.

The concerns about Mr. Englert's qualifications warrant this court's special attention to its assessment of Mr. Englert's methodology and its reliability. Mr. Howard's observations raise substantial questions about whether Mr. Englert's methodology consists of anything more concrete than *ipse dixit*. There is scant explanation of methodology in Mr. Englert's Declaration or report. Here is what can be gleaned:

> My reconstruction of a shooting scene involves applying the scientific method to determine the most probable outcome of what occurred out of a range of possibilities. Interpretation of the event analysis is based on the case's evidence and the parties' education, training and experience doing the reconstruction. A reconstructionist conducts a review of all materials and expert opinions. A reconstructionist is not an expert in many fields but has a knowledge base of all pertinent resources, *i.e.*, forensic pathology, ballistics, DNA, and blood patterns, among a few, that allow putting pieces of an active event together. Englert Decl., ¶ 6.

> In order to reconstruct the case, it was necessary to analyze the physical evidence in custody at the Salem Police Department. Thirteen (13) items of evidence were examined. Based upon the analysis, *multiple facts were uncovered by the EFC team that were important* for reconstruction purposes. Facts included *bloodstain patterns on two knives recovered from the scene, as well as bloodstain patterns documented throughout the scene.* Englert Decl., ¶ 7b(i).

> A review of all the evidence led to *a most probable finding* upon which our opinion was based. Englert Decl., ¶ 7b (iii)

> On October 13, 2023, my team and I performed a forensic reconstruction of the shooting incident at the Salem Police Department Training Center. The reconstruction was based on the physical evidence, investigative reports, scene processing reports, interviews, statements, testimony, autopsy report and photographs, scene photographs and Faro Scan. Englert Decl., ¶ 8

> A model was used to represent Arcadio Castillo III, which Officer Bush represented himself. Approximate bullet entry and exit wounds were marked on the model with red and black dots respectively. Bullet re-entry wounds were marked on the model with red dots with a black X while approximate projectile recovery locations were

**Page | 12 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
        **SUMMARY JUDGMENT**

marked on the model with a black circle with X. Rims of abrasion were indicated with black ink. The injuries were exaggerated in size for photography and demonstrative purposes. Englert Decl., ¶ 9.

The floorplan of the living, hallway, and porch were mapped out in the training room based on the approximate Faro diagram measurements. Englert Decl., ¶ 10.

Throughout the reconstruction, *a range of body positions were tested to determine the most probable body positioning given the physical evidence*. Englert Decl., ¶ 11.

The Declaration and the report contain little or no reasoning linking Mr. Englert's opinions to the physical evidence. How are the bloodstain patterns on the two knives, or any other physical evidence, connected to the reconstruction of Castillo III's location and movements during and after the shots and the shot sequence? If Englert's opinions represent "most probable", what other hypotheses were considered and rejected, and why are his opinions the "most probable"? Most certainly other hypotheses are not identified and the "probability" of Englert's conclusions are not explained. Assuming that the "string test" that is illustrated in Mr. Englert's report is being applied to reconstruct Castillo's body positions when struck by each bullet, what is the basis for claiming that test yields reliable results for a body in rapid forward motion as defendant Bush recalls? What empirical scientific studies support Englert's methodology? Defendant offers no evidence that Mr. Englert's "method" is standard and accepted in the field of forensic shooting reconstruction, or even if it is for some purposes, if it is accepted as producing reliable results regarding the type of opinions at issue here. Nor is there any way to tell whether Mr. Englert reliably applied his methods to the facts of this case. Both his Declaration and his report are nearly devoid of his reasoning.

In *Dasho v. City of Federal Way*, 101 F.Supp.3d 1025, 1032-33 (W.D. Wash. 2015), the court excluded the testimony of the plaintiff's forensic crime scene reconstruction expert regarding the sequence of shots and the plaintiff's movements in the time interval the shots were fired,

**Page | 13 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

observing that "several cases involving forensics experts suggest that it is at least doubtful whether forensic scientists can reliably establish shot sequence based on the type of evidence available here." The court's description of the evidence the plaintiff's expert relied on and expert's methodology in *Dasho* closely approximates what we are able to glean of Mr. Englert's description (such as it is) of his methodology here.

For the foregoing reasons, Mr. Englert's relevant opinions are unreliable and inadmissible under FRE 702.

D.     Numerous of Mr. Englert's opinions and statements concern matters that are not relevant, not helpful and invade the province of the jury.

In the event the court admits one or more of Mr. Englert's relevant opinions, plaintiff requests that the irrelevant matter contained in his Declaration described below and innumerable similar statements and opinions scattered throughout his report be stricken.

Expert testimony which does not relate to any issue in the case, concerns matter irrelevant to a disputed issue or concerns matters that laypersons can determine for themselves is not relevant. *Daubert*, 509 U.S. at 591. Experts cannot vouch for or bolster the credibility of other witnesses, nor testify about the reasons for a person's decisions or what they may have been thinking. Such testimony invades the providence of the jury, is unhelpful and improper. *US v. Barnard*, 490 F.2d 907, 912-13 (9th Cir 1973); *US v. Binder*, 769 F.2d 595, 602 (9th Cir 1985) *overruled on other grounds* by *US v. Morales*, 108 F.3d 1031 (9th Cir 1997) (*en banc*)

With the understanding that plaintiff need not address all matters that would properly be the subject of a motion *in limine* at trial, plaintiff limits her relevancy objections to the following statements in Mr. Englert's Declaration:

¶ 12          "[T]his incident occurred within a very confined area." This is within the knowledge of any layperson.

**Page | 14 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
                   **SUMMARY JUDGMENT**

| | |
|---|---|
| ¶ 12b | "Officer Bush at doorway … giving commands to drop the knife." Invades province of jury. The jury determines these facts. |
| ¶ 13a | "The evidence supports multiple commands to put the knife down were issued by Officer Bush prior to shots being fired. Invades province of jury. The jury determines these facts. |
| ¶ 13b | "The evidence supports that a total of four 9mm rounds were fired by Officer Bush during this shooting incident." This is not a fact in dispute, nor a fact requiring expert testimony. |
| ¶ 13c | "All four of the 9mm shots impacted Castillo III …" No facts in this paragraph are relevant to the determination of any disputed issue. |
| ¶ 13e-k | These paragraphs generally state where bloodstains appear in crime scene photographs. Any layperson can determine those facts for themselves. Mr. Englert does not explain how any of these facts are of aid in supporting his conclusions that "consistent with Bush's recollection" Castillo III was either "advancing" or "near the front door" when shot. |
| ¶ 15 | "Officer Bush entered the residence to help Castillo II (father) after Misty Castillo requested his help and called 911 in fear of her son Castillo III." Improper comment on matters outside an expert's knowledge (what a witness was thinking) and improper bolstering. |
| ¶ 20 | "All four cartridge cases were clustered on the front porch of the residence, consistent with Officer Bush's reported position during the shooting incident." This is not a fact in dispute. |
| ¶ 21 | "Bloodstain patterns on the knives, including expiration patterns, place the knives in Castillo III's vicinity during the bloodshed event." Any layperson can make their own determination from photographs that the knives have blood on them; the source of the blood is not a fact in dispute. |

It is perhaps worthy of note that Mr. Englert's Expert Reconstruction Report in *Alves*, *supra*, contained a large volume of similar irrelevant content. The district judge there observed, "Mr. Englert's proposed testimony does not just consist of unhelpful recitation of facts viewable on the video. He frequently veers into spinning those facts …," 2023 WL 2983583, at *11. This material is irrelevant and should be stricken from the record.

**Page | 15 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT**

I.    <u>Defendants are not entitled to summary judgment on plaintiff's claim that defendant Bush unlawfully entered the Castillo residence</u>.

Whether actions of the police are objectively reasonable "is to be judged by the circumstances known to them." *Dold v. v. Snohomish County*, 649 F.Supp.3d 1084, 1103 (W.D. Wash. 2022), *quoting United States v. Black*, 482 F.3d 1035, 1038 (9th Cir. 2007) (statements the reporting party made to the 911 dispatcher that were not conveyed to the deputies "cannot support the lawfulness of the deputies' conduct.").

Defendants offer Misty Castillo's statement to the 911 call taker that her son "threatened her with [a knife]," Defs. Mot. 2, citing Tapia Decl. Ex. 1 (audio recording of 911 call), ECF 61-1, and statements that Misty Castillo was afraid of her son, made to the Oregon State Police after the shooting, Defs. Mot. 10, citing Tapia Decl. Ex. 9 (audio of Misty Castillo's statement to OSP), ECF 61-7, and Tapia Decl. Ex. 10 (excerpt from transcript of Ex. 9), ECF 61-8, in support of their argument that Bush's belief that he needed to enter the residence to protect Arcadio Jr. was objectively reasonable.  These are neither relevant nor admissible for this purpose because Bush did not hear them or know of them.  Bush dep. 38:10-19.

A.    <u>Circumstances known to Bush prior to entry of Castillo residence</u>.

Everything defendant Bush knew about the circumstances of Misty Castillo's 911 call at the time he arrived and parked his patrol car on June Avenue, he learned from reading the mobile data screen in his patrol car.  Bush dep. 38:3 to 39:9; 41:4-20; 43:2-6.  The Salem Police Department Response Report contains the following record of that information:

> 503-884-4423 Caller Reporting that her adult son is mentally ill and assaulting family members. Subject/Castillo, Arcabio [sic] DOB:032798 … is intoxicated and under influence of marijuana, is armed with a knife. Caller is outside … Subject is inside, Caller's husband inside the house. Could hear female saying

**Page | 16 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**          SUMMARY JUDGMENT**

> "get away from me …" A male voice in the background and then female screaming and line disconnected.

*Id*., dep. Ex. 5.

Defendants incorrectly assert that "it is undisputed that Castillo III *still held the knife* when Officer Bush arrived," Defs. Mot. 1, and that "Bush knew that Arcadio III was wielding a large knife upon his arrival," Defs. Mot. 10, citing paragraph 15 of the Second Amended Complaint.  These statements mischaracterize the record. Paragraph 15 of the Second Amended Complaint describes what Bush saw *after* he opened the front door to the Castillo residence.  As noted above, when he arrived, he knew the 911 caller had reported that her son was armed with a knife.  However, as he approached the Castillo residence on foot, he saw Castillo III on the front porch, made a point of looking for a knife in Castillo III's hands, *and did not see one*.  Bush dep. 55:3-11.  In the security video animation, Ex. 2 to Newman's Decl., ECF 69, a feint light reflection on the Castillo residence appears at +/- time 0:01:10.  A reasonable inference is that this light is from Bush's flashlight.[5] Bush testified that he was able to see Castillo III's face well enough to believe that Castillo III had recognized his presence, dep. 52:6-23; 53:15-17.

In the statement Bush gave to the Oregon State Police on July 14, 2021, five days after the shooting, he provided the following description of the information known to him during the time interval between leaving his patrol car and opening the front door to the Castillo residence:

> Uh, I exited. I started walking up to the house. Um, at this time, I pulled my pistol out of its holster, uh, due to the information with the knife and this altercation, the hang up, and knowing that she was possibly outside. Uh, as I walked up, I first saw her standing in the driveway, but she was, I didn't see anybody else. She was alone standing in the driveway behind the car. Uh, as I continue walking, I saw a male, uh, it was kinda dark, but I noticed he wasn't wearing a shirt. Uh, he looked like he was standing facing me on the front patio. Um, I turned my attention to

---

[5] Bush was carrying a flashlight, dep.22:6-9, but when questioned, could not recall whether he used it during his approach to the Castillo residence.  *Id*. 74:5-7.  Ex. 2 to Newman's Decl., ECF 69, leaves no doubt that he was using a flashlight during his approach.

**Page | 17 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
                        SUMMARY JUDGMENT**

him. Uh, I said, hey, what's going on. He didn't say anything. He turned around and started walking back into the house. I told, I yelled at him, stop. Uh, he didn't react at all. He walked in and shut the door behind him.

Uh, I continue over to mom to try to get information. Uh, she says, she says, uh, help, you need to help us. He's assaulting us. He has a knife. Uh, and I, so I'm sorry. And then she tells me that he just drug her across the driveway. Uh, I asked if she was injured. She showed me her knee, and there were scrapes underneath her kneecap, fresh scrapes that ran down her shin. Um, I asked if that was her son that was just out on the porch. She said yes. I asked, uh, if her husband was still inside the house with him, and she said yes. I asked if anybody else was in the house, and she said no. Uh, I moved towards the house. I told her to stay in the driveway.

I moved towards the front door that, uh, where the male had went in. Uh, I went up to the front door, and I just listened and ****. Uh, I could hear two males talking. I couldn't make out what they were saying, but they sounded like they were in the same room and fairly close to the door, but I, I couldn't understand the words that they were saying. Uh, at this time, I, I had my pistol out by my side. I checked the door to see if it was unlocked. Uh, it didn't turn. I waited, uh, another moment, and then I heard the, the suspect say, or a male voice say, uh, I'm not going to, or I'm not gonna, and then I couldn't understand what he said, until they leave. Tell them to leave or something along, something like to that effect. Um, at that time, I could hear the dad speaking again to him, to him further, but I couldn't understand what he was saying. Uh, I reached for the door again. I turn it the other way. I heard an audible click. I'm not sure if it was the door jamb or the dad had unlocked it, and I swung the door open.

Page 9 of Transcript of OSP July 14, 2021, Interview of Bush, Park Decl., ECF 70-3 (hereinafter "Bush OSP Tr.") (formatting altered to aid readability). After reading the transcript of the statement he gave to the Oregon State Police during his deposition, Bush adopted his statements in the transcript as truthful, accurate and complete. Bush dep. 9:2 to 12:12.

When Bush observed Castillo III turn, go into his house and close the door, it was not a rushed nor unusual movement. Bush dep. 56:10-25. After Castillo III went inside the house and he was speaking with Misty Castillo, he heard no sounds coming from the house. *Id.*, 58:22 to 59:1. During his brief conversation with Misty in the driveway, he did not inquire whether there

**Page | 18 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

were guns in the house, *id.*, 61:12-14, he did not ask for permission to enter her house, *id.*, 61:15-20, and he did not verbally inform Misty that he intended to enter the house. *Id*, 61:22-24.

While on the front porch and before opening the door, Bush did not knock, dep. 74:8-9, and did not announce, *id.*, 74:10-14. He knew entering without announcing risked making the situation worse. *Id.*, 81:12-15. He had received training in verbal de-escalation and Directive 7.15.[6] *Id.*, 108:2-17. He did not attempt de-escalation before opening the door. *Id.*, 109:8-10. He had been trained that cover officers should be present before making contact with a person believed to be emotionally disturbed. *Id.*, 82:3-19. He knew his cover officers were seconds away but did not wait for them to arrive. *Id.*, 81:1-11; GJ Tr. 126:2-13.

B.     Consent to enter the Castillo residence was not given. Alternatively, facts material to the issue of consent are in dispute.

It is undisputed that no express consent was given to Officer Bush to enter the Castillo home. Defendants argue that consent may be inferred either from the evidence that Misty requested that Bush "go help (her) husband" or from evidence that Arcadio, Jr. unlocked the door when Officer Bush announced his presence. Defs. Mot. 9. That argument is foreclosed by *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), in which the Court held that an occupant's consent to a warrantless search of a residence is unreasonable as to a co-occupant who is physically present and objects to the search. The Court observed that the "constant element in assessing Fourth Amendment reasonableness in … consent cases" has been "the great significance given to widely shared social expectations." *Id.*, at 111. It then explained that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority

---

[6] "When police officers need to engage with a subject in behavioral crisis, the Salem Police Departments expectation is that they will attempt to de-escalate the situation, when feasible and reasonable." Bush dep. Ex. 7, page 1, Park Opp. Decl, Ex. 1, page 29 of 39.

**Page | 19 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
              **SUMMARY JUDGMENT**

in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.*, at 114.  For that reason, the Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.*, at 122-23.

The Ninth Circuit applied *Randolf* in *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018), which involved police response to a domestic violence call.  The Court held that the consent of the reporting party/girlfriend, who was standing safely outside her house and separated from her boyfriend when police arrived, was not sufficient to support a lawful entry in the face of boyfriend's refusal to respond to the police officer's request that he open the door.

Such is the situation here.  When Castillo III, while standing on his front porch, saw defendant Bush, then turned around, ignored Bush's order to "stop," entered his house and closed the door, he unequivocally demonstrated his objection to Bush entering his residence. Misty Castillo, the complaining party, was standing safely outside her home.  Under *Randolf*, neither Misty Castillo's nor Arcadio Castillo, Jr.'s consent could render the entry lawful as to Castillo III.

Consent can be inferred from nonverbal actions, but it must be "unequivocal and specific" and "freely and intelligently given."  *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990).  That is necessarily a case-specific analysis that requires consideration of the totality of circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 25-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  Should the court find the undisputed evidence of Castillo III's conduct after seeing defendant Bush insufficient to trigger the rule of *Randolf*, the issue of inferred consent is a jury question.  *Pavao v. Pagay*, 307 F.3d 915, 918 n.1 (9th Cir 2002).

**Page | 20 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
                  **SUMMARY JUDGMENT**

When giving his July 14, 2021, statement, Bush described Misty's request for help as "you need to help *us*," Bush OSP Tr. 9, and "you need to help *me*," *id*., at 13 (emphasis added). When asked about his observation of Misty Castillo's demeanor, Bush replied:

> Um, she was pleading for help. Un, I didn't hear any screaming. We …, I didn't hear any screaming or anything, but she was, she was just pleading for help, please help *me*, help *me*. She, and then she, she had started to follow me when I walked up to the door. That's when I told her to stay, stay where she was. She was stressed out, worried.

Bush OSP Tr. 20 (emphasis added). There is nothing in these statements to suggest that Misty Castillo invited Bush to enter her home, or to suggest that Misty's principal concern was the welfare of her husband.

In view of Bush's just quoted statement, that Ms. Castillo answered "yes" in testimony before the Grand Jury to the question, "Did you tell the officer to go help your husband?" is not evidence that she used those words or conveyed that sentiment when speaking with Officer Bush. It is at least equally plausible that her testimony to the Grand Jury was simply affirming what she believed may have been in her mind when she spoke with defendant Bush.

Defendant points to Bush's deposition testimony that "[Mrs. Castillo] told me that *I needed to go in* and help her husband," Defs. Mot., p. 2, as supporting an inference of consent. But, as evident from a comparison of that testimony with defendant Bush's July 14, 2021, statement – a statement devoid of references to a concern for the welfare of Arcadio Jr. -- defendant Bush's recollection of his conversation with Misty Castillo has "evolved" over time in a self-serving way that a reasonable juror could find lacks credibility.

Finally, defendants argue that consent may be inferred from Arcadio Jr.'s deposition testimony that he unlocked the door for defendant Bush. Assuming that is true, it does not support an inference of consent to enter. If consent to enter may not be implied from failure to

**Page | 21 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT**

object to entry, *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990), nor from moving aside to avoid physical contact with officers, *United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir. 1998), it most certainly may not be implied from Castillo, Jr.'s testimony that, "I was just opening the door. I barely opened the door. He pushed the door open without my permission." Tapia Decl., Ex. 4, ECF 61-4.

If the *Randolf* rule does not foreclose the issue of consent as a matter of law, there are at minimum conflicting inferences about implied consent that a jury must resolve.

C.    Emergent circumstances were not present.

Defendants argue that defendant Bush's warrantless entry was lawful because he "reasonably believed that he needed to enter the residence to avoid the risk of Arcadio III causing imminent, serious injury to Arcadio, Jr," Defs. Mot. 10.

From this framing of the issue, it is plain that defendants are relying on the emergency aid exception to the warrant requirement. "The emergency exception stems from the police officers' community caretaking function and allows them to respond to emergency situations that threaten life or limb." *Hopkins v. Bonivicino*, 573 F.3d 752, 763 (9th Cir. 2009) (internal quotation marks and citation omitted) (explaining the distinct legal rationales underlying the "emergency" and "exigent circumstances" exceptions).

For the emergency doctrine to apply, the defendants must show the following: "(1) considering the totality of circumstances, law enforcement had an objectively reasonable basis for concluding that there was *an immediate need* to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) (emphasis added). "[A]ll [Ninth Circuit] decisions involving a police response to reports of domestic violence have required an objectively

**Page | 22 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
           SUMMARY JUDGMENT**

reasonable basis for believing that an actual or imminent injury was unfolding in the place to be entered." *Bonivert, supra*, 883 F.3d at 877. The following evidence creates triable issues of fact as to whether Bush's alleged belief such circumstances existed was objectively reasonable.

          1.        <u>There are triable issues whether Arcadio Jr. was in immediate need of protection from harm.</u>

The proper temporal focus of the Fourth Amendment reasonableness analysis is the totality of circumstances known to the officer at the moment he or she takes the challenged action. *Glenn v. Washington County*, 673 F.3d 864, 873 (9th Cir. 2011) (the trier of fact "cannot consider evidence of which the officers were unaware – the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways").

On his approach to the Castillo residence, defendant Bush observed Castillo III standing on the front porch, apparently calm, non-communicative *and unarmed*. He observed Castillo III enter his residence and close the door. He observed and then made contact with Misty Castillo, the reporting party, in the driveway of the residence, knew that she and her son were separated, and that she was safe. Although Misty appeared stressed, no one was yelling, no one was screaming, and he heard no sounds of alarm coming from inside the house. He knew Arcadio III had not attacked his mother with a knife, and that her injuries, scraped knees, were minor.

Bush's behavior in his approach and upon arrival at the front door is inconsistent with a subjective belief that Arcadio Jr. was at imminent risk of harm. When he moved from the driveway to the porch, he passed by the main living room window using his flashlight, shining it on the house, not attempting to conceal his movements from any person who might be watching from the inside. Once on the porch, he paused and "just listened." As he listened at the door, nothing he told the Oregon State Police detectives on July 14, 2021 that he heard portended violence or an imminent threat of violence:

**Page | 23 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
                                  **SUMMARY JUDGMENT**

> I heard the, the suspect say, or a male voice say, uh, I'm not going to, or I'm not gonna, and then I couldn't understand what he said, until they leave. Tell them to leave or something along, something like to that effect. Um, at that time, I could hear the dad speaking again to him, to him further, but I couldn't understand what he was saying. Uh, I reached for the door again. I turn it the other way. I heard an audible click. I'm not sure if it was the door jamb or the dad had unlocked it, and I swung the door open.

Bush OSP Tr. 9.

Just as Bush's recollection of whether Misty expressed concern to him about her husband's safety has evolved over time, so has Bush's recollection of the sound of Arcadio Jr.'s and Castillo III's voices. Bush told the Grand Jury that as he was listening from the porch the conversation inside "sounded like it was ramping up a little bit." GJ Tr. 126:2-3. In deposition, he testified that "one of the voices that I hear, it begins to raise and it sounds aggravated." Bush dep. 67:4-5.

Bush did not inform the investigating OSP detectives that his decision to open the door was precipitated by a belief that Arcadio III was about to harm Arcadio Jr. The opposite inference flows from his testimony to the Grand Jury. Bush explained, "I knew I had people close. I wanted to see if the door was unlocked _if_ we needed to go in." GJ Tr. 126:3-5 (emphasis added). In deposition, Bush testified that he opened the door "because it's my perception they knew I was there and I wanted to get eyes on the problem before it got worse." Bush dep. 81:9-11. Neither of Bush's statements concerning his own state of mind at the time of entry support an inference of imminent harm. A reasonable juror could conclude from this evidence that there was no objectively reasonable basis to believe that Arcadio Jr. was at imminent risk of harm.

As the Ninth Circuit has made clear, "if [police officers] otherwise lack reasonable grounds to believe there is an emergency," they must "take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place." _U.S. v. Russell_, 436 F.3d 1086,

**Page | 24 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
              SUMMARY JUDGMENT**

1092 (9th Cir. 2006).  Bush did not do so.  It is a reasonable inference from the foregoing evidence that he opened the front door simply because it was unlocked.

### 2.    The manner and timing of entry were unreasonable

In *Snipe, supra*, the Court found the second prong of the emergency test satisfied – the manner of entry reasonable – specifically because "[the officers] knocked and announced their presence before entering the residence."  515 F.3d at 954.   Announcement prior to a forced entry is an element of the reasonableness inquiry under the Fourth Amendment. *United States v. Ramirez*, 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998).  One of the principal interests served by announcement is a reduction in the potential for violence to both police officer and the occupants of the house into which entry is sought.  *U.S. v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995) (discussing 18 USC § 3109, which codifies common law rule).   Police may be excused from 'knock and announce' only when they are faced with exigent circumstances that support "a reasonable suspicion that knocking and announcing their presence under the particular circumstances would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

If the evidence supports the reasonable inference that there was no compelling need – no precipitating sound or statement overheard by Bush that made immediate entry necessary – then the evidence also supports the inference that it was feasible and constitutionally required for Bush to announce he was about to enter.  Bush understood that opening the door without doing so risked making matters worse.  He was correct.  He opened the door, saw that Castillo III was

**Page | 25 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
       SUMMARY JUDGMENT**

holding a knife and, in plaintiff's theory of this case, that single fact immediately caused the use of deadly force and the death of Castillo III.[7]

Overlay this evidence onto the recent training recommendations Salem had implemented following release of the Operational Assessment. Park Decl., Ex. 2, pages 17-40 of 47 (Ex. 23 to Womack deposition). *See, also Monell* argument, *infra* at page 44.   Bush knew cover was on the way and close to arrival and had received training that an officer should wait for cover before engaging with an emotionally disturbed person. He had also been trained in Directive 7.15, which recommends use of de-escalation techniques whenever feasible when dealing with emotionally disturbed persons.  It was plainly feasible for Bush to call out from the front porch to Castillo Jr. and ask him to step outside.  Separating Castillo Jr. from Castillo III would have further de-escalated the circumstances.  He did not attempt de-escalation.   From this evidence, a reasonable juror could find that Bush's decision to open the door when and how he did was not objectively reasonable.

3.     <u>Bush is not entitled to qualified immunity</u>.

When resolving a motion for summary judgment based on qualified immunity, courts "engage in a two-step inquiry." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (citing *Tolan v. Cotton*, 572 U.S. 650, 655, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (*per curium*). First, courts ask "whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the deputies violated a constitutional right." *Id*.  Second, courts ask "whether that right was 'clearly established' at the time of the alleged constitutional violation."

---

[7] "Especially where officers are armed and on alert, violent confrontations are foreseeable consequences of unlawful entries." *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1078 (9th Cir. 2018).

**Page | 26 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
          SUMMARY JUDGMENT**

The first prong of the qualified immunity analysis asks whether, viewing the facts in the light most favorable to the nonmoving party, the state actor violated a constitutional right. *Peck*, 51 F.4th at 887. The constitutional right at issue is the Fourth Amendment's protection from unreasonable searches and seizures.

*Georgia v. Randolf, supra*, clearly established the law applicable to the consent exception. Viewing the facts in the light most favorable to plaintiff, Castillo III's unequivocal behavior on his front porch demonstrated his objection to Bush's warrantless entry and communicated that objection to Bush, rendering Bush's entry unreasonable as to him.

*Bonivert, supra*, clearly establishes the law applicable to the emergency aid exception. Taking the evidence in the light most favorable to plaintiff, there was no emergency until Bush, himself, created that emergency by opening the door. Prior to that moment, there were simply no circumstances known to Bush that pointed to an actual or imminent injury inside the home. Further, Bush's act of opening the door without announcement was objectively unreasonable under clearly established law. *Richards, supra.*

II.     Defendants are not entitled to summary judgment on plaintiff's claims that defendant Bush's use of deadly force was excessive under the Fourth Amendment and a battery state law.

The evidence and arguments set forth in Plaintiff's Motion for Partial Summary Judgment, ECF 66, fully respond to defendants' arguments in support of summary judgment on the merits and on the issue of qualified immunity. However, plaintiff will take this opportunity to direct the court to three additional Ninth Circuit authorities denying the defendant police officer qualified immunity in factual circumstances closely analogous to those presented here: *Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013) (domestic call, decedent walking toward officer holding knife), *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) (domestic call,

decedent holding a handgun that was pointed down) and *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624 (9th Cir. 2022) (decedent holding bat-like stick with end pointing down).

III.    <u>Salem ratified Bush's unlawful entry and use of deadly force</u>. [8]

The Ninth Circuit has found municipal liability on the basis of ratification "when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino v. Gates,* 99 F.3d 911, 920 (9th Cir. 1996) (citing cases). Ratification "and thus the existence of a *de facto* policy or custom, can be shown by a municipality's post-event conduct, including its conduct in an investigation of the incident." *Dorger v. City of Napa,* No. 12-440, 2012 WL 3791447, at *5 (N.D.Cal. Aug. 31, 2012) (citing *Henry v. Cnty. of Shasta,* 132 F.3d 512, 518 (9th Cir.1997)) (City of Napa alleged to have disregarded evidence adduced during internal investigation of an OIS that contradicted testimony of involved officers and failed to take objective unbiased look at what transpired). *See, also, Larez v. City of Los Angeles,* 946 F.2d 630, 645-48 (9th Cir. 1991) (individual filed a complaint with the LAPD alleging excessive force was used against him in a search, LAPD investigated it, and the police chief signed a letter stating that none of the complaints would be sustained, thereby ratifying the investigation and search); *Fuller v. City of Oakland*, 47 F.3d 1522, 1526 (9th Cir. 1995) (an officer investigated complaints of sexual harassment, and police chief who approved investigator's report and conclusion that there was no harassment ratified the

---

[8] It is not entirely clear from defendants' motion whether defendants intended to move against plaintiff's claim that Salem is liable for defendant Bush's unlawful entry into the Castillo residence on a *Monell* ratification theory, as plaintiff has alleged in paragraph 29 of her Second Amended Complaint, ECF 47. Defendants' motion, at page 13, Section 5, states: "Plaintiff alleges that the City of Salem maintains policies or practices that are deliberately indifferent to rights such as unlawful searches and foreseeable and recurring situations involving the use of deadly force. Second Amend. Compl. ¶¶23, 29." A ratification theory does not require proof of deliberate indifference.

**Page | 28 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**       SUMMARY JUDGMENT**

investigator's conclusion).  Ordinarily, ratification is a jury question.  *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999).

A.    Evidence of ratification

Chief Womack signed "concur" on a Memorandum dated December 27, 2021 (deposition exhibit 49), setting forth the findings of the Critical Incident Review Board review of the circumstances surrounding officer Bush's "Contact with Arcadio Castillo III and use of deadly force."  Womack dep. 32:6-14.  By "concur" Chief Womack means "I am agreeing that, yes, this is what we should do or this is a  -- was – I agreed with the review that was conducted within this document." *Id*., 18-24.  He agreed that Bush's use of deadly force was within policy. *Id*., 32:25 to 33:6. He agreed that the underlying reviews met all of his standards and expectations for those reviews.  *Id*., 33:7-15.

The Memorandum, at page 3, makes the following finding:

> Lieutenant Barratt reviewed this segment of the incident and found that Officer Bush's actions were within department directives and consistent with Salem Police Department training and expectations.

The Memorandum describes Officer Bush's act of opening the door without announcement and taking a step into the residence, page 3, and notes on page 4, that "it could be argued that Officer Bush should have waited for additional units to arrive prior to entering the residence[,] [h]owever, given the facts as he knew them, the board could not fault Officer Bush for attempting to contact the males inside the residence."  Thus, Chief Womack, ratified Bush's conduct by approving "[his] subordinate's decision and the basis for it."  *Gilbert v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

IV.    Defendants are not entitled to summary judgment on plaintiff's *Monell* theory that SPD maintained a longstanding custom and practice of failure to conduct *bona fide* internal review of OIS events.

One of the ways a plaintiff may prove an unconstitutional policy of a municipality is by showing "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002) (internal quotation marks and citations omitted). That is what plaintiff seeks to do here. Plaintiff's Second Amended Complaint alleges that Salem maintains a custom or practice of not conducting *bona fide* internal investigations of officers involved in shootings. 2nd Am. Cpl., ¶¶ 21, 23 and 29, ECF 47.

In order to prove a *Monell* claim, the plaintiff must "demonstrate that an 'official policy, custom or pattern' on the part of [the defendant] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008). Liability may be grounded in policies of inaction or omission, as well as policies of action or commission. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). A policy of inaction is based on a municipality's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143. The municipality will be liable as a consequence of its omissions "for a constitutional violation committed by one of its employees, even though its formal written policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind to prove the underlying violation." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002), *overruled on other grounds* in *Castro v. Cnty. of Los Angeles,* 833 F.3d 1060, 1076 (9th Cir. 2016). In such cases, the plaintiff must establish that the policy "amounts to deliberate indifference to the plaintiff's constitutional

**Page | 30 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
            SUMMARY JUDGMENT**

right," which requires showing that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao*, 698 F.3d at 1143 (citations and quotation marks omitted). A policy is a cause of the underlying violation of plaintiff's rights if an appropriate policy "could have prevented the violation." *Id*., at 1143.

As will be demonstrated below, Salem has had actual knowledge since at least May of 2014 that its internal review process for OIS events relies upon an investigative process that is incapable of providing all information necessary to determine if the involved officer used unnecessary (unconstitutional) deadly force, inadequate for determining whether policy or training was violated, and unlikely to inform Salem whether and what policy or training revisions need to be made to mitigate future risks that officers will use unconstitutional deadly force. Such an internal review process enables officers who engage in unconstitutional uses of force to cover up their misconduct with false justification narratives, secure in the knowledge that their misconduct will not be detected nor subject them to discipline. Between May 2014 and July 9, 2021, Salem conducted eight internal reviews of OIS events, finding each involved officer to be within policy and training and imposing no discipline. Park Decl., Ex. 9 (Defs' Am. Ans. to Pl's 1st Interrogatories).

In *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), the court rejected the argument advanced by Salem in this case, namely, that the existence of written policy establishing a formal complaint investigation process shields the municipality from *Monell* liability. Apropos of the facts of this case, the court commented:

> It is not enough that an investigative process be in place … "The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." … Formalism is often the last refuge of scoundrels.

**Page | 31 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

89 F.3d at 974 (quoting from appellant's brief). Failure to conduct *bona fide* investigations and failure to discipline (and thus mitigate future misconduct) are directly related. As the Court explained in *Velazquez v. City of Long Beach*, 793 F.3d 1010 (9ᵗʰ Cir. 2015):

> [A] custom or practice can be inferred from ... evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded. Evidence of "identical incident[s] to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions, while general evidence of departmental treatment of complaints and of the use of force can support[ ] the [plaintiff's] theory that ... disciplinary and complaint processes ... contributed to the police excesses complained of because the procedures made clear to [the] officer that ... [he] could get away with anything.

793 F.3d at 1027 (internal quotation marks and citations omitted).

In *L.K. by and through Brown v. City of Stockton*, 2020 WL 4043017 (E.D. Cal., July 17, 2020),[9] the district court found a genuine issue for trial on the plaintiff's *Monell* claim that alleged that the Stockton Police Department employed a custom or policy of delay of internal review of OIS events that permits its officers to act without regard for the consequences. The district court summarized the evidence offered in support of plaintiff's claim as follows:

> [T]he undisputed evidence shows SPD's review of OIS investigations regularly takes several years to resolve, and up to five years in some cases, and no officer has ever been terminated for use of unreasonable force under Chief Jones's command. *See Rodriquez v. Cty. Of Los Angeles*, 891 F.3d 776, 803 (9ᵗʰ Cir. 2018) ("It is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity."). *The delays in resolving investigations effectively deprive plaintiffs of the ability to point to factual details to support claims of prior excessive force.* Whether defendants' practice amounts to a custom or policy permitting unconstitutional behavior is for the jury to decide, given plaintiffs' evidence of "departmental treatment of complaints." *Velasquez*, 793 F.3d at 1027. Plaintiff's custom or policy *Monell* claim survives summary judgment.

2020 WL 4043017, at *21 (internal citations to record omitted) (emphasis added).

---

[9] Trevor Womack was Deputy Chief of Police for the City of Stockton at the time *L.K.* was pending and this opinion was issued. Womack dep. 7:1-16.

**Page | 32 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

Here, rather than delay resolution, Salem knowingly employed an internal review process incapable of detecting unconstitutional behavior, a process equally effective in depriving plaintiffs of the ability to point to factual details to support claims of prior excessive force. Plaintiff's longstanding custom and practice claim raises triable issues for the jury.

A.   The Internal Review Standards Necessary to Detect and Prevent Use of Unconstitutional Deadly Force

Chief Trevor Womack is the chief policy maker for the Salem Police Department. Womack dep. 25:20 to 26:8.[10]   When a Salem police officer takes the life of a citizen, the officer's actions should be subjected to the strictest scrutiny. *Id*., 27:11-14.  Chief Womack agrees that the following standards should be applied to Salem's internal review of the officer's actions:  the review should be conducted with careful attention to detail, *id*., 25:15-18, all available evidence should be reviewed, *id.,* 27:19-22, the physical evidence should be assessed to determine whether it supports or contradicts the officer's explanation for his or her decision to use deadly force,[11] *id*., 27:23 to 28:3, and if the assessment discloses that the circumstances did not warrant use of deadly force, Salem must acknowledge that fact and take corrective action. *Id*., 28:23 to 29:11.  If Salem's internal review of an officer-involved shooting does not meet these standards, the review process will not be successful in preventing unnecessary uses of deadly force.  *Id.*, 29:12-16.

---

[10] Excerpts from the deposition of Chief Womack are attached as Exhibit 2 to the Declaration of David D. Park in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Park Declaration").

[11] Inclusive of the autopsy report, Womack dep. 47:15 to 48:4, and blood spatter evidence, *id*., 48:15-25.

**Page | 33 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

B.      <u>Salem's Longstanding Methodology for Conducting Internal Review of OIS Events Was Inadequate to Detect Use of Unconstitutional Deadly Force</u>

Salem's internal review of Officer Bush's shooting of Castillo did not meet these standards. Black Declaration, Ex. 1, Report (hereinafter "Black Report"), page 41, Section S7, 1b. As discussed in greater detail, below, the review lacked careful attention to detail, all available evidence was not examined, and none of the seven supervisory staff (five sergeants and two lieutenants) who reviewed the shooting investigation materials[12] compared Bush's narrative of the circumstances relied on to justify his use of deadly force with the physical evidence. At least three factors contributed to Salem's substandard internal review, all of which are longstanding customs and practices of the Salem Police Department of which Salem was on actual or constructive notice: inadequate policy directives governing internal investigation and review of OIS events, exclusive reliance on the criminal (SB-111) investigator and District Attorney, *contrary to policy*, to determine the scope of investigation used for internal review, and Salem's consistent failure to conduct their own interviews of the involved officer(s).

1.      <u>Inadequate Policy Directives</u>

Salem Directive 4.14, *Police Use of Deadly Physical Force or In-Custody Death* sets forth SPD's policy for conducting the internal investigation of an officer involved in a use of deadly force. Section IV, Subsection H.2 assigns responsibility for the internal investigation of the OIS to the Professional Standards Unit investigator and states that the purpose of the investigation is to "determine if department policy and procedures were followed during the incident, and to evaluate employee and department performance related to the incident." The

---

[12] For its internal review of Bush's OIS, Salem relied on the contents of a thumb drive containing shooting investigation conducted by the Oregon State Police. Diede dep. 33:3 to 34:20. A duplicate of the thumb drive was produced by defendants in response to plaintiff's request for production number 30. Park Declaration, ¶ 5.

**Page | 34 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

policy provides no direction nor guidance how to conduct the investigation, what evidence must be collected, what categories of collected evidence should or must be processed and analyzed, nor any objective criteria against which the ultimate findings and conclusions can be measured. As a consequence, the internal review process is entirely subjective and highly susceptible to cognitive bias.[13]

### 2.     Reliance on Criminal Investigation

Salem has a longstanding custom and practice of relying on the criminal investigation (also called the "SB-111" investigation) conducted by the Oregon State Police as the exclusive source of witness interviews and collected, processed and analyzed evidence to conduct its internal review.  Womack dep. 28:3-22.[14] Defendants concede this point in their motion for summary judgment ("the SPD routinely delegates the investigation of officer-involved shootings to an outside agency").  Defs. Mot. 5.  However, that practice is contrary to Section IV, Subsection H.1.a. and Subsection H.1.d. of Directive 4.14 governing "Investigative Responsibilities:"

> H.1.a   The incident will be investigated by an outside law enforcement agency determined by the District Attorney in accordance with SB 111 protocols.  While

---

[13] Indeed, Subsection H.2.a. recommends delaying any interview of the involved officer until the District Attorney has made a decision whether the officer should be criminally prosecuted, even though Subsections H.1.g. and H.1.j. prohibit sharing of information between criminal and internal investigators, perhaps baking in a bias equating the decision to decline prosecution with the accuracy of the involved officer's explanation for his/her use of deadly force.

[14] Defendants Amended Response to Plaintiff's First Set of Interrogatories to Defendant, Interrogatory 1.d, confirms that Salem has relied exclusively on the SB-111 investigation for its internal review in every OIS event that occurred in the 10 years preceding the Castillo shooting (17 OIS events).  Chief Womack's knowledge and approval of Salem's reliance on the criminal investigation for its internal review of OIS events makes such reliance Salem's official policy notwithstanding the contrary provisions of Directive 4.14. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

**Page | 35 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**                    SUMMARY JUDGMENT**

the investigation will be conducted by an outside agency,[15] *overall responsibility for all aspects of the investigation will be retained by the Investigations Division.*

H.1.d    The investigating agency and CIS [Salem's Criminal Investigation Section] personnel will coordinate retention of all evidence from the incident and will be responsible for its processing, with the exception of *evidence collected specifically for an internal investigation.* (Emphasis added).

As the highlighted language makes plain, Salem Directive 4.14 places responsibility for the investigation necessary for an internal review with Salem's Criminal Investigations Section.

Salem's reliance on the Oregon State Police investigation to conduct its internal review is not supported by the language of the SB 111 Plan.  Section 5(12) of the Plan specifically recognizes that separate "[internal] investigations may be necessary for civil preparation, determination of policy violations or training issues."[16]  And good reasons not to rely on the outside agency investigation for the internal review have been long and well known to Salem's chief policy maker and Salem command staff.

On May 21, 2014, then Salem Chief of Police Gerald Moore received a Memorandum from Lt. Keith Blair, Patrol Division, of the Critical Incident Review of Officer-Involved Shooting re SMP#13-47009. Park Decl., Ex. 10, page 1 of 13.  The Memorandum at page 9 (COS 005865) noted serious deficiencies in the Oregon State Police investigation, *e.g.*, "it was assumed that the Oregon State Police investigation would thoroughly document the details of the incident in their investigative reports.  This information was found to be lacking in any of the OSP or other agencies documents or reports." *Id*., Ex. 10, page 2 of 13.  Lt. Blair further noted

---

[15] Directive 4.14, Section IV, Subsection F.2.c specifies that the "outside agency conducting the investigation" is the "Oregon State Police."

[16] Section 5(12), page 8, of the Plan states: "the assignment of outside investigative personnel does not preclude the agency involved from conducting a concurrent investigation for internal purposes as established by that agency."
https://www.co.marion.or.us/SO/Documents/DeadlyPhysicalForcePlan.MC%2012-2022.pdf.
Plaintiff requests that the court take judicial notice of the SB 111 Plan.  FRE 201.

**Page | 36 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**              SUMMARY JUDGMENT**

on page 35 (COS 005891) the overall poor quality of the investigation which included blurred

photographs, important measurements not taken, reports of key personnel that "seemed

rehearsed, vague and duplicated in content," and an interview of the involved officer that "le[ft]

the reader with more questions that needed to be answered" and "did not ask pointed and direct

questions … as to the reasons why he employed deadly physical force; and how his decision to

employ deadly physical force met Oregon law, department policy and … guidelines." *Id*., Park

Decl., Ex. 10, page 3 of 13.  To address the deficiencies in future internal review of OIS

incidents, Lt. Blair made several specific recommendations, which included the following:

> 3. A specially trained department shooting review team should be created to respond to all officer-involved shooting incidents to investigate the incident immediately after the Oregon State Police has completed scene processing and interviews. This department shooting review team could potentially be comprised of a Lieutenant, IA Sergeant, Crime Lab personnel, Civil investigator, and other trained investigators. The team's sole objective would be to gather and compile information to assist in the completion of the Critical Incident Review, IA investigation and civil investigation within the time constraints listed in Directive 4.14. This would consist of interviewing witnesses that are present at the scene in order to eliminate fading memories many months later and avoid trying to locate witnesses several months' later. The team would rely on first hand vs. third hand information in order to complete a comprehensive accounting and analysis of the incident. They would create a contemporaneous account of the incident at the time it occurred without waiting many months later to be tasked with completing the review where information, evidence and witnesses are no longer available to be collected. Additionally, the scheduling of the presentation to the Executive Board should not be made until after the Internal Affairs investigation and Critical Incident Review have been completed.
>
> 4.  … Additionally, a revision to policy 4.01 should be made to include the definition of the word "imminent" in order to eliminate any doubt to its meaning.

*Id*., Park Decl., Ex. 10, page 4 of 13.  Current versions of Salem policy directives 4.01 and 4.14

demonstrate that these recommendations were never implemented. Ditto Decl., Exs. 1, 2 and 3,

ECF 64.

**Page | 37 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
          SUMMARY JUDGMENT**

Identical deficiencies and similar recommendations for modification of OIS internal review policy and practice were noted in several subsequent Critical Incident Reviews of OIS events:  Memorandum dated October 1, 2018, from Lt. Ben Bales to Chief Jerry Moore: "[T]here is also no avenue for the investigating lieutenant to ask follow up questions of the involved officer" …  "The board unanimously agreed there is a need to form a committee to create a process/avenue to obtain additional information from the involved officer that are related to tactics, policy and training.  The criminal investigation does not ask the officers why they took the actions they did and what their thought process was at that moment.  These types of questions are not part of the criminal investigation … which leaves questions and gaps for the investigating Lieutenant." (COS 006266). *Id*., Park Decl., Ex. 10, page 6 of 13.  Memorandum dated April 15, 2021, from Ben Bales, Lt., Review Board Facilitator, to Trevor Womack (a cut and paste of Lt. Bales's comments and recommendations in the October 1, 2018, Memorandum. COS 006330). *Id*., Park Decl., Ex. 10, page 10 of 13.   Memorandum dated November 17, 2021, from Ben Bales, Lt., Review Board Facilitator, to Trevor Womack:

> There continues to be a lack of information to get a clear picture of a critical incident like this. There are many questions related to training, policies and actions taken that OSP simply does not ask. Our directive, 4.14 has an outlined policy on how to obtain this information but the department has not followed the directive to gain further information.

*Id*., (COS 006447-48), Park Decl., Ex. 10, pages 12 and 13 of 13.

Salem Lt. Jeffrey Barratt, who was charged with overseeing the internal review of Bush's OIS, testified:

> Q:     Okay.  Did you have an expectation that [Lt. Diede] would assess the thoroughness of the evidence gathered by the Oregon State Police criminal detectives and crime scene investigators?
>
> A.     I don't know that that is necessarily true.  We don't have any control over the state police in their investigation, and it's been my experience that there is

**Page | 38 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**               SUMMARY JUDGMENT**

stuff that we might want to have in their investigation that they don't deem to be pertinent so they don't collect it, but we don't have any ability to ask them to change anything.

Barratt dep. 36:12-22.

Conducting an internal review of an OIS in reliance on the criminal investigation has long been known by law enforcement professionals to produce substandard internal reviews. The standards for criminal liability and civil liability for unconstitutional behavior are markedly different, as are the public interests served by each process. The focus of a criminal investigation of an officer involved shooting is whether the *mens rea* to charge the officer with a crime is present. Black Report, Section S4, pages 15-21; Section 6a. Criminal detectives leading these investigations are not required to have, and most frequently do not have, training in conducting investigations necessary to conduct internal review. *Id,* Section S4 at pages 20-21. Black observes at Section 6a, at page 33, that "the CIRB recognized that there was an overreliance on the information gained form alternate investigative practices (i.e. criminal) and that this overreliance resulted in needed information not being captured to support a sound inquiry and internal review."

The focus of an internal investigation is to assess whether the use of deadly force was "objectively reasonable" in the constitutional sense from the perspective of the agency's policies and the officer's training – to learn from the event, recommend and implement changes to policy and/or training, impose discipline or provide additional training to the involved officer, and through that process mitigate the risk of future OIS events. *Id*., Section S4.

### 3.     No Interview of Involved Officer

Section H.2.a. of Salem Directive 4.14 provides no guidance when an internal interview of the involved officer must occur. Section H.2.a. simply states,

**Page | 39 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*If necessary*, the Professional Standards Unit investigation team will interview the involved officer after the investigating agency interview. This interview should be delayed until a decision is made by the District Attorney's office about the possibility of criminal prosecution resulting from the investigation of the incident. (*Emphasis added*).

Salem has a longstanding practice of reliance on the OSP interview of the shooting officer to conduct the internal review. Diede dep. 28:16-20; 29:9-15. With one exception, Salem conducted no internal interview of the shooting officer in the seventeen OIS events which occurred in the ten-year period preceding Bush's OIS.[17] Park Decl., Ex. 9, Defs.' Amd. Resp. to Pl's First Set of Interrogatories to Defendant, Response to Interrogatory 1.m. Because of the significant differences in purpose between interviews conducted for a criminal investigation and for an internal review, the information that Salem most needs to assess whether its policies and training are adequate is not collected and evaluated. Black Report. That information can only come from an interview of the officer. As stated by Dr. Black:

SPD's lack of internal interviewing demonstrates that SPD's internal administrative process is insufficient to understand the objective reasonableness standard [for use of deadly force] from the perspective of the involved officer(s) or identify areas of improvement for this policy.

Black Report, page 25, at ¶ iii (1).

C.    The Internal Review of Bush's OIS Demonstrates Salem's Ongoing Deliberate Indifference to the Substantial Risk that its Internal Review Policy is Inadequate to Detect and Prevent Unconstitutional Uses of Deadly Force.

Lt. Lance Diede conducted Salem's "Professional Standards Review of Officer Bush OIS." Diede dep. 32:21 to 33:2 and prepared the report marked deposition exhibit 16 (hereinafter, the "PSR"). He was assigned to Salem's Professional Standards section in January

---

[17] In that case, a Salem SWAT team member and rifle operator fired one round at a barricaded subject and missed under circumstances that were indisputably outside the Graham standard (the (continued) subject posed no imminent threat). Nevertheless, the Marian County DA did not bring criminal charges nor present the case to the Grand Jury.

**Page | 40 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

of 2020, Diede dep. 16:17-19, and remained in that section until October of 2021, *id*., 17:3-8.

While working Professional Standards, Salem provided him with training in internal review of

officer-involved shooting events. Diede dep. 19:8-18; 22:11 to 23:10, and Diede deposition

exhibit 21. To prepare the PSR, Diede reviewed memoranda prepared by each of Salem's

"training discipline leads", [18] *id.,* 33:17-21, as well as "all investigative reports compiled by the

Oregon State Police … interview transcripts, photographs, audio recordings, witness statements

and the Salem Police Department Directives and Policies." *Id*., deposition exhibit 16, page 2.

The PSR asserts that Lt. Diede "determined there was enough information in the investigation to

reach a conclusion regarding Officer Bush's compliance with Salem Police Department Policies

and Directives" and a further interview of Bush was "not necessary."[19] PSR, page 2.   However,

there are obvious material gaps and anomalies in the collected evidence that should have

triggered further inquiry and analysis.

 For example, the PSR recites the sequence of events that occur between the moment that

Bush opens the front door to the Castillo residence and the moment shots are fired.  In that

interval, Bush "pointed his duty weapon at Mr. Castillo III and ordered him several times to drop

the knife … Mr. Castillo III did not drop the knife as ordered, instead choosing to walk several

steps towards Officer Bush … [then] stopped, turned, and started to walk further into the

residence away from Officer Bush … *Officer Bush continued to order Mr. Castillo III to drop the*

*weapon* … stepped into the residence … as Castillo III walked further away … [then] before he

---

[18] There are a total of eight documents which, together, comprise Salem's internal review of
Bush's use of deadly force.  These eight reports were marked as Exhibits 11-18 to Lt. Diede's
deposition and are included with the excerpts of the deposition of Lt. Diede attached as Exhibit 4
to the Park Declaration.

[19] Diede was unaware of any instance in which Salem had conducted an internal interview of a
shooting officer. Diede dep. 29:16-23.

**Page | 41 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
                    **SUMMARY JUDGMENT**

could facilitate extracting Mr. Castillo Jr. from the residence, Mr. Castillo III suddenly spun around … and began to charge toward him … [and] Officer Bush fired …" Lt. Diede's recitation tracks Bush's OSP interview with one subtle but significant modification -- that Bush continued to yell drop the knife as Castillo III was walking away. According to the transcript of Bush's OIS statements, Bush reported that he "*stopped engaging*" Castillo when Castillo turned around and walked away. Bush OIS transcript, page 10, line 36. Lt. Diede's modification aligns Bush's narrative with otherwise objectively contradictory evidence gathered in the investigation – a neighbor's security camera that captured the sound of Bush's commands to 'drop the knife.'[20] If Bush stopped engaging Castillo III when Castillo III turned and walked away, there should be an audible pause between commands to drop the knife and the sound of shots fired. However, as stated in the PSR, security camera footage from a nearby residence captured "clear verbal commands *just prior* to several rounds being fired." No audible pause. This inconsistency, if documented in the PSR, could only be properly investigated through an interview of Bush. At minimum, Lt. Diede's failure to disclose and address this inconsistency in the PSR demonstrates a lack of proper attention to detail. In addition, it supports a reasonable inference that Diede acted deliberately, in accordance with a longstanding custom or practice of not conducting *bona fide* internal review of OIS events.

The thumb drive of the OSP investigation included security camera footage from the Village Shopping Center and LaTapatia Supermarket that captured Bush's approach to the property, his interaction with Misty Castillo and his approach and movements at the front door. Park Declaration, ¶ 5. Neither video nor their content is mentioned in the PSR, although Lt Diede knew there was "some sort of video" capturing those images. Diede dep. 64:16-24.

---

[20] This was the only video Lt. Diede could recall having reviewed. Diede dep. 64:3-15.

**Page | 42 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Nevertheless, Diede did not pursue the processing and analysis of this evidence, nor did he create a timeline of events between Bush's arrival on scene and the shooting, *id*., 64:25 to 65:24; 74:5-16, both of which would be of obvious value in assessing the accuracy of Bush's narrative, as well as determining whether Bush's actions complied with policy and training.   If Salem was conducting a *bona fide* internal review, the ready availability of security audio and video data should have triggered a request for processing this evidence and resulted in further analysis. Lt. Diede's failure to request this evidence to be processed supports an inference that he was acting pursuant to a custom or practice of not conducting *bona fide* internal reviews.

The PSR provides a second example of an apparently deliberate decision to ignore anomalies in the physical evidence that could call Bush's narrative into question or doubt.  At page 3 of the PSR, Lt. Diede makes note of selected items of evidence collected by OSP detectives at the crime scene which included "a thirteen-inch kitchen knife lying near Mr. Castillo" but conspicuously omits reference to the bloody thirteen-inch stainless-steel kitchen knife recovered from behind the recliner.  The same OSP crime scene investigation report is the source of both pieces of information.  See Exhibit 6 to Park Declaration in Support of Plaintiff's Motion for Partial Summary Judgment, ECF 70-5.   Lt. Diede cannot be aware of one large bloody kitchen knife without an awareness of both.  Bush's narrative places only one knife in Castillo's hands.  The fact there were two such knives raises the question, which of these two knives had Castillo been holding before he was shot?  An examination of the blood spatter at the scene and on these knives could be of aid in answering that question.  The internal review memoranda make no reference to the collected blood spatter evidence.[21]  But, of course, the

---

[21] Chief Womack agrees it should have been evaluated as part of the review.  Womack dep. 48:15-25.

**Page | 43 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

answer to that question could challenge the accuracy of Bush's narrative that Castillo was charging him with the knife raised to his shoulder height when shots were fired. Lt. Diede's failure to address and pursue investigation of this anomaly supports the inference that he acted pursuant to a longstanding custom or practice of not conducting *bona fide* internal review of OIS events.

It is undisputed that when defendant Bush responded to the domestic disturbance involving Castillo, he knew that he was responding to an emotionally disturbed or mentally ill person in crisis. It is also undisputed that Bush entered the Castillo residence to confront Castillo without back up. These circumstances are addressed by Salem's Directive 7.15, *Responding to Persons Experiencing Mental Health Crises*, Park Decl., Ex. 1, pages 29-39 (Ex. 7 to Bush deposition), and by officer training that followed from the February 2021 Operational Assessment, *Responses to Suicide Calls*. Park Decl., Ex. 2, pages 17-40 (Ex. 23 to Womack deposition). Of particular relevance, Directive 7.15 states a clear expectation that officers "will attempt to de-escalate the situation, when feasible and reasonable,"[22] and the Operation Assessment recommends "use of cover officers when responding to an incident involving a mental health crisis … wherein the presence of a weapon is likely."[23] The Operational Assessment counsels that "the lack of adequate backup for an officer increases the likelihood of serious injury or death to the person in crisis, innocent family, friends or bystanders, or the officer."[24] Some time after February of 2021 and before July 9, 2021, Salem implemented the recommendations in the Operational Assessment, Womack dep. 51:20 to 53:4, inclusive of training on the need to wait for cover officers. *Id.*, 54:22 to 55:11.

---

[22] Directive 7.15, date reviewed 06-04-21, Introduction, Section 1, page 1.
[23] Operational Assessment, page 17.
[24] *Id.*

**Page | 44 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
        SUMMARY JUDGMENT**

It is a reasonable inference that when the Bush OIS internal review was conducted, Lt. Diede and Lt. Barratt were familiar with the recent changes to policy and training regarding response to emotionally or mentally disturbed persons in crisis.  As noted in the discussion of lawfulness of Bush's entry of the Castillo residence earlier in this memorandum, the statement Bush made to OSP detectives about the reason for his decision to enter, at minimum, raise questions whether there was opportunity for attempt at verbal de-escalation before Bush opened the door and whether exigent circumstances rendered the decision to open the door when Bush did so, lawful. However, neither the PSR, Lt. Barratt's Lieutenant's Review nor the memorandum of any other use of force discipline lead address whether Bush's actions were in line with Directive 7.15 or the training flowing from the Operational Assessment.  Lt. Diede never considered whether Directive 7.15 was applicable. Diede dep. 72:23 to 73:2. The Lieutenant's Review does not address whether Bush's time listening at the front door presented an opportunity to attempt verbal de-escalation.  With regard to Bush's decision to enter without waiting for cover officers, Lt. Barratt noted that "it could be argued that Officer Bush should have waited for additional units to arrive prior to entering the residence," but approved of Bush's decision to enter "given the facts as [Bush] knew them."[25] Plainly, without interviewing Bush, Lt. Barratt had no way of knowing the facts as Bush knew them. Bush's SB-111 interview does not explore Bush's knowledge whether back up was on the way, when it would arrive, what the lighting conditions on the porch were, his perception of the imminence of any threat of harm that Castillo may have posed to his father or whether or how Bush may have weighed that information before making the decision to push open the door.  Here again, the longstanding practice of not

---

[25]  Lieutenant's Review, page 5.

**Page | 45 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

interviewing the involved officer supports the inference that Salem's internal review process was not authentic.

Salem knows that review of the autopsy report is an important element of every shooting death investigation. Diede dep. 50:4-6; Womack dep. 47:15 to 48:4; Barratt dep. 65:15-21. However, the autopsy report was not obtained and reviewed, Lt. Diede knew that it had not been obtained and reviewed[26] and, nevertheless Lt. Diede failed to flag the absence of this critical evidence in the PSR.[27]

Lt. Barratt was the lead command level staff overseeing Salem's internal review of the Bush OIS, Diede dep. 45:19 to 46:13, and he authored the "Lieutenant's Review", deposition exhibit 17. Barratt dep. 53:8 to 54:11, 55:18-25. The scope, content and standards for preparation of the Lieutenant's Review are not addressed by written policy. Lt. Barratt lacked a clear understanding of its purpose, Barratt dep. 56:1-15, and denied that he had a quality assurance function in its preparation. *Id*. 57:12-24. He was directed to compile the findings of the PSR and the training discipline leads into a single document "so that the Chief doesn't have to go back … through every single one of those documents." *Id*., 57:5-11. Nevertheless, Lt. Barratt received the thumb drive, Barratt dep. 38:15-17, and conducted his own "review of the Oregon State Police investigation, the Salem Police reports written about this incident, and the evaluations of the incident done by the Salem Police Department lead instructors for all use of

---

[26] The medical examiner's autopsy report was not among the documents on the thumb drive. Park Declaration, ¶ 5.

[27] The Firearms Review memorandum, exhibit 13, page 6, to the Diede deposition, specifically noted that the autopsy report was not available: "I was unable to review the autopsy report for this incident … It is extremely difficult to conduct a thorough, accurate review and assessment of bullet performance without additional information from the autopsy."

**Page | 46 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

force disciplines" and "examined the Professional Standards Office review of the incident." Lieutenant's Review, Diede deposition exhibit 17, page 3.

While preparing the Lieutenant's Review, Lt. Barratt learned that the autopsy report was not part of the investigative file. *Id.*, 71:8-12. He knew that the paths of bullets through the body cannot be determined by photographs of the gunshot wounds as Sgt. Smith attempted to do in his Firearms Review, *id.* 73:3-6. He knew that no member of the internal review team determined whether the bullet paths through Castillo's body supported or refuted Bush's narrative of events. *Id.*, 67:11-18. He knew that he did not know whether information in the autopsy report supported or refuted Officer Bush's version of the event. *Id.*, 74:24 to 75:6. Yet, he did not flag the absence of this critical evidence in the Lieutenant's Review, nor bring the matter to the attention of Chief Womack. *Id.*, 73:7-14. This is more than mere inattention to detail. Lt. Barratt's decisions support the reasonable inference that the methodology employed in Salem's review of Bush's OIS event was part of a longstanding custom and practice of not conducting *bona fide* internal reviews.

> D.    Plaintiff's Expert's Examination of Salem's Internal Reviews of OIS from 2011 to 2021 Shows a Recurring Practice of Conducting Substandard Investigations of which Salem knew or should have known and for which no corrective action was taken.[28]

John R. Black, a highly qualified police practices expert in both use of force policy and review of police accountability systems, see Exhibit 2 to Black Declaration (CV), and was retained by plaintiff's counsel to review materials regarding the Salem Police Department's policies, customs and practices with regard as assessment of whether their methodology and process for conducting internal review of officer involved shooting events resulted in bona fide

---

[28] In the interests of brevity, plaintiff has not attempted to summarize all of Dr. Black's observations and analysis. Plaintiff urges the court to carefully review Dr. Black's report.

**Page | 47 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

investigations.  The materials reviewed to form his opinions are listed in Exhibit 3 to his

declaration.   His opinions are summarized at pages 42 and 43 of his report, Black Declaration,

Exhibit 1, in response to questions posed by plaintiff's counsel:

> Is the Salem Police Department's (SPD) current internal review process adequate and capable of recognizing when an SPD officer uses deadly force contrary to law or agency policy?
>
>> • In my expert opinion, I find that the current internal review process is inadequate and not indicative of accepted practices found within sound inquiry when police officers use deadly force. It can be reasonably inferred that the inadequacy of the process contributes to an incomplete understanding of the event. An incomplete understanding can allow potential violations of policy and training, as well as areas for agency improvement, to go undetected.
>
> Is the SPD internal review process based on sound and accepted practices?
>
>> • In my expert opinion, the current internal review process does not incorporate accepted practices associated with the sound inquiry into a police officer's use of deadly force.
>
> If not, would adopting sound accepted practices increase the likelihood of SPD detecting applications of deadly force contrary to the current state of law or policy violation?
>
>> • In my expert opinion, the adoption of the concepts mentioned in this report and found in research increases the likelihood of SPD developing a complete understanding of when officers use deadly force. Combined with developing and refining policy based on model policy and research, training based on the same, and the training of specialized teams and individuals in the inquiry of deadly use of force, it would be expected that the likelihood of SPD detecting any potential violation of policy or law as well as areas for agency improvement in the same said areas would increase.
>
> Is there evidence that before July 9, 2021, SPD knew or should have known that its internal review process was inadequate and, therefore, unlikely to achieve the purpose of understanding whether policy had been violated or determining areas of agency improvement reliably?
>
>> In my expert opinion, there is evidence that SPD both knew (as found within the evidence provided) and should have known (as found within accepted understandings within the profession of law enforcement and related research) that the current review process is unlikely to achieve the purpose of fully understanding whether policy had been violated or determining areas of agency improvement reliably when police officers use deadly force.

**Page | 48 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
        SUMMARY JUDGMENT**

The foregoing evidence would permit a reasonable juror to find that defendant Salem has, with deliberate indifference to the citizens' constitutional right to be protected from excessive deadly force, maintained a longstanding custom and practice, amounting to official policy, of conducting inadequate internal review of OIS events. Salem's policy enables officers so inclined, as plaintiff alleges defendant Bush to be, to fabricate facially valid justification for their use of deadly force confident in the knowledge that their narrative will not be challenged. A reasonable juror may infer from Bush's fabricated narrative in this case that Salem's failure to conduct *bona fide* OIS investigations played a substantial part in bringing about Castillo's death and plaintiff's damages.

V.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Negligence Claim.

Defendants Bush and the City assert they are entitled to judgment as a matter of law on plaintiff's negligence (wrongful death) claim because, they argue, it is "settled law in this district" that state law negligence claims cannot be founded upon the same facts that give rise to a § 1983 claim. (Defendants' Motion at p. 19). Because plaintiff premises her negligence claim upon the same facts as her § 1983 claim, defendants argue, plaintiff's negligence claim is "invalid as a matter of law." (*Id.* at p. 20).

While this District has previously rejected negligence claims founded upon the same facts underlying concurrent § 1983 claims, that historical practice has since been examined and expressly rejected as any principle of "settled law." *Johns v. City of Eugene*, No. 6:16-cv-00907-AA, 2018 WL 634519, at *11 (D. Or. Jan. 30, 2018), *rev'd on other grounds and remanded*, 771 F. App'x 739 (9th. Cir 2019); *Bratcher v. Polk County*, No. 3:20-cv-02056-SB, 2022 WL 17184419, at *18 (D. Or. Sept. 1, 2022).

**Page | 49 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
               **SUMMARY JUDGMENT**

As the Court in *Johns v. City of Eugene* explained in its thorough examination, and ultimate rejection, of defendants' present argument "neither federal nor Oregon law prohibits negligence claims and civil rights claims based on the same set of facts from proceeding to trial together." 2018 WL 634519, at *11. Stated differently, there is no rule requiring this Court to reject a negligence claim "simply because it rests on the same factual allegations as a civil rights claim under § 1983." *Id*. at *14. After rejecting the bright-line rule Defendants argue for in the present matter, the Court in *Johns*, considered whether the concurrent negligence and § 1983 claims in that case presented a conflict for the jury:

> Here, for example, plaintiff's negligence claim centers on whether the individual officers breached their duty to perform a thorough and competent investigation before making an arrest decision. There is no conflict between a jury finding defendants liable on that negligence theory and simultaneously finding that the officer's investigation fell short of the Fourth Amendment's objective reasonableness standard.

*Id*. at 13.

As was the case in *Johns*, there is no conflict in the present claim for a jury finding defendants liable on concurrent negligence and § 1983 claims. Plaintiff's present negligence claim is premised on defendant Bush's conduct leading up to his ultimate use of force against Arcadio Castillo III. (First Am. Compl. ¶33). There is no conflict in a jury finding that defendant Bush's conduct leading up to his use of force was negligent, and a finding that Officer Bush's subsequent use of force violated the Fourth Amendment.

Thus, what remains is the question of whether there is sufficient evidence in the summary judgment record to support the reasonable inference that defendant Bush was negligent. A negligence claim, under Oregon law, requires plaintiff to prove:

> 1) that defendant's conduct caused a foreseeable risk of harm, 2) that the risk is to an interest of a kind that the law protects against negligent invasion, 3) that defendant's conduct was unreasonable in light of the risk, 4) that the conduct was a

**Page | 50 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
        **SUMMARY JUDGMENT**

cause of plaintiff's harm, and 5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made the defendant's conduct negligent.

*Son v. Ashland Cmty. Healthcare Servs.*, 244 P.3d 835, 841 (Or Ct. App. 2010).

There are material issues of fact as to all elements of plaintiff's negligence claim concerning Bush's conduct leading up to his entry into the Castillo residence, as alleged in Paragraph 33 of plaintiff's First Amended Complaint.[29] The first and third elements look to whether Bush's conduct caused a foreseeable risk of harm, and whether Bush's conduct was unreasonable considering the foreseeable risk of harm. As discussed above, prior to entering the Castillo residence Bush did not knock and announce his presence (Bush dep 74:8-14) despite knowing that if he entered without announcing he risked making the situation worse. (*Id*. at 81:12-15*). See also Zermeno*, 66 F.3d at 1062 (explaining the "knock and announce" rule, as codified at 18 USC § 3109 "reduces the potential for violence to both police officers and the occupants of the house into which entry is sought."). Bush was trained in verbal de-escalation techniques, and the City had directives on verbal de-escalation (*Id*. at 108:2-17), yet Bush did not attempt de-escalation prior to entering the Castillo residence. (*Id*. at 109:8-10). Additionally, Bush had been trained to await a cover officer before attempting contact with a person believed to be emotionally disturbed (82:3-19), and Bush knew that cover officers were seconds away, yet he did not await cover officers prior to entering the residence to contact Arcadio Castillo III (*Id*. at 81:1-11; GJ Tr. 126:3-13). Indeed, the City's Operational Assessment expressly confirms the foreseeable risks of not waiting for cover, counseling "the lack of adequate backup for an officer

---

[29] Because this case involves Arcadio Castillo III losing his life when Bush entered his house and shot him dead, there should be no dispute as to element two (that the risk is to an interest of a kind that the law protects against negligent invasion), and element five (that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made the defendant's conduct negligent).

**Page | 51 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

increases the likelihood of serious injury or death to the person in crisis, innocent family, friends or bystanders, or the officer." Park Decl., Ex. 2, page 33 of 47 (emphasis added). Consequently, there is ample evidence in the record from which a reasonable jury could find that Bush acted negligently when he entered the Castillo residence in the fashion he did, and this evidence does not conflict with the facts underlying plaintiff's § 1983 claim.

Finally, the fourth element requires the plaintiff to prove causation. From the evidence in the record a reasonable jury could conclude that if Bush had attempted any or all these techniques prior to entering the Castillo residence – knocking and announcing, attempting verbal de-escalation, and/or awaiting a cover offer – that Arcadio Castillo III's death would have been avoided. It follows that there is a material issue of fact on whether Bush's negligent failure to attempt any of these techniques prior to entering the Castillo residence was a substantial factor in causing Arcadio Castillo III's death.

**CONCLUSION**

Defendants Motion for Summary Judgment should be denied in its entirety.

DATED:          February 6, 2024.

ELLIOTT & PARK, P.C.

s/ David D. Park

By:    _____

David D. Park, OSB #803358
(Mr./he/him)
E-mail:  dave@elliott-park.com

Ron L. Sayer, OSB No. 951910
E-mail: rsayer@gattilaw.com
James M. Healy, OSB No. 123403
E-mail: jhealy@gattilaw.com
The Gatti Law Firm

Attorneys for Plaintiff

**Page | 52 - PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**