*FORENSIC ANALYSIS*
*Michael A Howard*
*Forensic Scientist*

61380 State Hwy. 129                              Cell  360-690-5733
Anatone WA. 99401
===============================================================

Jan. 23, 2024

In the case of Misty Castillo v. Nathan Bush and City of Salem I have been requested to review and comment on the Expert's Reconstruction Report and the draft Declaration[1] of Rod Englert with regard to the scientific reliability and validity of the opinions and conclusions expressed there.

Forensic crime scene reconstruction involves the "utilization of information gathered from the investigative process to develop or eliminate possible explanations for how an incident occurred."[2] In short, to determine what did or did not happen based on the physical evidence.  In performing that function a crime scene reconstructionist is required to use scientifically reliable and valid methods, practices and analytical procedures,[3] provide documentation and testimony of the scene that clearly represents its initial condition, act thoroughly to produce results, conclusions and testimony within the scope of the expertise of the individual practitioner,[4] and ascertain facts without regard to potentially biasing influences.[5]  When expressing an opinion or conclusion, the reconstructionist must explain how specific physical evidence gathered from the investigative process and any relevant scientific facts, methods or principles applicable to that evidence support the opinion or conclusion.

As discussed below, Mr. Englert's reconstruction of the shooting of Arcadio Castillo III (hereinafter referred to as "Castillo") does not follow this process

---

[1] An unsigned document titled "Declaration of Rod Englert in Support of Defendants' Motion for Summary Judgment was provided for my review by David Park on January 12, 2024.
[2] Organization of Scientific Area Committees for Forensic Science (OSAC) Proposed Standard 2021-N-0015, "Guiding Principles for Scene Investigation and Reconstruction", ¶ 3.9, Version 2.1, January 2024.
[3] Id., ¶4.3.
[4] Id., ¶4.6.
[5] Id., ¶4.7.

EXHIBIT 1 - Page 1

Castillo v. Nathan Bush and City of Salem
Page 2

and, as consequence, his ultimate opinion that the physical evidence presented does not contradict Officer Bush's recollection of the incident is invalid.

The first step of the reconstruction mentioned in Mr. Englert's declaration is "questions to be resolved." Mr. Englert's report does not contain a statement of the questions for resolution.  One might infer that his reconstruction is framed by a single question, 'Does the physical evidence contradict Bush's recollection of the incident?' Framing the question in this manner is problematic in at least two respects.  First, by beginning with the premise that Bush is telling-the-truth about Castillo's actions and location within his residence immediately prior to and at the moment he is shot, it introduces cognitive bias[6] into the scientific process.  Mr. Englert's reconstruction explores a single explanation of how the shooting occurred that is not grounded in physical evidence, rather than exploring one or more explanations derived from review and analysis of the physical evidence. Second, Officer Bush does not have a single consistent recollection of those facts. Mr. Englert does not explain how the physical evidence supported the probable accuracy of the recollection described in his report; further, Mr. Englert does not explain why the physical evidence eliminated the probable accuracy of Bush's prior conflicting recollection.

A reconstruction grounded in physical evidence poses the following questions: 1) Can Castillo's location  within the  residence during the one second interval that he sustained all four gunshot wounds be determined from the physical evidence?  2) Can Castillo's anatomic position and movements at that location during and after this brief interval be determined from the physical evidence?

Dr. Clifford Nelson, the pathologist who performed the autopsy, has stated in his deposition that gunshot wound (GSW) III, the wound that caused injury to Castillo's lungs, would cause expirated blood. That is blood that has entered the air canal and is being coughed, spit or snorted out. He also stated that after Castillo received the gunshot wound that perforated his heart, GSW I, Castillo's heart would continue to beat and pump blood for a

---

[6] Id., ¶3.1, defining cognitive bias as "a set of influences that may affect the reliability and validity of one's observations and conclusions."

EXHIBIT 1 - Page 2

Castillo v. Nathan Bush and City of Salem
Page 3

period and that this could cause blood to be pumped out of the wound. In this case, there is no disagreement that the GSW I wound did cause blood to be pumped out of the wound.   Arterial spurting from such a wound produces a blood stain pattern that is called projected staining. So, the two major sources of blood staining at the scene are projected stains and expirated stains. Castillo's other two gunshot wounds would also bleed but would not cause major patterns.

There are a number of bloodstained areas within the Castillo residence of significance that can help place Castillo at the time of the shooting. One of these areas is the blood spatter[7] on the tile floor behind the recliner. This bloodstain pattern was noted in Mr. Englert's original report in Image 24 without discussion of its relationship to Castillo's wounds or probable location when shot.  The spatter behind the recliner on the tile floor and on the south end of the blue couch and pillow is expirated blood. These bloodstain patterns can only occur after the wound that goes through the lungs and places Castillo south of the couch and to the right of and slightly behind the recliner (as one is facing) when he is shot, the location illustrated in Exhibit 12 to my prior declaration.  Mr. Englert's failure to take this blood spatter into account and explain how it could be back this far from the door if Castillo were charging the door and the shooting ended when Castillo and Officer Bush were "7 feet, 9-1/2 inches apart" ignores the role physical evidence must play in developing or eliminating possible explanations for how the incident occurred.

Another piece of physical evidence bearing on Castillo's physical location when shot is the stainless-steel knife that was located behind the recliner. In her July 10, 2021, statement to investigating officers Misty Castillo described the knife her son was holding that night as "all steel."  That knife is the only all-steel knife found at the scene.  No witness places more than one knife in Castillo's possession at the time he was shot, or at any other time before he was shot.  Mr. Englert observed that "the varied bloodstain patterns on each side of [this] knife blade indicate the knife was in movement during the bloodshed event".[8]  I agree.  Englert makes no comparable observations regarding the bloodstain patterns on either of the

---

[7] The definition of "spatter stain" is found in the Glossary appearing at page 62 of Englert's report: "A bloodstain resulting from an airborne blood drop created when external force is applied to liquid blood."
[8] Englert Report, page 57.

EXHIBIT 1 - Page 3

Castillo v. Nathan Bush and City of Salem
Page 4

other two knives found at the scene.  The bloodstain on the stainless-steel knife supports the factual conclusion that this was the knife Castillo was holding when he was shot. Yet, Mr. Englert is silent on the conclusion about Castillo's location when shot that necessarily follows from this physical evidence.

The stainless-steel knife was located at the very left  rear corner of the recliner (as one is facing). As noted by Mr. Englert, there was expired blood on the blade of this knife. Mr. Englert did not comment on the directionality of that blood.  My training and experience tell me this blood had a downward directionality toward the point, meaning the knife was being carried point down toward the floor and not aimed at Officer Bush when the blood was deposited on the knife. As the top of the recliner's seat back was against the wall the knife could not have been tossed to its recovered location from above. It means that after Castillo was shot and expired blood was deposited onto the knife, the knife was "tossed" behind the chair. There is a triangle of space behind the chair and the wall caused by the lean of the seat back. The knife would have to pass through this space to arrive at the location where it was found at the scene. Officer Bush places the knife in Castillo's right hand and down by Castillo's side and places Castillo standing in the space to the right side of the recliner (as one is facing) at the moment the front door is opened, placing Castillo at this very location during some portion of the incident. Mr. Englert's report and Declaration are silent on the necessary factual conclusion flowing from the recovered location of this physical evidence, namely, that Castillo was located to the right of the recliner roughly perpendicular to the space between the back of the recliner and the living room wall in a forward bending anatomic position when the knife left his hand.

There is expired blood staining on the right arm (as one is facing) of the recliner, backrest of the recliner and the steak knife recovered from the blanket situated on top of the seat of the recliner, Exhibit 4e to my prior Declaration. There is a projected pattern[9] of  blood staining on the arm of the recliner, back of the recliner, footrest of the recliner and the carpet in front of the recliner, Exhibits 3 and 8 to my prior Declaration, that have a right to

---

[9] "A bloodstain pattern resulting from the ejection of blood under hydraulic pressure, typically from a breach in the circulatory system."  Englert report, Glossary, page 62.

EXHIBIT 1 - Page 4

Castillo v. Nathan Bush and City of Salem
Page 5

left or west to east (as one is facing) directionality. There is a projected pattern on the carpet in front of the southerly (farthest from the front entrance) end of the couch that appears to have a south to north directionality (toward the door), Exhibit 4d to my prior Declaration. Mr. Englert's report makes note of this evidence, but it is silent on the factual conclusion  supported by this evidence, namely, that Castillo was  located close to the recliner when he was shot.

As Englert's report observes, the projected pattern stains on the floor at the doorway and on the door show that Castillo did, in fact, move forward to a location near the door after he was shot. There are expired blood stains on the north end (end closest to front entrance) of the couch. Also, projected stains are present on the linoleum floor between the fully open door and the couch. This means that the door had to have been partially closed when these stains were first deposited. The "swipe" pattern or smearing of the projected stains on the floor captured in images 15, 17, 19, 20 and 22 of Englert's report show the door was pushed back open after the projected pattern blood was deposited.  The necessary factual conclusion that follows is that Castillo began his movement toward the front door after he was shot from a distance greater than the distance the chest wound through his heart, GSW I, would project blood. If Castillo was in forward motion at the location and the front door was in the position shown in images 70 and 71 of Englert's report when Castillo sustained GSW I, the front door in the opened position shown in those images[10] would block deposit of projected pattern blood that is present on the floor between the open door and the couch and the expired blood on the north end of the couch.

Mr. Englert's report is silent on the presence of the swipe pattern and the necessary factual conclusion that the door was partially closed when the projected blood was deposited.  His statement on page 15 of his report that "the door was open during this bloodshed event" is particularly misleading because the swipe pattern is apparent in image 15 on that very same page.

Other available evidence provides an explanation supporting the factual conclusion that the door was in a partially closed position when or

---

[10] Unlike the door used in Englert's simulation, the crime scene photos show that the Castillo's entrance door in the open position extends to the southern most edge of the linoleum. *See, e.g.*, Englert report images 15, 16, 20 and 22.

EXHIBIT 1 - Page 5

Castillo v. Nathan Bush and City of Salem
Page 6

immediately after shots were fired.  Bush did not push the door all the way open before he shot Castillo. This is consistent with Mr. Keidatz's statement that, "as the door opened, which he demonstrated with his hands to open about two feet wide, the shots rang out."[11]

Castillo's Anatomic Position When Shot.

Mr. Englert conducted a simulation of Officer Bush's recollection of the shooting using a human model marked with bullet entrance and exit locations, a taped floor plan of the front door entrance, living room and hallway of the Castillo residence, Officer Bush and string to represent the trajectory of each bullet path through Castillo's body extending back to the simulated muzzle of Officer Bush's pistol (the index finger of Bush's right hand).  According to paragraph 7.b.ii of Mr. Englert's draft declaration, the principal objectives of the simulation were "to attempt to sequence the shots based upon the angle of wound entry and wound paths in the body" and to determine "what anatomic positions … Castillo III and Officer Bush have been in prior to, during and after the shooting."

Simulations are commonly used by reconstructionists to aid their understanding and interpretation of physical evidence.  However, to be of scientific value, simulations must accurately incorporate the conditions at the scene.  Mr. Englert's simulation does not.  Officer Bush was on the porch when he shot Castillo. The porch of the Castillo residence is between 3.5 inches and 6 inches below the elevation of the floor of the living room. Simple geometry informs us that the failure of Mr. Englert's simulation to replicate that condition invalidates every inference he has drawn about the anatomical positions of Castillo when struck by each bullet.

There is a second glaring scientific flaw apparent in Images 74, 75 and 76 depicting the simulated reconstruction of the trajectory of the bullet that caused GSW III.  Dr. Nelson testified that this wound was caused by a bullet that passed through another object prior to entering Castillo's right arm.  The physical evidence tells us the object was the front door.[12] As stated in Mr. Englert's description of Image 76, the Castillo model was positioned to be in

---

[11] 36" is the standard width of a front door to a residence.
[12] See Englert Report, pages 12-13, Images 10-11.

EXHIBIT 1 - Page 6

Castillo v. Nathan Bush and City of Salem
Page 7

"alignment with the door defect." The science of ballistics informs us that bullets deflect (change course) when they strike an intermediate target and the degree of deflection may be significant (e.g., the magic bullet in the JFK assassination) and unpredictable.[13] Because the degree of deflection is unknown, alignment of the model with the door defect yields no scientifically valid information about Castillo's anatomic position.

The description of "Phase E" of Mr. Englert's report, at page 43, states: "Officer Bush testified that Castillo went down toward the front door prior to standing back up and leaning forward while bleeding heavily.[14] Castillo then turned left (counterclockwise), stumbled backward and went down to the ground in front of the recliner chair in the living room, in a yoga-type position with his head pointed west."

Neither Mr. Englert's report nor his declaration identify the specific physical evidence (the crime scene photographs that depict the bloodstains relied on) that support Officer Bush's statements that Castillo turned left or collapsed with his head pointed west. The absence of significant projected bloodstain on the seat and backrest of the middle section of the couch and the presence of multiple locations of significant projected bloodstain to the east (right) of the front door are inconsistent with Castillo turning to his left from a standing position near the front entrance when he moved away from that door.

Officer Bush's statements to Mr. Englert about Castillo's movement away from the front door contradict his previous description of Castillo's movement provided to the Oregon State Police, his sworn testimony before the Grand Jury and his deposition testimony attesting to the accuracy of his statement to the Oregon State Police. Officer Bush previously described Castillo as stumbling backwards, turning to his right and collapsing on his knees with his right side against the recliner and his head pointed to the east.[15] That position is consistent with the location of the largest pooling

---

[13] Hueske, Edward E., Practical Analysis and Reconstruction of Shooting Incidents, Second Ed. pages. 17-21.

[14] Bush Grand Jury testimony: "he buckled so I don't know if he went all the way to the ground." GJ Tr. 137. Bush deposition testimony: "I don't know [if he went all the way to the ground]." Dep. 97.

[15] "[H]e was in front of that recliner. And his head was – his right side was along that recliner. So his – he had stumbled backwards and then he dropped to his knees in front of that recliner. And then slumped with his head kind of in dad's direction towards that east wall."

EXHIBIT 1 - Page 7

Castillo v. Nathan Bush and City of Salem
Page 8

stain in front of the recliner.  That position is consistent with Officer Bush pulling Castillo by his right wrist/arm and rolling Castillo onto his back to the location and body position depicted in the crime scene photo marked Exhibit 4d to my prior Declaration.  Castillo's feet are to the west side of the recliner and extend south.  Castillo's right arm is above his head, consistent with that limb being used to pull and turn Castillo face up from a position in which his head was pointed east.

Guiding principles for a crime scene reconstructionist include (and require) transparency.[16]  In expressing the opinion that "the physical evidence presented does not contradict Officer Bush's recollection of the incident", his failure to acknowledge this glaring contradiction in Bush's recollection and to explain how he nevertheless formed the stated opinion violates this basic principle and undermines its reliability and vailidity.

The foregoing comments are not intended to express a complete critique of the validity and reliability of Mr. Englert's opinions and conclusions.

It remains my opinion that the physical evidence and scientific testimony not only contradict Bush's recollections of the incident, but render impossible the scenario that Castillo was shot while charging Officer Bush with his right arm raised in the manner demonstrated by Officer Bush in his deposition.

Respectfully,

Michael A Howard
Forensic Scientist

---

[16] OSAC Proposed Standard 2021-N-0015, ¶4.6.

EXHIBIT 1 - Page 8