**David D. Park, OSB #803358**
dave@elliott-park.com
Elliott & Park, PC
Abernethy House
324 S. Abernethy Street
Portland, OR 97239-8529
Telephone: 503-227-1690
Facsimile: 203-274-8384

**Ron L. Sayer, OSB #951910**
rsayer@gattilaw.com
**James M. Healy, OSB #123403**
jhealy@gattilaw.com
The Gatti Law Firm
235 Front St. SE, Ste. 200
Salem, Oregon, 97301
Telephone: 503-363-3443
Fax: 503-697-0841

      Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>      Plaintiff,<br><br>   v.<br><br>NATHAN BUSH and CITY OF SALEM, A municipal corporation<br><br>      Defendants. | Case No. 6:22-cv-00684-MK<br><br>**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**ARGUMENT**

Defendants argue Plaintiff's Motion for Partial Summary Judgment is based on "conspiracy theories" and for that reason should be denied. Plaintiff's Motion for Partial Summary

**Page | 1 – PLAINTIFF'S REPLY**

Judgment is based on objective physical evidence, as detailed in Plaintiff's initial Motion, and should be granted.

> **A. Plaintiff's Expert Michael Howard is Qualified to Render His Scientific Opinions, and Contrary to Defendant's Expert, Rod Englert, Mr. Howard Sufficiently Explained His Methodology.**

As is apparent from Mr. Howard's CV he is qualified to render the opinions expressed in his original and Second Declarations. He has degrees in general science and medical terminology, and a long career as a *Criminalist* with the Oregon State Police. Howard Decl., Ex. 1, page 1, ECF 67-1. Mr. Howard is a lifetime member of Northwest Association of Forensic Scientists, which admits members who are "engaged in the application of natural sciences to the examination of physical evidence involved in legal problems."[1] *Id.*, Ex. 1, page 5. Mr. Howard is not a *Criminologist* as Defendants argue.[2] Defendants' apparent lack of understanding of the distinction between criminalists and criminologists, and further lack of understanding of what criminalists do, is why Defendants do not understand – and misrepresent – Mr. Howard's methodology.

Criminalistics is the application of scientific techniques to aid in the collection and analysis of physical evidence from a crime scene.[3] Criminalists compile, document, preserve, and observe physical evidence to understand the events of a crime, and use that evidence to piece together how an event unfolded.

Mr. Howard's methodology is patent in his opening Declaration. ECF 67. He first states what he was asked to determine using criminalistic analysis – Arcadio Castillo III's location within the residence when he was shot, his body position relative to the shooting officer when struck by

---

[1] www.nwafs.wildapricot.org/about (last viewed February 15, 2024).
[2] Defendants argue "[w]hile Mr. Howard may have expertise in certain criminology fields (e.g. Intoxilyzer machines or body fluid collection/analysis) he is not qualified to testify about bullet province and trajectory, nor is he qualified to testify about biomechanics." Defs. Resp., p. 2.
[3] Mirriam-Webster:  https://www.merriam-webster.com/dictionary/criminalistics

**Page | 2 – PLAINTIFF'S REPLY**

the bullets, the order in which the bullets struck his body, and whether any of the wounds were consistent with Arcadio Castillo III charging forward. *Id*., ¶2. Mr. Howard next discloses all the evidence he reviewed in the matter, including a site visit to the location of shooting. *Id*., ¶3. Finally, in answering the questions posed to him, Mr. Howard details his methodology by explaining how and why the objective physical evidence, when analyzed as a criminalist, supports his opinions. For example, in paragraph 5 of his Declaration Mr. Howard explains:

> "When Arcadio Castillo III was shot he was located in the short hallway leading to the eating area/kitchen at the approximate location of the knife that is identified by Evidence Marker 4 in the crime scene photo attached as Exhibit 3 to this declaration. All four gunshot wounds Castillo III sustained were sustained at this location. *This opinion is supported by the presence of apparent expectorated blood on the couch, overstuffed chair and floor behind the chair as noted on the crime scene photos attached hereto as Exhibit 4a, 4b, 4c, 4d, and 4e. The damage to Castillo III's lungs from the path through his body of the first bullet to strike Castillo III as described in paragraph 7, below, would cause Castillo III to expectorate blook from his mouth or nose. Witness Gary Keidatz was watching the Castillo residence from his bedroom window directly across the street at the time the shots were fired and observed that as the door opened to about to feet wide the shooting started. Both Nathan Bush, Exhibit 5 [Bush's marked Faro Scan Diagram, point "4" (see, Bush's July 14, 2021 OIS statement, pages 10, line 27 and 15, lines 38-40], and Arcadio Castillo, Jr.'s deposition diagram, Exhibit 6 [Castillo Jr. depo. 34, line 12 to 41, line 5 and dep. Ex. 109], place Castillo III at this same general location with his arms down at his sides when the front door opens.*"
> (emphasis added).

Unlike Defendant's expert who purports to reconstruct bullet trajectories using dissimilar site conditions and altered or conflicted witness statements, Mr. Howard did not conduct a bullet trajectory analysis. Instead, Mr. Howard engaged in a criminalistic analysis of looking at the totality of the evidence gathered at the crime scene, and then applying the various scientific methods of a criminalist to determine, on a more likely than not basis, Arcadio Castillo III's location and body position when he was shot, the probable order of the bullet injuries, and whether the physical evidence supports Defendants' assertion that Arcadio Castillo III was charging Defendant Bush when shot. For every opinion he reaches, Mr. Howard points to the evidence

**Page | 3 – PLAINTIFF'S REPLY**

upon which his opinion is based and explains how and why the evidence supports the opinions he forms. Mr. Howard's methodology meets the requirements of Rule 702.

Mr. Howard is certainly qualified to render the opinions he does, as evidenced from the face of his CV alone. Further, there is no Rule 702 problem with respect to Mr. Howard's methodology as Defendants complain. Defendants' objection to Mr. Howard's Declaration should be denied.

**B.** **The Contentions in Defendants' Response Brief Do Not Create Material Issues of Fact Such That Plaintiffs' Motion Should be Denied**

It is significant to note that Defendants fail to address, in any respect, the audio/video evidence and timeline, Exs. 2 and 3 to Newman Decl., ECF 69. This uncontradicted evidence establishes that 4.1 seconds (plus/minus 0.27 seconds) elapsed between defendant Bush's opening of the Castillo residence door and his shooting of Arcadio Castillo III. In that brief interval, the audio record establishes that defendant Bush yelled "put the knife down, put the knife down, put it down," followed immediately by four gunshots in rapid succession. As argued in Plaintiff's Motion for Partial Summary Judgment, ECF 66, p. 8-10, this physical evidence disproves Bush's sworn statements of his interaction with Arcadio Castillo preliminary to the shooting, i.e., Castillo III taking two "slow" steps toward Bush, Bush yelling *multiple* times "drop the knife," Castillo III turning around, walking away, and a verbal pause – "I stopped engaging him." Park Decl., ECF 70-3, Ex. 3, Bush Dep. p 38. It defies common sense – it is impossible -- for all the things Bush swore occurred to have occurred within that brief interval. Defendants' failure to address this evidence is, alone, sufficient reason for this Court grant plaintiff's motion.

On Plaintiff's evidence that Defendants have chosen to address, Defendants attempt to raise four issues of fact: 1) which knife from the crime scene Arcadio Castillo III was holding when he

**Page | 4 – PLAINTIFF'S REPLY**

was shot, Defs. Resp. at 6-8; 2) the order of the bullet injuries to Arcadio Castillo III, *id*. at 8-9; 3) how the stainless-steel knife got behind the recliner, *id*. at p. 9-10; and 4) the assertion that Arcadio Castillo III was "closing distance" between himself and Bush, *id*. at 10-12. Issue 1, which knife Arcadio Castillo was holding, and issue 3, the recovery location of stainless-steel knife, are addressed jointly because they are interrelated. Issue 2, regarding the order of bullet injuries, and issue 4, regarding Arcadio Castillo III closing distance are discussed in turn thereafter.

> i.    The Physical Evidence Establishes that the Stainless-Steel Knife Was The Knife Arcadio Castillo Was Holding When Bush Shot, and That Knife's Recovery Behind the Castillo Recliner Chair Makes It Impossible that Arcadio Castillo Was Charging as Defendants Contend.

As noted in the briefing and summary judgment record there were multiple knives found in the Castillo residence. One knife was stainless-steel (sometimes referred to as the "all steel" knife or the "steel handled" knife), which was found behind the recliner chair, adjacent to a wall, in the Castillo residence. Howard Decl., ECF 67-8, 67-9, 67-10, 67-11, Exs. 10, 11a, 11b, 11c. Another was a knife with a black handle that was found in the hallway between the living room and the kitchen. There is no dispute that Arcadio Castillo III was only holding one knife in his right hand when he was shot. Park Decl., ECF 70-3, Ex 4, Bush Dep. 86:6-7. The question of which of the knives from the crime scene Arcadio Castillo III was holding when he was shot is important because it serves as a significant clue in understanding where Arcadio Castillo III was physically located when he was shot. If Arcadio Castillo III was holding the stainless-steel knife when he was shot, then it is impossible for Arcadio Castillo III to have been charging Bush forward of the recliner because the stainless-steel knife was recovered behind the recliner, adjacent to the wall that is opposite the door outside which Bush stood when he shot Arcadio Castillo III. Howard Decl., ¶ 10, ECF 68; Second Howard Decl., Ex 1, pp 3-4, ECF 91-1.

**Page | 5 – PLAINTIFF'S REPLY**

Defendants clearly understand the significance of this physical evidence when compared to their theory that Arcadio Castillo III was charging Bush, which is why Defendants "maintain that the knife with the plastic handle was the knife Castillo III held," and that "Plaintiff's [sic] contend (based on pure conjecture) that Castillo III held the stainless-steel knife." Defs. Resp., 7. Because Defendants cite to no evidence in the record that establishes Arcadio Castillo III was *holding* the black handled knife when he was shot, because Bush testified he did not recall the color of the knife Arcadio Castillo III was holding when he shot, Park Decl., ECF 93-1, Ex. 1, Bush Dep. 86:9-14, and because Defendants' own submissions contradict Defendants' position, the physical evidence disproves Defendants' entire theory, and the Court should grant Plaintiff's Motion for Partial Summary Judgment.

First, the only evidence and argument Defendants advance to establish that the black handled knife, and not the stainless-steel knife, was the one Arcadio Castillo was holding is comprised of the following:

> "The blood patterns found on the knife with the black handle correspond with Defendant Bush's description of the knife the [sic] kicked back toward the back of the house. *** The small air bubbles observable on the black handled knife indicates the presence of arterial blood.[4] Englert demonstrates that the blood pattern on the black handled knife indicates motion between the knife and another surface while the blood was still wet, which is objectively consistent with the knife being kicked across the ground. *** No similar swipe patterns are found on the [stainless-steel] knife."

Defendants' Response Brief, p. 7-8 (citations to the record omitted).

---

[4] Here, again, is a 'red flag' related to defense counsel's lack of understanding of the physical evidence and the need for this court to exercise caution when evaluating the merits of the arguments in opposition to plaintiff's motion for partial summary judgment. Defendants' expert witness, Mr. Englert, characterizes the blood on the right side of the blade of the black handled knife as having "bubble rings" or "air bubbles," Tapia Decl. ECF 62-1, Ex. 7, Englert Report, pp. 30-31 (Image 39), 54 and 62 (glossary definition of "expiration pattern"). Arterial blood results from a breach in the circulatory system (glossary definition of "projected pattern"), not the respiratory system.

**Page | 6 – PLAINTIFF'S REPLY**

Defendants' evidence only supports the inference that Castillo III deposited blood on this knife after he was shot and that Bush kicked the black handled knife after he shot Arcadio Castillo III. That Castillo III's blood was on the knife, or that Bush kicked that knife, however, do not support an inference, let alone objectively prove, that the black handled knife was the knife Arcadio Castillo III was holding when he was shot. Thus, Defendants' evidence on this issue does not create a material issue of fact.

Furthermore, Defendants' own submissions contradict their position on this point. Defendants' expert, Rod Englert,[5] commented on some of the blood evidence found at the scene. When referencing the blood evidence on the stainless-steel knife, Englert states "the varied bloodstain patterns on each side of the knife blade indicate the knife was in movement *during* the bloodshed event." Englert Report, p. 57, ECF 62-1. Englert does not make any similar comments that the black-handled knife was "in movement" during the bloodshed event. *Id*. Nor can one see any of the "varied bloodstain patterns" indicative of movement on the black handled knife like those present on the stainless-steel knife. Plaintiff's expert, Michale Howard, agrees on this point. Howard Second Decl., ECF 91-1, Ex. 1, p. 3. Because there could be no blood anywhere until Arcadio Castillo III was shot, and because there is only one knife – the stainless-steel knife – that has any evidence indicating it was "in movement during the bloodshed event," it logically follows that it could be the *only* knife Arcadio Castillo III was holding when he was shot.[6]

---

[5] By citing to Defendants' expert report, Plaintiffs do not intend to waive their objections to Englert's report as detailed in Plaintiff's Response to Defendants' Motion for Summary Judgment, and the supporting materials submitted therewith.

[6] Mr. Englert now appears to agree. *See* Englert Decl. ISO Defs. Resp., ¶ 6(f), ECF 86. Further, crediting Bush's statement of where he first observed the (black handled) knife, see Park Decl., Ex. 4 at page 41 of 42, ECF 70-3 (Bush diagram point 7, identifying location of knife when kicked), a "[b]lack plastic Edgekeeper knife sheath for [the black handled knife was] found in the cushions of green couch in living room", *id*., Ex. 6 at page 2 of 5 (OSP Crime Scene Investigation and Neighborhood Canvass Supplemental Report), ECF 70-5. This evidence associates the location of the black handled knife at the time of the shooting with the couch. The

**Page | 7 – PLAINTIFF'S REPLY**

Defendants next argue that there remains a material question of fact how the stainless-steel knife got behind the recliner chair.  Defs. Resp. at 9-10.  Defendants contend it's possible that the stainless-steel knife could have been "dropped from approximately shoulder level, to slip between the over-stuffed recliner and the wall."  *Id.* at 9.  Tellingly, Mr. Englert does not support this argument.  *See* Englert Decl. ISO Defs' Resp. to Pl's Mot., ECF 86, ¶6(f) at page 7.  Despite defense counsels' protestations to the contrary, this explanation is contradicted by the position of the recliner in relation to the wall, as documented in the crime scene photos. Howard Decl., ECF 67, ¶ 10, and Exs. 9, 10, ECF 67-7, 67-8.  Equally defeating of defendants' position however is the inconsistency of this explanation with defendants' expert's theory of how the shooting unfolded.  How exactly could Castillo, who Mr. Englert opines was shot forward of the recliner while charging toward defendant Bush and was *turning to his left* as and after shots were fired, *have dropped the knife* from shoulder height into a location several feet *behind and to his right*?

Lastly, Defendants urge acceptance of Mr. Englert's speculation "that the [stainless-steel] knife could have easily been kicked or displaced by family members, emergency medical responders or even police officials in their rush to assess Castillo III."  Englert Decl. ISO Defs. Resp., ECF 86, ¶ 6(f)(ii).  Speculation is not evidence. Defendants point to no evidence in the record that creates a material question of fact on this point.  No witness statement nor crime scene investigation report documents movement of this knife prior to its seizure as evidence from its location beneath the recliner.

In sum, because the stainless-steel knife is the only knife the evidence shows Arcadio Castillo III was holding when he was shot, and that knife was located behind the recliner chair

---

difference in bloodstain pattern on this knife from that on the stainless-steel knife supports the inference that the black handled knife was not being held but was lying right side up when blood was deposited.  *Cf.*, Englert Report Images 38-41 (black handled knife) with Images 42-43, ECF 62-1, pages 30-32.

**Page | 8 – PLAINTIFF'S REPLY**

opposite from the door in which Bush was standing, the physical evidence disproves Defendants' theory that Castillo III was charging when shot and that Bush was justified in shooting because Castillo III was charging.

     ii.    <u>Plaintiff's Sequencing of the Bullet Injuries Is the Only Sequencing that Fits The Physical Evidence</u>

Defendants next argument takes issue with Michael Howard's opinions regarding the sequence of bullet injuries, described in the Medical Examiners report as Gunshot Wounds ("GSW") I, II, III, and IV.  Mr. Howard opines that GSW III was the first bullet to strike Arcadio Castillo III, which Defendant must concede could only happen if Arcadio Castillo III's right side was facing Bush when Bush shot.  Defendants' Response p. 8.  If, indeed, this bullet wound was the first – Arcadio Castillo III with his right side to Bush – it is impossible for Arcadio Castillo III to have been charging Bush as Defendants claim.

Defendants assert that "Plaintiff simply assumes that Gunshot Wound Number III was the first shot by Officer Bush."  However, as described in Plaintiff's Motion, this is not an assumption, but is Howard's expert opinion, based on his application of forensic science and resultant logical inferences flowing from the evidence collected at the crime scene.  As noted above, GSW III was the only wound that could have caused expired blood because GSW III damaged both of Arcadio Castillo III's lungs.  And the presence of expired blood on the couch, recliner chair, and the floor behind the recliner chair, (opposite the door from which Bush shot) places Arcadio Castillo III next to those locations at the time he suffers GSW III.  Howard Decl., ECF 68, p 4-5.  Mr. Englert posits that the blood on the recliner back, behind the recliner on the tile floor and on the couch cannot be characterized "expectorated" [sic] blood, but only blood spatter.  Englert Decl. ISO Defs. Resp., ¶ 6(a)(i) and (ii), ECF 86.  "Spatter stain" is "a bloodstain resulting from an airborne blood drop created when external force is applied to liquid blood."  Englert Report, p. 62, Glossary, ECF 62-

**Page | 9 – PLAINTIFF'S REPLY**

1.  There are two major external forces propelling Castillo's blood after he is shot.  Blood in his airways (expired) and blood in his arteries (protected pattern).  Howard Second Declaration, Ex. 1, pp. 2-3, ECF 91-1.  Englert agrees that expired blood is found on the steak knife recovered from the seat of the recliner.  Englert Report, pp. 32-33 ("Multiple spatter stains, less than 1mm in size, and containing apparent bubble rings were present on the left blade of the [steak] knife.  The left side of the blade was photographed at the scene facing upward."). This evidence (along with the shape, size and distribution of the bloodstains) supports the inference that the blood patterns documented on other surfaces in the same area are expired bloodstains.

If Defendants' theory were correct – that Arcadio Castillo III charged toward Bush before suffering GSW III – there is no logical explanation for the presence of expired blood caused by GSW III on the south end of the couch, the backrest and seat of the recliner chair, and especially on the floor *behind* the recliner chair.  Defendants submit no evidence that after being shot Arcadio Castillo III returned to a location from which he could have deposited this bloodstain evidence -- the only alternative explanation for the presence of expired blood in those locations.  Indeed, Bush's original description of Arcadio Castillo III's movements *after* being shot was that Arcadio Castillo III "then kinda steps, stumbles backwards, *turns to his right*, falls to his knees and collapses on the ground."  Park Decl., ECF 70-3, Ex. 4, page 38 of 42, Bush OIS Tr. 10 (emphasis added).  Bush diagrammed the location where he asserts Arcadio Castillo III collapsed, which clearly shows Arcadio Castillo III forward of the recliner chair.  *Id*. Ex. 4, page 41 of 42 (point 6). Bush's Grand Jury testimony was consistent with his OIS statement, and Bush did not proffer any details amounting to Arcadio Castillo III returning to an area *behind* the recliner chair.  ("So his – he had stumbled backwards and then he dropped to his knees in front of that recliner.") Park Decl., ECF 93-5, Ex. 5, Grand Jury Tr. 139:4-12.  As part of Defendants' Summary Judgment filings, Bush submitted a declaration in which he changed his prior sworn testimony, that "after Arcadio

**Page | 10 – PLAINTIFF'S REPLY**

Castillo III dropped to the ground and stood up momentarily, *then turned left*, and went to the ground again." Bush Decl., ¶ 15, ECF 63 (emphasis added). However, even this alternative statement from Bush provides no support for an inference that Arcadio Castillo III returned to an area rear of the recliner after being shot.

Bush's own contradicting statements aside, what is missing from all the evidence submitted by Defendants is any explanation for the presence of blood spatter on the floor behind the recliner, across the seat and seatback of the recliner and across the south end of the couch. For this reason, Michael Howard's expert opinion ordering the gun shot injuries, with GSW III being the first, is the only reasonable inference supported by the physical evidence.

As Howard's first declaration makes plain, his opinion regarding the order of shots flows from locating Castillo within his residence when shot and the inferences that follow from the times associated with the opening of the front door to the first shot (4.1 seconds) and the one second within all shots are fired and the bullet paths through Castillo's body documented by the medical examiner. All of the bullets move through Castillo's body from right to left, consistent with Castillo standing with his right shoulder toward the direction from which Bush is firing when Castillo is struck by the first bullet causing GSW III, Nelson dep. 18:1-7, 20:6-11 and Nelson dep. Exs. 32 and 33, then rotating in place to his right and bending forward at the waist as the successive shots are fired, ending with either GSW I or IV. Both GSW I and GSW IV require Castillo to be bent sharply forward at the waist and facing the shooter. Nelson dep. 28:20 to 29:17 (GSW I), and dep. 33:9-24 (GSW IV). As observed in paragraph 9 of Mr. Howard's declaration, ECF 68, and confirmed by paragraph 2 of Mr. Newman's second declaration, defendant Bush was shooting from a platform that is between 3.5 inches to 6.0 inches lower than the elevation of the floor on which Castillo was standing, necessarily meaning that Castillo is bending much farther forward at the waist when struck by these bullets than is consistent with a person charging forward with right

**Page | 11 – PLAINTIFF'S REPLY**

arm raised out at a 90 degree angle and holding a knife in a stabbing position.  Again, and tellingly, Mr. Englert does not address the fact that his trajectory analysis ignores the difference in elevation between defendant Bush and Castillo nor the obvious impact such difference has on the likelihood that Castillo was "charging" when he was shot.[7]

Aside from arguing that Michael Howard is unqualified to render his opinions (addressed above), Defendants identify no evidence in the record that contradicts the evidence relied on by Howard to form his opinions nor rebuts the inferences Howard has drawn from that evidence. Defendants rely only on hollow rhetoric, such as a "reasonable juror could easily conclude, and likely will conclude, that Castillo III, knife in hand, moved toward the officer and that Officer Bush responded with 4 very rapid shots."  Defs. Resp. at 9.  To establish a material issue of fact, Defendants are required to identify evidence in the record.  Fed. R. Civ. P. 56(c)(1).  Defendants have failed to do so.

iii.    <u>Defendants' Argument that Arcadio Castillo III "Closed the Distance" is Neither in Dispute, nor Material to a Dispositive Issue.</u>

Defendants final[8] factual argument appears to be that there is no dispute that Arcadio Castillo III moved towards Bush.  Defs. Resp. at 10-11.  Defendants point to the materials of Rod Englert regarding the large volume of blood evidence about the Castillo residence to argue "[a]s a simple matter of common sense, the only possible way for the blood drops to be at that location

---

[7] Paragraph 6(e) of Englert Decl. ISO Defs. Resp., ECF 86, comments on paragraph 9 of Howard's Declaration without addressing this highly significant observation of Howard regarding the difference in elevation.

[8] Defendants also argue the "pseudo stippling" associated with GSW III, which the medical examiner opined was caused by the GSW III bullet travelling first through the Castillo residence front door before hitting Arcadio Castillo III, required Arcadio Castillo III to be within "12 inches [of] the door."  Again, Defendants cite to no evidence, scientific studies or testing to support this assertion, and it should be disregarded.  Defs. Resp. 12.

**Page | 12 – PLAINTIFF'S REPLY**

[near Bush] is if the bleeder (Castillo III) was there and the blood fell from him. This evidence alone proves conclusively that Castillo III advanced on Officer Bush." (*Id*. at 11).

Plaintiff has never contended that Arcadio Castillo III remained in a static position after he was shot. Dr. Nelson's testimony confirms that Castillo was capable of movement after sustaining these wounds. Park Decl., Ex. 1, Nelson dep. 21:8-23, 22:15 to 23:6. And, plaintiff agrees that the physical evidence conclusively proves that Castillo moved towards and away from the front door after he was shot. However, where Arcadio Castillo III moved while bleeding profusely *after* he was shot is not material. There was but a single volley of shots fired by defendant Bush. The facts material to the lawfulness of the use of deadly force are Castillo III's location and his actions *prior* to Bush using lethal force. Those facts are determined by identifying the physical evidence that determines Castillo III's physical location *when* he was shot. Defendants make no effort to tie the bloodstain evidence to their argument that Castillo III was charging Bush forward of the recliner *when* he was shot. As observed in Howard's Second Declaration, defendants' expert simply ignores or dismisses the evidence that marks the location the bloodshed event originated.

### C. Defendants' Legal Arguments Are Improperly Applied

    i.    Defendants *Graham v. Connor* Arguments Are Misapplied to the Facts In This Case.

Defendants appear to argue that, even if Arcadio Castillo III had just been holding a knife, and he was not charging Bush as Defendants have contended this entire case, Bush's use of deadly force against Arcadio Castillo III was within constitutional bounds because 1) in hindsight Arcadio Castillo III seemed to be an immediate threat, even if he was just standing in his home with a knife, Defs. Resp. at 12-14; 2) Arcadio Castillo III "had committed heinous, violent, felonious crimes," *Id*. at 14-15; and 3) Arcadio Castillo III was "armed and indisputably uncooperative" which, according to Defendants, was akin to attempting to flee. *Id*. at 15.

**Page | 13 – PLAINTIFF'S REPLY**

Defendants' arguments are contrary to clearly established law.  Possession of a knife is not dispositive of the "immediate threat" factor; otherwise, "that a person was armed would always end the inquiry."  *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).  "In order to justify use of deadly force, it is not enough that a person armed with a knife takes 'dangerous, threatening, or aggressive action;' their actions must 'pose[] a threat of serious physical harm.'"  *Reed v. City of Modesto*, 122 F.Supp.3d 967, 980 (E.D. Cal. 2015) (*quoting Ludwig v. Anderson*, 54 F.3d 465, 473 (8th Cir. 1995).

Defendants also attempt to impermissibly leverage hindsight, listing all of the potential charges Arcadio Castillo III could have faced once the dust settled.  However, the proper temporal focus of the Fourth Amendment is the totality of the circumstances *known to the officer at the moment he or she takes the challenged action*.  *Glenn v. Washington County*, 673 F.3d 864, 873 (9th Cir. 2011) (the trier of fact "cannot consider evidence of which the officers were unaware – the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways") (emphasis added).  Here, although Defendants claim Arcadio Castillo III could have been charged with a myriad of "felony offenses," Bush's behavior in his approach to the scene indicates he was not concerned with any such "heinous, violent, felonious crimes."  On his approach to the Castillo residence, Bush saw Arcadio Castillo III standing on the front porch, calm, and unarmed. Park Decl., ECF 70-3, Ex. 4, Bush Dep. 51:7-16, 52:14-25, 53:1-21, 55:3-11.  He knew Arcadio Castillo III was away from Misty Castillo. *Id*., Ex. 4, page 37 of 42, Bush OIS Tr. 9.  Upon his approach Bush shined his flashlight into the window, in no attempt to conceal himself.  Newman Decl., ECF 69, Ex. 2.  Once on the porch he "just listened" and although he heard "two males talking," nothing he heard portended violence or an imminent threat of violence.  Park Decl., ECF 70-3, Ex. 4, page 37 of 42, Bush OIS Tr. 9.

**Page | 14 – PLAINTIFF'S REPLY**

Finally, Defendants' attempt to compare Arcadio Castillo III being "armed and indisputably uncooperative" to fleeing falls flat. First, as noted above, when Bush first saw Arcadio Castillo III he was *not* armed. *Id*., Bush dep. 55:3-11. Second, it is not "indisputable" that upon Bush's arrival Arcadio Castillo III was "uncooperative." Bush testified, upon his arrival and after seeing Arcadio Castillo III, "I slow[ed] down, I looked over to him and I just said, 'Hey, what's going on?'" *Id*., Bush dep. 52:14-16. In response Arcadio Castillo III looked back at him, and then "[h]e turned around and began walking towards the front door" and ultimately went back into the house. *Id*. at 53:1-2, 19-21. What is indisputable is that Arcadio Castillo III entered back into his house, rather than hopping into a car, or attempting to sprint down the street away from Bush.

Most important, however, is that *Defendant Bush has admitted, consistent with clearly established 9th Circuit precedent*, *that if Arcadio Castillo III was just standing there holding a knife, it was unlawful to shoot him*. Park Decl., ECF 70-3, Ex. 4, Bush Dep. 87:13-25, 88:1-6. And, consistent with that correct understanding of the law, the contention that Arcadio Castillo III was charging Bush has been, and remains, Defendants' sole justification for Bush's immediate resort to lethal force in this case. Defendants' apparent attempt to back pedal on the *Graham v. Connor* use of force analysis should be seen for what it is, a tacit admission that the physical evidence conclusively disproves Arcadio Castillo III charged defendant Bush.

## CONCLUSION

For the reasons outlined in Plaintiff's Motion for Partial Summary Judgment, and this Reply, Plaintiff respectfully submits she is entitled to Judgment as a Matter of Law on the issues of defendant Bush's liability for violation of Castillo III's Fourth Amendment rights and defendant Salem's liability for battery.

///

Respectfully submitted this 20th day of February 2024.

The Gatti Law Firm

/s/ James M. Healy
James M. Healy, OSB No. 123403
jhealy@gattilaw.com
Ron L. Sayer, OSB No. 951910
rsayer@gattilaw.com
235 Front St. SE, Ste. 200
Salem, OR 97301
Telephone: 503-363-3443
Facsimile: 503-371-2482


David D. Park, OSB No. 803358
dave@elliot-park.com
Elliot & Park, PC
The Abernethy House
0324 SW Abernethy St.
Portland, OR 97239
Telephone: 503-227-1690
Facsimile: 503-274-8384
Attorneys for Plaintiff

**Page | 16 – PLAINTIFF'S REPLY**