**Sebastian Tapia**, OSB No. 043761
*stapia@cityofsalem.net*
City of Salem Legal Department
555 Liberty St. SE, Room 225
Salem, OR 97301
    Telephone: (503) 588-6003
    Fax: (503) 361-2202
        Attorney for Defendants

**Andrew D. Campbell**, OSB No.  022647
Andrew@Heltzel.com
Heltzel Williams, P.C.
P.O. Box 1048
Salem, OR 97308
        Telephone: (503) 585-4422
        Fax: (503) 370-4302
        Attorney for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| MISTY L. CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III,<br><br>    Plaintiff,<br><br>    v.<br><br>NATHAN BUSH and CITY OF SALEM, a municipal corporation,<br><br>    Defendants. | Case No. 6:22-cv-00684-MK<br><br>**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

1.  Facts in the Light Most Favorable to Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

2.  Officer Bush's Entry was Lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

     a.   Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     b.   Exigency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     c.   Emergency Aid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3.  Fourth Amendment, Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.  Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5.  Policy and Practice of Constitutional Violations . . . . . . . . . . . . . . . . . . . . . . . . 23

6.  Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ............................................................................................ 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................ 16

*Bifelt v. Alaska*,
854 Fed.Appx. 799 (9th Cir. 2021) (memorandum) ........................................... 23

*Blanford v. Sacramento County*,
406 F.3d 1110 (9th Cir. 2005) ............................................................................ 22

*Bogle v. Clackamas County.*,
2017 WL 5490870 (D. Or. Nov. 15, 2017) ........................................................ 26

*Bonivert v. City of Clarkston*,
883 F.3d 865 (9th Cir. 2018) .............................................................................. 10

*Brigham City v. Stuart*,
547 U.S. 398, 403, (2006)................................................................................... 14

*Cardenas v. Saladen*,
— F.4th — ........................................................................................................... 12

*DeShaney v. Winnebago County Dep't of Soc. Servs.*,
489 U.S. 189 (1989) ........................................................................................... 26

*Connick v. Thompson*,
563 U.S. 51 (2011) ........................................................................................ 25, 27

*Hayes v. County of San Diego*,
736 F.3d 1223 (9th Cir. 2013) ............................................................................ 19

*Estate of Aguirre v. County of Riverside*,
29 F.4th 624 (9th Cir. 2022) ......................................................................... 20, 21

*Estate of Strickland v. Nevada*,
69 F.4th 614 (9th Cir. 2023) ......................................................................... 13, 23

*Fernandez v. California*,
571 U.S. 292 (2014) ........................................................................................... 10

*Fesser v. West Linn Police Department*,
2019 WL 7206448 (D. Or. Sept. 3, 2019) ......................................................... 25

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) .............................................................................. 19

*Georgia v. Randolph*,
547 U.S. 103 (2006) .................................................................................. 9, 10, 18

**CASES (continued)**

*Jett v. Dallas Independent School Dist.*,
    491 U.S. 701 (1989) ................................................................................................ 27

*Johns v. City of Eugene*,
    2018 WL 634519 (D. Or. Jan. 30, 2018) reversed 771 Fed.Appx. 739 (2019) ........................... 28, 29

*Kisela v. Hughes*,
    — U.S. —, 138 S.Ct. 1148 (2018) ................................................................................ 17, 20

*Mattos v. Agarano*,
    661 F.3d 433 (9th Cir. 2011) ................................................................................ 14-15

*Michigan v. Fisher*,
    558 U.S. 45 (2009) (per curiam) ................................................................................ 13

*Paulos v. FCH1, LLC*,
    685 Fed.Appx. 581 (9th Cir. 2017) ................................................................................ 24

*Ryburn v. Huff*,
    565 U.S. 469 (2012) (per curiam) ................................................................................ 13

*Sharp v. County of Orange*,
    871 F.3d 901 (9th Cir. 2017) (emphasis in original) ................................................................................ 18

*Sheehan v. City and County of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014) reversed on other grounds 575 U.S. 600 (2015) ................................ 24

*United States v. Black*,
    482 F.3d 1035 (9th Cir. 2007) ................................................................................ 13-14, 15

*United States v. Brooks*,
    367 F.3d 1128 (9th Cir. 2004) ................................................................................ 14

*United States v. Brown*,
    392 Fed. Appx. 515 (9th Cir. 2010) ................................................................................ 12, 13

*United States v. Collins*,
    650 Fed. Appx. 399 (9th Cir. 2016) ................................................................................ 12

*United States v. Guillen*,
    755 Fed. Appx. 643 (9th Cir. 2018) ................................................................................ 12

*United States v. Russell*,
    436 F.3d 1086 (9th Cir. 2006) ................................................................................ 13

*United States v. Snipe*,
    515 F.3d 947 (9th Cir. 2008) ................................................................................ 11

*Velazquez v. City of Long Beach*,
    793 F.3d 1010 (9th Cir. 2015) (emphasis added) ................................................................................ 25, 26

**STATUTES AND LAWS**

ORS 133.055 ................................................................................................................. 14

42 U.S.C § 1983 ............................................................................................ 25, 26, 27,  29, 30

Defendants file this Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment.

1.  Facts in the Light Most Favorable to Plaintiff

Plaintiff agrees that Misty Castillo called 911 and said that Castillo III was "mentally ill, intoxicated, under the influence of marijuana, assaulting family members and armed with a knife." ECF# 47 ¶ 11.  Officer Bush arrived less than two minutes later. ECF# 47 ¶ 12. Officer Bush could see Misty Castillo's injures included scrapes underneath her kneecap and fresh scrapes that ran down her shin. EFC# 90, p. 25. Plaintiff alleges that Castillo III was visible to Officer Bush but did not possess a knife upon Officer Bush's arrival. ECF# 90, p. 24.  Castillo III went inside shortly after Officer Bush's arrival and did not move quickly when he did so. *Id*.  Misty Castillo appeared "stressed out, worried." ECF# 90, p. 28.  Misty Castillo told Officer Bush, "[H]elp, you need to help us. He's assaulting us. He has a knife." *Id*.  In the alternative Misty Castillo said, "[Y]ou need to help me, uh, my son's assaulting us, uh and he has a knife." ECF# 90, p. 25. She told Officer Bush, "go help my husband." ECF# 61-2, p. 3. She later said she was worried that Castillo III might stab her husband or harm himself. ECF# 61-8, p. 2.

Officer Bush testified he heard Castillo III talking on the other side of the door. He heard Castillo III say, "I'm not gonna, . . . Tell them to leave or something along, something like to that effect." ECF# 90, p. 25.  Officer Bush first tried the doorknob and found that it was locked.  ECF# 90, p. 31.  Castillo II locked the front door after Castillo III went inside but unlocked it when Officer Bush was at the door.  ECF# 61-4, p. 2. Officer Bush opened the door at that time.  EFC# 90, p. 25.  Plaintiff does not allege that any co-habitant verbally refused permission for Officer Bush to enter the residence.  ECF# 90, p. 27-29.

As the door opened, Officer Bush saw Castillo III with a large knife in his hand; the blade was pointed downward. See again Bush Dep. 86:1-7.  The parties agree that Castillo III held a thirteen-inch long[1] knife.  Officer Bush saw that Castillo II was in the same room as Castillo III.  ECF# 63 ¶ 14 Officer Bush yelled "put the knife down" two times.  EFC# 90, p. 8.  Plaintiff's expert agrees that Castillo III did not put the knife down.  ECF# 91-1, p. 4[2].  It is also undisputed that Castillo II was in the same small living room or the hallway leading to the living room the entire time. See ECF# 70-3.

Plaintiff's expert opines that Castillo III was to the side of the recliner in the hallway, just past the living room.  See ECF# 69-4.  In the light most favorable to Plaintiff, the farthest distance between Officer Bush and Castillo III was estimated to be 12 feet.  See ECF# 66, p. 7.  Plaintiff's expert opines that that Castillo III was bent at the waist and turned perpendicular to Officer Bush when he was shot by the first bullet.  ECF#66, p. 7.  Plaintiff's expert agrees with Defendants that Castillo III was moving rotationally when shots were fired.  Id.  Plaintiff's expert agrees that all four rounds were shot in about a second.  ECF# 67 ¶ 6. The parties agree that Gunshot Wound Number 1 (labelled by Dr. Nelson) hit Castillo III almost square in the chest: "path goes from front to back, *very* slightly right to left, and downward." Nelson Depo., 28:23-35 (emphasis added).  The parties agree that to receive Gunshot Wound Number 1, Castillo III would have been "more or less facing the shooter." *Id.,* 29:8-9.  Plaintiff opines that this is among the last two shots fired. ECF# 67, ¶ 9.  These facts show that Plaintiff acknowledges that Castillo III must have been turning approximately ninety degrees toward Officer Bush in the one second that shots were fired.  Plaintiff agrees that Castillo III continued to hold the knife after the

---

[1] The parties disagree about which knife Castillo III held, but both knives at issue are the same length. See ECF# 90, p. 50.
[2] Howard writes, "[T]he knife was being carried point down toward the floor and not aimed at Officer Bush when the blood was deposited on the knife."

first shot was fired, as evidenced by blood flow patterns on the stainless-steel knife. ECF# 91-1, p. 4.

### 2. Officer Bush's Entry was Lawful

Plaintiff argues that that Misty Castillo's consent was not explicit.   In the alternative, Castillo III expressly refused consent for Officer Bush's entry.   ECF# 90, p. 27.

#### a. Consent

Misty Castillo told 911 dispatch that Castillo III is "mentally ill and assaulting us." Minutes later as Officer Bush arrived, she told Officer Bush, "[Y]ou need to help me, uh, my son's assaulting us, uh and he has a knife."  She had obvious scrapes on her legs and stated Castillo III had caused them.  Decl. Campbell, Ex. 1 (photo showing injury to Misty).  Misty Castillo appeared "stressed out, worried."  Misty Castillo's choice of verb tense, such as Castillo III is "assaulting us" and he "has a knife," is indicative of an ongoing emergency.  Misty Castillo told Officer Bush to "go help [her] husband." *Response,* (ECF# 90), at 28.

Plaintiff points out that Misty Castillo was not in immediate danger at that time.  ECF# 90, p. 30.  Defendants agree.  In that context, it should be apparent that even in the light most favorable to Plaintiff, Misty Castillo was pleading with Officer Bush to help *her* by protecting her husband who was inside the house with Castillo III.  Misty Castillo also said, "go help my husband." *Response*, (ECF# 90), at 28. Officer Bush confirmed that Castillo III was inside with someone else because he could hear people talking.  Bush heard Castillo III say, "I'm not gonna, . . . Tell them to leave or something along, something like to that effect."  Although Castillo III's tone was not elevated, the statements Officer Bush heard showed that the conflict had not ended.

Misty Castillo gave Officer Bush her consent to enter her residence when she asked Officer Bush to "help her", in refence to her husband's safety.  She also consented when she

said, "go help my husband," which could not be done from outside. Plaintiff's attempt to create

a question of fact on this front is not successful. Plaintiff quotes Misty's testimony. *Response,*

(ECF# 90) at 28. There is no question of fact about the grand jury testimony: it records what

Misty was asked and it records what her answer is. She was asked "Did you tell the officer to go

help your husband?" *Id.* Her answer was "yes." *Id.* The question was not confusing or

compound, nor was Misty's answer convoluted or hedging. Plaintiff may have some

metaphysical doubt about what Misty was thinking, but her testimony is crystal clear: she asked

Officer Bush to help her husband (who was inside the house with Castillo III who had just

assaulted Misty and who was also, presumably, armed.)

Plaintiff's heavy reliance on *Georgia v. Randolph*, 547 U.S. 103 (2006) is preposterous.

*Randolph* involved a search for evidence, it was not an entry to intervene or arrest ongoing

domestic violence; it was a drug case. In fact, the Court specifically cautioned against importing

its logic to domestic violence situations.

> But this case has *no bearing on the capacity of the police to protect domestic
> victims*. *** No question has been raised, *or reasonably could be*, about the
> authority of the police to enter a dwelling to protect a resident from domestic
> violence; so long as they have good reason to believe such a threat exists, it would
> be *silly* to suggest that the police would commit a tort by entering, say, to give a
> complaining tenant the opportunity to collect belongings and get out safely, *or to
> determine whether violence (or threat of violence) has just occurred or is about to
> (or soon will) occur*, however much a spouse or other co-tenant objected.

*Id.,* 118 (emphasis added). The Supreme Court called it "silly" to suggest that police commit a

tort when making a warrantless entry into a home in order to intervene in domestic violence.

Undaunted by this unusually candid admonishment by Justice Souter, Plaintiff makes this

precise, "silly" argument. To be clear, *Randolph* holds that "no question" can even "reasonably

be asked" about an officer's authority to enter a home, *sans* warrant, to "determine whether

violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Id.* To do otherwise is "silliness" which is precisely what Plaintiff has done.

Plaintiff points out that the Ninth Circuit has held that the "express refusal" requirement of a co-tenant from *Randolph* may be satisfied by non-verbal communication, citing *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018). In doing so, Plaintiff elides the fact that the case at bar undeniably involves an ongoing episode of domestic violence. *Randolph* was beyond clear that its holding about co-tenancy consent may not be applied where an officer enters to "determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Randolph,* 547 U.S. at 118. And subsequent case law holds that *Randolph* represents a narrow holding. *See, Fernandez v. California,* 571 U.S. 292, 300 (2014) ("we recognized a narrow exception" in *Randolph).* Despite the Supreme Court's characterization of *Randolph* as a "narrow exception" and despite its admonishment not to apply *Randolph* where a family member may be in danger, Plaintiff seeks to apply broadly in this case.[3]

  b. <u>Exigency</u>

Plaintiff argues that a jury could find that Officer Bush was not faced with an exigent circumstance. ECF# 90, p. 31. Plaintiff argues that Misty Castillo was not in danger after Castillo III went inside the house. ECF# 90, p. 30. Plaintiff also argues that the tone of the conversation Officer Bush could hear between Castillo III and Castillo II was not suggestive of immediate violence. ECF# 90, p. 23.

Plaintiff acknowledges that exigency exists when, "(1) considering the totality of circumstances, law enforcement had an objectively reasonable basis for concluding that there

---

[3] *Bonivert* does not control because that case too acknowledged that a "co-occupant's refusal is vitiated where there is a threat to the victim..." *Id.,* 874. And in *Bonivert* it was undisputed that no one was in danger – a critical fact differentiating that case from this one.

was an immediate need to protect others or themselves from serious harm; and (2) the search's

scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952

(9th Cir. 2008). In that case, police received a call–not an emergency call to 911, but a call to the

police department itself–that simply said "get the cops here now" while sounding "hysterical."

*Id.,* 515 F.3d at 949. Upon arriving at the house, the officers announced their presence and

opened the front door of the house by knocking with enough force to push the door open. *Id.*

Without observing anything else, the officers stepped into the house and began speaking with

occupants they encountered. *Id.* The court held that officers conduct (opening the front door and

immediately proceeding into the house) was objectively reasonable due to exigent circumstances.

*Id.,* 954-55. The court explained that the call alone was likely sufficient for a warrantless entry,

even though it was not a "911 call." *Id.* Moreover, the court held that the circumstances the

officers observed (front door standing slightly ajar, lights on despite other houses dark, an

unrecognized vehicle and someone walking or running back into the house) "underscored" the

objective reasonableness of their warrantless entry. *Id.,* 955.

  Returning to the case at bar, Officer Bush acted with even more objective reasonableness

than the officers in *Snipe.* Not only was there a call to 911 (an *emergency* call) as opposed to a

non-emergency police number, it is undisputed that Officer Bush knew that Misty reported an

active assault, saw evidence of a fresh assault (wounds to Misty), knew that Misty reported to

him that Castillo III "has" a knife, and personally observed Castillo III ignore police commands,

walk into the house where another person was, and was implored by Misty to "help my

husband." Hence, Officer Bush had an objectively reasonable basis to open the door and scan, at

a minimum, the common area of the entry.[4]

---

[4] The scope of Officer Bush's entry was clearly reasonable. There is no evidence that he proceeded into other private areas of the home.

An identical conclusion was reached in *Cardenas v. Saladen,* --- F.4th ---, 2023 WL 2324356 (9th Cir. March 2, 2023) (memorandum). In that case "Cardenas was 'feeding the dog poison,' [he] and his mother were in the same residence, [he] was 'extremely irate' and had 't[aken] the phone away from [his] mother and wasn't allowing her to speak,' [he] was suffering from PTSD, and [he] was complaining of childhood abuse and demanding to speak to Child Protective Services (CPS)." *Id.,* *1. Based on this, there was "an objectively reasonable basis for the Officers to believe Cardenas posed a threat to others who were in the family residence with him." *Id.* As such, officers' warrantless entry was constitutional. Similarly, in *United States v. Guillen,* 755 Fed. Appx. 643 (9th Cir. 2018) (memorandum) a caller told a 911 call-taker that someone in a house was yelling "at the top of his lungs" and threatening someone. *Id.,* 645. When officers arrived, they encountered Guillen on the front porch who, by his words and demeanor, corroborated the 911 caller's report. *Id.* When the officers learned that a roommate was somewhere inside the house they made a warrantless entry to ensure his safety. The court held that "the officers had an objectively reasonable basis to conclude somebody inside required their immediate assistance or protection from serious harm." *Id.,* 646. *See also, United States v. Collins,* 650 Fed. Appx. 399 (9th Cir. 2016) (memorandum) (warrantless entry justified where suspect ran into apartment, shut the door and officers could hear "screaming, yelling" and "get out!").

The fact that Officer Bush did not see Castillo III holding a knife as he walked back into the house does not alter the conclusion. Police responding to dangerous situations need not make benign assumptions about people; in fact, police must often assume the worst. For example, in *United States v. Brown,* 392 Fed. Appx. 515 (9th Cir. 2010) (memorandum) officers responded to an in-progress domestic violence 911 call. Upon arrival, they observed a couple who appeared

safe exit the apartment area. *Id.,* 516.  Nonetheless, they proceeded, eventually located the correct parties and entered their apartment without a warrant.  Brown argued that exigency should have dissipated when the officers observed a couple walking, safely, from the apartments.  The court disagreed: "[t]he officers need not have assumed that the couple seen leaving the apartment complex were the other individuals reported by the second 911 caller, and, thus, that all of the individuals reportedly involved in the dispute were accounted for." *See also, Estate of Strickland v. Nevada,* 69 F.4th 614, 621 (9th Cir. 2023) (officers entitled to disbelieve decedent's assurances that the apparent shotgun was only a replica and were therefore allowed to use deadly force.)

Simply because Officer Bush could not see a knife in Castillo III's hands as he walked into the house, the officer was not required to assume the benign. In other words, given the totality of the circumstances, viewed objectively, Officer Bush was allowed to worry that Castillo III had simply concealed the weapon and was still armed or in the alternative, that he was momentarily unarmed but that there were other weapons accessible inside the home. "Even if the situation were clear in hindsight [that there was no threat], *** the police had only a few minutes in which to determine whether a lurking predator or injured person in need of assistance might be [on the property]." *United States v. Russell*, 436 F.3d 1086, 1090–93 (9th Cir. 2006) (affirming warrantless search because "there was confusion" as to how many persons were involved in the incident, justifying a search "to determine whether there were other injured persons"); *see also Ryburn v. Huff*, 565 U.S. 469, 476–77 (2012) (per curiam) ("[A] combination of events each of which is mundane when viewed in isolation may paint an alarming picture."); *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam) ("Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception."); *United States v. Black*, 482 F.3d 1035, 1039–41 (9th Cir. 2007) (affirming warrantless search where police

detained suspect and used suspect's key to enter residence and "ma[k]e a quick sweep" because they could not locate the victim and reasonably "feared that [she] could have been inside *** and in need of medical attention"). Unlike the officers in *Russel*, *supra*, Officer Bush did not have minutes, he had a second, maybe two, to decide whether to ensure the safety of anyone in the house by immediately opening the door. Given the objective evidence he confronted, his warrantless entry was justified.

Finally, the scope of Officer Bush's entry was reasonable. Defendants do not understand Plaintiff to allege that the scope of Officer Bush's warrantless entry was unreasonable, and indeed, he never proceeded beyond a common entry-area.

     c.  <u>Emergency Aid</u>

The emergency aid exception permits law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403, (2006). Each of the facts under Exigency equally apply to Officer Bush's lawful entry under Emergency Aid.

Additionally, Castillo III has just committed an act of domestic violence. Officer Bush was required to arrest Castillo III. See ORS 133.055 (2)(a). Critically, as it relates to the "emergency aid" exception to the warrant requirement, domestic violence calls are simply different than other calls police receive. The Ninth Circuit has specifically held that ensuring the safety of people is uniquely important in the context of domestic violence; a very dangerous type of violent crime where the privacy of a home is, itself, *the* primary tool enabling offenders. Because of this unique dynamic, "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may override considerations of privacy." *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004); *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) ("When

officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call.") While the Circuit has stopped short of a blanket rule, it gives wide latitude to officers who find themselves at the scene of domestic violence and wonder whether a victim might be secreted away behind closed doors.

*United States v. Black,* 482 F.3d 1035 (9th Cir. 2007) (*supra*) is a case on point. In that case, police knew that a domestic violence victim was returning to her apartment to retrieve her belongings. *Id.,* at 1039. When police arrived, they located the abuser but not the victim, so they entered the apartment–without a warrant–to ensure she was not injured/captive inside. *Id.* The court ruled that the warrantless entry was constitutional under the emergency aid exception. In reaching its decision, the majority acknowledged the dissent's preference to parse the evidence in order to create a benign scenario that, had the police adopted such a view, would have negated the need to enter the residence without a warrant. The majority rejected this approach, observing that the officers "were not conducting a trial, but were required to make an on-the-spot decision as to whether Walker could be in the apartment in need of medical help…" *Id.,* 1040 The court explained:

> This is a case where the police would be harshly criticized had they not investigated and Walker was in fact in the apartment. ***Erring on the side of caution is exactly what we expect of conscientious police officers.*** This is a "welfare search" where rescue is the objective, rather than a search for crime. We should not second-guess the officers objectively reasonable decision in such a case.

*Id.,* (emphasis added). In precisely the same way, had Officer Bush stood back and waited for a warrant and, in the meantime, had Castillo III stabbed his father to death or taken his own life inside the house, undoubtedly Officer Bush would be back in court, only this time he would be accused of failing to intervene in an obviously dangerous situation. As stated in *Black*, Officer

Bush did precisely what the law demands of police officers ("what we expect of conscientious police officers"): confronted with a dangerous domestic violence scenario, he entered the home without delay to ensure the safety of those who may have been inside. In sum, it was a textbook emergency aid warrantless entry.

3.  <u>Fourth Amendment, Excessive Force</u>

Defendants withdraw their argument that they are entitled to judgment as a matter of law for the Fourth Amendment unlawful force claims based on self-defense or defense of others. Upon briefing, it is readily apparent that there a myriad of genuine factual disputes, many of which are encapsulated by "dueling experts," that the Court simply may not resolve on summary judgment. To be clear, Defendants in no way concede these issues and strenuously deny the merits of Plaintiff's accusations. However, it is clear that the Court would be required to weigh the evidence for or against a party in order to grant summary judgment on this claim; and that is something that is not permitted at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Defendants agree that these issues are issues for trial. As such, Defendants withdraw their motion, narrowly, to the extent it prays for summary judgment on the merits of Plaintiff's Fourth Amendment, excessive force claim, and all arguments and evidence therewith. Defendants also withdraw their reliance on Rod Englert's declarations, ECF# 82 and ECF# 86. However, Defendants do continue to move for summary judgment on these claims based on qualified immunity.

4.  <u>Qualified Immunity</u>

As briefed in Defendants' Motion, even assuming *arguendo* that the constitution was violated in this case, Officer Bush is nonetheless entitled to qualified immunity. To begin, it was *Plaintiff's burden* to present this Court with actual case law, from higher courts within this

Circuit, that addresses facts similar to the facts of this case and rule that a Fourth Amendment violation took place. *Ashcroft v. al-Kidd*, 563 U.S. 731, 471 (2011) *citing Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The proponent of a purported right has the 'burden to show that the particular right in question *** was clearly established' for qualified-immunity purposes.") It is not Defendants' burden to demonstrate that there are no cases on point, instead it was Plaintiff's burden to direct the Court to such precedent. Defendants pause to emphasize the heightened importance of identifying cases that deal with facts specifically like the facts from this case in the qualified immunity analysis.

> "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

*Kisela v. Hughes,* --- U.S. ---, 138 S.Ct. 1148, 1552-53 (2018) *quoting Mullenix v. Luna,* 577 U.S. ---, ---, 136 S.Ct. 305, 308 (2015) (per curiam). Hence, pursuant to *Kisela,* Plaintiff's burden of pointing the Court to case law with matching facts is especially crucial in this use of force case. Plaintiff has flatly failed to meet this important burden.

With leave of the Court, Plaintiff filed a Response that actually exceeds the maximum page limit for filings in this District. ECF# 87. Despite such a voluminous filing, Plaintiff utterly fails to point to any case with similar facts for purposes of qualified immunity. Plaintiff correctly cites the qualified immunity standard, albeit in summary fashion. *Response,* (ECF#90) at 34. However, the only two cases offered by Plaintiff fall well short of "clearly establishing" that in July 2021 any competent officer would have understood that Officer Bush's conduct violated the constitution.

First, Plaintiff points to *Georgia v. Randolph,* 547 U.S. 103 (2006) for the proposition that entering a home under the circumstances here was unconstitutional. *Response,* (ECF# 90), at 34. For reasons already briefed above, *Randolph* does not control this case due to the domestic violence issue. Plaintiff also points to *Bonivert v. City of Clarkston,* but this reference is equally ineffective. Like *Randolph, Bonivert* hinged on the fact that no one at the location was possibly in danger, and even viewing the evidence in a light most favorable to Plaintiff, that is simply not the case here.

Second, Plaintiff cites no cases, and (as a consequence) offers zero analysis of any cases involving excessive force in the section of her brief regarding qualified immunity. Pulling cases from other portions of Plaintiff's brief is problematic because whether or not a given case "clearly establishes" a constitutional violation requires special, specific factual analysis. Hence, the Court should simply note that Plaintiff has failed to, for purposes of qualified immunity analysis, cite the Court to even a single case holding that conduct like Officer Bush's was "clearly established" as unconstitutional and, as a result, Officer Bush is entitled to qualified immunity.[5]

If one looks beyond Plaintiff's qualified immunity analysis, while eschewing any analysis whatsoever about how or why the facts are specifically similar to Officer Bush's, she

---

[5] Given the dearth of case law in Plaintiff's qualified immunity analysis, it may be that she relies on the "obviousness exception." "Except in the rare case of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must '*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the" constitution. *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (emphasis in original) *citing White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). If this is Plaintiff's silent argument, it must be rejected because the "obviousness exception" is generally not applicable in Fourth Amendment, excessive force cases. *Sharp,* 871 F.3d at 912. The "obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context *** [because] [t]here are countless confrontations involving officers that yield endless permutations of outcomes and responses. So the obviousness principle has real limits when it comes to the Fourth Amendment." *Id.* Hence, any attempt to escape the requirement to cite and analyze specific cases in order to overcome qualified immunity must be rejected.

does cite three cases for the broad proposition that Bush used excessive force. *Response,* (ECF#
90) at 35. First, Plaintiff points the Court to *Hayes v. County of San Diego,* 736 F.3d 1223 (9th
Cir. 2013). *Hayes* was a case brought by a minor under the Fourteenth Amendment and state
law claims. However, for jurisdictional reasons unique to California state law, *Hayes* did *not*
analyze the Fourth Amendment and as a result did *not* analyze the *Graham v. Conner* factors.
*Id.,* 1229. Hence, *Hayes* cannot be read as establishing "clearly established" law of the Fourth
Amendment: it is simply the wrong law.

The facts of *Hayes* are also different in key respects. In that case the court went to great
pains to explain that the officers had no idea that the decedent was a threat to anyone except
himself. *Id.,* 736 F.3d at 1227 ("there had not been a physical altercation *** there were no guns
in the house *** she made no indication that Hayes might be armed with a knife.") Contrast
with the case at bar, and the difference is obvious. In the case at bar Officer Bush knew that
Castillo III had "assaulted" his mother, Misty told Officer Bush that Castillo III "has" a knife,
and asked Officer Bush to "help" her husband. In summary, *Hayes* involved police shooting a
peaceful but suicidal man who refused to drop a knife; in the case at bar, Officer Bush shot a
man who reportedly had just assaulted a family member and who also refused to drop a knife.
What the officers knew of the subject changes dramatically how they might react. *Hayes* is
wrong on the law and on the facts.

The second case cited by Plaintiff is *George v. Morris*, 736 F.3d 829 (9th Cir. 2013).
However, *George* involves a prior, "cold" domestic violence situation (*i.e.*, one that had
resolved by the times officers arrived), where a 64 year-old man with terminal cancer was shot
from across a back yard while he was holding a gun pointed downward and using a walker to
hold himself up. *Id.,* 838-39. It is unclear, and Plaintiff makes no effort to explain, how these

facts would put someone in Officer Bush's situation on notice that he was violating the constitution when he confronted the active, ongoing domestic violence scenario he did in July 2021.

Finally, Plaintiff cites *Estate of Aguirre v. County of Riverside,* 29 F.4th 624 (9th Cir. 2022). Like *George* and *Hayes,* Plaintiff offers absolutely no analysis applying the facts of *Aguirre* to the facts in the case at bar. However, there is another reason this case cannot be the basis of a denial of qualified immunity: *Aguire* was published in March 2022, Castillo III was shot by Officer Bush in July 2021. ECF# 47 ¶ 11. Because Officer Bush's encounter with Castillo III predates the Ninth Circuit's decision in *Aguirre* that case did not "clearly establish" the law in this area in July 2021.

While Defendants have no burden to produce similar cases on qualified immunity, cases holding that officers in similar situations should receive qualified immunity nonetheless abound. For example, in *Kisela, supra,* the officer "shot Hughes because, *although the officers themselves were in no apparent danger*, he believed she was a threat to Chadwick." *Id.,* 138 S.Ct. at 1153 (emphasis added). The facts are summarized by the Supreme Court as follows:

> [The officer] had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down [the police]. [The officer] was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife.

*Id.* Rather than hacking at a tree, Officer Bush knew that Castillo III had just attacked his mother with a knife. He watched as Castillo III ignored his commands and walked into a house where his father was. Misty pleaded for him to "help" her husband in the house. Upon opening the door, he "had mere seconds to assess the potential danger" to himself as he was mere feet from

Castillo III[6] as well as Castillo II who was also mere feet away. The parties agree that at that moment Castillo III held a large knife and ignored orders to drop it. Given the totality of the circumstances, just like the officer in *Kisela*, Officer Bush had a fleeting second to make a life and death decision, and just like the officer in *Kisela,* Officer Bush is entitled to qualified immunity regarding the decision. This is the case even crediting Plaintiff's expert and thus assuming that Officer Bush, himself, was not in imminent danger because doing so places Officer Bush in an identical position as the officer in *Kisela* who also was in no danger.

In addition, viewing the evidence in a light most favorable to Plaintiff, and therefore assuming that Castillo III did *not* take a step toward anyone when shot, the facts are still aligned with *Kisela.* This is so because the danger, or threat, the officer faced remains identical. In *Kisela* the Supreme Court noted that Hughes was within a "few" feet of Chadwick; in the case at bar, Castillo III was within a "few" feet of his father and Officer Bush.[7] Hence, the officer in *Kisela* had to make the exact same split-second decision that Officer Bush had to make. And in making that decision, the Supreme Court, examining Ninth Circuit case law, held that the officer was entitled to qualified immunity. That holding is binding on this court. Even setting aside *stare decisis* there is no sound reason to deviate from *Kisela* and police officers in Officer Bush's position were (and are) entitled to rely on it in making their day-to-day decisions about use of force.

Critically, in finding that the officer was entitled to qualified immunity, the Supreme Court observed that the Hughes *held the knife down by her side. Id.,* at 1153 (emphasis added).

---

[6] 12 feet, giving the Plaintiff the benefit of all doubts.

[7] Even crediting Plaintiff's expert, Castillo III was, at most, 12 feet from Bush, and likely even closer to his father. When it comes to dangerous offenders armed with a knife, the difference between 12 feet and (for example) 5 feet is immaterial. Increasing the distance by 30, 40 or 50 feet may alter the objective reasonableness of an officer's risk assessment. However, splitting hairs regarding a "few" feet in these circumstances is not objectively reasonable.

This is the same position, viewing the evidence in a light most favorable to Plaintiff, that Castillo III held the knife. Again, examining Ninth Circuit case law, the Supreme Court held that the officer was entitled to qualified immunity. The landscape of law in this area has not altered materially since 2018 when *Kisela* was announced and Officer Bush is entitled to qualified immunity.

In addition to *Kisela,* there is *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005). In that case, police encountered Blanford walking down the street with a sword. *Id.,* at 1112. While no one was near Blanford but the armed police, they were "extremely concerned that Blanford posed a significant danger to any individual *who might* come near him or to [themselves] *if* he turned and charged." *Id.* (emphasis added). Eventually, after orders to drop the sword went ignored, the officers shot Blanford multiple times, despite no one in his proximity and despite the lack of any physical aggressiveness toward the officers, as he attempted to enter a residence. *Id*., 1113-1114. In short, the Ninth Circuit held that the officers' belief about the potential imminent danger, even if later proven incorrect in a courtroom, justified the use of deadly force. *Id*., 1119.

Pursuant to *Blanford,* an officer in Officer Bush's situation would not believe that he violated the Fourth Amendment. Just like the officers in *Blandford*, Castillo III only posed a *potential* immediate danger to others.[8] That potential threat was very real, very present, and exacerbated by a failure to obey or meaningfully acknowledge Officer Bush. Just like the officers in *Blanford,* Officer Bush had to make a split-second "what if" decision. In *Blandford,* the dangerous potential was an armed suspect entering a residence where people *might* have been put in danger. Again, based on this *potential* threat, the Ninth Circuit held that the officers were

---

[8] Again, viewing the evidence in a light most favorable to Plaintiff and thus crediting Plaintiff's expert.

justified in shooting Blandford. In the case at bar, the threat was even more immediate and more acute, Castillo III was, literally, in the same room as his father–mere feet away–armed with a knife and also a few feet away from the officer and not complying with orders to drop the knife and had freshly assaulted his mother. If the officers in *Blandford* did not offend the constitution, it is certainly not "beyond debate" that Officer Bush's actions violate the constitution.

*Blanford* has not been overruled or abrogated by subsequent case law. It remains binding precedent in the Ninth Circuit and continues to be cited as such. *See, e.g., Estate of Strickland,* 69 F.4th at 622; *Bifelt v. Alaska,* 854 Fed.Appx. 799 (9th Cir. 2021) (memorandum). As with, *Kisela,* police officers in this Circuit should, and are entitled to, rely on the decisions from the Ninth Circuit.

Not only has Plaintiff utterly failed to direct the Court to a case that places Officer Bush's alleged constitutional violation "beyond debate," the existing case law indicates that the closest analogous cases resolve the question in favor of the officer. In other words, Ninth Circuit and Supreme Court case law indicates that even if the Court presumes *arguendo* that Officer Bush violated the Fourth Amendment, on these particular facts such a presumption would be novel, meaning Officer Bush is, by law, entitled to qualified immunity.

5.  Policy and Practice of Constitutional Violations

Plaintiff alleges *Monell* liability in two ways: (1) that over time Salem maintained a widespread custom of indifference regarding Fourth Amendment violations in the form of substandard officer-involved-shootings (OIS), and; (2) following the shooting, the City "ratified" Bush's conduct. ECF# 47 ¶ 29. The City is entitled to summary judgment on these *Monell* theories of liability.

Beginning with the ratification theory, this claim fails because a city's mere decision to abstain from disciplining a police officer does not amount to ratification as a matter of law.

> Sheehan contends that the city ratified the officers' conduct by not disciplining them. Ratification, however, generally requires more than acquiescence. There is no evidence in the record that policymakers "made a deliberate choice to endorse" the officers' actions. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir.1992). The mere failure to discipline Reynolds and Holder does not amount to ratification of their allegedly unconstitutional actions. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir.2010) (holding that the failure to discipline employees, without more, was insufficient to establish ratification); *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir.1989) (refusing to hold that the "failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under Monell ").

*Sheehan v. City and County of San Francisco,* 743 F.3d 1211, 1231 (9th Cir. 2014) *reversed on other grounds* 575 U.S. 600 (2015); *see also, Paulos v. FCH1, LLC,* 685 Fed.Appx. 581 (9th Cir. 2017) (memorandum). The fact that Salem Police Chief Womack concurred that Bush acted within internal policy simply does not amount to endorsing (viz ratifying) a constitutional violation. If, on the other hand, the record revealed that the internal investigation determined that Officer Bush did, in fact, violate the constitution, and *then* the Chief of Police ratified the conduct by failing to discipline Bush, the conclusion would be much different. However, as things stand, viewing the evidence in a light most favorable to Plaintiff, the Critical Incident Review Board found that Officer "Bush's actions were within department directives and consistent with Salem [PD] training and expectations." *Response,* (ECF#90) at 36. And *that* conclusion is what Chief Womack ratified. Hence, there is no evidence of ratification of a constitutional violation.

Turning to the practice or custom theory of *Monell* liability, the claim fails for two independent reasons. First, Plaintiff's Response explains in great detail why, in her expert's opinion, the Oregon State Police's investigations of Salem PD shootings have from time to time

fallen short of perfection but, in doing so, she fails to explain why less-than-perfect

investigations amount to *constitutional* violations themselves. *See, Response,* (ECF# 90) 42-56.

Second, Plaintiff's Response fails to explain how less-than-perfect investigations could have

possibly led to Officer Bush's encounter with Castillo III; *i.e.*, causation.

　　Beginning with the lack of constitutional violations, the parties agree: a "custom or

practice can be inferred from *** evidence of *repeated constitutional violations* for which the

errant municipal officers" were not disciplined. *Velazquez v. City of Long Beach,* 793 F.3d 1010,

1027 (9th Cir. 2015) (emphasis added) *citing Hunter v. Cnty. of Sacramento,* 652 F.3d 1225,

1233 (9th Cir.2011). This makes sense because, when it comes to § 1983 liability, cities "are

responsible only for their own *illegal* acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011)

(emphasis added). Hence, while *Monell* allows liability for a custom of violating the constitution,

it does not allow liability for a custom of generally substandard work by government employees.

　　In the interest of brevity, Defendants will not summarize Plaintiff's lists of alleged

deficiencies. Suffice to say, none of the deficiencies listed are *constitutional* violations. If

Plaintiff presented evidence that Salem had a widespread custom of *unlawful* shootings*, or

unlawful* investigations, or *unlawful* entry into homes, or unconstitutional *anything*, that custom

would present a possible *Monell* question for a jury to consider. But that is not the case. Again,

in a custom or practice *Monell* case, the custom or practice *itself* must amount to a *constitutional*

violation. *Velazquez, supra.* The custom or practice may not be simple missteps, bad behavior,

indolence, or low performance, because those issues fall short of constitutional violations.

　　This is not a novel shortcoming for courts in this District. *See, Fesser v. West Linn Police*

*Department,* 2019 WL 7206448, at *4 (D. Or. Sept. 3, 2019) *adopted in relevant part* 2019 WL

5839305, n.1 (denying motion to amend complaint to add *Monell* custom or practice theory

because the underlying/historical conduct was not, itself, constitutional violations); *Bogle v. Clackamas County.,* 2017 WL 5490870, at *15-20 (D. Or. Nov. 15, 2017) (granting summary judgment for the county on plaintiff's *Monell* claim, in part because the plaintiff did not submit evidence of other examples of the sheriff's office use of canines in a manner that amounted to excessive force). In sum, Plaintiff catalogues a menagerie of complaints about the Oregon State Police's historical OIS investigations in Salem. They range from photographs with smears, to personnel assignments, availability of autopsy reports to certain administrators but not others, the timing of certain interviews, the role of the District Attorney, etc. *See, Response,* (ECF# 90) 42-56. This Reply should not be read to make light of such issues about such an important topic, however, Plaintiff fails to explain how the past, allegedly substandard investigations (by another police agency) amount to their own, separate *constitutional* violations committed by the City of Salem. *DeShaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 196 (1989) (generally no § 1983 action for lacking/substandard government conduct). Giving the Plaintiff the benefit of all inferences, substandard investigations are not positive, but that is a far cry from a constitutional violation.[9] In a custom or practice *Monell* case, that is the cornerstone: a plaintiff must present "evidence of repeated *constitutional* violations" to amount to a widespread custom or practice of constitutional violations. *Velazquez,* 793 F.3d at 1027.

Plaintiff explains her theory that the custom of poor investigations may "lead a reasonable juror [to] infer from Bush's fabricated narrative in this case that Salem's failure to conduct *bona fide* OIS investigations played a substantial part in bringing about Castillo's death…" *Response*, (ECF#90), at 56. This crystalizes Plaintiff's misunderstanding of a customs-

---

[9] As just one permutation, an investigation into a Salem Police shooting may determine that the shooting was within policy while at the same time being a terribly flawed investigation. Yet, despite the flawed investigation, it is also possible, that the shooting was, at the same time, entirely lawful and justified. Hence, inadequate investigations may not yield any sort of violation, constitutional or otherwise.

and-practices case under *Monell*. *Monell* custom-and-practice liability exists to prove that the government's informal customs, *themselves*, are unconstitutional and injurious. *Connick*, 563 U.S. at 60.  The informal customs are not circumstantial evidence to prove an *individual* defendant's liability under *Monell*; instead, in this kind of case, the government itself violates the constitution by its widespread, informal custom.  Yet, Plaintiff seeks to use customs-and-practices evidence differently.  Not to prove the liability of *Salem* in connection to *those* previous faulty investigations, but to prove the liability of Bush for unlawfully shooting Castillo III, and further, to make the City of Salem vicariously liable for that shooting.  Yet, Salem cannot be vicariously liable for its employees. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 735 (1989).  In short, Bush's liability, if any, will be settled in the § 1983 claims against him individually.  It is improper to use a poor OIS investigation by the State Police seven years ago to establish Bush's individual liability.

Turning to the causation problem, Plaintiff concedes that she must prove a causal connection between the constitutional violation and the longstanding custom and practice of failing to conduct a bona fide internal investigation.  *Response,* (ECF#90), at 38.  Plaintiff explains that this can be proved by showing that "an appropriate policy could have prevented the violation."  *Id*.  Plaintiff fails to establish a causal connection. Plaintiff's theory seems to turn entirely on her own speculation, to wit: if old, historical OIS investigations would have been done better, Officer Bush would not have used lethal force in July 2021.  There is no evidence in the record so support this inferential leap.  There is no evidence in the record that Officer Bush knew about prior, faulty OIS investigations and somehow calibrated his behavior in July 2021 based on that knowledge.

Defendants rely on Officer Bush's declaration to disprove any causal connection between an alleged custom and practice and Officer Bush's decisions in his case. Officer Bush wrote, "Prior to my interaction with Arcadio III, I was aware of Salem Police Department's policy concerning officer involved shooting would require that a law enforcement officer from [an] outside agency would interview me about a shooting. I knew that I would be required to testify at grand jury to determine whether my actions were justified. I knew that separate from the grand jury process, a panel would review my statements and the evidence collected, and discipline could have resulted if the panel decided that my actions were not justified or if I had violated policy." This demonstrates that even if Officer Bush was mistaken about the actual practice, he believed he would be interviewed, deposed at grand jury, and that a panel would review his actions. He indicates that the process could have resulted in criminal charges or discipline. Plaintiff fails to make any arguments to address Officer Bush's understanding of the policy prior to his encounter with Castillo III.

6. Negligence

The fundamental problem with Plaintiff's reliance on the reversed decision of *Johns v. City of Eugene*, 2018 WL 634519 (D. Or. Jan. 30, 2018) *reversed* 771 Fed.Appx. 739 (2019) is the underlying logic of that case does not apply to this case. In *Johns* the plaintiff alleged a variety of claims, including a Wrongful Arrest, Fourth Amendment claim, but *not* an Excessive Force claim.

As Plaintiff points out, because the plaintiff in *Johns* brought a wrongful arrest claim, the court warily allowed the negligence claim to survive summary judgment. The court pointed to cases involving strictly intentional mental states like use of excessive force, and commented "[i]t is difficult to see how negligence principles could be applied to such scenarios, which do not

involve a failure to exercise due care to avoid a foreseeable risk of harm." *Id.,* at *10. The court drilled down on the problem with negligence claims being tried with excessive force claims: "[w]hen an excessive force claim and a negligence claim based on the same underlying factual allegations proceed to trial, there will be some risk that the jury will confuse issues and improperly subject police officers to liability for negligent use of excessive force." *Id.,* at *14 n.5. Acknowledging this as a "significant" risk, the court hypothesized that jury instructions might be the solution. *Id.* The salient point here is, *Johns* did not involve that risk. The case at bar, however, does. If this case goes to trial and the negligence claim survives, a jury will be completely dumbfounded about the competing mental states. There is a real risk, as expressly stated by Judge Aiken in *Johns,* that Officer Bush will be found liable for a negligent § 1983 claim – which is legally impossible. To invite such a "significant risk" about a miscarriage of justice, based solely on a decision from a trial court that was reversed by the Ninth Circuit, would be error.

Plaintiff cited *Son v. Ashland* for the elements of wrongful death – negligence.  ECF# 90, p. 58.  Plaintiff focuses on the first and third elements.  *Id*.  The third element states, "that defendant's conduct was unreasonable in light of the risk."  Defendants assert that Officer Bush's conduct was both reasonable and necessary in light of the risk.

It is indisputable that Misty Castillo told dispatch that Castillo III is "mentally ill and assaulting us."  Plaintiff argues that Misty Castillo's pleas for help were for herself.  Defendants argue that whether Misty Castillo said help me or help my husband, Misty intended for Officer Bush to help her husband.  The Oregon State Police detective who interviewed Misty Castillo hours after the shooting asked her, "Do you think, do you think he could have killed your husband?"  She responded, "I think he could have killed my husband, yeah."  ECF# 61-8, p. 2.

Officer Bush reasonably believed that his immediate action was necessary to protect Castillo II. Plaintiff may argue that Castillo II was not in danger, but no one knows if Castillo II would be alive today without Officer Bush's immediate action.  Misty Castillo certainly will not be able to argue that Castillo II was safe in Castillo III's presence that evening.

Additionally, Defendants continue to rely on their arguments previously presented on the exclusion of Negligence as a cause of action when the same facts are used to support a § 1983 action.

## Conclusion

For all the reasons discussed above, Plaintiff's claims should be dismissed. Defendants respectfully request an Order granting summary judgment in their favor.

DATED this 20th day of February, 2024.

*s/Sebastian Tapia*
Sebastian Tapia, OSB No. 043761
stapia@cityofsalem.net
Andrew D. Campbell, OSB No.  022647
Andrew@Heltzel.com
Of Attorneys for Defendants
