UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

MISTY L. CASTILLO, as Personal
Representative of the ESTATE OF
ARCADIO CASTILLO, III,

Case No. 6:22-cv-00684-MK

**OPINION AND ORDER**

Plaintiff,

vs.

NATHAN BUSH and CITY OF SALEM,
a municipal corporation,

Defendants.

_____

**KASUBHAI,** United States Magistrate Judge:

Following the July 9, 2021 police shooting and killing of Arcadio Castillo III ("Castillo

III"), Plaintiff Misty Castillo (the personal representative of Castillo III's estate), filed this civil

rights lawsuit under 42 U.S.C. § 1983 ("Section 1983") and Oregon State law. Compl., ECF No.

1. Plaintiff alleges claims against the officer involved in the shooting, Nathan Bush, and the City

of Salem. Before the Court are (1) Plaintiff's Motion for Partial Summary Judgment and (2)

Defendants' Motion for Summary Judgment. For the below reasons, Plaintiff's motion is denied,

and Defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

On July 9, 2021, at approximately 11:20 p.m., Misty Castillo called 911, reporting that her son was mentally ill, intoxicated, under the influence of marijuana, assaulting family members, and armed with a knife. Answer ¶ 7, ECF No. 53. Misty Castillo also yelled "get away from me" and then screamed before the 911 call was disconnected. *Id*. Defendant Bush was on his way to another call when he saw the call of a nearby domestic disturbance and self-dispatched. Bush Dep. 36:7-14, ECF 70-3. Defendant Bush was aware of the contents and nature of the 911 call. *Id*. at 38:21-39:9; *see also* Answer ¶ 7.

When Defendant Bush arrived and exited the vehicle, he drew his gun because he thought Misty Castillo was potentially being stabbed. Bush Dep. 68:20-69:9. He approached the residence on foot, putting his weapon away when he saw Misty Castillo standing in the driveway of the family home. Bush Dep. 49:4-8, 69:7-20. ECF 70-3. He observed Castillo III standing on the porch in front of the house. *Id.* at 51:7-16. Defendant Bush looked for a knife but did not see one. *Id.* at 55:3-11. Defendant Bush said, "What's going on?" and Castillo III looked at him, then turned around and entered the home, shutting the door behind him. *Id*. at 52:14-54:21.

Defendant Bush then approached Misty Castillo in the driveway to acquire more information. *Id*. at 58:22-25; 59:8-11. Defendant Bush testified that Misty Castillo told him that Castillo III had "drug her across the driveway," and Defendant Bush observed fresh scrapes underneath her kneecap and down her shin. Park Decl. Ex. 4 at 37, ECF No. 70-3. She told him that he needed to "go help" her husband, who was located inside the house with Castillo III. Tapia Decl. Ex. 3 at 62:7-10, ECF No. 61-3; Tapia Decl. Ex. 2 at 60:3-4, ECF No. 61-2.

Defendant Bush approached the porch and climbed the steps, eventually hearing voices inside the home. Bush Dep. 65:13-22. As he approached the door, he drew his weapon again.

Bush Dep. 69:21-24. He heard the conversation inside the house "escalating," and checked the door. Bush Dep. 74:21-75:5. When he checked it a second time, he "heard a loud audible pop" and felt that his position was compromised, so he opened the door to "get eyes on the problem." *Id*.

The parties provide different accounts of what happened next. However, the shooting itself and state of the scene afterward are not disputed. Audio and video evidence show that Defendant fired his first shot approximately 4.1 seconds after he opened the door. Nelson Decl. Ex. 3, ECF No. 69-2. Defendant Bush shot Castillo III four times, in the mid-chest, left chest and arm, right upper arm and chest, and left abdomen. Park Decl. Ex. 1, ECF No. 70-1. The crime scene investigation report reflected that Castillo III's body was on the carpet of the living room floor near the front door. Park Decl. Ex. 6, ECF No. 70-5. There was blood on the floor of the front entry, living room floor, and a brown recliner. *Id*. There was a 13-inch bloody kitchen knife with a black handle between Castillo III's body and the dining room. *Id*. There was a bullet strike "midway up the [front] door with an entrance in the front of the door near the edge and an exit through the edge of the door." *Id*. Another bloody 13-inch kitchen knife—this one with a stainless-steel handle—was found behind the brown recliner in the living room. *Id*. There was also a 9.25-inch steak knife with three small spots of blood on top of a blanket on the seat of the brown recliner.

The parties have introduced conflicting evidence about the events that took place during time between Defendant Bush opening the door and his shooting of Castillo III.  Defendant Bush has testified that, after opening the door, he observed Castillo III facing him on the other end of a couch, holding a large knife in his right hand. Bush Dep. 85:19-24. At initial contact, the knife was down at Castillo III's side and he did not appear to be threatening Castillo Jr. Id. at 87:1-11;

88:11-14. Defendant Bush testified that he pointed his gun at him and commanded him to "drop

the knife." *Id.* at 86:15-24. After that, Defendant Bush described the events as follows:

> Initially when I told him to "drop the knife," he began walking towards me, took
> approximately two steps, a couple feet towards me, and then stopped, turned
> around, and started walking away. I stopped talking to him hoping he would walk
> back into the house, because my goal at that point was to get his dad out of the
> house. I took one step through the doorway, and I took my left hand off my pistol.
> I reached out towards Arcadio, Junior, to try to tell him to come to me so I could
> pull him out of the house so he could get away from the problem, and then at that
> point Arcadio, III, spun to his left, his weight shifted forward, and he charged at me
> with the knife raised near his right shoulder.

Bush Dep. 89:16-90:10. He testified that Castillo III was then "running directly towards [him]"

with the knife "up and pointed towards [him]…in a stabbing motion." *Id.* at 92:9-22. He testified

that he fired the first shot shortly after Castillo III began running towards him. *Id*. at 94:5-7.

In contrast to Bush's testimony, Castillo Jr. testified that when Defendant Bush fired the

first shot, Castillo III was "just standing there with the knife," both hands by his sides. Castillo

Jr. Dep. 38:22-39:19, ECF No. 70-2.  Plaintiff's expert also opined based on the physical

evidence that it is "impossible" for Castillo III to have been charging in the manner Defendant

Bush described. Howard Decl. ¶ 11, ECF No. 68. His opinion is based on, among other things,

the locations and condition of blood spatter, the condition of the recovered bullets, the nature of

Castillo III's wounds, the locations of the knives, and the timing of the shots fired. *See generally*

Howard Decl.[1]

Pursuant to agency policy, the shooting was investigated by the "Critical Incident Review

Board, which is an interagency work group that includes several high-ranking managers within

---

[1] Defendants' response to Plaintiff's motion contests Mr. Howard's qualifications to render the
opinions in his report. However, even if considered, Mr. Howard's opinions do not entitle Plaintiff
to summary judgment for the reasons explained later in this opinion. Accordingly, the Court
declines at this point to make a Rule 702/*Daubert* ruling with respect to Mr. Howard's testimony
without a formal motion and separate briefing on the issue.

the Salem Police Department." Ditto Decl. ¶¶ 3-6, ECF No. 64. On December 27, 2021, Chief of

Police Trevor Womack received a memorandum setting forth the findings of the Critical Incident

Review Board. Park Decl. II Ex. 2, ECF No. 93-2. The document concludes that Defendant

Bush's actions were "within department directives and consistent with Salem Police Department

training and expectations. *Id*. Chief Womack signed "concur" on that memorandum. *Id*.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute

as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs.,*

*Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is

such that a reasonable jury could return a verdict for the nonmoving party determines the

authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the

absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings

and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all

reasonable doubts as to the existence of genuine issues of material fact should be resolved

against the moving party; and (2) all inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

/ / /

/ / /

## DISCUSSION

I.    **Section 1983 Claims against Defendant Nathan Bush**

A.    **Fourth Amendment Unlawful Entry**

Defendants move for summary judgment against Plaintiff's claim that Defendant Bush violated Castillo's Fourth Amendment rights by entering his home without a warrant. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation and quotations omitted). However, as relevant here, warrantless entry is permissible where the occupant consents to it or where exigent circumstances justify it. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (warrantless entry of a home is permissible "with the voluntary consent of an individual possessing authority); *Lange v. California*, 141 S. Ct. 2011, 2016 (2021) ("an officer may make a warrantless entry when 'the exigencies of the situation' create a compelling law enforcement need"). Defendants argue that there is no genuine issue of fact that Defendant Bush's entry into the home was lawful because (1) he had express consent from Misty Castillo and Castillo Jr. to enter, and (2) exigent circumstances justified the entry.

1.    Consent

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Randolph*, 547 U.S. at 106. Defendant Bush argues that he had unambiguous voluntary consent to enter the home based on Misty Castillo's request that he go help her husband (who was inside the home) and Castillo Jr.'s unlocking of the front door when he was aware of Defendant Bush's presence at the doorway. Plaintiff argues that—even if Misty Castillo and/or Castillo Jr. consented to Defendant Bush's entry—warrantless entry was not

justified because co-occupant Castillo III "unequivocally demonstrated his objection to Bush entering the residence." Pl. Resp. 20.

On the consent issue, the Court finds that Plaintiff has failed to establish a genuine issue of material fact on Misty Castillo's express consent to Defendant Bush's entry into the home. Misty Castillo testified that she told the officer to go help her husband, who was inside the home. Tapia Decl. Ex. 2 at 60:3-4. Plaintiff has not identified any evidence negating this clear testimony supporting her consent to enter the home. Accordingly, Defendants have established that Defendant Bush had Misty Castillo's consent to enter the home.

Notwithstanding Misty Castillo's consent, however, there is a question of fact as to Castillo III's refusal of entry. The Supreme Court has held that, even where one occupant consents to entry, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Randolph*, 547 U.S. at 106. Plaintiff likens this case to *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018). In that case, police responding to a domestic dispute call received the consent of the victim to enter her home where the plaintiff (a co-occupant of the home) was located. *Id*. at 868-69. The officers approached the front door and instructed the plaintiff to come to the door. *Id*. at 870. The plaintiff locked the side door and did not respond to an officer's command to "come out or we are coming in." *Id*. After speaking with witnesses outside the home and receiving the victim's consent to enter, an officer again knocked on the door and advised the plaintiff to open the door. *Id*. at 870. When officers shined a flashlight through the window to look inside, the plaintiff retreated and ducked out of sight. *Id.* at 871. Police then broke a windowpane on the backdoor and unlocked it. *Id*. at 871. After briefly interacting with the officers at the door, the plaintiff tried to shut the door but the officer "rushed through with . . . force." *Id*. at 875. The Ninth

Circuit held that the plaintiff's behavior constituted an express refusal to permit the officers'

entry. *Id*. at 875. Specifically, the Ninth Circuit explained that the victim's consent was no longer

valid once the plaintiff locked the side door and attempted to shut the front door on the officers

and that a reasonable officer would have understood the plaintiff's behavior as an express

refusal. *Id*. at 875-76.

Defendants argue that *Randolph* and *Bonivert* should not apply because this case, unlike

those cases, involved an ongoing domestic violence incident in which there was an alleged

potential victim inside the home with Castillo III at the time Defendant Bush sought entry. They

argue that, where an ongoing domestic violence situation is unfolding, an alleged domestic

abuser cannot refuse consent. Defendants' argument conflates the consent analysis with the

exigency analysis and misapprehends Justice Souter's limitation of *Randolph*'s application. The

existence of potentially ongoing domestic violence is certainly relevant to the existence of

exigent circumstances justifying entry, but there is nothing in the rationale of *Randolph* or

*Bonivert* to suggest such a fact would alter the consent analysis. Indeed, Justice Souter's

comment that *Randolph* "has no bearing on the capacity of the police to protect domestic

victims" notes that "[t]he undoubted right of the police to enter in order to protect a victim,

however, has nothing to do with the question in this case, whether a search with the consent of

one co-tenant is good against another, standing at the door and expressly refusing consent."

*Randolph*, 547 U.S. at 118-19. In other words, recognizing the ability of a co-occupant to refuse

consent for purposes of that exception to the warrant requirement does not negate the ability of

an officer to enter the home when faced with exigent circumstances (a different exception to the

warrant requirement).

While the Court recognizes that the facts in *Bonivert* more clearly establish refusal of consent than do the facts at issue here, there is enough in the record from which a juror could conclude that a reasonable officer could have understood Castillo III's behavior as express refusal of entry sufficient to render Misty Castillo's consent invalid. Specifically, Castillo III walked inside and closed the door in response to being addressed by Defendant Bush. Thus, Defendants are not entitled to summary judgment on this claim on the basis of consent because there is a question of fact on whether a reasonable officer would have understood Castillo III refused consensual entry. However, as addressed later in this opinion, Defendant Bush is entitled to qualified immunity on this claim.

2.    Exigent Circumstances[2]

Exigent circumstances can also justify warrantless entry. That exception applies when "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). As to the first prong, "whether the actions of the police are objectively reasonable is to be judged by the circumstances known to them." *United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007). While the existence of a domestic dispute does not *per se* amount to exigent circumstances, "[c]ourts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief

---

[2] The parties make arguments with respect to both "exigency" and "emergency aid," both of which are exceptions to the rule against warrantless entry. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). However, "the distinction between the two exceptions largely fades away … when the primary exigency or emergency justifying warrantless entry is…the risk of physical harm to another person following an alleged assault." *Dold v. Snohomish Cnty.*, 649 F. Supp. 3d 1084, 1101 (W.D. Wash. 2022) (collecting Ninth Circuit and Supreme Court cases). Thus, the Court's analysis of "exigency" encompasses "emergency aid" as well.

that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004), quoting *Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir. 1998). In general, "Whether reasonable cause to believe exigent circumstances existed in a given situation, 'and the related questions, are all questions of fact to be determined by a jury.'" *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001) (quoting *Wallis v. Spencer,* 202 F.3d 1126, 1138 (9th Cir.2000)).

Defendant Bush argues that he is entitled to summary judgment on Plaintiff's Fourth Amendment unlawful entry claim because undisputed facts establish an objectively reasonable basis to believe there was an immediate need to protect Castillo Jr. from harm. In particular, Defendant Bush emphasizes that he knew that Castillo III was "mentally ill and assaulting [Misty Castillo and Castillo Jr.]" with a knife before he arrived at the home. After his arrival, Misty Castillo expressed concern for the safety of Castillo Jr. and asked Defendant Bush to help him. Defendant Bush observed that Misty Castillo had been injured and testified she told him Castillo III had drug her across the driveway. When he approached the home and listened at the door, he heard voices escalating. All these facts could lead a reasonable officer to conclude there was an immediate need to protect Castillo Jr. from harm inside the home.

On the other hand, Plaintiff identifies other facts in the record from which he contends a reasonable jury could conclude the warrantless entry was not justified based on exigent circumstances. Specifically, she notes that Castillo III appeared calm and unarmed when Defendant Bush arrived at the scene, and nobody was yelling or screaming. Misty Castillo's injuries were minor and she had not been harmed by a knife.

Despite the wealth of circumstances that suggested exigency, Plaintiff has identified sufficient facts to the contrary such that this issue is properly resolved by a jury. Based on the facts known to Defendant Bush at the time, viewing all the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant Bush lacked an objectively reasonable basis for concluding that there was an immediate need to protect Castillo Jr. from harm. However, as addressed later in this opinion, Defendant Bush is entitled to qualified immunity on this claim.

### B.    Fourth Amendment Excessive Use of Force

Plaintiff moves for summary judgment on her claim that Defendants violated Castillo III's Fourth Amendment rights by "intentionally shooting [Castillo III] without an objectively reasonable belief that [he] presented an immediate threat of serious bodily harm to defendant Bush or any other person and without providing [him] reasonable time to comply with his commands nor fair warning of his intention to use deadly force." Sec. Am. Compl. ¶ 28, ECF No. 47.[3] Defendants argue that genuine issues of material fact on the events that led to Castillo III's death preclude summary judgment in Plaintiff's favor.

"Fourth Amendment excessive force claims are examined under the reasonableness standard and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989)." *Price v. City of Sutherlin*, 945 F.Supp.2d 1147, 1155 (D. Or. 2013) (citation omitted). In evaluating a claim of excessive force, the critical question "is whether the use of force was objectively reasonable in light of the facts and circumstances confronting the . . . officer." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citation and internal quotations omitted). This analysis requires courts to consider (1) the severity of the crime at

---

[3] Although Defendants initially cross-moved for summary judgment on this claim, they withdrew this motion in their reply. Def.'s Reply. 16.

issue; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3) whether the individual was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. The Court must also "look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). Because excessive force claims "almost always turn on . . . credibility determinations" and "nearly always requir[e] a jury to sift through disputed factual contentions," summary judgment is rarely warranted. *Smith v. City of Hemet*, 394 F.3d 689, 701 (2005) (citation and internal quotations omitted).

       1.    Immediate Threat

The "most important" *Graham* factor is whether the individual posed a threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Here, the parties agree that mere possession of a weapon is not enough to establish an immediate threat but disagree as to whether Castillo III engaged in any actions creating an immediate threat.

As noted above, the parties offer conflicting evidence about the events that unfolded before Defendant Bush shot Castillo III. Despite the conflicting evidence, Plaintiff contends that the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007) compels the Court to find the absence of a genuine issue of fact because the "physical facts" directly contradict Defendant Bush's testimony that Castillo III was charging at him with a knife when he fired his first shot.

In *Scott*, the parties provided different evidence supporting their accounts of events that took place during a car chase that culminated in the defendant police officer "ramming" the plaintiff's vehicle. The Supreme Court began its analysis by stating the general rule that, when

parties present different accounts of the facts, summary judgment is inappropriate. *Id*. at 378. However, the Court explained that there was "an added wrinkle in this case: existence in the record of a videotape capturing the events in question." *Id*. The events depicted in the video clearly contradicted the plaintiff's version of the story, and "there was no contention that what [the video] depict[ed] differs from what actually happened." *Id*. The Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 380.

The facts at issue here are not comparable to *Scott* for two related reasons. First, while there was no contention in *Scott* that the events depicted in the video were different from what actually happened, the parties here *do* dispute that the evidence at issue (Mr. Howard's interpretation of the physical evidence) align with what actually happened. Plaintiff's argument conflates the physical evidence at issue with her expert's interpretation of it. While the parties may not dispute the condition of the scene after the shooting, they do dispute Mr. Howard's interpretation of it (*i.e.* "what actually happened"). This distinguishes *Scott* from this case.

Second, the Court cannot equate an expert's interpretation of physical evidence as "physical facts" comparable to video evidence, nor has Plaintiff identified any controlling case law supporting such an expansion of the rule announced in *Scott*. While the Ninth Circuit has explained that *Scott* is not limited to videotapes, Plaintiff has cited no controlling case law that has applied the rule in the manner she seeks to apply it here. Indeed, the Ninth Circuit has declined to apply *Scott* when one party relied on physical evidence that they contended directly contradicted another witness's testimony." *Orn v. City of Tacoma*, 949 F.3d 1167, 1175 (9th Cir. 2020). The Court explained that while physical evidence "provide[d] some support for [the

defendant's] version of events, they [we]re nowhere near conclusive enough to meet *Scott*'s 'blatantly contradicts' standard, where the Court relied on a videotape clearly depicting the events in question. *Id.* Whatever the outer limits of *Scott*'s application, there is no support for applying it to Mr. Howard's testimony. Significantly, Defendants identify numerous assumptions Mr. Howard makes to arrive at his conclusion that it was "impossible" that Castillo III was charging Defendant Bush, including which knife Castillo III held, which of Castillo III's wounds were sustained in which order, and differing interpretations of blood stain patterns. The numerous pieces of physical evidence and inferences drawn from them underscores the danger of applying the *Scott* rule to an expert's interpretation of physical evidence.

In sum, the Court cannot say, as the Supreme Court did in *Scott*, that "no reasonable jury could believe" Defendant Bush's testimony. Thus, *Scott* does not foreclose a jury from considering Defendant Bush's testimony and weighing it against an expert's interpretation of physical evidence. Because Defendant Bush's testimony contradicts Mr. Howard's analysis of the physical evidence as well as Castillo Jr.'s testimony on the issue of Castillo III's immediate threat, a genuine issue of fact remains on the issue of Castillo III's immediate threat at the time Defendant Bush shot him. Viewing the evidence in the light most favorable to Defendant, a reasonable jury could find that Castillo III posed an immediate threat.

2. Severity of the Crime at Issue

The next factor to consider is the severity of the crime at issue. *See Graham,* 490 U.S. at 396. As with the other factors, the scope of this inquiry is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal citation and quotation omitted).

Plaintiff concedes that Defendant Bush had probable cause to believe that Castillo III may have committed Assault IV, ORS 163.160, and Menacing, 163.190, but argue that such

crimes cannot justify the use of deadly force. Plaintiff relies on *Smith*, 394 F.3d 689 in support of her assertion that use of deadly force was prohibited as a matter of "clearly established law." *See* Pl.'s Mot. 21. In *Smith*, the police responded to a report of domestic abuse, but upon arrival the suspect was "standing on his porch alone and separated from his wife." *Smith*, 394 F.3d. 702-03. He "had no guns or other weapons in his possession and there were none in the house." *Id.*

The facts in *Smith* are distinguishable from those here. Here, unlike in *Smith*, the suspect was neither separated from all potential or alleged victims, nor was it clear that he had no weapons on his person or in the home. Although Misty Castillo was separated from Castillo III, Defendant Bush knew that Castillo Jr. was still in the house, that Castillo III had just walked back into it, that Castillo III had possession of a knife, and that Misty Castillo was fearful for her husband's safety. Defendants also identify other crimes Defendant Bush had reason to believe Castillo III committed. Defendant Bush received a report that Castillo III had threatened family members with a knife, which would constitute felony Unlawful Use of a Weapon under ORS 166.220. He also understood that Castillo III had interrupted Misty Castillo's 911 call, which would constitute Interference with Making a Report under ORS 165.572.

In response, Plaintiff argues that Defendant Bush's "behavior in his approach to the scene" indicates that he was unconcerned about the commission of felony crimes. Pl. Reply 14. As an initial matter, Plaintiff does not identify any case law holding that a defendant's subjective belief regarding the commission of dangerous crimes is relevant to the Court's inquiry on this factor, which is an objective test that depends on whether a reasonable officer would have concluded a serious crime was occurring. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir. 2017). Even if relevant, Defendant Bush's alleged lack of concern appears to be a question of fact; although Plaintiff points out that Defendant Bush made little attempt to conceal

himself and only heard voices talking, he had also drawn his weapon and testified that he heard the conversation escalating. Finally, the question of Defendant Bush's behavior and its consistency with his beliefs about the commission of dangerous felony or person crimes goes to the credibility of his testimony, which is inappropriate for this Court to resolve at summary judgment.

In sum, viewing the evidence in the light most favorable to Defendant, a jury could find that a reasonable officer under the circumstances would have had probable cause to believe that Castillo III had committed serious crimes.

### 3.    Attempt to Resist or Flee

The final *Graham* factor involves an inquiry into whether Castillo III was resisting or attempting to evade arrest. Plaintiff argues that she is entitled to summary judgment because "Castillo III's location within his home and physical orientation to Bush when shot, in conjunction with the short period of time the shooting occurred after the front door opened[,] conclusively controvert a reasonable inference that Castillo III was either resisting arrest or attempting to flee." Pl.'s Mot. 21. But, as explained in detail above, there is a dispute of fact on Castillo III's position and actions immediately preceding the shooting. Moreover, there is evidence that Castillo III failed to respond to Defendant Bush before withdrawing into the home, and that he failed to drop the knife during his confrontation with Defendant Bush inside the home. Drawing all inferences in Defendants' favor as to Castillo III's response to Defendant Bush's inquiries and commands and his position prior to the shooting (*i.e.* whether he was charging), a reasonable jury could conclude that Castillo III was resisting or attempting to evade arrest.

In sum, the disputed facts about the events that led to Castillo III's shooting preclude this Court from granting summary judgment for Plaintiff on this claim.

### C.    Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Here, the Court has already found that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Castillo III's Fourth Amendment rights against unlawful entry and excessive use of force were violated. Thus, the first prong of the analysis is satisfied, and the remaining question is whether the rights allegedly violated were clearly established in light of the specific context of the case.

The Supreme Court has emphasized that the asserted right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that

right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (brackets and internal quotation marks omitted).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority[.]' " It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (citations omitted). In other words, while qualified immunity does not require "a case directly on point, [ ] existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The specificity of the clearly established law is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal citation, quotation, and alterations omitted).

For the reasons explained below, the Court grants Defendant Bush summary judgment on the basis of qualified immunity against Plaintiff's unlawful entry claim but denies summary judgment against Plaintiff's excessive use of force claim.

   1.   Unlawful Entry

Defendant argues that even if there were a genuine issue of material fact as to unlawful entry—as this Court has found there is—he is still entitled to summary judgment based qualified immunity. Plaintiff contends that Defendant Bush is not entitled to qualified immunity because the law applicable to the consent and exigency exceptions was clearly established based on *Randolph*, *supra*, and *Bonivert*, *supra*, respectively.

As to the consent exception, neither *Randolph* nor *Bonivert* clearly establish the law such that every reasonable official would have understood that Defendant Bush's reliance on consent would violate Castillo III's Fourth Amendment right. As explained above, *Randolph* establishes the law that an occupant's refusal to permit entry renders warrantless entry invalid even if another co-occupant consents. *Randolph*, 547 U.S. at 106. But a qualified immunity analysis requires factually analogous circumstances, and neither *Randolph* nor *Bonivert* are sufficiently similar. With respect to *Randolph*, the co-occupant there was specifically asked for permission to search the house and "unequivocally refused;" the issue in the case was not *whether* he refused, but rather the *effect* of that refusal. *See id.* at 107. It does not clearly establish the law on what conduct constitutes refusal of consent. Although the facts in *Bonivert* as illustrated above are somewhat more analogous to those here, that case is still insufficient to clearly establish the law. In particular, the behavior of the officers there (who were clearly seeking entry) followed by multiple indications of refusal by the plaintiff (refusing to answer the door when asked, affirmatively locking the door, hiding within the home, and attempting to close the door on the officers) were far more unequivocal. By contrast, Castillo III's simply walked inside the house following a vague police inquiry that did not suggest the officer was requesting permission to enter the home. The facts are insufficiently similar to clearly establish the law on Castillo III's alleged refusal of entry.

As to the exigency exception, *Bonivert* does not clearly establish the inapplicability of the exigency exception to warrantless entry. In that case, the alleged victim of the domestic abuse was "safely outside the home before the officers even arrived." *Bonivert*, 883 F.3d at 879. By contrast, here, Castillo Jr. was inside the home with Castillo III, Misty Castillo had expressed concern for her husband's safety, and Defendant Bush heard escalating voices prior to his entry.

Not every reasonable official would conclude from *Bonivert* that Defendant Bush's entry under those circumstances would violate Castillo III's Fourth Amendment rights.

Defendant Bush is therefore entitled to qualified immunity on Plaintiff's unlawful entry claim and is entitled to summary judgment in his favor on that claim.

>2.   Excessive Use of Force

Defendant Bush also moves for summary judgment against Plaintiff's excessive use of force claim based on qualified immunity. However, whether Defendant Bush's use of force violated clearly established law in this case depends on the disputed facts about what happened after Defendant Bush opened the front door and immediately prior to his shooting of Castillo III.

Qualified immunity is, "by design," usually resolved before trial "in order to preserve the doctrine's status as a true immunity from suit rather than a mere defense to liability." *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017) (internal quotation, citation, and alteration omitted). However, "when there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Id.* (quoting commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017)). In such a case, "only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Id.* at 823.

Here, with so many material facts in dispute over the circumstances that preceded Defendant Bush's use of force, the Court cannot determine whether Castillo III's Fourth Amendment right against the use of excessive force was clearly established. That issue can be resolved only after the jury decides on the disputed facts. Accordingly, Defendant's motion for

summary judgment against Plaintiff's excessive force claim on the basis of qualified immunity is denied.[4]

## II.    Section 1983 Municipal Liability against Defendant City of Salem

Defendants move for summary judgment against Plaintiff's claim for municipal liability under Section 1983 against Defendant City of Salem, arguing that Plaintiff cannot offer any evidence from which a jury could conclude that Defendant City of Salem had a pattern and practice of unconstitutional conduct.

In certain circumstances, a municipality may be held liable as a "person" under Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Liability only attaches where the municipality itself causes the constitutional violation through the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Gillette v. Delmore,* 979 F.2d 1342, 1347 (9th Cir. 1992) ("[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability") (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126 (1988)).

There are three methods by which a plaintiff may establish municipal liability under *Monell*. First, a local government may be liable where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

---

[4] While the Court allowed supplemental briefing on the effect *Calonge v. City of San Jose*, 104 F.4th 39 (9th Cir. 2024), on the question of qualified immunity, that case does not alter the Court's conclusion that addressing qualified immunity is inappropriate here given the disputed facts.

represent official policy, inflict[s] the injury." *Rodriguez v. City of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694). Second, a local government can fail to train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Third, a local government may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 802–03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

Here, Plaintiff advances two theories of municipal liability: (A) that Chief Womack, an individual with final policy-making authority, ratified Defendant Bush's unconstitutional conduct; and (B) that Defendant City of Salem had a longstanding policy and practice of failing to conduct bona fide internal reviews of officer-involved shootings.

### A.    Ratification

Plaintiff's first theory of municipal liability is that Chief Womack ratified Defendant Bush's unconstitutional conduct by concurring in the findings of the Critical Incident Review Board that Defendant Bush's use of force was within policy. Under a ratification theory, "a plaintiff must prove that the authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quotations and citation omitted). Ratification is typically a question for the jury, but a plaintiff must still "establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Id.*

A policy-maker's finding that an officer's conduct was not wrongful is not, standing alone, sufficient to go to the jury on a ratification theory. *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003). When relying on a single decision of a policymaker to establish municipal liability, "the plaintiff must show that the triggering decision was the product of a 'conscious, affirmative choice' to ratify the conduct in question." *Id.* (internal quotations omitted). For example, in *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), the Ninth Circuit held that a city could be liable based on a single decision where an expert testified that "any reasonable police administrator" should have identified the "holes and inconsistencies" contained in the investigation that resulted in the failure of the chief of police to discipline an officer accused of using excessive force." *Id.* at 647.

Here, Plaintiff's conclusory ratification theory notes that Chief Womack concurred with the conclusion of the Critical Incident Review Board that Defendant Bush acted within department policy. Pl. Resp. 29. But unlike in *Larez*, Plaintiff has not introduced any expert evidence that a reasonable police administrator should have identified any issues with the report, nor any other evidence that Chief Womack made any "conscious affirmative choice" to ratify any unconstitutional conduct. While Plaintiff may object to the adequacy of the general investigation and review process, that is the subject of Plaintiff's other theory of liability, not her ratification theory. The evidence shows only that, in this case, Chief Womack agreed with the report's conclusion that Defendant Bush's conduct was within department policy. There is no evidence that he was aware of any unconstitutional conduct which he then ratified, nor is there any evidence that he knew the investigation was inadequate. Defendant is therefore entitled to summary judgment against Plaintiff's ratification theory of *Monell* liability.

B.        Policy and Practice of Inadequate Investigations

Plaintiff's second theory of *Monell* liability is that Defendant City of Salem had a

longstanding policy and practice of failing to conduct bona fide internal reviews of officer-

involved shootings. Plaintiff's response in opposition to Defendants' Motion for Summary

Judgment identifies myriad evidence that she contends supports her theory and she includes

expert testimony evaluating that evidence. *See* Black Decl. Ex. 1, ECF No. 94-1. That expert

identifies deficiencies in the investigation processes and policies, concluding that "the current

internal review process is inadequate and not indicative of accepted practices found within sound

inquiry when police officers use deadly force. It can be reasonably inferred that the inadequacy

of the process contributes to an incomplete understanding of the event. An incomplete

understanding can allow potential violations of policy and training, as well as areas for agency

improvement, to go undetected[.]" *Id.* at 42. Defendant argues that, even accepting all of

Plaintiff's evidence as true, such evidence cannot support liability because there is no evidence

of a constitutional violation, and no evidence that deficient policies caused the conduct at issue.

First, Defendant argues that Plaintiff cannot defeat summary judgment without showing

that prior constitutional violations did in fact occur. In other words, evidence of "a widespread

custom of *unlawful* shootings, or *unlawful* investigations, or *unlawful* entry into homes, or

unconstitutional *anything."* Def. Reply 25. But Defendant's theory of the law on this issue would

allow municipalities to avoid *Monell* liability by simply turning a blind eye to potentially

unconstitutional conduct and therefore never identifying it as such.

The Ninth Circuit explained in the *Larez* case that a jury may conclude from expert

testimony about past complaints and investigations that "[police] disciplinary and complaint

processes, executed by policy or custom, contributed to the police excesses complained of

because the procedures made clear to officers that, at least in the absence of independent, third-

party witnesses, they could get away with anything." *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991). Here, Plaintiff's expert explains that:

> In my expert opinion, there is evidence that SPD both knew (as found within the evidence provided) and should have known (as found within accepted understandings within the profession of law enforcement and related research) that the current review process is unlikely to achieve the purpose of fully understanding whether policy had been violated or determining areas of agency improvement reliably when police officers use deadly force.

Black Decl. Ex. 1 at 43, ECF No. 94-1. A reasonable jury could conclude from this expert testimony (and the evidence it relies on) that Defendant City of Salem had a custom or policy of failing to investigate officer-involved shootings such that it amounted to deliberate indifference to the risk of excessive use of force in violation of the Fourth Amendment.

Defendant's second argument, that Plaintiff has shown no evidence of causation, is equally unavailing. Given the evidence in the record about the policies and practices regarding investigation of officer-involved shootings, including expert testimony on its deficiencies, a jury could conclude that adequate investigation could have resulted in policies that would have prevented Castillo III's shooting. While Defendant may frame this as "speculation," it is based on evidence that supports the inference. Because there are genuine issues of material fact on Plaintiff's inadequate investigation theory, Defendants are not entitled to summary judgment against it.

### III.    State Law Claims

#### A.    Wrongful Death – Battery

The parties cross-move for summary judgment on Plaintiff's wrongful death claim based on battery (Second Claim for Relief). The parties' arguments on this claim—which relate to the common law defenses of defense of self and of a third person—rest on the same disputes of fact as for the Section 1983 excessive force claim. Thus, for the same reasons, there is a genuine

issue of material fact as to the threat Castillo III posed to Defendant Bush that prevents summary judgment in either party's favor. Accordingly, the parties' cross-motions for summary judgment as to this claim is denied for the same reasons explained above with respect to the Section 1983 excessive force claim.

### B.    Wrongful Death – Negligence

Defendants move for summary judgment on Plaintiff's wrongful death claim based on negligence (Third Claim for Relief). Defendants' argument is based on a series of decisions in this district which have held that "it is settled law in this district that a state common-law claim of negligence may be maintained separately from a § 1983 claim *only* when the negligence claim is based on facts that are different from the facts on which the § 1983 claims are based." *Lifestyle Ventures, LLC v. Cnty. of Clackamas*, No. 3:15-CV-1291-SB, 2016 WL 11394982, at *5 (D. Or. May 18, 2016) (collecting cases); *but see Johns v. City of Eugene*, No. 6:16-CV-00907-AA, 2018 WL 634519, at *13 (D. Or. Jan. 30, 2018) (finding that "neither federal nor Oregon law prohibits negligence claims and civil rights claims based on the same set of facts from proceeding to trial together"), *reversed on other grounds*, 771 F. App'x 739 (9th Cir. 2019).

As an initial matter, there can be no "settled law" based on other district court decisions, which are not controlling. Defendants have cited no binding authority setting forth a bright line rule that negligence and Section 1983 excessive force claims cannot coexist. The binding authority Defendants do cite relates to the general proposition that intentional conduct is "categorically not negligence." Defs.' Mot. 20, citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002), *Kasnick v. Cooke*, 116 Or. App. 580, 582-583 (1992); *Denton v. Arnstein*, 197 Or. 28, 45 (1952). Defendants argue that because Section 1983 excessive force claims requires intentional conduct, there can be no negligence claim based on the same facts.

But here, the negligence and excessive force claims are not coextensive with one another such that the rationale of those cases should bar a negligence claim. Specifically, Plaintiff's specifications of negligence pertain to Defendant Bush's actions leading up to the shooting, including the failure to summon and wait for help, failure to knock and announce, and failure to prioritize the removal of Castillo Jr. *See* Compl. ¶ 36. In other words, the negligence claim here relates to Defendant Bush's alleged *creation* of the risks that led to the confrontation and shooting, while the Section 1983 claim relates to the shooting itself. Defendants express concern that allowing both claims to proceed creates a risk that the jury will confuse the two and find a Section 1983 claim based on negligent, rather than intentional, behavior. Although the Court acknowledges that there is some possibility that a jury might confuse the issues, it finds that risk can be sufficiently mitigated by carefully constructed jury instructions and verdict forms.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment is DENIED. Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, Defendants are entitled to summary judgment against (1) Plaintiff's Unlawful Entry claim based on qualified immunity, and (2) Plaintiff's *Monell* claim to the extent that it relies on a "ratification" theory. Defendants' motion is otherwise denied.


DATED this 15th day of August 2024.


s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge