**MISTY CASTILLO, as Personal Representative of the ESTATE OF ARCADIO CASTILLO, III, Plaintiff,**

**v.**

**NATHAN BUSH and CITY OF SALEM, a municipal corporation, Defendants.**

**Case No. 6:22-cv-00684-MK**

**Report of Spencer Fomby**

**QUALIFICATIONS AND BACKGROUND**

1. My name is Spencer Fomby. I am a retired police Captain. I was most recently employed as the Captain of the Boise Police Department Training, Education, and Development Division in Boise, Idaho. I have been a sworn police officer for 22 years. I previously worked for the Berkeley Police Department in California for 20 years. I have held primary assignments in patrol, narcotics, and community-involved policing. I was assigned to the Berkeley Police Department's SWAT team (SRT) for 16 years. I was the Team Leader, Team Commander, and lead tactical instructor for nine years. During my career, I have been involved in over 1000 high-risk tactical operations. I have been involved in 4 officer-involved shootings precipitated by the suspect ambushing officers.

2. I have extensive training in the various tactics and concepts required for individual SWAT members and the best practices for SWAT teams. I attended Basic SWAT in 2004 and then received 20 hours of dedicated SWAT training each month for the next 16 years. The monthly training covered firearms, defensive tactics, negotiations, de-escalation, chemical agents, active shooter response, high-risk warrant service, barricaded subjects, less lethal weapons, K9 operations, technology integration, open area searches, maritime operations, linear assaults, breaching techniques, tactical medicine, dignitary protection, public order, and hostage rescue operations. I have extensive experience teaching all aspects of tactical response including hostage rescue.

3. I participated in the Urban Shield SWAT competition for eight years and evaluated other teams for two years. The competition was a 48-hour non-stop event with over 30 realistic scenarios. Many of the scenarios were based on actual events. The scenarios focused on active threat response and hostage rescue operations.

4. I have been a police use of force instructor for seventeen years. I am a certified Force Science Analyst and Force Science Realistic De-escalation Instructor. I have also attended the Force Encounters Analysis course and Officer Involved Shootings and Use of Force Investigations course. I have been a certified instructor in the following disciplines: firearms (pistol, shotgun, and carbine), weaponless defense, impact weapons, ground fighting, active shooter, ALICE, chemical agents, flash bangs, public order tactics, public order command, less lethal weapons, live-fire shoot house and tactical de-

escalation. I created two CA POST (California Commission on Peace Officer Standards and Training) approved tactical de-escalation courses.

5.  I was the Berkeley Police Department lead departmental public order instructor; responsible for equipment selection, tactical training, less lethal weapon selection, chemical agent selection and deployment, and mission planning. I was a squad leader in more than 75 protest events including:

| | |
|---|---|
| Oscar Grant Protest | (Oakland Ca)- January 2009 |
| Mehserle Verdict | (Oakland Ca)- July 2010 |
| Occupy Oakland/Berkeley | (Oakland/Berkeley Ca)- October 2011 |
| Eric Garner/BLM | (Berkeley Ca)- December 2014 |
| Pro Trump Protests 2017 | (Berkeley Ca)- February 1, March 4, April 15, April 27, August 27, September 24-27 |
| George Floyd Protests 2020 | (Oakland Ca)- May/June 2020 |

6.  I am a tactical instructor and use of force subject matter expert for the National Tactical Officers Association (NTOA). I am the NTOA Public Order Section Chair. I coordinated the creation of the NTOA Public Order Operations Standard that was released in June 2023, the NTOA Public Order Basic Command Course, and the NTOA Public Order Grenadier Workshop. I previously taught the NTOA Police Counter Ambush Course and the NTOA Advanced Response Police Officer Course.

7.  I have presented on public order best practices and extremist activity at multiple recent law enforcement conferences including:

California Force Instructors Association- NTOA Public Order Use of Force, 2024
Western States Public Order Conference- NTOA Force Trends, 2024
Daigle Law Group First Amendment Summit- Public Order Response Standards, 2022, 2023, 2024
Daigle Use of Force Summit- Public Order Use of Force, 2022
California Association of Tactical Officers Conference- NTOA Standards and Public Order Use of Force, 2022
National Tactical Officers Association Virtual Conference- Public Order Best Practices, 2022
Daigle Use of Force Summit- Public Order Best Practices with NTOA Standards, 2021
National Tactical Officers Association Annual Conference- Public Order, 2021, 2020, 2019, 2018
NTOA Panel Discussion- Less Lethal Munitions in Crowd Control Operations, 2021
National Asian Peace Officers Association Conference- Public Order Policing Best Practices, 2021
Daigle Law Group First Amendment Summit- Modern Crowd Control Issues, 2021

8.  As Captain of the Boise Police Department Training, Education, and Development Division, I managed the development and implementation of department training and education programs through an annual organizational needs assessment. I designed, developed, and implemented an annual training plan and evaluated training results. I

developed, planned, managed, and implemented police training activities and programs, including the recruit academy, field training program, quarterly training, and leadership development. I coordinated testing, evaluation and purchase of department equipment. I was responsible for training reviews of all Boise Police Department officer involved shootings.

9. I participated in the development of the following departmental policies: use of force update, body cameras, handcuffing and restraint devices, firearms, foot pursuits, probation and parole searches, public order, chemical agent deployment, armored vehicle deployment, use of spit hoods and restraint devices, de-escalation, and use of less lethal weapons.

10. I have participated in use of force review boards at Berkeley PD and Boise PD. As the use of force lead at Berkeley PD, I advised the review board as a use of force subject matter expert and gave recommendations on training and policy. As a Captain at Boise PD, I participated in review boards and gave recommendations on policy violations and corrective action, including suspension and termination.

11. I supervised the Berkeley Police Department Community Involved Policing unit and collaborated with community organizations, social service agencies, city staff, and merchants' associations to resolve complex issues. I was assigned to the City of Berkeley Problem Properties Team (PPT), a multi-disciplinary nuisance abatement team for eight years. The PPT included the following City of Berkeley agencies: Fire Marshal, Code Enforcement, Building and Safety, Environmental Health, and the City Manager's Office.

12. I was assigned to the Berkeley Police Department Drug Task Force for two years as an officer and then supervised the unit for two years as a sergeant. I was responsible for disrupting street-level narcotics activity in Berkeley and investigating regional drug trafficking cases with a nexus to Berkeley. I worked with a team of officers to generate felony cases through self-initiated stops. I participated in surveillance operations, undercover operations, buy/bust operations, and sex trafficking investigations. I also participated in over 1000 high-risk tactical operations that included search warrant services, fugitive recovery, probation searches, and parole searches.

13. I was selected as a subject matter expert in civil disturbance for a National Institute of Justice Special Technical Committee. I am a subject matter expert in police equipment and tactics for the Department of Homeland Security First Responder Resource Group. I was also a Visiting Fellow in Police Science at the University of Derby, U.K. I earned a Bachelor of Arts degree in Administration of Justice from Howard University.

14. I am the author of the chapter on public order use of force in the international public order book, *"Public Order Policing A Professional's Guide to International Theories, Case Studies, and Best Practices; 2023."*

15. I have testified as an expert at ten depositions and three trials.

Confidential                                                                 3

16. I am being compensated $350 per hour for reviewing evidence and preparing a report.

**METHODOLOGY**

17. The policing profession is not a hard science in which the generally accepted best practices are clearly established by a governing body and verifiable by following a defined scientific methodology. Generally accepted policing practices are established by the collective training and experience of practitioners, academic research, court decisions, after-action reviews, and model policies and standards established by credible professional organizations. Examples of credible professional organizations are the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the Major Cities Chiefs Association (MCCA), and the National Tactical Officers Association (NTOA). State Peace Officers Standards and Training (POST) organizations establish training standards for individual states.

18. My opinions are based on my background as a police officer and instructor, my collaborations with academics specializing in police science, a thorough review of the relevant evidence, insights from contemporary academic theories, and the standards and model policies set by professional organizations.

19. I begin my process by reviewing the complaint and identifying the allegations. I review the available evidence and determine if there is additional evidence that I need before forming an opinion. I research related topics in publications, standards, and model policies created by professional organizations in the policing industry. Based on this evaluation, I render an opinion on whether the actions and decisions of the involved officers were consistent with generally accepted policing practices.

20. To determine whether the actions or decisions of the involved officers are consistent with generally accepted policing practices, I apply the reasonable police officer standard in order to properly contextualize the analysis. This standard grounds the analysis from the perspective of the police officer as they respond to events in real-time. The standard asks what information was known to the police officer at the time the decision at issue was made.

21. When police officers use force, the reasonableness of their actions is determined using the reasonable officer standard. The reasonable officer standard evaluates whether a reasonable officer on scene with training in generally accepted policing practices would take the same or similar action, based on the same or similar circumstances. This determination must be based on the information known to the officer at the time the force was applied and without the benefit of 20/20 hindsight. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989).

**OPINION(S)**

22. My opinions are based upon my education, training, and experience as a law enforcement officer/trainer in the area of active shooter response, patrol operations, public order, security, tactical operations, SWAT, and the facts of the case presented and materials reviewed.

23. Please note, that I am not an attorney; though my opinion may contain references to statutory and case law, nothing in this opinion should be construed as a "legal" opinion or to infringe on the role of a competent court or legal arbitrator. Any reference in my opinion to law is for the purpose of illustrating how the law is interpreted in the law enforcement industry, how it is taught to officers, and how a reasonable officer might be expected to comport his or her behavior with the industry's understanding of the law.

24. Attorney Andrew D. Campbell asked me to render an expert opinion on whether Officer Bush's use of deadly force was consistent with generally accepted policing practices and whether Salem Police Department (SPD) followed generally accepted policing practices for an internal investigation of an officer-involved shooting. I also reviewed the report written by the plaintiff's expert witness, Dr. John R. Black.

25. I presently hold the following opinions to a reasonable degree of professional certainty:

## I. <u>Factual Background</u>

26. The subject involved in this case was Arcadio Castillo III. SPD had prior contacts with Mr. Castillo III, who was not wanted for any crime at the time. Mr. Castillo III had a criminal history of harassment, intimidation, attempted assault, escape, criminal mischief, violation of the release agreement, and failure to appear. He had a history of marijuana/alcohol abuse, a history of mental illness, and suicide attempts involving knives/sleeping pills.

27. On July 9th, 2021, at 11:19 p.m., Dispatch received a call from Misty Castillo indicating that her son, Arcadio Castillo III, was intoxicated, under the influence of marijuana, and was assaulting family members. She said that her son was also mentally ill and was currently armed with a knife. Officer Bush responded to the call and arrived at 11:22 p.m. He initially parked a short distance away from the call, but updates to the call indicated that the call taker had heard someone say, "Get away from me!" with a male voice in the background and then a female screaming before the line disconnected. Ring video from across the street captured the female screaming.[1]

28. Officer Bush drew his handgun and approached the residence. He found the complainant, Misty Castillo, standing in the driveway. He also saw a male with no shirt standing on the patio by the front door. He called out to the male, who did not respond. The male turned and walked into the residence despite Officer Bush's commands to stop. Officer Bush spoke with Mrs. Castillo. He determined that the male was her son and that he had just assaulted her. She told Officer Bush that her son had a knife and that her husband was inside the residence where her son had just gone.

---

[1] Dkt 69-1 - Exhibit 2 (Castillo_Animation), timestamp 00:14-00:32.

29. Mrs. Castillo told Officer Bush that they needed help. She said, "He's assaulting us," and "He has a knife". Officer Bush walked up to the front door and listened. He heard two males talking. He could not hear what was said, but they sounded together and near the front door. Officer Bush tried the door, but it would not open. He listened again and heard a male voice say what sounded like "I'm not going to," and then either "Until they leave" or "Tell them to leave."

30. Officer Bush turned the door knob in the other direction, and this time, it opened. He saw Mr. Castillo III, approximately 12 feet away, directly in front of him. He saw a second male, later identified as Castillo Jr., standing several feet to his left. Mr. Castillo III had a large butcher knife in his hand, and his arms were down at his side. He was looking at Officer Bush. Officer Bush pointed his handgun at Mr. Castillo III and ordered him to drop the knife, but he did not comply or respond. He began taking slow steps toward Officer Bush.

31. Officer Bush continued to order Mr. Castillo III to drop the knife. Mr. Castillo III did not comply but turned away from Officer Bush and began walking farther back into the residence. Officer Bush decided to attempt to remove Castillo Jr. from the residence, reasoning that if he did so, he could return with more resources and deal with Mr. Castillo III in a safer, more controlled manner. He took his left hand off his pistol, intending to guide Mr. Castillo Jr. out of the residence.

32. Before Officer Bush could extract Mr. Castillo Jr. from the residence, Mr. Castillo III suddenly lifted the butcher knife and charged at him. Officer Bush gave loud verbal commands as Mr. Castillo III continued to advance. Fearing that his life was in danger, Officer Bush fired four rounds from his Glock 17. All four rounds struck Mr. Castillo III. Mr. Castillo III stopped approximately six feet from Officer Bush. Officer Bush again ordered him to drop the knife, but he stumbled backward and fell to the ground.

33. Officer Bush rendered aid to Mr. Castillo III until other officers arrived and then assisted them in rendering aid until medics arrived and took over.

34. Mr. Castillo III was pronounced dead at the scene.

35. Oregon State Police (OSP) conducted the officer-involved shooting investigation in conjunction with the Marion County District Attorney's Office. A Marion County grand jury found that Officer Bush was justified in using deadly force.

36. After the grand jury reached a decision, SPD convened a Critical Incident Review Board (CIRB). The CIRB found that Officer Bush's actions were consistent with SPD policies.

### **Opinion #1 Officer Bush's Use of Deadly Force Was Consistent With Generally Accepted Policing Practices and SPD Policy and Training.**

37. It is my opinion that Officer Bush's decision to use deadly force to stop Mr. Castillo III from approaching with a butcher knife was consistent with Officer Bush's training, Salem Police Department policy, and generally accepted policing practices. Mr. Castillo III was

armed with a butcher knife, disregarded lawful commands, and posed an immediate threat to Mr. Castillo Jr. and Officer Bush. Any reasonable officer with the same training and experience, in the same or similar circumstances, would have perceived Mr. Castillo III's actions as an immediate threat of death or serious bodily injury and would have used deadly force in response.

38. Mr. Castillo III was under the influence of alcohol and marijuana and was likely in a mental health crisis. His mother, Misty, was so afraid for her family's safety that she called 911 for police assistance. Misty knew her son had serious mental health issues and was a danger to himself and others. Misty and her husband were actively working to get Mr. Castillo III placed on a civil commitment for his mental health issues.

When Officer Rebello arrived on the scene and contacted Misty, she told him the following:

"Misty told me that she was married to Arcadio Jr. and the mother of Arcadio III. She explained that Arcadio III had an addiction issue with alcohol and marijuana as well as undiagnosed mental health disorder. She said that the family was currently working on a the two-party civil commitment process, but it was being delayed by doctors who wanted to diagnose Arcadio III while he was sober."[2]

39. In Oregon, two individuals can petition the court to have a person involuntarily committed for mental health evaluation per ORS 426.070. The Oregon Health Authority defines when a person can be committed as follows:

"A person can be committed if the judge finds by clear and convincing evidence that the person has a mental disorder and, because of that mental disorder, is:
- Dangerous to self or others, or
- Unable to provide for basic personal needs like health and safety.

A person can also be committed if the judge finds that the person is:
- Diagnosed as having a major mental illness such as schizophrenia or manic-depression and
- Has been committed and hospitalized twice in the last three years, is showing symptoms or behavior similar to those that preceded and led to a prior hospitalization and,
- Unless treated, will continue, to a reasonable medical probability, to deteriorate to become a danger to self or others or unable to provide for basic needs."[3]

40. Mr. Castillo III violently attacked his mother, causing visible injuries. She heard Officer Bush warn Mr. Castillo III at least twice to drop the knife and heard Mr. Castillo III's refusal to comply.

---

[2] COS 005331-COS 005360, page 1.
[3] https://www.oregon.gov/oha/hsd/amh/pages/civil-commitment.aspx.

Confidential

Misty told Officer Rebello the following:

"Misty explained that his sudden change in demeanor made her scared for her safety. When Arcadio III walked into the living room, Misty left the residence and called 911 for police assistance. She told me that while she was on the phone with the call taker, Arcadio III came outside and saw her on the phone. she said he still had the knife in his right hand. Arcadio III walked up to her and grabbed her by the right wrist. She said he 'violently' pulled on her arm, causing her to hit their Buick vehicle that was parked in the driveway, and fall over. Misty said even after she fell on the ground, Arcadio III continued to pull. She described it as being 'drug across the pavement.'"[4]

"Misty said eventually, Arcadio III let go and went back inside the residence for a few moments. Shortly after, he came back out and took her phone before going back inside the residence. She told me that Arcadio III still had the knife in his hands. Misty was able to stand up and observed an officer arriving on scene. She told the officer that Arcadio III had a knife. She said the officer pulled out his gun, 'and got ready to shoot if he needed to'. Misty told me the officer entered the residence and went out of view. **She heard the officer say, 'put the knife down' at least twice. She also heard Arcadio III respond, 'I'm not going anywhere.' Misty said about five seconds passed and she heard three loud bangs that sounded like gun shots.** She assumed the officer had shot Arcadio III. Misty said that she started walking towards the residence, but the officer came outside and told her to wait there. He also told her that he was going back inside to start CPR. She said as the officer went back inside, she saw Arcadio III 'crumpled' on the ground and saw the officer start chest compressions. Misty had no further details."[5]

41. Officer McBride contacted Mr. Castillo Jr. when he arrived on the scene, and Mr. Castillo Jr. told him the following:

"Arcadio said when his son began to get physical with Misty, he stepped in to defend his wife. Arcadio III was shoving his parents and getting aggressive with them. Arcadio said that at some point during the incident prior to police arrival Arcadio said that his son got a knife from the kitchen. Arcadio said his son wasn't pointing the knife at them or threating them with it in any way. Arcadio said he told his son that he needed to put the knife away, but he refused.

Arcadio said when police arrived, they ordered his son to put the knife away, but he refused to comply. **Arcadio said he saw his son point the knife at the police officer with an outstretched arm.** I asked Arcadio what happened next and he said at that point shots were fired after Arcadio III refused to put the knife down."[6]

42. Police officers receive use of force training beginning in the police academy and continuing throughout their careers. This training covers the physical application of force, theoretical concepts, decision-making, human performance under stress, and legal standards. Police

---

[4] COS 005331-COS 005360, page 1.
[5] COS 005331-COS 005360, page 1.
[6] COS 005331-COS 005360, page 5.

officers are trained that their actions need to comply with Constitutional Standards for the use of force and relevant case law. The primary cases that dictate current police use of force standards are *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). These cases are the foundation for modern police use of force policies around the United States.

43. Officers receive training on *Tennessee v. Garner*, 471 U.S. 1 (1985). The decision in *Tennessee v. Garner* has informed police training that restricts the use of deadly force against an unarmed fleeing suspect. Officers are trained that they can use deadly force to apprehend a dangerous fleeing felon, when necessary to prevent escape, and when the officer reasonably believes the use of deadly force is justified to protect the officer or another person from death or serious bodily injury.

44. Justice White delivered the opinion of the United States Supreme Court:
"This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where [471 U.S. 1, 12] feasible, some warning has been given."[7]

45. *Graham v. Connor*, 490 U.S. 386 (1989) provides the foundational guidance for the Fourth Amendment's objective reasonableness standard for use of force by police officers. An officer's use of force has to be evaluated based on the totality of circumstances and the information the officer knew at the time the force was applied. The force a police officer uses has to be objectively reasonable and meet the reasonable officer standard. The reasonable officer standard evaluates whether an officer with the same level of training and experience would have used the same or similar force.

46. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The language in *Graham v. Connor* accounts for the challenge that police officers face in these circumstances. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[8]

---

[7] TENNESSEE v. GARNER, 471 U.S. 1 (1985), **Citation:** 471 U.S. 1, **Docket No:** No. 83-1035, **Argued:** October 30, 1984, **Decided:** March 27, 1985, **Court:** United States Supreme Court.
[8] Graham v. Connor, 490 U.S. 386 (1989).

Confidential                                                                                             9

47. SPD training and directives were based on *Graham v. Connor* and *Tennessee v. Garner* and were consistent with generally accepted policing practices for use of force policies. SPD Policy 4.01 provided the following guidance on the use of deadly force.

"C. Justification for Use of Deadly Force

An officer may use deadly physical force only when, based on the officer's knowledge and observations at the time, the officer reasonably believes that no reasonable alternative will accomplish the objective in one or more of the following situations:

The defense of the officer or another person from what the officer reasonably believes to be the imminent infliction of serious injury or death.

2. The apprehension of a person whom the officer has probable cause to arrest for the commission of a crime, when the officer reasonably believes that delayed apprehension poses a clear and present danger of serious injury to the officer or others.

3. The prevention of the escape of a person from custody where the officer reasonably believes that the person has used, or will use force risking serious injury or death as a means of accomplishing escape or preventing recapture.
4. As defined by Oregon Revised Statute 161.239.

D. Deadly Force – Warning

Wherever practical under the circumstances, an officer shall give some warning before using deadly force. Warning shots shall not be fired."[9]

48. Police officers in the United States are taught the "*Graham* Factors" including:

- The severity of the crime at issue
- Whether the suspect poses an immediate threat to the safety of the officers or others
- Whether he is actively resisting arrest or attempting to evade arrest by flight

**Information known to Officer Bush at the time the force was applied**

49. The first consideration is the information Officer Bush knew at the time the force was applied. Officer Bush was dispatched to a low-priority call when he saw a computer-aided dispatch (CAD) call regarding an in-progress violent crime occurring at 3796 June Ave NE. Officer Bush read the CAD notes and learned that the victim was reporting her mentally ill adult son was assaulting family members. Officer Bush was close to the violent crime, so he added himself to the call and responded to the emergency. Dispatch updated the call, and Officer Bush learned the subject was intoxicated and armed with a knife. The victim

---

[9] Dkt 64-1 - Exhibit 1 (Policy 4.01), page 6.

reported that she was outside of the house, and the subject was inside with the knife and her husband.[10]

The SPD CAD notes provided the following information:

"07/09/2021 23:20:17 [503-884-4423] C/ RPTG THAT HER ADULT SON IS MENTALLY ILL AND ASLTG FAMILY MEMBERS

07/09/2021 23:21:36 S/CASTILLO, ARCABIO DOB: 032798 .... IS INTOX AND UNDER INFL OF MARIJUANA, IS ARMED WITH A KNIFE

07/09/2021 23:22:03 C/ IS OUTSIDE ... S/ IS INSIDE, C'S HUSB INSIDE THE HOUSE LEESMITH

07/09/2021 23:22:39 COULD HEAR FEM SAYING

07/09/2021 23:23:05 "GET AWAY FROM ME .... " A MALE VOICE IN TH BACKGROUND AND THEN FEM SCREAMING AND LINE DISCONNECTED

07/09/2021 23:23:10 ATTEMPTING TO CALL BACK

07/09/2021 23:23:27 VM ON CALL BA

07/09/2021 23:24:00 POLICE RECENTLY OUT AT LOC ON EDP ISSUES, 7/4 & 7/5"[11]

50. Officer Bush arrived quickly and made a tactical approach by not activating his lights and siren. This was an intentional decision not to alert the subject that the police were on the scene, potentially escalating the situation. Dispatch further updated the call to indicate that the victim was heard saying, "Get away from me." Dispatch also heard a male voice in the background.[12] Officer Bush parked his patrol vehicle, drew his firearm, and walked to the house, where he found a female, later identified as Misty Castillo, standing in the driveway. Officer Bush saw a male wearing shorts with no shirt, later identified as Mr. Castillo III, standing on the front patio. Officer Bush spoke to Mr. Castillo III but got no response. Mr. Castillo III turned and walked into the house as Officer Bush yelled commands to him. Mr. Castillo III did not react and closed the door behind him.

51. Officer Bush holstered his firearm as he approached Misty Castillo. She told Officer Bush that Mr. Castillo III was armed with a knife and was assaulting the family. She said that Mr. Castillo III dragged her across the driveway and showed Officer Bush evidence of her injured knees.[13]

Misty Castillo made the following statement to the grand jury:

A It made me fall on the ground and I've got scars on my leg now.
Q Then he drug you for a little bit on the pavement.
A Um-hum.
Q And then, he was hitting and kicking you while you were on the ground.

[10] 113599_EXHIBIT 01, page 9.
[11] COS 005361-COS 005370, page 1.
[12] 113599_EXHIBIT 01, page 9.
[13] 113599_EXHIBIT 01, page 9.

A Um-hum.
Q Were you still on the phone with 911 or had he already taken the phone?
A I was -- no, he -- at that point at that point, he had already taken the phone.
Q Did he then go back towards the house?
A Yeah.
Q And right around that same time, did you see a police officer running up?
A Yes.
Q Was he walking slow or is he actually running to you?
A He was running.[14]

52. Officer Bush verified that the man who was on the porch was Misty Castillo's son, who assaulted her. He also verified that Misty's husband, Mr. Castillo Jr., was inside. Misty Castillo asked Officer Bush to help her husband.

Misty Castillo made the following statement to the grand jury:

Q And you needed help. Did he tell you he was there
to help you?
A No. He said -- he didn't say anything to me. He
just -- I told him that my son was mentally ill and that he
has a knife. And my husband is still in the house with
him.
Q Did you tell the officer to go help your husband?
A Yes.[15]

53. Officer Bush moved to the front door of the house and listened. He could hear two males talking inside. He could not hear what was said, but they sounded together and near the front door. He drew his pistol and tried the door, but it would not open. He listened again and heard a male voice say what sounded like "I'm not going to," and then either "Until they leave" or "Tell them to leave." Officer Bush was able to open the door, and he pushed it wide open. The door opened from left to right. When the door opened, he saw Mr. Castillo III, approximately 12 feet away, directly in front of him. He saw a second male, later identified as Mr. Castillo Jr., standing several feet to his left. Mr. Castillo III had a large butcher knife in his hand, and his arms were down at his side. He was looking at Officer Bush.

54. Mr. Castillo III had his arms to his sides, holding a large butcher knife in his right hand. Officer Bush pointed his handgun at Mr. Castillo III and ordered him to drop the knife, but he did not comply or respond. He began taking slow steps toward Officer Bush. Officer Bush continued to order Mr. Castillo III to drop the knife. He did not comply but turned away from Officer Bush and began walking farther back into the residence.

55. Officer Bush saw an opportunity to remove Mr. Castillo Jr. from the house, taking away a potential victim and mitigating a potential hostage situation. Officer Bush moved into the

---

[14] Dkt 61-2 - Exhibit 2 (Grand Jury Proceedings), page 2.
[15] Dkt 61-2 - Exhibit 2 (Grand Jury Proceedings), page 2-3.

threshold of the door to guide Mr. Castillo Jr. out of the house. Before Officer Bush could remove Mr. Castillo Jr., Mr. Castillo III turned around and started charging with the knife raised near his head and the blade pointed forward.

During his interview with OSP, Officer Bush described this sequence of events as follows:

"Uh, I stopped engaging him, uh, I, I took a step through the doorway and took my left hand off my, my support hand off of my handgun 'cause I wanted to get dad out of the location. I knew if I could get dad out, we could back away, and we could buy a lotta time. Um, and. we had other resources coming. Uh, a canine was dispatched. I know there are other less lethal shotguns, uh, we had, uh, at least one 40 mike mike less lethal on duty, so I wanted to get him out. Uh, before I could address dad at all, uh, the suspect spins around to his left, very quickly."[16]

### Severity of the crime

56. Mr. Castillo III committed aggravated assault against his mother, and assault with a deadly weapon and attempted murder of a peace officer against Officer Bush.

### Whether the suspect poses an immediate threat to the safety of the officers

57. Mr. Castillo III posed an immediate threat of death or serious bodily injury to Mr. Castillo Jr. and Officer Bush when he brandished a large butcher knife and approached them.[17]

Officer Bush described the threat during his interview with OSP as follows:

"Detective Kimberly Long: Okay. Um, so going back to, uh, the incident, he's pointing the knife at you. Um, how, how did this make you feel?

Officer Nathan Bush: So, uh, like I was trying to say before, uh, everything happened so fast, and I was kinda in the moment, uh, between him charging. I mean it was a split second, and shooting rounds and then trying to do aid, I, I was, didn't process it then. I didn't really think. I was just, uh, focusing on what I needed to do. Um, I mean later on, I ran this through my head a lot, repetitively, uh, and it was clear that I, I mean I was in immediate danger of death or, or being seriously physically harmed. Um."[18]

"Detective Ian McKay: Okay. Um, what did you perceive the suspect's intent was when he was charging you?

Officer Nathan Bush: Uh, his intent was clearly to attack me with that knife, to stab me with that knife.

---

[16] 113599_EXHIBIT 01, page 10.
[17] 113599_BushNathan Full Size, page 90-91; 93.
[18] 113599_EXHIBIT 01, page 18.

Detective Ian McKay: Um, can you describe, uh, again, the pace he was moving towards you at?

Officer Nathan Bush: Extremely quick. Um, uh, I mean it was, uh, his, his body, upper body was shifted forward. I mean I'd call it a sp, a sprint.

Detective Ian McKay: And I believe you previously said that, uh, when you first entered the home, you, did you say 12 feet you estimated roughly?
Officer Nathan Bush: Estimated roughly, yes.

Detective Ian McKay: And what do you think would've happened if you chose not to shoot?

Officer Nathan Bush: I, I think he would've attacked me with the knife. I think he would've stabbed me and tried to kill me.

Detective Ian McKay: Do you believe your use of force was necessary?

Officer Nathan Bush: Absolutely."[19]

**Whether he is actively resisting arrest or attempting to evade arrest by flight**

58. Officer Bush had probable cause to arrest Mr. Castillo III for assaulting his mother and brandishing a deadly weapon. Mr. Castillo III was actively resisting arrest with violence while armed with a deadly weapon. He failed to comply with lawful orders. Officer Bush was allowed to use objectively reasonable force to overcome resistance, effect an arrest, prevent escape, or in the defense of himself or others.

59. It is my opinion that any reasonable officer with the same training and experience in the same or similar situation would have made the same decision to use deadly force to stop Mr. Castillo III from causing death or serious bodily injury to Officer Bush or Mr. Castillo Jr.

**II.  Opinion #2 SPD's Handling of The Internal Administrative Investigation was Consistent with Generally Accepted Policing Practices.**

It is my opinion that SPD followed generally accepted policing practices in conducting an internal officer-involved shooting investigation. There is no evidence that the investigation was mishandled, inadequate, or inaccurate. Officer Bush's use of deadly force was consistent with generally accepted policing practices, SPD policy, and applicable case law. There is no evidence that the internal affairs investigation, CIRB process, or Chief Womack approved unconstitutional conduct or any SPD policy violation.

---

[19] 113599_EXHIBIT 01, page 19.

**Officer-involved Shooting Investigations**

60. There is no national governing body in American policing, and very few accepted national standards exist. There is wide variation in policing policies and practices around the country. State Peace Officer Standards and Training (POST) organizations create guidelines for officers in a particular state. For any given aspect of policing, there is a range of generally accepted practices. In 2018, the Major City Chiefs Association (MCCA) conducted a study on OIS investigations around the United States and Canada, "*Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada,*" and discovered a wide range of approaches to these important investigations. Some of their findings are as follows:

"Substantial variation exists in how large law enforcement agencies conduct OIS investigations. There are substantial differences in terms of who actually conducts the investigation, the role the involved agency has in the process, and the extent to which OIS investigations are independent and transparent. There are some best practice models (the Peel Regional Police Service in Canada, the Milwaukee County [Wisconsin] consortium, and others) that are worthy of more extensive review and replication.

There are clear advantages and disadvantages with involving external agencies, partners, task forces, or others during OIS investigations. Ultimately, involving external investigators who are not representatives of or affiliated with the involved agency makes sense with respect to ensuring independence; however, investigator experience and expertise are sometimes compromised. Many MCCA law enforcement leaders agreed that investigative independence was an important goal. A few participants argued that independence was not particularly important, but the majority recognized that investigative independence includes both substantial costs and offers clear benefits."[20]

61. The MCCA investigation, "*Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada,*" found the following disparities in who was in charge of the criminal investigation of an OIS:

"Independence of OIS investigations is a function of who or what individuals, agencies, or task forces handle OIS investigations. Most of the responding MCCA agencies reported that criminal investigations associated with OISs are most often conducted by homicide detectives (49 percent), followed by an internal shooting investigation team (38 percent), the prosecutor's office (37 percent), or another state investigative agency (15 percent). Fewer agencies reported that another local agency (5 percent) or a combined task force (6 percent) investigated these events (see figure 2).

---

[20] Kuhns, Joseph B., Josie F. Cambareri, Shannon Messer, and Darrel Stephens. 2018. *Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada.* Washington, DC: Major Cities Chiefs Association, page viii.

Most agencies reported that the prosecutor's office (75 percent) made final decisions on filing criminal charges, although some agencies (7 percent) were directly involved and made the decision collaboratively with the prosecutor. Two agencies (2 percent) reported making those decisions independent of the prosecutor's office. A few other agencies reported having some civilian oversight committee involvement in these final decisions."

**Figure 2. Who conducts criminal investigations of OIS? (n=81)**

**Administrative Investigation Best Practices**

62. For the administrative investigation of an officer-involved shooting, several processes are generally accepted within the policing profession, although none of these processes are mandated or universally accepted. The generally accepted practice is to keep the criminal investigation separate from the internal administrative investigation. The criminal investigation typically takes precedence and can be conducted by investigators from the involved agency, investigators from an outside agency, or an external critical incident task force. The criminal investigation is normally conducted in collaboration with the involved prosecutor's office. Internal affairs or professional standards investigators from the involved officer's agency typically conduct the administrative investigation. The administrative investigation can be conducted concurrently with the criminal investigation, or the agency can wait for the criminal investigation's conclusion to begin the internal inquiry.

The International Association of Chiefs of Police (IACP) provided the following guidance regarding the administrative investigation of an officer-involved shooting:

"F. Administrative Investigation

Law enforcement agencies vary with regard to the unit assigned responsibility for the preliminary investigation of an officer-involved shooting. The options for the preliminary

---

[21] Kuhns, Joseph B., Josie F. Cambareri, Shannon Messer, and Darrel Stephens. 2018. *Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada.* Washington, DC: Major Cities Chiefs Association, page 14.

and the overall comprehensive investigations may involve the lead being taken by the agency directly concerned, by a regional law enforcement agency as part of a preexisting protocol or mutual agreement, or by another identified entity, for example, the local or special prosecutor's office.

Depending on the seriousness of the incident, the circumstances involved, and the protocols of the specific agency, parallel administrative and criminal investigations of officer-involved shootings **may** be conducted. The goal of the administrative investigation is to determine whether violations of agency policy, procedures, rules, or training occurred and, if so, whether corrective action should be recommended or modifications to policy, procedures, or training should be considered. However, there are several considerations when conducting these investigations. In the United States, criminal investigators may not be present during administrative questioning and any information gained as a result of administrative interviews must not be shared with criminal investigators. All interviews should be audio- and preferably video-recorded. In addition, investigators should be cognizant of symptoms of post-traumatic stress when conducting interviews with involved officers. These may include time and space distortions, confusion, auditory and visual distortions, and emotional impairment during questioning.

In officer-involved shooting situations, involved officers who discharged their weapons or used deadly force should be placed on mandatory leave with pay or on administrative assignment. This ensures that the agency's investigation into the incident can take place without interference. Placing involved officers on leave or administrative assignment also communicates to the public that the agency is responding to the incident appropriately. However, agencies should be prepared for the investigation to take an extended period of time, especially in cases where the administrative and criminal investigations are not conducted concurrently, and should develop policies related to administrative leave with this in mind."[22]

63. The MCCA investigation, "*Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada,*" found the following disparities in how agencies handled the administrative investigation of an OIS:

"Internally, most OIS investigations were conducted by an Internal Affairs division or unit (67 percent) or by an internal task force team (16 percent). Civilian review board involvement was rare (2 percent; see figure 4 on p. 18).

---

[22] Officer Involved Shootings - FULL clean, page 19.

**Figure 4. Who conducts the internal OIS investigation? (n=81)**



Following an OIS, a determination regarding whether the event was consistent with agency policy was determined differently across agencies, by an Internal Shooting Review Board (31 percent), an external agency (28 percent), by a wide range of other decision-makers or units (such as an Office of Professional Standards—sometimes but not always akin to an Internal Affairs Division—or a Firearms Board/Committee, a Standing Review Board, a Chief's Advisory Board, an Inspectional Service Bureau, more than one person/entity, etc.), or in a few cases by a the chief or command staff (4 percent; see figure 5 on p. 18).

**Figure 5. Who determines whether an OIS was consistent with agency policy? (n=81)**



An additional question inquired about who would make a final decision regarding officer discipline if necessary. For 89 percent of the agencies (72 agencies), an internal shooting review board decided on disciplinary decisions that followed OIS investigations. In some other cases, decisions were made by a combination of internal and external participants. Only one agency indicated that an external agency would make such determinations."[23]

---

[23] Kuhns, Joseph B., Josie F. Cambareri, Shannon Messer, and Darrel Stephens. 2018. *Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada.* Washington, DC: Major Cities Chiefs Association, page 15-17.

64. In 2022, I attended the "Officer Involved Shootings and Use of Force Investigations Course", taught by officer-involved shooting expert Mark Kollar. Kollar is the assistant superintendent of the Ohio Attorney General's Bureau of Criminal Investigation. He is one of the foremost experts in the United States on officer-involved shooting investigations and the author of *Best Practices For Investigating An Officer-Involved Critical Incident.* Kollar's book provided the following guidance on administrative investigations for officer-involved shootings:

**"3. Internal/Administrative investigations**

The internal affairs (IA), or administrative, investigation serves multiple important functions subsequent to an Officer Involved Critical Incident (OICI). Typically conducted by a designated investigator of the involved officer's employing agency, the IA investigation primarily seeks to ensure that the department's policies and procedures were appropriately followed during the incident, forming the basis of discipline and/ or termination decisions. Additionally, an IA investigation can be useful in defending civil lawsuits, decreasing the department's potential liability (by showing that policy violations are investigated and enforced), identifying training and tactical inadequacies, determining equipment needs, assisting with return-to-work decisions, and determining whether policies need revision to help ward off future incidents."[24]

65. The criminal investigators will attempt to interview the involved officer soon after the incident. The interview may happen immediately but is often delayed by 48-72 hours or more. The involved officer typically has legal and/or union representation and the right to 5th Amendment protection against self-incrimination. If the officer chooses to give a voluntary statement, the internal affairs investigators can monitor the interview remotely or review the statement or videotaped interview later once the criminal investigation is completed.

66. The administrative investigators can choose to interview the involved officer. If they choose to conduct an interview, the officer will be advised of *Garrity* protections. The admonishment advises the involved officer that the compelled statements will be used to evaluate any potential policy violations, but the statements will not be used in any criminal investigation. The choice to conduct a separate interview for the purposes of the administrative investigation is at the discretion of the agency and investigators. There is no requirement to compel a *Garrity* statement, and there is no consensus in American policing regarding this issue.

The International Association of Chiefs of Police (IACP) provided the following guidance related to *Garrity* Statements during an OIS investigation:

"The officer's statement is a critical component of an OIS investigation, but, by conferring immunity from self-incrimination, a department that provides *Garrity* rights becomes unable to use any evidence from that statement during a subsequent criminal investigation.

---

[24] Mark Kollar, BCI Special Agent Supervisor. 2021. *Best Practices For Investigating An Officer-Involved Critical Incident,* page 16.

However, granting use immunity under *Garrity* is not required, and departments should offer it on a case-by-case basis, and only after deliberating with the prosecuting attorney.

Agencies need not grant *Garrity* use immunity automatically, since responding to questions and providing any statement are part of an officer's routine job duties, just as is the filing of an incident, arrest, or other report. In addition, whether verbal or written, there is a presumption of voluntariness and truthfulness associated with officer statements. If it is demonstrated during the investigation that statements were not truthful, an officer is subject to discipline up to and including termination. The intent of an administrative investigation does not relate to gathering evidence of criminal acts. Therefore, automatic invocation of *Garrity* warnings is not necessary in many cases. Criminal prosecutions of officers for actions taken during shooting incidents are not a commonly anticipated outcome, and automatic provision of *Garrity* rights may not be needed.

Departments must ensure that administrative and criminal investigations occur separately from each other. The internal affairs authority normally conducts the administrative investigation, while criminal investigators conduct the criminal investigation; the investigations are not commingled." [25]

67. The Pennsylvania District Attorneys Association Officer-Involved Shooting Investigation Best Practices report provided the following guidance on internal investigations:

"Internal Affairs Investigation. The department of any officer involved in any officer-involved shooting has the discretion to conduct the department's internal affairs investigation into the shooting at the same time as or after the District Attorney's investigation. That department's internal affairs investigation shall be separate and distinct from the District Attorney's investigation. That department's internal policies regarding the work status of any officer shall control regarding those issues."[26]

68. Officer-involved shooting expert Mark Kollar's book provided the following guidance on separating criminal and administrative investigations during an OIS.

"The two easiest ways to avoid Garrity violations are:

- Have an external agency conduct the criminal investigation, with no information sharing from IA to the external agency.
- Wait to conduct the IA investigation until the criminal investigation is completed.

Ideally, agencies should consider employing both of these suggestions. Smaller agencies without a separate IA unit should absolutely consider at least one of the methods, as the consequences for failing to do so can be disastrous. In a perfect world, the criminal investigation would be completed before the IA ever begins, but our world isn't perfect. Staffing shortages, budgetary concerns and the psychological ramifications of long-term

---

[25] International Association of Chiefs of Police. 2016. *Officer-Involved Shootings: A Guide for Law Enforcement Leaders*. Washington, DC: Office of Community Oriented Policing Services. page 17.
[26] Pennsylvania District Attorneys Association Officer-Involved Shooting Investigation Best Practices, page 5.

Confidential

administrative leave can be prohibitive for agencies. Before allowing the officer to return to duty, however, the agency would be best served by having completed the IA investigation. In theory, the criminal and IA investigations can run parallel with each other if the separation/independence can be maintained. In such a case, agencies — particularly smaller ones — should strongly consider having an external agency handle the criminal investigation."[27]

## SPD Policy

69. SPD Directive 4.14, POLICE USE OF DEADLY PHYSICAL FORCE OR IN-CUSTODY DEATH, provided guidance on the process following the use of deadly force or an in-custody death. The directive was consistent with generally accepted practices for this type of policy. The policy provided specific guidance for the involved officer, companion officers, dispatch, responding officers, supervisors, criminal investigators, crime scene investigators, internal investigators, and civil investigators. The following policy language is applicable to the plaintiff's allegations and my opinions in this case:

H. Investigative Responsibilities:

"1. The investigation may consist of three separate and parallel investigations: Incident investigation, internal investigation, and civil investigation.

a. The incident will be investigated by an outside law enforcement agency determined by the District Attorney in accordance with SB 111 protocols. While the investigation will be conducted by an outside agency, overall responsibility for all aspects of the investigation will be retained by the Investigations Division.

g. The internal or civil investigators will not be present during the incident investigation interview. In most instances the incident investigators will interview all persons involved before the civil or internal investigators.

j. Incident investigators will not have access to internal or civil investigator files, and internal and civil investigators will not share information with investigators conducting the incident investigation.

2. The Professional Standards Unit investigator and other investigators designated by the Chief of Police will be responsible for the internal investigation. The purpose of this investigation is to determine if department policy and procedures were followed during the incident, and to evaluate employee and department performance related to the incident.

a. **If necessary, the Professional Standards Unit investigation team will interview the involved officer after the investigating agency interview**. This interview should be delayed until a decision is made by the District Attorney's office about the possibility of criminal prosecution resulting from the investigation

---

[27] Mark Kollar, BCI Special Agent Supervisor. 2021. *Best Practices For Investigating An Officer-Involved Critical Incident,* page 18.

of the incident.

c. If Miranda Rights were invoked, the Professional Standards Unit investigator will give the involved officer the Garrity Advisement.

IMPORTANT - Never compel an employee to provide information until it has been determined that no criminal prosecution will result from the investigation."[28]

70. SPD Directive 4.14 provided guidance on the Critical Incident Review Board (CIRB) that was consistent with generally accepted policing practices for reviewing a critical incident and evaluating policy violations, training issues, employee wellness, investigative issues, and individual or systemic areas of improvement. I have participated in similar review boards at two agencies, Berkeley PD and Boise PD, and in two states, California and Idaho. The CIRB process and its inquiry goals are consistent with the best practices in policing. SPD policy provided the following guidance for the CIRB:

"B. Critical Incident Review Board:

1. A critical incident review board will meet after the traumatic incident debrief and within 60 days of the conclusion of grand jury. The board is designed to critically examine the incident relative to: officer safety disciplines (EVOC, Firearms, Defensive Tactics, ConSims issues, Taser, etc.), supervisory input and performance, identified training needs, policy and procedure issues, officer support/peer support issues, and investigative issues relative to other governmental agencies such as the District Attorney's Office, the City Attorney's Office, Risk Management and the Civil Investigations Team. If circumstances dictate, other issues may also be addressed."[29]

The IACP recognized the use of a review board as a best practice and provided the following guidance:

**"Force review**
Once the investigation is complete, some agencies present the results to a Force Review Committee, Shooting Review Committee, Board of Inquiry, or similar entity that convenes on an ad hoc basis to review such findings. This approach is strongly recommended, as it adds an additional level of review. The committee should be comprised of command-level officers, personnel at the supervisory level who were not involved in the incident or investigation, and any other agency specialists who can provide insight. Some LEAs also include citizen representation on these review boards. These forums intend to bring together all elements of the investigation in a risk management context to determine whether they have potential implications for the department's training, policies, and procedures. Their ultimate aim is to improve the agency's response to such critical

---

[28] Dkt 64-2 - Exhibit 2 (Directive 4.14), page 7-9.
[29] Dkt 64-3 - Exhibit 3 (Directive 4.14, pg 13-15), page 2.

incidents and to make any corrections needed in the agency's policies, procedures, training, supervision, and discipline that will help avoid identified problems in the future."[30]

71. It is my opinion that SPD Directive 4.14 was consistent with generally accepted policing practices for investigating an officer-involved shooting. The policy prioritized the criminal investigation and forbade the exchange of information between the criminal investigators and administrative investigators until the criminal investigation was complete. The administrative investigation was delayed until the prosecutor made a charging decision. The policy provided the opportunity for the professional standards investigators to interview the involved officer if the officer invoked the 5th Amendment protection against self-incrimination or if there was a need for follow-up questions after a review of the criminal investigation. SPD Directive 4.14 was consistent with guidance provided by recognized national policing organizations IACP and MCCA and the instruction and guidance from the foremost experts in officer-involved shooting investigations.

### Plaintiff's Expert Dr. John R. Black

72. The plaintiff retained police practices expert Dr. John R. Black. Dr. Black is a former police officer and Army Sergeant Major who earned a PhD in "studying how people interpret and process information visually and then interact with or are influenced by their use of visualizations while making sense of their world (sensemaking) during the decision process."[31] He applied this area of study to his analysis of SPD's policies and practices related to the investigation of officer-involved shootings. Dr. Black offered the following opinions in summary:

- "In my expert opinion, I find that the current internal review process is inadequate and not indicative of accepted practices found within sound inquiry when police officers use deadly force. It can be reasonably inferred that the inadequacy of the process contributes to an incomplete understanding of the event. An incomplete understanding can allow potential violations of policy and training, as well as areas for agency improvement, to go undetected.

- In my expert opinion, the current internal review process does not incorporate accepted practices associated with the sound inquiry into a police officer's use of deadly force.

- In my expert opinion, the adoption of the concepts mentioned in this report and found in research increases the likelihood of SPD developing a complete understanding of when officers use deadly force. Combined with developing and refining policy based on model policy and research, training based on the same, and the training of specialized teams and individuals in the inquiry of deadly use of force, it would be expected that the likelihood of SPD detecting any potential violation of policy or law as well as areas for agency improvement in the same said areas would increase.

---

[30] International Association of Chiefs of Police. 2016. *Officer-Involved Shootings: A Guide for Law Enforcement Leaders*. Washington, DC: Office of Community Oriented Policing Services. page 22.
[31] Dkt 94-1 - [Sealed] Exhibit 1 (Black Report), page 5.

- In my expert opinion, there is evidence that SPD both knew (as found within the evidence provided) and should have known (as found within accepted understandings within the profession of law enforcement and related research) that the current review process is unlikely to achieve the purpose of fully understanding whether policy had been violated or determining areas of agency improvement reliably when police officers use deadly force."[32]

73. Dr. Black's opinions are speculative, counterfactual, and inconsistent with generally accepted policing practices. He relied on his educational background in sensemaking and academic research unrelated to policing but did not cite current best practices promoted by credible organizations or experts in the field. The question is not whether sense-making and decision-making analysis have been accepted for many years in the military, business, or industry; the question is whether this process is an accepted standard or generally accepted practice in policing.

74. As I have previously established, there is wide variation in the approach to officer-involved shooting investigations. There is no national mandate or enforceable standard for the investigative process. Several processes are considered generally accepted policing practices. Guidance provided by IACP, MCCA, and experts in the field is the closest thing we have to standards. An agency's adherence to best practices should be evaluated based on standards from the policing profession, not Dr. Black's aspirational goals for what a perfect police agency could do. SPD's practice of using CIRB's to review OIS incidents, with the option of initiating an internal affairs investigation if any reviewer identifies an actual or potential policy violation, is consistent with generally accepted policing practices relating to investigating OISs.

75. Dr. Black opined that SPD internal investigators would be unable to conduct a complete investigation and understand Officer Bush's reasoning and decision-making because they did not conduct their own interviews. Dr. Black highlighted a recommendation that SPD create a process for follow-up questions specific to tactics, policy, and training.[33] As I have previously noted, a Garrity interview of the involved officer is always an option. However, there is debate in the policing profession about the need for a second interview. SPD's process was consistent with recommendations from IACP and OIS investigations experts. Lt. Barratt reviewed the available evidence, including the Oregon State Police investigation, the Salem Police reports written about this incident, the Professional Standards Office review of the incident, and the evaluations of the incident done by the Salem Police Department lead instructors for all use of force disciplines.[34] Lt. Barratt understood the information that Officer Bush relied upon, what Officer Bush considered important, Officer Bush's understanding of case law related to search and seizure, attempts to de-escalate, and decision-making. This process was consistent with generally accepted policing practices, and there is no evidence that SPD's investigation was inadequate because they chose not to interview Officer Bush.

---

[32] Dkt 94-1 - [Sealed] Exhibit 1 (Black Report), page 42-43.
[33] COS 005548-COS 006502 (CONFIDENTIAL) Rsp. No. 36.pdf, page 719.
[34] COS 000225-237 (CONFIDENTIAL) Rsp No. 12, page 10.

As an example, Lt. Barratt's memo to Chief Womack provided the following details:

"It could be argued that Officer Bush should have waited for additional units to arrive prior to entering the residence. However, given the facts as he knew them, I cannot fault Officer Bush for attempting to contact the males inside the residence. He had an initial call that the suspect was EDP, intoxicated, armed with a knife, and attacking family. When he walked up to the residence the suspect saw him, ignored his attempts to verbally engage and walked back into the residence despite Officer Bush's order to stop. Officer Bush confirmed with Mrs. Castillo that her son had been attacking the family and was armed with a knife, and that her husband was still inside the residence. He also learned that her son had just attacked her and developed probable cause to arrest Castillo Ill for that crime.

When he got up on the porch, he could hear two males talking who sounded like they were close to the door, and in close proximity to each other. **Believing that this was Castillo Ill speaking with his father, he decided to enter the residence to protect the father.**

**Officer Bush's intent was not to effect an arrest on his own, but rather to prevent harm to Castillo Jr.** Had he decided to not make entry until more officers arrived, there was the chance that Castillo Ill would either attack his father or take him hostage, as he knew the police were there. Officer Bush tried to remove the father from the residence without using force on Castillo III, but had no choice when Castillo Ill charged him with the knife. Given the circumstances and the layout of the residence, it is unlikely that the presence of another officer would have materially altered the outcome of the incident."[35]

76. Dr. Black suggested that SPD investigators did not have the requisite training to conduct internal officer-involved shooting investigations. However, he highlighted evidence in the training records that indicated SPD was compliant with generally accepted policing practices. In my training and experience, internal affairs or professional standards investigators typically attend an internal affairs course, an interview and interrogation course, and an officer-involved shooting investigations course. The training records show that SPD officers attended similar courses, and their training was consistent with best practices. Deputy Chief Ditto, who was the CIRB facilitator during this investigation, also attended advanced training through the Force Science Institute.

Dr. Black provided evidence that SPD officers attended industry-standard training related to internal affairs investigations and officer-involved shooting investigations, but based on Dr. Black's aspirational standard, this training was not specific enough. In my opinion, this training meets or exceeds generally accepted policing practices for the internal investigation of an officer-involved shooting.

Dr. Black identified the following evidence in the SPD training records:

i. "Training related to decision making totaled approximately 90 hours

---

[35] COS 000225-237 (CONFIDENTIAL) Rsp No. 12, page 12.

between 3 individuals, with 80 dedicated to SWAT command.

ii.  Training focused on understanding human error totaled 4 hrs between 2 individuals in 2022.

iii.  Training related to interviewing was primarily focused on the REID interview and interrogation methodology. There was a total of approximately 124 hours between seven individuals, with 28 hours being something other than the REID method.

iv.  Training involving the critical incident mindset or the outward mindset (a concept proposed by the Arbinger Institute (Wankiewicz, 2023) totaled 19 hours between two individuals.

v.  Training involving officer-involved shooting, as well as the investigation of OiS, totaled 29 hours between three individuals.

b.  Additional relevant training.

i.  AELE (Americans for Effective Law Enforcement) Use of Force for Internal Affairs was attended by Lts. Bales and Diede in 2021 (32 hours/ea).

ii.  DC. Ditto attended the Force Science certification course and advanced Force Science specials course for a total of 178 hours. He was also certified as a realistic de-escalation instructor by Force Science.

These courses taught by Force Science (FS) are considered premier courses in understanding the use of deadly force. The training records indicate that DC. Ditto is teaching FS concepts to SPD during in-service training."[36]

77. In his deposition, Lieutenant Barratt, internal affairs sergeant at the time of this incident, testified that he attended a 40-hour internal affairs school:

Q. In your two and a half years in the
internal affairs department --

---

[36] Dkt 94-1 - [Sealed] Exhibit 1 (Black Report), page 31.

A. Yes, sir.
Q. -- can you tell me what training specific to those job tasks that you received?
A. I went to one week-long course. I believe it was put on by AELE down in Las Vegas.
Q. Okay. Yeah. The one week, 40 hour --
A. Yes, sir.[37]

78. In his deposition, Lieutenant Diede, professional standards lieutenant at the time of this incident, testified that he attended a 40-hour internal affairs school:

Q. Okay. When you were initially assigned to professional standards and you had no prior experience in it, tell me what was done to orient you to the -- your job tasks and responsibilities.
A. Sure. So I went through a 40-hour internal affairs school in Dallas/Fort Worth in Texas, and then I trained in-house with the professional standards sergeant at the time, Sergeant Steve Smith, for a period of one month, I believe. And then he retired, and I took over that section.[38]

79. Dr. Black suggested that members of the CIRB engaged in groupthink because they reached unanimous findings before issuing a report. In my experience, there is typically debate and disagreement during a review board process, and those discussions are not necessarily documented in the final report. It is a generally accepted practice to reach a consensus before issuing an official finding. The lack of a written dissent does not mean that there were no differences of opinion during the review board process.

80. Dr. Black identified CIRB findings that highlighted areas for improvement in the investigative process, policies, and training. Using the CIRB to identify areas for improvement is a best practice, as I previously identified in paragraph 70 of this report. That process is consistent with recommendations from IACP. Police agencies should constantly look to improve their processes and training. The evidence showed that SPD was proactive in identifying challenges and finding solutions. In his deposition, Chief Womack identified several projects that have been implemented under his leadership. These projects are consistent with progressive policing and industry-standard best practices. Chief Womack discussed creating an early warning system[39], deployment of body-worn cameras[40], Lexipol policy software implementation[41], and Police Executive Research Forum (PERF) Integrating Communications, Assessment & Tactics (ICAT) training.[42]

---

[37] Barratt Jeffrey (Full Sized), page 9.
[38] Diede Lance (Full Sized), page 20.
[39] Womack, Trevor (Full Sized).pdf, page 13.
[40] Womack, Trevor (Full Sized).pdf, page 12.
[41] Womack, Trevor (Full Sized).pdf, page 21.
[42] Womack, Trevor (Full Sized).pdf, page 55.

Confidential                                                    27

81. It is my opinion that Dr. Black is attempting to create his own standard for the internal investigation of an officer-involved shooting. His opinions are based on his study of systems and related academic research. However, he has not relied upon established, generally accepted policing practices created by IACP, MCCA, or other credible experts to form his opinions. Dr. Black's standard is not recognized in the policing industry, and he cannot provide citations from credible policing organizations to support it. In policing, no national governing organization creates rigid standards that agencies must follow. There are a range of acceptable processes for investigating an officer-involved shooting. Failure to meet Dr. Black's aspirational standard does not mean that an agency cannot conduct a fair, objective, and thorough investigation. SPD's process for the internal investigation of an officer-involved shooting meets or exceeds the generally accepted policing practice.

## III. Reference Material

I generally relied on the following documents in forming my opinions. These documents provide guidance on generally accepted policing practices. Many of these documents have multiple versions and are updated periodically.

- International Association of Chiefs of Police. 2016. *Officer-Involved Shootings: A Guide for Law Enforcement Leaders*. Washington, DC: Office of Community Oriented Policing Services.
- Mark Kollar, BCI Special Agent Supervisor. 2021. *Best Practices For Investigating An Officer-Involved Critical Incident.*
- International Association of Chiefs of Police. April 2019. *Investigation of Officer-Involved Shootings and Other Serious Incidents.*
- Kuhns, Joseph B., Josie F. Cambareri, Shannon Messer, and Darrel Stephens. 2018. *Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada.* Washington, DC: Major Cities Chiefs Association.
- Pennsylvania District Attorneys Association Officer-Involved Shooting Investigation Best Practices

Spencer Fomby
Date: January 8, 2025

## MATERIALS REVIEWED

I have been provided the following materials and reviewed portions in forming my opinion(s) in this matter:

A. **Pleadings**
1.     Dkt 47 - Plaintiff's Second Amended Complaint
2.     Dkt 53 – Defendants' Answer to Second Amended Complaint
3.     Dkt 60 - Defendants' Motion for Summary Judgment
4.     Dkt 61 – Declaration of Sebastian Tapia ISO Defendants' MSJ
     Dkt 61-1 Exhibit 1, 911 audio call
     Dkt 61-2 Exhibit 2, Grand Jury Proceedings
     Dkt 61-3 Exhibit 3, Bush Depo transcript
     Dkt 61-4 Exhibit 4, Castillo Jr. Dep Transcript
     Dkt 61-5 Exhibit 5, Audio recording clarification Nest Camera
     Dkt 61-6 Exhibit 6, Misty Castillo Depo Transcript
     Dkt 61-7 Exhibit 9, OSP Audio Interview of Misty
     Dkt 61-8 Exhibit 10, OSP Interview Transcript of Misty Castillo
     Dkt 61-9 Exhibit 11, Womack Depo Transcript
     Dkt 61-10 Exhibit 12 Diede Depo Transcript
     Dkt 62 Exhibits 7 Englert Forensic Consultant Report & Exhibit 8 Autopsy Report of Arcadio (Restricted per PO)
5.     Dkt 63 - Declaration of Bush ISO Defendants MSJ
     Dkt 63-1 Exhibit 1 (Photo of Bush)
6.     Dkt 64 – Declaration of Ditto ISO Defendants MSJ
     Dkt 64-1 Exhibit 1, Policy 4.01
     Dkt 64-2 Exhibit 2, Directive 4.14
     Dkt 64-3 Exhibit 3, Directive 4.14, pg 13-15
7.     Dkt 66 – Plaintiff's Motion for Partial Summary Judgment
8.     Dkt 67 - Declaration of Michael Howard
     Dkt 67-1 Exhibit 1, Howard CV
     Dkt 67-2 Exhibit 2, Photo of Bush
     Dkt 67-3 Exhibit 5, Bush Diagram of House
     Dkt 67-4 Exhibit 6, Castillo Jr. Diagram
     Dkt 67-5 Exhibit 7a, Crime Scene Photo Entrance
     Dkt 67-6 Exhibit 7b, Crime Scene Photo Entrance
     Dkt 67-7 Exhibit 9, Crime Scene Chair
     Dkt 67-8 Exhibit 10, Knife Close up
     Dkt 67-9 Exhibit 11a, Evidence photo knife
     Dkt 67-10 Exhibit 11b, Evidence photo knife
     Dkt 67-11 Exhibit 11c, Evidence photo knife
9.     Dkt 68 - [Under Seal] ECF Exhibits 3, 4a-e, 8, 12 (Evidence Marker #4 knife, Images, Couch photo, Castillo III position)
10.     Dkt 69 - Declaration of Joel Newman
     Dkt 69-1 Exhibit 1, Newman CV
     Dkt 69-2 Exhibit 2, Castillo Animation
     Dkt 69-3 Exhibit 3, Timeline of Events

Dkt 69-4 Exhibit 4, House Diagram
Dkt 69-5 Exhibit 6, Diagram of Evidence Collected
11.      Dkt 70 – [Under Seal] Declaration of Park ISO MSJ
Dkt 70-1 Exhibit 1, Nelson Depo Transcript
Dkt 70-2 Exhibit 2, Nelson Depo Video
Dkt 70-3 Exhibit 3, Castillo Jr. Depo Transcript
Dkt 70-4 Exhibit 4, Bush depo Transcript
Dkt 70-5 Exhibit 5, Bush demo
Dkt 70-6 Exhibit 6, Yoder Supplemental Report
Dkt 70-7 Exhibit 7, Det. Evarts Marion Co. SO Report
Dkt 70-8 Exhibit 8, Keizer PD Report of Det. Farrens
Dkt 70-9 Exhibit 9, Subpoena FARO Scan data
Dkt 70-10 Exhibit 10, Keizer PD Report of Det. Avetisyan
Dkt 70-11 Exhibit 11, Keidatz Interview Trans. Excerpts
Dkt 70-12 Exhibit 12, M. Castillo OSP Interview Transcripts
12.      Dkt 115-1 SB111-Marion-DeadlyPhysicalForcePlan.MC 12-2022
13.      Dkt 117 – Opinion & Order

B. **Depositions**
1.      Barratt, Jeffrey Deposition Transcript, *Exhibits 13, 16-17, 44-49*
2.      Bush, Nathan, Deposition Transcript, *Exhibits 1 – 8, 24* i. Deposition Video, Nathan Bush

3.      Castillo, Arcadio Jr. Deposition Transcript, *Exhibit 109*
4.      Castillo, Misty Deposition Transcript, *Exhibit 101 – 108*
5.      Diede, Lance Deposition Transcript, *Exhibits 13 – 18, 20-22, 29*
6.      Gould, Brandon Deposition Transcript, *Exhibits 5, 8-9, 11-18, 25*
7.      Keidatz, Gary Deposition Transcript, *Exhibits 1-4*
8.      McBride, Morgan Deposition Transcript, *Exhibits 5, 27*
9.      Nelson, Clifford, MD, Deposition Transcript, *Exhibits 30 – 43*
i. Nelson Deposition Video
10.     Rebello, Eric Deposition Transcript, *Exhibits 5, 27-1, 28*
11.     Skelton, Nicholas Deposition Transcript, *Exhibits 5, 7, 10, 19, 26*
12.     Womack, Trevor Deposition Transcript, *Exhibits 23 & 50*

C. **RFP & Interrogatories**
1.      2023-06-30 Defendants' Response to Plaintiff's Second RFP
2.      2023-09-05 Plaintiff's First Interrogatories and Fourth RFP to Defendants
3.      2023-09-13 Defendants' Amended Response to Plaintiff's Third RFP
4.      2023-11-21 Defendants' Amended Response to Plaintiff's Fourth RFP
5.      2023-12-07 Defendants' Amended Response to Plaintiff's First Interrogatories

D. **Discovery**
1.      MOU re Mental Health, (COS 000197-211)
2.      CIRB for Nate Bush 2021 (CITY 000225-237)
3.      2016 Annual Use of Force Report (CITY 000243-249)

4.      2017 Annual Use of Force Report (CITY 000250-257)
5.      2018 Annual Use of Force Report (CITY 000258-266)
6.      2019 Annual Use of Force Report (CITY 000267-276)
7.      2020 Annual Use of Force Report (CITY 000277-286)
8.      2021 Annual Use of Force Report (CITY 000287-297)
9.      Emails (CITY 000304-482)
10.     Policy 4.01 – Law Enforcement Operations (COS 000860-872)
11.     Directive 5.02 – Arrests and Transportation of Prisoners (COS 000873-879)
12.     AIMWeb Report, Nathan Bush 1/30/17 – 7/9/2021 (COS 00933-934)
13.     Directive 2.11- Appointment to Career-Development Positions (COS 000997-1002)
14.     Directive 2.01 – Complaint Reception and Investigation Procedures (COS 001003-1011)
15.     Email re Professional Standards Training, (COS 001783)
16.     CIRB Documents (COS 001864-1923)
17.     Directive 4.14 – Police Use of Deadly Physical Force or In-Custody Death (COS 001924-1938)
18.     PowerPoint Presentation, Lt. Barratt's review of OSI (COS 001939-1968)
19.     CIT Documents (COS 001969-5397)
20.     SPD Policies (COS 5410-5546)
21.     OIS Matrix, RFI No. 1 (COS 005547)
22.     OIS Internal Review Materials (re RFP No. 1) (COS 005548-6502)
23.     Payment History, Meeting Request information with CSM (COS 6503-6508)

E. **Training Records**
1.      Bales, CJ IRIS Transcript
2.      Barratt CJ IRIS Transcript
3.      Baskett CJ IRIS Transcript
4.      Diede CJ IRIS Transcript
5.      Ditto, CJ IRIS Transcript
6.      Johnson, CJ IRIS Transcript
7.      Smith CJ IRIS Transcript
8.      Wann, CJ IRIS Transcript
9.      Womack CJ IRIS Transcript

F. **Black, John Expert Report Materials [Under Seal]**
1.      Dkt 94 – Declaration of John R. Black
        Dkt 94-1 Exhibit 1, Black Report
        Dkt 94-2 Exhibit 2, Black CV
        Dkt 94-3, Exhibit 3, Black Materials Reviewed

# SPENCER FOMBY

## LAW ENFORCEMENT TACTICAL CONSULTANTS INC.

Austin, TX 78703 ● Tel.: 916-595-0560 ● email: spencer@leexperts.net

---

### SUMMARY OF EXPERIENCE

Retired Police Captain, SWAT Commander and Police trainer with 20 years' experience working in the San Francisco Bay Area. Former Captain of the Boise PD Training, Education and Development Division. Served as program manager for the Defensive Tactics and Active Shooter programs for the Berkeley PD. Created two CA POST approved De-escalation courses. SME in public order for a National Institute of Justice Special Technical Committee on Civil Disturbance Unit Equipment and DHS First Responder Resource Group. Public Order Section Chair for the National Tactical Officers Association (NTOA); coordinated the creation of the NTOA Public Order Response and Operation Standards, the NTOA Public Order Basic Command Certification Course, and the NTOA Public Order Grenadier Workshop. Former Visiting Fellow in Police Science at University of Derby, U.K. Author of *Public Order Policing: A Professional's Guide to International Theories, Case Studies, and Best Practices: Use of Force.* (2024)

Lead departmental public order instructor; responsible for equipment selection, tactical training, less-lethal weapon selection, chemical agent selection and deployment, and mission planning. Squad leader in more than 75 protest events including:

Oscar Grant Protest (Oakland Ca)- January 2009

Mehserle Verdict (Oakland Ca)- July 2010

Occupy Oakland/Berkeley (Oakland/Berkeley Ca)- October 2011

Eric Garner/BLM (Berkeley Ca)- December 2014

Pro Trump Protests 2017 (Berkeley Ca)- February 1, March 4, April 15, April 27, August 27, September 24-27

George Floyd Protests 2020 (Oakland Ca)- May/June 2020

---

### PROFESSIONAL POLICE EXPERIENCE

**BOISE Police Department** ● Boise, ID 83704

**POLICE CAPTAIN, March 2021 to January 2023**

*The Boise Police Department is a professional full-service law enforcement agency providing public safety to 260,000+ community members through engaging the public, keeping the peace, and responding to emergencies.*

**Berkeley Police Department ●** Berkeley, CA 94704

**POLICE LIEUTENANT, January 2020 to March 2021**

**POLICE SERGEANT, December 2006 TO January 2020**

**PATROL OFFICER, December 2000 to December 2006**

*The Berkeley Police Department is a professional full-service law enforcement agency providing public safety to 150,000+ community members through engaging the public, keeping the peace, and responding to emergencies.*

**TRAINING, EDUCATION AND DEVELOPMENT DIVISION COMMANDER.** Managed development and implementation of department training and education program through annual organizational needs assessment. Designed, developed, and implemented an annual training plan and evaluated training results. Developed plans, managed, and implemented police training activities and programs, including the recruit academy, field training program, quarterly training, and leadership development. Coordinated testing, evaluation, and purchase of department equipment. Managed the wellness program.

**SPECIAL OPERATIONS GROUP COMMANDER.** Lead Boise PD Special Operations Group, including the Special Operations Unit (SWAT), Explosive Ordinance Disposal, and Mobile Field Force.

**NARCOTICS AND VICE TASK FORCE MEMBER.** Assigned to the Berkeley Police Department Drug Task Force for 2 years as an officer and then supervised the unit for 2 years as a sergeant. Responsible for disrupting street-level narcotics activity in Berkeley and investigating regional drug trafficking cases with a nexus to Berkeley. Worked with a team of officers to generate felony cases through self-initiated stops. Participated in surveillance operations, under-cover operations, buy/bust operations, and sex trafficking investigations. Participated in the service of over 1000 high-risk search warrants, probation searches, and parole searches.

**SECURITY AND DIGNITARY PROTECTION PROFESSIONAL.** 18 years of SWAT experience with specialized training in physical security and dignitary protection. 5 years experience as the special events coordinator for the City of Berkeley. Planned and coordinated the police and civilian deployment to large-scale events, including street fairs, concerts, rallies, festivals, and sporting events. Coordinated and supervised the police security for film shoots in the City of Berkeley, including the Steve Jobs movie, America's Most Wanted and Ballers. Experience providing security for Cal Football games. Experience coordinating and providing security

2

for visiting dignitaries including His Holiness the Dalai Lama, Former President Bill Clinton, Senator Bernie Sanders, Congresswoman Barbara Lee, and President Joe Biden. Experience coordinating with outside law enforcement agencies, the United States Department of State, and the United States Secret Service.

Berkeley Police Department active shooter program coordinator. Provided active shooter safety training to local stakeholders including Berkeley Unified School District, Jewish Community Center, Zaytuna College, French American School, City of Berkeley Library, Berkeley Community Emergency Response Teams, Wareham Properties, Berkeley Repertory Theater, St. Mary's High School, UC Berkeley Ed Roberts Campus, Berkeley City College, East Bay YMCA, Sutter Hospital, and Global Montessori School.

**POLICY, ADMINISTRATION, AND COMMUNITY-INVOLVED POLICING EXPERTISE.** Participated in the development of the following departmental policies: use of force update, vehicle pursuits, foot pursuits, probation and parole searches, crowd control, chemical agent deployment, armored vehicle deployment, use of spit hoods and restraint devices, de-escalation, and use of less-lethal weapons.

Supervised the Community Involved Policing unit—collaborated with community organizations, social service agencies, city staff, and merchants' associations to resolve complex issues. Member of a multi-disciplinary nuisance abatement team. Certified in Crime Prevention Through Environmental Design (CPTED). Participated in security assessments for various City of Berkeley facilities and private sector organizations. Provided recommendations for security and technology improvements to City of Berkeley facilities.

**MEDIA AND PUBLIC RELATIONS.**  Recent presentations on police tactics and use of force:

1. NACOLE National Conference- Public Order Policing Panel, 2024
2. National Tactical Officers Association Public Order Grenadier Workshop, 2024
3. Western States Public Order Conference- NTOA Force Trends, 2024
4. National Tactical Officers Association Annual Conference- Public Order Use of Force, 2023
5. UK Home Office Communications Directorate- Hiring and Retention Challenges in Policing, 2023
6. Axon Accelerate Conference- Reducing Deaths Between Police and Community, 2023
7. Daigle Use of Force Summit- Public Order Use of Force, 2022, 2023, 2024
8. California Association of Tactical Officers Conference- NTOA Standards and Public Order Use of Force, 2022
9. Daigle Law Group First Amendment Summit- Public Order Response Standards, 2022, 2023, 2024
10. National Tactical Officers Association Virtual Conference- Public Order Best Practices, 2022
11. Daigle Use of Force Summit- Public Order Best Practices with NTOA Standards, 2021
12. National Tactical Officers Association Annual Conference- Public Order, 2021, 2020, 2019, 2018
13. NTOA Panel Discussion- Less Lethal Munitions in Crowd Control Operations, 2021
14. National Asian Peace Officers Association Conference- Public Order Policing Best Practices, 2021
15. Renne Public Law Group Public Safety Reform and Innovation Webinar Series, 2021
16. Daigle Law Group First Amendment Summit- Modern Crowd Control Issues, 2021
17. Association of California School Administrators Annual Conference- Active Shooter, 2019
18. National Alliance for Mental Illness Conference- Tactical De-escalation 2018

## EDUCATION AND PROFESSIONAL DEVELOPMENT

**Bachelor of Arts, Administration of Justice, Howard University, Washington DC**

**Visiting Fellow in Police Science, University of Derby, United Kingdom**

## POLICE TACTICS SUBJECT MATTER EXPERT

Defensive Tactics and Active Shooter Program Coordinator. Trained officers in defensive tactics, firearms, active shooter response, tactical de-escalation, crowd control/management, less-lethal weapons, counter-ambush, chemical agents, sting balls, flash bangs, live-fire shoot house, scenario based training and close quarter tactics. Taught and evaluated SWAT tactics using live-fire, marking cartridges, and scenario-based training.

Advised the chief of police, city manager, city attorney and city council on best practices for police use of force and tactics with a focus on reducing injury to officers and community members, reducing city liability, and improving police legitimacy.

- 2011 Berkeley Police Department Officer of the Year.
- Team Leader of the 2013 Urban Shield SWAT Competition first place team.
- Involved in 1000+ tactical incidents, including assigned as Squad Leader in 75+ crowd control events.
- National Tactical Officers Association Public Order Section Chair. Coordinated the creation of the Public Order Unit National Standard. Coordinated the creation of specialized public order training for law enforcement.
- SME in public order equipment and tactics for DHS First Responder Resource Group. Identified police protective equipment deficiencies and made recommendations for new designs. Identified limitations of current crowd dispersal options and gave guidance for manufacturers to develop new less-lethal technologies.
- SME in public order for a National Institute of Justice Special Technical Committee on Public Order Unit Equipment. Worked with NIJ scientists to create national standards for police protective equipment.
- SME in active shooter response for the International Association of Chiefs of Police Collaborative Reform Initiative Technical Assistance Center (CRI-TAC). In partnership with the Department of Justice (DOJ) Office of Community Oriented Policing Services (COPS) and nine other law enforcement agencies.
- SME in ballistic shields for the ASTM Ballistics Shields Task Group.
- Created two California POST-approved de-escalation courses. Trained hundreds of officers on tactics used to reduce the use of force against people in mental health crises, under the influence of drugs or alcohol, people armed with weapons other than a firearm, or unarmed but non-compliant. Shared de-escalation course with agencies around the country. Advised law enforcement agencies and community members on de-escalation best practices.
- In January 2016, invited to attend Police Executive Research Forum (PERF) Reengineering Use of Force Meeting in Washington DC; in November 2016, invited to attend PERF ICAT presentation in New Orleans; in January 2019, invited to attend the PERF Less-lethal Symposium in Los Angeles.
- Responsible for acquisition of the following equipment: Outer vest carriers, FLIR handheld devices, DJI Mini 2 Drones, Axon Taser 7, Axon Body 3 Cameras, LEFTA training management software, Argus public order helmets, concealable limb guards, Avon C50 respirators, Revision Stinger hawk laser eye

4

protection, red dot pistol sights, WRAP devices, Armored Mercedes Sprinter van, 40mm launchers, FN 303, Crye Airframe ballistic helmets, TCI hearing protection, ballistic shields, rifle plates and carriers, Angel Armor RUC body armor, breaching shotguns, Peacekeeper batons, Accuracy International sniper rifles, backpack breaching kits, individual first aid kits and vehicle medical kits.

## CERTIFICATIONS

1. NTOA Less-lethal, FSDD, Chemical Agent Instructor Certification, 2024
2. Force Science Realistic De-escalation Instructor, 2022
3. FEMA Active Shooter Incident Management Course, 2022
4. ALERRT Active Shooter Instructor Level 1, Train the Trainer, 2022
5. CATO Chemical Agent Instructor, 2020
6. FN 303 less-lethal Instructor/Armorer, 2018
7. ALICE Instructor, 2018
8. CTS Less-lethal instructor, 2018
9. CTS Sting ball Instructor, 2017
10. CTS Chemical Agent Instructor, 2017
11. CTS Distraction Device Instructor, 2017
12. Crisis Intervention Team (CIT), 2017
13. Gracie Survival Tactics Level 1 Instructor, 2015
14. Peacekeeper Baton Instructor, 2015
15. Force Science Analyst Certification, 2015
16. NTOA Shoot house Instructor, 2013
17. Simunition Scenario Instructor, 2012
18. NTOA Active Shooter Instructor, 2011
19. CA POST Long Rifle Instructor, 2011
20. CA POST Firearms Instructor, 2010
21. CA POST Impact Weapons Instructor, 2009
22. CA POST Defensive Tactics Instructor, 2007

## PROFESSIONAL DEVELOPMENT

1. Police & The Press: Navigating Today's Complex Interactions Webinar, 2022
2. At the Point of the Spear Fire Service Leadership, 2022
3. Officer Involved Shootings and Use of Force Investigations, 2022
4. Daigle Use of Force Symposium, 2021

5. Transform Community and Police Relations, 2020

6. PFC Structure Clearing, 2019

7. PFC Carbine Movement Under Fire, 2019

8. Daigle First Amendment Conference, 2019

9. PERF Less Lethal Symposium, 2019

10. CNOA San Bernardino Attack Debrief, 2017

11. NCRIC Domestic Terrorism Update, 2017

12. FTF Armored Vehicle Operations, 2017

13. Force Encounters Analysis, 2017

14. D-Co Active Shooter, 2017

15. PERF ICAT Implementation, 2016

16. NTOA Advanced Carbine, 2016

17. TACOPS Hostage Rescue, 2016

18. CATO Tactical Operations Liability, 2016

19. FEMA Campus Emergencies, 2016

20. CATO Supervising High Risk Search Warrants, 2016

21. CNOA Implications of the Use of Force, 2016

22. PERF Re-engineering Use of Force, 2016

23. CA POST Crowd Management, 2015

24. Federal/Speer Wound Ballistics Workshop, 2015

25. D-Co Maneuver Tactics, 2015

26. Tactical Leadership, 2015

27. NTOA Hostage Rescue, 2015

28. Bias Based Policing: Remaining Fair and Impartial, 2014

29. Fulcrum Concepts Advanced SWAT, 2013

30. Snipercraft Sniper Team Leader Course, 2013

31. Law Enforcement Officers Killed and Assaulted (LEOKA), 2012

32. FEMA LASER Active Shooter Course, 2012

---

**AFFILIATIONS**

1. National Tactical Officers Association

2. California Association of Tactical Officers

3. Intl. Law Enforcement Educators and Trainers Assoc.

4. International Association of Chiefs of Police

6

SPENCER FOMBY

LAW ENFORCEMENT TACTICAL CONSULTANTS INC.

PO Box 301258, Austin TX 78703 ● Tel.: 916-595-0560 ● email: spencer@leexperts.net

**RECORD OF TRIAL TESTIMONY & DEPOSITIONS**

1. **Deposition: Case No.: 18 L 12534**
   March 12, 2022, Estate of Harith Augustus v. City of Chicago, et al., Defendants, In the Circuit Court of Cook County, Illinois County Department, Law Division.

2. **Deposition: Case No. 20-cv-01302**
   June 10, 2022, Jared Goyette, et al v. City of Minneapolis, et al., Defendants, In the United States District Court District of Minnesota.

3. **Deposition: Case No. 6:20-cv-1489-MC**
   September 6, 2022, Eleaqia McCrae v. City of Salem, et al., Defendants, In the United States District Court for The District of Oregon Eugene Division.

4. **Deposition: Case No. 18-cv-06378**
   September 20, 2022, Benito Flores Delgado v. City of Chicago, et al., Defendants, In the United States District Court Northern District of Illinois Eastern Division.

5. T**rial: Case No. 6:20-cv-1489-MC**
   September 29, 2022, Eleaqia McCrae v. City of Salem, et al., Defendants, In the United States District Court for The District of Oregon Eugene Division.

6. **Trial: Case No. CV01-22-06789**
   July 20, 2023, St. Luke's Health System, et al v. Ammon Bundy, et al., Defendants, In the District Court of The Fourth Judicial District of The State of Idaho, In and For the County of Ada.

7. **Deposition: Case No. 1:22-cv-1213-NYW-SKC**
   September 7, 2023, Tejas Cousik et al. v. City of Aurora, et al., Defendants, In the United States District Court for The District of Colorado.

8. **Deposition**: **Case No. CV2021-008186**
   December 12, 2023, Erma Johnson, an unmarried individual and on behalf of all statutory beneficiaries of the wrongful death of her son, Dion Johnson, Plaintiff, v. State of Arizona, Et Al., Defendants, In Maricopa County Superior Court State of Arizona.

9. **Deposition: Case No. 24-C-18-000515**
   April 19, 2024, Mayor & City Council of Baltimore, Plaintiff, v. Purdue Pharma, L.P., Et Al., Defendants, In the Circuit Court for Baltimore City.

10. **Deposition: Case No. 22-2-08993-8 SEA**
    April 28, 2024, Diaz Love, an Individual, Plaintiff, v. The State of Washington, the City of Seattle, and Dawit Kelete, Defendants, In the Superior Court of Washington For King County.

11. **Deposition: Civil Action No. 1:23-cv-00806-BAH**
    June 7, 2024, Pamela Goodwin, et al., Plaintiffs, v. District of Columbia, et al., Defendants, In the United States District Court For The District Of Columbia.

12. **Trial: Civil Action No.: 3:20-cv-01878-JR**
    November 13, 2024, Marie Tyvoll v. City of Portland, et al., Defendants, In the United States District Court for The District of Oregon Portland Division.

13. **Deposition: Civil Action No. No. 19-cv-04838**
    November 19, 2024, Krystal Archie, et. al., Plaintiffs, v. City of Chicago, et al., Defendants, In the United States District Court for The Northern District Of Illinois Eastern Division.



# PENNSYLVANIA DISTRICT ATTORNEYS ASSOCIATION OFFICER-INVOLVED SHOOTING INVESTIGATION <u>BEST PRACTICES</u>

## I. <u>Introduction</u>

An officer-involved shooting is a traumatic and sensitive event. Following a shooting, law enforcement must address the immediate safety of people at the scene, the trauma to the person who was shot and officers involved, conducting a careful and unbiased investigation, and the public interest and perception of the event. Officer-involved shootings are unique in many ways and require best practices standards to preserve the integrity of law enforcement.

For purposes of this policy, an "officer-involved shooting" is any discharge of a firearm by an on-duty law enforcement officer which results in death, any bodily injury to another person, or where another person was the target of the firearm discharge (whether the target was struck or not).

There are two main themes that apply throughout this best practices policy. First, the investigation of an officer-involved shooting should be conducted by an

Rev. 11/2016

agency that is separate and independent from the agency involved in the shooting. Second, in the case of an officer-involved shooting, the District Attorney will be called upon to render a decision regarding whether the shooting was justified. Therefore, the investigating agency should answer to and be directed by the District Attorney.

Every county in Pennsylvania is different. We have densely populated urban counties, sparsely populated rural counties, and everything in between. These counties have very different resources and interactions between law enforcement agencies. Therefore, the District Attorney for each county shall have the discretion and responsibility to tailor this policy to the specific circumstances and needs of their respective county and the individual case.

The following best practices apply to any officer-involved shooting.[1]

## II. Policy

A. **Independent Agency**. The investigation of an officer-involved shooting shall be conducted primarily by a law enforcement agency independent from the agency involved in the shooting (the "Independent Agency"). The use of the Independent Agency avoids any appearance of bias in the investigation. The agency involved in the shooting may play a role in supporting and coordinating with the Independent Agency, which will be important because of that agency's knowledge of its own internal procedures and policies. However, the Independent Agency maintains ultimate investigative responsibility. In counties where the District Attorney's Office includes County Detectives, the Detectives may be the designated Independent Agency. In other counties, the Pennsylvania State Police or a separate municipal police Department may be designated.[2]

B. **District Attorney**. At the conclusion of the investigation, the District Attorney of the jurisdiction where the officer-involved shooting took place will be required to make a decision whether the shooting was justified or

---

[1] This best practices policy does not address use of force protocols for law enforcement. Those protocols are addressed in Pennsylvania statutory law (18 Pa. Cons. Stat. Ann. §501 *et seq.*) and precedent from the United States Supreme Court (Graham v. Connor, 490 U.S. 386 (1989)).

[2] If an officer from the designated Independent Agency is involved in the shooting, the District Attorney should designate a different outside agency to conduct the investigation. In some smaller counties where the Pennsylvania State Police cover virtually the entire county and there is not another large law enforcement agency nearby, the District Attorney may need to rely upon an independent group with the Pennsylvania State Police to do the investigation (such as a team of investigators from outside barracks).

-2-

whether criminal charges should be filed. Because the District Attorney has this responsibility, it is important that the Independent Agency report directly to the District Attorney in order to assure that all necessary investigative steps are followed. The District Attorney shall designate the Independent Agency, and the Independent Agency shall work under the direction of the District Attorney.

C. **Safety**. When an officer-involved shooting occurs, the first priority is the safety of any injured person and the security of law enforcement personnel. Emergency medical treatment should be provided to any injured person. After such safety and security have been established, the scene is to be secured immediately.

D. **Securing the Scene**. The scene of the incident shall be fully secured. A perimeter shall be established using crime scene tape and personnel. There shall be only one entry/exit point for the scene. An officer shall be assigned to the entry/exit point to keep a log of any person who enters the scene. No evidence at the scene shall be moved or altered, except where required for safety concerns. If a person is dead at the scene, law enforcement shall shield the body from public view.

E. **Notification**.    Immediately after the scene is secured, the senior commanding officer at the scene shall notify the District Attorney's Office (the "DAO") via police radio.    The DAO shall notify the designated Independent Agency who will conduct the investigation.    The scene shall remain secured during this time. When the Independent Agency arrives at the scene, the Independent Agency becomes responsible for the scene.

F. **Firearms**. To the extent possible, any firearms involved in the officer-involved shooting or located at the scene should remain in place and undisturbed prior to the scene being processed. If the scene is fully secured and a firearm is at the scene, an officer should be posted to guard the firearm. If the scene is of such a nature that the firearm cannot be safely left at the scene, officers at the scene should move the firearm to a secure location, but not otherwise alter the condition of the firearm (for instance, do not unload it). If the firearm involved is still in the possession of the officer involved in the shooting, that officer shall surrender his or her firearm to a supervisor. The supervisor then shall secure the firearm for later inspection without altering the condition of the firearm. Any officer involved in the shooting also shall surrender his or her duty belt to a supervisor.    All

-3-

movements of and transfers of the firearm and duty belt shall be documented.

G. **Processing the Scene**. The Independent Agency shall process the scene for evidence. The Independent Agency shall maintain custody of all recovered evidence until the District Attorney makes a final decision on the nature of the shooting. Some of the standard evidentiary issues to consider when processing the scene include: (1) for a larger scene, it may be useful to use a total station device or similar tool to ensure complete and accurate mapping of the scene; (2) video recording of the scene; (3) securing any video recording of the event, including body-worn cameras, mobile video recorders, civilian-recorded videos, and/or surveillance videos; (4) photographing all critical pieces of evidence, such as location of weapons on-scene; (5) if the person shot at police officers, obtaining gun-shot residue samples from the hands/clothes of the suspect; and (6) processing any firearms, knives, or other weapons for DNA and/or fingerprints.

H. **Multiple Officers Involved**. If multiple officers were involved in the shooting, those officers shall avoid discussing the details of the shooting together both before and after the officers are interviewed. The officers may confirm the well-being of their fellow officer(s). To the extent practicable, after the scene has been secured, the involved officers should be kept separate at the scene, on the ride back to the station, and at the station prior to their respective interviews. The transportation of the involved officers from the scene back to the station (or other location) shall be noted in a report, including who transported each officer.

I. **Interviews**. The Independent Agency shall conduct interviews related to the officer-involved shooting. The initial interview of any officer who discharged his or her weapon during the officer-involved shooting and any officer who witnessed the shooting shall take place as soon as reasonably possible, taking into consideration potential issues of shock and trauma to the officer, as well as any applicable procedures established in a governing collective bargaining agreement. Each officer shall be advised of his or her right to representation prior to any interview. Under normal circumstances, there will be an initial general interview for purposes of public safety and orientation of the scene. There will be a later, more detailed interview after the officers have had an opportunity to decompress and the evidence at the scene has been reviewed. The timing of the interviews will depend on the circumstances of the shooting. Interviews of civilian witnesses shall take

-4-

place according to the same timing and procedures.  To the extent that there are uncooperative witnesses, the District Attorney may use the resources of an investigating grand jury.

J. **Photographs**.  If possible, the Independent Agency shall photograph the officers involved in the shooting in the uniforms worn by those officers during the shooting.

K. **Internal Affairs Investigation**.  The department of any officer involved in any officer-involved shooting has the discretion to conduct the department's internal affairs investigation into the shooting at the same time as or after the District Attorney's investigation.  That department's internal affairs investigation shall be separate and distinct from the District Attorney's investigation.[3]  That department's internal policies regarding the work status of any officer shall control regarding those issues.

L. **Counseling.**  Any law enforcement officer involved in an officer-involved shooting should receive counseling after the event.  This counseling should be available immediately after the event and on an on-going basis as needed.

M. **Union Representatives**.  The union representative of the officers involved may be present for the interview of the officers and otherwise involved in representing the officers.  Therefore, to the extent possible, the union representative should not be involved in any other aspect of the investigation in order to avoid any claim of conflict of interest (for instance, taking possession of the officer's weapon).

N. **Confidentiality**.  Prior to the District Attorney's final decision regarding an officer-involved shooting, all officers involved in the incident and investigation shall maintain complete confidentiality regarding the incident.  All media inquiries are to be directed to the DAO.

O. **Video/Audio Recording Release.**  If there is a video/audio recording of the officer-involved shooting, the District Attorney will need to make a decision whether to release the recording publicly.  This is a very case-specific decision, requiring the balancing of many factors.  In general, the following guidelines are appropriate.  If the shooting has been deemed justified, the recording should be released.  The public should be allowed to see the basis

---

[3] Because of the potential impact of warnings provided under Garrity v. New Jersey, 385 U.S. 493 (1967), the internal affairs investigation may not be commingled with the criminal investigation.

for the prosecutor's decision. If the officer may be or has been charged, the recording should not be released. The Pennsylvania Rules of Professional Conduct specifically restrict prosecutors from releasing material that will "have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter" or "have a substantial likelihood of heightening public condemnation of the accused."[4] The release and widespread public dissemination of a recording where an officer may be or has been charged will make it substantially more difficult to provide for a fair trial.

P. **Preliminary Statement**. The District Attorney shall have the discretion to make a preliminary statement to the public about the factual circumstances of the officer-involved shooting. Because the investigation will still be ongoing at that point, the District Attorney may be limited in the areas that can be covered, but a preliminary statement may be useful for the public to understand the basic issues involved in the investigation. Whether a preliminary statement will be issued will depend on the circumstances of every case.

Q. **Completion of Investigation**. Once the Independent Agency and District Attorney have completed the investigation of an officer-involved shooting, the District Attorney shall publically announce the results regarding whether the shooting was legally justified. The timing will depend on the factual and legal circumstances of the officer-involved shooting. As a general policy, if the shooting is deemed justified, the officers involved will not be named. This follows the general rule that citizens who are not charged with a crime are not identified publicly.[5] If the shooting is deemed not justified and criminal charges are filed, the case will be treated with the same rules that cover other criminal cases.

---

[4] See Rules 3.6(a) and 3.8(e) of the Pennsylvania Rules of Professional Conduct.

[5] There may be some limited circumstances where identification of the officer involved may be appropriate. However, careful consideration and consultation with the officer and agency involved must take place prior to such a decision.

-6-

# Investigation of Officer-Involved Shootings and Other Serious Incidents

April 2019





International Association of
Chiefs of Police

The IACP Law Enforcement Policy Center creates four types of documents: Model Policies, Considerations Documents, Concepts & Issues Papers, and Need to Know one-page summaries. Typically, for each topic, either a Model Policy or a Considerations Document is created, supplemented with a Concepts & Issues Paper. This file contains the following documents:

- *Model Policy*: Provides police agencies with concrete guidance and directives by describing in sequential format the manner in which actions, tasks, and operations are to be performed.
- *Concepts & Issues Paper*: Designed to provide context and background information to support a Model Policy or Considerations Document for a deeper understanding of the topic.
- *Need to Know...*: Synthesizes the key points of the topic into a brief, one-page overview. This document is developed by Policy Center staff following the final approval of the policy and paper.

# Glossary

*Incident Commander (IC):* The individual responsible for all incident activities, including the development of strategies and tactics and the ordering and release of resources. The IC has overall authority and responsibility for conducting incident operations and is responsible for the management of all operations at the incident site.

*Involved Officer(s):* Unless otherwise indicated, those sworn officers in on-duty or off-duty status who are involved in a serious incident or are direct witnesses to such an event.

*Qualified Mental Health Professional (QMHP):* An individual who is licensed as a mental health professional and has an in-depth understanding of trauma-related disorders and the law enforcement culture.

*Serious Incident:* For the purposes of this document, a serious incident includes, but is not limited to, the following:

- Any use of deadly force, regardless of whether the employee's actions resulted in injury or death, except as provided below
- Any death or serious injury resulting from, or that occurs during, the course of an agency operation
- Pursuits resulting in serious injury or death
- Employee-involved collisions resulting in death or serious injury
- Matters of an unusually serious nature involving agency employees, to include large-scale event response

*Serious Injury:* Injury that involves a substantial risk of death, protracted and obvious disfigurement, or extended loss or impairment of the function of a body part or organ.

# Model Policy

Updated: April 2019

# Investigation of Officer-Involved Shootings and Other Serious Incidents

## I. PURPOSE

The purpose of this policy is to provide guidelines for the investigation of officer-involved shootings and other serious incidents, as defined herein.

## II. POLICY

It is the policy of this agency that officer-involved shootings and other serious incidents be investigated to determine whether the actions of involved officers conform to applicable law and agency rules, policies, procedures, and training.[1]

## III. PROCEDURES

The following procedures are tailored to address an officer-involved shooting. However, the general guidelines and principles can be used when investigating any serious incident.

Officers involved in an officer-involved shooting shall, to the degree reasonably possible, take initial steps to ensure that any threat from the subject has been eliminated, protect the safety of themselves and others, render first aid where necessary, and preserve evidence.

### A. Incident Command (IC) Responsibilities

The IC shall be responsible for ensuring that standard incident response protocols have been implemented.[2] In addition, the IC shall ensure that the following tasks are addressed, if not previously completed.

    1. Any remaining threats are identified, and necessary action is taken.

---

[1] The investigation of officer-involved shootings and other serious incidents shall normally be conducted in two separate parts and by separate authorities—a criminal investigation and an administrative investigation. This discussion focuses on the administrative investigation.

[2] See the IACP Policy Center document on Incident Command available at https://www.theiacp.org/resources/policy-center-resource/incident-command.

2. The physical condition of the involved officer(s), subject(s), and third parties is determined, emergency first aid is provided, if necessary, and emergency medical assistance is summoned.[3]

3. A brief public safety statement is taken, preferably by a supervisor, individually from the involved officer(s), covering only information necessary to focus initial law enforcement response and direct the preliminary investigation into the officer- involved shooting. Information obtained should include, where appropriate,

   a. type of force and weapons used;

   b. direction and approximate number of shots fired by involved officer(s) and subjects;

   c. location of injured persons;

   d. description of at-large subjects and their direction of travel, time elapsed since the subjects were last seen, and any weapons;

   e. description and location of any known victims or witnesses;

   f. description and location of any known evidence; and

   g. any other information necessary to ensure officer and public safety and to assist in the apprehension of at-large subjects.

4. All necessary agency notifications are made, such as those to the

   a. chief executive;

   b. patrol commander;

   c. lead investigator/officer-involved shooting investigation team;

   d. office of professional standards personnel;[4]

   e. evidence technicians;

   f. public information officer;

   g. coroner or medical examiner;

   h. legal advisor and/or prosecutor; and

   i. agency chaplain, labor representative, mental health professional, and peer support program coordinator.

5. An adequate inner perimeter is established.

6. An outer perimeter is established to prevent anyone from entering except those who have a specific function to perform.

7. A media staging area is identified beyond the outer perimeter and that it is appropriately staffed.

8. A command post is established when it appears that an extended on-site investigation will be necessary.

9. An officer is appointed to serve as a "recorder," with responsibility for making a chronological record of activities at the scene, to include persons present and those who have been at the scene and actions taken by law enforcement or other official personnel.

10. Photographs are taken as soon as possible of the involved officer(s) as they appear at the scene, to include any injuries sustained.

---

[3] For the purposes of this document, the term subject is used to describe any individual who has contact with law enforcement officers and may include criminal suspects.

[4] Note that the term "office of professional standards" is used in this document to indicate the designated employee(s) or unit, which may be external to the agency, with primary responsibility for addressing internal matters within the agency. This may also be known as internal affairs or professional responsibility.

11. Involved officer(s) are directed not to discuss any aspects of the shooting among themselves or with others, with the exception of their attorney, a qualified mental health professional, or authorized investigative personnel.

12. Involved officer(s) are separated and removed from the immediate scene and assigned a companion officer to ensure the physical needs of the involved officer(s) are met and that no statements regarding the incident are made.

13. All potential witnesses are identified and separated and asked to remain on hand to provide a statement. If witnesses wish to leave and there is no legal obligation to detain them, officers should obtain their contact information for future communications.

14. If equipment is available, video recordings are made of the entire incident scene and those present, including witnesses and bystanders.

15. Determinations are made whether video recordings were made by in-car cameras; body-worn cameras; electronic control weapons; and agency, business or private surveillance cameras and that they have been secured as evidence as soon as reasonably possible.

16. Available information is collected about the subject and law enforcement actions from witnesses at the scene.

17. Any clothing or other personal items that may have been discarded or removed from subjects or involved officer(s) by medical personnel are located and secured as evidence.

18. The involved officer(s) weapon(s) is located and secured—or secured in place—and expended ammunition casings are marked.

19. The firearms and other weapons of involved officer(s) are physically checked for evidence of a discharge.[5] Weapons that were fired shall be secured as evidence, and primary service firearms shall be replaced by a similar firearm as soon as reasonably possible.

20. Where applicable, weapons, ammunition, and expended cartridges used by the subject are located and secured in place.

21. The position(s) of the involved officer(s) and the subject at the time of the shooting are determined and marked.

22. All expended bullets are accounted for. This may include examining walls or other structures and determining if there are any additional victims who may require medical treatment.

23. If an involved officer is transported to the hospital, someone, such as a companion officer or peer support personnel, accompanies or meets them there.[6]

24. If the involved officer is incapable of calling, another agency member notifies the involved officer's immediate family as soon as possible and in person, when reasonably possible. The notification should provide the family members with basic information on the status of the involved officer and when and where they will be able to see the officer.[7]

---

[5] See the IACP Policy Center documents on Firearm Recovery available at https://www.theiacp.org/resources/policy-center-resource/firearm-recovery.

[6] See the IACP Policy Center document on Line-of-Duty Deaths available at https://www.theiacp.org/resources/policy-center-resource/line-of-duty-deaths and Line-of-Duty Serious Injury available at https://www.theiacp.org/resources/policy-center-resource/line-of-duty-serious-injury.

[7] See the IACP Policy Center documents on Death Notification available at https://www.theiacp.org/resources/policy-center-resource/death-notification and Line-of-Duty Deaths available at https://www.theiacp.org/resources/policy-center-resource/line-of-duty-deaths.

## B. Lead Investigator Responsibilities

Whenever possible, the lead investigator shall do the following:

1. Receive a briefing from the IC.
2. Confirm that the public safety statement has been collected.
3. Confirm that all items of potential evidentiary value are identified and properly collected.
4. Obtain audio- and/or video-recorded preliminary statements from subjects and witnesses.
5. Canvas the immediate area for potential witnesses who have not come forth and obtain information or statements as available.
6. Obtain search warrants for any vehicles, containers, homes, or vehicles as may be necessary.
7. Where possible, audio- or video-record interviews with emergency medical personnel, fire department personnel, and first responding officers regarding conditions at the incident scene when they arrived to include any action that may have been taken to move or otherwise alter persons or objects of potential evidentiary value.
8. Collect information regarding the subject, where appropriate, to include
   a. information provided by the reporting party;
   b. involved officer observations of the subject's behavior in the course of the interaction;
   c. whether others indicated that the subject had been consuming alcohol, using drugs, or both;
   d. whether the subject had been involved with law enforcement on prior occasions;
   e. the subject's proximity to weapons and whether or not the subject was threatening to use them; and
   f. whether the subject was visibly injured in any way when law enforcement arrived and what, if any injuries were sustained during the interaction with officers.
9. Gather information regarding the response to the call, to include, where applicable,
   a. the number of involved officer(s) present;
   b. the relative age, size, strength, and physical ability of the involved officer(s) compared to the subject(s) involved;
   c. experience and training of the involved officer(s);
   d. force options available to the involved officer(s);
   e. basis for subject contact, to include seriousness of offense, if any;
   f. potential for injury to the public, involved officer(s), or subject(s);
   g. risk of escape of the subject;
   h. degree and length of time of subject resistance;
   i. means used to control or restrain subject;
   j. legal basis for use of force or custody;
   k. the behaviors and reactions of the subject once detained or in custody;
   l. whether emergency medical services was called and, if so, at what point;
   m. If the subject was seriously injured or admitted to a medical facility:
      i. What were the nature and severity of the injuries?
      ii. Were the injuries consistent with the incident as described by the involved officer(s)?

10. In the event of death, consult with the coroner or medical examiner at the scene and at, or subsequent to, the autopsy.

11. Prepare a summary report regarding the nature of the officer-involved shooting and include the involved officers' use-of-force reports, where applicable, for submission to the chief executive officer.

## C. Administrative Investigation

The goal of the administrative investigation is to determine whether violations of agency policy, procedures, rules, or training occurred and, if so, whether disciplinary action should be recommended or modifications to policy, procedures, or training considered.[8]

1. Criminal investigators shall not be present during administrative questioning, and any information gained as a result of administrative interviews cannot be shared with criminal investigators.

2. All interviews should be audio- and preferably video-recorded.

3. Investigators shall be trained in and take into account symptoms of post-traumatic stress during involved officer interviews, such as time and space distortions, confusion, and hearing and visual distortions associated with recalling details of the incident, as well as emotional impairment during questioning.

4. As appropriate, involved officers who discharged their weapons or used deadly force should be placed on mandatory leave with pay or on administrative assignment.

## D. Training

All officers should receive initial and regular training regarding:

1. Agency policy and applicable laws regarding the investigation of officer-involved shootings;

2. Potential negative emotional, psychological, and physical reactions following officer- involved shootings and related available resources; and

3. What to expect following an officer-involved shooting.

---

[8] See the IACP Policy Center Document on Investigation of Allegations of Employee Misconduct available at
https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their legal advisor before implementing any policy.

© Copyright 2023. Agencies are encouraged to use this document to establish a policy customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

# Concepts & Issues

Updated: April 2019

# Investigation of Officer-Involved Shootings and Other Serious Incidents

## I. INTRODUCTION

### A. Purpose of Document

This paper was designed to accompany the *Model Policy on Investigation of Officer-Involved Shootings and Other Serious Incidents* established by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model policy to the requirements and circumstances of their communities and their law enforcement agencies.

This document focuses on officer-involved shootings. However, many of the guidelines discussed are also applicable to the investigation of other serious incidents, defined herein as any use of deadly force, regardless of whether the employee's actions resulted in injury or death; any death or serious injury resulting from, or that occurs during the course of an agency operation; pursuits resulting in serious injury or death; employee-involved collisions resulting in death or serious injury; and matters of an unusually serious nature involving agency employees, to include large-scale event response.

### B. Background

All officers—not just those responsible for investigation—should have an understanding of the steps that must be taken in response to an officer-involved shooting. The initial response of the involved officer(s) at the scene and the steps taken thereafter by first responders and supervisory and investigative personnel often determine whether an accurate and complete investigation is conducted.[1] The accuracy and professionalism of officer-involved shooting investigations can have a significant impact on involved officers, their respective agencies, community-law enforcement relations, and public perceptions of law enforcement.

---

[1] Involved officers are those sworn officers in on-duty or off-duty status who are involved in an officer-involved shooting or are direct witnesses to such an event.

Investigations of officer-involved shootings should be designed to accomplish several important goals. First, it must be determined whether involved officers, in the course of their duties, took measures that were objectively reasonable under the circumstances of the incident. Second, the investigation must be capable of determining whether involved officers acted in accordance with agency policy, procedures, rules, and training. Results of the foregoing investigations have a direct bearing on possible criminal charges or administrative discipline and liability that may attach to the involved officers, the agency, or both. Third, the agency should take timely measures to ensure that factual information about the officer-involved shooting is readily available for public dissemination. Agencies are advised to incorporate both traditional and social media options for ensuring that community members and the public at-large are properly and promptly informed about the accurate facts regarding officer-involved shootings.

From a broader standpoint, findings from these investigations have a direct bearing on risk management within agencies and on public perceptions of law enforcement performance. Information gathered on the circumstances surrounding officer- involved shootings is essential in identifying patterns, trends, and contributing causes that can lead to changes in agency practices, procedures, tactics, training, and equipment. In addition, organizational transparency should be developed as an agency priority in order to ensure that the public remains effectively informed of the results, findings, and recommendations of these sensitive investigations.

Accurate, complete investigation of officer-involved shootings requires agency planning and the establishment of guidelines and protocols that must be followed. It also depends largely upon the prudence of decisions made and steps taken immediately following the incident by the involved officer(s), supervisory personnel, criminal investigators, professional standards personnel, and other concerned investigative bodies.[2] Many agencies, because of their limited resources and expertise in these types of investigations, rely all or in part on another law enforcement authority with appropriate jurisdiction for assistance. Some agencies also run investigations in cooperation with the local prosecutor's office. However, most of the burden for evidence preservation and protection of the incident scene is the responsibility of involved officers and first responders, as well as the incident commander (IC) and lead investigator. Therefore, it is essential that all officers have an understanding of the significance and importance of taking appropriate initial actions and measures that will prove essential as the investigation unfolds.[3]

## C. Physical and Emotional Reactions

Involved officers may experience some form of emotional and physical disorientation following an officer-involved shooting. These reactions may vary according to many factors including the officer's perceived vulnerability during the incident, the amount of control they had over the situation, and their ability to react effectively.

A complete discussion of the symptoms and effects of post-traumatic stress or operational stress injuries is beyond the scope and purpose of this paper.[4] However, for the purpose of the present discussion, it may be sufficient to recognize that such emotional and psychological phenomena are relatively common. As such, officers should be aware of these possibilities and recognize that they are natural responses to traumatic and unusual events.

---

[2] Note that the term "office of professional standards" is used in this document to indicate the designated employee(s) or unit, which may be ex- ternal to the agency, with primary responsibility for monitoring adherence of employees to agency policy, procedures, and rules and for conducting investigations of employee misconduct allegations. This may also be known as internal affairs or professional responsibility.

[3] For an in-depth review and comprehensive summary of several officer-involved shooting deaths, please see *Deaths of Anthony William Young; Shaun Basil Kumeroa; Edward Wayne Logan; Laval Donovan Zimmer; and Troy Martin Foster*, inquest (Brisbane) COR 2013/2988; 2014/3598; 2014/4321; 2014/4239; 2014/4357 (20 October 2017).

[4] See the IACP Policy Center documents on Critical Incident Stress Management available at https://www.theiacp.org/resources/policy-center-resource/critical-incident-stress-management.

A variety of traumatic reactions caused by an officer-involved shooting may interfere with an involved officer's ability to react effectively and appropriately. For example, an officer involved in an officer-involved shooting may experience perceptual distortions of various types. Some may experience time distortion in which events appear to occur in slow motion. For others, time may seem to accelerate. Auditory distortions are also possible. For most, sound diminishes, and gunshots, shouts, or other sounds may be muffled or unheard. An officer involved in a shooting might not hear all the shots being fired and would not be able to relate this type of information accurately if questioned at a later date. Involved officers should be aware of the possibility that their recall is impaired in one or more of these ways and investigative officers should keep these and related factors in mind when conducting interviews. Involved officers may simply be unable to provide accurate information concerning the officer-involved shooting.

## II.    PROCEDURES

## A. Initial Response

*Safety and Welfare.* The safety and well-being of the involved officer(s) and any bystanders are the first priority. Where applicable, involved officers should ensure that any threat from the subject has been eliminated.[5] This includes, but is not limited to, disarming, handcuffing, or otherwise securing the subject. An involved officer should never assume that because a subject has been shot or appears to be otherwise incapacitated the subject is unable to take aggressive action.

All subjects should be handcuffed according to agency policy unless emergency life-saving activities being employed at the time would be hindered by these actions or if the individual is obviously deceased. If not secured during the application of emergency first aid, an armed officer not directly involved in the initial incident should be present at all times to oversee security of the subject and the safety of emergency service providers. All firearms or other weapons in the vicinity of the subject should be properly secured, particularly if part of the incident scene, or confiscated, if possible.[6] Dropped or discarded firearms should be left in place only when they cannot be accessed by subjects or any third parties who may be in the immediate area.

Once the scene is made safe, involved officers and other first responders should render first aid where necessary, as consistent with their training. If not already summoned, emergency medical personnel should be requested as a matter of routine even when there are no immediate indications that injuries have been sustained. The adrenaline rush of officer- involved shootings often masks injuries. It can also create a severe elevation in blood pressure, pulse rate, respiration, and body temperature, which individually or collectively can prove dangerous to even healthy and physically fit individuals. All of these factors should be monitored as a matter of routine following any officer-involved shooting.

If an involved officer has been injured, a companion officer or peer support personnel should accompany them to the hospital and remain until relieved.[7] Agencies may wish to transport involved officers to an emergency care facility where they can be checked for injuries and monitored for any delayed physical or emotional reactions to the incident that demands medical attention. The involved officer's family should be notified as soon as possible and provided with basic information on the officer's status and when and where they will be able to see them. If the involved officer is unable to make this notification himself or herself, another agency member should follow agency policy regarding notification of the officer's designated emergency contacts or next of kin as soon as possible and in person, when reasonably possible.

---

[5] For the purposes of this document, the term subject is used to describe any individual who has contact with law enforcement officers and may include criminal suspects.

[6] See the IACP Policy Center documents on Firearm Recovery available at https://www.theiacp.org/resources/policy-center-resource/firearm-recovery.

[7] See the IACP Policy Center documents on Line-of-Duty Deaths available at https://www.theiacp.org/resources/policy-center-resource/line-of-duty-deaths.

*Apprehension of Subjects.* Where applicable, the agency's communication personnel should be provided with information on any subjects or suspicious persons who may have left the area, to include their physical description, mode and direction of travel, and whether they are armed. If appropriate, the description should be provided to other local or regional law enforcement agencies.

*Protection of the Incident Scene.* Following the incident, involved officers should focus their attention on their surroundings and take note of important facts such as lighting conditions, persons present, those who may have departed the scene, witnesses or potential witnesses, possible subjects or accomplices, and suspicious vehicles. As time and physical and psychological conditions may permit, the involved officer(s) should protect the immediate scene from incursion by bystanders and others, note and secure anything of evidentiary value, and request any eyewitnesses to remain present for a brief statement.

In some cases, emergency medical personnel and/or firefighters may be on hand prior to the arrival of backup law enforcement personnel. Officers at the scene should make note of this with the understanding that these personnel could unknowingly move, misplace, or even inadvertently destroy evidence in the course of performing their duties, or may note important information relevant to the incident.

*Identification of Witnesses.* Once witnesses have been identified, they should be separated so that their statements can be obtained without the potential influence of opinions and observations gleaned from others. The names, addresses, and phone numbers of witnesses and other persons in the general vicinity of the shooting should be recorded. Any witnesses or potential witnesses who have been identified should be asked to remain on hand until a statement has been taken. However, if witnesses wish to leave, they should be allowed to, unless a legal obligation to detain them exists.

*Officer Interviews.* If involved officers are physically capable, they should provide a brief public safety statement at the scene as soon as reasonably possible. The purpose of this statement is to establish the level and type of threat that may still exist, aid the initial operational response to locate subjects, and focus the investigation. This statement may be supplemented by information from other first responders who may be able to provide additional critical information.

The brief public safety statement should be limited to the following, where appropriate:

- Type of force and weapons used
- Direction and approximate number of shots fired by involved officer(s) and subjects
- Location of injured persons
- Descriptions of at-large subjects and their mode and direction of travel, time elapsed since they fled and weapons that were available to them
- Descriptions and locations of any known victims or witnesses
- Description and location of any known evidence
- Information that would help ensure officer and public safety and assist in the apprehension of subjects

There may be legal or contractual limitations on questions that may be asked of involved officers. These factors must be incorporated into the types of questions being asked. It should be noted that some jurisdictions have policies or protocols in effect that preclude law enforcement personnel involved in an officer-involved shooting from talking with investigators for a fixed period of time. These prohibitions may be the result of national or regional guidelines, legislation, or collective bargaining or other agreements. Investigative personnel should be cognizant of these criteria. In addition, it may be appropriate to inform the agency's public information officer (PIO) so that this can be clarified publicly if questions related to the delayed questioning of law enforcement personnel arise.

## B. Interactions with Involved Officers

All personnel should be aware that involved officers may be experiencing post-incident psychological, emotional, and physical reactions. If this is the case, they should be handled in a manner consistent with agency policy and

professional practice.[8] For example, the involved officer(s) should be moved away from the immediate scene and a companion officer should be assigned. The companion officer should not elicit statements or entertain conversation about specifics of the incident—but rather should provide whatever company and comfort to the involved officer as is necessary and appropriate.

Involved officers should be instructed not to talk about the incident to persons other than their attorneys, mental health providers, or authorized investigators. However, involved officers might nonetheless discuss the incident with their loved ones. In these situations, officers should be cautioned against providing specific details or confidential information regarding the incident to friends or family members, as these communications may become part of future legal proceedings. In addition, involved officers should be prohibited from posting about the incident on social media.

## C. Documentation and Evidence Collection

The overall scene should be diagrammed, indicating the location and relative distances between key points and items of evidence. The positions of involved officers and any subjects at the time of the officer-involved shooting should be determined and marked. Then, photographs and, where possible, a video recording should be made of the overall scene and all pieces of evidence.

If possible, it is also a good practice to video record and/or photograph, in a general manner, any bystanders or onlookers who may be at the scene. Some of these individuals may be witnesses to the incident but may disperse before their identities can be determined. Some may fail to come forward as witnesses, fail to provide information if questioned, or provide false identification. A visual image may assist investigators at a later time in identifying and locating these individuals, if necessary.

If the involved officer is still at the scene of the incident and it is reasonably possible to do so, it is highly advisable to take photographs of their physical appearance and any wounds or injuries that were sustained. Should this not be possible at the scene, such photographs should be taken later with consent of the officer and in consultation with hospital staff, where applicable.

Voice transmissions are also potentially important pieces of information or evidence. Arrangements should be made to identify and interview the communications personnel who handled the incident and to secure and review all recorded voice and data transmissions surrounding the incident, to include the logs of mobile data terminals where employed. Video recordings, audio recordings, or both may also be available through devices mounted in patrol vehicles and on electronic control weapons, body-worn cameras, and commercial or governmental surveillance cameras.

In addition to collecting the video and other electronic evidence, a canvass by investigators may also determine if other business or private video or photographs of the actions leading up to, during, or following the incident are available. All efforts should be made to procure this evidence voluntarily from these individuals.[9] If these individuals decline to cooperate, the investigator involved should contact the local prosecutor for further assistance. All related videos and photos available via social or traditional media should also be reviewed for prospective evidentiary value and to determine the validity of this potential evidence. The agency's PIO should request that all such material be presented to the law enforcement agency or investigative authority involved as soon as possible.

In obtaining statements during the course of the investigation, investigators should not overlook information and observations made by emergency service personnel, such as paramedics and firefighters, and other first responders at the scene. Their initial impressions concerning the circumstances of the incident upon their arrival, what was said by those involved, actions taken at the scene, and other matters can be of great value to the investigation.

---

[8] See the IACP Policy Center documents on Critical Incident Stress Management available at https://www.theiacp.org/resources/policy-center-resource/critical-incident-stress-management.

[9] See the IACP Public Recording of Police project at https://www.theiacp.org/prop.

Interviews should be conducted with each involved officer, irrespective of statements made previously at the scene. These interviews should be conducted in a private location away from the sight and hearing of other agency members and persons who do not have a need and a right to the information solicited from the officers. All interviews should be recorded to ensure the existence of an accurate record. In addition, each involved officer should prepare a written report on the incident that should be attached to the final report. Agencies may elect not to conduct group interviews since group dynamics may negatively influence individual recall and judgment. Individual involved officers may also be disinclined to offer views and opinions that differ from the majority of the officers present.

At some point following the incident, whether at the hospital or another facility, involved officers should be tested to determine if alcohol or drugs are in their system, as authorized by state law and contractual agreement. This information will be essential to defend against any future allegations that the involved officers were impaired when the officer-involved shooting took place.

***Procedures Specific to Officer-Involved Shootings.*** Following an officer-involved shooting, the involved officer's firearm should be secured safely until it can be examined by investigators or other designated law enforcement personnel and the officer should be provided with another firearm that they are qualified to use. The firearm should not be removed if it is holstered, nor should it be reloaded or tampered with in any other manner. In some instances, the involved officer's or subject's firearm may have been dropped at the scene. In such cases, it should be left in place if this can be done safely. If safety precludes this, the location and position of the firearm should be marked, and it should be secured in a holster or in another acceptable manner. However, the preferred procedure is that weapons, expended cartridge casings, bullets, speed loaders, magazines, and related items be left in place undisturbed until the arrival of the appropriate investigative personnel. At an appropriate juncture, the serial number, make, model, and caliber of all officer and subject weapons used at the scene should be recorded. Weapons, expended bullets, and cartridge casings should be marked, photographed in place, and eventually collected as evidence for forensic examination.[10] All expended bullets should be accounted for as part of the evidence collection process. This may include examining walls or other structures and determining if there are any additional victims who may require medical treatment.

The primary and backup firearms of the involved officer and any officers who may have been at the scene during the incident should be inspected to determine if they were fired. In so doing, an agency may be able to respond more accurately to potential allegations or concerns about additional shots fired by law enforcement personnel. The results of this inspection should be documented within the preliminary report detailing the circumstances of the event.

Involved officer and subject clothing should be preserved, as it can often provide useful information. In officer-involved shooting investigations, this may include the proximity of the involved officer(s); the position of the subject's arms (either up or down); the distance and trajectory of shots that were fired; or entrance and exit points. Examination of the clothing can help prove or refute charges that the involved officer fired shots while the subject was handcuffed, lying on the ground, standing with hands and arms raised, or when the subject was not a threat to the involved officer. Therefore, investigators should ensure that arrangements have been made to secure this clothing before it is discarded by emergency service workers, hospital personnel, or others.

## D. Incident Commander (IC) Responsibilities

***Incident Assessment and Establishing Command.*** An incident command system is appropriate for use in an officer-involved shooting where many tasks need to be performed concurrently and cooperatively.[11] The IC's role is to assign, where necessary, individual responsibility for the implementation of standard incident response protocols.

---

[10] See the IACP Policy Center documents on Firearm Recovery available at https://www.theiacp.org/resources/policy-center-resource/firearm-recovery.

[11] See the IACP Policy Center document on Incident Command available at https://www.theiacp.org/resources/policy-center-resource/incident-command.

The IC's first responsibility is to ensure that the safety, security, and welfare of involved officers and others at the scene has been adequately addressed. The potential threat from assailants or unruly and uncooperative individuals should be addressed first, and any subjects at the scene should be detained or arrested, as appropriate. Emergency medical personnel should be summoned if not previously requested. The IC should ensure that emergency medical personnel conduct a medical screening, even if preliminary, of the involved officers. Particular attention should be paid to symptoms of physiological stress, such as elevated blood pressure and heart rate and tinnitus or other hearing-related conditions.

The IC should take measures to secure the incident scene and maintain its integrity until investigators arrive. As personnel arrive and assignments are made, the perimeter should be secured, and all nonessential personnel should be precluded from entering the incident scene. Any items of potential evidentiary value should be protected. If emergency, fire, or medical personnel need to move persons or items in order to provide medical assistance, their original position and

condition should be noted. Official photographs or video recordings of the scene should be taken as soon as possible to assist in evidence preservation.

The IC should then focus attention on any other tasks not previously completed. That is, there may still be a need to broadcast lookouts for subjects; request backup and related support services; identify persons who may have been at or within close proximity to the scene of the incident; and identify witnesses and request their cooperation.

The IC should determine, based on the particular circumstances at the scene, the need for specific actions and make assignments of responsibility for their completion. These tasks may include, but are not limited to, the following:

- Locating and securing in place the involved officers' weapon(s) and expended casings
- Locating and securing in place weapons used by subjects
- Securing any clothing that may have been removed from subjects or involved officers by emergency medical personnel
- Marking the location(s) of all involved officers and subjects at the scene

*Notifications.* In addition to the request for backup and specialized assistance previously mentioned, other necessary personnel in the agency should be contacted depending upon the seriousness of the incident and the requirements of agency policy. Such notifications may include the agency's chief executive, patrol commander, lead investigator, specialized investigative teams, professional standards personnel, evidence technicians, PIO, coroner or medical examiner, legal advisor, chaplain, law enforcement advocate, qualified mental health professional, and/or peer support coordinator.

*Command Post.* It may also be necessary and prudent to establish a command post in the immediate vicinity of the incident in order to better coordinate the personnel involved in the investigation and when an extended period of time will be required to complete on-scene investigative activities. In these circumstances, it is also a good idea to appoint one officer to make a detailed record of events and relevant information involving the officer-involved shooting. The duties of this officer will be to document the event and establish a chronological record of the activities at the scene. This record should include, but need not be limited to, the identities of all persons present and those who entered the incident scene; actions taken by law enforcement personnel; evidence processed; and any other matters of significance.

It may also be necessary to establish a staging area in situations that are likely to attract crowds and significant media attention. Law enforcement officer-involved shootings invariably draw sizeable contingents of media representatives. If the agency has a PIO, this individual may be used to coordinate with media representatives and provide them with information as available and appropriate. Should a PIO not be employed or readily available, the IC should appoint an officer at the scene to liaise with these individuals and provide them with the basic details of the incident as they become available and as they are appropriate for release. Caution should be exercised in the release of

any information at the scene prior to a more complete investigation of the incident.[12] In addition, the deployment of law enforcement community relations, community policing, or community affairs personnel to the scene may prove beneficial.

## E. Lead Investigator's Responsibilities

After being briefed by the IC, the lead investigator should assume responsibility of the scene. Supervisory officers and other law enforcement personnel at the scene should, from that point on, endeavor to fully cooperate and assist the identified investigative team. The lead investigator should determine the degree to which the foregoing on-scene tasks have been completed and, where deficiencies exist, ensure that these tasks are fully undertaken.

Investigators should ensure that all essential details of the incident have been or are being documented. These include, where applicable:

- the nature of the call to which the officer was responding;
- the time it was received, dispatched, and time of arrival;
- the number of officers present;
- the general circumstances in which subjects were encountered;
- the identity of the subject;
- potential for injury to the public, involved officer(s), and subject(s);
- the time of day of the incident;
- the weather and lighting conditions;
- the full identity and assignment of involved officers;
- the identities of all persons with access to the scene;
- the time of dispatch and arrival of any backup officers;
- whether the involved officers were in uniform or, if in plainclothes, whether they were identifiable as law enforcement officers at the time of the incident; and
- the types of vehicles used by involved officers and subjects, if appropriate.

If force was used by involved officers or the subject is taken into custody, the following information should be documented:

- the relative age, size, strength, and physical prowess of the involved officer(s) compared to the subject(s);
- experience and training of the involved officer(s);
- force options available to the involved officer(s);
- degree and length of time of subject resistance;
- means used to control or restrain the subject;
- legal basis for use of force or custody;
- the behaviors and reactions of the subject (e.g., did the subject become calm or continue to struggle and act physically and verbally combative);
- whether emergency medical services was called and, if so, at what point; and
- if the subject was seriously injured or admitted to a medical facility, what were the nature and severity of the injuries and were the injuries consistent with the incident as described by involved officers?

---

[12] For a detailed discussion of information that may and may not be released at the scene of these and other incidents, see the Policy Center documents on Police-Media Relations available at https://www.theiacp.org/resources/policy-center-resource/police-media-relations.

If the subject is arrested or otherwise in law enforcement custody, officers should note where and how the subject was situated (e.g., placed facedown on the ground, in a seated position, in a law enforcement vehicle sitting or lying down) and whether the subject's condition (such as breathing and consciousness) was monitored after arrest. If the subject became unresponsive, agencies should document who was present at the time, and what steps were taken by the involved officer(s).[13]

In addition, information should be gathered regarding the subject, where appropriate, to include

- information provided by the reporting party;
- involved officer observations of the subject's behavior in the course of the interaction;
- whether others indicated that the subject had been drinking heavily, using drugs, or both;
- whether the subject had been involved with law enforcement on prior occasions;
- subject's proximity to weapons and whether or not the subject was threatening to use them; and
- whether the subject was visibly injured in any way when law enforcement arrived and what, if any, injuries were sustained during the interaction with officers.

When interviewing witnesses, investigators should be aware of the fragile nature of perception and memory. This is particularly the case if eyewitnesses have had time to confer with one another about what they saw or believed they saw. Investigators should focus on gathering, verifying, and corroborating eyewitness statements. They should never share their opinions or divulge investigative information in an effort to elicit information or statements from witnesses.

While law enforcement officers are trained to be exacting in both observation and descriptions, they also are not immune to these same problems of perception. In addition, involved officer judgments and perceptions can be influenced by heightened levels of fear or anxiety when operating in dangerous environments as well as the psychological trauma of the actual incident.

With these issues in mind at the scene of an officer-involved shooting, investigative officers should ensure that all pertinent evidence has been or is in the process of being collected. When time permits, investigators may follow up on leads and additional points of contact. For example, all pertinent subject information should be obtained, such as a complete description and any prior criminal records to include parole or probation history. Search warrants for residences, other buildings, and any vehicles involved in the incident should be obtained, and searches conducted where appropriate in a timely manner.

If someone has died, it is particularly important to work closely with the coroner or medical examiner's office, including attending the autopsies. Among issues of importance for officer-involved shooting investigations may include those related to the determination of entrance and exit wounds, estimates of shooters' positions, and the presence of any controlled substances in the decedent's blood.[14]

The lead investigator should brief the agency chief executive as soon as practical once preliminary results of the investigation have been established.[15] Following this, with approval of the chief executive or their designee, a staff memorandum should be prepared that provides the general facts of the incident. This memorandum should be posted or

---

[13] See the IACP Policy Center documents on Excited Delirium available at https://www.theiacp.org/resources/policy-center-resource/excited-delirium.

[14] The importance of employing experienced officers who are completely familiar with shooting investigations cannot be overemphasized. For example, research has demonstrated that normal delays in the reaction time of officers in hostile shooting encounters often explain unusual bullet entrance and exit wounds of subjects and others, to include seemingly unexplained and suspicious shots to the subject's or victim's back. The entrance wounds of bullets do not always provide a full explanation of the circumstances surrounding the shooting event. Only highly trained and experienced investigators can decipher the full range of potential evidence involved in a complex shooting investigation.

[15] For a discussion of procedures to be used in the event that criminal or administrative charges are brought against an officer in the course of a shooting or other investigation, see IACP Policy Center documents on Investigation of Allegations of Employee Misconduct available at https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

distributed to all personnel as soon as possible following the shooting. By doing so, staff rumors can be kept to a minimum and concerns over unknown circumstances of the event can be resolved before speculation supplants fact.

In addition, in order to counter misleading or false information about the incident that may be conveyed via social or traditional media mechanisms, the PIO should be provided with timely and relevant information about the incident that can be released, ensuring that this information does not compromise the ongoing investigation.

An additional briefing of the prosecutor's office should be conducted in a timely manner following the officer-involved shooting. In some cases, a member of the prosecutor's office will respond to an officer-involved shooting as a matter of established protocol. Nonetheless, the law enforcement agency should make a preliminary statement of facts as soon as possible to the prosecutor's office and work with them closely throughout the investigation. This statement may then be released to the media with the approval of the agency chief executive or other designated personnel.

## F.  Administrative Investigation

Law enforcement agencies vary with regard to the unit assigned responsibility for the preliminary investigation of an officer-involved shooting. The options for the preliminary and the overall comprehensive investigations may involve the lead being taken by the agency directly concerned, by a regional law enforcement agency as part of a preexisting protocol or mutual agreement, or by another identified entity, for example the local or special prosecutor's office.

Depending on the seriousness of the incident, the circumstances involved, and the protocols of the specific agency, parallel administrative and criminal investigations of officer-involved shootings may be conducted. The goal of the administrative investigation is to determine whether violations of agency policy, procedures, rules, or training occurred and, if so, whether corrective action should be recommended or modifications to policy, procedures, or training should be considered.[16] However, there are several considerations when conducting these investigations. In the United States, criminal investigators may not be present during administrative questioning and any information gained as a result of administrative interviews must not be shared with criminal investigators. All interviews should be audio- and preferably video-recorded. In addition, investigators should be cognizant of symptoms of post-traumatic stress when conducting interviews with involved officers. These may include time and space distortions, confusion, auditory and visual distortions, and emotional impairment during questioning.

In officer-involved shooting situations, involved officers who discharged their weapons or used deadly force should be placed on mandatory leave with pay or on administrative assignment. This ensures that the agency's investigation into the incident can take place without interference. Placing involved officers on leave or administrative assignment also communicates to the public that the agency is responding to the incident appropriately. However, agencies should be prepared for the investigation to take an extended period of time, especially in cases where the administrative and criminal investigations are not conducted concurrently and should develop policies related to administrative leave with this in mind.

## G.  Force Review Board

Once an investigation is completed, some agencies elect to bring these findings in front of an ad hoc group of individuals for review. This group may comprise command level officers, supervisory personnel not involved in the investigation, and first responders. Some agencies may also choose to include external or public involvement. The scope and intent of these forums is to assess such incidents to determine whether they have any implications for the agency's training function, policies, and procedures. These forums are an effort to bring together all elements of an investigation in a risk management context to improve the agency's response to these critical incidents and to make any corrections in agency practice or procedure that will help avoid identified problems in the future.

---

[16] Ibid.

## H. Training

In order to encourage a cohesive response to the investigation of officer-involved shootings and other serious incidents, it is important that all officers receive initial and regular training on this topic. Officers should have a comprehensive understanding of agency policy and applicable laws regarding officer-involved shooting investigations. Training should also include an explanation of the potential negative effects on an officer's well-being during and following a shooting incident, including possible emotional, psychological, and physical reactions. Agencies should provide information on and bring awareness to related resources for officers to utilize if they are experiencing these adverse effects.[17] Officers should also be trained on what to expect after an officer-involved shooting, to include the procedures used during the interview process and potential legal restrictions that may exist regarding what information officers are allowed to discuss and with whom.

## III.     ADDITIONAL ITEMS FOR CONSIDERATION

There is no consensus on exactly how the following items should be addressed in law enforcement policy and procedures. However, agencies should consider these items and, in consultation with their legal advisor, determine how each will be addressed in policy prior to an officer-involved shooting occurring.

*Timing of Interviews*. Agencies may choose not to conduct in-depth interviews with officers immediately following their involvement in an officer-involved shooting. Interviews conducted after the involved officer has had the opportunity to regain their composure and after undergoing a thorough medical screening or evaluation, may be more productive. Furthermore, an officer's mental and physical wellness and memory consolidation processes may be dependent upon sufficient sleep, and thus allowing for the option of at least one sleep cycle prior to interviewing an involved officer is sometimes beneficial. However, investigators should be available if involved officers voluntarily choose to participate in an interview immediately following the officer-involved shooting. Additional guidance is available from the IACP Psychological Services Section.[18]

***Allowing Involved Officers to Watch Videos Prior to Writing Reports and/or Being Interviewed.*** In situations where video footage exists of the incident, such as that captured by body-worn, in-car, and/or surveillance cameras, agencies should consider whether officers should be allowed to view the videos prior to writing their reports and/or being interviewed.

An individual's ability to accurately process and recall details following an officer-involved shooting can be severely impacted by the stressful and traumatic nature of the incident. The information captured in the video may enhance the officer's recollection of the event.

However, memory is fallible and easily impressionable. An officer's recollection of the event may forever be changed by watching the video. In this instance, the officer's memories of the shooting may no longer be based solely on what the officer viewed, heard, or felt, but may be colored by what was captured by the video. In addition, an officer may, either consciously or subconsciously, change their story to more accurately reflect what is shown in the video footage, potentially undermining the legitimacy of the officer's statements.[19]

It is also worth noting that involved officers sometimes experience intense negative emotions resulting from viewing footage of an incident, and, therefore, agencies may wish to consider offering a companion officer, peer support, professional referrals, or other support resources to officers who may experience such a reaction.

---

[17] See the IACP Policy Center documents on Critical Incident Stress Management, Employee Mental Health Services, and Post-Shooting Personnel Support available at https://www.theiacp.org/policycenter.

[18] For more information, please see the *Officer-Involved Shooting Guidelines* found at https://www.theiacp.org/sites/default/files/all/p-r/Psych-OfficerInvolvedShooting.pdf.

[19] See Rebecca H. Grady, Brendon J. Butler, and Elizabeth F. Loftus, "What Should Happen After an Officer-Involved Shooting? Memory Concerns in Police Reporting Procedures," *Journal of Applied Research in Memory and Cognition* 5 (2016): 246–251.

No matter which option an agency elects to adopt in its policy, this information should be provided to the public to promote transparency of these investigations and enhance community trust.

***Release of Involved Officers' Names to the Public.*** In response to the increased media attention following an officer-involved shooting, agencies should consider in advance and include in policy when and how the names of the involved officer(s) should be released to the public. When making this decision, agencies should consider any threats that have been made and work to promote the safety of the officer and the officer's family prior to release of the name. In all situations, it is strongly suggested that the name not be released until after the officer has made their statement and the officer has been provided with an opportunity to notify the officer's family and others who may be directly affected. Once the decision has been made, the officer should be notified prior to the release of the officer's name.

Some agencies elect to release the names of involved officer(s) within a relatively short period of time, such as 24–48 hours after the incident, with the goal of increasing transparency to the public. However, other agencies choose to wait until the full investigation has been completed before releasing names. Either way, the agency should keep the public informed of its policy on the matter.

***Releasing Video to the Public.*** If video footage exists of the incident, agency policy and procedures should address when and if the video is released to the public. Agencies should consult their legal advisor when developing policy in this area to ensure that any decisions are consistent with applicable law and that release of the video will not interfere with any legal proceedings. In addition, the agency should consider community dynamics, to include the public's response to the shooting. However, in all cases, the video should not be released until the involved officer(s) have been notified of the intent to release and have been provided with an opportunity to view it.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their legal advisor before implementing any policy. This document is not intended to be a national standard.

© Copyright 2023. Agencies are encouraged to use this document to establish a policy customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

# Need to Know …

Updated: April 2019

# Investigation of Officer-Involved Shootings and Other Serious Incidents

*Officer-involved shootings often result in intense media coverage and public scrutiny. As a result, it is imperative that law enforcement agencies conduct a thorough and impartial investigation into these incidents.*

- The purpose of investigating officer-involved shootings is to determine whether the **actions of involved officers** conform to applicable law and agency rules, policies, procedures, and training.

- The procedures used in an officer-involved shooting investigation can also be applied to **other serious incidents**, such as vehicular pursuits and use of force that results in serious injury.

- Standard **incident response** protocols should be implemented in response to an officer-involved shooting, to include identification of an incident commander (IC) and establishment of a command post and inner and outer perimeters.

- A brief **public safety statement** should be taken from all officers involved in the shooting. The purpose of this statement is to obtain the information necessary to focus initial law enforcement response and direct the preliminary investigation.

- Systematic **documentation** of the scene and **evidence collection** conducted by trained personnel are crucial in officer-involved shooting investigations, which should include, but not be limited to, collecting any clothing or other items that may have been discarded or removed from subjects or officers and locating and securing any firearms and expended cartridges.

- Officers involved in a shooting may experience a variety of **traumatic reactions** that may interfere with their ability to react effectively and appropriately. All officers should receive training about potential negative psychological, emotional, and physical reactions to these traumatic situations, and investigators should be aware of the impact these reactions may have on the officers' ability to recall the incident.

- Prior to an officer-involved shooting occurring, law enforcement agencies should **consider and develop policies and procedures** related to timing of officer interviews; whether involved officers will be provided with an opportunity to watch videos of the incident prior to being interviewed; when and how the involved officers' names will be released to the public; and if and when any videos of the incident will be released to the public.

- Law enforcement agencies should strive to be **transparent** with the public regarding the procedures used to investigate officer-involved shootings. Each agency must balance the need to release timely information regarding the status of the investigation with the obligation to protect the integrity of the investigation.



**International Association of Chiefs of Police**
44 Canal Center Plaza, Suite 200
Alexandria, VA 22314
703.836.6767 | FAX 703.836.4743
**www.theIACP.org**



# Independent Investigations of Officer-Involved Shootings

Current Practices and Recommendations
from Law Enforcement Leaders in the United States and Canada



**MAJOR CITIES CHIEFS**



This project was supported, in whole or in part, by cooperative agreement number 2016-CKWX-K034 awarded by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the author(s) or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the date of this publication. Given that URLs and websites are in constant flux, neither the author(s) nor the COPS Office can vouch for their current validity.

Copyright © 2018 Major Cities Chiefs Association. The U.S. Department of Justice reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and authorize others to use, this resource for Federal Government purposes. This resource may be freely distributed and used for noncommercial and educational purposes only.

Recommended Citation:

Kuhns, Joseph B., Josie F. Cambareri, Shannon Messer, and Darrel Stephens. 2018. *Independent Investigation of Officer-Involved Shootings: Current Practices and Recommendations from Law Leaders in the United States and Canada*. Washington, DC: Major Cities Chiefs Association.

# Contents

Acknowledgments ..........................................................................................................................................................................................v

Executive Summary .................................................................................................................................................................................vii

Introduction .......................................................................................................................................................................................................1

Literature Review ..........................................................................................................................................................................................3

    President's Task Force recommendation for independent investigations .....................................................................3

    Preliminary review and search of MCCA agency policies ...............................................................................................7

Survey Results of MCCA Officer-Involved Shooting Practices .................................................................................... 13

    Current practices—External and internal involvement in OIS investigations ......................................................... 15

    Advantages and disadvantages of internal and external OIS investigations ......................................................... 17

    Informing the public and victims and families regarding OIS investigation status ........................................... 19

Summary of Roundtable Focus Group Discussions ............................................................................................................ 21

    Common barriers to effective OIS investigations .............................................................................................................. 21

    Various forms of external agency involvement in OIS investigations ....................................................................... 22

    Recommended training for OIS investigators ..................................................................................................................... 22

    Indicators of OIS investigative independence .................................................................................................................... 23

    Varying levels of independence in investigations .............................................................................................................. 24

    Indicators of OIS investigative transparency ....................................................................................................................... 26

    Which matters more to community members: Investigative independence or transparency? ................... 28

Conclusion...................................................................................................................................................29

References...................................................................................................................................................31

Appendix A.................................................................................................................................................35

Appendix B.................................................................................................................................................39

About the Authors.....................................................................................................................................43

About the Major Cities Chiefs Association.............................................................................................45

# Acknowledgments

We are indebted to the following law enforcement practitioners, leaders, and experts who contributed substantively to the development of this report by participating in a focus group meeting in August 2017 in Louisville, Kentucky:

- Randy Blankenbaker, Assistant Chief, Dallas (Texas) Police Department

- Sharon Burlingame, Commander, Mesa (Arizona) Police Department

- Steven A. Caballero, Captain, Milwaukee (Wisconsin) Police Department

- Matt Clark, Lieutenant, Denver (Colorado) Police Department

- Oliver Cunningham, Deputy Chief, Oakland (California) Police Department

- Bobby Dobbins, Assistant Chief, Houston (Texas) Police Department

- Jeffrey Estes, Deputy Chief, Charlotte-Mecklenburg (North Carolina) Police Department

- Russ Hamill, Assistant Chief, Montgomery County (Maryland) Police Department

- Kim Jacobs, Chief, Columbus (Ohio) Division of Police

- Mike John, Assistant Chief, Cincinnati (Ohio) Police Department

- James Kelly, Chief Inspector, Philadelphia Police Department

- Robert Lopez, Commander, Los Angeles Police Department

- John McMahon, Captain, Los Angeles Police Department

- Dale Mumby, Superintendent, Peel (Ontario) Regional Police Service

- Bryan Roach, Chief, Indianapolis (Indiana) Police Department

- Tom Roberts, Assistant Sheriff, Las Vegas (Nevada) Metro Police Department

- Mike Shearin, Deputy Chief, Memphis (Tennessee) Police Department

- Paul Spagnoli, Commander, San Jose (California) Police Department

- Melissa A. Staples, Chief, Chicago Police Department

- Mike Sullivan, Deputy Chief, Louisville Metro Police Department

- Richard W. Wiser, Lieutenant, Chicago Police Department

- Patricia Williams, Associate Director, Major Cities Chiefs Association

# Executive Summary

Officer-involved shootings (OIS) remain a challenging and often controversial aspect of the law enforcement process in the United States and elsewhere. The policies and practices associated with OIS investigations are critically important to law enforcement agencies, communities, offenders and victims, the broader criminal justice system, and other stakeholders. Unfortunately, there is currently a rather limited academic and practitioner literature that focuses on OIS investigations. Further, it is apparent that widespread variation exists in use of force policies and practices regarding how law enforcement conducts OIS investigations.

Following a series of controversial officer-involved shootings in the United States, then President Obama's Task Force on 21st Century Policing identified promising law enforcement practices and offered recommendations within six primary pillars. The six pillars focused on (1) building trust and legitimacy, (2) policy and oversight, (3) technology and social media, (4) community policing and crime reduction, (5) officer training and education, and (6) officer safety and wellness (President's Task Force on 21st Century Policing 2015, 1). The Policy and Oversight pillar included the following specific recommendation: "law enforcement agencies should have comprehensive policies on the use of force that include training, investigations, prosecutions, data collection, and information sharing. These policies must be clear, concise, and openly available for public inspection" (President's Task Force on 21st Century Policing 2015, 20). One aspect of this recommendation suggests that agencies' use of force policies should require "external and independent criminal investigations in cases of police use of force resulting in death, officer-involved shootings resulting in injury or death, or in-custody deaths" (President's Task Force on 21st Century Policing 2015, 21).

This study examines how large law enforcement agencies in the United States and in Canada are currently investigating OISs and assesses whether investigative independence and transparency are apparent. The study included four primary phases:

1.  A literature review on prior OIS investigation research and current practices in the academic and law enforcement practitioner literatures

2.  A snapshot assessment of OIS policies and accessibility among Major Cities Chiefs Association (MCCA) member websites

3.  An online survey of MCCA agencies that examined current OIS investigation policies and practices

4.  A focus group session with MCCA law enforcement leaders, academics, and practitioners to identify best practices and discuss recommendations for improving OIS investigations in the future

The following are some of the primary findings and recommendations from this project:

1.  There is clearly a need for a broader understanding of OIS investigations, policies, and practices in the law enforcement community. A broader academic and practitioner literature on this topic and more extensive cross-country comparisons of OIS investigative practices would be informative.

2.  Some of the large MCCA law enforcement agencies have already responded to the task force recommendations by updating their OIS policies and procedures and ensuring that the relevant documents are readily accessible to the community and easily retrieved from websites. A few MCCA agencies reported making these changes in direct response to the task force recommendations or because such changes were considered important to their communities and departments. This subsample of large law enforcement agencies may be more responsive to various forms of pressure (community members, politicians, media, etc.) to make investigative changes and increase transparency. However, some of the MCCA agencies have not made significant changes, so in many communities it would be difficult for community members, the media, and other interested parties to understand how local OIS investigations are conducted.

3.  Substantial variation exists in how large law enforcement agencies conduct OIS investigations. There are substantial differences in terms of who actually conducts the investigation, the role the involved agency has in the process, and the extent to which OIS investigations are independent and transparent. There are some best practice models (the Peel Regional Police Service in Canada, the Milwaukee County [Wisconsin] consortium, and others) that are worthy of more extensive review and replication.

4.  There are clear advantages and disadvantages with involving external agencies, partners, task forces, or others during OIS investigations. Ultimately, involving external investigators who are not representatives of or affiliated with the involved agency makes sense with respect to ensuring independence; however, investigator experience and expertise are sometimes compromised. Many MCCA law enforcement leaders agreed that investigative independence was an important goal. A few participants argued that independence was not particularly important, but the majority recognized that investigative independence includes both substantial costs and offers clear benefits.

5.  There are certainly advantages to improving transparency during OIS investigations, although not at the expense of the overall integrity of the investigation. Some states have passed laws to ensure increased transparency, and some law enforcement agencies have expanded transparency on their own. Other states have passed laws that seemingly limit investigative transparency—through restrictions on the release of body camera footage as one example. Most of the MCCA law enforcement leaders agreed that transparency is critically important and can substantially contribute to improving community relationships in the future. Ultimately, most of the MCCA law enforcement leaders agreed that increased transparency was more important to the investigation, to their communities, and to their organizations than OIS investigative independence. A series of recommendations for ensuring OIS investigative independence and improving transparency is included in this report.

# Introduction

Officer-involved shootings (OIS) can be and often are emotional and controversial events for law enforcement officers (Klinger 2010), victims, and communities. Recent OIS events in the United States have generated considerable discussion regarding the training of officers, use of force policies, and the internal and criminal investigations of these incidents (Oettmeier and Bratton 2017). Despite the recent attention, when considering all contacts between police and community members, officers use force or threats of force, in less than two percent of officer-civilian encounters (Hickman, Piquero, and Garner 2008). Police-community interactions where officers employ deadly force are even rarer when considered within the broader context of the extent of police-community member contacts.  Recent reports show police having contact with one in four U.S. adults annually and making more than 11 million arrests each year (BJS 2011; FBI 2014; FBI 2015). Meanwhile, the *Washington Post* reports nearly a thousand fatal force incidents in 2015 and 2016 (991 and 963 deaths, respectively; it is also important to note that there are multiple databases that track officer-involved shootings, and each has strengths and weaknesses with respect to reliability and validity—see Zimring 2017). Despite the fact that OISs are fairly uncommon, every event should be investigated carefully and respectfully.

Law enforcement agencies, policymakers, and the public all have a stake in identifying opportunities to increase community trust and agency/officer legitimacy surrounding investigations of OIS incidents. Amid debates of modern-day policing practices, there is a growing demand for more neutral and unbiased reviews of OISs. As a result, OIS outcomes are often judged on the extent to which investigations are conducted independently from those officers and agencies that are directly involved (Savage 2013). This study examines how large law enforcement agencies in the United States and Canada currently investigate OISs and whether independence and increased transparency are apparent. These study findings provide a foundation for developing a set of best practices and recommendations for improving investigations of OISs in the future.

# Literature Review

## President's Task Force recommendation for independent investigations

In December 2014, weeks after a grand jury decided not to indict Darren Wilson for the shooting death of Michael Brown, then President Obama signed an executive order and formed an 11-member task force to identify key issues in law enforcement and to develop recommendations and solutions. The task force identified best practices and offered recommendations within the following six pillars: (1) building trust and legitimacy, (2) policy and oversight, (3) technology and social media, (4) community policing and crime reduction, (5) officer training and education, and (6) officer safety and wellness (President's Task Force on 21st Century Policing 2015, 1). The policy and oversight pillar included the following recommendation: "law enforcement agencies should have comprehensive policies on the use of force that include training, investigations, prosecutions, data collection, and information sharing. These policies must be clear, concise and openly available for public inspection" (President's Task Force on 21st Century Policing 2015, 20). One aspect of this recommendation is outlined in action item 2.2.2, which mandates that agencies' use of force policies should require "external and independent criminal investigations in cases of police use of force resulting in death, officer-involved shootings resulting in injury or death, or in-custody deaths" (President's Task Force on 21st Century Policing 2015, 21).

The International Association of Chiefs of Police (IACP) defines an officer-involved shooting as "a discharge of a service weapon by an officer during a hostile encounter or an accidental discharge, while on-duty or off-duty, irrespective of injuries to suspects, officers, or third parties" (IACP 2015). However, the manner in which agencies investigate OIS has become an important topic of conversation among law enforcement leaders, community members, and politicians. Moving toward an expectation of ensuring independent and external investigations can potentially improve perceived legitimacy and transparency of policing, particularly within racial and ethnic minority communities.

### Variations of independence

While several recent officer-involved shootings (Ferguson, Missouri; North Charleston, South Carolina; and Baltimore, Maryland, among others) preceded President Obama's executive order, controversy stemming from police-involved shootings has existed for decades (Donner et al. 2017; Nelson 2001; Geller and Toch 1996). Historically, after an officer has been involved in a shooting, a range of responders (which, depending on the agency, can include homicide and forensic investigators, commanders, public information officers, district attorneys, medical examiners, union representatives, etc.) arrive at the scene to begin investigating the incident. While investigative teams vary by department, these teams have traditionally included a combination of officers from within the involved agency, including officers from Internal Affairs, Homicide units, special investigatory units, and other entities (IACP 2016). Larger agencies tend to use homicide detectives or special investigative teams to conduct criminal investigations of OISs. Smaller agencies, often more limited by resources, may ask other local or state agencies to lead these investigations (Katz 2015). Even departments that have developed special task forces for OIS criminal investigations are subjected to frequent threats to independence (e.g., the inclusion of investigatory officers from the same agency as the officer(s) involved in the event; Hammonds et al. 2016). Investigations of OISs have always been subject to debate. But a more specific challenge to police organizations is emerging—when criminal liability of an officer is to be decided, it is the "independence element" (and thus, the justness and fairness) of investigations that is increasingly being scrutinized (Savage 2013, 95).

While the IACP guide to OISs (IACP 2016) does not offer specific strategies for implementing independent criminal investigations, it does discuss how to increase transparency during investigations, such as by releasing details of the incident and identifying the officer(s) involved (with some exceptions, such as undercover officers or where there may be threats to officers' safety) in a timely manner. In addition, after investigations are completed, some agencies conduct a formal review of the findings, which can include personnel not involved in the incident, specialists, the prosecutor's office, and community members. This post-incident approach welcomes objective and external assessments of investigation findings. While this process may represent a step in the direction of achieving independent criminal investigations, it does not represent the level of change that groups like the American Civil Liberties Union and National Association for the Advancement of Colored People have advocated for in recent testimony (President's Task Force on 21st Century Policing, 2015).

Initiating external criminal investigations of OISs will involve significant procedural changes for most departments. The task force proposes two methods to accomplish and promote independence. One method for achieving objectiveness and independence in investigations is to form a new investigative entity comprising actors from different jurisdictions and across varying levels of law enforcement. A second method is to transfer this process and power to an external agency, either a local agency outside the jurisdiction or at a different level (e.g., a state investigative agency). By relying on external law enforcement agencies or officers not directly employed by the agency under review, these recommendations promote independence, potentially without hindering the thoroughness and accuracy of investigations. However, especially in cases that occur in large police departments with dedicated and experienced homicide investigators, an external agency may very well lack the expertise, experience, access, and resources to investigate these incidents.

In a more philosophical analysis of police complaint review processes in the United Kingdom and Ireland, Savage (2013) differentiated three grades or degrees of independence: (1) impartiality, (2) distance/separateness, and (3) objectivity. These varying degrees of independence were related, often overlapping concepts, but were not mutually exclusive categories. Impartiality was the most frequently adopted interpretation of independence, and impartiality emphasized neutrality. Agencies that cited this method of achieving independence mostly stressed their impartiality in deciding which narrative (i.e., the one from the officer or the complainant) was the most supported by the evidence. Distance/separateness is less about neutrality between two opposing parties and more about being separated from one party in particular (the police). Distance/separateness suggests not being affiliated with or led by law enforcement during the investigations, as well as not being accountable to a law enforcement organization (Savage 2013). This would potentially exclude state agencies or larger agencies from conducting investigations for smaller departments. Finally, objectivity as a conception of independence is more focused on facts and seeking the truth. Even among agencies that have an external review system in place, independence may be interpreted and implemented in different ways, both philosophically and in practice. As articulated by Savage (2013), the concept of independence is complex, subjective, and therefore often inconsistent across different states and jurisdictions.

## Implications of independent OIS investigations

The thoroughness and accuracy of OIS investigations is critical in determining whether formal charges or other administrative processes will follow for the involved officer(s). Furthermore, transparency of the investigation and perceived legitimacy of the involved law enforcement agency will have implications for community member reactions, media coverage, and trust between agencies and their communities (IACP 2016; Savage 2013). Without transparent external criminal investigations, some civilians will continue to perceive these incidents as indicators of law enforcement bias that may affect their legitimacy (Katz 2015). Even more concerning is that these same community members are likely to question local prosecutors and the effectiveness of the broader criminal justice system. Importantly, among some countries that have created independent bodies to investigate OIS incidents, public perceptions of the criminal justice system are more favorable, even among racial and ethnic minorities, than in the United States (Katz 2015; Jackson et al. 2011).

*Investigations of officer-involved shootings are high-stakes processes with countless implications for community members and officers.*

While helpful in building trust and accountability, there are notable challenges presented with obtaining independence. Even independent investigators may be too "close" to police, in terms of relationships, reliance on resources, or support. Members of the media and the public have argued that there is an inherent bias in the process of these investigations, where law enforcement officers and prosecutors benefit from a strong working relationship with each other (Katz 2015). Just as agencies investigating their own officers raises some concerns, district attorney involvement in these investigations presents another question about independence (Hammonds et al. 2016). Another challenge exists where investigators are an entirely separate entity outside of the law enforcement organization in question and, as a result, may have limited resources and lack adequate and equivalent levels of expertise (Hammonds et al. 2016; Savage 2013, 104). Independent investigatory bodies may also have a small number of investigators covering a large geographical area. With constrained resources, it becomes increasingly important for investigators to maintain a cooperative relationship with law enforcement agencies, especially when they must rely on police expertise and services. Limited resources and expertise will not result in successful reform of these investigations and may displease the public and law enforcement alike.

## Implementation of independence outside of the United States

Implementation of independent review processes in other countries, and suggestions by U.S. policymakers, can help to guide successful, independent investigatory bodies in the United States. In addition to the task force, the IACP released an OIS guide for law enforcement leaders that includes some recommendations, beginning with the preparation and training of officers and ending with post-incident considerations for addressing the media. This guide discusses external civilian oversight reviews of decisions; however, it is generally silent on the implementation of independent investigations (IACP 2016).

Meanwhile, the United Kingdom, Norway, and several Canadian provinces have developed legislation requiring independent (and often more transparent) investigations, and these models have successfully separated investigators and the involved police organizations and officers (Katz 2015; Savage 2013). For example, Ontario uses a civilian law enforcement agency to investigate questions of officer criminal liability; this implementation model of independence is successful because the investigatory unit also has entirely separate personnel and resources, including forensic specialists and a laboratory (Katz 2015; Special Investigations Unit 2018). Similar models, with varying degrees of independence from the police, are currently operating in Ireland, the United Kingdom, Norway, and other Canadian provinces (Seneviratne 2004). The practices in these countries may serve as foundational models for developing an independent and external review process for OISs in the United States. It is important to point out, however, that the annual number of OISs in the United States is substantially higher than in many other countries (Kuhns and Knuttson 2010), and the corresponding challenges of ensuring independence are therefore more challenging and costly.

Some common characteristics were observed among successful independent investigatory units. For example, Katz (2015) asserts that these units must have legislative power to investigate officers' potential criminal liability and must have the power to make recommendations to prosecutors. These units must operate in a way that appears to be independent to most external observers (i.e., be disassociated from any law enforcement agency). In addition, to conduct thorough and accurate investigations, these units must have unrestricted access to all police records and operate with a substantial and sufficient budget. While other countries have used civilian investigative bodies, the President's Task Force on 21st Century Policing (2015) acknowledges that the accuracy and thoroughness of these investigations and their findings is of primary concern. Therefore, the task force recommended that independence can be achieved through investigations by other law enforcement agencies, which undoubtedly have more experience and expertise regarding use of force incidents.

## Implementation of independence in the United States

In the United States, a handful of states have made changes to existing laws regarding the investigations of OISs; however, these laws have achieved varying degrees of independence. Wisconsin's statute §175.47, enacted in April 2014, mandates that investigations be led by at least two investigators (typically former law enforcement officers who report to the attorney general), neither of whom can be employed by the agency in question. Similarly, a

Utah law (House Bill 361) requires that the investigating agency not be the agency where the involved officer is employed. OISs in Florida have also introduced an element of independence, although not uniform in protocol. Some agencies in Florida have the Florida Department of Law Enforcement (FDLE) investigate OISs, while other agencies investigate their own. A Florida senator proposed requiring the FDLE to investigate all such incidents, but this bill was withdrawn from consideration in March 2018. Colorado made changes to its investigation protocol, although not to achieve complete separateness from the involved agency. Effective since 2015, the Colorado law mandates that at least one outside agency assist in the implicated agency's investigation. Other states, including Georgia, Tennessee, and Minnesota, have taken steps towards increasing independence in OISs by turning these investigations over to state agencies (e.g., Georgia Bureau of Investigation, Tennessee Bureau of Investigation, Bureau of Criminal Apprehension), and it is possible that still others will follow. Currently, the Wisconsin model offers one American solution toward independence, and notably, it does so while ensuring a thorough and accurate investigation (Hammonds et al. 2016).

## Preliminary review and search of MCCA agency policies

To broaden our understanding of OIS investigations in the United States, member agencies of the MCCA participated in an online survey designed to assess current OIS practices. Specifically, the MCCA was interested in examining whether recommendations of the task force on 21st century policing had affected OIS policies as of mid-2017.

Prior to examining the survey results and as a cross-check of some of the anticipated answers from the survey, a systematic preliminary search of MCCA agency websites and OIS policies was conducted. More specifically, the purpose of this preliminary review was to collect descriptive information on MCCA agencies and their respective use of force and OIS policies. MCCA agency website searches were completed between January and February 2017.

While the MCCA includes both American and Canadian members, Canadian agencies were excluded from this preliminary phase of the project because task force recommendations are directed to U.S. agencies only and Canada already has independent OIS investigations. However, the subsequent survey results will include Canadian agencies and practices. During the systematic website search, the following types of information were gathered:

1. Agency website address

2. Availability of use of force policies and OIS policies

3. Ease of access to these policies (how easy was it to locate policies on the website)

4. Document names and URLs

5.  Presence and titles of OIS investigative units and entities

6.  Indications of independence as a mentioned element of OIS investigations

7.  Evidence of a written policy on investigative independence

8.  Most recent year of OIS policy updates and whether any updates occurred after the task force report release in May 2015

9.  Evidence of some direct response to the task force recommendations

## Search strategies for policies and ease of access

The task force recommendations emphasize a need for comprehensive use of force policies and specify that these policies be "clear, concise, and openly available for public inspection" (President's Task Force on 21st Century Policing 2015, 20). Based on the task force's goal of promoting trust and legitimacy between law enforcement and the communities they serve, these policies should therefore be easily accessible on agency websites. To maintain transparency between law enforcement and the communities they serve, it is critical that use of force policies, particularly policies addressing OISs, be available to the public and easily accessible.

To measure and assess accessibility and transparency, keyword searches were conducted on 68 MCCA member agency websites.[1] MCCA agencies were then rated based on a subjective assessment of the how easy or difficult it was to locate this information. Agencies whose use of force policies were accessible online and easily retrieved received a rating of 1. Specifically, an agency was rated 1 if a link to the departmental directive or policy was found on the home page of the website or if the directive was found on the first page of the search results. In addition, agencies that displayed their use of force policy under site headings such as "transparency," "data," or "resources" were rated 1. MCCA member agency policies not located with these search strategies but that were found with subsequent searches received a rating of 2. Most of these directives were located under "about" or "information" headings. Finally, MCCA agencies without a use of force policy available on their site received a rating of 3.

Forty-three agencies (63 percent) had use of force and OIS policies that were easily found when employing these basic search strategies, while eight agency policies (12 percent) were found using additional search strategies. There were 17 agencies (25 percent) for which searches did not locate the department directive. Specific departments and ease-of-access ratings are summarized in table 1. It is important to note that these access ratings would likely change over time and potentially improve as websites and search processes improve.

---

1.  The DeKalb County (Georgia) Police Department recently joined the MCCA but did not participate in this study. The following search terms were used: "department directives," "department policies," "rules and regulations," "general orders," "use of force," "officer-involved shooting," "deadly force response," and "response to resistance." It is important to note that these initial search process results are dependent on the search engine or protocol operating on each respective website. Therefore, these preliminary results do not fully reflect the value that each department places on the importance of OIS policies and procedures. Further, some departments may have justifiable reasons for limiting public distribution of some operating policies and procedures. Regardless, these results can potentially help some departments improve communication and transparency regarding OIS investigations.

**Table 1. Ease of access to OIS policies (n=68)**

| Rating | | Agency | | Agency |
|---|---|---|---|---|
| Group 1. Policy was easily found (n=43) | 1. | Albuquerque, NM | 22. | Milwaukee, WI |
| | 2. | Atlanta, GA | 23. | Minneapolis, MN |
| | 3. | Aurora, CO | 24. | Montgomery County, MD |
| | 4. | Baltimore, MD | 25. | New Orleans, LA |
| | 5. | Baltimore County, MD | 26. | Oakland, CA |
| | 6. | Boston, MA | 27. | Oklahoma City, OK |
| | 7. | Charlotte-Mecklenburg, NC | 28. | Omaha, NE |
| | 8. | Chicago, IL | 29. | Philadelphia, PA |
| | 9. | Cincinnati, OH | 30. | Phoenix, AZ |
| | 10. | Cleveland, OH | 31. | Portland, OR |
| | 11. | Dallas, TX | 32. | Prince George's County, MD |
| | 12. | Denver, CO | 33. | Sacramento, CA |
| | 13. | Fairfax County, VA | 34. | Salt Lake City, UT |
| | 14. | Jacksonville, FL | 35. | San Antonio, TX |
| | 15. | Kansas City, MO | 36. | San Diego, CA |
| | 16. | Las Vegas Metropolitan, NV | 37. | San Francisco, CA |
| | 17. | Long Beach, CA | 38. | San Jose, CA |
| | 18. | Los Angeles County, CA | 39. | Seattle, WA |
| | 19. | Los Angeles, CA | 40. | Tucson, AZ |
| | 20. | Louisville Metropolitan, KY | 41. | Virginia Beach, VA |
| | 21. | Mesa, AZ | 42. | Washington, DC |
| | | | 43. | Wichita, KS |
| Group 2. Policy was found with additional searches (n=8) | 1. | Austin, TX | 5. | Honolulu, HI |
| | 2. | Columbus, OH | 6. | Newark, NJ |
| | 3. | Fort Worth, TX | 7. | New York City, NY |
| | 4. | Fresno, CA | 8. | Tulsa, OK |
| Group 3. Policy was not found on agency website (n=17) | 1. | Arlington, TX | 8. | Miami-Dade, FL |
| | 2. | Buffalo, NY | 9. | Miami, FL |
| | 3. | Detroit, MI | 10. | Nashville, TN |
| | 4. | El Paso, TX | 11. | Nassau County, NY |
| | 5. | Houston, TX | 12. | Orlando, FL |
| | 6. | Indianapolis, IN | 13. | Pittsburgh, PA |
| | 7. | Memphis, TN | 14. | Raleigh, NC |
| | | | 15. | St. Louis, MO |
| | | | 16. | Suffolk County, NY |
| | | | 17. | Tampa, FL |

In accordance with the task force's recommendation that policies be available for public inspection, agencies should at minimum include use of force policies on department websites. For those agencies that already make their policies or directives publicly available, small changes could positively affect how quickly and easily these documents could be found by members of the public, media, and others. Further, including these policies on primary pages or under clearly defined subheadings is also encouraged. In addition, making policies easily identifiable could simply mean adopting a uniform set of names or titles for these documents. Searches of each department's site found that policies regarding use of force and OIS policies had considerable variation in key words chosen for document titles.

## Recent changes and responses to task force

At the same time use of force and OIS policies were searched and located, changes to these policies were recorded by year. Specifically, we recorded whether departments had updated their policies since the task force recommendations were released in May 2015, and whether departments explicitly updated these policies in response to this document. Most of the policies had been updated recently (three in 2017, 17 in 2016, 10 in 2015, and two where the dates were unclear). Of the 51 agencies with OIS policies available for public inspection, 31 (61 percent) had made changes since the task force report was released in May 2015. Of these 31 agencies, five departments (16 percent) clarified that they had have updated their policies explicitly in response to the task force recommendations.[2] Agencies with policy changes that occurred since the task force report was released and specifically in response to the task force recommendations are displayed in table 2. It is worth noting, of course, that we could not ascertain exactly what changes had occurred because we did not have the original documents for purposes of comparison.

---

2.    The criterion for inclusion in this group was whether specific language was used by the department (e.g., "21st century policing", "policing initiative", or "presidential initiative") within a retrievable document or, more generally, on a website heading.

**Table 2. Recent policy changes and responses to task force recommendations (n=31)**

| Date and motivation for policy change | | Agency | | |
|---|---|---|---|---|
| Departments with recent OIS policy changes (after May 2015) | 1. | Albuquerque, NM | 17. | Mesa, AZ |
| | 2. | Aurora, CO | 18. | Minneapolis, MN |
| | 3. | Austin, TX | 19. | Montgomery County, MD |
| | 4. | Baltimore, MD | 20. | New Orleans, LA |
| | 5. | Baltimore County, MD | 21. | New York City, NY |
| | 6. | Charlotte-Mecklenburg, NC | 22. | Oklahoma City, OK |
| | 7. | Chicago, IL | 23. | Philadelphia, PA |
| | 8. | Cincinnati, OH | 24. | Phoenix, AZ |
| | 9. | Denver, CO | 25. | Prince George's County, MD |
| | 10. | Fairfax County, VA | 26. | Salt Lake City, UT |
| | 11. | Fort Worth, TX | 27. | San Francisco, CA |
| | 12. | Fresno, CA | 28. | San Jose, CA |
| | 13. | Kansas City, MO | 29. | Seattle, WA |
| | 14. | Las Vegas Metropolitan, NV | 30. | Virginia Beach, VA |
| | 15. | Long Beach, CA | 31. | Wichita, KS |
| | 16. | Louisville Metropolitan, KY | | |
| Departments with changes specifically noted to be in response to the task force recommendations | 1. | Charlotte-Mecklenburg, NC | 4. | Philadelphia, PA |
| | 2. | Louisville Metropolitan, KY | 5. | San Jose, CA |
| | 3. | Mesa, AZ | | |

## Language of independence or policy on independent investigations

One primary objective of this project was to summarize current OIS practices among MCCA member agencies. Specifically, the MCCA is assessing the implementation of recommendation 2.2.2 of the task force report, which urges police agencies to mandate external and independent criminal investigations of police use of force incidents resulting in injury or death.

Departmental OIS policies and websites were searched for language indicative of independent investigation practices, and those departments with current practices mentioning principles of independence were noted.[3] In addition, each agency's OIS policy was searched to identify the primary investigative unit or entity that handled OIS incidents.

---

3.   The search terms were "independence" OR "independent investigation" OR "outside investigation" OR "external investigation".

Of the 51 MCCA member agency policies available online, 13 departments (25 percent) had a policy mentioning an independent investigation of OISs.[4] To be clear, a mention of the word "independent" or "external" in a policy does not guarantee that the agency practices independence during investigations or involves an external agency in the process. This simply records which agencies mention these words in their policy documents.

A more comprehensive search of each agency's directives resulted in a list of the investigative entities charged with investigating OISs. Among the 13 agencies with policies mentioning independence, investigative entities appear (at least by name) to be special investigatory teams created for this purpose. Nearly every agency had multiple teams, entities, or bodies that were responsible for the criminal investigation of OISs. However, there are nearly as many names of these entities (e.g., Critical Incident Response Team, Officer Involved Shooting Investigation Team, Firearms Discharge Investigation Team) as there are agencies. If departments are interested in expanding the public's understanding of how OIS events are investigated, encouraging consistency and uniformity in naming OIS response teams may also be helpful for those who are not familiar with the decentralized nature of law enforcement in the United States. It was unclear exactly how these special teams and investigatory bodies are formed (i.e., which individuals are involved in external investigations). Therefore, another recommendation is to include this information within OIS policies. For a full list of these investigative entity names please refer to appendix A.

---

4.  The 13 agencies were Baltimore, Boston, Chicago, Fairfax County, Fresno, Jacksonville Sheriff's Department, Louisville Metropolitan, Mesa, New Orleans, Oakland, Salt Lake City, San Diego, and San Francisco.

# Survey Results of MCCA Officer-Involved Shooting Practices

To broaden our understanding of the status of OIS investigations, independence, and transparency, MCCA agencies were invited to participate in an online survey. The survey explored questions about whether MCCA agencies had modified their OIS practices and policies, about whether such changes occurred since the task force report was released in May 2015, about how investigations occur and assessing the extent of independence, and exploring whether agencies are moving towards transparency in their OIS responses. Eighty-one agencies completed the survey, which was open between February and March 2017.[5] The survey instrument is included as appendix B.

Sixty-two percent of responding MCCA agencies reported receiving some community pressure to change their agency's approach to OIS investigations, 42 percent perceived some media pressure to facilitate changes, and 40 percent reported pressure from local officials. Fewer agencies were encouraged by civilian oversight boards (19 percent) or unions and employees (20 percent) to make such changes. Just over one-third of agencies (37 percent) indicated that they initiated some changes following the release of the task force report (see figure 1). Overall, two-thirds (67 percent) of the agencies had made changes to their OIS investigation policies in 2015 and 2016, and another 22 percent indicated that proposed changes were in progress but not yet fully adopted and implemented.

**Figure 1. Sources of pressure to change OIS practices and policies (n=81)**



5.    Three additional agencies responded, in part, but did not self-identify, and one agency responded twice. These four cases were removed from some of these analyses.

Independence of OIS investigations is a function of who or what individuals, agencies, or task forces handle OIS investigations. Most of the responding MCCA agencies reported that criminal investigations associated with OISs are most often conducted by homicide detectives (49 percent), followed by an internal shooting investigation team (38 percent), the prosecutor's office (37 percent), or another state investigative agency (15 percent). Fewer agencies reported that another local agency (5 percent) or a combined task force (6 percent) investigated these events (see figure 2).

Most agencies reported that the prosecutor's office (75 percent) made final decisions on filing criminal charges, although some agencies (7 percent) were directly involved and made the decision collaboratively with the prosecutor. Two agencies (2 percent) reported making those decisions independent of the prosecutor's office. A few other agencies reported having some civilian oversight committee involvement in these final decisions.

**Figure 2. Who conducts criminal investigations of OIS? (n=81)**



## Current practices—External and internal involvement in OIS investigations

Forty agencies (49 percent) indicated that they conduct their own OIS investigations and do not include external agencies in the process at all. Among the other 41 agencies that reported involving some external investigators, one-third (14 agencies) indicated that their agency was also involved in the investigation at some level, and some agencies were involved with both investigating and processing the crime scene (see figure 3).

Internally, most OIS investigations were conducted by an Internal Affairs division or unit (67 percent) or by an internal task force team (16 percent). Civilian review board involvement was rare (2 percent; see figure 4 on p. 16).

**Figure 3. Role of an external agency conducting an OIS investigation of our agency (n=81)**



**Figure 4. Who conducts the internal OIS investigation? (n=81)**



Following an OIS, a determination regarding whether the event was consistent with agency policy was determined differently across agencies, by an Internal Shooting Review Board (31 percent), an external agency (28 percent), by a wide range of other decision-makers or units (such as an Office of Professional Standards—sometimes but not always akin to an Internal Affairs Division—or a Firearms Board/Committee, a Standing Review Board, a Chief's Advisory Board, an Inspectional Service Bureau, more than one person/entity, etc.), or in a few cases by a the chief or command staff (4 percent; see figure 5 on p. 17).

**Figure 5. Who determines whether an OIS was consistent with agency policy? (n=81)**



An additional question inquired about who would make a final decision regarding officer discipline if necessary. For 89 percent of the agencies (72 agencies), an internal shooting review board decided on disciplinary decisions that followed OIS investigations. In some other cases, decisions were made by a combination of internal and external participants. Only one agency indicated that an external agency would make such determinations.[6]

## Advantages and disadvantages of internal and external OIS investigations

In addition to understanding agency involvement in OIS investigations, the survey solicited a more comprehensive perspective of potential challenges to moving towards independence. Respondents from participating MCCA agencies reported what they perceived as the advantages and disadvantages of internally conducted (by their own agency) and externally conducted (independent of their agency) OIS investigations. These sets of questions were open-ended and therefore yielded a broader range of responses. A content analysis of these responses was completed and the results are discussed in the following sections.

---

6.  Many departments conduct both a criminal investigation to assess whether any laws were violated and an internal policy review to determine whether the officer(s) adhered to departmental policies and procedures. Given the large number of departments in the United States, many conduct the internal policy reviews differently.

## Internally conducted OIS investigations

Agency responses regarding the advantages of conducting OIS investigations internally most frequently included the terms "knowledge," "expertise," and "resources." Regarding "knowledge," there were more than 30 responses suggesting that internal investigations benefit from training and understanding of the investigative process. In addition, knowledge of departmental OIS policies and procedures was often cited as an advantage of internal investigations. MCCA agency respondents listed expertise as an advantage of internal investigations nearly as frequently as knowledge of policy and procedures. Specifically, agencies frequently reported that internal investigators have unmatched experience and skill in responding to shooting investigations and the case management of OISs as well as subject matter expertise throughout an investigation. The most frequently noted advantage of internally conducted OIS investigations was resources. Further, nearly half of the responding agencies provided comments on the timeliness of investigations; ease of access to information, data, and evidence; access to facilities (e.g., forensics lab); and access to officers. Other advantages offered by respondents included community trust and cooperation, union relationships, credibility of the investigations, reduced anxiety for involved officers, familiarity with geographical areas, and "familiarity with our jobs" (e.g., "This is what we do every day").

In contrast, agencies discussed numerous disadvantages associated with internally conducted OIS investigations. Summarizing these disadvantages yielded two common and related themes: (1) reduced public opinion and trust and (2) perceptions of bias. Nearly half of the respondents stated that internally conducted investigations can generate negative public opinion. Respondents explained that these types of investigations often give rise to increased public scrutiny and criticism of agencies as well as a lack of confidence and trust in the investigative process or the involved officers.

About 60 percent of MCCA responding agencies explained that internally conducted investigations can suffer from a public perception of bias or subjectivity. A few agencies stated that internal investigations might produce a perceived or actual bias between investigators and the involved officers because of personal or professional relationships ("the perception that we are policing ourselves, and that we can be trusted to do that"). Other disadvantages included a lack of transparency, ongoing criticism by the media, lack of independence and oversight, concerns with ensuring legitimacy in the process, possible contamination or interference, managing union interference and involvement, and monetary or personnel costs for agencies.

Two agencies responded with "none" when asked about disadvantages of internally conducted OIS investigations.

## Externally conducted OIS investigations

In a separate open-ended survey question, agencies discussed what they believed were the advantages and disadvantages of external or independently conducted OIS investigations. As expected, agency comments on the advantages of external and independent investigations closely mirrored the responses given for the disadvantages of internally conducted investigations. Nearly all agencies felt that external or independent investigations help to increase transparency and accountability, improve public trust in policing and public confidence in the outcomes of investigations, reduce suspicion or criticism of police by media or activist groups, and eliminate actual or perceived bias in the investigations. Other advantages offered were resource-related (e.g., reducing costs and relieving agency detectives from these investigations).

Agency remarks on the disadvantages of external investigations also repeated themes discussed earlier in the section on advantages of internally conducted OIS investigations. A majority of responding agencies believe that external investigators lack the knowledge, skills, training, expertise, experience, familiarity with policy and procedure, and resources of internal investigators and their investigations. The most frequently cited disadvantage of external investigators managing these incidents was a delayed response to the crime scene and delays throughout the duration of an investigation (due to less qualified personnel, lower levels of experience and training, less cooperation from officers, and limited access to resources and facilities).

Beyond these more general disadvantages, agencies frequently mentioned skepticism or lack of trust between investigators and involved officers, less control over processes and information, logistical complexity, and cultural barriers. Other comments included limited police union trust, officer morale concerns, fear and anxiety among involved officers, unresponsiveness to community concerns, lack of information released to the public, lack of objectivity (political influences or pressure), and lack of thoroughness in investigating. One agency remarked that external investigations remain problematic when the external investigative entity is also a law enforcement organization (the perception of "policing our own" persists). Given these agency responses, clearly the benefits derived from externally conducted investigations (i.e., transparency, reduced bias, and increased public trust) are perceived by law enforcement to be at odds with the advantages of internally conducted investigations (i.e., familiarity with policies and procedures, training, knowledge and experience, and access and resources).

## Informing the public and victims and families regarding OIS investigation status

The public release of information following an OIS investigation is often decided and managed by the department (in 64 percent of agencies) but is sometimes handled by an external investigative agency (15 percent), by the prosecutor (4 percent), or through some other arrangement (multiple agencies, agency and prosecutor decide, etc.). Many agencies indicated a willingness to release video (if available), although the timing of the release varied considerably (e.g., after charges are filed, at trial, after the investigation can no longer be compromised, or on a case-by-case basis [44 percent]). Only six agencies indicated that they would never release OIS video to the public. Some agencies (16 percent) reported that they would always share video evidence with involved families and victims prior to public release. More agencies (33 percent) indicated that they never share the video with families. However, nearly half of the agencies reported that this decision is made on a case-by-case basis (49 percent). Further, there are some state legislatures that have either mandated (e.g., Ohio) or severely limited (e.g., North Carolina, South Carolina, and others) the public release of law enforcement in-car and body camera videos, in which case the departmental discretion is regulated or restricted by state laws.

# Summary of Roundtable Focus Group Discussions

Finally, to solicit additional information from law enforcement leaders, a focus group meeting occurred in August 2017 in Louisville, Kentucky. The primary purposes of the meeting were to (1) discuss the preliminary draft of the report, which included a literature review, the systematic review of MCCA agency websites, and the online survey results and (2) solicit input from agency representatives regarding how they conduct OIS investigations and what works effectively in their organizations and communities. Specifically, the discussions focused on the specific mechanics of how each agency conducts their OIS investigations, barriers to effective OIS investigations, OIS investigation training and policy recommendations, and indicators and extent of investigative independence and transparency. The meeting included representatives from 19 MCCA agencies.[7] These agencies were included based on their responses to the online survey; specifically, we invited agencies that relied on varied investigative models or practices when responding to OISs. In other words, some relied completely on independent investigative processes, some were completely non-independent, and others had both internal and external investigative processes or used varied hybrid approaches. These agencies typically responded to at least a few and as many as 100 OIS incidents each year.

## Common barriers to effective OIS investigations

Many of the focus group comments mirrored the narrative comments from the online survey. Specifically, organizational capacity, expenses, and resources were common challenges to effective investigations. Many agencies discussed their concerns with external investigations, specifically with respect to expertise, timeliness and response time (specifically, the Ferguson concerns of having the deceased lying outside on the street for several hours), cultural and organizational knowledge, trust between internal and external investigators, and organizational transparency (including between organizations and between the organizations and the public).

Depending on the agency, union influences presented additional challenges to OIS investigations. Again, depending on the agency and community, differences in policies (e.g., body-worn cameras) could impact OIS investigations. To clarify this point, one participating agency (Indianapolis Police Department) reported that their officers did not currently have body-worn cameras and that the agency had very few in-car cameras. Other participating agencies reported that all officers had body-worn cameras. Further, some law enforcement agencies were limited by state laws or local prosecutors with respect to the public release of videos, while others were required to release body-worn camera videos associated with an OIS investigation within a specified time frame. The state of Ohio, as one example, mandates that all in-car camera videos be available immediately as matters of public record. Still other agencies had installed both body-worn and in-car cameras but maintained complete case-by-case discretion regarding video release decisions and schedules. Many community members are unaware of the impact of state laws and therefore hold the agency or the chief responsible for the perceived lack of transparency.

---

7.    The participating agencies included Charlotte-Mecklenburg (NC), Chicago (IL), Cincinnati (OH), Columbus (OH), Dallas (TX), Denver (CO), Houston (TX), Indianapolis (IN), Las Vegas Metro (NV), Los Angeles (CA), Louisville Metro (KY), Memphis (TN), Mesa (AZ), Milwaukee (WI), Montgomery County (MD), Oakland (CA), Philadelphia (PA), and San Jose (CA) police departments from the United States and the Peel Regional Police Service from Canada.

## Various forms of external agency involvement in OIS investigations

There was a considerable variety of opinions about the usefulness of involving external agencies. Most agencies conduct both an internal (administrative) and an external (criminal) investigation simultaneously. Often local laws dictate that these investigations occur independently of one another. Many agencies also have multiple entities involved in OIS investigations (homicide units, internal affairs, prosecutor's office, civilian review boards, external agencies, etc.). Focus group participants indicated that involving external investigators creates distance and independence for the involved agency and can help reduce community pressures regarding the timely release of information—and ultimately when making difficult decisions about controversial OIS cases.

Regardless, there were considerable differences in approaches with respect to external agency involvement and what that involvement entails. For example, during OIS investigations, walkthrough interviews of the involved officers at the scene are common, but not all agencies used this practice. Collecting on-scene verbal statements from involved officers is common, but again not always a part of the protocol. Lawyers for the officers are sometimes present during questioning—but not always. In some agencies, attorneys are involved immediately; in other agencies officers provide written statements and conduct walkthroughs immediately without a lawyer present. Finally, at least one agency requires its officers who are involved in an OIS to "take a couple days" before being interviewed at all (which arguably could severely compromise transparency or, at minimum, appear to do so). External investigators, of course, would need to fully understand the organizational complexities, policies, practices, and culture prior to initiating an effective OIS investigation, and that process can take some time and impact transparency and independence of the investigative process. In some cases, organizational culture and leadership may further limit access, transparency, and investigative independence (Paoline and Terrill 2014).

## Recommended training for OIS investigators

Some of the focus group discussions centered on training considerations and recommendations. When identifying potential OIS investigators, many agencies recommended and generally started with their best homicide detectives. There are both pros and cons with using this approach. Certainly, the more capable homicide detectives will increase the quality of the investigative work. On the other hand, OIS investigators may or may not remain assigned to the homicide unit or division depending on the agency. Maintaining an assignment with the homicide unit limits the appearance of independence for an OIS investigator or investigation (this topic is discussed further beginning on page 23). Other training suggestions included video examination techniques (forensic breakdown and diagnosis of videos), interviewing and interrogation skills, and social media training (for experienced detectives who may be skilled investigators but are less familiar with current and evolving technologies). Some states, including California, have specific classes devoted to OIS investigations. The Federal Law Enforcement Training Center also offers these courses.

Other post-investigation recommendations included using completed OIS investigations as case studies to expand training internally. For example, body-worn camera footage is sometimes used for subsequent OIS training and to develop firearms simulator scenarios. Random checks of body-worn camera video footage may also be useful for identifying tactical mistakes.

In addition, subject matter experts (SME) can examine OIS investigations and consider ways to improve. Some agencies routinely conduct a "hot wash" review of all OISs with commanders and executives. Law enforcement leaders recommended de-escalation training and training officers on the sanctity of life and hiring officers who place a high value on the lives of others. Training officers, supervisors, and possibly dispatchers to slow down potentially risky events that could result in an OIS was a considered a priority. In short, proactive steps designed to limit the likelihood of OISs in the future is an important recommendation that merits broader attention. A prior report based on a MCCA project on the use of firearms against law enforcement officers may provide some insights on potentially risky OIS events (Kuhns et al. 2016). It would be useful for agencies to carefully and systematically consider which kinds of calls for service and other events are most likely to escalate into OISs and proactively identify methods, processes, and procedures for de-escalating these events before the use of firearms becomes necessary.

## Indicators of OIS investigative independence

The focus group meeting included some extended conversation regarding the value of independence and transparency (discussed in the sections that follow) during an OIS investigation. Again, the levels of investigative independence varied considerably among the participating agencies, and the range of possible indicators of independence can be numerous. For example, independence is based to some degree on the agency's level of involvement in the investigation. Arguably, less agency involvement is indicative of increased investigative independence. However, investigative independence extends beyond the level of agency involvement in the actual investigation. For example, the involvement of the prosecutor or district attorney may or may not extend investigative independence. Some law enforcement agencies work directly with prosecutor's officers routinely (and retired officers work in the prosecutor's office in some communities and vice versa). Further, investigative independence can be related to the role and level of discretion that an external agency has during the investigation. Some external agencies offer recommendations to the involved organization and executive leader rather than making actual decisions.

Community involvement in reviewing OIS investigations and findings offers another potential indicator of independence. Agencies that have active and empowered citizen[8] review boards (Walker 2000), which investigate independently or review findings after the internal or external investigation is completed, arguably offer an additional level of independence (and transparency, discussed in the sections that follow). However, the process for appointing community members to review boards may limit the appearance of independence and ultimately the capability of the board. During the focus group meeting, some agencies reported that their citizen review board lacked diversity, while others indicated that diversity (not expertise or capability) influenced appointment processes. Further, the findings from citizen review board cases over time (do they always find in favor of the department?), level of authority (subpoena powers, ability to overturn findings, etc.) and the external reporting process (are the findings made public or only provided to the department?) can all impact transparency, independence, and effectiveness (Walker 2000; IACP 2000).

For agencies that are involved in OIS investigations, ensuring some level of independence often requires parallel but separate investigations for policy rather than criminal outcomes or investigation by other units that are outside of normal investigative units (Internal Affairs, Homicide, etc.). As suggested by some of the focus group participants, physical and functional separation of an OIS investigation team from the agency or other investigative units may

---

8.     This report uses "citizen" to refer to all individuals in a city or town who are not sworn law enforcement officers or government officials. It should not be understood to refer only to U.S. citizens.

be an important step toward increased independence. Ultimately, independence can impact an agency's relationship to the community, and communities that lack investigative independence following an OIS may compromise that relationship in the future.

## Varying levels of independence in investigations

In Canada, fully independent OIS investigations are standard practice. In 1989, the Ontario Provincial Government created an external agency and developed and implemented a fully independent investigative process that ensures external investigation and oversight of all OISs (although they have had only 30 from 2007 to 2017) that occur in the Peel Regional Police Service (and other Canadian agencies). There is also a fully independent Citizen's Complaint Bureau. This level of commitment allows for complete independence within the OIS investigative process. The Peel Regional Police Service reports some concerns with timeliness and transparency during the investigation, but the extent of independence is clear and generally indisputable.

### Peel Region

The Peel Regional Police Service has several levels of civilian oversight established by the Police Services Act in 1990. The Police Services Act covers all police agencies in Ontario. The act establishes policing standards and four levels of civilian oversight and review.

1. Police Services Board

   • Determines, after consultation with the chief of police, objectives and priorities with respect to police services within the municipalities

   • Establishes policies for the effective management of the police service

   • Recruits and appoints the chief and deputy (or deputies) of police and annually determines their remuneration and working conditions

   • Establishes guidelines for the administration of the public complaints system and receives quarterly reports on the subject

   • Negotiates collective agreement

   • Approves the capital and operating budget (Police Services Board 2017)

2. Special Investigation Unit

   • The mandate of the SIU is to investigate incidents of police actions resulting in serious injury, death, or allegations of sexual assault.

   • Incidents that fall within this mandate must be reported to the SIU by the police service involved and may be reported by the complainant or any other person.

   • The objective of every SIU investigation is to determine whether there is evidence of criminal wrongdoing on the part of the police. It is not to determine whether the involved officer(s) may have committed some lesser offence, such as the breach of a provincial law or professional misconduct under the code of conduct of police officers.

3. Office of Independent Review Director

   • The Office of the Independent Police Review Director (OIPRD) is responsible for receiving, managing, and overseeing all public complaints about the police in Ontario.

   • The OIPRD accepts complaints about the conduct of a police officer or the policies and services of a police department.

- Conduct complaints are about how a police officer behaves. Policies of a police department are the rules and standards that guide an officer in delivering police services. Services are how effectively and efficiently a particular department performs its duties.

- The OIPRD has the power to conduct systemic reviews. A systemic review goes beyond the immediate issues raised by a given complaint and looks at the underlying causes to determine whether an organization's practices comply with its underlying legal and policy framework and—more importantly—whether that framework can be improved to prevent such issues from arising in the future.

- A systemic review is generally not about individuals. Its purpose is not to assign individual fault but to determine whether systemic failings have occurred, to make recommendations to address those failings, and to help restore and enhance public confidence in police and policing.

4. Ontario Police Commission performs adjudication process

- The Ontario Civilian Police Commission (OCPC) is an independent oversight agency tasked with ensuring that adequate and effective policing services are provided in a fair and accountable manner under the Ontario Police Services Act.

  - Hears appeals of police disciplinary decisions

  - Adjudicates disputes between municipal councils and police service boards involving budget matters

  - Conducts hearings into requests for the reduction, abolition, creation, or amalgamation of police services

  - Conducts investigations and inquiries into the conduct of chiefs of police, police officers, and members of police services boards

  - Determines the status of police service members

  - Administers general enforcement relating to the adequacy and effectiveness of policing services (Stubbings 2017)

Ontario recently commissioned an Independent Police Oversight Review by Justice Michael H. Tulloch, a judge who serves on the Ontario Court of Appeal. Justice Tulloch has made more than 70 recommendations for change in the Ontario civilian oversight processes. These recommendations are under consideration by the Ontario Attorney General.

Most agencies in the United States have adopted lesser forms of independence when conducting OIS investigations, and generally the level of independence in the U.S. law enforcement community varies considerably. For example, the Indianapolis Police Department conducts all of their investigations internally, although the Federal Bureau of Investigation (FBI) may become involved in controversial cases (this is the case in most states—the FBI can and sometimes does review OIS cases, particularly those involving potential violations of civil rights). The Charlotte-Mecklenburg Police Department also conducts their investigations internally; however, community members can request a concurrent external investigation from the State Bureau of Investigation. The Memphis Police Department conducts their own investigations simultaneously with the Tennessee Bureau of Investigation, and the Denver Police Department conducts an internal investigation, but the agency is legally required to work with an external agency. The Las Vegas Metropolitan Police Department relies on an Office of Internal Oversight and Constitutional Policing unit that handles these investigations. Their process includes the district attorney and a citizen's review board, both of which visit the investigative scene. Each of these approaches offers some investigative independence, but clearly the processes are varied and the level of independence is quite different from one jurisdiction to the next. Considerable variability also exists with respect to how agencies conduct internal policy reviews following an OIS.

An OIS investigative model that is operational in the state of Wisconsin provides a level of independence while addressing some of the disadvantages of fully independent investigations. The Milwaukee Police Department (MPD), operating under a Wisconsin state law, has a multiagency cooperative agreement in place throughout Milwaukee County that allows any of the member agencies (21 agencies as of late 2017) to rely on another external agency to conduct OIS investigations. There are five agencies designated as lead agencies (the MPD is one of these five), and these five agencies assume primary investigator responsibility on OIS cases on a rotational basis. The investigative processes and procedures are fully articulated, signed, and agreed upon in writing. The task force meets on a regular basis to assign new cases, to discuss changes to the investigative protocols and policies, and occasionally to add new member organizations to the agreement. This county-level cooperative model of investigative independence may work well in larger metropolitan areas or counties—particularly those with numerous large law enforcement agencies but that lack a state-level investigative agency (or that may have limited numbers of experienced investigators in the state investigative agency).

## Indicators of OIS investigative transparency

In addition to discussing the importance of investigative independence, the conversation focused on the importance of OIS investigative transparency. Most if not all of the law enforcement leaders agreed that investigative transparency was more important to community confidence than investigative independence. Agencies that focus on ensuring organizational transparency generally and that were successful at maintaining transparency during OIS investigations reported being less susceptible to criticisms regarding limited (or a complete lack of) investigative independence. Effective and informed leaders and public information officers are particularly important during an OIS investigation. Further, many agencies indicated that ensuring transparency further strengthened their relationship with the communities they serve, which is particularly important when a controversial OIS occurs. The Houston Police Department specifically noted that organizational transparency has been helpful during difficult times, and other law enforcement leaders echoed that sentiment.

The focus group offered a range of best practices and proactive methods for increasing investigative and organizational transparency. Some potential indicators of organizational transparency include the following:

1. A willingness to publicly acknowledge when the investigation showed an OIS was inconsistent with organizational policy

2. Prior arrests or prosecutions of officers who were criminally liable

3. Proactively disseminating information about civil litigation or settlements associated with OIS investigation outcomes

4.  Releasing timely updates about the status of the OIS investigation, including

    a.  releasing involved officer(s)' names, experience levels, and assignments (although exceptions were expected for undercover officers or for officer safety);

    b.  press releases and open question-and-answer sessions, certainly within 24 hours of the event and routinely thereafter, although some participating agencies reported that their chief, executive, or designated public information officer would be on the news from the crime scene within hours of the event;

    c.  assigning an officer to work directly with families during an OIS investigation and ensure timely communication;

    d.  establishing and maintaining open access to OIS investigations, records and reports including the release of body-worn camera or in-car camera video (following private viewings with family members of those involved as appropriate while recognizing that some agencies are bound by state laws to either release or not release videos);

    e.  informing the public through a variety of methods, potentially including via animated videos of the OIS process (Louisville Police Department), website updates (Dallas and Las Vegas Metropolitan Police Departments), town hall meetings (Oakland Police Department) or YouTube channels or other social media outlets (Columbus Division of Police and others)

5.  Making OIS policies and procedures available to the public and easily retrieved on agency websites, including providing a clear timeline of investigative milestones and a publicized date of investigation completion

6.  Publicizing complaints department activities and civilian review board findings and ensuring that those entities are functional, that they are legally authorized to conduct independent reviews (including serving subpoenas), and that members are appointed using a process that is democratic and appropriate and that ensures adequate rigor and experience

## Which matters more to community members: Investigative independence or transparency?

There appears to be some professional and perhaps organizational tension between OIS investigation independence and transparency. Agencies that conduct their own investigations are criticized for a lack of independence. However, those agencies can likely mitigate some criticisms with increased transparency. Meanwhile, agencies that rely on external investigators to conduct their OIS investigations are criticized for a lack of transparency, presumably in part because those external (often state-level) agencies and investigators are less affected by and less responsive to local demands for transparency and timely communication. On the other hand, the external investigation relieves some of the pressures associated with internal investigative processes for the local agency.

Considered broadly, organizational transparency is probably easier to establish, improve, and maintain when investigations are conducted by external agencies, and increased transparency seems to help agencies during the difficult times that often follow an OIS. Ultimately, organizational transparency may be more important than investigative independence to community members. Some community members or community groups will simply never trust law enforcement, but others may be more willing to give the agency the benefit of the doubt if there has been a persistent pattern and practice of transparency, collaborative communication, and proactive community relationship development. In short, law enforcement agencies that are proactively and positively engaged with their communities and neighborhoods are in a potentially advantageous position to benefit from their collective good will when an OIS occurs. Agencies that are less engaged with their communities and less committed to community policing, partnership development, and collaborative problem solving may be under greater scrutiny and perhaps are at increased risk for civil unrest following controversial OIS events.

# Conclusion

The overall effectiveness of the law enforcement process and the perceived and actual legitimacy of that process depend on the establishment and maintenance of mutual trust and confidence between community members and law enforcement agencies. Nurturing and protecting public trust and confidence is an important priority for law enforcement leaders and organizations, particularly those operating in communities with high crime rates, diverse populations, and poverty.

OISs are relatively rare events in many communities and countries and are nearly nonexistent in countries with unarmed populations (Kuhns and Knutsson 2010). Nevertheless, these rare events can severely compromise and erode community trust and confidence in law enforcement, facilitate substantial levels of civil unrest, and generate long-lasting negative views of law enforcement officers and departments—even if the OIS is fully justified and legal—if the event and subsequent investigation are suspect and not transparent. Therefore, the methods by which OISs are investigated are critically important for agencies and communities.

Ideally, OIS investigations are conducted in a manner that is transparent, fair, and legitimate for the officers, victims and their families, the criminal justice system, and local community. Ideally, OIS investigations are conducted in an impartial (and perhaps independent) manner that prioritizes communication, maximizes transparency, and ultimately ensures justice and community confidence in the outcome. Not surprisingly, the ideal OIS investigative process is difficult to achieve and is unlikely to be the same in every community, state, or country.

This study offers some helpful insights and suggestions into how OIS investigations are conducted and how such investigations might be improved in the future. Building on a limited literature review, which needs to be broadened, this study assessed the status and nature of the OIS investigative processes in large law enforcement agencies in the United States and Canada. A survey of those law enforcement agencies offered additional insights regarding how these organizations have responded to a national call for change, how they currently conduct OIS investigations, and what steps they are taking to adopt and perhaps improve investigative independence and transparency. A focus group session with law enforcement leaders confirmed (1) that OIS investigations are handled in a variety of ways; (2) that there are substantial differences of opinions and wide variations in practice regarding whether and how to involve external agencies and investigators; and (3) that investigative transparency, while vitally important to many law enforcement leaders and communities, is constrained by local practices, departmental policies, union rules, and state laws. Some of these local practices, policies, and laws make sense; others should be reconsidered (e.g., allowing an officer to "take a couple days" before submitting a statement following an OIS is not a practice that enhances public confidence in agency transparency).

Despite our many differences, most people can agree that investigating law enforcement officers, who are authorized to enforce our laws and who unfortunately are sometimes required to use force (including deadly force) while doing so, is a particularly difficult and highly sensitive process. Fortunately, most law enforcement officers will never be directly involved in a shooting event and most community members will not be directly impacted by OIS events. Justice and fairness demand that we carefully investigative OIS events knowing that the relatively few officers who ultimately fire weapons in the line of duty may also suffer afterward (Klinger 2010). OIS investigations that are unjust or perceived as unfair ultimately jeopardize public safety and arguably make the law enforcement process more dangerous for everyone involved.

# References

CDC (Centers for Disease Control and Prevention). 2018. "About Underlying Cause of Death 1999–2016." Accessed April 27, 2018. https://wonder.cdc.gov/ucd-icd10.html.

Donner, Christopher M., Jon Maskaly, Alex R. Piquero, and Wesley G. Jennings. 2017. "Quick on the Draw: Assessing the Relationship between Low Self-Control and Officer-Involved Police Shootings." *Police Quarterly* 20(2): 1–22. http://journals.sagepub.com/doi/pdf/10.1177/1098611116688066.

FBI (Federal Bureau of Investigation). 2013. "Table 29: Estimated Number of Arrests—United States, 2012." In *Crime in the United States, 2012*. Uniform Crime Report. Washington, DC: Federal Bureau of Investigation. https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/29tabledatadecpdf.

———. 2014. "Table 29: Estimated Number of Arrests—United States, 2013." In *Crime in the United States, 2013.* Uniform Crime Report. Washington, DC: Federal Bureau of Investigation. https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-29/table_29_estimated_number_of_arrests_united_states_2013.xls.

———. 2015. "Table 29: Estimated Number of Arrests—United States, 2014." In *Crime in the United States, 2014.* Uniform Crime Report. Washington, DC: Federal Bureau of Investigation. https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-29.

———. 2016. "Table 29: Estimated Number of Arrests—United States, 2015." In *Crime in the United States, 2015.* Uniform Crime Report. Washington, DC: Federal Bureau of Investigation. https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-29.

Geller, William A., and Hans Toch, eds. 1996. *Police Violence: Understanding and Controlling Police Abuse of Force*. New Haven, CT: Yale University Press.

Hammonds, Amari L., Katherine Kaiser Moy, Rachel R. Suhr, and Cameron Vanderwall. 2016. *At Arm's Length: Improving Criminal Investigations of Police Shootings*. Stanford, CA: Stanford Criminal Justice Center. https://law.stanford.edu/publications/at-arms-length-improving-criminal-investigations-of-police-shootings/.

Hickman, Matthew J., Alex R. Piquero, and Joel H. Garner. 2008. "Toward a National Estimate of Police Use of Nonlethal Force." *Criminology and Public Policy* 7(4): 563–604. https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1745-9133.2008.00528.x.

IACP (International Association of Chiefs of Police). 2000. *Police Accountability and Citizen Review*. Alexandria, VA: International Association of Chiefs of Police. http://www.theiacp.org/Police-Accountability-and-Citizen-Review.

———. 2016. *Officer-Involved Shootings: A Guide for Law Enforcement Leaders*. Washington, DC: Office of Community Oriented Policing Services. https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P350.

———. 2018. *Officer-Involved Shootings, In-Custody Deaths, and Serious Uses of Force*. Model Policy. Accessed April 27, 2018. http://www.theiacp.org/model-policy/model_policy/officer-involved-shootings/.

Investigation Protocols for Peace Officers Use of Force. Utah H.B. 361 (2015). https://le.utah.gov/~2015/bills/static/HB0361.html.

Jackson, Jonathan, Tia Pooler, Katrin Hohl, Jouni Kuha, Ben Bradford, and Mike Hough. 2011. *Trust in Justice: Topline Results from Round 5 of the European Social Survey*. London: European Social Survey. http://eprints.lse.ac.uk/41680/.

Johnson, Richard R. 2015. *Factually Examining Deaths from Police Use of Force*. Plainfield, IN: Legal & Liability Risk Management Institute. http://www.llrmi.com/articles/legal_update/2015_johnson_useofforce.shtml.

Katz, Walter. 2015. "Enhancing Accountability and Trust with Independent Investigations of Police Lethal Force." *Harvard Law Review Forum* 128: 235–245, https://harvardlawreview.org/2015/04/enhancing-accountability-and-trust-with-independent-investigations-of-police-lethal-force/.

Klinger, David A. 2010. "The Consequences of Using Deadly Force." In *Police Use of Force: A Global Perspective.*, edited by Joseph B. Kuhns and Johannes Knutsson, 152–162. Santa Barbara, CA: Praeger Security International.

Kuhns, Joseph B., and Johannes Knutsson, eds. 2010. *Police Use of Force: A Global Perspective*. Santa Barbara, CA: Praeger Security International.

Kuhns, Joseph B., Diana Doliver, Emily Bent, and Edward R. Maguire. 2016. *Understanding Firearms Assaults against Law Enforcement Officers in the United States*. Washington, DC: Office of Community Oriented Policing Services. https://ric-zai-inc.com/ric.php?page=detail&id=COPS-W0797.

Langton, Lynn, and Matthew Durose. 2013. *Police Behavior during Traffic and Street Stops, 2011*. Special Report. Washington, DC: Bureau of Justice Statistics. https://www.bjs.gov/content/pub/pdf/pbtss11.pdf.

Miller, Laurence. 2015. "Why Cops Kill: The Psychology of Police Deadly Force Encounters." *Aggression and Violent Behavior* 22: 97–111. https://www.sciencedirect.com/science/article/pii/S1359178915000452.

Nelson, Jill, ed. 2000. *Police Brutality: An Anthology*. New York: W.W. Norton and Co.

Oettmeier, Timothy N., and Terry A. Bratton. 2017. *Reflections on Police Shootings: A Look at How Agencies Should React*. California Association of Tactical Officers. http://catonews.org/files/2017/03/Reflections-on-Police-Shootings.pdf.

Paoline, Eugene A., and William Terrill. 2014. *Police Culture: Adapting to the Strains of the Job*. Durham, NC: Carolina Academic Press.

Peace Officer-Involved Shooting Statute. Colorado Revised Statutes 16-2.5-301 (2015). https://leg.colorado.gov/sites/default/files/images/olls/crs2015-title-16.pdf.

President's Task Force on 21st Century Policing. 2015. *Final Report of the President's Task Force on 21st Century Policing*. Washington, DC: Office of Community Oriented Policing Services. https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P311.

Savage, Stephen P. 2013. "Thinking Independence. Calling the Police to Account through the Independent Investigation of Police Complaints." *British Journal of Criminology* 53(1): 94–112. https://academic.oup.com/bjc/article-abstract/53/1/94/611422.

Seneviratne, Mary. 2004. "Policing the Police in the United Kingdom." *Policing and Society* 14(4): 329–347. https://www.tandfonline.com/doi/abs/10.1080/1043946042000286056.

Special Investigations Unit. 2018. "What We Do." Queen's Printer for Ontario. Accessed April 30, 2018. https://www.siu.on.ca/en/what_we_do.php.

Walker, Samuel. 2000. *Police Accountability: The Role of Citizen Oversight*. Belmont, CA: Wadsworth.

Wisconsin Department of Justice. 2014. "Officer Involved Critical Incident." Wisconsin Department of Justice. Accessed May 8, 2018. https://www.doj.state.wi.us/dci/officer-involved-critical-incident.

Zimring, Franklin E. 2017. *When Police Kill*. Cambridge, MA: Harvard University Press.

# Appendix A

This section details the entities that handle OIS investigations for each of the law enforcement agencies responding to the MCCA survey.

| Agency name | Investigating agency, entity, or unit |
|---|---|
| Albuquerque, NM | Critical Incident Response Team (CIRT) |
| | Force Investigation Team (FIT) |
| | Multi-Jurisdictional Task Force |
| Atlanta, GA | Homicide Officer Involved Shooting Team (HOIST) |
| Aurora, CO | Officer Involved Shooting Investigative Team (OISIT) |
| | Internal Affairs (IA) |
| Austin, TX | Special Investigations Unit (SIU) |
| | Internal Affairs (IA) |
| Baltimore County, MD | Homicide/Missing Persons Unit (HMPU) |
| | Internal Affairs Section (IAS) |
| Baltimore, MD | Special Investigation Response Team (SIRT) |
| | Homicide |
| | Office of the State's Attorney* |
| Boston, MA | Firearm Discharge Investigation Team (FDIT) |
| Charlotte-Mecklenburg, NC | Officer Involved Shooting Team (OIST) |
| | Internal Affairs (IA) |
| Chicago, IL | Bureau of Internal Affairs (BIA) |
| | Bureau of Detectives |
| | Crime Prevention and Information Center (CPIC) |
| Cincinnati, OH | Criminal Investigations Section (CIS) |
| | Internal Investigations Unit (IIU) |
| | Homicide Unit |
| Cleveland, OH | Use of Deadly Force Investigation Team (UDFIT) |
| | Firearm Investigation Team (FIT) |
| Columbus, OH | Critical Incident Response Team (CIRT) |
| | Internal Affairs* |
| Dallas, TX | Special Investigations Unit (SIU) |
| Denver, CO | Major Crimes Division |
| | DA's Office |
| | Internal Affairs (IA)* |
| Fairfax County, VA | Major Crimes Division |
| | Criminal Investigations Bureau |
| | Internal Affairs |

| Agency name | Investigating agency, entity, or unit |
|---|---|
| Fort Worth, TX | Major Case Unit |
| | Critical Police Incident Investigation Team |
| | Internal Affairs |
| Fresno, CA | Homicide Unit |
| | Internal Affairs |
| Honolulu, HI | Criminal Investigation Section of the Professional Standards Office |
| Jacksonville, FL | Homicide |
| | Cold Case Team |
| | DA's Office* |
| Kansas City, MO | Police Incident Team |
| | Violent Crimes Division (VCD) |
| | Internal Affairs Unit (IAU) |
| Las Vegas, NV | Critical Incident Response Team (CIRT) |
| | Force Investigation Team (FIT) |
| | Office of Internal Oversight (OIO) |
| Long Beach, CA | Homicide Unit |
| Los Angeles County, CA | Internal Affairs Board (IAB) Force |
| | Shooting Response Team |
| Los Angeles, CA | Force Investigation Division (FID) |
| | Real Time Analysis and Critical Response Division (RACR) |
| Louisville, KY | Public Integrity Unit (PIU) |
| | Crime Scene Unit (CSU) |
| | Professional Standards Unit (PSU)* |
| Mesa, AZ | Homicide Unit |
| | Maricopa County Attorney's Office (MCAO) |
| Miami-Dade, FL | N/A |
| Milwaukee, WI | Assigned Police Lieutenant |
| Minneapolis, MN | Supervising Officer* |
| | Homicide* |
| Montgomery County, MD | Homicide Section |
| | Internal Affairs Division (IAD) |
| | Use of Force and Weapons Review Committee |
| New Orleans, LA | Force Investigative Team (FIT) |
| | Public Integrity Bureau (PIB)* |
| | Independent Police Monitor |
| | Use of Force Review Board (UFRB)* |
| New York City, NY | Force Investigation Division (FID) |
| | Detective Bureau |
| Newark, NJ | Supervisor |

| Agency name | Investigating agency, entity, or unit |
| --- | --- |
| Oakland, CA | Homicide Section |
| | Internal Affairs Division (IAD) |
| | DA Office Standby Team* |
| Oklahoma City, OK | Homicide Division |
| | Crime Scene Investigations |
| Omaha, NE | Officer-Involved Investigations Team (OIIT) |
| Philadelphia, PA | Homicide Unit* |
| | Detective Division of Occurrence |
| | Internal Affairs Shooting Team (assists) |
| Phoenix, AZ | Professional Standards Bureau (PSB) |
| | Violent Crimes Bureau (VCB) |
| | Incident Review Unit (IRU) |
| Portland, OR | Detective Division |
| | Homicide Division |
| | District Attorney's Office (DA)* |
| Prince George's County, MD | Special Investigation Response Team (SIRT) |
| Sacramento, CA | Homicide Unit |
| | District Attorney* |
| Salt Lake City, UT | Protocol Team |
| | Detective Division |
| | DA's Office* |
| San Antonio, TX | Shooting Team |
| | Homicide Unit |
| | Internal Affairs |
| San Diego, CA | Homicide Unit |
| | Internal Affairs |
| | District Attorney |
| San Francisco, CA | Homicide Detail |
| | Risk Management Office |
| | Office of the DA |
| San Jose, CA | Homicide-Crime Scene Unit |
| | Internal Affairs Unit |
| Seattle, WA | Force Investigation Team (FIT) |
| Tucson, AZ | Crimes Against Persons Division |
| | Office of Internal Affairs (OIA) |
| Tulsa, OK | Major Crime Unit (MCU) |
| | Detective Division/Internal Affairs |
| Virginia Beach, VA | Internal Affairs |
| | On-Duty Supervisor |

| Agency name | Investigating agency, entity, or unit |
|---|---|
| Washington, D.C. | Force Investigation Team (FIT) |
| | Office of the Superintendent of Detectives |
| Wichita, KS | WPD |
| | Persons Crime Bureau |

* indicates that those units may be used at the discretion of the agency in some cases

# Appendix B

*The formatting of this section has been slightly modified to conform to publication standards.*

1.  Have you faced pressure to change your approach to officer-involved shooting investigations (OIS) from any of the following?

    | | Yes | No |
    |---|---|---|
    | Community | | |
    | News media | | |
    | Civilian Oversight Board | | |
    | Elected officials | | |
    | Union / Employees | | |
    | Other (please specify) | | |

2.  The President's Task Force on 21st Century Policing report was released in May 2015. Have you made OIS policy changes in response to the President's Task Force on 21st Century Policing?

    ___ Yes

    ___ No

    If yes, please specify _____

3.  When was the last time that you modified your OIS policy?

    ___ Within the past two years

    ___ Within the past 3 to 5 years

    ___ More than 5 years ago

    Comment _____

4.  Have changes to your OIS policy been proposed and not yet adopted?

    ___ Yes

    ___ No

    If yes, please specify _____

5.  Who conducts the criminal investigation for officer-involved shootings? Please check all that apply.

      ___ Our homicide detectives

      ___ Our shooting investigative team

      ___ Other local agency

      ___ Task force (our department and others)

      ___ Prosecutors' office

      ___ State police

      ___ Other state investigative agency

      ___ Other (please specify) _____

6.  The determination on whether on not criminal charges will be filed is made by:

      ___ Police

      ___ Prosecutor

      ___ Police and prosecutor together

      Other (please specify)  _____

7.  What are the advantages/disadvantages of *internally conducted* (by your agency) OIS investigations?

      Advantages_____

      Disadvantages _____

8.  What are the advantages/disadvantages of an *external/independently conducted* OIS investigation?

      Advantages_____

      Disadvantages _____

9.  When an external agency investigates an OIS for our agency (Check all that apply):

      ___ The external investigative agency has complete independence from our agency.

      ___ The external investigative agency leads but we have investigators assigned as well.

___ Our agency processes the crime scene.

___ The external agency processes the crime scene.

___ We work together to process the crime scene.

___ Not applicable because we conduct our own (internal) investigations.

Comment: _____

10. Who conducts the internal investigation (policy) for OIS?

___ Our internal affairs investigators

___ Internal Force Investigative Team

___ Civilian oversight agency

___ Other law enforcement agency

___ Other (please specify) _____

11. Who makes the determination of whether or not an OIS was consistent with agency policy?

___ Internal Shooting Review Board

___ External agency

___ Chief/Command staff

___ Other (please specify) _____

12. Disciplinary decisions are the responsibility of my department.

___ Yes

___ No

If no, who is responsible? _____

13. Who has the primary responsibility for releasing public information on OIS investigations?

___ Our agency

___ The external investigative agency

___ The prosecutor

___ Other (please specify) _____

14. If you have video footage of the shooting, when do you publicly release it?

___ We never publicly release the footage.

___ The footage is typically publicly released after the charging decision is made.

___ The footage is typically publicly released at the trial.

___ The footage is typically publicly released when the investigation has progressed to the point that it will not be harmed.

___ The timing of video footage release to the public is decided on a case-by-case basis.

___ Other (please specify)

15. Do you normally review video footage with the family of the deceased before it is released?

___ Yes

___ No

___ Varies depending on the case (please specify) _____

16. Address

Name _____

Department _____

City/Town _____

Email address _____

Phone number _____

# About the Authors

## Joseph B. Kuhns

Dr. Joe Kuhns teaches courses in policing, community policing, drugs and crime, and research methods at the undergraduate and graduate levels. Prior to arriving at the University of North Carolina at Charlotte in 2003, Dr. Kuhns served as a Senior Policy Analyst at the U.S. Department of Justice (Office of Community Oriented Policing Services). Dr. Kuhns has worked on a wide range of research and evaluation projects focused on use of deadly force by and against the police, alcohol, drug and violent crime relationships, and the impact of burglary offending and victimization. From 2005 to 2009, he worked with a number of scholars and practitioners and with the Trinidad and Tobago Police Services to help to reduce violent crime and improve law enforcement services in that developing nation. His coedited book about police use of force, firearms, and nonlethal weapons in various countries around the world was recognized with a Choice Award in 2010. Dr. Kuhns is continually working directly with numerous police departments, national associations, and federal agencies to improve policing practices, identify emerging priorities, and enhance officer and community safety.

## Josie F. Cambareri

Josie Francesca Cambareri is a doctoral student in the School of Criminology and Criminal Justice at Northeastern University. Cambareri received her Master of Science in Criminology and Criminal Justice from the University of North Carolina at Charlotte. Her research interests include recruitment of women into law enforcement; civilian oversight of police; officer-involved shooting policy; perceptions of police; and the intersection of race, justice, and policing. Cambareri is currently a research assistant on an experiment to enhance procedural justice in hot spots policing and a project to evaluate a Boston nonprofit's mission to reduce youth crime through education.

## Shannon Messer

Shannon Messer is a graduate student at the University of North Carolina, studying under the tutelage of Dr. Joe Kuhns. She has worked on several policing projects including a study of deadly force against police and another focused on the impact of burglary offending and victimization. Shannon has previously served as a Teaching and Research Assistant at UNCC and is the recipient of the Graduate School Masters Merit Award. She intends to pursue a career in criminal justice reform.

## Darrel W. Stephens

Darrel W. Stephens served as the Executive Director of Major Cities Chiefs Association for seven years from 2010 to 2017. He is an accomplished police executive with more than 40 years of experience. His career began as a police officer in Kansas City, Missouri, in 1968. In addition to his police experience, he served for two years as the City Administrator in St. Petersburg, Florida, where he was responsible for a work force of approximately 3,000 employees and a budget of $380 million. He has 22 years of experience in a police executive capacity including almost nine years from September 1999 to June 2008 as the Chief of Police of the 2,100 member Charlotte-Mecklenburg Police Department. He also served as a member of the faculty of the Public Safety Leadership

Program in the School of Education at Johns Hopkins University from 2008 to 2013. In addition, he served as the Executive Director of the Police Executive Research Forum from 1986 until 1992. Stephens has written extensively about policing, is widely sought after for consulting, and is a frequent speaker advocating progressive policing approaches. He received the prestigious Police Executive Research Forum's Leadership Award and the Academy of Criminal Justice Sciences O.W. Wilson Award. In 2006, he was awarded an Honorary Doctorate of Laws Degree from Central Missouri State University. He was inducted into the Evidence Based Policing Hall of Fame in 2010 and also received the Distinguished Achievement Award in Evidence Based Crime Policy.

# About the Major Cities Chiefs Association

The **Major Cities Chiefs Association (MCCA)** is a professional association of chief police executives representing the largest cities in the United States, Canada, and the United Kingdom. MCCA membership comprises chiefs and sheriffs of the 67 largest law enforcement agencies in the United States, 10 largest in Canada, and two in the United Kingdom. They serve 91.4 million people (70 million in the United States, 11.5 million in Canada, and 9.9 million in the United Kingdom) with a sworn workforce of 241,257 (162,425 in the United States, 21,939 in Canada, and 56,893 in the United Kingdom) officers and nonsworn personnel. The MCCA's strategic goals are

- to guide national and international policy that affects public safety and major cities;

- to develop current and future police executive leaders;

- to promote innovation and evidenced-based practices in policing.

To learn more, visit the MCCA online at https://www.majorcitieschiefs.com.

This paper presents the results of research by the Major Cities Chiefs Association (MCCA) of large law enforcement agencies in the United States and Canada to study community perceptions of officer-involved shootings and the investigations that follow them. There is a growing demand among the public for increases in the transparency of such investigations and in the neutrality of the investigators. The MCCA looked into the range of practices already in place, conducted focus group discussions, and administered a survey; this report presents summaries of the research and recommendations based on it.



**Major Cities Chiefs Association**
1025 Connecticut Avenue NW, Suite 1000
Washington, DC 20036

To obtain details about MCCA programs,
call the Major Cities Chiefs Association
at 202-828-1260.

Visit the Major Cities Chiefs Association online
at **https://majorcitieschiefs.com**.

e041810876
Published 2018

# BEST PRACTICES FOR INVESTIGATING
# AN OFFICER-INVOLVED CRITICAL INCIDENT

MARK KOLLAR, BCI SPECIAL AGENT SUPERVISOR | 2021



# BEST PRACTICES FOR INVESTIGATING
# AN OFFICER-INVOLVED CRITICAL INCIDENT

MARK KOLLAR, BCI SPECIAL AGENT SUPERVISOR | 2021



DAVE YOST
OHIO ATTORNEY GENERAL

## Acknowledgments

This book marks the culmination of years of training and experience by the many dedicated professionals at the Ohio Attorney General's Bureau of Criminal Investigation and the larger Ohio Attorney General's Office. The idea to share our collective insights with the law enforcement community originated with Ohio Attorney General Dave Yost. Without his vision and leadership, this book would not have been possible. Additionally, the BCI leadership team was instrumental in guiding the policy and protocol development that inspired much of the information contained herein: Thank you to Superintendent Joseph Morbitzer, Assistant Superintendent Heinz von Eckartsberg and Special Agent in Charge Gary Wilgus. Although I have learned a great deal from a variety of individuals, a special note of gratitude goes to the men and women — past and present — of Special Investigations Unit Company B, who have shouldered the heavy responsibility of conducting these difficult investigations through the years. Without their passion, professionalism, knowledge and hard work, I would not be in a position to write such a publication. Thank you to Special Agent Supervisor Jeff Cook, who handled my supervisory responsibilities for the many months it took to complete this book. To Publications Director Mary Lynn Plageman, whose editing ability and patience throughout the writing process have helped to create an eloquent and professional end product — thank you! And, finally, this book was truly a multidisciplinary team effort by those subject-matter experts who shared their writing and expertise.

Your contributions and sacrifices have made the finished product timely and credible.

Therefore, a special thanks goes to:

- Special Agent Cory Momchilov (BCI)
- Special Agent Charles Moran (BCI)
- Special Agent Daniel Boerner (BCI)
- Special Agent Eric Lehnhart (BCI)
- Senior Assistant Attorney General Anthony Pierson (Special Prosecutions)
- Victim Specialist Cindy Kuhr (BCI)
- Senior Assistant Attorney General Lori Duckworth (Criminal Justice)
- Senior Assistant Attorney General Michelle Brizes (Court of Claims)
- Senior Special Projects Director Glenn Sheller (Administration)

Others whose help is equally appreciated:

- Chief of Staff Benjamin Marrison
- Director of Law Enforcement Operation Doug Dumolt
- Graphic Designer Jennifer Bachelder
- Offices Services Printing Leader Liz Swartz
- Special Agent Albert Bansky (BCI)
- Special Agent Arvin Clar (BCI)
- Special Agent Jonathan Lieber (BCI)
- Special Agent Charlie Snyder (BCI)
- Special Agent Matthew Collins (BCI)

# Table of **Contents**

**A message from AG Dave Yost** ..................................................................................................................i

**Terminology** .......................................................................................................................................... v

**Preface** ................................................................................................................................................. vii

**Introduction** ........................................................................................................................................ ix

**Chapter 1: Legal Standards** ............................................................................................................... 1

    Criminal charges and use of force ....................................................................................................1

    Civil lawsuits and use of force...........................................................................................................6

    Standards of conduct of law enforcement vs. private citizens .........................................................8

    Official vs. individual capacity and qualified immunity....................................................................9

**Chapter 2: Pre-Event Planning & Policy Considerations**...................................................... 11

    Crime scene.....................................................................................................................................12

    Criminal investigation......................................................................................................................13

    Internal/Administrative investigations ............................................................................................16

    Involved-officer considerations........................................................................................................19

    Community and media relations ......................................................................................................20

**Chapter 3: Investigative Personnel**.............................................................................................. 23

    Primary considerations ...................................................................................................................23

    Primary investigative models ..........................................................................................................28

**Chapter 4: Investigative Methodology** ....................................................................................... 31

    Leadership/Incident command .......................................................................................................32

    10 keys to effective leadership at an OICI scene............................................................................. 33

    Big-picture goals............................................................................................................................. 36

    Preparation and protocols .............................................................................................................. 39

    Scene response................................................................................................................................ 41

    Hospital response ........................................................................................................................... 48

    Initial contact with involved officers .............................................................................................. 50

    Crime scene .................................................................................................................................... 52

    Neighborhood canvassing and witness interviews.......................................................................... 68

    Involved-officer statements ............................................................................................................ 76

    Action and reaction ....................................................................................................................... 85

    Video evidence ...............................................................................................................................91

    Social media and electronic evidence ........................................................................................... 100

    Search warrants ............................................................................................................................ 109

    In-custody deaths ......................................................................................................................... 110

    Suicide by cop .............................................................................................................................. 112

    Reporting on investigative findings ............................................................................................... 113

    Presenting findings and courtroom testimony .............................................................................. 118

**Chapter 5: Post-Mortem Examinations** .................................................................. **121**

    Information sharing ..................................................................................... 122

    Medical examiner vs. coroner ..................................................................... 123

    Death scene ................................................................................................ 123

    Autopsy reports ......................................................................................... 124

    Cause and manner of death ........................................................................ 128

    Incapacitation times .................................................................................. 129

**Chapter 6: Mental Health Considerations** ........................................................... **133**

    The brain and trauma ................................................................................ 133

    Unique perspectives ................................................................................... 135

    Death notification protocol ....................................................................... 141

**Chapter 7: Prosecution** ....................................................................................... **145**

    Acknowledging the pressures ..................................................................... 145

    Calling in the prosecutor ........................................................................... 146

    Checking for a conflict .............................................................................. 147

    Arriving at the scene .................................................................................. 148

    Remembering Garrity issues ...................................................................... 148

    Reviewing video evidence .......................................................................... 149

    Restricting the subject's attorney ............................................................... 150

    Leaving the scene ....................................................................................... 151

    Reaching out to the subject's family ........................................................... 151

    Deciding on grand jury involvement .......................................................... 152

**Conclusion** ......................................................................................................... **157**

**Epilogue** ............................................................................................................. **159**

    The right to know vs. the rule of law ......................................................... 160

    The lessons of Ferguson ............................................................................. 161

    The way forward ........................................................................................ 164

    Good-faith efforts are necessary ................................................................. 169

**Appendices** ......................................................................................................... **171**

    A.   Public Safety Statement ..................................................................... 172

    B.   Criminal Investigation Notification ................................................... 173

    C.   Conflict Assessment .......................................................................... 174

    D.   BCI's OICI Response Overview and Guidelines ................................. 176

    E.   Supervisor Checklist ......................................................................... 190

    F.   Investigator On-Scene Checklist ........................................................ 192

    G.   Investigator Post-Scene Checklist ...................................................... 194

    H.   Crime-Scene Checklist ...................................................................... 196

    I.   Crime-Scene Processing Outline ....................................................... 198

    J.   Crime-Scene Access Log .................................................................... 202

    K.   Neighborhood Canvass Form ............................................................ 203

    L.   Officer Statement .............................................................................. 206

# A message from AG Dave Yost

Government exists, in the first place, for public safety. It is the primary function of government, and remains the most important.

Before there was government, man existed in what Thomas Hobbes called a state of nature – "solitary, poor, nasty, brutish and short." Whoever was bigger, faster and stronger killed you, enslaved your family and took your stuff.

Government was the solution. By gathering together in mutual security, humankind had a shot to live a longer life, to build and acquire property. No matter that the government would likely be, at first, the arbitrary rule of a strongman: A semblance of public safety had sprouted.

The rule of law would eventually follow – the idea of neutral rules, more or less collectively agreed to, generally applicable to all. And the rule of law required law enforcement, which occasionally necessitates the use of force.

That force, however, is the public's use of force. It is the public that authorized its use, for the public's benefit. It is the public's agents, the police, who are the means of applying that force. Every arrest, every use of a baton or handcuffs or a gun are the acts of the collective public.

The vast majority of police encounters with the public do not result in the use of force. Of those that do, the vast majority are proper. There are both evil people in the world and people who are unable to voluntarily conform their conduct to the law.

The most critical uses of force on the public's behalf are those that result in the death of a person. And although the vast majority of these incidents, too, are proper, we cannot settle for being right most of the time. The death of any person by the use of publicly authorized force is too serious.

*i*

Because these fatal uses of force are authorized on behalf of the community, what the community thinks about its agents' use of that authorized force is a central question. And, as people are inclined to say these days, it's complicated.

First, people in the community often question whether a police agency can objectively investigate one of its own. Whether or not there is evidence of bias in a given investigation, the appearance is there when the investigators carry the same badge as that of the subject of the investigation. Similarly, critics question whether a prosecuting attorney who works daily with the police can objectively assess the nature of officers' actions.

If law enforcement is to have the support of the communities it serves, independence in the investigation of a fatal use of force is not a luxury but a requirement. The day of the do-it-yourself investigation is quickly passing.

Second, some investigations are not expertly performed. Although many investigations are very well done, there are those that are not – and that is unacceptable when the public's authority to use deadly force results in a death. Whether the use of force is ultimately ruled to be proper or improper, it must be completely and expertly investigated.

A poor investigation may be due to a lack of training, or to the small size of the agency investigating the incident. It may be due to a lack of communication between agencies, or even well-intentioned interference by elected leaders. It is certainly exacerbated by the lack of a definitive resource on how to conduct such investigations.

Third, much of the process occurs in a confidential investigation, or before a grand jury whose proceedings and deliberations are, by law, secret. Although plaintiff's lawyers representing the families may hold regular press conferences with partial information as it comes out, the investigators themselves are bound by the investigation or the law to limit public statements. What emerges can be a misleading or even inflammatory picture.

A great example is video footage. Frequently, a body-cam video is released as a public record. Although investigators eventually may locate many videos with different points of view from multiple public and private sources, the

*ii*

public's impression is formed by that single initial point of view, burned into its consciousness by regular repetition on television news and social media.

It is hard to overstate how harmful this trickle of information is. Think about a football game. A critical call by a referee is reviewed by the booth. While viewers wait on the final word, the initial camera views are shown by the broadcasters. It seems obvious that the official got the call wrong – until precisely the right camera angle is found; then it becomes clear that the ref was right all along. We viewers just didn't have the full picture.

Or, perhaps the ref was wrong.

The point is that pieces of information, isolated from other information and from context, can easily lead to a wrong conclusion.

And that, fundamentally, is what this book is about. Justice requires that an investigation be independent, that it be performed completely and expertly, and that it be done with as much transparency as possible.

The aim is to set a national standard for investigation of law enforcement use-of-force incidents, and then to improve upon it as techniques, technology and experience expand the investigative toolbox in the future.

And no one is better qualified to set that standard than this book's main author, Special Agent Supervisor Mark Kollar of the Ohio Attorney General's Bureau of Criminal Investigation, whom I recently promoted to the newly created position of statewide coordinator for officer-involved critical incident investigations.

Kollar has spent almost three decades in law enforcement, working patrol, narcotics, crime scene, detective bureau, and in a variety of supervisory roles. He helped to create and now leads BCI's Major Case Response Team and the Northeast Regional Critical Incident Response Task Force. Besides writing this and several other books, he is a regular contributor to PoliceOne and other law enforcement publications.

But his ultimate credential is experience: He has investigated or supervised more than 200 officer-involved critical incidents. He has done the work.

*iii*

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

Drawing on that experience, he has instructed law enforcement agencies nationwide on how to conduct expert investigations of officer-involved critical incidents. In this book, he has combined his experience and the experiences of many other investigative experts to create what I believe is a state-of-the-art guide to these investigations.

You also will find a chapter on the law, for investigations are about finding facts to which the law will be applied to reach a just result. A team of senior attorneys in my office co-wrote this material. Likewise, another senior attorney contributed the chapter on prosecution, information that will be useful to investigators and prosecutors alike.

Finally, in the Epilogue, we explore emerging principles regarding independence and communications.

This last material is the most fluid, because it is written as our society is still struggling to work through the way forward. As such, it is offered as non-exhaustive, experience-based observations about what the future might look like; little could be described as "proven."

It is my hope that these pages will help all of us in law enforcement get better; strengthen trust between citizens and police; and result in more just outcomes, both in reality and in perception.

# Terminology

Terminology and definitions for officer-involved critical incidents (OICI) vary widely depending upon the locale and the intended purpose. Some terms may be defined by policy or law; others are used more broadly.

The following terms are defined as used for the purposes of this book:

- **Officer-involved critical incident** refers to any of the following:

  - The discharge of a firearm by a law enforcement officer or other official during the course of his or her duties that is directed at a human being (not including the shooting of an animal, training accidents or accidental discharges that result in no injuries), whether or not the person sustains an injury.

  - Any incident in which a law enforcement officer suffers serious physical harm or death at the hands of another, including "friendly fire" situations.

  - Any incident involving the use of force by a law enforcement officer against another person when it appears that the person may have sustained serious physical harm or death.

- **Employing agency** (also called the **parent agency**) is the law enforcement agency that employs or is affiliated with the officer(s) involved in a critical incident.

- **In-custody death** refers to the death of a subject in the legal custody of law enforcement or a correctional facility who dies while in that custody, absent any use of force

*v*

or other action/inaction by law enforcement or correctional personnel that is suspected to be a contributing factor in the death. Examples of an in-custody death include suspected suicides, drug overdoses, deaths from natural causes, or accidental deaths of a jail inmate or arrestee. If a governmental official's actions or inactions may have contributed to the death, such as a struggle with the decedent contemporaneous to or immediately preceding the death, then the death would fall more broadly under the OICI classification rather than being considered an in-custody death under this definition. *["In-custody" is defined as: "a situation when there has been a formal arrest or when, under the totality of the circumstances, there has been a restraint on freedom of movement of the degree associated with formal arrests." United States v. Lacy, 2009 U.S. Dist. LEXIS 86970, 2-3 (E.D. Wis. Aug. 13, 2009)]*

# Preface

Until recently in our nation's history, instances of law enforcement use of force went largely unnoticed and unscrutinized by the media and much of the public. Most Americans generally accepted that a use of force by police must have been necessary and justified.

Such a sentiment, however, is no longer the standard. With the proliferation of technology (cellphone video recordings, the 24-hour news cycle, social-media shares, etc.) and the occasional violation of the public trust by some in law enforcement, the issue is no longer seen as binary — "good" or "bad" — nor do incidents remain under the radar.

Controversy, protests and calls for reform can be sparked by many potentially contentious triggers, including racial tensions, situations in which innocuous objects are mistaken for weapons, encounters with people who suffer a mental illness or are drug-influenced, subjects shot in the back, and patterns of excessive force by agencies or individual officers. The complexities facing law enforcement are now routinely thrust front-and-center into the living rooms of everyday citizens, who once enjoyed the safety provided by law enforcement without having to witness the sometimes-unpleasant methods needed to keep the peace.

Although many in law enforcement might view the public conversation and the scrutiny of police negatively, the far more constructive perspective is to frame these critiques as opportunities to improve, increase professionalism and better serve the constituents we are sworn to protect.

Times and expectations have changed, and law enforcement must adjust its methods of investigating use-of-force cases to

reflect the desires of its communities. Agencies that have recognized the need for progress have had to proceed blindly, through trial and error. This deficiency in specific guidelines has yielded wide-ranging and inconsistent approaches throughout the country.

Understanding the need for uniform standards and established best practices, the Ohio Attorney General's Office formed working groups of subject-matter experts to develop protocols for the objective, professional and timely criminal investigation of officer-involved critical incidents (OICI). The methods have been tested through application and refined through experience. In an effort to work collaboratively with other investigative agencies and assist in establishing investigation uniformity, we detail in this book what we view as current best practices for investigating law enforcement use of force.

It is important to note that, like other protocols, this is a "living document." Continual evaluation and evolution of best practices are vital as new knowledge and understanding are acquired, laws change and additional experience is gained. We view these guidelines, as of their publication time, to be one of the best models available. Still, individual circumstances and locales should always be considered. Please consult your agency's legal adviser regarding the applicability in your jurisdiction of the information presented.

Additionally, some of the issues discussed in the book have multiple possible solutions, including several that might be valid. In such cases, we have sought to present the arguments on all sides of the debate with the understanding that individual departments can then make an informed decision regarding which method would work best in their communities and be able to articulate and defend their rationale.

Nothing in this book is meant to convey legal, medical or psychological advice. The information is presented to expand your knowledge of the material and provide the methodology in use by the Ohio Attorney General's Bureau of Criminal Investigation. The more ideas to which leaders and practitioners are exposed, the more informed their decisions will be. In that spirit, then, we share what we view as the current best practices for investigating officer-involved critical incidents.

# Introduction

Law enforcement officers are the only government officials legally entrusted to exercise deadly force against a fellow citizen in situations requiring a split-second judgment. With that power, though, comes the tremendous responsibility of ensuring that any such use of force was justified and objectively reasonable under the circumstances.

Without a transparent and thorough investigation, a police agency's relationship with the community it serves suffers and the agency's legitimacy can be called into question. This is why an officer-involved fatal shooting may be one of the most important — and scrutinized — investigations a detective ever conducts. Not only will the involved officer's actions be publicly scrutinized, but the investigation of those actions will be equally challenged if it is anything less than professional, unbiased and fair to all parties involved. Public trust versus unrest, civil litigation, departmental reputation and the very freedom of those involved all hinge on the competence and thoroughness of the subsequent criminal and administrative investigations. The legality and constitutionality of the actions of all involved parties, including law enforcement, must be properly assessed with impartiality. The manner in which an investigation is conducted directly affects public trust, perhaps as much as the incident itself.

This book is designed to present best practices for the modern world, providing a standardized and systematic approach to use-of-force investigations. It employs an investigative model specific to use-of-force and officer-involved shooting incidents, including sample checklists and policy considerations that can be immediately used by your agency. The information provided is current and relevant to today's technology and political climate,

covering topics that include the implications of social media; analysis of video recordings (body- and dash-cam, cellphone, surveillance, etc.); the management of media and public-relation concerns; legal considerations; crime-scene processing and reconstruction; and the benefits of incorporating 3D scans and overhead drone footage to visually present the findings of your investigation.

This book seeks to provide an investigative methodology beginning with some crucial pre-incident considerations all the way through to the courtroom presentation of the facts and circumstances surrounding an incident. In conjunction with other training as well as experience, it aims to provide readers with the knowledge, skills and confidence necessary to appropriately investigate and document any use-of-force incident, including those resulting in serious bodily injury or death.



# Chapter 1
# Legal Standards

After any use-of-force incident, it is standard practice for the involved officer's agency to conduct an internal investigation. Given the stressful circumstances at hand, however, the involved officer might not initially consider that he/she also faces the likelihood of a criminal investigation. The considerations that a prosecutor weighs in determining whether — and, if so, how — to charge a police officer with a crime are discussed more fully in Chapter 7. This chapter explores the legal standards for evaluating criminal and civil liability, and how an officer's constitutional rights may come into play during an investigation of an officer-involved critical incident (OICI).

## Criminal charges and use of force

By virtue of their position, many police officers at some point during their careers face the decision of whether to use deadly force against a civilian. Doing so makes an officer a de facto "suspect" in a homicide investigation. Because law enforcement officers are granted the authority to use lethal force under certain circumstances, their actions are judged by a different standard than that of the general public.

*1*

## Officer statements

During any OICI investigation, the involved officer(s) is likely to be asked to provide a statement — written, verbal or both — about the incident. Because this statement is one of the more important components of an OICI investigation, it is crucial that it be taken in a lawful manner, both to protect the officer's rights and to maintain the statement's admissibility in court, should that be necessary.

Law enforcement officers enjoy the same constitutional protections as any other suspect, including the privilege against self-incrimination and the requirements that these statements be knowing and voluntary.[1]

Although an internal investigation focuses on whether an officer has violated department policy or procedure and how this may affect the officer's employment, a criminal investigation seeks evidence of illegal action or intent. Therefore, the U.S. Supreme Court has held that statements made as part of an internal investigation, where the officer faces potential employment consequences, are not admissible in criminal proceedings.[2]

In *Garrity v. New Jersey*, police officers were questioned by state officers about a scheme to fix traffic tickets. The officers were advised of their Fifth Amendment privilege against self-incrimination but also told that if they did not answer questions, they could lose their jobs.[3] The officers answered the questions, and some of the statements were used against them in criminal trials regarding the scheme.[4] The Supreme Court found that the officers were essentially given a choice between incriminating themselves or losing their jobs — and, therefore, the statements were not voluntary, as required by the Constitution.[5] Thus, officer statements were not admissible in subsequent criminal proceedings.[6]

---

1   *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

2   *Id.*

3   *Id.* at 494.

4   *Id.* at 495.

5   *Id.* at 497.

6   *Id.* at 500.

From the first moment that an OICI investigator arrives on the scene to be briefed about the circumstances, the potential to taint the investigation with Garrity information may exist — a problem that can result in the suppression of statements and evidence from a criminal trial. If investigators aren't careful, even seemingly innocuous tasks — such as reviewing the involved agency's police reports or watching body-camera footage — might inadvertently compromise a prosecution with Garrity information.

During an interview with an officer, the officer's defense attorney might attempt to invoke his/her client's Garrity rights, either out of ignorance or savvy of the law. If savvy, it is an effort to immunize the client officer from criminal charges should the interviewer allow those Garrity rights to be asserted. Such a mistake can doom the investigation.

Garrity can be a complex legal issue for investigators to navigate, as its interpretation and application may vary somewhat from state to state. Even prosecutors and defense attorneys might lack a firm understanding of the many nuances of Garrity unless they are experienced in public-sector employment law. This makes it incumbent upon investigators to research, discuss and understand these issues prior to making a critical error that might jeopardize a case. Always consult your agency's legal counsel with any concerns, erring on the side of caution by avoiding any statements that could even remotely be construed as Garrity until a prosecutor deems otherwise.

## Potential charges

As a result of Garrity, the question of criminal charges should remain separate from the internal investigation. When a suspect is injured or killed, an officer could be charged with a misdemeanor or felony in the county or state court. As discussed in Chapter 7, the prosecutor evaluates the evidence to determine whether the elements of a criminal offense are met.

In addition to criminal charges at the state or local level, an officer may be subject to federal criminal indictment for civil-rights violations and hate crimes, including charges pursuant to 18 U.S.C. § 242. These statutes are the criminal liability "sisters" of 42 U.S.C. § 1983, which authorizes lawsuits for alleged violations of civil rights.

18 U.S.C. § 242 subjects any person acting "under color of any law…" who "willfully" violates another's constitutional or civil rights to criminal liability. The U.S. Supreme Court has held that "willfully" requires the prosecution to show the offender's specific intent to deprive the victim of a particular federal right.[7] An act is willful, then, if it is not only intentional but also is done with bad motive.[8] Specific intent is difficult to prove. Significantly, however, a prosecutor does not have to prove an overt act; it can be enough if law enforcement "knows of and disregards an excessive risk to [health and safety]."[9] Thus, a law enforcement officer not only must act in a constitutional manner but also not fail to act when the Constitution requires it.

Failure to act includes the obligation to intervene when one officer observes another officer violating a suspect's constitutional rights. By failing to intervene when a fellow officer is using excessive force, an officer on the sidelines can face criminal charges. To prosecute a failure to intervene, the government must show that the officer was "aware of the constitutional violation, had an opportunity to intervene, and chose not to."[10]

## 'Reasonableness'

When use of force results in criminal charges or a lawsuit, an officer's defense will often be that his actions were "objectively reasonable." For prosecutors, the decision to charge any offender with a criminal offense begins with probable cause; then a prosecutor considers his ability to prove the case beyond a reasonable doubt while weighing the fairness of a charging decision.[11]

A prosecutor is uniquely situated to consider all the issues when charging anyone, including a law enforcement officer, with a criminal offense. First, a

---

7    *Screws v. United States*, 325 U.S. 91, 103 (1945).

8    *Id.* at HN5.

9    See *United States v. Lanham*, 617 F.3d 873, 885 (6th Cir. 2010), where corrections officers knew of and disregarded risk of sexual assault and bodily harm to inmate by other inmates in his cell.

10    The United States Department of Justice, Law Enforcement Misconduct, https://www.justice.gov/crt/law-enforcement-misconduct#intervene (accessed December 15, 2020).

11    Simmons, *The Role of the Prosecutor and Grand Jury in Police Use of Deadly Force Cases: Restoring the Grand Jury to Its Original Purpose*, 62 Cleve.St.L.Rev 519 (2017).

prosecutor can rely on his experience and that of his co-workers.[12] Second, the prosecutor is typically enmeshed in and involved with the community and the "pulse" of its citizenry.[13] By its nature, fairness is a subjective question; thus, a grand jury may be charged with this decision.[14]

Law enforcement use-of-force cases pose additional considerations when prosecutors are weighing criminal charges. The media may be following the case closely, leading to close public scrutiny and possibly skewing the facts, making it more difficult for prosecutors to fairly evaluate a case.[15] The public may be so inundated with information that finding an impartial jury becomes next to impossible.[16] Prosecutors and police tend to be allies, thereby making a judgment about potential criminal liability difficult.[17] Finally, studies have shown that most law enforcement prosecutions for lethal force are unsuccessful,[18] which obviously affects a prosecutor's perspective of whether he/she can prove a case beyond a reasonable doubt.

However, prosecutors are also in the best position to evaluate the officer's actions and whether they are reasonable under the circumstances. Less-reasonable actions should be more likely to lead to criminal charges. At the same time, actions that possess some reasonableness make proving guilt beyond a reasonable doubt more difficult. Ironically, much of the applicable case law regarding the reasonableness of an officer's actions — and the factors to assess it — come from civil cases, not criminal cases.

---

12   *Id.* at 521.

13   *Id.*

14   *Id.* at 519.

15   *Id.* at 524.

16   *Id.*

17   *Id.*

18   *Id.* at 524, citing Police Officers Prosecuted for Use of Deadly Force, Wash. Post (Apr. 11, 2015), https:// www.washingtonpost.com/graphics/investigations/police-shootings/; Kevin Gresha et al., After Tensing Mistrial, What Will Deters Do Next?, Cincinnati.com (Nov. 13, 2016), http://www.cincinnati.com/story/news/tensing/2016/11/12/tensing-jury-continue-deliberatopms-saturdau/93671484/.

Attachment 3
140 of 389

# Civil lawsuits and use of force

Whether or not criminal charges are filed, a person may also face a civil lawsuit — and the lack of a criminal conviction does not mean that an individual won't be held liable in a civil court for monetary damages.

Perhaps the most famous example of this is the O.J. Simpson case. Simpson was acquitted of murder by a jury in 1996, but, in a subsequent civil lawsuit, a jury unanimously found him responsible for the victims' deaths. The victims' families were awarded $33.5 million in damages.

Such a situation arises because of the different burdens of proof in criminal vs. civil cases. In either dispute, the defendant is initially presumed to be innocent of wrongdoing, and the prosecution/state or the civil plaintiff bears the burden of proving the defendant's guilt or liability. In criminal cases, the burden of proof is "beyond a reasonable doubt," meaning that the prosecution must provide enough evidence to remove any reasonable doubt in the minds of the jurors that the defendant is guilty of the crime charged. The burden of proof for civil cases is significantly lower: a "preponderance of the evidence," meaning that the plaintiff must prove that it is more likely than not that the defendant is responsible for the claims brought by the plaintiff.

> At the conclusion of a vehicle pursuit, multiple officers fired their weapons into the passenger compartment of the vehicle, killing both occupants (who were later determined to be unarmed at the time). One of the officers fired rounds from three locations into the vehicle, the last while standing atop the hood of the decedents' vehicle and shooting downward through the windshield. The prosecutor ruled that the shots from the officer's first two locations were objectively reasonable based upon the totality of the circumstances known by the officer at the time. But the prosecutor and grand jury felt that the final shots, fired from the hood, lacked reasonableness, and a criminal indictment against the officer was filed. At trial, the judge disagreed, finding that the prosecution failed to prove its case beyond a reasonable doubt and that the force was used "in a constitutionally reasonable effort to end an objectively reasonable perception that he and others present were threatened … with imminent serious bodily harm."

6

## 'Under color of law'

Naturally, law enforcement officers are held to different standards than private citizens in civil lawsuits because they are operating "under color of law," meaning government-issued authority to maintain security and order in society and to arrest those accused of committing crimes. Thus, law enforcement officers are often placed in situations that compel them to use force. Unlike private citizens, law enforcement officers are trained to use force.

These differences between private citizens and law enforcement officers affect how the necessity and proportionality of the force is justified. Law enforcement officers must recognize and abide by these different standards in their jobs and in their private lives.

As mentioned earlier, the primary federal statute under which individuals may sue law enforcement officers is 42 U.S.C. § 1983, which allows individuals to sue officers who, acting under color of law, violate others' civil rights. A person acting as such must either be a government employee or reasonably appear to be acting on behalf of the state. In addition to employed law enforcement officers, this may include, for example, private contractors working with law enforcement, or off-duty law enforcement officers.[19]

Among the factors to consider as to whether someone is acting "under color of law":

- Whether the officer is on duty and in uniform
- The motivation behind the officer's actions
- Whether the officer had access to the situation because of his or her position, or whether the officer invoked his or her official status
- Whether the officer threatened to use his/her official status in the future

In other words, law enforcement officers may be subject to civil liability for excessive force whether or not they were actually employed as a law enforcement officer or whether their actions were specifically authorized.[20]

---

19    *Griffin v. Maryland*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action.")

20    *Monroe v. Pape*, 365 U.S. 167 (1961) (A law enforcement officer acts "under color of any statute, ordinance, regulation, custom or usage of any State" even when state law did not authorize the action.)

# Standards of conduct of law enforcement vs. private citizens

These types of claims brought against law enforcement officers for use of force against individuals are generally referred to as "excessive force," and the relevant U.S. constitutional amendment that applies depends on the status of the plaintiff.

The Fourth Amendment's unreasonable seizure clause applies to claims brought by unconfined private citizens, and the Eighth Amendment's cruel-and-unusual punishment clause applies to convicted inmates in the custody of the state. Also, un-convicted pretrial jail detainees may sue police officers or jail personnel under the Fourteenth Amendment's due process clause. For the purposes of this publication, Fourth Amendment cases are most relevant.

A law enforcement officer's use of force must be "objectively reasonable." This does not necessarily mean that the officer must use the absolute least amount of force available; the officer's actions must be judged as circumstances were at the time of the incident. For example: *Was there a perceived immediate danger that required quick action?* Or: *Was the officer responding to a call or approaching a situation on his/her own initiative?*

"Objective reasonableness" is defined in this context in two U.S. Supreme Court cases. In *Tennessee v. Garner*,[21] the court held that deadly force is a "seizure" under the Fourth Amendment and, therefore, must be reasonable in order to be constitutional. A few years later, in *Graham v. Connor*,[22] the court further expanded on guidelines for what is deemed reasonable force for law enforcement officers. Factors to consider include:

- The severity of the suspected crime.
- Whether the suspect was actively resisting arrest.
- Whether the suspect posed an immediate threat to the safety of any person.

To assess the legality of an officer's use of force, the court will inquire into the

---

21    471 U.S. 1 (1985)

22    490 U.S. 386 (1989)

objective reasonableness of the officer's actions through the lens of another "reasonable" officer "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." The Supreme Court also stated, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

In short: Given the facts known at the time, would a similarly trained and experienced officer respond in a similar fashion? Officers do not have to make perfect decisions or be correct in every action they take; they do, however, have to make use-of-force decisions that are reasonable under the circumstances. Failure to do so might constitute a crime or subject the officer to civil liability.

The officer must also have been acting "willfully." There is no single settled standard for this among the federal courts, and courts have held that this can mean simply that the use of force was intentional, or that the officer acted with "reckless disregard" for an established constitutional right.[23]

In current times, much social and political attention has been given to what the public perceives to be excessive use of force by law enforcement, bringing the conduct of law enforcement officers under heavy scrutiny. With most every individual now carrying a mobile phone equipped with a video camera capable of instantly sharing footage with millions of others online, the challenge is substantially heightened for those charged with investigating excessive-force cases. In order to charge an officer, investigators must believe that there is enough admissible evidence to more likely than not obtain a criminal conviction.[24]

# Official vs. individual capacity and qualified immunity

As previously discussed, an officer may still face a civil lawsuit even if he/she is not criminally charged. Where an officer is sued in his/her official capacity, the liability rests only with the entity he represents. In the city of New York,

---

23    18 U.S.C. § 242; See, e.g. *United States v. Johnstone*, 107 F.3d 200 (3rd Cir. 1997).

24    Principles of Federal Prosecution, Justice Manual, § 9-27.220.

for example, if an officer were sued in her/her official capacity, the actual defendant facing liability would be the New York City Police Department.[25] Whether or not an officer may be subject to an official capacity suit varies based on the situation and type of governmental entity.

More important for an officer to know is that he/she may be subject to being sued in an individual capacity. In most cases, employers will indemnify law enforcement officers for any civil liability, meaning that the employer covers the cost of legal representation and any monetary damages awarded to a plaintiff. However, in certain jurisdictions, where an officer is found to have acted so recklessly that his/her actions were deemed outside the scope of employment, the officer may become personally liable and be required to pay for legal representation and damages.

An officer sued in an individual capacity has access to an additional legal protection not afforded to private citizens: qualified immunity. Qualified immunity shields the officer from liability where the conduct at issue did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[26]

The clearly established rights must be specifically defined, especially in Fourth Amendment claims against officers. Courts recognize that it can be difficult for an officer to determine the level of force necessary given the situation that he/she is dealing with. Whether or not a right is clearly established is a point of much contention with no real unity among the courts.

There is also a growing public outcry against qualified immunity, as cases that are often perceived by the public as "clear-cut" have not ultimately resulted in the officer being held liable for damages. For this reason, law enforcement officers are faced with the challenge to be extremely vigilant in their use of force.

---

25    *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)

26    *Kisela v. Hughes*, 584 U.S. ___, 138 S.Ct. 1148 (2018) (per curiam)



# Chapter 2
# Pre-Event Planning & Policy Considerations

The foundation for any credible investigation of an officer-involved critical incident (OICI) consists of policies developed well before any such event occurs. This ensures that the decisions made stem from thoughtful deliberation, not emotional influence. When a crisis strikes, decisive action must often be taken quickly on multiple fronts by employees at all levels of your organization. The easiest way to ensure an appropriate and consistent response is to have well-formed protocols already in place to serve as your agency's guiding blueprint.

The point is worth repeating: If you do not already have a written plan in place for your agency's response to an officer-involved critical incident, you must develop those policies now. In broad terms, this plan should address five crucial areas:

1. Crime-scene preservation and processing
2. Criminal investigation
3. Internal/administrative investigation
4. Involved-officer considerations
5. Community and media relations

In some instances — often due to conflicts of interest, agency size or lack of resources — relationships must be formed with outside investigative agencies for some of these tasks. Memorandums of understanding (MOU) should be developed outlining each agency's expectations, rights and responsibilities, thus minimizing the chance for miscommunication. For example, you do not want your protocols to be predicated on an external agency conducting the investigation if you haven't first confirmed that that agency is both capable of doing and willing to do the work. Further, you don't want your agency's response to contradict the desires of that external agency.

Once you have formed the requisite relationships and MOU agreements with any external agencies, it is imperative that you communicate the agreed-upon procedures with staff throughout your chain of command — including dispatchers — and provide periodic refresher training. The best-formed plans prove to be of little use when employees are uncertain about the proper protocols at 2 a.m. amid the chaos of an emergency. Every minute spent searching for answers to procedural questions reduces the critical early minutes available to deal with the situation at hand.

# 1. Crime scene

Although detailed information is presented later in this book regarding specific best practices for scene preservation and processing, policy decisions must be made in advance regarding a few overarching issues:

- **Who will process the scene?** Crime-scene personnel must be among the most competent available, preferably with experience in homicide scenes, shooting incident reconstruction and bloodstain pattern analysis. They must also be appropriately trained and equipped for the complex scenarios often presented in officer-involved critical incidents. An additional consideration is whether or not your own internal crime-scene investigators should be involved in the case. They may be capable, but the community may look unfavorably on the apparent lack of independence when any internal personnel are involved in an investigation of a colleague. Regardless of how your agency decides to handle this matter, having the decision made and plans in place prior to an event is vital.

An additional consideration is the need for extra personnel. A large

metropolitan agency may be able to spare patrol officers to handle scene security, crowd control, traffic direction and a crime-scene entry log, but smaller departments will likely require additional resources, whether that involves tapping off-duty personnel or requesting external agency assistance. Mutual-aid agreements and specific call-out procedures can be established to reduce the waiting time for the arrival of backup resources.

- **In the event of a fatality, who is responsible for notifying the next of kin?** Not only is it important to delineate who will handle this difficult duty, but those individuals must be appropriately trained for the delicate task. Even more so than a "typical" death notification, OICI death notifications are complicated by the fact that a relative was possibly killed by police; therefore, extra preparation and precautions are necessary. Also, keep in mind that when personnel are making these notifications, they remain unavailable for other incident duties, possibly depleting already-strained resources. Having written procedures in place will aid the timeliness and efficiency not only of this notification but also the allocation of appropriate resources.

- **When such notifications are appropriate, who is responsible for notifying the prosecutor and coroner?** Under certain circumstances, notifications must also be given to the prosecutor/district attorney and coroner/medical examiner. Although these notifications seem straightforward, agencies often realize during an emergency that they don't have after-hours phone numbers for these officials. Further, if these details are not incorporated into policies or checklists, these notifications may be inadvertently overlooked amid the many other exigent tasks presented to investigators and administrators. A few minutes spent in preparation now can ward off many troubles later, when time is precious.

## 2. Criminal investigation

As with crime-scene processing, it is important to determine in advance who will conduct the criminal investigation of the incident (and, if necessary, to have an MOU in place). Criminal investigators generally need to be available at any time, which requires the establishment of emergency after-hours protocols. Also helpful are specific parameters for when a criminal

investigation is triggered. Will an investigation be as thorough if shots are fired yet no one is injured? It should be, as the intent was the same even if the outcome was not. What about accidental or negligent discharges of a weapon? Shots fired at aggressive animals (which has the potential to be just as controversial as shots fired at a human)? Injured animals shot to humanely euthanize? What about when a police canine bites and injures a subject? Is that investigated with the same fervor as a use of force by a human officer? These decisions and others should be well-considered and protocols established in advance so you are never confronted with having to decide on the proper response after an incident occurs.

The importance of having a well-defined, transparent investigative process cannot be overstated. Even when details of a specific investigation cannot be publicly released, the process being followed generally can be, helping to reinforce the detailed nature, thoroughness and impartiality of the investigation.

A realistic timeline for completing the investigation should also be established and explained. Having a consistent methodology fosters trust, communicating the message that no matter the circumstances, all parties involved will be fairly treated and afforded due process in the pursuit of justice.

The independence and impartiality of the criminal investigation are far more controversial than is the crime-scene processing; therefore, the investigation necessitates far more pre-event deliberation. The investigators charged with providing the factual details for prosecutorial consideration must be unbiased, fair and professional. The investigators probing an OICI must be capable of pursuing justice without wavering, demonstrating indifference to the fact that a fellow officer is being investigated or might be charged with a crime. If the investigators aren't able to do this — or if the public perceives that the investigators are unwilling to do this — the credibility and public acceptance of such investigations will be jeopardized.

> Agencies tend to be very quick to publicly confirm whether a subject was found to have been in possession of a weapon. When no weapon is found, however, they refuse to answer that same question, often saying, "No comment due to an ongoing investigation."
>
> What message does this inconsistent response communicate to the public?

Leadership requires that there are those who willingly follow. Similarly, law enforcement agencies and their officers have authority and legitimacy only to the extent that the public willingly grants it. If the people we serve do not recognize or submit to our authority, we have no authority — which undermines the purpose of our existence: to serve and protect. Unfortunately, public trust in law enforcement — including our ability to fairly police ourselves — appears to be at an all-time low these days. Stories about protests, riots, civilian oversight, calls for reform and defunding of police seemingly consume mainstream media outlets and social-media platforms. Although we are unlikely to pacify all naysayers, we must recognize the importance of trust between a community and its law enforcement. Independent investigations of officer-involved critical incidents are becoming the norm in an effort to rebuild some of the trust that has been lost. Accountability is a key component of that trust.

In some of the nation's largest cities, there may not be an external agency in the area capable of handling the volume of use-of-force cases to be investigated, thus requiring the involved agency to investigate its own personnel. In rural areas where officer-involved critical incidents might be exceedingly rare, it may be difficult to find investigators with adequate experience to properly investigate. Such circumstances, coupled with the level of trust in a particular community, must be considered when deciding who will lead OICI investigations. Although answers will vary from agency to agency, a solution that elicits community buy-in and support is all-important. If relying on a singular external agency isn't viable, multi-agency task forces, embedded prosecutors and civilian review boards are just a few of the available options that can bolster the public's perception of the investigation as legitimate and credible.

For all involved, including the community, an investigation should be completed as swiftly as possible. When an investigation drags on unnecessarily, it can appear to lack transparency, hindering the community's trust in it. Finality and resolution — whether or not criminal charges are filed — are essential for healing to begin. At the same time, however, the quality and thoroughness of an investigation should never be sacrificed for the sake of expedience or public appeasement. "Getting it right" is more important than a quick investigation that is missing information, possibly leading to a miscarriage of justice. The timeliness goal should be accomplished not by cutting corners but only by allocating ample resources to the investigation.

Also important to keep in mind and communicate to the public is the fact that some components of the investigation are outside the investigators' control. Autopsy reports, medical records, laboratory testing, subpoena compliance, video analysis and other vital contributions depend on external entities, and they may slow the investigators' ability to promptly complete their work.

# 3. Internal/Administrative investigations

The internal affairs (IA), or administrative, investigation serves multiple important functions subsequent to an OICI. Typically conducted by a designated investigator of the involved officer's employing agency, the IA investigation primarily seeks to ensure that the department's policies and procedures were appropriately followed during the incident, forming the basis of discipline and/or termination decisions. Additionally, an IA investigation can be useful in defending civil lawsuits, decreasing the department's potential liability (by showing that policy violations are investigated and enforced), identifying training and tactical inadequacies, determining equipment needs, assisting with return-to-work decisions and determining whether policies need revision to help ward off future incidents.

IA investigations needn't be limited to only the officer(s) who used force; rather, the conduct of all involved employees — including dispatchers and supervisors — can be assessed. The burden of proof for policy violations is usually lower than that for violations of criminal law, typically a preponderance of evidence for IA versus proof beyond a reasonable doubt for criminal conviction. The IA investigation can encompass both actions and inactions not necessarily relevant to the criminal case, including:

- Did actions tend to escalate or de-escalate the situation?
- Did actions adjust to changing circumstances?
- Was the level of force mitigated, if reasonable?
- What was the feasibility of less-lethal options?
- What was the method and manner in which force was applied and ceased?
- If feasible, was persuasion used and were warnings given?

16

- Was the use of cover and concealment appropriate for the circumstances?

- Were disengagement, repositioning, retreat, distance and containment considered (if appropriate)?

- Were communications (among officers, supervisors, dispatch, callers, etc.) sufficient for relaying pertinent information?

- Were proper tactics and tactical plan utilized?

- How well was the overall control/leadership based on the circumstances?

- Was medical aid rendered and/or assistance summoned in a timely manner?

- Did officers intervene/intercede if needed?

- Was the documentation of the incident accurate and complete?

Not only is it important to have an effective internal investigation protocol in place — along with qualified investigators to complete it — but the interaction between the criminal and IA investigations must also be addressed. Rightly so, the criminal investigation must always take priority over the IA investigation. The independence of these two distinct investigations must be assured; otherwise, the criminal case could be severely compromised by legal complications.

Legal issues will be examined more thoroughly later in this book. In a nutshell, though, only consensually obtained statements from the involved officers may be used in the criminal review of those officers' actions. The IA investigation, on the other hand, may use both consensual and compelled (Garrity) statements. Given this important distinction, criminal investigators must maintain their distance and have absolutely no knowledge of compelled statements obtained during the IA investigation. The criminal investigators can share information with IA, but IA cannot share compelled (or derivative) information with the criminal investigators. This "wall" between the two investigations is crucial because violations of Garrity rights can result in the exclusion of statements from the criminal case based on the Fifth Amendment to the U.S. Constitution (freedom from self-incrimination).

The burden to prove that Garrity violations have not occurred rests with the government. In any prosecution of the involved officers, the prosecution must prove that the criminal investigators remained unaware of any compelled statements.

Proving a negative can be challenging, and failing to do so can have broad implications for the case. The two easiest ways to avoid Garrity violations are:

- Have an external agency conduct the criminal investigation, with no information sharing from IA to the external agency.

- Wait to conduct the IA investigation until the criminal investigation is completed.

|  | Internal/Administrative | Criminal |
|---|---|---|
| **Voluntary statement** | YES | YES |
| **Coerced statement** (Threat of severe discipline or termination) | YES | NO |

Ideally, agencies should consider employing both of these suggestions. Smaller agencies without a separate IA unit should absolutely consider at least one of the methods, as the consequences for failing to do so can be disastrous. In a perfect world, the criminal investigation would be completed before the IA ever begins, but our world isn't perfect. Staffing shortages, budgetary concerns and the psychological ramifications of long-term administrative leave can be prohibitive for agencies. Before allowing the officer to return to duty, however, the agency would be best served by having completed the IA investigation. In theory, the criminal and IA investigations can run parallel with each other if the separation/independence can be maintained. In such a case, agencies — particularly smaller ones — should strongly consider having an external agency handle the criminal investigation.

As this brief description underscores, the complexities surrounding IA investigations are many (and these challenges don't even factor in restrictions based on employment contracts, civil service regulations, or other state and local laws and ordinances). The way to mitigate the many intricacies is to pre-plan your response through well-developed policies, procedures and IA investigation protocols. Take the time now to study these issues and prepare for how your agency will appropriately navigate them without infringing on anyone's rights or jeopardizing a potential prosecution.

# 4. Involved-officer considerations

How an involved officer is treated subsequent to an OICI can have severe legal, psychological and employment ramifications. Although some of the decisions may amount to common sense, others are easily overlooked if not written into policy and/or checklists. As with many of the issues surrounding OICI, a definitive right or wrong answer cannot always be universally applied to all agencies throughout the country. What is important is that each topic is thoughtfully considered and that the department-specific solution is put in writing, eliminating inadvertent omissions or inconsistent responses. Further, you should be able to articulate the rationale for how and why you arrived at a particular decision. Working groups of involved stakeholders tend to be a productive way to explore the various perspectives and eventually arrive at a consensus opinion.

One of the more contentious issues that agency leaders must consider is the timing for obtaining statements from officers involved in an incident. There is conflicting research as to whether or not a "cooling off" period of two days (or a two-sleep cycle) enhances or hinders an officer's recall of the events. In reality, it probably depends on the individual officer. After an incident, some officers shake violently and can barely speak, a reaction that isn't conducive to facilitating accurate memories or coherently communicating those memories to an investigator. On the opposite end of the spectrum, some officers have little difficulty immediately relating their memories of the event, with a delay only serving to cause forgetfulness that is consistent with the passage of time. Consultation with a criminal defense attorney oftentimes leads to no immediate statement regardless, although this is not always the case. The advantages and disadvantages of both approaches are discussed in greater detail (with a best practice recommendation) later in the book. The important point is that the issue calls for thoughtful deliberation and an established protocol before your agency faces such a decision.

Along those same lines, will you ask the involved officer pre-defined public-safety questions (example in Appendix A) or have him or her complete a scene walk-through? Will you Mirandize the officer or offer some other admonition regarding the voluntariness of his/her criminal statement (example in Appendix B). Will you allow the officer to watch body-cam/dash-cam footage prior to his/her formal statement? What labor union or contractual considerations must you navigate?

From an employment perspective, will the officer be placed on administrative leave? Will you offer light/desk duty to the officer prior to the officer's return to patrol duty? Will you replace the officer's gun after it is collected as evidence? Will a psychological exam be required before the officer returns to full duty?

Likewise, the officer's physical and mental well-being should be considered. Will he/she be transported to a hospital for a physical evaluation after the incident, even if apparently uninjured? What about having the officer drug- and alcohol-tested (as many departments do subsequent to an on-duty traffic crash)? If mandated to do so, care must be exercised to make sure those test results are not provided to criminal investigators (unless a prosecutor/district attorney advises otherwise). Critical incident stress debriefings should be considered for employees, including other first responders and dispatchers. Mandating attendance via policy eliminates any stigma associated with participation. Finally, do you have a policy for handling a tragic situation in which an officer is killed? Simple details — such as having a liaison assigned to the surviving family to provide information, support and resources — can go a long way.

# 5. Community and media relations

Having procedures in place regarding the news media and community outreach is yet another pre-event area that should be addressed. Emotions run high after an incident for everyone affected, and agency leadership is not immune. High-level decisions and articulate dialogue can be impeded by defensiveness, frustration and a sense of feeling unappreciated when it appears that the media or the public is attacking — or second-guessing — the actions of an officer. Training and a definitive crisis communication plan can pay dividends, helping to ensure that your agency's reaction doesn't make a bad situation worse.

Only authorized representatives of your agency should be allowed to speak to the media, and your policies should clearly identify those people. Having unofficial information released from "an anonymous source close to the investigation" can cause big headaches for an agency and potentially interfere with the criminal investigation. Additionally, the appropriate timing of authorized media releases should be considered. Although transparency advocates demand the immediate release of all known information pertaining to the incident, prosecutorial and privacy concerns must also be weighed.

Adhering to your written communications plan can help alleviate criticism resulting from inconsistent responses or from violating applicable public-records laws.

Will you release the involved officer's name? If so, when? What about any decedent's name? Video footage from body or dash cameras will also be highly sought by the media. Will it be released and, if so, when? What about details of the incident, such as how many shots were fired and whether or not the subject was armed with a weapon? Something as simple as releasing details about the decedent's criminal record or the presence of illegal narcotics can backfire from a public-relations standpoint, making it appear as if your agency is slandering/vilifying the decedent with information "unrelated" to the OICI.

Not every conceivable scenario or detail needs to be spelled out in policy, but your protocol should contain enough general information to guide your agency's decision-making. For your decisions pertaining to the release of information (or lack thereof) to be defensible, they should follow procedures developed beforehand in conjunction with your stakeholders. Such pre-event planning allows for sufficient research and thought to be given to the advantages, disadvantages and legalities involved.

> In seeking to remain transparent, the chief of police of one agency immediately released the involved officer's name publicly — before the officer had had an opportunity to call his wife to inform her of his involvement in the fatal shooting incident. This obviously was not an ideal situation for the officer or his family.
>
> Having a media plan in place allows your agency to appropriately balance transparency with privacy and investigative interests.

*21*



# Chapter 3
# Investigative Personnel

All of the successful models for investigating officer-involved critical incidents (OICI) have one key component in common: eminently qualified investigative personnel. Highly trained and experienced investigators — particularly those leading an investigation — are crucial not only for investigative work itself but also for the credibility of that investigation after the gathered facts have been presented to the public and/or in a courtroom. A competent investigation is of little value if the results are perceived as untrustworthy.

## Primary considerations

In determining who will conduct an OICI investigation, your agency should consider three primary factors:

1. Training
2. Experience
3. Credibility (of the investigators and the investigating body)

# 1. Training

Fatal officer-involved critical incidents are among the most complex, scrutinized and difficult cases an investigator is likely to be assigned. Although general and homicide investigative training is important, they typically aren't enough to qualify detectives for OICI investigations. Those courses need to be supplemented with OICI-specific training. Myriad topics that are unique to OICI require specialized instruction, including case law governing use of force; a working knowledge of Garrity issues; interviewing law enforcement officers; and injury analysis for positional asphyxia, impact weapons, chemical irritants and electronic control devices (typically only encountered in deaths associated with law enforcement intervention). Additionally, OICI investigations require training on the specific protocols adopted by the agency conducting the inquiry.

Below are recommendations for the minimum level of training that investigators should successfully complete before leading an OICI investigation. These recommendations are likewise highly recommended for all investigative personnel involved in any aspect of an investigation. (Note that some courses may combine topics, so separate trainings for each subject area might not be necessary):

- Basic/advanced criminal investigative techniques
- OICI investigations
- Human memory and performance, including action/reaction
- Legal aspects of use-of-force cases and state laws and statutes
- Interview and interrogation
- Basic crime-scene theory and application for investigators (those actually processing the scene require significantly more specialized training)
- Awareness-level training in shooting incident reconstruction and bloodstain pattern analysis
- Search warrants
- Implicit bias
- Ethics
- Death/homicide investigation (including post-mortem injury analysis)

- Electronic evidence
- Social media
- Video evidence
- Internal investigations
- Report writing/documentation
- Media and public-relations considerations
- Testifying in court

Ideally, the crime-scene processing is conducted by specialized personnel dedicated to that area of the investigation. Whether or not evidence documentation and collection make up a sole or ancillary duty, however, the investigators who process scenes require more-focused training and equipment knowledge beyond the aforementioned and in addition to basic crime-scene-processing training, including:

- Advanced photography techniques
- Shooting incident reconstruction
- Bloodstain pattern analysis
- Electronic evidence preservation and collection
- Scene diagraming/mapping (preferably 3D scanner operation)
- Unmanned aerial vehicle/drone operation and certification

Some aspects of an investigation are even more complex, perhaps requiring assistance from experts outside the customary investigative team. It is important to build relationships with these specialists in advance so that everyone knows and agrees on expectations, abilities and procedures. Examples include:

- Vehicle airbag control modules/event data recorders and vehicle infotainment systems
- Traffic crash reconstruction
- Forensic audio/video analysis
- Firearm/defensive tactics instructors
- Crime laboratory scientists
- Forensic pathologists

## 2. Experience

Another primary consideration is investigative experience, including OICI-specific investigative experience. Training is extremely important, but it is no substitute for experience, particularly in multifaceted, rapidly evolving situations in which the stakes are high and circumstances demand quick, definitive decision-making. An overwhelmed, uncertain and/or panicky investigator will not make decisions equal in quality to those made by an investigator who remains calm, confident and comfortable. Experience helps to "inoculate" investigators from the adverse effects of nervousness. Further, experience allows an investigator to draw on lessons learned — even some that stemmed from mistakes — to keep him/her continually learning and improving.

Generally speaking, three to five years of significant investigative experience (full-time, felony-level and/or homicide experience) is recommended for investigators of OICI. Further, for an investigator to take the lead on a case, he/she should have participated significantly in multiple OICI investigations. In jurisdictions where such cases are infrequent, local investigators with the necessary qualifications simply may not exist. Instead of assigning inadequately trained or inexperienced investigators, your agency should seriously consider asking another entity, such as a state-level criminal investigative agency, to handle the case. If you were personally involved in a shooting incident, whose level of experience would make you feel more comfortable? Your answer to that question can serve as a barometer when making investigation assignments.

## 3. Credibility

The final primary consideration in deciding who should investigate OICI is credibility. Having a team whose work is generally accepted as legitimate and credible by the public being served requires that both the individual investigators and the investigating agency be beyond-reproach trustworthy. Unfortunately, even when this standard is met, the public's perception of the investigative protocol is still sometimes unfavorable, possibly because of a tumultuous relationship between the community and the agency or an individual member of that agency. Even when the public's concerns seem unjustified, your agency should do whatever is reasonably possible to maintain

overall public confidence. Such efforts might include asking an independent agency to handle the investigation or — at a minimum, if impartiality is a concern — screening investigators for potential conflicts of interest.

Maintaining the integrity of all investigations is vitally important. This means including only professional, independent, unbiased and conflict-free investigators on each investigation. Conflicts will inevitably arise from time to time, but any investigators with conflicts (or perceived conflicts) should be excluded from significant investigative activity or privileged information about the incident with which they have a conflict. The manner in which any conflicts or perceived conflicts are addressed can have serious implications for the investigations being conducted.

Independence is a complex issue, one that can be difficult to ascertain, particularly in rapidly evolving circumstances where, at the outset of the investigation, details of the incident are typically sparse and the identities of some participants unknown. Independence encompasses impartiality, proximity/separation, relationships, and the ability to maintain objectivity. Additionally, a credible investigative process, transparency and communication are crucial for building and enhancing public trust. To avoid even the appearance of conflicts or impropriety, and to limit subjectivity to the determination regarding whether a conflict exists, investigators should complete a conflict assessment before joining any investigation (example in Appendix C). In addition, each investigator must continually self-assess after that initial screening in case a conflict arises later as more information becomes known about the incident.

If an investigator ever suspects or determines that a potential conflict exists — or that he/she cannot otherwise remain impartial — the investigator must remove himself/herself from that investigation and notify leadership of the potential conflict. Similarly, any command staff members who believe a conflict (or the appearance thereof) exists should compel the investigator's removal or limit his/her access to the investigation. Although having a conflict (or perceived conflict) is not wrong, agency policy should prohibit an investigator from knowingly remaining involved in an investigation without disclosing the conflict and assessing it with leadership.

Also important to the issue of credibility is past and present behavior of investigators seeking a role in an OICI investigation. For instance, if an investigator has previous

founded/substantiated allegations of using excessive force against citizens, that history can impact the perceived legitimacy of any subsequent investigation completed by that investigator. The same is true for other significant discipline against the investigator, criminal convictions and/or Brady/Giglio disqualifiers (for past dishonesty). Any such incidents demand a thorough, case-by-case review. Further, although hateful or discriminatory ideologies or social-media posts by officers are generally understood to be unacceptable, posts that are extremely pro-law enforcement can likewise influence the level of perceived bias of an investigator who is assessing the actions of another law enforcement officer as part of an OICI probe. Having policies in place regarding what conduct is impermissible can help ensure that only credible investigators participate in OICI investigations.

Independence and credibility are similarly vital for the entity conducting the investigation to be perceived as unbiased. As mentioned, the public may frown on an agency with a poor reputation leading an investigation of its own employees — and might not even trust that agency to conduct an outside investigation into another agency's incident. In such situations, having a trusted independent agency conduct OICI investigations would be beneficial.

## Primary investigative models

Generally speaking, there are three main investigative models for conducting OICI investigations:

1. Independent agency
2. Multi-agency task force
3. Interdepartmental

Each model has its strengths and weaknesses. In determining which model best suits your agency, you need to consider many factors, including:

- Agency size
- Available resources
- Level of public trust
- Geography

28

- State and/or local laws
- Interagency cooperation

## 1. Independent agency

An OICI investigation tends to work very well when an independent, trusted agency is available and willing to conduct it. Following that agency's protocols and using personnel accustomed to working with one another lead to a much smoother and more streamlined investigation.

The public generally accepts this model as the most credible, with the independent agency having no stake in the ultimate outcome of the investigation as long as it is fair and thorough. State police agencies, state criminal investigative agencies or another local law enforcement agency with sufficient separation from the involved agency can potentially serve as this independent agency. But strains on the resources of a singular department can affect the investigation's timeliness and cause budgetary concerns. Such factors may leave some agencies unwilling to conduct investigations for outside entities.

## 2. Multi-agency task force

To limit the financial burden that these manpower-intensive investigations place on a single agency, another option is creating a multi-agency task force. When investigators with a broader range of experience share the workload, it decreases the personnel sacrifices of any one agency but still maintains a level of independence that is acceptable to the public.

Individual conflicts are more common under this model; therefore, stringent guidelines for ensuring that the right investigators take part in any investigation should be adopted.

Further, the coordination of personnel from various agencies — each with its own policies and procedures — can become increasingly more difficult to manage as an investigation progresses. To reduce the potential for misunderstandings or conflict, one standardized set of policies for all assigned investigative personnel should be established and placed in an MOU in advance.

# 3. Interdepartmental investigation

An agency conducting its own interdepartmental investigation is the final option. Generally speaking, it also is the model that's least acceptable to the public. Small- to medium-sized agencies should try to avoid this model if possible due to both credibility and legal concerns. The smaller an agency is, the more difficult it becomes to maintain the bright-line separation between the criminal investigation and the internal affairs investigation. Also, the public often questions an agency's ability to fairly police its own personnel when a finding of fault may expose the agency to liability or scrutiny. Having a separate, dedicated IA unit helps to lessen these concerns but may not eliminate them.

Large metropolitan agencies, on the other hand, may be compelled to conduct their own investigations, often because no other independent agency in the area has the experience or the resources to handle the volume of OICI investigations. In such cases, credibility can be enhanced, if needed, by embedding personnel from the prosecutor's/district attorney's office into the investigation or by incorporating a level of external or civilian oversight.



# Chapter 4
# Investigative Methodology

Even the most seasoned leaders can feel overwhelmed upon arriving at the scene of an officer-involved critical incident. Those first critical minutes are often characterized by chaos, confusion, conflicting information and sensory overload. It is often dark outside, with strobe lights, piercing sirens, blaring radios and the lingering scent of gunpowder creating a sense of disorientation. There may be deceased individuals on the ground and severely injured individuals pleading for help. Armed subjects may still pose a danger, yet you may be unaware of their presence.

An instantaneous decision may be required: Pursue a fleeing subject who could possibly harm more people, or provide lifesaving medical aid to the injured at the scene? Curious and potentially irritable crowds may begin to gather, possibly to the point of contaminating evidence or posing an additional threat should they become hostile in the aftermath. Communicating with dispatch, coordinating a response and making proper notifications all must happen nearly simultaneously, with any failures possibly resulting in the needless loss of life.

Although OICI incidents remain rare, the stakes are always high. Perhaps lost in the description above is that all responding officers and investigators — regardless of rank — have a duty to assume a leadership role to bring the chaotic scene under control. It is incumbent upon all personnel to prepare

*31*

their response, prioritize crucial tasks and execute their plan to ensure a successful resolution with minimal loss of life and evidence. This includes the investigators and administrators who respond to a scene, which typically remains active for many hours after the shooting incident has ceased.

Although this book's primary focus is investigative methodology, strong leadership is integral to properly controlling and investigating an OICI; as such, it is essential to the discussion. Proper preparation, organization and direction are crucial to coordinating and ultimately resolving the investigation in a manner consistent with public expectations and best practices. Investigators must know their capabilities and limitations, have the ability to be flexible and think on the fly, and apply common sense and investigative experience to the circumstances at hand.

# Leadership/incident command

Leadership is not a quality that is bestowed simply by promotion. Rank and leadership are not always synonymous, as titles alone do little to inspire and motivate teams. Conversely, a well-respected, decisive, confident and caring officer who lacks a managerial rank may routinely be looked to for leadership by his/her peers. Although some people may inherently possess better leadership characteristics than others, the skill is one that can be improved with knowledge and practice. Attending leadership courses, reading, listening to podcasts and simply observing leadership qualities (or the lack thereof) in others can all help to increase a person's ability to positively influence others toward a common goal. All officers should continually work to improve their leadership attributes regardless of their career goals; everyone, after all, benefits from effective leadership.

Being prepared with checklists, knowing your agency's protocols and rehearsing your desired response, even if only mentally, allow you to remain calm and in control while others might be panicking. Taking time for a deep, calming breath as you review checklists can help ensure proper prioritization of tasks with less emotion; controlled emotions, in turn, can help ensure sound decision-making. Decisiveness and forward action, even if slight, is preferable to no action at all, or "freezing." If no one else is taking control, officers/investigators should be prepared to do so on their own, regardless of rank. Know what needs to be done and then do it, instead of waiting to be asked or told. This is no time for egos or power struggles.

32

# 10 keys to effective leadership at an OICI scene

The number of simultaneous tasks that need to be completed is more than any one investigator or leader can effectively handle alone. Duties must be delegated and the assignments documented. Don't assume — communicate. Double-check that your instructions are clear and that your expectations are understood, so you don't duplicate or neglect an important task. Institute the plan that you have mentally rehearsed, allowing the following steps to guide you through the first minutes despite the intense pressure, stress and/or confusion you may be feeling:

*1* **Approach cautiously.** As you arrive on the scene of an OICI, do so knowing that threats similar to those leading to the incident still might exist. Exercise caution to ensure that no additional injuries occur. Your leadership will be of little value if you become a victim. Be mindful of potential evidence, unsecured weapons and the possibility that additional suspects may be in the area or fleeing from it. Consider the possibility of the presence of biological fluids and other hazards at the scene; the safety of all involved is paramount.

*2* **Take control.** Take a deep, calming breath and begin directing activity at the scene. Remove unnecessary personnel, mitigate dangers and delegate tasks. Although the suggestions here are presented as a numbered list, many of the activities should occur simultaneously, requiring communication, command and control. Although you may initially need the assistance of the involved officers to stabilize the situation, every attempt should be made to relieve them of scene responsibilities as quickly as practical so they can concentrate on their physical and mental well-being.

*3* **Render medical aid.** The preservation of life takes priority over the collection or preservation of evidence. That being said, be a good witness by making mental notes if, during the urgency of medical treatment, alterations to the scene are necessary to care for the injured. Officers should attempt lifesaving efforts within their abilities using any equipment available, but medical first responders should be summoned without delay. If practical, clear an entry/egress route to the scene that's relatively free of obvious physical evidence and direct responding medical personnel to follow that path.

*33*

If time permits and without sacrificing the welfare of the injured, photograph the positioning of the injured and evidence before moving anything. Physically check involved officers for injuries; they may be unaware of their own injuries because of heightened adrenaline.

4 **Secure the scene and evidence.** Physical barriers, such as crime-scene tape, should be positioned as quickly as possible to protect the integrity of the scene and evidence. Always start with an area larger than you believe is needed; it's easier to collapse the size of a scene than to increase it. Designate officers to maintain security and a crime-scene log, with areas separate from the crime scene being established for a command post, equipment staging area and the media. Attempts should be made to protect fragile or transient evidence from destruction by adverse weather, rescue personnel or other means. Await the arrival of appropriate crime-scene processing personnel to collect evidence, including any firearms, unless exigent circumstances dictate otherwise. If a weapon poses no hazard, it should be left untouched as it was found. If it becomes necessary to move or unload the firearm because of safety concerns, be mindful of fingerprint and DNA evidence. Do not attempt to re-position the weapon into the scene. Make detailed notes regarding its location, positioning and status (whether there was a live cartridge in the chamber, for example, or an apparent malfunction, such as a "stovepipe").

5 **Identify and separate witnesses.** All witnesses to the incident, including officers, should be identified and separated to avoid contamination of their memories. Separate, however, does not necessarily mean alone. It is a good practice to assign a companion/peer officer to stay with the involved officer to serve as a liaison and resource but to not actively discuss the incident unless the involved officer insists. The police department, command post, a hospital or his/her own residence (once positively identified and contact information is obtained) can serve as locations for staging witnesses while awaiting investigators' arrival. Keep detailed notes as to where people were sent or taken for the arriving investigators. It generally is not practical or advisable to keep witnesses at the primary scene longer than is absolutely needed. A canvass of the area is typically needed to identify all potential witnesses; many will cooperate if asked but won't necessarily come forward voluntarily. Also note the presence of any possible recordings (surveillance systems, cellphone video, etc.) and make attempts to obtain and preserve them (or notify responding investigators of their existence).

34

6 **Make necessary notifications.** The seriousness of the incident or injury tends to dictate the notifications required to be made. Calls for additional personnel or resources (investigators, crime-scene staff, scene security, traffic/crowd control, etc.) are common, as are notifications to the agency's command staff and public information officer. In the event of a fatality, contact with the decedent's next of kin, the coroner/medical examiner and the prosecutor/district attorney may also be warranted. Exercise great caution when briefing the criminal investigators who arrive on the scene to avoid sharing any statements (or derivative information) made by the involved officers under potentially compelled circumstances (possible "Garrity" issues).

7 **Comply with departmental policies.** A detailed agency protocol may include taking the involved officers to the hospital for medical and psychological evaluations; administering drug/alcohol tests; and taking photographs of the officer as dressed at the time of the incident and, if applicable, any visible injuries to the officer. Policy may also dictate who should collect the officer's firearm as evidence (such as a supervisor or crime-scene personnel) and provide that it be replaced with a spare. Additionally, prescribed public-safety questions and/or an initial walkthrough of the scene with investigators may be requested or required based on agency protocol. In short, know your agency's policies and comply with the mandates for a given situation.

8 **Consider legal issues.** Though generally the responsibility of the criminal investigators, small agencies may rely on supervisors to contemplate legal issues surrounding law enforcement's continued presence and evidence collection at the scene absent a search warrant or other exception to the Fourth Amendment's search-and-seizure protections. Just because law enforcement was legally called to the scene and a shooting death resulted does not necessarily give you the right to conduct further searching once any life-threatening exigency has subsided. Consult with your local legal counsel to ensure that evidence is collected in a constitutionally appropriate manner.

9 **Accurately document the scene.** Timely and accurate documentation of the scene and of your actions relative to the incident are crucial for the investigations that are likely to follow (administrative, criminal, civil and training/tactical review). Small details, such as whether the lights

were on or off in a situation where an officer mistook an object for a weapon, can become vitally important to the investigation. Use checklists to ensure every pertinent fact has been recorded and keep notes throughout regarding your observations, post-incident alterations to the scene, persons present and statements made. Photographs taken as soon as practical — and then progressively throughout the scene response — can also be useful in quickly documenting large amounts of information.

*10* **Conduct a debrief/self-assessment.** We all make mistakes, and there is always room for improvement. Conduct an honest self-assessment to identify areas where you can refine your leadership or better prepare for future incidents. Look for opportunities to enhance your policies and procedures and to train the staff to better accomplish the goals and objectives of a critical incident scene response. Question your officers about their perceptions of how the event was handled, and solicit their constructive criticism on how things can be improved. Once the dust settles, it can also be useful to speak with the involved officers to gain their perspective on the aftermath and ways they could feel better supported during those initial minutes following an OICI event.

# Big-picture goals

Investigations of officer-involved critical incidents (OICI) consist of multiple layers of inquiry — criminal, internal affairs (IA), civil, tactical — that might be interwoven or entirely independent of one another. The criminal investigation tends to be the most exhaustive, as the ramifications can be life-altering, with the freedom of those involved potentially at stake. The criminal investigation, which typically forms the basis for many of the other investigations, is the focus of this book. The criminal investigation must be prioritized to the highest level to prevent any interference from the other investigations.

With the exception of the criminal investigation, which either results in charges being filed or not, OICI inquiries do not necessarily lead to binary results — that is, either all "good" or all "bad." A use of force by a law enforcement officer may be determined to have been within the bounds of the law yet still a violation of departmental policy. Even when everything was done "right," the outcome might still have been tragic, to the point of drawing public condemnation. Tactical errors may have been made or an officer's actions may have escalated,

not curtailed, the circumstances, leading to mandated additional training or, perhaps, discipline. And, even when no crime was committed, an officer or agency might be found civilly liable for having violated a person's constitutional rights, a determination that requires a lesser standard of proof.

These and other nuances make it necessary for your agency to clearly delineate, from the outset, the goals of the criminal investigation and the information needed to achieve those goals. What may be pertinent to one such investigation may have no bearing on another.

Generally speaking, criminal investigations have two overarching goals: detailed fact finding and investigator objectivity.

## Detailed fact-finding

The initial goal of the criminal investigation is providing facts that support or disprove the "objectively reasonable" factors established for the officer's actions in *Graham v. Connor*:

- The severity of the crime at issue
- Whether the suspect poses an immediate threat to the safety of the officers or others
- Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

In addition, the facts and circumstances regarding the totality of the incident must be gathered for review by the prosecutor/district attorney for the applicable elements of any local, state or federal law that might have been violated by any involved party. Along with information to support criminal charges, any mitigating or exculpatory facts that tend to exonerate participants must also be presented in complete and unbiased fashion. The investigation generally seeks to reconstruct all of the actions and responses leading up to, during and subsequent to the critical incident — and sequentially order those events in a narrative description or timeline.

The objective reasonableness of the officer's actions must consider his/her perceptions and beliefs regarding the individual and/or the circumstances of the incident. Previous knowledge of the subject, information obtained from

*37*

dispatch, observation/interpretation of possible weapons or threats, how quickly the events transpired, and how tense or uncertain the situation was are only some of the factors that prosecutors/district attorneys need from an investigator's report in order to fairly evaluate the legality of conduct.

Officer/subject factors such as relative size and strength may be readily apparent to investigators on the scene who observed all parties in person, but it is a mistake to assume that others would recognize or understand the potential implications of these factors without investigative documentation being made available to them for consideration.

The Investigative Methodology chapter of this book and the referenced checklists are designed to assist in ensuring that such important but easily overlooked details are properly gathered and documented as part of any OICI investigation.

## Investigator objectivity

Particularly during the early stages of an investigation — when all of the facts are not yet known — investigators must take extreme care to withhold any judgment regarding the legality of the officer's use of force. Investigators must be unbiased collectors of fact, avoiding any predetermined decisions about the reasonableness of actions. This oftentimes requires a paradigm shift in the way officers think and act — as they possibly have a natural inclination to assume that an officer's conduct was justifiable without yet knowing everything that transpired.

Even the language in an investigative report can portray bias if the writer is not careful. Labeling a participant as "suspect" or "victim," for example, indicates

> An investigator arrived at the scene of a fatal officer-involved shooting incident and was briefed on the circumstances by the on-scene personnel. At the conclusion of the three- to four-minute briefing, the lead investigator verbally concluded, "It looks like a good shoot to me." This statement was recorded by media personnel who were within earshot.
>
> **A judgment made before all of the facts and evidence have been gathered can be detrimental to even the most thorough and otherwise-unbiased investigations. In such instances, the public will always perceive the case with skepticism and uncertainty.**

*38*

that a judgment has been made prematurely regarding who was in the right and who was in the wrong. In reality, the officer and the subject might both be victims or both be criminal suspects — so terms such as "involved officer," "subject" and "involved individual" more accurately reflect an impartial perspective.

Regarding victim-rights laws and mandatory notifications, such as Marcy's Law, there is generally no harm in providing notifications to all parties involved because it might initially be unclear who the victims are.

## Preparation and protocols

Preparation is one of the main factors that differentiates an exceptional agency or investigator from an average one. The importance of establishing overarching pre-event policies has been discussed; likewise, having detailed investigative guidelines and checklists to standardize and direct an investigator's response is crucial.

A policy might state, for example, that a criminal investigation will be conducted whenever an officer discharges a firearm at a human. The guidelines and checklists help model how that investigation should actually be carried out. Policies generally are fixed, with no deviation permitted. Guidelines, on the other hand, can be developed to afford more flexibility in the process as warranted by individual circumstances.

> In one officer-involved shooting, the officer was wearing a personally owned body camera that captured the incident. The officer, however, declined to give criminal investigators access to the video evidence.
>
> **This is just one example of a situation that can be difficult to anticipate and, therefore, no specific policy was in place directing investigators on how to proceed. Training, experience and discussions with stakeholders guided the response to a successful (and legal) outcome without needing or violating any policy.**

Even if it were possible to write a policy for every conceivable scenario that an investigator might face, the policy manual would be of unimaginable length and, thus, impractical to remember. The benefit of investigative guidelines is

*39*

that they allow for deviation based on an investigator's training and experience (and with a supervisor's approval) and still maintain the "commander's intent" of the broader policy. Each situation is unique. Every case must be independently assessed with discretion exercised as to how and when to perform investigative tasks to best achieve the goals of the investigation.

To help clearly differentiate flexible guidelines from rigid policies, disclaimers can be added, such as:

> *This document serves only as a guide (not a fixed policy) for investigating officer-involved critical incidents — typically comprised of cases involving use of force by a law enforcement officer or custodial deaths. When a law enforcement officer uses force and a citizen dies or is seriously injured, the public expects a thorough, impartial investigation regarding the circumstances of the use of force. Because each incident is unique, it is not possible to produce a guide that addresses every conceivable scenario that might present itself. For this reason, only appropriately trained and experienced investigators capable of independent thought and reason are selected to lead such investigations. At all times during the investigation, the investigators — in consultation with their supervisors — will utilize their discretion to determine whether investigative acts described in this guide are needed or applicable based on the facts and circumstances of the case at hand. Additionally, the prosecutor may expand or limit the scope of the investigation as appropriate. Therefore, deviations from this guide are likely and do not necessarily constitute a breach of policy, procedure or best practice.*

An example of the guidelines followed by the Ohio Bureau of Criminal Investigation can be found in Appendix D. Please note, however, that — as with all guidelines and policies — these are regularly revised to reflect current best practices, which evolve over time.

The use of checklists is highly encouraged for many reasons, including some that are less obvious:

- Having your agency's protocols abbreviated into a short checklist helps to standardize the response of investigators without compelling them to commit the procedures to memory.

40

- The proper use of a checklist aids in prioritizing activities and preventing oversights in the chaos of an incident, particularly when multiple activities are taking place simultaneously.

- Checklists provide an easy method to delegate and track personnel assignments and to ensure that tasks have been completed — without duplication.

- A checklist gives an investigator or a supervisor a reason to step aside alone for a few minutes, take calming breaths and organize his/her thoughts. Sound decisions by leaders are rarely made in midst of a storm, which tends to cloud judgement. Taking a little time to physically and mentally detach from the emotion of the scene allows an investigator to see the larger picture from a broader, strategic perspective, resulting in better assessments of the situation with fewer errors or omissions.

Checklists should be tailored to your agency's specific protocols and listed by job function. Examples that can be adapted for your agency's use include the supervisory checklist (Appendix E), investigator on-scene checklist (Appendix F), investigator post-scene checklist (Appendix G), and crime-scene checklist (Appendices H and I).

# Scene response

In the later stages of an OICI investigation, investigators have time for research, questions and rest, moving at whatever pace works for them. Further, if an error is made in a report or an investigator initially neglects to collect some records, such issues can generally be easily corrected with no long-term adverse effects on the investigation.

At the scene of an OICI, however, the pace is generally much quicker. Time is limited (especially when rain is destroying your evidence), fatigue becomes a factor and mistakes can have irrevocable consequences on your investigation or prosecution. Because there is only one chance to get the scene response correct, your agency must commit to significant planning and training for this phase of the investigation.

## Calling ahead

Before an investigator even arrives at the scene, he/she can often ensure that certain precautionary measures are taking place by making a phone or radio call to an on-scene commander. The investigator can remotely verify, for example, that medical aid has been summoned, the crime scene is properly protected, hazards have been mitigated and a scene access log has been initiated. An assessment of the resources needed to respond can also typically be made by phone.

When an OICI occurs on a desolate country road, there will likely be fewer witnesses to interview and videos to collect than with a shooting in, say, an apartment complex parking lot. The scene location influences the number of investigators needed, as do the approximate number, status (e.g. wounded, deceased, fugitive, etc.) and locations of participants and witnesses. And notifications to prosecutor/district attorney, coroner/medical examiner and agency command staff can be made relatively quickly, thus affording investigators more time to respond to the scene.

## Setting priorities

As investigative resources are being contacted and dispatched, coordination and prioritization by a supervisor or lead investigator are essential. Everyone has a natural tendency to want to report directly to the shooting scene, which may or may not be where they are needed. There may be multiple scenes, or individuals might have been taken to various locations, possibly requiring investigators to be divided into response teams.

If there are injured or deceased individuals who have been taken to a hospital, resources should be deployed there for statements/dying declarations, evidence collection, photographing of wounds and potential conversations with family members/next of kin. If involved officers have been taken to their police department, those officers will need to be photographed, evidence will need to be collected there and statements might need to be taken.

Other locations potentially requiring asset allocation include a command center or staging location; a jail, if an involved individual has been incarcerated; a private residence; and/or the morgue. To minimize the potential for lost evidence or statements, the scene circumstances should dictate the priority for each activity.

42

## Requesting a briefing

Upon arriving at the OICI scene and ensuring that the aforementioned precautionary measures are in place, investigators should seek a briefing from the on-scene personnel. Even if previously briefed by the phone, investigators should be shown locations so they have an understanding of what happened in the appropriate context.

Knowing where incident events took place also helps investigators determine potential lines of sight, so they know where to search for witnesses or video recordings that might have captured those events. Further, on-scene personnel can indicate the whereabouts of participants or witnesses who are awaiting interviews or convey where individuals were taken (having been kept separate from one another to avoid contamination of their memories).

## Avoiding a conflict

Of absolute importance during a briefing is safeguarding investigators from any potential compelled (Garrity) statements that may have been made by involved officers. Investigators should not learn any details from a supervisor who might have questioned the involved officer, as this could taint the entire investigation from the outset, resulting in evidence and statements (and derivative evidence/statements) being suppressed from use in any subsequent criminal proceedings against that officer.

In some states, "implied Garrity" may be of concern, whereby involved officer statements may be immunized from criminal investigators even if they were not directly ordered to answer a question (but felt that they would be severely disciplined or terminated if they failed to answer, and that belief was reasonable under the totality of the circumstances).

Therefore, great caution must be exercised in determining the source of briefing information before it is relayed to a criminal investigator. *(For detailed information regarding Garrity, see Chapter 1.)*

If so little is known about what transpired that it is necessary to ask public-safety questions of the involved officer, this should be done voluntarily, if possible, and preferably by patrol personnel before the arrival of criminal investigators. But

if there were other officers involved who did not use force who can relay what happened, or video footage of the incident clearly depicts what happened, the involved officer may not need to be asked public-safety questions. Should it become necessary to compel an involved officer to answer public-safety questions, those responses should not be provided to criminal investigators without first consulting the prosecutor/district attorney for an opinion regarding their admissibility.

## Managing a walk-through

If policy or circumstances necessitate a scene walk-through with an involved or witness officer, a few additional considerations should be addressed.

First, those conducting the walk-through should be sure to coordinate with crime-scene personnel to prevent contamination or destruction of evidence. Nothing should be touched or moved without authorization from crime-scene personnel. If Internal Affairs is doing the walk-through, the IA personnel should be aware of potential Garrity statements that criminal investigators, including crime-scene processing personnel, should not hear.

The determination of whether or not to record walk-throughs should be made in advance of an OICI incident and be written into policy. For various reasons, many agencies choose not to record the walk-through. Your agency must weigh the pros and cons of the issue and decide in consultation with agency, community and prosecutorial stakeholders.

Another detail to note: While you are within a crime scene, be cognizant of the media or onlookers who might be filming your gestures, facial expressions and conversations.

## Coordinating at all times

Throughout the response, coordination among criminal investigators and crime-scene personnel is vital. Crime-scene investigators can describe for criminal investigators what they're seeing at the incident site, helping to preliminarily reconstruct events and locations. Such information is useful in determining whether witness statements being received by other investigators are consistent with the physical evidence.

44

Criminal investigators can inform crime-scene personnel about details such as the minimum number of shots fired, based on the number of wounds observed on an involved person who was taken to a hospital or on locations of potential evidence sites gleaned from witness accounts or video footage.

As mentioned, non-crime-scene investigators who need access to the scene for a walk-through should proceed only at the direction of crime-scene personnel to avoid inadvertent destruction or contamination of evidence.

Finally, legal considerations — including the potential need for a search warrant — should be discussed before such a search is initiated.

## Assessing those involved

As they begin to contact participants in the incident, investigators should determine whether any involved individuals require treatment for physical injuries, health conditions or mental trauma and/or testing for drug or alcohol influences.

It is important to note that, especially early on, a person could be injured and not realize it. Even if no one is wounded or otherwise injured, other medical issues — related to, say, high blood pressure, drug influence, hyperventilation and/or rapid heart rate — may need to be evaluated.

For the criminal investigation, drug and alcohol testing generally requires a voluntary sample or a search warrant based on probable cause that a person is under the influence. Mandatory (compelled) testing under departmental policy or employment contract is generally not available to criminal investigators unless the employee consents.

## Clarifying investigatory boundaries

Depending upon the circumstances leading up to the OICI — and if individuals are alive — it may be necessary to investigate and file criminal charges for one or more of the participants. For example, if an armed robbery suspect flees the scene and subsequently encounters law enforcement, resulting in an OICI, both the robbery and the OICI will need to be investigated.

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

> After a subject fled a shoplifting scene and assaulted a store security guard, a police officer fired his weapon, mildly wounding the subject. The employing agency called for an outside, independent agency to conduct the investigation. After being treated at the hospital, the subject was discharged. He left the hospital doors uncharged due to a lack of communication between the employing agency and the investigating agency regarding who would handle the underlying offenses.
>
> **This incident was successfully resolved once the subject was taken back into custody, but the outcome could prove tragic should a violent offender who was allowed to go free for similar reasons hurt someone else.**

Although there is a relationship between the two, the outcome of each incident could be entirely different. The subject may be guilty of the robbery yet hypothetically also be the victim of excessive use of force by the officer. This poses a challenge to investigators who are trying to remain impartial, as the perception may be that they are biased in the officer's favor if they are referring to the individual as a "suspect" and criminally charging the person for a portion of what happened.

To avoid a perception of conflict, the two incidents should be separately investigated if possible, preferably by different investigators. There are times, however, when the incidents are so inextricably intertwined that they must be treated as one investigation. Regardless, it must be clearly delineated and communicated who will investigate and/or charge any underlying offenses leading up to the OICI.

## Documenting lighting conditions

One final must-do for investigators, whether crime-scene personnel or otherwise, is thorough documentation of the lighting conditions as near the time of the incident as possible. Just as video of the incident likely does not accurately represent the lighting as seen by the human eye, crime-scene photography likewise cannot be used to accurately document such conditions. The digital sensors in photography and video equipment operate differently from our vision, a topic discussed in greater detail in the "Video Evidence" section of this chapter.

Lighting documentation can be crucial in an investigation, particularly when an object is mistaken for a weapon. Recall that it is the officer's perceptions and assess-

*46*

ment of the incident — and whether or not those are objectively reasonable — that form the basis of determining the legality of actions under *Graham v. Connor*.

What is learned in 20/20 hindsight — such as the fact that an object turned out to be a phone instead of a gun — is not to be used in the analysis. In determining whether the misperception was objectively reasonable, however, lighting conditions become an important factor. Although it is possible to document ambient light with a light meter, the results generally hold little weight to a layperson who is unfamiliar with such measurement values. Instead, highly descriptive, understandable and objective documentation should be used. Record items such as:

- Sky conditions
- Visibility (such as mist or fog)
- Sunrise and sunset times
- Ambient light
- Street light locations and functionality
- Vehicle headlights
- Spotlight illuminating the scene or blinding individuals
- Police vehicle strobe/overhead lights
- Use of flashlights, including weapon-mounted
- Shadows





*In the example above, a digital camera was fixed on a tripod. The camera setting for shutter speed was manipulated, resulting in the lighting conditions appearing to change, even though they remained the same.*

- Backlighting conditions
- Quick changes in lighting conditions requiring pupils to adjust (bright to dark environment, or vice versa)

During an officer interview, you should also inquire about corrective lenses, night blindness, color blindness or other vision-related impairments that may have affected perceptions.

# Hospital response

If any participant has been taken from the scene for medical treatment, investigators generally should prioritize their hospital response, as some activities there may be time-dependent. The identity of the individual might not even be known yet, and that detail could possibly be ascertained at the hospital.

When staffing levels allow, a team of investigators should be dispatched directly to the medical facility. This generally requires someone from the incident scene to remember to ask emergency medical services (EMS) personnel where they intend to transport the patient. Particularly when a scene is close to multiple trauma centers, precious time can be wasted if this question is not posed before EMS leaves the scene. The need to ask this question is even more crucial when a medical helicopter is used for transport, because the number of facilities where the patient could potentially be flown grows exponentially.

Among the areas that investigators assigned to a hospital should focus on:

- **Clothing.** The clothes of a person involved in the incident could be jeopardized if the patient's injuries require his or her clothing to be cut in order for medical aid to be rendered. The hope is that any such cuts can be made without damaging bullet holes or other evidence. But even when cuts don't damage the defects in the clothing, the clothes are of little use if the items are tossed in a biohazard bag and incinerated before being collected as evidence by law enforcement officers. Investigators must get to the hospital to request preservation of all evidence pertinent to the investigation, including clothes that are destined for disposal.
- **Gunshot residue (GSR).** This transient evidence is lost with the passage of time, although care should be exercised to determine the probative value of GSR (consult your local crime laboratory). Bullets recovered during

48

surgery, cellphones and identification cards are other common items of interest to investigators that should be preserved and seized lawfully. (Consult your local legal counsel. Some prosecutors might require a search warrant; others might view the situation as exigent circumstances, which don't require a warrant.)

- **Dying declarations.** The content — and the context in which such statements are made — should be thoroughly documented. Even if the person ultimately survives, such statements may be admissible if the person thought death was inevitable.

- **Patient interviews.** Interviews should be attempted with patients who are lucid if they won't interfere with medical treatment. But keep in mind: Miranda warnings may be necessary if the subject is in custody. If state and local laws allow it, all such interviews should be recorded.

- **Photographs of wounds.** These, too, can be extremely helpful to investigators in determining the number, location and directionality of gunshots or in documenting other injuries. If the subject survives, autopsy photographs will obviously not be available to assist in this regard. Because hospitals rarely photograph wounds, the often-technical and confusing narrative descriptions in medical records may be the only documentation of wounds available unless investigators take photographs.

- **Interviews with medical personnel.** To the extent that medical personnel are able to disclose information without violating patient confidentiality, they should be questioned about any statements made by the patient, relatives or visitors — even if they were just overheard. Or, perhaps, a subject spoke to EMS during transport or treatment — something an investigator can know only by asking. Other details that hospital staff can help with include the patient's prognosis and room assignment as well as security coordination.

- **Medical records from the hospital and EMS.** These records will ultimately be needed during the investigation, and they usually require consent from the patient or a search warrant. Each hospital tends to have its own procedure and documentation requirements; a few questions now regarding the specific protocol can save investigators a lot of time later. Beyond documentation of wounds, the medical records will contain information regarding drugs administered during treatment

that might affect toxicology testing; painkillers, for example, could be mistaken for opiate abuse. Blood transfusions could theoretically affect DNA standards if taken by a blood card rather than buccal swab. Mental health assessments could reveal suicidal or homicidal ideations.

# Initial contact with involved officers

Unless they are needed for a walk-through, involved officers should generally be removed from the scene as quickly as practical. In small jurisdictions, involved officers may be needed to assist with medical treatment, scene security or other activity until backup resources arrive. When this is the case, relieving the involved officer of those duties should remain a high priority.

If information needed to address public-safety concerns is required from the involved officer, this should be treated as an exigency and done as soon as possible. Involved officers should then be taken to a private, safe location to await investigators, such as the police department or a hospital. The preferred response is hospital transport — for evaluation (even if the officer doesn't think it is necessary).

Among other best practices, involved officers should:

- **Be kept separate from witnesses and asked to refrain from discussing the incident to avoid contamination of their memories.** This doesn't necessarily mean they should be left alone, though. Assigning a departmental liaison to each officer can aid the flow of information, provide someone to tend to any physical needs an officer might have and ease some of the anxiety that is likely being felt. The officers should be given the opportunity to contact loved ones and, if desired, to obtain emotional and legal support.

- **Be instructed to leave their uniform and duty equipment on until investigators arrive, unless any of it has biological contamination — in which case, photos, if practical, should quickly be taken before the officer undresses.** Departmental policy may dictate whether a supervisor or investigator should remove the officer's weapon as potential evidence; either way, it should be handled as little as possible with precautions taken to preserve potential DNA and fingerprint evidence.

- **Be introduced to investigators when they arrive and given an explanation of the investigative process.**

- **Be photographed.** Photos of the officers' clothing, gear, weapons and, if applicable, injuries should be taken, with photos of the outer garments establishing whether the officer was clearly identifiable as a law enforcement officer. In some cases, such as undercover buy-bust operations, a subject may claim that he was unaware that he was encountering law enforcement, asserting that he was defending himself against, say, a drug-related robbery. This may or may not be true, but investigators must collect all such facts regardless. It is the job of a prosecutor — and, possibly, later a judge or jury — to determine the credibility of the defense argument, not an investigator's.

- **Be assessed for evidence.** The collection of physical evidence from the officer should be based on the circumstances known or reasonably inferred at the time. For instance, if an officer indicates that he or she was strangled by the subject, blind swabs for touch DNA of the officer's neck should be obtained along with the officer's clothing and ballistic vest (which may potentially have the subject's DNA around the collar area). If there was no physical contact between the officer and the subject, collecting these same items may not be necessary. If no information is known in this regard and the officer declines to provide a statement to investigators at that time, investigators should err on the side of caution and preserve/collect as much physical evidence as is reasonable, not knowing whether it might be pertinent until later in the investigation.

- **Not be judged for their response to the OICI.** Officers involved in an OICI react in a wide range of ways. Some violently shake and are unable to speak for some time afterward; others are seemingly unaffected.

- **Potentially be interviewed.** The decision of whether or not to conduct a criminal interview of an officer at this early stage is impacted by the investigator's agency protocols as well as the officer's willingness or desire. Although it might be the protocol to interview the officer as soon as possible, the officer has the option to refuse a voluntary interview now (or ever), with no reason or explanation being required. The officer might be too upset at that moment, may wish to confer with legal counsel, may want time to mentally process what transpired, may be sticking to an

employment contract or labor union agreement, or may have myriad other possible explanations — or none at all. An investigating agency can adopt a policy for when it prefers its investigators to conduct officer interviews, but, in the end, the power to dictate that timing rests with the involved officer. The policy decision of the investigating agency in this regard is explored further in the Officer Interviews section of this book.

# Crime scene

Crime-scene investigation for officer-involved critical incidents (OICI) can range from highly simple (say, the collection of a firearm and cartridge cases) to extremely complex (a case involving multiple firearms, multiple cartridges cases, analysis of trajectories, documentation of bloodstain patterns, multiple involved subjects and multiple scenes). Each scene requires the full attention of the crime-scene investigators, investigating agency and parent agency. In any crime-scene investigation, investigators seldom have a chance to revisit the scene as it appeared immediately after the incident; they have only one shot at getting it right. This limited window of opportunity means that your agency and your crime-scene investigators must be properly prepared and trained to document an OICI scene.

OICI crime scenes are among the most complex and stressful that an investigator is likely to encounter on the job. Under such circumstances, the investigator is responsible for processing the scene and any secondary scenes, which includes collecting evidence at the scene(s), documenting the law enforcement personnel involved and documenting the subject(s) involved. Because these responsibilities are typically time-consuming, more than one crime-scene investigator might be required.

## Keys to an effective OICI investigation

The most skilled OICI investigations encompass nine primary factors:

1. Pre-planning
2. Response
3. Processing
4. Ballistic evidence

5. DNA evidence

6. Less-lethal tools

7. Technology

8. Other considerations

9. Report writing

*1* **Pre-planning.** At a minimum, your pre-planning should address the issues of staffing, equipment and investigator training. Trying to determine whether your agency has sufficient personnel and the necessary equipment to document the scene as the investigation plays out is unacceptable, as it could expose both your agency and your investigators to criticism.

Ideally, at least two crime-scene investigators would be dedicated to processing a scene. These investigators should each represent a stand-alone unit, each with its own set of equipment. The number of units required to process a scene is typically dictated by agency policy and procedure, a protocol that should be in place and understood by staff before the agency takes on an OICI investigation.

After you have determined the number of crime-scene investigators you will send to an OICI scene, your agency must equip those investigators with the tools needed to skillfully process a scene. Ideally, each investigator has a dedicated crime-scene kit containing the following:

- A digital camera (external flash, macro lens, tripod, additional memory cards, scales)

- Evidence placards/identifiers

- Packaging materials: packing tape, envelopes, paper bags, boxes and zip ties

- DNA collection material: distilled water, sterile swabs and envelopes

- Diagramming/measuring tools: laser scanners and total stations, with diagramming software highly recommended

- UAVs/drones for large outdoor scenes

- Ballistic evidence documentation: trajectory rods, angle finder and protractor

- Metal detector for locating cartridge cases

> Part of the value of bloodstain-pattern analysis (BPA) and shooting-incident reconstruction (SIR) is the ability to provide science-based opinions regarding the relative locations and heights within a scene — which, in the absence of video evidence, can help corroborate or refute statements. For instance, a witness might claim that a subject was defenseless on the ground at the moment he/she was shot. BPA and/or SIR can help investigators discern the truthfulness of that assertion, but scenes must be properly documented for appropriately trained analysts to perform this work.

The argument for one kit per investigator is that it allows your agency to send an investigator to a second — or even a third — scene simultaneously and know that each has the necessary equipment available to do the job well.

Before processing the scene of an OICI, an investigator should be highly trained and skilled in a number of disciplines. If a new investigator is assigned to process an OICI scene, he or she should have the on-scene guidance of an experienced investigator. At a minimum, a crime-scene investigator should be trained in photography, evidence collection and preservation, DNA collection, shooting-incident documentation, bloodstain-pattern documentation and scene diagramming. It is important to note that complex OICI scenes may require advanced analysis, so crime-scene investigators should develop working relationships with subject-matter experts, including forensic pathologists, crime laboratory scientists and forensic video/audio analysts.

2 **Response.** A crime-scene investigator's response to an OICI should be expedient and within agency protocol. Once on the scene, the investigator should confirm that a perimeter, ideally larger than needed, has been established. Also, the investigator should request that a crime-scene log (for an example, see Appendix J) be started, if one hasn't already been initiated, and request that nonessential personnel exit the scene. Unless your agency head is one of your crime-scene investigators, there is no reason for him/her to remain within the scene. Setting up an area outside the crime scene for nonessential personnel is an easy way to separate nonessential personnel from essential personnel.

In addition to securing the scene, the crime-scene investigator must determine whether he/she has the legal authority to search the scene. The investigator should ask, "Am I here legally?" If the answer is no or the investigator is unsure, a search warrant or consent (preferably in written form) should be obtained, at a

*54*

minimum, from the owner of the property that encompasses the scene. Consent can also be obtained from a party in control of the property, such as a renter. The responsibility for — and potential consequences of — collecting evidence without a search warrant or consent lies with the crime-scene investigator.

Once the primary scene of an OICI is secured, the crime-scene investigator should determine whether there are any ancillary scenes of interest to the investigation as well as any items of transient evidence subject to destruction because of weather, traffic or other factors. An OICI typically consists of at least three scenes requiring documentation: the area where the use of force is suspected of taking place (the primary scene), the involved officer (an ancillary scene) and the involved subject (another ancillary scene). A crime-scene investigator or another investigator with training in evidence documentation and collection should, as soon as possible, document both the involved officer and the subject. Additional ancillary scenes might include:

- The subject's vehicle
- Other involved subjects
- Police vehicles
- Other involved officers
- If the crime scene is outdoors, residential/ commercial buildings
- The hospital to which the involved officer and/or subject was transported
- The medical examiner's (or coroner's) office (autopsy)

*An example of a crime scene that delineates working areas for essential personnel (the crime scene and inner perimeter), nonessential personnel (the outer perimeter) and the media.*

**3** **Processing.** The processing of an OICI scene should be thorough and organized. The first priority for a crime-scene investigator is personal safety. He/she should take the time to assess the scene and put on personal protective equipment (PPE) to shield himself/herself and the scene from contamination and cross-contamination. An investigator should change gloves often, especially in between handling items of suspected evidence.

55

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

The crime-scene investigator should document, in writing and via photographs, his/her observations: *What does the investigator see or not see? Smell or not smell? Hear or not hear?* Such details may be important to the investigation and should be noted. Also important to document are weather conditions, lighting, vehicle positions, door positions, traffic conditions, position and orientation of bodies, and alterations to the scene before and after arrival (i.e. Fire/EMS intervention). Some of these details might seem insignificant but could later prove integral to the investigation. Notes, sketches and other documentation created or received during the crime-scene investigation and subsequent follow-up should be retained according to your agency's retention policy.

A crime-scene investigator should document/process a scene as he/she found it. The same goes for documenting the involved officer and the involved subject. If possible, the officer and subject should be photographed in a private or semi-private location (say, the police station, a fire station or a hospital). Objects placed within the scene before the investigator's arrival should be photographed and left unmoved. Objects collected and removed from the scene should not be placed back within the scene. If an object is moved before the crime-scene investigator arrives, the investigator should document that information in his/her report.

Once the crime-scene investigator has assessed the scene, he/she should take photographs of the entire scene, including potential witness views and surveillance video locations. After the photographs are taken and a systematic and methodical search for evidence has been conducted, the investigator can begin the process of placing evidence placards/identifiers within the scene to identify items of suspected evidence. The evidence placards/identifiers should be cleaned and sanitized between uses (with a bleach-and-water solution or commercially available products). With the evidence placards/identifiers in place, the investigator should again take photographs of the overall scene as well as evidence-establishing (midrange) photographs and close-up photographs of potential evidence. The investigator can typically expect to locate the following items of suspected evidence at an OICI scene: firearms, cartridge cases, bullet/projectile fragments, bullets/projectiles, cartridges and magazine. But an investigator should keep an open mind, taking care to also look for objects that might seem unrelated to the scene or are in an unusual location, missing or damaged. All such items should be documented and collected. Also, it is important to remember to look upward and in less-obvious locations, such as within tire treads, atop roofs or in sewers.

The general rules for evidence collection, contamination control, packaging, preservation and chain of custody must be followed at all times. Individuals and items that must be thoroughly documented include:

**Officer(s), in uniform (if applicable)**

- Uniform: photograph condition of dress from the front, back, left and right (see photographs on next page)
- Boots
- Gloves
- Duty belt (holster), etc.
- Vest
  - Outer carrier
- Weapon(s) involved
  - Make
  - Model
  - Serial number
  - Condition
    - Loaded/unloaded
    - Cartridge in chamber
    - Magazine
      - Seated/not seated
      - Number of cartridges in magazine
- Backup weapon (if applicable)
- Injuries

**Subject**

- Clothing
- Injuries
- Weapon(s) involved
  - Make
  - Model
  - Serial number
  - Condition
    - Loaded/unloaded
    - Cartridge in chamber
    - Magazine
      - Seated/not seated
      - Number of cartridges in magazine

*57*

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**



*A series of photographs depicts the documentation, from all sides, of an officer's uniform worn at the time of the incident.*



*This series of photographs depicts an officer's firearm as it was received (inappropriately packaged in plastic), far left; the firearm out of the plastic bag, left center; the firearm made safe, right center; and the firearm documented properly as evidence, far right.*

If the officer's or subject's clothing is recovered by another investigator and not photographed before being packaged, the crime-scene investigator, when possible, should photograph the clothing in a clean environment. Items of suspected evidence should be collected in a manner consistent with best practices and with your crime laboratory's protocols. Typically, items of evidence are placed in paper bags or envelopes. Plastic bags should be avoided because potential sources of DNA can degrade in plastic. If an item of evidence is wet or blood-soaked, it should be packaged and allowed to dry in a drying room or other secured area. Leaving a wet or blood-soaked item of evidence in a sealed paper bag also causes DNA degradation.



*An overhead diagram created using laser scan data and diagramming software*