If the officer's or subject's clothing is recovered by another investigator and not photographed before being packaged, the crime-scene investigator, when possible, should photograph the clothing in a clean environment. Items of suspected evidence should be collected in a manner consistent with best practices and with your crime laboratory's protocols. Typically, items of evidence are placed in paper bags or envelopes. Plastic bags should be avoided because potential sources of DNA can degrade in plastic. If an item of evidence is wet or blood-soaked, it should be packaged and allowed to dry in a drying room or other secured area. Leaving a wet or blood-soaked item of evidence in a sealed paper bag also causes DNA degradation.



*An overhead diagram created using laser scan data and diagramming software*

Collected firearms should be packaged, if possible, in cardboard boxes, with any cartridge from the chamber packaged separately from the magazine, assuming the magazine is present. Both the chamber cartridge and the magazine should be stored with the firearm, unless agency policy or procedure prohibits this. While handling a firearm, a crime-scene investigator should be aware of potential sources of DNA and/or fingerprints on the weapon (i.e. slide, grip, trigger/trigger guard). The scene investigator should change gloves before and after handling the firearm. The scene investigator should document any suspected biological material (i.e. blood, hairs, brain matter) observed on the firearm.

If a body remains on the scene upon a crime-scene investigator's arrival, the investigator should photograph it as found, taking care to thoroughly document the position of the body, the condition of clothing (if any), any visible injuries, the individual's hands, and the positions of items of suspected evidence near the body. Photographs should be captured from above the body, from the head toward the feet, from the feet toward the head, and from both sides of the body. Once the body has been removed from the scene, a photograph should also be taken of the area where the body lay. A word of caution: The body should not be moved or touched without permission from the medical examiner/coroner. Before the body is transported from the scene, the investigator should request that the hands of the individual be bagged so they can be processed for possible DNA evidence and gunshot residue (GSR). Although the investigative value of GSR being found or not found on an individual's hands, clothing or elsewhere may be minimal, the crime-scene investigator should nevertheless preserve that evidence for collection.

After the scene has been photographed and the evidence identified, the crime-scene investigator should take steps to measure and diagram the scene as found, a process typically referred to as a rough sketch. The rough sketch should include all items pertinent to the investigation. The investigator need not document every piece of furniture in a room, for example, but should document relevant pieces of furniture. Once the rough sketch is completed, the crime-scene investigator should create two diagrams, either hand-drawn or computer-generated. The first, known as a "clean diagram," is a general diagram of the scene with no evidence placards or identifiers marked. Investigators use the clean diagram during interviews with the involved officer(s), subject(s) and witnesses.

The second diagram, known as a "to-scale diagram," is essentially a copy of the "clean diagram" but with evidence placards and identifiers in place. The to-scale diagram is typically used in a courtroom to show the jury/judge the location of items of evidence and other details.

The diagramming process can be simplified with a laser scanner, a total station and diagramming software. The laser scanner and the total station allow quicker and more accurate documentation than does a tape measure, and both can be used to create a three-dimensional model of the scene, which can help viewers visualize the scene as it appeared on the day of the incident. Another benefit of the tools: They typically require only one investigator to operate, which frees up other investigators to work on other tasks.

4 **Ballistic evidence.** The documentation of ballistic evidence at an OICI scene should be completed by a seasoned and skilled crime-scene investigator, notably because a crime-scene investigator's ability to determine where the muzzle of a gun was at when a particular gunshot or a series of gunshots occurred can prove to be a crucial aspect of the crime-scene analysis.

As with crime-scene documentation, documentation of ballistic evidence should incorporate overall, evidence-establishing (midrange) and close-up photographs of the evidence both with and without scale. The investigator should look carefully for items of ballistic evidence, including cartridge cases, cartridges, fragments/projectiles and ballistic events/impacts (i.e. ricochets and defects). If identified, these items should be photographed, measured/diagrammed and, if possible, collected. The equipment required to document ballistic events/impacts includes but is not limited to:

- Trajectory rods
- An angle finder
- A protractor
- Lasers
- String
- Sticky scales

BEST PRACTICES FOR INVESTIGATING
## AN OFFICER-INVOLVED CRITICAL INCIDENT



*Ballistic event/impact without trajectory rod*







62








*Photographs depicting instances of ballistic event/impact documentation*

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

In addition to the identification, documentation and collection of ballistic evidence, a crime-scene investigator might be assigned to reconstruct the shooting event. This task should be assigned only to an investigator trained in shooting-incident reconstruction who is internally certified and approved by his/her agency. The investigator who conducts this reconstruction should report his/her findings in a peer-reviewed technical report using standardized terminology and definitions.

> In one fatal OICI, the officer claimed that the subject was strangling him around the neck, resulting in the officer's lethal use of force. Touch DNA samples collected from around the officer's uniform shirt collar and around the neckline of his bullet-resistant vest tested positive for the subject's DNA, partially corroborating the officer's version of events. The same can be true when there is a struggle for an officer's firearm.

5 **DNA evidence.** DNA evidence can be highly crucial to an OICI investigation, so a crime-scene investigator must be familiar with the various types of DNA (i.e. touch DNA, wearer DNA) and various sources of DNA. The investigator should take extreme care when handling the clothing and equipment of the involved officer and the clothing of the subject. In particular, the investigator should exercise extreme care when handling these items:

- Officer's clothing
- Officer's duty belt
- Officer's vest
- Subject's clothing
- Firearms
- Cartridges
- Cartridge cases
- Biological fluid

*A photo depicting suspected bloodstains on an officer's duty belt*

64

In addition to being familiar with the various locations and sources of DNA during an OICI investigation, a crime-scene investigator must know how to collect samples of DNA/body fluids for analysis. The best practice for such collections is to follow your agency's and crime laboratory's policies and procedures.

6 **Less-lethal tools.** Although OICI often involve firearms, a crime-scene investigator must also be able to document scenes involving a less-lethal tool. For example, an investigator should be able to accurately and thoroughly document electronic control devices (ECD), batons, pepper spray, restraints such as handcuffs or hobbles, etc. Such documentation should include overall, evidence-establishing (midrange), and close-up photographs both with and without scale. Detailed documentation is crucial, because some facts — whether a baton was found extended or collapsed, for instance — can prove pertinent to an investigation. Extreme care should be applied when documenting the condition of the less-lethal tool and the presence of possible trace evidence and DNA/biological fluid. Especially when such a tool is used unsuccessfully — resulting in the involved officer's escalating use of force — proper documentation and collection of less-lethal tools can prove vital. The ability to adequately explain failures in such as case can be crucial to the overall understanding of the incident.

> In a fatal in-custody death investigation, officers deployed OC spray in an attempt to bring a combative subject under control. The spray failed to subdue the individual, who later died. Subsequent analysis determined that the spray was well beyond its listed expiration date and the active ingredient was no longer sufficiently present in the canister. Collecting and examining the OC spray showed that the spray did not contribute to the subject's death and also helped explain why officers had difficulty controlling the subject despite attempting to use the less-lethal method.
>
> Other examples include when ECD are ineffective due to the wires short-circuiting, low battery power or probes that don't adequately penetrate heavy clothing.

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**



*Photographs depicting an example of Taser® barbs embedded in a subject's sweatshirt, indication that the probes perforated the sweatshirt.*

**7 Technology.** Given the rapid pace at which technology advances, a crime-scene investigator needs to keep on top of technological improvements not only in crime-scene documentation and collection but also in the field of forensic science. Investigators need to be aware of the documentation products available to them. Laser scanners, total stations and diagramming software are among the technology that has essentially become standard with OICI investigations. And the use of computers, tablets and printers has enabled crime-scene investigators to provide real-time updates regarding scene documentation/processing. Crime-scene investigators, supervisors and other investigators can share this information via commercially available applications, perhaps even receiving the information while processing another scene several miles away. The use of unmanned aerial vehicles (UAVs)/drones is also on the rise, and crime-scene investigators should utilize them when available.



*Inner perimeter*    *Outer perimeter*

*A photograph from UAV/drone footage of an OICI scene delineating inner and outer perimeters.*

8 **Other considerations.** Although a crime-scene investigator should be concerned with preserving the scene(s) as found, investigators also need to check for different types of evidence that could aid the process of evidence identification and collection. Included are any statements made by a non-shooting officer and/or a witness and the existence of surveillance cameras, body cameras, dash cameras and/or witness videos. These types of evidence can direct a crime-scene investigator to additional scenes or areas of interest to the investigation.

Before leaving an OICI scene, a crime-scene investigator and the investigator(s) responsible for the overall investigation should conduct a walk-through of the site, making sure to look for items of suspected evidence that might have previously gone unnoticed. A walk-through also serves as a way to check and confirm that no equipment or items used to document/process the scene remain. Any trash created by the crime-scene investigator should be collected and discarded. If possible, especially in cases where the subject dies after a struggle, the scene should be held until the autopsy is complete. In the event that additional follow-up is needed at the scene, the scene is then available to crime-scene investigators without the need to obtain a new search warrant or consent from the owner/occupant.

Attachment 3
202 of 389

It is recommended that a crime-scene investigator assist the lead investigators on the case with evidence submission to the crime laboratory. The crime-scene investigator is typically best capable of describing the location and condition of evidence as well as possible biological sources on the evidence, and providing context about the evidence's potential value to the investigation.

*9* **Report writing.** A crime-scene investigator's report should be thorough, accurate and strictly factual, void of the investigator's opinions. Included in the report should be facts that the investigator either directly observed or learned through another documented source. It is recommended that a separate report be written for each scene that was documented/processed, as it is much easier for someone to find necessary information by referring back to a specific report than having to comb through myriad pages of a comprehensive narrative.

# Neighborhood canvassing and witness interviews

In some instances, witnesses to an OICI may voluntarily approach law enforcement investigators to describe what they saw. More frequently, however, witnesses — even when willing to cooperate — speak only when approached by investigators and specifically asked to provide a statement. Even witness-captured video footage of the incident often appears on social media or TV news before investigators know that it exists. This tendency requires investigators to proactively search for witnesses and, once identified, to conduct thorough interviews.

Nearly every OICI requires a timely canvass of the surrounding neighborhood, except perhaps in remote locations where there are no neighbors. Even when an incident transpires entirely indoors and out of the sight of others, neighbors may be able to provide background or historical information about the participants or may have seen or heard something relevant to the incident, such an earlier argument or the sound of gunshots.

## Canvassing process

When going door to door in the area to search for potential witnesses, investigators should be sure to keep detailed notes of observations, interview

subjects, the status of homes (abandoned or unoccupied?) and any additional information that may prove valuable later in the investigation. Even documenting license plate numbers of parked vehicles can be useful in helping to identify those who were possibly in the area at the time of the incident — and who might have witnessed something. If a resident refuses to answer the door or to speak to investigators, particularly in a neighborhood where cooperation with law enforcement is discouraged, noting those circumstances can be beneficial for plain-clothes investigators to return later to attempt an interview when cooperation can be obtained more discreetly.

It is crucial to attempt witness interviews as soon after the incident as practical and to record them if state law permits it. Witnesses tend to be most honest soon after the incident. As time passes and witnesses confer with one another, exaggerate their observations to the media or speak with relatives of the participants, statements may change (either unconsciously or in an effort to undermine the investigation). This is especially true for relatives of the involved individual if the loved one has been killed. As relatives transition through the stages of grief, and potentially speak with civil attorneys, their cooperation with law enforcement can quickly diminish.

Besides canvassing for witnesses, investigators should look for video recording devices (such as surveillance cameras and doorbell cameras) and for videos of the incident in the media or on open-source social media platforms. Investigators should also begin monitoring the news media and social media as soon as possible, sending preservation letters to the respective platform or news outlet as soon as an evidentiary communication is identified.

Often, witnesses can initially be identified through a video or commentary post on social media or in the comments section of online news articles. If a witness provides an interview to a news organization, oftentimes the news outlet airs only a few seconds of a much longer interview. Investigators may want to obtain the full interview to compare the witness's official statement to law enforcement with what he/she is saying elsewhere; a lack of consistency might speak to the witness's credibility. Because investigators must be prepared to properly collect and/or preserve video evidence as quickly as possible, it is helpful to have dedicated and/or trained video personnel as part of the investigative team.

> Family members called 911 to report having been assaulted by a relative who fled with a gun in his possession. The family members were certain that he had a gun and allowed deputies to photograph the injuries they suffered. Fearing the subject, the relatives filed for protection orders.
>
> Deputies later located and confronted the subject, who purported to have a gun underneath his shirt. The subject was ultimately shot and killed. Once the relatives learned that the "gun" was actually a remote control, they changed their stories, saying that they had not been assaulted, that they never believed he had a gun and that they were coerced into signing the protection orders. The subject's mother even told the media that no one had called 911, despite the existence of a 911 recording of the mother begging for help.

Pre-printed canvassing forms are useful for investigators conducting a neighborhood canvass, as they help to prevent important information from being missed and allow less-experienced personnel to assist without adversely affecting the interview quality. Appendix K contains an example of a canvassing template for OICI that can be adapted to your agency. One task that canvassers frequently overlook is taking a photograph from the vantage point of a witness toward the location where any of the described activities took place. Such photos help to establish how well the witness would have been able to actually observe the incident due to distance, lighting, obstructions or other complicating factors. The canvassing form contains a reminder to take these important photographs.

## Witness interviews

Once a witness to the actual incident has been identified, a formal interview is generally warranted, preferably video-recorded at a police department or in another controlled environment. If a material witness does not wish to accompany investigators to the department, however, all attempts should be made to get as complete and thorough of a statement as possible at the witness's residence (or other location) — and to record it, if permitted by law.

Even when questioning witnesses at their home, investigators should attempt to question them separately, a task that is complicated in an uncontrolled environment. The aforementioned canvassing form contains many of the

70

suggested questions investigators should ask a witness, although this generic aid is not a replacement for experienced investigators tailoring their questions to the particular OICI. Therefore, if inexperienced officers are assisting in a canvass, an experienced investigator should be summoned to conduct or participate in any crucial witness interviews.

Among the broad topics to explore with witnesses:

- Knowledge of or a relationship with any of the participants, including historical knowledge

- Actual observations of the incident, including their vantage point and the location of events

- Sounds heard relative to the incident, including commands, gunshots, etc.

- Timing of events

- Any video of the incident from a phone, surveillance camera, doorbell camera, etc.

- Knowledge of other possible witnesses or the existence of other videos (e.g. observed a social media post)

- Observations of any use of force and rendering of subsequent medical aid

When questioning a witness, investigators should avoid leading questions and document what the witness says that is the person's opinion rather than a factual observation. When summarizing the witness's statement in a report, investigators must not change the meaning of something that was said or portray a statement out of context.

Witnesses often are curious about aspects of the investigation, and it can be tempting to share details, particularly when a witness is being very cooperative. However, investigators must not discuss any specifics of the investigation that they do not want to be publicly known. Investigators may politely ask witnesses to refrain from speaking with others or the media regarding their observations if doing so would be detrimental to seeking the truth; such a request, though, is generally unenforceable.

When interviewing family members, it is beneficial to speak with them as soon as possible after the incident, despite the awkward and uncomfortable nature of

Attachment 3
206 of 389

such discussions. Although this interview can theoretically be incorporated into a next-of-kin notification, having other investigators conduct the interviews after the notification has been made is often more successful. As mentioned, it is imperative that these interviews be recorded if legally permissible, as family members may change their stories once the initial shock has subsided. Investigators should generally focus on obtaining the following information from relatives:

- Subject's known activities in the 24-48 hours prior to the incident
- Any communications with the subject, including text messages or other forms
- Subject's cellphone number and service provider (saves time later)
- Subject's social media accounts (may be under a pseudonym)
- Any acquaintances of the subject who may have relevant knowledge
- Any knowledge of the actual incident
- Drug- or alcohol-addiction problems for the subject
- Any mental health issues, including previous suicidal ideations, for the subject. If so, where is/was the subject treated (to possibly obtain records via search warrant if they become pertinent).
- Any bias the subject had toward law enforcement
- Any radical/extreme beliefs, memberships or ideologies
- Subject's knowledge of, fascination with or possession of weapons
- Recent life stressors or sudden shifts in behavior

## Discrepancies in statements

It likely comes as no surprise that witnesses sometimes lie to police. Although investigators need to be aware of this possibility and explore inconsistencies, they must also consider that a witness may truly wish to be helpful and is honestly presenting his/her perceptions of the incident, even if those perceptions turn out to be completely erroneous.

OICI generally occur very quickly and can be traumatic for witnesses. A witness's memory, like those of officers, may be incomplete or inaccurate, particularly when under stress. Perspectives vary, as do individual

72

interpretations of observations. Further, detail and accuracy can be lost during the process of verbally communicating perceptions to another person.

Assume that a witness watches an OICI develop from the moment officers arrive at the scene through the shooting incident. That person's perspective and statement will likely differ substantially from those of another witness whose attention was drawn to the scene only after hearing gunshots. Whether or not the witness knows the individuals involved, and the context of that knowledge, may also affect his/her observations or interpretations. If the witness knows the involved individual to be an unreasonable "jerk," he/she may be more forgiving of law enforcement's use of force against that person. Conversely, if the witness knows the subject to be a sweet, loving person who is just going through a rough time, the witness may be more likely to condemn that same officer.

Each person has his/her own unique hobbies, interests and knowledge base, all of which can also have a bearing on a witness's perceptions of an incident — notably, what draws the person's attention and what he/she more easily remembers. For instance, a witness who is a car enthusiast will likely offer accurate and detailed information regarding the vehicles involved in the

The lone occupant/driver of a vehicle struck an officer in a parking lot while attempting to flee in the car. The officer shot and killed the driver, yet the vehicle continued accelerating as it careened across an intersection and smashed into vehicles in a strip-mall parking lot several hundred yards away.

One young witness who was working in one of the strip-mall businesses provided an interview to the media regarding her perceptions of what transpired. The witness did not know anyone involved and had no reason to lie. However, she described that the driver fled the scene on foot after crashing and that the vehicle's passenger was taken away by ambulance. In fact, the driver was still deceased behind the steering wheel, and there was no passenger.

**The witness pieced together disjointed bits of information from her observations (which were traumatic) and conversations with others, resulting in a completely erroneous conclusion with no intent to deceive.**

incident. On the other hand, a fashion designer's observations may be more focused on the clothing worn by participants, but he/she may have only a vague or even an inaccurate recollection of the vehicles. For these reasons and others, the composite (or average) of all witness statements is likely to be more accurate than that of any singular witness. The more witnesses there are, the more closely the truth can generally be ascertained.

Errors in perceptions are not limited to our vision, as with optical illusions or tunnel vision; they can also extend to other senses. Auditory exclusion is extremely common in traumatic situations, with witnesses not having heard the shout of a command or even gunshots. Officers frequently do not recall how many shots they fired (almost always underestimating) and may not honestly know whether another officer, standing only a short distance away, also fired. Time distortions, the ability to judge distances, heights and colors, and even perceptual errors with odors and touch are all possible.

All of this is to say that witness accounts may or may not be accurate — and when inaccuracies are noted, they may possibly be unintentional based on the physical limitations of the human brain. It is therefore incumbent on investigators to utilize their interviewing skills and experience to determine the credibility and weight that is given to a statement and, when discrepancies with the evidence exists, to distinguish perceptual errors from purposeful deception.

## First responder interviews

First responders — whether they be police, fire or EMS personnel — generally need to be interviewed by investigators for their observations and alterations while at the OICI scene. These interviews may not necessarily need to be completed the day of the incident, but waiting too long may affect the responders' ability to recall specifics, particularly if the first responder has since been to several other traumatic scenes (where details can become confused or attributed to the wrong incident).

It is necessary at times for first responders to enter a scene and alter it, either to bring the situation safely under control or to render aid to those injured. The way investigators approach the first responders regarding such crime-scene contamination can greatly influence the level of cooperation and information received. For instance, if investigators take an accusatory stance with first

responders, the responders may become defensive and be less forthcoming with information that they believe will elicit criticism. Conversely, if investigators explain that alterations are inevitable and many times required in order to preserve life, the tone of the conversation shifts and first responders tend to be more comfortable disclosing changes made to the scene or evidence.

Among the specific information that investigators should elicit from first responders:

- Were there any utterances made by patients or overhead from others?
- Any alterations made to the scene?
    - Anything touched or moved, even if placed back?
    - Weapons cleared? What was their condition prior to being cleared?
    - Cartridge casings potentially kicked?
    - Clothing cut?
    - Items introduced into the scene, such as medical equipment?
- Where were items located and how were they oriented?
- Any photographs taken at the scene?
- Others present at the scene?
- Any treatment rendered, including drugs administered?
- Any actions taken relative to the incident, such as placing a subject into or removing handcuffs?
- Any other observations or documentation?

If a first responder did have physical contact with a key piece of evidence, it may be necessary to request elimination standards for the responder's DNA, fingerprints or footwear impressions. This need should be explained professionally, not with condescension.

To help mitigate this issue, consider providing training to first responders on proper crime-scene procedures from the law enforcement perspective. First responders who understand the importance and rationale will be much more careful within a scene and serve as much better witnesses to any alterations that had to be made.

# Involved-officer statements

One of the most difficult and controversial aspects of OICI investigations centers on the interview of the involved officer(s). The process of interviewing a fellow officer poses unique challenges for an investigator; it can also be the source of heavy scrutiny.

A common refrain from the media/public is that officers should be treated exactly the same as homicide suspects and afforded no "special" rights or privileges, such as not being questioned immediately after the incident. That is, of course, until an officer exercises his/her Fifth Amendment right to remain silent, at which point the suggestion may be made that public servants — while on duty and being paid with taxpayer dollars — should be forced to provide statements regarding incidents in which they participated.

But the controversy isn't limited to the media/public. Even within law enforcement circles, debate persists regarding the best way to handle officer statements so that the needs of the investigation are properly balanced with the rights of all parties involved.

In this section, various arguments and perspectives about these common issues will be presented. In many cases, an absolute "right" regarding the best practice does not exist. Therefore, agencies are encouraged to address these controversial topics by developing a firm understanding of both the pros and cons of each concern, including the associated ramifications; discussing these matters with stakeholders for their opinions; and then making a defensible policy decision that seems to be the most acceptable for each individual community.

## Pre-interview considerations

Whenever an officer sits with a criminal investigator to provide an interview, there is an element of risk. The officer could be misunderstood, make an inappropriate statement or have a discrepancy later used against him/her criminally, civilly or in the context of internal discipline/termination. Once a statement is made, it remains forever, with no realistic way to retract it. The officer likely does not know the investigator and, therefore, may be wary of the process, motivations or intent.

With so much on the line, officers in such cases often retain an attorney or even decline an interview, citing their Fifth Amendment rights. This presents

*76*

a challenge for investigators because, as previously stated, the surest way to determine which *Graham v. Connor* factors were present during the incident is from the officer himself/herself.

Investigators should be sensitive to the precarious situation the officer faces. Deliberate questions should be developed in advance, and, if a question doesn't add to the understanding of the incident, perhaps it doesn't need to be asked. For example, investigators might know from video footage and physical evidence exactly how many times the officer discharged his/her weapon. Knowing that officers almost always underestimate this number due to human performance limitations, is it necessary to ask the officer how many times he/she fired? When an officer's recollection of the number of shots he/she fired is incorrect, others may attempt to unjustly use this against the officer, portraying the officer as a liar who is trying to minimize his/her actions. Or, if the question does need to be asked, perhaps it can be asked in a way that does not "box in" the officer — such as "How many times did you believe or perceive that you fired?" instead of "How many times did you fire?"

These suggestions are in no way meant to try to limit an investigator's effort to get at the truth — that is always of paramount importance. If an answer needs to be known, the question must be asked. The key is for investigators to ask questions "with deliberate purpose," not ask solely for the sake of asking. This is best accomplished by remaining on topic and focusing on what happened from the officer's perspective using open-ended, non-leading questions.

As for where to conduct the interview, it is usually best to choose a somewhat-neutral location, such as a private conference room, with only the minimum number of required people present. Although using a department's interview room may be convenient, the environment will do little to put the officer at ease — something that's necessary when trying to elicit traumatic memories. Interviews should be audio- or video-recorded when permissible, with video preferred for its ability to record expressions, gestures and emotion.

Careful consideration should be afforded to determining who will be present during the interview, with that number being kept to as few as possible. Due to potential Garrity concerns, supervisors or internal affairs investigators from the involved officer's agency should not attend, unless their presence is specifically requested by the officer being interviewed (and he/she understands

their presence in no way affects the voluntary nature of the interview). Further, although it is beneficial to collaborate and cooperate with federal agencies who may be investigating other aspects of the incident such as potential civil rights violations, the presence of those investigators may reduce the ability to gain voluntary statements from officers or other witnesses (due to the higher level of apprehension associated with federal authorities). If this is a concern, potential solutions include immediately providing the federal investigators with recordings/transcripts of the interviews conducted during the criminal investigation or requesting that they delay their interviews until after the state criminal interviews are completed.

Criminal interviews must be voluntary, not compelled. Thus, Garrity warnings are never used. If an officer or his/her attorney attempts to read or recite Garrity rights, the investigator must stop the interview and reiterate that only a voluntary interview will be conducted. If the officer or his/her attorney insists on Garrity recitation, the interview should not take place.

Unless the interview is a custodial interrogation, Miranda warnings are not necessary and should generally be avoided. Instead, investigators may consider an admonition, which clearly indicates that the interview is voluntary, that it may be stopped at any time and that is not being compelled under Garrity. An example of such a form, the Criminal Investigation Notification, can be found in Appendix B.

Investigators must be willing to accept that when a person involved in a traumatic experience says that he/she doesn't remember something, it is quite possible that he/she doesn't. The officer's focus may have been on something else, or his/her brain may have filtered inputs to only that which was necessary for survival, as with tunnel vision. Repeatedly asking the same question to which the individual has said he/she doesn't know the answer can ultimately be counterproductive. Wanting to be helpful, the officer might finally feel compelled to guess at an answer to appease the investigator. This effectively creates a "new" memory for the officer, to which the officer will reply with the "new" answer each subsequent time the question is asked — an answer the officer was essentially forced to provide because he/she honestly doesn't actually remember the detail.

*78*

# Interview format

In almost every instance, an officer who agrees to be interviewed tells the truth about the incident, at least from his/her perspective. Although it may become necessary to transition to more of an interrogation mindset if an attempt to deceive is suspected, the investigator should generally aim to assist in eliciting facts and details through enhanced memory recall. To aid in the retrieval of this information, investigator training in cognitive or trauma-informed interviewing methods is recommended.

One highly effective approach to officer interviews is the use of two investigators, with one serving as the lead during the questioning. The secondary investigator will be less familiar with the case and unlikely to have watched any video recordings from it, enhancing the second investigator's ability to be an active listener and to help determine whether the officer's statement makes sense from an "outsider's" perspective.

The interview typically begins with introductions, an explanation of the process and any necessary admonitions, such as the Criminal Investigation Notification form. Thereafter, the lead interviewer should ask preliminary background questions, such as the officer's years of experience, specialized training, equipment carried, vehicle being used, etc. Starting with simple, non-threatening questions allows the officer to become more relaxed and comfortable and to establish a rapport with the interviewer.

When the time comes to discuss the actual incident in question, the lead investigator should first allow the officer to tell the entire story, from beginning to end, without interruption. As the officer provides his/her account of what occurred, the investigator should take notes about details meriting follow-up and/or discrepancies in need of further exploration. Interrupting the officer with questions as the officer tells the story greatly diminishes the officer's ability to recall information and may create confusion regarding the sequence of events.

Once the officer finishes the story, the lead investigator can proceed with follow-up questions and/or pre-determined questions. Once the lead interviewer finishes asking all the questions he/she considers relevant, the secondary interviewer can ask anything that might have been missed. (A suggested format for the officer interview and a list of questions can be found in Appendix L.)

Attachment 3
214 of 389

When all questions have been asked of the officer, video footage of the incident may be shown to the officer. After one or two viewings, the officer can address any inconsistencies he/she wishes to and provide specifics on anything he/she might have forgotten to address.

## Waiting periods prior to interviews

Undeniably, law enforcement officers hold a distinctive place in society, having been granted arrest authority and the ability to make split-second decisions that literally may be the difference between life and death. With this power, though, comes the responsibility to wield it reasonably and the duty to hold one another accountable if abuses occur.

The question then becomes: Given their unique status, should officers be treated any differently during a criminal OICI investigation than any other citizen?

Unlike the typical murder suspect, officers don't go to work one day with the desire or intent to cause another person harm — let alone his/her death. The vast majority want to be beacons of light in the darkness, helping those in need and keeping our communities safe from those who do possess nefarious ideals. It seems reasonable, then, that an officer would be more traumatized by killing another human being, even when justified, than someone who sets out with that goal.

The resulting trauma — and the associated memory lapses that such trauma may induce — is what leads some agencies to wait one or two days or sleep cycles before even attempting to interview an officer. Such a delay forms the crux of one argument suggesting that officers are given preferential treatment not afforded to other homicide suspects.

Conflicting research exists on the benefits of allowing a waiting period. Some research suggests that memories begin to fade nearly immediately after an incident, indicating that interviews should be conducted as soon as possible after the OICI. Other research asserts that the human brain needs time to reconcile/process the vast number of sensory inputs with which it was just flooded, along with associated biochemical changes in the body. Recall is more accurate, this research suggests, after two sleep cycles.

Perhaps a third possibility exists, too — one recognizing that each officer and the totality of each situation differ. After all, what bothers one person may have little effect on another, and officer-involved critical incidents vary widely — from the highly minor event with no resultant injuries to the major confrontation with significant and horrific loss of life.

For as much as this book has emphasized the need to have firm, standardized policies in place, the decision regarding when to interview an officer may be one that is best left "to be determined" based on the facts specific to each case.

In many OICI, the basic facts are known, such as:

> *An officer responded to a domestic disturbance, and one of the participants brandished a gun, as evidenced on body-camera footage. The individual with the gun was subsequently shot and killed by Officer Smith after the gun was raised and fired in Officer Smith's direction, missing him by inches.*

In such an instance, an immediate officer interview may do little to further the understanding of the incident and, therefore, delaying the interview for a couple of days would cause no significant harm to the investigation. The entire investigation may take months to complete, after all, and Officer Smith may be very upset, shaking uncontrollably from the near-death experience and the fact that he just killed another human. The officer's blood pressure may be skyrocketing, exacerbating a chronic medical condition that he has battled for years. He may be rambling, his speech virtually incoherent. Pursuant to departmental policy, Officer Smith will be placed on administrative leave immediately, so there is minimal (if any) community risk in allowing Officer Smith to remain free until a statement is taken. Based on his employment contract, Officer Smith is provided an attorney, and the attorney may wish to wait for the interview until he has had time to confer with his client.

Reasonable minds would agree, it seems, that, despite research suggesting memory fades with time, eliciting a detailed statement from Officer Smith while he is actively recovering the immediate physical and psychological effects of the OICI is unlikely to generate the most accurate and helpful information needed for the investigation. Further, because this is a criminal investigation, his statement is voluntary, and he has a right to legal

representation if he desires. The media/public may not recognize these factors, instead only seeing the delay in questioning as preferential treatment of an officer and "proof" that the investigation is biased.

That said, there certainly can be OICI with less-dramatic results, situations in which the officer suffers minimal adverse effects and does not request an attorney, and/or when certain information regarding the incident remains unknown and needs to be addressed immediately. In such cases, it may make sense to conduct the officer interview soon after the incident, assuming the officer is willing.

Having a blanket policy providing all involved officers a two-day waiting period prior to a criminal interview isn't advisable. Similarly, requiring an immediate interview of all involved officers could be detrimental to some cases. Instead, this issue is probably best decided incident by incident, based on the totality of the circumstances in each incident. In reality, most officers are advised to decline an interview before obtaining legal counsel — so the decision of when an interview takes place doesn't lie with the investigators; it lies with the involved officer and his/her attorney.

## Prior review of video footage

Whether or not to allow an involved officer to view body-camera/dash-camera recordings before the officer gives a statement is another highly controversial aspect of officer interviews.

In most every other instance/arrest that an officer makes, the officer can review camera footage before writing his/her report to ensure that his/her recollection matches the video evidence. But an OICI is not your typical incident or arrest. Besides the fact that the officer's actions are being reviewed, both the legal standard and the process by which a determination is made differ substantially from those of most conventional cases.

A valid argument can be made that the fast-moving and traumatic nature of an OICI has a significant influence on an officer's ability to recall many of the specifics of the incident. Discrepancies between the officer's perceptions and what the video shows can potentially be exploited for use against the officer in

*82*

both criminal and civil proceedings, perhaps even painting the officer as a liar. Some officers may even believe that investigators are intentionally trying to trap them into making a false statement by withholding video evidence, only so it can be used against them.

It is not unreasonable for officers and their attorneys to have such concerns, but experience has shown that some discrepancies are to be expected in most every OICI witness statement, including those of involved officers. An inconsistency doesn't necessarily equate to purposeful deception. This is why it is crucial for only the most experienced and knowledgeable investigators to conduct officer interviews; they must be able to differentiate between normal perception errors/ memory gaps and blatant lies intended to mitigate potential wrongdoing. Investigators should seek specific training in this regard to become familiar with human performance and memory limitations during traumatic events.

Looking at the legal analysis of an officer's use of force based on *Graham v. Connor*, you should recall that the assessment is based on the objective reasonableness of the officer's actions in light of the facts and circumstances confronting him/her, judged from the perspective of a reasonable officer on the scene, without the benefit of 20/20 vision of hindsight. Video footage of an incident does not capture this all-important information and is exactly the type the 20/20 hindsight the Supreme Court cautioned against.

Investigators can review video and see it as one piece of the puzzle, but of paramount importance is what the officer perceived and his/her interpretation of those perceptions. Ultimately, would another officer reasonably come to the same conclusion and take the same actions under those same circumstances? This requires knowing what knowledge an officer had available to him/her to consider; what the officer was focused on and actually observed; how the tense, uncertain and rapidly evolving events affected the officer's decisions; and what the officer's overall analysis was of the danger posed and the need for force. The investigation seeks to determine whether or not the officer's assessment that the suspect posed an immediate threat to the safety of the officers or others was objectively reasonable based upon those factors.

Again, video does not show this. Camera footage may show an individual in a dark alley pull an object from his/her waistband. When the video is zoomed, slowed and enhanced, the image clearly reveals itself to be a wallet and not, as

Attachment 3
218 of 389

the officer perceived it, a gun. But this video is 20/20 hindsight; investigators need to know whether or not the officer's misperception was objectively reasonable to an officer on the scene at the moment the force was used. For instance, if the subject yelled that he was going to kill the officer and then rapidly pulled out the wallet, pointing it like a gun, the officer's force might be found to be reasonable. However, if during a calm encounter with no threat of violence the officer asks for identification and the person slowly pulls out his/her wallet to comply, maybe the same action by the officer would be found to be unreasonable.

The totality of the circumstances is needed for the investigation, and this generally comes in large part from an officer interview, not video. When officers are allowed to repeatedly watch a video of the incident before being interviewed, the officer's interview tends to become a narration of what the video shows, rather than a recitation of requisite observations from the officer's perspective (instead of the camera's), the officer's internal dialogue, the knowledge the officer had about the person/situation from the outset, the decision points, etc. In short, the video shows what happened but not why.

If officers view the video prior to the interview, several ramifications could result:

- An officer's memory could be changed or tainted, making it difficult for the officer to reconcile what actually happened from his/her perceptions of what happened.

- It becomes much more difficult to elicit the minute details, observations and perceptions necessary for a full understanding of why the event transpired in the manner it did. This loss of detail could prove to be a disservice to the investigation and the officer as well. It's possible that an officer, by watching the video, could learn a detail he/she didn't previously know about. If the officer then mistakenly relates that detail during the interview as if he/she knew it at the time of the incident, that detail could be the difference between the officer's actions being deemed reasonable (if he/she didn't know that fact) and unreasonable (if he/she knew that fact but acted despite it).

- The allegation of the officer receiving preferential treatment is again introduced, because investigators generally would not allow others to view video evidence prior to an interview (at least not by policy).

*84*

Officers tend to be much better at articulating details needed to assess the *Graham v. Connor* factors when they haven't viewed any incident-related video. The more times video is viewed before the interview, the less successful the interview typically is at drawing forth those facts. Therefore, it is recommended that officers generally refrain from watching video before a formal criminal interview.

This best practice, however, may not always be possible. When a video of the incident is played by the media, for example, the officer might see it before his/her interview. In such cases, it is sound advice to suggest that the officer watch it as few times as possible to avoid the problems previously described.

When an untainted interview is possible, investigators, after completing the interview, may wish to show the officer the video and afford him/her the opportunity to explain any discrepancies or provide additional details that the video may have helped the officer recall.

## Action and reaction

*A vehicle travels down an isolated country road when the driver catches movement in the tree line in his peripheral vision. At first, he is uncertain whether that movement poses a threat; it could just be the wind, birds, or something else innocuous making the leaves rustle. In the moment that follows, however, a whitetail deer emerges from the brush. Suddenly, the driver is fully aware of the situation, recognizing the hazard the deer could pose if it were to jump into the vehicle's path — and, just then, it does.*

*Much like the driver needed time to recognize the movement as a potential threat, the driver now must decide whether to brake, swerve, accelerate or brace for the inevitable impact — all depending on relative speed, distance and motion. This decision, too, takes time.*

*Settling on the decision to slam on the brakes, the driver needs his brain to send a message to his right leg and foot to act and to then carry out the physical motion of removing the foot from the accelerator and placing it onto the brake — hard. During the time needed to process the visual stimuli, assess the threat, make a decision and act on that decision, the vehicle has likely traveled hundreds of feet farther along the road.*

*The driver, of course, was unsure what the deer was going to do at any given moment: It could have stood motionless, retreated back into the woods or leaped unexpectedly into the roadway. Though prepared to act, the driver was at a disadvantage not knowing the deer's intentions; essentially, the deer was "calling the shots," leaving the driver to react to whatever the deer decides to do.*

*Even when a driver makes all of the right decisions in such a situation, he could end up smashing his vehicle into the side of the deer, causing a potentially horrific accident.*

The action and reaction in the scenario presented above is not unlike what plays out during an officer-involved critical incident.

In most OICI cases, the subject (like the deer in the example above) generally initiates an action and the law enforcement officer (like the driver) faces the decision of how to react.

A reaction encompasses the time that elapses between the beginning of the application of a stimulus (the action) and the beginning of a person's reaction to it. In that time, the officer must quickly assess the nature of the threat, the welfare of other people in the area, the legality of actions, and whether or not a contemplated reaction would be within the bounds of established policy and procedures.

Despite the collection of split-second considerations that officers confront under life-threatening circumstances, the public sometimes expects officers to react in a way that yields only the best possible outcome. To be able do so, though, requires superhuman vision, judgment and physical abilities; it also assumes that the involved officer knows the intentions and future actions of the subject with whom the officer is interacting.

Recognizing such expectations to be impractical if not impossible, the U.S. Supreme Court allows for officers to be mistaken in their split-second judgments and actions as long as those judgments and actions were "objectively reasonable" under the circumstances (and without the benefit of 20/20 vision of hindsight).

This is where the job of an OICI investigator comes in. Tasked with providing a prosecutor/district attorney with sufficient information about the critical incident to allow the prosecutor to make an informed assessment of the reasonableness of the officer's actions under the circumstances, OICI investigators should include

in their work an examination of the involved officer's reaction time. The concept is technical and scientific, so proper training in this area is essential.

This section offers an awareness-level overview (not a comprehensive review) of action and reaction as a way of underscoring how such training can benefit OICI investigations without jeopardizing the investigators' need to remain impartial.

## Reaction time

In many officer-involved critical incidents, the officer's reaction time is a potential factor that requires close examination.

Say, for example, that a subject is shot in the back; that extra shots are fired after the subject has already dropped his/her gun and no longer poses a threat; or an officer fires at a driver to stop the driver's vehicle from striking him, yet bullet holes are found in the side and rear of the car instead of the windshield, where they would be expected.

Each of these scenarios might be the result of an officer committing a blatant criminal act. Or, they might be explainable through an assessment of the mechanics and physiology associated with the time lag between the officer's decision to shoot/not shoot and his execution of that decided course of action.

In that brief time, the subject might have quickly turned his back; the gun might have fallen to the ground; or the car's acceleration might have moved it past the officer. An investigator's ability to understand such dynamics and articulate them to the prosecutor, judge and/or jury can mean the difference between a justifiable shooting and a crime.

For example, a subject might be pointing a gun at an officer. The officer, based on the totality of the circumstances, reasonably determines that his/her life is in danger and decides to respond with deadly force. As the officer draws his weapon, aims and starts to squeeze the trigger, the subject drops the gun 1/100th of a second before the officer's first shot. Most people would probably agree that the officer's actions were still reasonable and that the elapsed time after the subject dropped the gun was not sufficient for the officer to recognize this change and react in a new way.

If the delay was a full minute between the gun being dropped and the first shot being fired, however, most would probably agree that the shot was unreasonable (all other factors being the same). The difficulty comes in determining precisely where that line between reasonable and unreasonable lies.

By studying human performance limitations and action/reaction research, investigators will enhance their ability to present all necessary information to the prosecutor, judge and/or jury, who will ultimately decide the reasonableness of the officer's actions.

## Reaction and the senses

Human physiology is a crucial component of OICI.

Humans must use at least one of their five senses to identify a stimulus (an action) and begin reacting to it. Among the senses, vision is most predominantly used in an OCIC, especially by the officer involved in the incident.

In simple terms, an officer must sense the action of the involved individual (usually by seeing the person perform it), cognitively process what he/she saw and is seeing (perception), begin a motor-system process to react to the action (physiology), and then repeatedly perform this process throughout the incident, even after it ends.

If you imagine this process playing out in a life-threatening situation with a very limited time for the reaction, you can appreciate the complex nature of the reaction process.

As mentioned, reaction is the time between the beginning of the application of a stimulus and the beginning of a person's reaction to it. In an OICI, the reaction by the involved officer has a distinct timing to it. The officer's reaction morphs into a response because the officer has to identify the action and then initiate his/her movement, typically the use of force. The start of the officer's response and the start of the officer's reaction are distinct — meaning that there is usually a timing difference between when the officer made the decision to shoot his/her weapon and when the officer actually shoots it. The decision made by the officer then requires time for the officer to physically perform the action. Any thought a person has or an action a person takes requires time — and this is particularly true for an officer facing a life-threatening situation.

OICI investigators who listen for and consider what the involved officer does and does not describe in detail during his/her statement will gain an appreciation for what the involved officer sensed and was focused on during the incident, and how he/she reacted to it. Investigators trained in human performance limitations will have an idea of the action and reaction that played out during the incident.

Using the car-vs.-deer scenario described at the start of this section, assume that the vehicle is in the process of being passed by another vehicle as the deer is heading toward the roadway on the right side of the street. The driver in the main vehicle swerves to miss the deer but instead strikes the vehicle that is passing on the left. The driver has no awareness of the other vehicle because he/she is fixated on the deer.

This outcome reinforces the importance of finding out where the officer's focus was and what information the officer was basing decisions on.

## Judgments of reactions

As noted, the public has very high expectations of law enforcement officers, regardless of the circumstances.

But officers are human, and, as such, they aren't always going to make ideal decisions, especially when their own lives or the lives of others are potentially at risk.

If an officer reacts too quickly to a subject, the officer has less information available to him/her and might make a poor decision that results in criminal consequences. If the officer reacts too slowly, the officer or someone else might be killed. Officers often confront such dilemmas in the middle of a critical incident — and, after the fact, they might face criticism from outsiders who are uninvolved and uninformed.

Additionally, officers may face scrutiny over their ability to observe, detect and react to sudden changes during an incident. One example centers on the number of shots fired by the officer (and the timing of those shots) after an OICI subject begins to fall or has fallen to the ground. Scrutiny is also common when an officer shoots at a vehicle that at one point was driving at him/her but the officer's gunshots strike the vehicle on the side and/or rear of the vehicle.

But the complicated decision-making involved — officers must detect sudden changes in a subject's activity, assess his/her own response and then decide whether to continue or discontinue his/her current action — is difficult to complete rapidly. The delay caused by the time needed to detect a subject's changes and react to those changes might result in additional shots being fired even after the threat no longer exists.

These and other factors are among those that investigators can learn about in human performance training.

## The importance of training

Though highly controversial, the concept of action and reaction as it relates to police use of force is gaining ground as an area of study.

It is imperative that OICI investigators understand and are able to explain how an officer's reaction might be relevant to an OICI investigation. Investigators are obligated to avoid bias and to avoid definitive statements and opinions regarding whether the OICI event was "right" or "wrong," but they are equally obligated to present to prosecutors a report containing all relevant and factual information about the incident.

Many investigators were at one time uniformed police officers. In that role, they likely experienced or nearly experienced multiple officer-involved critical incidents. That background, combined with training in proper OICI investigation tactics and training in human performance factors, would essentially qualify OICI investigators to be practitioners in this area of the investigation.

Although prosecutors usually rule on the legality of an OICI, they often do not possess the practitioner experience of an OICI investigator. The same holds true for grand jurors, the media, the general public and other stakeholders. Thus, the stakeholders rely on OICI investigators to provide them with a full set of facts and details so they can become fully informed and then decide what is relevant and not relevant and whether an officer's action rises to the criminal level.

# Video evidence

Investigating an officer-involved critical incident is a complex process from the moment the investigation begins. Adding video evidence to the list of items to be properly considered, collected and evaluated only heightens the complexity. The vast majority of OICI are recorded in some manner — via video, audio and/or photographs. Planning for how video evidence will be handled, executing that plan, and evaluating the way in which video evidence is processed will allow the investigative agency to complete a thorough and accurate inquiry that encompasses proper use of video evidence.

It is crucial to preserve and acquire OICI-related video recordings as soon as possible. Decisions about an officer-involved critical incident are often made before the investigation is completed, usually because of videos posted to social media platforms by uninformed witnesses and by the media using those platforms to obtain the videos and mass-publish them.

Investigative agencies that properly work with video evidence can rapidly use video evidence to provide more accurate context about the incident and provide forensically sound sub-clips and images to the media and, if necessary, even post them to their own social media accounts.

## Advantages and disadvantages of video evidence

Video evidence allows everyone involved in an OICI to "see" what happened. It often provides factual content, including the sequence of events, the actions of those involved, and the location of individuals and evidence at the scene. When multiple cameras record the same event, a "global" view of the incident results.

If not collected and evaluated properly, however, video evidence can be detrimental to the investigation. Issues with video compression, variable frame rates, missing frames, and un-synced video and audio streams are just some of the challenges investigators must be aware of with video evidence.

Video recording devices capture images differently than does the human eye, especially in low-lighting conditions. In many instances, video evidence does not capture the area of focus of the officers and individuals involved. It captures the action but not the interpretation of the action, especially the officer's

interpretation of the action. Videos can be slowed and reviewed multiple times, whereas the memories of those involved cannot be reviewed in this manner.

Video recording devices usually have a limited field of view. They can distort distances, especially when a wide-angle or "fish-eye" lens is used in the device. Accurate measurements need to be taken at the incident scene so that fixed points can be used to determine approximate distances observed when reviewing video evidence. There are times when the lens can be blocked by objects that limit the field of view.

With nearly all videos being recorded digitally nowadays, some video compression is inevitable. Video compression reduces the space required to store the data and the size of the data when the video is transferred. Compression can cause anomalies in video evidence, such as objects appearing or disappearing from the actual recording.

Frame rate is the number of pictures per second. Frame rates can vary among video recording devices. If the device has a variable frame rate, actions and movements can appear faster or slower than they actually occurred. The same is true if video and audio streams are not synced. Determining the frame rate and ensuring the proper playback of the video provide a more accurate depiction of the event. The higher the frame rate, the "smoother" the action will be; the lower the frame rate, the "jumpier" the action will be. The common frame rates for most law enforcement videos, cellphone videos, and other digital videos are 30 frames per second (fps) and 60 fps.

Video evidence is a strong source of evidence, but it is not perfect. It should not be solely relied upon to determine what actually occurred during the incident; it should be evaluated with all other evidence as well as the facts obtained during the investigation.

## Pre-incident planning

Investigators will undoubtedly collect and use video evidence in OICI investigations. Among the many types of video evidence usually available during these investigations are:

- Law enforcement body-camera video(s)
- Law enforcement dash-camera video(s)

92

- Cellphone video(s) from witnesses
- Video(s) from surveillance systems — both business and residential
- Video(s) posted to social media

The identification and collection of video evidence starts in the field or at the scene. Understanding that there may be difficulties with collecting videos, playing the videos, ensuring that the videos are playing back properly, and evaluating the videos accurately in describing the events captured will allow investigators to prepare for these challenges before the investigation starts.

Well-prepared law enforcement agencies will consider the following questions and answers in establishing agency protocols and procedures regarding video evidence:

- **Why should video evidence be collected?** If video evidence is lost or is unrecoverable, a thorough and accurate investigation is difficult to achieve. If video evidence is altered or edited, it can spread through various outlets and provide an inaccurate and shortened version of the event. Both issues hinder the investigation and can diminish public trust in the investigative process.

- **Who collects and analyzes video evidence?** The investigative agency should have investigators, analysts or evidence technicians who are trained in forensically extracting or acquiring video(s) from all of the previously listed sources in the field. After the videos are obtained, they should be analyzed by forensic video analysts to ensure that the video evidence is forensically sound and can be used to provide an accurate depiction of the event.

- **What will be collected?** Investigators should obtain any video that captured the OICI — particularly any video that recorded the moments immediately before the incident, the incident itself and/or the moments immediately after the incident. Forensic acquisition techniques and methods should be used to acquire these critical videos. Other videos that are further away from the scene or capture other relevant, but not necessarily evidentiary, events (i.e. subject flight path, pre-incident activity, post-incident activity) can be obtained through non-forensic methods. Such videos could provide context for the activity that occurred during the critical incident.

- **When will it be collected?** Like any other evidence, video evidence should be collected as soon as practically possible. Prompt collection helps ward off the loss of video evidence and any possibility of the video being erased or overwritten. It also prevents anyone from altering or editing the video.

Attachment 3
228 of 389

- **How will it be collected and analyzed?** Investigators, analysts, or evidence technicians operating in the field should be equipped with the proper forensic tools to extract and acquire the pertinent video from the types of devices previously described. The ancillary video can be collected through regular methods and exports if forensic capabilities are already being used for the pertinent videos or are otherwise unavailable. Forensic video analysts should be equipped with the proper computers and monitors capable of handling the processing speeds and high-definition playback required for videos. A variety and appropriate collection of video and audio analysis software is necessary for the forensic video analyst to perform his/her duties. If the investigative agency has no forensic video analysts, arrangements must be made with an agency that does employ video analysts to perform forensic analysis of video evidence.

## At the incident scene

The independent investigative agency will be required to send investigators to the OICI scene. Among the many tasks needed to be completed will be the identification of sources and locations of cameras and video evidence. Again, these five types of video are most commonly encountered:

- Law enforcement body-camera video(s)
- Law enforcement dash-camera video(s)
- Cellphone video(s) from witnesses
- Video(s) from surveillance systems — both business and residential
- Video(s) posted to social media

Investigators should have a proven and reliable process for obtaining video evidence. Here are several basic steps for collecting video evidence for all video types:

*1* **Ensure that a chain of custody is completed.** Like other types of evidence, chain-of-custody documentation is crucial. Whether in the form of an evidence receipt or a narrative report detailing the steps taken to obtain the video evidence, this basic investigative step should not be overlooked.

*2* **Photograph the placement of the camera.** This includes taking photographs of where the body cameras were affixed to the officers, where the dash cameras were positioned inside the police vehicles, the

94

location from which civilian witnesses were recording, and the locations and positions of surveillance cameras at businesses and residences.

*3* **Identify and document the make and model of the video recording device.** The make and model of the video recording device may not initially mean much to investigators collecting the video evidence, but those details may provide valuable information to the forensic video analysts tasked with evaluating the technical capabilities of a particular device. If necessary, investigators can identify the serial number or other unique identifiers of the video recording device.

*4* **Document any date and time offset.** The investigator should document any date and time offset of the recording device with a known and accurate date and time source. Any modern smartphone usually has the date and time on display, and any offset with the recording device can be easily documented.

*5* **Obtain videos in their native format and their universal formats.** The need to immediately view video recordings is often paramount in these types of investigations so that there is a general understanding of the events that occurred. If possible, investigators should collect a universal file format such as Audio Video Interleave (AVI), Windows Media Video (WMV) or Moving Pictures Expert Group 4 (MP4) of the videos — so they can be played in a general media player. The universal formats are also acceptable for the ancillary videos that do not show the incident directly. Videos that capture the incident should also be collected in their native formats. The native formats often provide the forensic video analysts with data that the general investigator is unaware of. The native format gives the forensic video analyst the best opportunity to determine whether a video is missing frames, a video is playing back correctly, the audio and video streams are synced, and a video is forensically sound.

*6* **Obtain a warrant for video evidence as needed.** Generally, investigators will not need to obtain a warrant for the body-camera videos and the dash-camera videos from law enforcement agencies. Investigators often must obtain a warrant to forensically examine a cellphone or other personal recording device and, depending on the level of owner cooperation, sometimes surveillance systems at businesses and homes. When videos are posted to social media and the

recording device is not immediately available or identified, investigators need to preserve the social media account that posted the video and obtain a warrant for the video recording from the social media company. Obtaining the video from the social media company is a better alternative than screen-capturing or screen-recording the video from the social media post. Screen capturing or recording can produce errors when playing the video.

## Post-incident work

When the videos are collected by the proper means, they should be provided to the forensic video analyst(s) for review and follow-up. Investigators and forensic video analysts should work together to determine what is needed from the videos.

### Forensic analyst tasks

In many instances, the forensic video analyst completes all or some of the following tasks, often in collaboration with the investigator:

- Ensures that the videos are forensically sound
- Syncs the videos into one screen
- Creates title slates identifying each video
- Adds a time code effect or frame counter to the videos
- Adds an audio wave form effect or audio wave bar to the videos
- Performs video clarification or enhancement of certain portions of the videos
- Performs audio clarification or enhancement of certain portions of the videos
- Pulls still images from the videos
- Creates playback of the videos at ½ speed and then playback at full speed
- Creates sub-clips of portions of the events
- Enlarges certain areas of the videos
- Adds arrows or boxes to direct attention to specific and relevant areas
- Adds subtitles
- Creates demonstrative presentations for prosecutors, grand juries, court, the law enforcement agency involved, family of the involved individual, the public and the media
- Documents the forensic video analysis in a report



*This synced view of an OICI could potentially show actions and events that are captured by one camera but not another. It can show the overall movement of those involved with the incident and, if the videos and audio recordings capture significant moments, especially the moments before and during when gunshots are fired, it can assist the investigator with obtaining factual information and the perspectives and perceptions of those involved in the incident.*



*The audio wave form effect is helpful to the investigator for identification of sounds heard during the incident, especially when the activity is not captured on video or when the video is being reviewed frame by frame.*

Attachment 3
232 of 389

### Investigator tasks

The investigator responsible for reviewing the videos after they are processed by the forensic video analyst should have training in areas such as interviewing involved individuals, understanding the technical components of video and video's value and limitations, evaluating physical evidence (ballistics, trajectories, etc.), and human performance factors. After the video content is forensically analyzed, the investigator will need to complete a written report documenting the review.

The investigator should use the audio wave form effect and time code effect included by the forensic video analyst to aid in determining the approximate timing of events that occurred during the incident. The investigator can use the videos synced and presented in one screen for a "global" view of the incident and obtain as close to a 360-degree view as possible.

If the incident occurs outside the field of view of a camera but sounds are captured by the audio stream of the recording, the potential value of the audio recording should not be discounted. Audio streams are often more valuable in determining the timing of the events and actions during an incident.

## 00:08:55:11

**Incident example:** An officer chased an individual into the woods and away from the dash camera. The officer's dash camera did not capture the activity, but the microphone attached to the officer captured audio of the entire event. The officer's verbal commands, "other" sounds and gunshots were recorded by the audio stream. After the officer provided a statement to investigators, the "other" sounds were able to be identified as moments when the involved individual pushed the officer face down into the mud (creating silent moments on the audio recording), the physical struggle (rustling sounds), gunshots that included a pistol malfunction and the officer having to clear the malfunction, and sounds made by the individual and officer after the shooting, particularly the officer coughing and making other sounds after being choked.

*98*

The time code effect is helpful to the investigator for calculating the approximate timing of the events during the incident. For the common frame rate of 30 fps, the time code effect will count from 00:00:00:00 to 00:00:00:29 for each of the approximate 30 frames within a second. If the investigator is calculating the approximate timing between events, a simple equation can be used (number of frames elapsed between events x 1/30 or 0.03333333).

The investigator should develop language about the review of the video explaining multiple factors for evaluating and observing the video. Each incident is different, and only the applicable factors should be noted by the investigator. Some general examples are:

- Video records within the technical capabilities available. The positions of the cameras, lighting, obstacles and distance from the incident need to be considered.

- Video is recorded for storage and review.

- Video is a two-dimensional depiction of a three-dimensional reality experienced by those involved.

- Video records more information about an incident than a human being is able to observe, record and recall. Those involved tend to report on what they were focused on at moments throughout the event.

- Video lacks history, perspective and the interests of those involved.

- Video records the event from the same position or perspective of those involved.

- Video often does not record or capture subtle movements of tactile cues (i.e. tensing or bracing) experienced by those involved.

- The speed and complexity of the incident are often difficult to fully comprehend by viewing the video alone.

- Video and audio recordings are only components of an investigation and should not be the only evidence relied upon.

- Some of the language developed by the investigative agency, investigator or forensic video analysts is unique to the incident being investigated.

99

The investigator should be trained in how to explain the timing of events, especially action and reaction. With the available video, the investigator can compare and evaluate what was reported by the involved parties, what evidence was discovered at the scene and relevant human performance factors. The investigator should use non-definitive language that describes the activity and timing of the incident recorded by video, unless the activity and timing are so clear that anyone who reviewed the video evidence would draw the same conclusion. The investigator can explain the video, statements, evidence and human performance factors to the prosecutor and grand jury.

# Social media and electronic evidence

In this age of ever-advancing technology, criminal investigators face numerous related challenges. Twenty years ago, investigators did not have the complication of obtaining evidence through social media platforms and electronic devices. Today, almost every criminal investigation has an electronic/social media evidentiary component, and investigations of officer-involved critical incidents are no exception.

## Social media

Social media encompasses websites and applications that enable users to create and share content or to participate in social networking. There are many social media platforms in use today, including these popular sites:

- Facebook
- Twitter
- YouTube
- TikTok
- Instagram
- Snapchat

Facebook alone has an estimated 190 million users nationwide and 1.7 billion users worldwide. It is important to remember that the popularity of a social media platform changes often and that new social media platforms are created regularly. Also, the popularity of a social media platform can vary drastically based on demographic factors, such as age and gender.

**Why social media is important when investigating OICI**

In the vast majority of instances, investigators can find social media posts about the involved individual — information about his/her background (posted before the incident) and/or details related to the incident (shared afterward) — from the individual himself/herself, witnesses or family members of individual.

For example, an involved individual may post information related to his/her mental health or attitude toward law enforcement. And it is not uncommon for a suicidal individual to post suicidal ideations to social media platforms just before the incident.

Witnesses commonly post on a social media platform about having observed the event. Oftentimes, these individuals are unknown to law enforcement, perhaps because they left the scene before investigators arrived. In some instances, these witnesses have recorded at least a portion of the event with a cellphone, and they immediately post the video to a social media platform. It is necessary to locate these individuals and retrieve or forensically image the cellphone used to record the event.

Conversely, it is becoming more common for individuals who had nothing to do with the OICI to interject themselves into the investigation by claiming to have witnessed the incident. Such individuals tend to paint law enforcement in a negative light and post false or misleading information about the event. It is equally crucial to identify and interview these individuals, as a well-conducted interview can often discredit these individuals.

**How to locate social media accounts**

Many social media users leave much of their personal information public, which is why investigators should conduct an "open source social media search." An internet search might help investigators learn what social media platforms are being used by involved individuals, witnesses and other involved parties.

Locating a social media account can prove a little more difficult when the user is using a nickname or an alias. Thus, an investigator will need to dig a little deeper. In such cases, it may be wise to search for the accounts of the involved individual's family members or other known associates and to review the involved individual's "friends" or "followers."

Attachment 3
236 of 389

Another way to identify social media accounts is to simply ask relatives and friends whether the individual uses social media and, if so, what his/her username is. Electronic devices found at the scene or on involved individuals may also reveal social media applications.

If pertinent information is revealed on a social media platform, it is prudent to screen-capture any relevant information. A screen capture alone, however, isn't likely to pass judicial muster, so additional steps are necessary — such as obtaining a search warrant or court order for the user's account.

When pertinent information is revealed, the investigator should immediately send the social media platform a "preservation letter." Such a letter asks the social media platform to retrieve and hold all requested information until a search warrant or court order can be obtained (usually within 30 to 60 days), thus preventing a user from permanently deleting the information. It is important to remember that, depending on the platform, content may be retained only for a short period.

Also crucial to remember is that some social media platforms have a private messenger feature. For example, Facebook, Instagram and Twitter all have a messenger application that allows users to send private messages to other users.

> A sheriff's office was dispatched to a domestic dispute involving adult siblings (a brother and sister). A deputy arrived, and the male sibling was ultimately shot and killed by the deputy. The female was interviewed by investigators and gave her version of events. The female later made numerous public posts on social media about the incident. Investigators began monitoring the female's social media account, through which she encouraged those reading her post to send a "private message" if they wanted details of the incident.
>
> Investigators obtained a search warrant for the female's social media account and obtained all the female's private messages. Investigators learned that the female communicated with multiple individuals through private messages, stating that her brother was suicidal and that he wanted to be killed by the deputy — information that contradicted what she had told investigators.
>
> Investigators also located public posts on the male's social media account in which he had revealed suicidal ideations.

Depending on the platform, these messages may or may not be retrievable through the judicial process. (For example, Snapchat's principal feature is that photos and messages usually remain available only for a short time before they become inaccessible to the user).

Also important: Be sure to continuously monitor throughout the investigation any social media accounts that have been deemed pertinent to the case.

## Electronic evidence

As stated, nearly every crime today has some type of electronic or digital evidentiary component. Many federal, state and local law enforcement agencies now have entire units dedicated to the collection, preservation, analysis and documentation of electronic and digital evidence. Entire books have been written on the analysis of electronic devices, and it takes hundreds of hours of training and practical applications to become proficient in this specialty field.

Best practices suggest that all electronic evidence be collected by an investigator trained in forensic preservation, ideally one who is trained in this specialized area and a member of your OICI investigation team.

Also important to understand is that most of the electronic evidence collected in use-of-force investigations will require authorization to be examined and analyzed. This authorization might involve a search warrant, a court order or consent. It is wise to check with your local prosecutor/district attorney before analyzing the legality of the searches.

This section is designed to give a use-of-force investigator an overview of the electronic devices that may be important to an OICI investigation — not outline how to collect, preserve, analyze, or document electronic or digital evidence.

The list of potential electronic evidence is extensive, including but not limited to computers (desktop or laptop), hard drives (external or internal), media devices (compact discs, zip drives, thumb drives and memory cards), cellphones, digital cameras, video cameras, surveillance cameras (digital video recorders, network video recorder), digital audio recorders, video game systems, global positioning systems (GPS), smart watches, smart devices, vehicle event data recorders and doorbell cameras.

There is also electronic evidence that is specific to law enforcement officers and agencies, including but not limited to automated license plate readers (LPR), electronic control devices, body worn/in-car camera systems, gunshot detection systems and computer-aided dispatch systems.

Not all electronic devices found at a scene or on someone's person will contain pertinent information related to the investigation. For example, if an investigator is searching an involved individual's residence and a digital camera is located, tucked away in closet, why would the investigator suspect that the camera has any evidentiary value to the investigation? This is why investigators must conduct interviews of witnesses, family members, involved individuals and neighbors as soon as possible. If a neighbor claims that the involved individual routinely takes pictures of only police vehicles as they pass by his residence using a digital camera, it makes sense for the investigator to now think that the camera might contain relevant information and that it may need to be seized.

Because the potential electronic evidence is seemingly endless, the remainder of this section focuses on electronic items that a use-of-force investigator is likely to encounter during an investigation.

**Cellular phones**

Nearly every U. S. citizen has a cellphone, with the vast majority owning a "smart phone" — a device capable of communicating, recording, editing, uploading images and sending a text to multiple social media platforms in a matter of seconds. Digital evidence that could possibly be obtained from a cellphone handset includes:

- Text messages
- Call logs
- Pictures
- Videos
- Social media accounts
- Applications
- Possible previous locations of phone
- E-mail accounts
- Internet search history

> A male assaulted his wife, causing injury, and then fled the couple's residence. Deputies were contacted, and a domestic violence report was completed. The male had gone to his parents' house, located across the street. The female then began receiving text messages from her husband stating that he had a gun and was going to kill her. The female again contacted the sheriff's office and informed deputies that her husband was at his parents' house, armed with a gun, and that he had threatened to kill her. Deputies arrived at the house of the male's parents and located the male in an upstairs bedroom. The male told deputies that he had a gun and made movements under his shirt. The male was shot and killed by deputies. Investigators later discovered that the male was unarmed.
>
> The female refused to speak with investigators without a lawyer present. The female was eventually interviewed by investigators and stated that she did not actually believe that her husband had a gun or that he would hurt her. The female also stated that she had not spoken with anyone about the incident and that she was not injured from the initial domestic incident.
>
> Investigators obtained a search warrant for the female's cellphone records through her cellular provider. In the text message content that was included, investigators learned that, hours after the shooting, the female sent text messages to numerous individuals stating that her husband had a gun and was going to kill her. The female also sent text messages stating that she had suffered injuries from her husband during the domestic incident.

All of these could prove relevant in a use-of-force investigation. The information located on the device may reveal who the involved individual communicated with leading up to the incident, the location of the individual before the incident, the motive or intent of the involved individual, criminal activity the involved individual may have been conducting before or during the incident, and possible criminal co-conspirators.

Another option, if the cellphone's whereabouts are unknown or unavailable, is to obtain some of the above information directly from the cellular service provider. This option will require that a search warrant or court order be sent directly to the provider. Also, a preservation letter should immediately be sent to the provider.

Attachment 3
240 of 389

## Surveillance cameras/Doorbell cameras

Most investigators are aware that surveillance cameras are prevalent in public spaces, but they might not realize that surveillance cameras and doorbell cameras are becoming increasingly common on the exterior and interior of private residences.

At the scene of an OICI, an investigator should be assigned to search the area for the presence of security cameras that may have captured any portion of the incident. Some security cameras, it is important to remember, are designed to be camouflaged, or not readily identifiable.

If a security camera is located, a trained individual may be able to retrieve the relevant footage from its hard drive. In other instances, the entire hard drive may need to be taken and analyzed. Only an investigator trained in electronic evidence preservation should power down and remove the hard drive.

> Officers attempted to stop a vehicle that had fled from a routine traffic stop. After a brief pursuit, the suspect vehicle crashed. Before officers could get out of their cruisers, the involved individual exited his vehicle and opened fire on officers. Officers returned fire, striking and killing the involved individual.
>
> A cellphone was located in the subject's vehicle. A subsequent analysis of the phone revealed that the individual had sent text messages to family members stating that he was being pulled over by the police and was going to "shoot it out."

## Body cameras/Dashboard cameras

Many police departments and law enforcement agencies require their officers to wear a body camera when interacting with the public. This requirement has led to an increasing number of OICI being captured on camera.

Policy and guidelines should be established by your investigating agency for the collection and preservation of the recording device and video footage. Some investigative agencies obtain the video footage from the body-camera or dash-camera system and then collect the devices as evidence. Other

investigative agencies are content with obtaining a copy of the video footage and allowing the department to retain the recording device.

It is also be prudent to collect any video footage from assisting or responding officers.

**Electronic control devices (ECD)**

Typically, when deployed, an ECD automatically records information pertinent to its deployment, such as sequence number, date, time, event (safe, armed, trigger) and duration.

An individual trained in ECD analysis can conduct an examination of the cartridge and probes, if a cartridge deployment was used (non-drive-stun), and possibly determine the indication of the transfer of energy. Some devices also record audio/video during a deployment event, necessitating retrieval.

**Vehicle event data recorders (EDR)**

Modern vehicles contain some form of event data recorder, usually located in the vehicle's airbag control module or powertrain. This device is sometimes called the vehicle's "black box." Unlike an aviation flight recorder "black box," which is continuously recording, a vehicle's EDR records technical and occupant information for a brief period before (usually 2.5 to 5 seconds), during and after a triggering event, usually a crash or near-crash situation.

> As an officer arrived at the scene of a call, a subject fleeing in a vehicle drove in the direction of the officer, resulting in the officer shooting the driver. Moments later, the vehicle crashed into a parked car as a result of the injuries suffered by the driver. When interviewed, the driver claimed that he was braking and swerving to the right to avoid striking the officer. However, an analysis of the vehicle's EDR showed that the vehicle was accelerating with the steering input 15 degrees to the left — toward the direction of the officer — at the moment that the gunshots would have been fired. Such indisputable physical evidence can be lost if investigators are unaware of its existence or the potential value it holds for an investigation.

Attachment 3
242 of 389

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

Among the information that may be documented by an EDR:

- Vehicle speed
- Change in velocity
- Brake application
- ABS activity
- Seat-belt usage and seat occupation
- Throttle percentage
- Engine RPM
- Gear selection
- Steering angle
- Stability control (engaged/not engaged)

The amount and type of information recorded varies among vehicle models and manufacturers.

The information collected from a vehicle's EDR may play a crucial part in officer-involved critical incidents in which a vehicle was used, or purported to have been used, as a weapon. Investigators who specialize in accident reconstruction and are trained in EDR analysis should collect and analyze the data from the event data recorder.

Vehicle infotainment systems may be present in commercial motor vehicles or as an upgraded option on some passenger vehicles. Data recorded by these systems is similar to that of the EDR but may not require a triggering event (crash). Legal issues, such as the possible need for a search warrant, should be discussed prior to obtaining data from either an EDR or infotainment system. With vehicle infotainment systems or autonomous cars, the data that is uploaded onto the cloud (including video footage) may be retrievable from the vehicle manufacturer via a search warrant.

When data from an EDR or infotainment system is expected to be collected, investigators should seize the vehicle keys and prohibit anyone from starting or driving the vehicle. If the keys must be used for some reason, such as steering the vehicle to aid in its towing, the vehicle's battery should be disconnected first. If the vehicle is started, investigators should note how many times its was started between the event and the data recovery.

# Search warrants

As with any other criminal investigation, a search warrant may be required by OICI investigators to conduct a search of persons, locations or vehicles for evidence of a crime and to confiscate any evidence found. The Fourth Amendment to the U.S. Constitution protects against unreasonable search and seizure. Violations can not only lead to civil ramifications for investigators and their agencies but also threaten the admissibility of evidence, potentially damaging any criminal prosecution.

There are potential exceptions to a search warrant requirement, including:

- Search incident to a lawful arrest
- Plain view exception
- Consent
- Stop and frisk
- Automobile exception
- Emergencies/hot pursuit

When conducting an OICI investigation, an investigator arrives at the scene well after the incident occurred and, therefore, needs to be cautious when using a search warrant exception. Remember, there is no "homicide" exception to the search warrant requirement, and once an exigency/emergency has been rendered safe, further search of the area may not be permitted without a warrant or another exception to the warrant requirement. A search warrant is far less likely to be challenged than a search conducted under an exception.

Generally speaking, the best course of action for obtaining evidence in an OICI is through a search warrant.

Beyond physical evidence, other items that can be obtained via search warrant include:

- Electronic/digital evidence
- Medical records
- Mental health records
- Phone records
- Social media records

- Vehicles/EDR data
- Emails and other communications
- Location data
- DNA/fingerprint standards
- Alcohol and/or drug testing

All major cellphone providers and many social media providers accept search warrants via email or fax.

The national nonprofit organization SEARCH, which is the National Consortium of Justice Information and Statistics, keeps a comprehensive list of internet service providers and other online content providers on its website (Search.org). For each internet service provider and online content provider in the organization's database, you will find the legal contact information and instructions needed to serve subpoenas, court orders and search warrants. This resource can be invaluable for the time it can save you when interacting with such companies.

# In-custody deaths

The cause and manner of death tend to be relatively straightforward in most officer-involved shooting incidents. With in-custody deaths, however, the potential options must be expanded beyond homicide to include accidental, natural or suicide — especially in a jail setting.

The uncertain nature of in-custody deaths requires them to be treated as if they are homicides until they are definitively proved to be otherwise. Even when a death appears to have an obvious cause, a thorough investigation is still warranted. Failure to do so can lead to years of allegations of corruption by family members; conspiracy theories surrounding the death; civil suits; calls for federal investigations; and, almost certainly, negative publicity. The extra effort expended to thoroughly process the scene of the death and conduct a comprehensive investigation will pay long-term dividends.

In general, a criminal investigation should be initiated with all in-custody deaths, perhaps with the exception of a jail death resulting from natural causes while the inmate was under a physician's care for a disease or condition not involving a custodial trauma, suicide or overdose. And, even in those cases, an

administrative investigation might still be prudent in the event that allegations of wrongdoing or lawsuits arise later.

In deaths that occur after the discharge of a conducted energy weapon (CEW) or electronic control device (ECD), some additional investigative actions are required. At the location where the device was deployed, crime-scene personnel need to document and collect the device itself, along with the probes, wires, cartridges, anti-felon identification tags (AFID) and the clothing worn by the decedent. Even if the device was ineffective, these pieces of evidence become vital if a malfunction is determined to have occurred. When a less-lethal device is ineffective, an officer may have been left with few other options but to escalate the use of force. Therefore, it is necessary to attempt to determine why the less-lethal device failed to subdue the individual. Specially trained and equipped examiners can analyze the device and other evidence to potentially answer that question.

In addition to the physical evidence, it is important to document the subject's behavior before, during and after the use of a CEW or an ECD, as well as the weather conditions, the probe locations and any other injuries. The medical examiner/coroner might suggest collecting defibrillator readings; body core temperature; and hair, nail and brain tissue samples. Most manufacturers have a checklist indicating the proper documentation and collection procedures associated with their particular device.

If other less-lethal tools were used during an incident — chemical sprays, impact devices or restraints — those implements should be collected as potential evidence. As with CEW/ECD, their ineffectiveness to subdue may require an explanation, particularly if the result of the failure was an escalation in force. Investigators should also consider collecting documentation indicating that officers were properly trained/certified to use the devices (if applicable). Depending on the circumstances, DNA evidence collected from less-lethal tools may also become pertinent.

Other factors that can present themselves in the context of in-custody deaths include compressional or positional asphyxia, excited delirium and strangulation. Even failure to request medical aid in a timely manner and/or failure to intervene in another's use of force may become relevant issues requiring investigation. Close interaction with the medical examiner/coroner is advisable in any scenario in which one of these circumstances could potentially be present.

Suicides and drug overdoses are possible even when a subject is in custody and precautions have been taken to attempt to prevent such situations. As mentioned, these should be treated and processed as homicide scenes until conclusive proof is obtained showing otherwise. Families are particularly reluctant to accept that a relative committed suicide while in police custody, and the lack of any substantive scene processing or investigation will only exacerbate their contention of foul play.

Remember, once the scene is released, any potential evidence will likely be lost forever. All too often, allegations made by families cannot be conclusively refuted due to the limited documentation and collection of evidence at the time of the death. Always err on the side of caution by documenting/collecting more than is thought necessary. Maintaining the integrity of the crime scene until the autopsy is completed is also advisable, in case any unexpected post-mortem findings are discovered that require further searching or evidence collection from the scene.

# Suicide by cop

In some situations, suicidal individuals may lack the means to commit suicide themselves, such as not owning a weapon. Or, the subject may be unable to otherwise bring himself/herself to commit the act without help. The person may attempt to provoke a law enforcement officer into using deadly force, a phenomenon commonly referred to as "suicide by cop." Suicide by cop is largely a classification decision made by the medical examiner/coroner. Such cases require the same level of investigation as any other use of deadly force, with a few added indicators to look for and to document.

One indicator is when a subject points an object at an officer knowing that it cannot harm the officer, such as a toy gun. The individual wants the officer to believe the individual presents a threat, yet he/she may have no real intention of causing harm to anyone except himself/herself. The subject may apologize for his/her actions, ask to be killed or behave aggressively toward the police for no apparent reason.

Another indicator is when the individual doesn't act like a "normal" criminal offender, such as not attempting to leave the scene or committing random acts of vandalism in front of an officer. Just because the person is in an apparent mental health crisis, however, doesn't necessarily make him/her any less dangerous — desperate people may take desperate action.

When investigating a possible suicide by cop, it is important to remember the context of the call and surrounding circumstances. Precipitating life events or stressors should be explored, as well as the mental health history and medications of the subject (likely requiring a search warrant to the medical provider). Family members, cellphone contacts, pharmacies, prescription bottles, medical paperwork at the home and/or insurance companies are all potential sources for determining who the mental health provider for the individual may be. Documentation of suicidal ideations, manifestos, suicide notes or similar warnings — whether delivered verbally, through social media or another communication method — are crucial to preserve and collect.

# Reporting on investigative findings

An often-overlooked but crucial aspect of OICI investigations is documenting the event. Writing reports can be the most time-consuming and tedious element in an OICI investigation, but it is also one of the most important. A poorly written report that is confusing and filled with grammatical errors will reflect poorly on the author and may make the investigator seem inept or unqualified. Additionally, a poorly written and/or incomplete report could call the entire investigation into question by challenging the legitimacy of the investigator.

Remember, OICI events are some of the most controversial and contentious aspects of law enforcement, so a significant number of people read the resulting investigative reports. In addition to the prosecutor/district attorney, civil attorneys, civil rights activists, citizens and law enforcement officers commonly obtain copies of the investigative file and dissect every written word.

## Documenting the event

Some investigators write one continuous report to document an entire investigation. Such a format is confusing because the reader is reading a timeline of one investigator's activity. Typically, the continuous report format is not suitable for OICI investigations.

It is best to write a separate report on each investigative activity, rather than one continuous run-on document. The separate-report format allows the reader to read all the details pertaining to one topic at one time (witness interviews, officer interviews, etc.), even if they were written by multiple investigators.

The following is a list of potential reports that need to be completed in an OCIC investigation:

- Investigator's response to scene/action taken at scene

- Crime-scene documentation (usually completed by crime-scene investigator or evidence technician)

- Coroner/prosecutor/next-of-kin notifications (as applicable)

- Neighborhood canvassing (as applicable)

- Information from attending autopsy (as applicable)

- Review of surveillance/body cameras/dash cameras

> An example of a continuous report, which is not recommended for an OICI investigation:
>
> **June 1, 2020-2320 hours**
>
> Investigator Smith responded to an officer-involved shooting at 123 Main Street … etc.
>
> **2345 hours**
>
> Investigator Smith located surveillance camera footage at the Quick-Mart located at 120 Main Street … etc.
>
> **June 2, 2020 0800 hours**
>
> Investigator Smith interviewed Jane Doe at her residence 125 Main St. … etc.
>
> **1000 hours**
>
> Investigator Smith received a phone call from John Doe … etc.

- Review of personnel files (of officers who fired or used force)

- Review of training records for involved officers, including weapon qualifications, training certification and any use-of-force training

- Receipt of department's use-of-force policy

- Interviews of witnesses (separate report for each witness)

- Interviews of family members (if applicable and appropriate, with a separate report for each family member)

- Interviews of witness officers (separate report for each officer)

- Interview of first responders (as needed, with a separate report for each responder)

*114*

- Interviews of involved officers (separate report for each involved officer)
- Radio of CAD/dispatch logs/radio traffic/MDT messages
- Review of agency reports/photographs of incident (excluding any Garrity statements or Garrity derivative information)
- Review of 911/other dispatch calls
- Review of medical records/EMS reports (if applicable) for involved individual, officers or victims
- Any acquisition, transfer, submission or return of evidence
- Review of autopsy results
- Review of cellphone, Taser, cyber analysis (if applicable)
- All search warrants obtained/returned
- Summary of laboratory submission
- Summary of laboratory results
- Request/results of NCIC and ATF traces on all involved weapons not belonging to law enforcement
- Review of prior law enforcement involvement with involved individual/ criminal record
- Review of tips, pertinent social media post, pertinent statements in mass media, etc.
- Any other documentation as necessary
- A comprehensive summary (Prosecutor Summary)

Each report should contain all of the important and pertinent information related to the investigative activity.

Remember, a report should never contain the investigator's opinion to the legality of the involved officer's actions in an OICI. Generally, a report should not contain the investigator's opinion on any matter in the investigation. In rare circumstances, however, it may be appropriate for the investigator to render an opinion if, say, the investigator has advanced training or is considered an expert on the topic (bloodstain-pattern analysis, statement analysis, etc.).

Attachment 3
250 of 389

## Prosecutor summary

It is not uncommon for some OICI investigations to contain hundreds, if not thousands, of pages of documents and reports. Given the volume, it is wise for an investigator to complete a comprehensive summary of the investigation, also known as a Prosecutor Summary. A Prosecutor Summary allows the reader to obtain an overview of key aspects of the investigation.

A Prosecutor Summary should be written in a topical format rather than a chronological timeline, with the following topics covered and the circumstances of the OICI dictating the length of each section:

1. Preface
2. Investigative Team
3. Summary of Process
4. Incident Summary/Overview
5. Decedent or Involved Person
6. Witnesses
7. Officer Interviews
8. Physical Evidence
9. Dispatch-Related Information
10. Video Recordings
11. Autopsy Report
12. Conclusion

**Preface:** Here is an example of a preface that contains a disclaimer, which every Prosecutor Summary should have:

*This report serves as a synopsis of the investigation into the **DATE** officer-involved shooting in **ENTER LOCATION**. This report only summarizes the information that the investigative team determined to be the most useful in achieving an overall understanding of what occurred in this incident. Every fact and detail are not presented in this summary report. Therefore, it is recommended that each individual report from which this document is derived be read in order to obtain a complete understanding of this investigation. Further, audio and/or video recordings exist for the majority of the interviews conducted, revealing further details of statements given regarding the incident.*

*This investigation was conducted with the purpose of determining, to the extent possible, the facts and circumstances surrounding this incident. As unbiased collectors of fact, the investigative team members have not and will not render any opinion of the legality of officers' actions. Instead, this investigation is intended to provide the basis of information for decisions to be rendered by the appropriate authorities.*

**Investigative Team:** This section should list all investigators and supervisors involved in the investigation as well as support staff, such as crime lab personnel.

**Summary of Process:** A list of the investigative activities or methods used throughout the investigation

**Incident Summary/Overview:** A very brief overview of the incident

**Decedent or Involved Person:** Information on the involved individual, such as demographics, any past involvement with law enforcement, criminal history, medical records, mental health records, etc.

**Witnesses:** An overview of information obtained from pertinent witnesses.

**Officer Interviews:** An overview of information obtained from interviews of the involved officer as well as non-involved officers.

Attachment 3
252 of 389

**Physical Evidence:** An overview of pertinent physical evidence obtained during the investigation as well as any laboratory results and the results of any electronic device analysis (cellphones, Taser, etc.).

**Dispatch-Related Information:** An overview of 911 calls, radio traffic and any other CAD-related information or dispatch-related information.

**Video Recordings:** An overview of pertinent information related to surveillance video and body-camera or dash-camera video.

**Autopsy Report:** An overview of pertinent information obtained from the autopsy report and toxicology report.

**Conclusion:** A brief summary of the main points of the investigation. It could also point out any discrepancies — or lack of discrepancies — noted in the investigation. Opinions regarding the legality of the involved officer's actions should not be included.

# Presenting findings and courtroom testimony

Once an OICI investigation is completed, the investigative reports and all investigative documents, audio files, video files and photographs should be forwarded to the prosecutor/district attorney. Investigators should never render the incident "justifiable" on their own. Investigators should always consult the prosecutor/district attorney before releasing any reports or evidence — even to the involved police department — during the pendency of the criminal review.

## Presenting findings

In this electronic era, it is not uncommon for a case file to be submitted to a prosecutor/district attorney electronically, or on a device such as an external hard drive or thumb drive. Regardless of how the investigative file is submitted, the file should be well-organized and all material should be easily accessible.

It may be prudent for the lead investigator to schedule a meeting with the prosecutor/district attorney when submitting the case file so the investigation can be discussed in detail and all pertinent information can be relayed. In rare occasions, the prosecutor/district attorney may want additional follow-

up conducted, such as additional crime-lab testing for evidence items or additional interviews of pertinent witnesses.

Once the case file is reviewed by the prosecutor/district attorney, the district attorney may take one of the following actions:

- Rule that the incident was justifiable and that no further legal action will be pursued.

- Present the investigation to a grand jury.

- Present the case at a preliminary hearing or a probable cause hearing (depending on the state).

## Courtroom testimony

An investigator who conducts an OICI investigation should have extensive experience testifying in court. Still, testifying in such cases usually presents unusual challenges not typically seen in other criminal investigations.

It is a statistical fact that most officers involved in OICI will not face prosecution beyond a grand jury proceeding or preliminary hearing. However, in rare instances, law enforcement officers have faced trial regarding their actions. An investigator should be prepared to testify extensively at some point in the legal process.

In grand jury testimony, the investigator may be required to educate the grand jury on police tactics, training and other topics discussed throughout this book. Grand jurors will often have impractical expectations of law enforcement and ask questions such as, "Why didn't the officer shoot the gun out of his hand?" or "Why didn't the officer shoot the guy in the leg?" The investigator should be prepared to answer all questions professionally and in an informative manner.

In most cases, usually some time has elapsed between the investigation's conclusion and the investigation's presentation in a court proceeding. Before testifying, an investigator should refresh his/her memory by reviewing all investigation reports and documents. This is critically important when testifying in a civil trial, which may be occurring years after the OICI incident. Also important to remember when testifying in a civil trial is that

Attachment 3
254 of 389

the civil attorney will more than likely have the transcript of the investigator's testimony if the investigator previously testified in open court on the investigation. The civil attorney will try to discredit the investigator and the investigation if the officer involved in the OICI was cleared of criminal charges. The civil attorney will paint the investigator as inept or dishonest if the investigator's testimony varies ever so slightly.

When testifying in a criminal trial involving an OICI, it is important to remember that such events are controversial and highly publicized. Media will oftentimes be in the courtroom. It is vital that the investigator present himself/herself in a professional manner by dressing appropriately, acting in a serious and respectful manner, and avoiding jokes and laughter.

In these circumstances, due to the high-profile nature of the case, the investigator likely will be cross-examined by a skilled and capable defense or plaintiff's attorney who has spent significant time reviewing the investigation. It is crucial, then, that the investigator be prepared with an exceptional knowledge of the facts and nuances of the investigation.



# Chapter 5
# Post-Mortem Examinations

The role of the medical examiner/coroner differs considerably from that of a criminal investigator, but the two share a common goal in officer-involved critical incidents: Both work to reveal the truth about the circumstances leading to the death. Investigators, therefore, need to cultivate a strong working relationship with these medical professionals and to work collaboratively toward that end. The likelihood of finding the needed answers to fulfill each respective role only increases when the two share information and work cooperatively.

In the event of a fatality, an investigator familiar with the circumstances of the death should, if permitted, attend the post-mortem examination/autopsy. Final autopsy and toxicology reports often aren't provided to investigators for many months. In the meantime, it is important for investigators to have at least a preliminary understanding of the injuries to aid in their assessment of what transpired and to determine whether statements align with the physical evidence.

Investigators should have a basic understanding of some medical terminology to help them communicate more effectively with the coroner/medical examiner. And knowing the capabilities and limitations of forensic pathologists may afford investigators the ability to use information gathered during the autopsy and apply it to questions that need answers (such as using the

*121*

diameter of a stippling pattern around an entry gunshot wound to determine the approximate muzzle-to-target distance). Understanding the basics of the autopsy report, manners of death, incapacitation times, fatal injuries and other medicolegal concepts can benefit the investigative team. Investigators should seek additional training in this regard, as this section simply introduces some of the principal considerations.

# Information sharing

The importance of investigators working collaboratively with coroners/medical examiners — and the coroner's/medical examiner's investigators — cannot be overstated. All too often, there is a competitive or adversarial relationship between the two concurrent investigations, which does nothing to help uncover the truth. Each side should understand and respect the boundaries of their respective investigations and stay within that scope. Information should be shared to assist each other, with egos being set aside. Neither investigation can be entirely successful without the assistance of the other, necessitating the flow of information in both directions.

There are two caveats regarding information sharing that need consideration in some states. First, public-record laws for coroners/medical examiners may differ from those for law enforcement. If investigators provide reports, photographs or other evidence to be considered for the autopsy, those records may potentially be subject to release (when they would otherwise be confidential law enforcement investigatory records). If this is a concern, perhaps an acceptable compromise would be to allow the forensic pathologist to view the photographs/records to enhance his/her understanding of the scene but not provide physical copies.

The second issue centers on Garrity. Coroners/medical examiners are typically unconcerned about the source of the information they receive for making their determinations regarding cause and manner of death. Their role, after all, is not focused on a potential criminal prosecution. Should compelled/Garrity statements be used in making determinations, severe complications could arise if the source of the Garrity statements (a public official or an officer) ever be charged with a crime related to that death.

An in-custody death of an arrestee triggered both a criminal investigation and an internal affairs investigation. The investigator for the medical examiner's office was present while IA investigators questioned the involved officers under Garrity (compelled statements). Some of those statements were subsequently incorporated into the autopsy report as well as the decision by the medical examiner to rule the manner of death a homicide. This resulted in extreme complications with the criminal investigation because the autopsy results could not be used in the assessment of the legality of the officers' actions leading to the death.

# Medical examiner vs. coroner

Although the terms are often used interchangeably, medical examiner and coroner are not synonymous. In states that operate on a medical examiner system, board-certified medical specialists, usually a forensic pathologist, are appointed to perform post-mortem examinations to determine or opine the cause, manner and mechanism of a person's death. Medical examiner systems usually include a medical director in the place of a coroner.

In states that operate on a coroner system, the coroner is often an elected public official who may or may not have medical training. Training aside, many coroner's offices in major metropolitan areas employ a forensic pathologist to perform the procedures of a post-mortem examination.

A cooperative and consultative process between OICI investigators and the medical examiner/coroner is what then leads to the determination that appears on the death certificate.

# Death scene

At the scene of any death, the deceased and all injuries should be documented and photographed while still at the scene whenever possible. Remember, though, that medical treatment should never be delayed to accomplish this — the preservation of human life is always a top priority.

In most states, the decedent should not be touched or moved without the permission of the coroner or medical examiner. In some states, touching a

Attachment 3
258 of 389

decedent without permission, even by law enforcement, constitutes a crime. Cooperation and coordination are imperative.

Once the scene investigation is completed, the decedent is typically placed in a new, sealed body bag for transport to the morgue/autopsy. Efforts to preserve trace evidence should be considered throughout this process, including the bagging of hands (in paper) when appropriate. It may also be necessary for an officer to accompany the body from the scene to the location of the autopsy in order to maintain a proper chain of custody (again, depending on the state).

# Autopsy reports

There are advantages to working with the same medical examiner's office on each event. Among them are a familiarization with the pathologist and the autopsy assistants completing the post-mortem exam as well as the consistency of their preliminary and final exam reports.

For those who don't have the benefit of a consistent post-mortem procedure, meaning that your decedents could end up at one of several available examiner offices, you may find it initially frustrating to navigate through the documentation. The frustrations should lessen, though, with each subsequent visit to that facility. When unsure whether what you have seen or read is important, you must ask questions. Unless you graduated from medical school or are an expert in human anatomy, it is normal and expected for investigators to have questions about the examination. Remember, the medical professionals conducting the post-mortem examination have the same investigative goals that you have — to collect as many facts about the event as possible.

Although each medical examiner's office may format its reports differently, the information provided will be important to achieving your investigative goals.

- **The cover letter.** The cover letter usually begins with the identification of the decedent, the examiner's case number and the county of jurisdiction that authorized the examination (or where the decedent was pronounced deceased). The cover letter also usually provides a brief synopsis of the pathologist's findings. A medical dictionary or popular search engine can assist in deciphering and understanding difficult medical terminology. In addition to any unnatural findings,

the examiner may document the identification of natural diseases found during the examination, such as the discovery of kidney stones. And, finally, the examiner should provide an opinion of a cause and manner of death in the cover letter. This is usually in a one sentence declaration, such as "It is my opinion that the cause of death of John Doe is: Gunshot wounds of torso, with a manner of death being homicide."

- **The detailed reporting of the examination.** This section of the report provides an expanded explanation of the processes documented in the cover letter. Here's a closer look at the types of information typically provided by the medical examiner that could aid the criminal investigation:

    **Individual.** A brief expanded description of the individual on whom the examination is being conducted. The details appearing in this section may include the individual's name, age and gender; the time and date of the examination; and the medical examiner's office conducting the examination.

    **Attendance.** This includes the identification of the examination team members and sometimes a description of their customary duties, be it the photographer, assistants or other physicians present. This section also should name any law enforcement officials or the requesting jurisdiction's coroner's investigator who might be witnessing the examination.

    **Clothing and property.** Knowing what the decedent was wearing when he/she arrived at the post-mortem examination can be crucial information for the investigative team. Additionally, any secondary property found on the body could prove useful in placing the decedent in locations before the event that caused his/her death.

    **Identification tags.** Especially in large jurisdictions, investigators should ensure that they are witnessing the correct post-mortem examination. Typically, a medical examiner's office will be performing multiple autopsies simultaneously. A decedent's appearance at the medical examiner's office may be different from his/her driver's license or photographs obtained from family or friends. Additionally, it's possible that another member of the investigative team who wasn't at the scene

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

to know the decedent's appearance may be called upon to attend the post-mortem examination. Checking and photographing the decedent's identification tag will ensure that you're at the right examination station and collecting the correct information for the investigation.

**External examination.** A head-to-toe visual examination of the decedent will be documented in this section. Some details for investigators to look for and record:

- Does the decedent appear to be compatible with his/her recorded age, weight, height and sex?

- Is he/she well-developed and well-nourished?

- What type of/how many external trauma injuries are present on the body?

- Are there entrance or exit wounds? If so, are they front to back or back to front?

- Is there an upward or downward direction to any injury?

The medical examiner should record these details, but if they aren't there, ask him/her to verify these facts for you before finishing the autopsy. The external-exam documentation should also include any tattoos and piercings and any evidence of medical intervention, whether that be from a receiving medical center or the first responders to a scene. Medical intervention could be in the form of electrocardiogram (EKG) pads, vascular or intravenous (IV) access, a catheter or intubation tubes.

**Internal examination.** The pathologist may identify and detail any examination of the following human systems:

**Cardiovascular.** The cardiovascular system's primary function is to move blood around the body. This is completed with the help of the heart and blood vessels, such as veins, arteries and capillaries.

**Respiratory.** The respiratory system is a network of organs and tissue that assist in the breathing process. The lungs, muscles that power the lungs and the blood vessels that carry the oxygenated and unoxygenated blood to the vital organs are all parts of this

126

system. The human body needs oxygen to survive. A drop in oxygen levels in blood is called hypoxia.

**Musculoskeletal.** The musculoskeletal system's primary function is to support the body and allow movement or motion. The skeleton, joints, muscles, tendons and ligaments make up this system support group. This information could be useful to the investigation, along with body mass, when reviewing or considering incapacitation times.

**Nervous.** The nervous system controls, regulates and communicates all vital information for the human body. In simpler terms, the nervous system is the body's on-board computer. The brain, spinal cord, sensory organs (eyes, ears, nose, tongue, hands and feet) and nerves work with the body's other systems to maintain homeostasis or a relatively constant internal environment.

**Other systems.** Other bodily systems that may be reported by the pathologist are the digestive, hepatobiliary, endocrine, genitourinary and hematopoietic systems.

Although these systems may or may not be pertinent to your specific investigation, a thorough review of all documented information from the pathologist should be completed by the investigative team.

- **The laboratory report.** The laboratory report is often considered a supplemental report of the overall post-mortem examination. During the post-mortem examination, the pathologist will collect urine, vitreous fluid from the eyes and heart blood from two locations. These fluids are submitted to a forensic laboratory to test for volatile substances that would not normally be present in the human body. The presence of such substances, such as illicit drugs and/or alcohol, may be helpful in explaining the behavior of the individual.

Prior to reviewing the results of the post-mortem laboratory testing, the investigative team should obtain a complete copy of any medical intervention performed on the decedent at a hospital or medical center prior to their death. It is not unusual for trauma patients to be administered antiepileptic, pain management or other analog medication

Attachment 3
262 of 389

during lifesaving attempts. Knowing exactly what the medical center's trauma team administered will eliminate any unnecessary surprises arising from the toxicology results. Additionally, when reviewing results of the medical center's records or the toxicology results, understand that the laboratory will sometimes list concentration levels. These concentration levels should not be mistaken for legal per se levels, as the medical center and pathologist are not necessarily looking at the concentration levels in the same way that the criminal investigative team or prosecutors do.

# Cause and manner of death

An injury or disease that starts a sequence of events that leads to death is considered the CAUSE of death. The cause of death is divided into two types: the proximate cause (or the initial event) and the immediate cause (or the last event preceding death). Both a detailed history of events and investigative research are essential to determining the proximate cause of someone's death.

The time between the proximate cause and the immediate cause do not change a formal diagnosis of the cause of death as long as the sequence of events is unbroken. This is true whether the sequence of events spans minutes, days, weeks or even years.

Example:

> On Saturday, April 10, 1965, three members of the ABC Police Department were injured while investigating an armed robbery. Officer A died at the scene; Officers B and Officer C survived the shooting but were both left paralyzed.
>
> Twenty-eight years later — on Friday, Aug. 27, 1993 — Officer C died. Officer B passed on Monday, Jan. 23, 2012 — 46 years after the shooting. Both officers died of complications of their proximate cause of death: gunshot wounds. The immediate cause of Officer C's death was an infection; Officer B's was pneumonia.

Circumstances surrounding a death is considered the MANNER of death. Investigators are probably more familiar with the five determinations of manner of death: natural, homicide, suicide, accidental or undetermined.

- **Natural:** a death that is caused by disease or the result of the aging process
- **Homicide:** a violent act on the part of one person that causes the death of another

- **Suicide:** an intentional act of causing one's own death
- **Accidental:** an unnatural death caused by an accident — differentiated from death by nature (aging/disease) and an intentional act of homicide or suicide
- **Undetermined:** when the preponderance of the evidence does not support a determination of homicide, suicide or accidental death

Investigators should be cautious about any biases that may arise from any of the manner-of-death determinations. Remember, it is the court's jurisdiction to determine criminality of an event. For example, a "natural" manner-of-death determination by the medical examiner may rise to the level of a homicide if the totality of the events leads toward this. Additionally, not all homicides rise to meet the level of intent to make it a criminal act.

After an OICI, the media often reports that the manner of death, according to the coroner or medical examiner, is homicide. The context in which this is used tends to infer wrongdoing on the part of officer(s). But homicide is not synonymous with murder. We usually know that an officer caused the death of another in a shooting incident, which meets the definition of homicide. But many homicides do not rise to the level of a criminal offense, such as murder or manslaughter. Homicides may be lawfully committed by law enforcement within the scope of their duties, in self-defense by ordinary citizens, by soldiers in times of war, and even by the government when carrying-out capital punishment sentences. It is therefore important to understand and delineate to the public the difference between a medical manner of death and a criminal act under applicable state laws. All murders are homicides, but not all homicides are murders.

# Incapacitation times

When thinking about incapacitation times in individuals involved in an OICI, we first need to understand what it means to be incapacitated. At its basic level, according to Merriam-Webster, the definition of incapacitation is:

1. to deprive of capacity or natural power; disable
2. to make legally incapable or ineligible

Attachment 3
264 of 389

Also, by definition, an incapacitating injury would be any injury, other than a fatal injury, that prevents the injured person from walking, driving or normally continuing the activities he/she was capable of performing before the injury occurred.

In officer-involved critical incidents, incapacitation times may become pertinent in determining whether an individual continued to present a threat of death or serious physical harm to others even after an initial use of force against him/her. Contrary to many Hollywood portrayals, an individual who is shot doesn't always fall immediately to the ground unconscious. The person may still be able to move, shoot or otherwise pose a danger. For instance, a person armed with a gun might be shot in the chest and fall to the ground, with the weapon still in his/her hand. Despite the wound and the fall, the subject might still pose a very real threat if the injury isn't immediately incapacitating.

Key questions to ask: Is there a reliable estimation of incapacitation time following an exposure to law enforcement use of force? Or: How long can an individual survive, engage or function after a debilitating injury? The short answer to both: No one truly knows. The human body is a mysterious machine, and stimuli affect everyone differently. As such, incapacitation times will differ depending on the individual's will, body mass and/or any potential effect of chemical influences, such as phencyclidine (PCP) or other mind-altering drugs.

It is important that the investigative team work closely with the medical examiner to determine what, if any, injuries classify as incapacitating injuries. As laypeople, we are confident in our training that injuries to the brain, whether caused by blunt force trauma or a fired bullet, will more often than not cause incapacitation or be fatal to the receiving party. Without an in-depth understanding of the physiological and psychological makeup of the human body, however, we must rely on medical professionals to assist in that determination. Such factors may become important in assessing whether an individual continued to pose a threat after some initial use of force was applied.

# Other considerations

### Asphyxiation

Suffocation is the process of depriving the body's vital organs of oxygen, which can lead to unconsciousness or death. If, in fact, the subject dies, asphyxiation then becomes the cause of death. The most common forms of asphyxia involve airway obstruction, such as food or foreign material in the throat; asthma; and drowning. But a manual constriction of the airway (also known as choking) or positional compression of the torso due to positioning of the body can also obstruct oxygen exchange, leading to death.

### Excited delirium syndrome (ExDS)

Excited delirium syndrome is not a recognized medical condition by the American Medical Association (AMA), American Psychiatric Association (APA) or World Health Organization (WHO), although cases attributed to this condition continue to rise. According to the Journal of Emergency Medicine, EDS is characterized by delirium, agitation, acidosis and hyperadrenergic autonomic dysfunction, typically in the setting of acute-on-chronic drug abuse, serious mental illness or a combination of both.

Be aware that a decedent having a positive toxicology report for an amphetamine does not necessarily place his/her death in the excited delirium category. A totality of symptoms — such as extreme agitation, delirium, sweating and hyperthermia — should all be explored before assuming that the subject suffered from ExDS. This diagnosis is controversial in the medical community, and some coroners/medical examiners do not recognize or cite it when making death determinations.

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**



# Chapter 6
# Mental Health Considerations

There is no universal reaction to trauma. What is traumatic for one person may have little effect on another. A person who reacts in a particular way — whether it be a strong emotional response or no response at all — should never feel embarrassed about his/her reaction; likewise, others should avoid judging that response.

An officer-involved critical incident can be characterized as a trauma. As such, the parties involved may experience crisis and traumatic reactions, including some that are unique to their respective roles in the incident. Those affected may include the involved officer, the involved individual or subject, and the investigating officer. Understanding what these parties may be experiencing can both help criminal investigators reduce the parties' traumatic responses and aid investigators' efforts to gather facts about the event.

## The brain and trauma

The trauma experienced by any of these parties may result in what can be identified as acute stress — or a sudden, random traumatic event. Shock, disbelief and denial are often part of such a traumatic response. A basic view of how the brain works during a traumatic event can provide insight; understanding the impact and associated behavioral indicators, in turn, can benefit an OICI investigation.

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

When a traumatic event occurs, adrenaline slams through the body at a high speed with the memory being imprinted in the amygdala, which is the holder of the emotional response and the significance of the event. The event is stored not like a story but through an individual's sensory gathering of it, meaning that the individual's memories essentially consist of fragments of visual images, hearing, touch, taste or smell, depending on what the person's senses were experiencing at the time. Initially, one of the senses may be heightened at the exclusion of the others.

This basic explanation reinforces why, after a trauma, the brain can be activated or triggered by sensory stimuli like those experienced during the event. This, then, can create a sense of danger when there actually is no danger. The brain is basically hijacked by the sensory input, sometimes creating an emotional response like the one experienced during the incident.

During an interview, the recollection process may activate some of these responses depending on what the individual's senses experienced — which helps explains why an individual involved in an OICI might not initially recall the details in order.

(It would be good agency protocol to have OICI investigators participate in a crisis/trauma or trauma-informed course to solidify their understanding of individuals experiencing crisis and trauma.)

The simplified explanation of how the brain responds to trauma provides insight for agencies in deciding when to conduct an initial interview with the involved officer. There are multiple theories regarding the best time. One theory maintains that the officer is best equipped to be interviewed after having had one full "sleep cycle." Another theory holds that it is better to interview the officer immediately, assuming that he/she is willing to participate.

Regardless of your agency's policy, it might prove most helpful to both the officer and the investigation if, during that first interview, the officer is initially allowed to talk without interruption. This may be the officer's opportunity to reveal how he/she recorded the incident. Afterward, investigators may find that the interview questioning proceeds more smoothly, with the officer potentially able to provide additional details.

From an investigative standpoint, given the way the senses play into memories of a trauma, investigators should consider asking the officer what he/she recalls

seeing, smelling, hearing tasting and/or touching during the incident — as a way to draw forth details that investigators otherwise might not be able to get at. In doing so, though, it is important to be aware that recalling these sensory responses may elicit the reactions described earlier. To help reduce the trauma response from the officer, investigators should try validating the responses with comments such as "you are safe right now" or "I am glad that you are here talking to me right now."

# Unique perspectives

In a general sense, the traumatic response is one that can be experienced by all parties involved in an OICI. As mentioned, though, each of the parties also has distinct reactions and responses based on the individual's role in the event. It's worth taking a closer look at the perspectives unique to each party involved: the involved officer, the investigating officer and the individual involved (or his/her family).

## The involved officer

During the investigation, the involved officer may have distortions associated with his/her perception of the event, possibly including:

- Tunnel vision.
- One or more of the senses being more enhanced than the others.
- Time warp, slowing or accelerated time.
- Lack of awareness of other senses (may not be able to recall sound).
- Strong images.
- Memory loss of or confusion about part of the event, including his/her actions.
- Emotional and physical responses.
- Isolation.
- Withdrawal.
- Lack of trust of others.
- Intrusive thoughts.
- Second-guessing or self-doubt.
- Increased alcohol or drug use.

*135*

BEST PRACTICES FOR INVESTIGATING
**AN OFFICER-INVOLVED CRITICAL INCIDENT**

- Relationship issues.
- Grief.
- Guilt or sorrow, if the incident resulted in the injury or death of another.
- Sleep difficulties.
- Increased sense of danger.
- Anger.
- Reliving or ruminating the event.

The officer involved would benefit from strong connections following the OICI, because the possible reactions can be overwhelming. The incident is sure to create emotions of isolation, which can be a formidable enemy. Likewise, the officer may feel anxious about the media attention and the criminal investigation.

Given the range of emotions the officer might be dealing with, it is important that he/she be provided (in a confidential setting) with the names of counselors. Requiring any officer involved in an OICI to meet with a counselor would be a sound agency practice. Among the benefits of such a mandate:

- The officer may welcome the opportunity.
- The officer does not have to ask for such a meeting.
- It reduces the stigma related to the stress and trauma associated with the incident.
- It validates management's stance that "we know this is difficult, and we want to support your mental health during this time."

The involved officer's mental health should be a priority during and after the OICI investigation. Before the officer returns to full duty, that officer would benefit from at least two sessions with a counselor — one immediately after the event, the other before returning to the job. The officer may also wish to attend sessions with the counselor during and after the investigation is completed — which the employing agency should encourage. A counselor can help the officer by identifying coping skills and encouraging him/her to use them during and after the investigation.

Putting the counseling mandate in writing helps the agency because officers become aware of the protocol upon joining the department and before an incident occurs. A written policy can also reduce trauma for the involved

*136*

officer, as the officer is less likely to face doubts about the department's request if he/she already knows that the requirement exists.

Sessions between a counselor and the officer would be confidential, or privileged, information. The officer needs to be reassured that he/she can freely and confidentially discuss his/her reactions to the event, etc. with the counselor. The department should, however, require confirmation that the officer attended the sessions. The agency might want a counselor's input on an involved officer's readiness to return to full duty — a confirmation that can be facilitated and approved by the officer involved.

Other factors your agency should consider ahead of the involved officer's return to full duty:

- **The location of the incident.** Did the incident take place in an area where the officer patrols or frequently travels? If so, your agency policy on return to full duty may also include a requirement that the officer first return to the scene with a colleague, a crisis responder or an administrator. With traumatic events, "firsts" are significant. Going to the scene and identifying what reactions the officer may experience are important, as it allows the officer to directly connect any of the emotional responses (sight, sound, smell) to the actual event site. Such a requirement would reduce the chances of the officer being alone and experiencing such reactions at the same intensity as he/she did in going back the first time.

- **The newly assigned or newly returned weapon.** For an officer whose weapon was taken as evidence, the officer might want to have someone nearby when he/she shoots the newly assigned weapon for the first time. Likewise, an OICI-involved officer whose original weapon is being returned to him/her would benefit from discharging it again for the first time in a safe, supportive environment with a co-worker present.

- **If other officers were involved, a group debriefing.** A joint debriefing with crisis responders may be beneficial at the completion of the investigation as a way of decreasing the involved officer's sense of isolation and creating an opportunity for validation and support (based on the outcome of the investigation). Such a practice would also create an opportunity for all involved to discuss their reactions to the event.

An officer's life may be forever changed by his/her involvement in a major OICI, especially one involving a fatality. Self-doubt, fear, isolation, anger, guilt, defensiveness and even depression may result. Officers should understand that such reactions are common and will, in fact, form the basis of a "new normal"—despite the temporary nature of many of the initial adverse reactions.

Instead of dwelling on things that cannot be changed, officers need to learn to cope with and accept these changes in a positive, healthy way while looking to the future. Peer and family support, along with counseling, are crucial. Officers should resolve to return to work better and stronger than before, a goal achieved during this difficult time by keeping an active lifestyle, whether that means volunteering in the community, exercising or relying on other outlets.

Officers should recognize that the situation they are in may not be their fault — which might elicit anger, confusion or a desire to assign blame. Traumatic experiences sometimes exaggerate differences in people. Close relationships might become closer, but fractured relationships tend to become much worse unless this phenomenon is recognized and proactive measures are taken to mitigate these effects. It is important to express commitment and affection to your spouse and family members, not alienate them. Know that the situation will likely improve with time, and focus on problem-solving instead of blame.

Some additional recommendations for the involved officers:

- Do not use alcohol or drugs other than prescribed medication. Although it may be tempting to drown any pain in alcohol, such behavior is destructive in both the short and long term.
- Do not give up the enjoyable things in your life.
- Avoid media reports of the incident, particularly the comment sections of newspapers and social media; some people will undoubtedly be critical, regardless of the circumstances
- Remember that the incident not only affects you but also your family members. They, too, may need a support system. Do not push loved ones away; you all need one another.
- If on administrative leave, use that time for something positive and constructive. Attempt to incorporate coping techniques that will guide you in being a "survivor" of this difficult event.

*138*

- Avoid isolation and surround yourself with positive role models and mentors.
- Define in your mind when this incident will be completely over and you will move on. Will it be upon the completion of the criminal or IA investigations? One-year anniversary of the OICI? Conclusion of the civil suit?

The employing agency should recognize the need to assist the officer during this time, with some officers requiring more help than others. Try to keep the officer as informed as possible about the status of the incident without compromising any investigation. Having a designated liaison can be beneficial for that purpose. Ensure that the resources available to the officer are known.

Some peers or supervisors might avoid contacting the officer for fear of not knowing the "right" thing to say. But those individuals should instead reach out and let the officer know you care and are there for him/her. Just being a good listener can prove tremendously helpful.

## The investigating officer

The investigating officer is responsible for conducting an investigation that is fair and supportive to the nature of the investigation. Such a task is difficult for many reasons.

Though trained to conduct an unbiased inquiry, the investigator knows that some people are still likely to question the inquiry's integrity. It is difficult to investigate a fellow law enforcement officer, especially given the high-profile nature of OICI. The media pays a great deal of attention to such events, with much public scrutiny given to the outcome. The investigator is aware that the outcome could ignite a negative or accusatory reaction to the investigation. It is not easy knowing that someone or some set of individuals is very likely not going to support the outcome.

It is crucial, then, for the investigating officer to practice self-care and to be open to private sessions with a counselor if the investigator is having strong emotional reactions to the inquiry. This decision could be a private, confidential one made by the investigating officer, but the agency that employs the investigator should also consider offering such support.

Regarding self-care, the investigator should:

- **Look for opportunities during the investigation to do something unrelated to the case before leaving work.** In the final 15 to 30 minutes of the workday, the investigator might, for example, do paperwork from another case. Such diversions can help with the transition to home.

- **Once the investigation is complete, take off for a day or two.** The investigator might consider returning to work for a day to focus on something unrelated to the case — maybe to review a previous case, go through a backlog of emails or catch up on new office protocols — and then take off the next day. The reasoning: The day of unrelated work provides an interruption of the response to the investigation. There is a separation of the investigation-related trauma, meaning that that the investigator's last activity before the day off was not associated with reactions to the OICI investigation. Such an approach can help ease the transition to being away from work.

Neither of these suggestions is intended to insinuate that the investigating officer ignore emotional responses to the investigation, only that this process enables and supports a successful transition from work to personal life. Debriefing with others on the case is important for the investigating officer.

## The individual involved or his/her family

The individual, or the family of the involved individual, may also experience trauma-related reactions. To reinforce a fair and equal balance in the investigation, it is important to offer suggestions for supportive services. Providing information about counseling or other support personnel can help reduce the opportunity for doubts about a fair outcome of the investigation. Your agency might want to develop a list of counseling and other resources, including options outside the county (to allay any concerns the family may have about the counselor potentially knowing the officer involved). The involved individual or his/her family then has the option of pursuing counseling or other help outside the jurisdiction of the incident, which can reduce stress on all involved, including your agency and the investigating officer.

The support person can offer crisis response to the involved individual or the individual's family, provide information about crisis resources and serve as a liaison with the investigators. In meeting the family initially, whether by phone or in person, the advocate should identify himself/herself as "a support person," "an advocate" or "a crisis responder."

One final important detail to note: Some involved individuals and/or their family members will not welcome a support person or an advocate. Many seek attorneys soon after the incident, and the attorney often encourages the client(s) to accept only the attorney's support. Many subjects may be encouraged to limit their contact to only the attorney or the attorney and the investigator.

Nonetheless, it is important that agency policy consist of offering such help to the individual involved or his/her family. The offer might be refused, but the investigating agency has at least extended the option for additional crisis support.

# Death notification protocol

An OICI investigation may involve the need to conduct a death notification, perhaps the most difficult news for a person to deliver or to receive. Here are some guidelines for ensuring the sensitivity of such notifications:

- Gather as much information as possible about the death (when, where, etc.) before going to the residence of notification. There will be questions. Of course, full details of the incident may not be available at that time, but the person making the notification should try to provide as much detail as possible without compromising the integrity of the investigation. This will both reduce the opportunity for denial and reduce the trauma associated with the recipient learning more news later that they could have begun processing at the time of the notification. That said, the ongoing discovery of new information is inevitable for a while.

- Gather as much information as possible about the location and the person you are notifying. It is important to confirm that this is the appropriate next of kin. Equally important is learning about the background of those living at the residence of notification.

- Conduct notifications in pairs. Multiple individuals could be in the residence or children might be present with adults, so two notifiers eases the unenviable task. There may be emotional responses to the notification that require assistance (medical, flight or fight, etc.), and a partner (an investigator, an officer, an advocate, etc.) can help reduce the trauma for the primary notifier by making a post-notification debriefing between the two possible.

- If an advocate is on the scene initially, enlist the advocate's help with the notification. This may be an opportunity to begin building trust with the family, which is crucial during an OICI investigation. Letting the advocate handle the support and assistance for the family also allows investigators to spend more time on the investigation.

- If an advocate cannot assist in the notification, investigators should remember to offer support by asking, "May an advocate or crisis responder reach out to you to offer support and direction for you and other family members?" Then provide the name and phone number of the advocate and inform the family that the advocate will be following up to make sure "you are aware of resources available to you." By doing this, investigators take the burden of making that first phone call off the family members at a time when they are undoubtedly struggling to process the subject's death.

- At the residence of notification, after identification of the proper next of kin is made, ask to enter the home, using phrases such as "May we come in?" Such an approach affords some power to the family in a situation that soon may make family members feel powerless. Once inside, ask: "May we sit down?" The goal is to get the family members seated, too, before the death notification is given. Standing increases the likelihood that a person will pass out, flee or respond physically to the shock.

- Once seated, attempt to be an arm's length away to reduce your chances of withstanding any physical response to the shocking news.

- Deliver the notification as quickly as possible. The family is already alert to the fact that something is very wrong, so avoid unnecessary delays. It is important to use the first name of the deceased individual, as it makes the delivery more sensitive and makes clear who the news is about.

*142*

Say, for example, that the next of kin is a mother with two sons. A notification made regarding the "death of a son" does not clarify which son you are referring to, but a first name reduces the chances that she initially grieves the impact of the death of both sons.

- Use phrasing that includes the word died. It may feel difficult or harsh, but avoiding euphemisms (passed away, etc.) is important, as the next of kin needs to grasp the finality. The death of a loved one is harsh, and denial is not uncommon during a death notification. If accurate and clear information is not provided at the time of the notification, the trauma can be prolonged.

- Be prepared for a range of emotions in response. This is where fight-or-flight reactions may be exhibited. Allow the opportunity for that reaction, and then follow with "I am so sorry for your loss" or "I am so sorry for your pain." Assure the next of kin that you are there to help in any way possible, perhaps by asking, "Is there anyone else we can call to be with you right now?"

- Ask whether there is anything you can do for the family, and be sure to provide your name and phone number before leaving. Remember that this may very well be the worst day of the family member's life, making a sensitive death notification all the more crucial. There is no easy way to notify someone of a family member's death. A sensitive approach reduces the impact of the painful news.

*To learn more about this topic, the FBI and Penn State University offer a free online death-notification course (called "We Regret to Inform You …") at www.deathnotification.psu.edu.*



# Chapter 7
# Prosecution

Prosecuting an officer-involved critical incident is one of the most difficult and technical areas within the law — due, in part, to potential conflicts of interest and a specific set of applicable standards. Solid preparation and an established policy regarding OICI cases will put prosecutor's offices in the best position to handle the challenges.

## Acknowledging the pressures

As stated in Chapter 1, the criteria used to evaluate a police officer's use of force differs from those applied to civilians. Oftentimes, pressure from the employing agency itself may present an undue influence on how a case is handled. Likewise, media and community pressures sometimes accompany OICI investigations.

These pressures may assert that the officer's conduct was outrageous and, therefore, that he/she should be indicted and sent to prison. Or they might contend that the involved individual should have anticipated law enforcement's reasonable response based on the individual's own actions, which required the officer to use force. In many use-of-force incidents, both dynamics are present. It is not rare to have one group of people arguing for punishment of the law enforcement officer and others, including the officer's police union, arguing that the officer should be immediately exonerated and back on the street to protect and serve.

The challenging dynamics involved in appeasing the involved individual's family, the officer and police union, the community, and the media are all important considerations even before applying the law to the facts and progressing toward an indictment or a no-bill. It is true that these extraneous influences should in no way shape or otherwise affect whether or not a case results in an indictment. Equally true is the clear reality that outside influences can play a crucial role in the outcome of a case presented to a grand jury. If these outside influences are handled efficiently and properly, the effect on a case moving through the judicial system will be minimal.

A prosecutor who chooses to ignore these influences might avoid misplaced application of the law for a time; in the long run, though, he/she will likely face the worst-case scenario of having a case be decided on community outrage, not applicable law. Getting this dynamic right can mean the difference between instilling confidence in our criminal justice system and preparing a city for demonstrations and possibly more.

# Calling in the prosecutor

Let's say that, very early one weekday morning, a local prosecutor's office gets a call about an OICI in which the subject has been shot by a police officer. Established office protocols should detail when a prosecutor (district attorney) should respond to the scene. These protocols may differ depending on the severity of the injury (life-threatening or non-life-threatening) or circumstances under which the force was used. Generally, though, a prosecutor should proceed to an OICI scene as soon as practical — ideally within an hour of being called.

Seasoned trial prosecutors have long recognized the value of visiting the crime scene of any important case. Upon notification of an OICI, the prosecutor has a unique opportunity to head to the site of the incident and view firsthand the still-active scene, gaining context and insight that otherwise would be unobtainable.

Prosecutors should be aware that whether or not they go to the scene, an attorney for the officer will likely be there. An attorney representing the police union (and, therefore, the officer) or an individually retained attorney is often the second call (after dispatch) that an officer makes in such a situation. The prosecutor is often further down on the call-tree list, unless protocols specifically dictate otherwise.

146

The prosecutor's presence at a still-active scene can prove beneficial in many ways. For example, the prosecutor:

- Can observe the distance from the officer to the subject.

- Can see what is physically behind the subject (sometimes referred to as "backstop"), which may be important in determining charges.

- Might be able to direct an investigator to a witness who may have seen something but has not been interviewed by law enforcement.

- Can prevent improper conduct by an officer involved in the OICI, such as crime-scene processing or witness interviewing. Sometimes the involved officer feels that the shooting was completely justified and, without intervention, begins processing the scene pertinent to the underlying crime for which the police agency was initially called.

- Can answer any legal questions from the investigating agency, such as determining whether a search warrant is needed.

# Checking for a conflict

Given these upsides, a prosecutor tasked with hustling to an OICI scene should first do the following:

- Obtain proper contact information from the officer in charge and the location of the incident.

- Obtain a summary of the incident.

- Advise the officer on scene of his/her estimated time of arrival — information that should then be communicated up the prosecutorial chain of command (presumably, this is delineated in policy).

Once the prosecutor gathers this information, he/she should review the names of the parties involved to make sure there is no personal conflict of interest that could create the appearance of impropriety or an inability to be impartial or independent. A more detailed analysis should be done as soon as possible — and before the prosecutor attends any scheduled interview of those involved — to determine that the prosecutor's office has no conflict. If a conflict exists, a qualified and independent prosecutor should be assigned.

Attachment 3
282 of 389

On the scene, a prosecutor is in a good position to assess the level of sophistication of the investigation and to help ensure that it remains unbiased. If the prosecutor notices sloppy police work or that a law enforcement agency is investigating its own involved officer, the prosecutor could recommend that an outside investigatory agency be used.

## Arriving at the scene

The prosecutor should wear clothing that clearly identifies him/her as law enforcement or a prosecutor, as an OICI scene can become chaotic with multiple civilian witnesses waiting to be interviewed and emotions running high. The job of officers securing the perimeter is made easier when a prosecutor arrives on the scene wearing, say, a jacket labeled "Prosecutor" and a badge. Such attire can save everyone valuable time that would otherwise be spent by the officer trying to radio his sergeant or peppering the prosecutor with questions.

One of the pillars of a prosecutor responding to an OICI scene is to avoid becoming a witness. A prosecutor should remember that he/she is there in an advisory and investigative capacity only. The prosecutor's role is not to track down leads, gather evidence or begin conducting interviews. Although a prosecutor may conduct interviews and/or discover evidence, he/she should always ensure that an officer is present in such situations. Additionally, only in the most extreme circumstances should a prosecutor gather evidence. Instead, the prosecutor who discovers something of interest should point it out to the investigative agency and have its investigators collect it as part of their procedures.

The prosecutor should introduce himself to the officer in charge and, if present, the involved agency's captain and police chief. One of the most important pieces of evidence in use-of-force cases is the duty weapon of the involved officer(s). Thus, an arriving prosecutor should ensure that any police weapon used in the incident is taken into evidence and secured by the investigating agency.

## Remembering Garrity issues

The on-scene officer in charge should be reminded (even though he/she is likely already aware) that the involved officer should not be required, as part of departmental policy, to give a statement or write a report for the

criminal investigation. Any statement that the officer gives at this point that is compelled by the police department is likely to be barred as evidence due to a violation of the officer's Garrity rights. (See Chapter 1).

Although the involved officer may not be *forced* to give a statement to law enforcement, he/she may choose to give one willingly. Therefore, the prosecutor should request that investigators schedule an interview with the officer within the coming days. The officer, of course, may decline to be interviewed because he/she cannot be compelled on behalf of his employer to give a statement as part of the criminal investigation and the Fifth Amendment protects the officer against self-incrimination. Therefore, the interview must be completely voluntary.

The use of a protected Garrity statement is a potential landmine, as such a statement could severely damage an OICI case. To prevent any Garrity pitfalls, a police investigator who obtains or seeks to obtain a statement that potentially contains portions of Garrity-protected statements should have the statement screened by a third party to ensure that that information is not passed on to the prosecutor. This function can usually be performed by a prosecutor in a separate section or a paralegal or secretary who will have no future involvement in the prosecution or investigation of the case.

Extra caution is recommended during the initial briefing by an agency's command staff (to determine the source of the information to be relayed); when reviewing video footage after the incident and upon arrival of supervisors; and when obtaining any written reports or documents, such as use-of-force reports, authored by the involved officer.

# Reviewing video evidence

These days, many use-of-force events are captured on video. Oftentimes, before attending an interview with an investigator, the involved officer wants to view his/her body-worn camera or other video evidence to "refresh his memory." Such a request presents a challenge for a prosecutor.

An officer who reviews his/her body-worn camera video first will lack credibility when giving a follow-up statement or testifying before the grand jury. Instead of providing testimony or a statement as to what he/she remembers, the officer will be seen as providing a statement to best fit the narrative he/she wants to present.

Some prosecutor's offices have a policy that, if an officer insists on viewing a body-worn camera before making a statement, that prosecutor does not schedule an interview with the officer but simply presents the case to the grand jury. An officer who wants to make a statement to the grand jury will be permitted to do so during the grand jury proceedings. During those proceedings, however, the grand jury will be told that the officer declined to make a statement without first viewing his/her body-worn camera video and that, having viewed the body-worn camera video, now wants to make a statement.

Conversely, those jurisdictions that do not take every use-of-force case to the grand jury will usually have a policy to inform the officer that, if he/she insists on viewing his/her body-worn camera footage before giving a statement, the case will automatically be presented to the grand jury. If, however, the officer chooses to provide a statement to the investigator before viewing the video, the officer will be told, the case won't be presented to the grand jury if the evidence shows that the use of force was justified.

# Restricting the subject's attorney

As stated, police union attorneys (or even defense attorneys) often are alerted to officer-involved shootings and sometimes make their way to the crime scene. It is important that those attorneys not be allowed to interfere in the investigation. The attorney may accompany the officer during any walk-through but should be excluded from any part of the investigation.

If the attorney insists on being present for other parts of the investigation, investigators should simply finish their work with the involved officer, dismiss the officer, then escort the attorney out of the secure crime scene. After all, once the involved officer is no longer being questioned in any capacity, the union attorney's (or defense attorney's) function at the scene is complete.

Some attorneys attempt to represent multiple officers out of a single incident. Although this practice is not strictly prohibited by all courts, the prosecutor should view such representations with strict scrutiny. After all, if an officer is a witness to another officer's misconduct, it is virtually impossible for a single attorney to represent both individuals without creating a conflict of interest.

A clear dilemma arises when it would be in the best interest of one client to tell the investigator everything and the complete opposite would hold true for the other client. The prosecutor may need to challenge such a representation (based on conflict of interest) if he/she thinks that the arrangement *could* prevent or impair a complete and unbiased investigation.

# Leaving the scene

It is not necessary for the responding prosecuting attorney to remain at the scene until investigators finish processing it. A responding prosecutor should stay at a scene only for as long is necessary to:

- Get a good gauge of the scene.
- Retrieve all relevant information regarding the incident.
- Ensure that the investigation is progressing appropriately and efficiently.

Before leaving the scene, the prosecutor should provide contact information to the lead investigator and take note of any scheduled interviews.

# Reaching out to the subject's family

It is important that prosecutors not overlook the important step of providing a letter to the family (or the subject, if he/she survives the incident).

The letter should introduce the prosecutors who will be handling the case from the investigation forward, give a broad outline of the process ahead, and identify any advocate and/or contact person.

There are differing schools of thought regarding when a letter should be sent to a subject's family. Some prosecutor's offices require the letter to be sent within five days of the incident; others wait until the criminal investigation is completed. The timing of the letter is less important than the letter itself, but there is universal agreement that the letter should be sent before a decision is made about whether the case will be presented (or not presented) to the grand jury.

# Deciding on grand jury involvement

After all necessary witnesses have been interviewed, the subject's family has been notified, and the investigation is completed and submitted to the prosecutor, an important decision must be made with respect to presenting the case to the grand jury. The main question is: *Will the case will be presented to the grand jury?* There are differing schools of thought on this issue, but consistent handling of such cases is crucial.

Generally speaking, there are two models for approaching OICI cases and grand jury presentation:

## Model No. 1: Every case goes to the grand jury

Some prosecutor's offices have a policy that every case involving the use of deadly force is presented to the grand jury. Such a policy doesn't differentiate between, say, a subject shot by an officer in response to the subject's own barrage of gunfire and a subject shot at a traffic stop because he reached for his wallet. Every case goes to the grand jury for an evaluation of the merits of an indictment.

Cases presented to the grand jury under this model differ from run-of-the mill cases that are presented. Because the prosecutor is first attempting to determine whether the officer's actions were reasonable under the law, more information needs to be presented to the grand jury. A prosecutor presenting an OICI in a non-biased way should seek to present as much relevant information as practical. This process could span multiple eight-hour days, but the time needed will vary depending on the complexity of the case.

To ensure a thorough and non-biased presentation, there are some key details to consider. A liaison or investigating detective alone will not rise to the level of "thorough" grand jury presentation. Videos, physical evidence, and live witness testimony should be a staple of any OICI presentation.

Also, the prosecutor should not rely exclusively on the investigating agency to provide witnesses but also reach out to the subject's family members to ask whether they know of any witnesses with information

*152*

about the incident. A liberal allowance of such witnesses would greatly aid in avoiding the appearance of bias or impropriety. It is much easier, after all, to place a witness on the witness stand and allow him/her to say their piece, even if the details aren't relevant, than to defend what might seem like bias in closed-door grand jury proceedings.

Prosecutors might consider utilizing a national expert to help explain the technical and intricate nature of use-of-force incidents. If a national expert is impractical (say, for budgetary reasons), consider using a training officer from an adjacent jurisdiction to detail how officers are trained as well as what they are trained to do in certain circumstances. A reputable training officer or national expert can explain to jurors, for example, why shooting a suspect in a leg while he/she brandishes a knife is neither a good idea nor something that officers are trained to do.

To be transparent with the grand jurors, consider walking them through the entire investigation, identifying all of the pieces of evidence retrieved and all of the witnesses interviewed. A prosecutor should tell the grand jurors something to the effect of, "I plan to present to you the relevant portions of this case that I think will enable you to make an informed decision. If, however, you want to view evidence that I do not show you, please ask and I will make it available."

Additionally, to bolster the credibility of the grand jury and promote a non-biased environment, consider asking the administrative (or lead) judge to read and provide the applicable law regarding officer use of force to the jurors.

The involved officer should be invited to testify. Because he/she is being considered for indictment, the officer should not be subpoenaed to testify. With many officer-involved shootings that are presented to the grand jury, the officer's attorney (or union attorney) is notified that the grand jury is convening and that the officer may testify if desired.

Once at the grand jury proceedings, the officer is sworn in, read his/her Miranda rights by the prosecutor and given an opportunity to testify about the events in question. For the officer, this opportunity is akin to a double-edged sword. The officer's testimony could help him/her avoid indictment, but if the

*153*

officer is indicted, he/she is likely locked in to a statement for trial. This tough decision is between the officer and his/her attorney; regardless, the officer should be invited to the grand jury to testify. It may also be helpful to inform the officer, in advance, that a Miranda warning will be given. This provides the officer an opportunity to discuss the matter with his/her legal counsel and prevents the officer from being surprised by the action, something that, if not previously known, could impact his/her willingness to testify.

Also worth pointing out is that many jurisdictions prohibit the release of grand jury transcripts, but some courts throughout the country have ordered their release. Therefore, it is important to keep the record clean and complete.

Prosecutor's offices that present every OICI to the grand jury do so via a two-step process:

- The first step is to present the case to the grand jury with a single question for consideration: Did the officer act reasonably in his/her application of use of force? The jurors should be required to record their vote via a vote sheet. If enough jurors feel that the officer acted reasonably to prevent the requisite number of votes to secure an indictment, the case ends there. If, however, enough jurors vote that the officer did not act reasonably in using force, the case progresses to the second phase.

  If a grand jury decides that an officer did not act reasonably, the prosecutor and jurors need to discuss the specifics of where jurors dismissed the officer's actions as reasonable. A case involving deadly force may encompass various aspects of the encounter, so it's important to determine specifically what the jurors viewed as not reasonable.

- The second step is for the prosecutor to identify the charges that are most applicable. Those charges and their application to the facts are then presented to the grand jury for consideration. The grand jurors then vote on the charges — much like any other grand jury proceeding. If the required number of jurors vote in favor of indictment, those charges are indicted.

## Model No. 2: The prosecutor decides

Under the second model, only cases that the prosecutor deems appropriate are sent to the grand jury for indictment. Typically, the prosecutor's office conducts a review of the investigation (preferably by a panel) and decides what, if any, charges should be brought to the grand jury. In a report, the reviewing prosecutors detail the potential charges; which charges will be presented to the grand jury; and, if charges are rejected, why they were rejected.

Jurisdictions that do not present cases to grand jurors usually generate a report that details what charges will be brought against the officer and what charges, if any, were rejected and why.

If an officer faces trial for an inappropriate use of force, a one-size-fits-all approach to trying such cases is impossible. As with any other criminal case that progresses to trial, the multiple variables prevent a "formulaic" approach to presenting the case to a jury. No two OICI cases are the same.

There are, however, a few considerations that merit serious thought. As mentioned earlier, the value of using a national expert (or training officer) cannot be overstated. Additionally, a prosecutor taking a use-of-force case to trial should be well-versed in police officer tactics and protocols as well as the application and use of deadly force.

Attachment 3
290 of 389



# Conclusion

Officer-involved critical incidents are just that: critical. The life-or-death ramifications impact not only those involved and their families but also the agencies involved and the community in general.

The method in which OICI are handled and investigated directly influences the reputation of the department and the legitimacy of the policing profession as a whole. Professional, independent, fair, unbiased and transparent investigations of these incidents are crucial to maintaining public trust and to ensuring that justice is always appropriately served.

Preparation is a recurring theme throughout this book, and it should serve as the key takeaway. Do not wait until you are forced to confront the issues described herein to determine how you will respond; the time to begin discussions and policy development is now, before facing an emotionally charged incident that requires rapid decisions that could have grave consequences.

The hope is that you are now armed with enough knowledge to create sound policies and protocols, with adequate accompanying training planned for your staff — all in an effort to benefit your community. Know who will investigate OICI and how such investigations will be carried out. Be aware of divisive issues and determine which stance your agency will take — and be prepared to defend that choice. Form relationships with stakeholders and partner agencies.

Attachment 3
292 of 389

Continue to study the issues and developments in case law surrounding use-of-force legal standards and investigations. Revisit and revise policies often, ensuring that they remain up-to-date and known to your personnel.

And, finally: Stay safe out there, and remain true to the oath we all swore to uphold.

*The badge is light; the responsibility is heavy.*

# Epilogue

In the wake of an officer-involved critical incident, two important principles immediately collide head-on. One is the public's right to know. The other is the justice system's need to conduct an uncontaminated investigation so that the truth of what happened can be known. The results of this investigation will form the basis for deciding whether the officer's use of force was justified and legal.

Although the controversies and protests about police use of force have led to a number of challenges and changes to policing philosophies and practices, the tension between the public's right to know and the need to conduct uncontaminated investigations has received much less attention.

Unfortunately, the time needed for an investigation exceeds the patience of the public and the news media demanding to know what happened. The longer it takes to provide information to the news media and public, the more suspicion grows that authorities are deliberately covering up something and dragging their feet.

Meanwhile, as word of the event spreads virally and instantaneously through social media, a host of special interests converges, engulfing the event in a fog of half-truths — including videos that show only a part of what happened, speculation, misunderstanding, grandstanding, narratives and counter-narratives, accusations, demands for instantaneous "justice" — and, sometimes, outright lies.

As seen repeatedly in recent years, this seething cauldron has the power to heighten community and racial tensions, provoke protest and civil unrest, and result in violence and destruction.

And all of this happens before anyone has determined what actually happened and where responsibility falls.

The question is how to manage competing principles and competing interests to ensure that, in each officer-involved critical incident, the facts can be determined, responsibility for the incident assigned, and the correct and just conclusion reached. Half of the facts produce only half-truths.

As tensions rise and trust falls, the most important foundations of our society are weakening — the promise of equal justice for all, and the promise of safety and civil order.

Law enforcement was the first function of government, and it remains the most important. It doesn't matter how good the schools are or how well the streets are paved or how beautiful the parks are if we're hunkered down in our homes, afraid to walk out the door.

To carry out that mission, society grants law enforcement officers a fearsome power: to use force, in some situations even deadly force. Those officers are society's agents, carrying out our directives, exercising our authority. When the performance of their duty results in the death of a member of society, they are acting on our behalf.

We have to get this right.

## The right to know vs. the rule of law

In a government of the people, by the people and for the people, the people must know what their government is doing in matters big and small.

The police are agents of the government and, therefore, the people. Unlike most other government employees, though, they are vested with the power to use deadly force against their fellow citizens. This is the most awesome power that a local government wields, and, therefore, it must be subject to close and constant public scrutiny.

When an officer deploys deadly force, the public has a right to know exactly what happened and why — and as soon as possible.

The news media act as the eyes and ears of the public, and, as a result, the news media typically bring the pressure for public disclosure, often suing law enforcement for disclosure of body-cam video and other evidence even before investigators have finished collecting evidence and witness statements.

But faith in government also rests on confidence in the rule of law. If the law is not applied equally and justly to all, the legitimacy of government is undermined.

Under the rule of law, every citizen accused of a crime is entitled to the presumption of innocence and to a fair trial, at which evidence can be presented and challenged. This ensures justice not only to the subjects of police use of force but also the police officers.

In the wake of a police use of force, justice demands an investigation that is expert, impartial, complete and uncontaminated, so that the criminal and civil justice systems have the facts needed to render judgment on the incident.

A key factor in conducting an uncontaminated investigation is giving investigators enough time not only to secure physical evidence but also to interview witnesses before their recollections of the event have been tainted by exposure to news media coverage of the incident or by reactions to the incident on social media.

Likewise, investigators must be able to interview witnesses before the witnesses have been approached by the special interests that converge on the event, including public figures, politicians, attorneys for the subject and/or the subject's family.

This is where the two principles mentioned at the outset of this Epilogue collide. If information about the incident is released before investigators have been able to secure physical evidence and witness statements, the chances of conducting an uncontaminated investigation diminish, with a corresponding harm to the just determination of responsibility for the use-of-force incident.

## The lessons of Ferguson

No investigation of a use-of-force incident can match the pace at which public information, misinformation, perceptions, misperceptions and falsehoods about the event spread through news and social media. A case in point is the fatal police shooting on Aug. 9, 2014, of 18-year-old Michael Brown in the St. Louis suburb of Ferguson, Missouri.

Attachment 3
296 of 389

As detailed in an investigation by the U.S. Department of Justice, Brown, who was black, had just carried out a strong-arm robbery at a local market and liquor store when he was approached by a police SUV driven by white Ferguson Police Officer Darren Wilson.

Brown and a companion were walking in the middle of the street, and Officer Wilson told them to step onto the sidewalk. When Officer Wilson realized that the two might be suspects in the robbery, he called for backup and used his vehicle to block them.

At this point, Brown reached into the window of the police vehicle and punched the officer in the face several times and grappled with him. As the struggle continued, Officer Wilson drew his firearm. As he and Brown struggled over the pistol, Wilson shot Brown in the hand.

Brown then ran a short distance away from the police vehicle with Wilson following him and repeatedly ordering him to stop. Brown, who at 6 feet 4 inches tall and 292 pounds was much larger than Officer Wilson, then turned and charged Officer Wilson in a way that witnesses said was clearly threatening. Officer Wilson fired several times as Brown charged him, until Brown fell to the pavement dead.

Within minutes, a hostile crowd had gathered at the scene, with some calling for onlookers to kill the police. Some claiming to have witnessed the shooting said that Officer Wilson had shot Brown in the back (he didn't) as he ran away; that Brown had raised his hands in surrender and said to Wilson, "Don't shoot"; or that Wilson had shot Brown again after the young man had collapsed to the pavement.

The Department of Justice investigation later debunked these reports, but at the time they were widely reported in the news, via social media and by word of mouth. In short order, protests turned to riots and a number of businesses were looted and some burned. The unrest continued for days. At the same time, the story became a national and international sensation. It also was used to fuel the assertion that racist police routinely gun down unarmed black men.

Three months later, when the local investigation was completed, the local grand jury declined to indict Officer Wilson. Given the public suspicion of local authorities, many people were dubious about that outcome. But five months after that, the U.S. Justice Department – led by Attorney General Eric

Holder, who was appointed by U.S. President Barack Obama – released the results of its investigation, finding that there were no grounds to bring charges against Wilson.

The report said: "Under the law, it was not unreasonable for Wilson to perceive that Brown posed a threat of serious physical harm, either to him or to others. When Brown turned around and moved toward Wilson, the applicable law and evidence do not support finding that Wilson was unreasonable in his fear that Brown would once again attempt to harm him and gain control of his gun. There are no credible witness accounts that state that Brown was clearly attempting to surrender when Wilson shot him. As detailed throughout this report, those witnesses who say so have given accounts that could not be relied upon in a prosecution because they are irreconcilable with the physical evidence, inconsistent with the credible accounts of other eyewitnesses, inconsistent with the witness's own prior statements, or, in some instances, because the witnesses have acknowledged that their initial accounts were untrue."

In 2020, new St. Louis County Prosecutor Wesley Bell, a former member of the Ferguson City Council, announced that his own confidential re-examination of the Michael Brown shooting also found no grounds to charge Officer Wilson.

In short, three investigations failed to find grounds to charge Officer Wilson, but those results came months and years too late to prevent the outbreak of violent civil unrest that began within 36 hours of Brown's death.

There could be no clearer case to illustrate how the public's right to know – right now! – conflicts with the often-time-consuming effort to determine exactly what happened. Anyone who reads the Department of Justice report will gain an appreciation for how much effort is required to properly investigate such an incident.

As this case illustrates, investigators cannot satisfy the public/news media demand for information when that information simply hasn't been collected yet.

In the meantime, the information vacuum is filled by speculation, suspicion, unverified and sometimes-false witness claims, and the characterizations of reporters covering the story. For example, a New York Times story about an autopsy conducted on Brown's body repeated three times that Brown was "unarmed," the implication being that Brown was harmless.

The story also quoted the lawyer representing Brown's family as saying, "We want to make sure people understand what this case is about: This case is about a police officer executing a young unarmed man in broad daylight."

This claim, which inflamed public opinion about the case, was later shown to be unfounded by the three separate investigations.

# The way forward

If such destructive reactions can be curbed, it likely would require some kind of agreement between law enforcement and the news media, with each side accommodating the other's needs in a way that benefits both.

The simplest formulation would be for the news media to relinquish immediate access to body-cam video and other evidence in return for greater access to investigatory information after law enforcement has secured the physical and witness evidence that will form the basis for any legal action growing out of the incident.

Such an accommodation would require much greater levels of trust and good faith than currently exist between some journalists and law enforcement. The major hurdle is how to negotiate an agreement on a nationwide scale involving thousands of law enforcement agencies and news outlets.

It might begin with discussions organized at the highest levels of law enforcement and the news media. For example, bringing state attorneys general, prosecutors and major law enforcement agencies together with the leading lights of journalism, including major print, broadcast and online news organizations. This could be followed by the creation of a joint committee to explore ways that law enforcement and the news media can work together to ensure that justice *and* public access are optimized.

In the meantime, there are steps that all parties (law enforcement, the news media and social-media platforms) could undertake independently that could help.

## Law enforcement

Law enforcement must explain itself better.

This is not in any way to minimize misconduct for which there is no explanation or defense. Law enforcement officers overwhelmingly act in ways

*164*

that are professional and even valorous – but in the instances in which they act unjustly, they must be held accountable.

The public and many of those who report the news simply do not understand what the day-to-day work of a law enforcement officer is like, nor what laws govern their actions. They don't realize how a peaceful interaction between an officer and a subject can turn violent and deadly in an instant, requiring an officer to make split-second, life-or-death decisions with little time to think.

Many don't understand when the use of deadly force is justified and when it isn't. There also seems to be a widespread belief that an "unarmed" subject poses no threat, despite the fact that officers have been killed or severely injured by unarmed subjects.

Similarly, many believe that if a subject is shot in the back, this must be the result of unlawful actions by an officer. In fact, given human reaction times, a fleeing suspect can turn, shoot at pursuing officers and then turn away to continue running, only to be hit in the back by an officer's reaction shot. In addition, in Tennessee vs. Garner, the U.S. Supreme Court ruled that officers can shoot a fleeing felon, even in the back, if the felon poses a significant threat of death or serious physical injury to officers or others.

The public and many of those who report the news simply don't understand how investigations are conducted, and why information is not immediately available and forthcoming.

In the face of demands for immediate access to body-cam footage, law enforcement needs to do a better job of explaining that one view of an event does not necessarily provide a complete picture of all that was happening, nor does it provide the context of what was happening before the video was recorded. Also, one video may give a certain impression of an event, and a video recorded from a different vantage point conveys a different impression.

Increasingly, multiple videos of an event are available. These include surveillance cameras at private businesses, cellphone video, police and private-car dashboard cameras, and home security cameras. In cases where multiple videos exist, it is important to collect and correlate them in space and time, to gain maximum understanding of what the visual evidence says about the incident.

Attachment 3
300 of 389

If law enforcement can't immediately provide answers to the questions being asked by the news media and public, authorities need to explain why the information is not available or is being withheld.

## The news media

The First Amendment affords almost complete latitude to the news media to report as it sees fit, so no one can dictate how media cover an event. Only journalists can impose checks on themselves. Historically, they have done this by setting professional standards, then enforcing them within their own organizations.

But simply because the First Amendment protects a practice does not make it a good idea. In the late 1960s, national news networks began using exit polls to predict outcomes on Election Day. Then the networks called the 1980 presidential race for Ronald Reagan — three hours before the polls closed in California.

It was not the publication of the information that created the backlash, but the timing. The election itself was incomplete, with voters still casting ballots. Congressional hearings ensued about whether the news media's reporting suppressed voter turnout.

Today, there is an argument that the timing of the news media's publication of individual, incomplete fragments of information about police shootings may also impact the public's understanding of these events, and their trust of this most fundamental community institution. As with Election Day exit polling, the First Amendment may well keep a solution out of the hands of the government. Like exit polling, though, the news media are part of our society and may choose to take voluntary actions that they cannot be compelled to take.

Journalists pride themselves on being the indispensable eyes and ears of the public, and serving the public good. With the public good in mind, these are matters journalists might consider:

- The character of news coverage can inflame an already tense and angry situation and result in further harm. When angry mobs loot and burn businesses and neighborhoods, innocent people may lose their businesses, their jobs, even their lives. Does that serve the public that the news media represent? Would waiting a day, or even several days, to gather a

more complete and accurate account of what happened better serve the community than what the public now receives in bits and bytes?

- The U.S. Department of Justice report on the Ferguson incident found that a number of witnesses made false claims portraying Officer Wilson as a murderer who executed a surrendering Michael Brown in cold blood. In reporting on inflammatory claims made by participants or witnesses of an incident, would it not be legitimate at the very least to note that the claims have not been verified and that, in similar situations, some inflammatory claims have later proved to be false?

- How familiar are you with the realities of day-to-day police work, including the fact that peaceful interactions between police and subjects can turn deadly in an instant, requiring officers to make split-second, life-or-death decisions with little time to think? With other stories — for example, complicated legal or medical issues — a reporter will do additional reporting by interviewing an independent expert for context and understanding. Police use-of-force stories, on the other hand, tend to be reported like political election stories: the sensational, angry charge, followed by the "no comment" from the accused, with the political opposition adding its take and the police union standing in for the political party of the accused at the bottom of the story.

- To gain more context and knowledge about police work, participate in ride-alongs with officers, particularly in areas with the highest level of crime calls. Also take part in Citizen Police Academies, to learn more about how local law enforcement works. Consider sponsoring community forums in which police and members of the community can talk about officer-involved critical incidents.

- Every incident has unique participants and unique circumstances. The facts, circumstances and outcomes of one incident are seldom directly transferable to another situation. Under our system of justice, guilt is not based on association or patterns or narratives. Everyone is presumed innocent until proved guilty. This applies to everyone, law enforcement and suspects alike.

- Recognize that investigations take time, not because investigators are engaged in coverup but because the work of collecting and analyzing physical evidence is painstaking and slow, as is finding and interviewing

Attachment 3
302 of 389

witnesses to the event. As part of the coverage of an event, explaining why authorities cannot immediately provide all the details that the news media and public are asking is also part of fully informing the public. It is the difference between reporting a vote by a city council and a Pulitzer-prize winning investigative story: One may be done ethically and accurately in an evening; the other will take weeks or months.

Although lawmakers cannot control the actions of the news media, they can impact other actors in this system. Journalists should ask themselves whether a grand bargain might be possible: Journalists might voluntarily forbear the reporting of daily (and often-unverified) statements or developments in exchange for legal requirements that the entire investigation be made public at its conclusion.

## Social-media platforms

Social-media platforms play a very complicated role in the public perception of officer-involved critical incidents. At the most basic level, they are conduits for news stories produced by conventional news sources, such as newspapers and broadcast outlets. But they also host news outlets that are exclusively web-based.

To the extent that these more-conventional news sources are committed to responsible reporting, there will be some effect on how information about officer-involved critical incidents is conveyed on social media.

But social-media platforms also are public squares, where virtually anyone can publish virtually anything they like — true or untrue, responsible or irresponsible, calming or inflammatory.

Further complicating this gusher of content is the vetting and editing policies that each of these private internet services imposes on those who use each platform. This private filtering of content — and the potential for bias — is a major controversy in itself.

Social media also is a tool for action, allowing activists to quickly reach out to an audience of millions to sell a narrative and mobilize people, which is why recent incidents have so quickly resulted in protests nationwide and sometimes worldwide.

With so many moving parts and so much power, these platforms will have to be a part of any effort to ensure that the public's right to know is balanced with the need to conduct investigations that result in just outcomes.

# Good-faith efforts are necessary

At present, there is a profound division in our country between those who see law enforcement as unequivocally oppressive and untrustworthy and those who see law enforcement as an institution in which the vast majority of officers are decent and dedicated but within whose ranks are a small number who don't deserve to wear the badge.

This split underlies the protests and civil unrest that have resulted from officer-involved critical incidents in recent years. The aim of this book is to ensure that investigations of such incidents are independent, professional, complete and unbiased as a way of building public trust in the outcome, whether the outcome validates an officer's actions or leads to charges against an officer for breaking the law and violating a subject's rights.

But while this effort is under way, the nation needs people of good faith on all sides of this question to work together to prevent, or at least reduce, the instances in which an officer-involved critical incident leads to reactions that are devastating for innocent people, neighborhoods and entire communities.

— Ohio Attorney General Dave Yost

Attachment 3
304 of 389

# APPENDICES

## Appendix A
# Public Safety Statement

 

**Ohio Attorney General's Office**
**Bureau of Criminal Investigation**

**Public Safety Statement**

In the interest of public safety, the following questions are being asked. Your response to these questions is completely voluntary; you are not required to answer these questions.

1. Are you injured or are you aware of anyone else who is injured and in need of immediate medical attention? If so, where is the person located?

2. Are you aware of the location(s) of any weapons or other hazards that are in need of being secured?

3. Are there any outstanding suspects? If so, what is the description, direction and mode of travel? How long has the suspect been gone? What crime(s) is the suspect wanted for? What weapons is the suspect armed with?

4. Are you aware of other witnesses/participants? If so, what are their locations?

5. In what approximate location was any person who discharged a firearm? In what direction was the weapon fired? Approximately how many shots were fired from each location?

6. Can you identify and describe the scope (size and location) of the involved scene?

BCI-INVEST-38
Revised 04/21

Attachment 3
307 of 389

## Appendix B
# Criminal Investigation Notification




**Ohio Attorney General's Office**
**Bureau of Criminal Investigation**

**Criminal Investigation Notification**

1. This investigation is being conducted in order to determine whether any criminal laws have been violated on the part of those involved in this incident. Specifically, to collect facts and information to be provided to the prosecutor and/or grand jury in order for them to determine whether the conduct involved is authorized or prohibited by criminal statutes.

2. Your participation in this interview is voluntary, and you may decline to answer or cease the interview at any time. You are entitled to have an attorney present if you wish.

3. The criminal investigation is separate from any internal, administrative investigation that your employer may or may not be independently conducting. You are not being compelled to give any statement or answer any questions. This is **not** a "Garrity" interview (where you could be required to answer).

_____                    _____
Printed Name of Interviewee                          Date/Time


_____
Signature of Interviewee



_____
BCI Agent (Printed)



_____
BCI Agent (Signature)

BCI-INVEST-34
Revised 04/21

## Appendix C
## Conflict Assessment

 

Bureau of Criminal Investigation
Office (330) 659-4600
Fax (330) 659-0681

**Northeast Regional Critical Incident Response Task Force**
## Conflict Assessment

Each Northeast Regional Critical Incident Response Task Force (CIRTF) investigator should complete this assessment before being assigned to a particular investigation. Although a verbal acknowledgement of the assessment is satisfactory for exigent responses, this written attestation should be completed as soon as practical and maintained with the corresponding case file. The Conflict Assessment is designed to help identify actual and potential conflicts of interest between any CIRTF member and those involved in an incident under investigation. A conflict of interest may occur when an individual's interest or activity influences or appears to influence his/her ability to exercise objectivity or impair his/her ability to objectively investigate an officer-involved use-of-force incident.

Involved (Employing) Agency: _____  Date of Request: _____

BCI/CIRTF Case Number: _____

CIRTF Investigator's Name (printed): _____

| Does the CIRTF investigator: | Yes | No |
|---|---|---|
| Work for (past or present) any of the involved (employing) agencies? | | |
| Work for an agency adjoining any of the involved agencies?* | | |
| Have a personal or social relationship with: | | |
| • Any current officer/trooper from the involved agency/agencies? | | |
| • The subject(s) involved in the incident? | | |
| Have a personal or social relationship currently or previously with the involved officer(s)? | | |
| Believe that he/she is unable to remain objective, impartial and unbiased? | | |

\* In the case of State Highway Patrol troopers or other state peace officers, the involved (employing) agency, for the purpose of this assessment, is considered the specific post/regional location where the involved troopers/officers are assigned. For sheriff's offices, this section is not an automatic disqualifier; answers will be assessed case by case.

| Does the CIRTF investigator: | | |
|---|---|---|
| Work within the same county as that of the involved agency/agencies? | | |
| Casually or professionally know any officers/troopers from the involved agency/agencies, casually or professionally know the involved officer(s) or casually or professionally know the involved subject(s)? | | |
| Have an identifiable work-related relationship with any person involved in this incident or a relative/close acquaintance of that person? (e.g. been in the chain of command with, been supervised by, worked directly with, been trained by, or served on a SWAT/other team with that person?) | | |
| Live in or near the same community as that of the involved agency/agencies or have community contact with any person involved in this incident? | | |

Notes regarding any "Yes" responses:

_____

_____

_____

_____

"Yes" responses to any of the highlighted assessment questions (the first box) will disqualify that CIRTF investigator from performing any substantial investigative activity or receiving privileged information pertaining to that specific investigation.

"Yes" responses to any of the non-highlighted questions (the second box) require a discussion/assessment between CIRTF leadership and the investigator to determine the scope/level of the potential conflict. Once CIRTF leadership has ascertained the circumstances of any potential conflict, a decision will be rendered regarding the level of participation, if any, that the investigator may have (weighing the level of the perceived conflict against the investigator's ability to remain objective, impartial and unbiased).

I hereby attest that the foregoing information is true and accurate to the best of my knowledge. I further acknowledge that, should any of the information change or I otherwise become aware of a potential conflict, I will cease investigative activity and notify CIRTF leadership for a re-assessment of the potential conflict.

CIRTF Investigator's Signature: _____

_____

I have reviewed the above assessment and hereby set the level of participation for this investigator as:

☐ Disqualified/No Substantial Investigative Activity
☐ Full Participation/Lead Authorized
☐ Partial/Limited Access as Supporting Investigator:

   Specific limitations: _____

   _____

CIRTF Commander's Name (printed): _____

CIRTF Commander's Signature: _____

*175*

Attachment 3
310 of 389

Appendix D
## BCI Guidelines





**Ohio Attorney General's Office**
**Bureau of Criminal Investigation**

## OFFICER-INVOLVED CRITICAL INCIDENT RESPONSE
## OVERVIEW AND GUIDELINES

**Purpose**:

The purpose of the Ohio Bureau of Criminal Investigation's (BCI's) officer-involved critical incident (OICI) response is to ensure a standardized and consistent criminal investigation of all law enforcement-involved or other government agency-involved shootings and in-custody deaths, or similar types of investigations as ordered by the BCI superintendent or his/her designee. After receiving a formal request from an agency of jurisdiction, BCI will conduct the investigation in an independent, unbiased, transparent and professional manner. It is the bureau's belief that a team of resources (Special Investigations, Crime Scene, Cyber Crimes and Criminal Intelligence) should be deployed together, acting collaboratively but autonomously to develop a comprehensive and unbiased investigation.

**Officer-Involved Critical Incident Defined:**
**(BCI CONDUCTS ONLY CRIMINAL INVESTIGATIONS)**

1.  The discharge of a firearm by a law enforcement officer(s) or other official (not including the shooting of an animal, training accidents or accidental discharges where no injuries occur) that occurs within the state of Ohio.

2.  Any incident in which a law enforcement officer(s) sustains serious physical harm or death at the hands of another, including "friendly fire" situations.

3.  Any incident involving the use of force by a law enforcement officer(s) against another person when it appears that the person may have sustained serious physical harm or death.

4.  The death of a person while "in custody" by a law enforcement officer(s). *["In custody" is defined as "a situation when there has been a <u>formal arrest</u> or when, under the totality of the circumstances, there has been a <u>restraint on freedom of movement of the degree</u> <u>associated with formal arrests</u>." United States v. Lacy, 2009 U.S. Dist. LEXIS 86970, 2-3 (E.D. Wis. Aug. 13, 2009)]*

5.  Any other incidents as ordered by the BCI superintendent or his/her designee (with the option to decline to conduct such an investigation as deemed appropriate by the superintendent or his/her designee).

BCI-INVEST-33
Rev. 04/21

**Response Responsibilities:**

1.  When an official request is received for BCI assistance involving an OICI (as previously defined), the regional Special Investigation Unit (SIU) special agent supervisor and/or the Crime Scene Unit (CSU) special agent supervisor will be immediately contacted to evaluate the request and possible resources needed to adequately handle the investigation. If, after evaluating the request, it is decided that SIU or CSU is not required but that another section of BCI is needed, that section's special agent supervisor will be contacted immediately.

    -   Normally, BCI will not provide investigative assistance for OICI investigations that have already been started by another agency, especially in instances where the original crime scene has been processed and cleared. In certain incidents, this guidance may be waived with the approval of the Attorney General or his/her designee.

2.  Once the determination has been made by a special agent supervisor regarding the resources needed for the request, a special agent from the primary unit, as defined in the Case Management Report Writing Manual, will be assigned and be responsible for the overall investigation. Each unit will designate a lead agent, who is responsible for ensuring that the individual unit's work product is thorough and complete and communicated to the primary agent. When multiple units are deployed, each BCI unit will work collaboratively with the primary agent to complete the investigation but also remain autonomous, to ensure a complete and impartial investigation.

3.  When assigning agents to the request, special agent supervisors must ensure that the assigned agent(s) are not previous employees of the agency or do not have some other connection to the agency or involved officers that would give the appearance of a possible conflict of interest.

4.  When multiple units of BCI are deployed to handle an incident, a special agent supervisor will be identified as the lead supervisor and all decisions and information will be forwarded up the chain of command from this individual.

5.  When BCI is requested by law enforcement to handle any or all aspects of a critical incident, a public information officer from the Attorney General's Office will be notified and requested to assist with all news media activities.

BCI-INVEST-33
Rev. 04/21

**Lead Special Agent Supervisor:**

When notified that a critical incident has occurred and BCI has been officially requested, the lead special agent supervisor will be responsible for briefing the special agents in charge (SACs) about the incident as soon as possible.

**SIU Special Agent Supervisor/Lead SIU Special Agent:**

*Note: Not all duties and responsibilities are covered here because each case presents a distinct set of circumstances.*

1. When practical, a minimum of four SIU special agents will be assigned to all officer-involved critical incidents.

2. Make certain that the scene is secure; if necessary, expand it.

3. Separate all involved law enforcement officers (if local law enforcement has not already done this).

4. Have the on-scene (uninvolved) law enforcement officer(s) brief the team on the facts known and have that officer notify all first responders, regardless of their part in the incident, to remain on the scene until a special agent releases them. See the section of this protocol pertaining to Garrity issues for guidance on what information may or may not be obtained from first responders.

5. Make the necessary assignments to cover all aspects of the investigation:

   • Assign a SIU special agent as the primary case agent.
   • Assign a SIU special agent to respond to the hospital (if applicable).
   • Allow the involved officer(s) to be transported to the closest law enforcement facility or appropriate government location. In some instances, it may be appropriate to have the involved officers physically and/or mentally evaluated at an area hospital, or to consensually have drug/alcohol screening conducted.
   • Assign the remaining SIU special agents to interview witnesses, law enforcement and civilians, or to canvass the area surrounding the scene.
   • Request other BCI resources to respond and/or assist from afar as needed.

6. Determine whether obtaining a search warrant will be necessary.

7. Contact the lead crime-scene special agent to inform him/her of the case circumstances.

Page **3**

BCI-INVEST-33
Rev. 04/21

8. When possible, officers who witnessed the incident but did not themselves utilize force should be brought to the scene for a preliminary walk-through and interview. In unusual circumstances – for example, when no other witnesses are available or there is a danger to the public, the potential to lose evidence or an inability to locate the crime scene – an involved officer, if he/she is willing, can be brought to the scene for a walk-through, allowing for legal representation if requested. In the interest of public safety, a voluntary public safety questionnaire may be completed with the involved officer(s) if necessary for resolving any potential safety concerns.

   Questioning should be limited in scope to relevant public safety needs until the formal interview is conducted (in accordance with the formal interview procedure).

9. After the walk-through, have the involved officer(s) respond to a suitable location so that a special agent can photograph him/her and his/her weapon, and collect the officer's weapon. All firearms in the officer's possession at the time of the incident should be visually inspected and, if discharged or possibly discharged, collected.

**Additional Responsibilities of the Lead SIU Special Agent if a Fatality Occurred:**

*Note: The coroner and prosecutor will be from the county in which the law enforcement-involved situation occurred.*

10. Ensure that the requesting agency notifies the county coroner or medical examiner's office as soon as practical. Coordinate all evidence collection from the decedent with the coroner or medical examiner's office to ensure compliance with applicable state law.

11. Ensure that the county prosecutor is contacted and advised.

12. Ensure that next of kin is/are notified, preferably by the requesting agency or county coroner's office. The decision/responsibility of releasing the decedent's name will be left to the county coroner or medical examiner's office unless otherwise authorized by the superintendent or his/her designee.

13. It will be the decision/responsibility of the requesting agency to release the name(s) of the involved officer(s) unless otherwise authorized by the superintendent or his/her designee.

14. Ensure that special agents respond to the hospital and photograph any/all injuries to the injured subjects (when applicable).

**Lead SIU Special Agent:**

1. Note the time that you were notified of the critical incident and the time that you arrived at the scene.

2. Upon arriving at the scene, examine it and indicate to the patrol supervisor in charge any security inadequacies that need to be corrected. Coordinate with all on-scene BCI personnel as needed.

3. Make certain that all names and titles of <u>ALL</u> law enforcement personnel at the scene are recorded.

4. Participate in the walk-through with the involved officer(s) so that you are aware of his/her statements.

5. List the names of all persons who handled or moved items contained in the scene or have otherwise contaminated or altered the original scene.

6. Perform any/all duties consistent with being the lead SIU special agent on a homicide investigation.

7. Keep the SIU special agent supervisor advised of any/all pertinent information.

8. Complete and/or coordinate all pertinent interviews. Collect any and all video surveillance (local businesses, home security and/or cruiser/body cam). Collect 911 logs and recordings as well as radio recordings.

9. If the incident was fatal, attend the autopsy or send a designee. Obtain and summarize the final autopsy report once completed.

10. Be responsible for all follow-up investigation pertaining to this matter.

11. Complete a Prosecutor's Summary for the incident.

**Hospital Follow-Up:**

*Note: Obtain a search warrant/consent to search when necessary.*

1. If possible, obtain information of any treated person's emergency room chart.

2. Collect all property belonging to the subject and/or the involved officer, if admitted to the hospital.

3. Obtain evidentiary clothing, even if the subject and/or officer is released.

4. Interview the emergency squad/medic personnel, attending physicians and any law enforcement personnel who rode with the subject to the hospital. Be sure to ask about any statements made by the subject. Be sure to get FULL names.

5. Obtain the opinion of the physician concerning the condition of the patient and any treatment necessary.

6. Note the name, identity and location of all injured or involved parties as well as the location of all wounds, injuries, etc. Also, if a projectile(s) remains inside the body, report this information to the necessary BCI personnel on the scene as soon as possible.

7. Recover weapons, bullets, fragments and any other available evidence.

8. Interview any family members at the hospital. If the incident was fatal, make sure next of kin is notified (with a strong preference for the requesting agency or coroner's office to handle this task).

9. If fatal, arrange to have the deceased's hands bagged with paper bags by hospital staff. Coordinate with the coroner or medical examiner's office regarding the collection of evidence from any decedent to ensure compliance with applicable state law.

Page **5**                                  BCI-INVEST-33
                                            Rev. 04/21

10. At the direction of the SIU special agent supervisor/lead SIU special agent, interview the person being treated. (Do not attempt an interview if it would in any way interfere with medical treatment or the person's constitutional rights).

11. Obtain medical records for any individuals treated as a result of the incident.

**Follow-up Investigation:**

1. Collect the employing law enforcement agency's use-of-force policy.

2. Obtain all police reports and statements for the incident generated during the normal course of business for the department (outside of compelled Garrity statements).

3. Obtain the involved officer's personnel records, including prior discipline or commendations as well as the officer's training records, firearms qualifications records and OPOTC records regarding his/her current peace officer status.

4. If applicable, obtain any relevant mobile data terminal logs or instant messages.

5. Attempt to obtain any photographs taken of the scene by non-BCI personnel, including those captured with departmental or privately owned cameras or cellphones.

6. Inspect the ballistic vests worn by involved officers for any bullet impacts, and, if necessary, collect them as evidence.

7. As dictated by the investigation, run an ATF National Gun Trace and NCIC check on any non- law enforcement weapon(s) or personally owned, non-departmentally issued firearms involved in the incident. Follow up as needed.

8. Depending on the circumstances, offer assistance from the BCI Crime Victim Advocate for post-traumatic event counseling/debriefing.

Page **6**

BCI-INVEST-33
Rev. 04/21

*181*

Attachment 3
316 of 389

**<u>Canvassing Special Agents and Civilian Witness Interviews</u>**

1. At the direction of the SIU special agent supervisor/lead SIU special agent, conduct a canvass of the neighborhood surrounding the scene of the critical incident and interview civilian witnesses.

2. The lead SIU special agent or special agent supervisor has the discretion to decide whether or not to record (via audio and/or video) the initial contact with potential witnesses during the canvass – although every effort should be made to remain consistent within one investigation. Should it be determined that a subject witnessed the relevant portion of the incident, however, every attempt should be made to conduct and record the subsequent formal interview.

3. In addition to possible witnesses, the involved areas should be canvassed for all available surveillance video or other recordings that may have captured the incident. As needed, the BCI Cyber Crimes Unit can assist in recovering pertinent recordings.

4. Be careful to record the correct addresses to which you respond.

5. If there is no answer, note that for each address. You may also note that the residence appears vacant and other such details.

6. When contact is made, be sure to get as complete an identification as possible from the inhabitants. Witnesses must be positively identified and the means of re-contacting them established.

7. If a contact refuses to give his/her identification but agrees to speak with you, attempt to identify him/her later via established databases.

8. Try to ascertain how many persons are inside each residence, and attempt to contact each.

9. If someone you contact claims to actually have witnessed a portion or portions of the critical incident, make sure that you have that person show you exactly where he/she was positioned when making the observations. Be sure that Crime Scene special agents take photographs from this location.

10. AVOID LEADING QUESTIONS. The information must come from the witness, not by suggestion or assumption.

11. Summarize what the witness has said, but remember: OPINIONS ARE NOT ADMISSIBLE. When summarizing, be certain not to change the meaning of the witnesses' statement.

12. ALL eyewitnesses will be requested to accompany special agents to a suitable location for a formal recorded statement.

13. At the conclusion of your canvass, advise the SIU special agent supervisor/lead SIU special agent of the information you collected.

14. Records checks should be completed on each contact (at a later time).

15. The BCI Criminal Intelligence Unit can conduct a canvass of social media sites for postings/information relative to the incident or to persons under investigation.

Page **7**

BCI-INVEST-33
Rev. 04/21

**Officer Witness Interviews:**

*Note regarding Garrity rights:* All BCI personnel must be well-versed in the legal implications involved with compelled Garrity statements made by involved officers and ensure that they have <u>NO</u> knowledge of any such compelled statement (actual or implied). BCI investigations are criminal not internal; therefore, all obtained statements must be voluntary (with no threat of adverse employment action should an officer refuse to provide a statement). Any knowledge of compelled statements (verbal or written) may taint the investigator/investigation and potentially result in the exclusion of evidence during any subsequent criminal proceeding. If an agent inadvertently learns of any such material, the agent should immediately recuse himself/herself from the remainder of the investigation and not discuss the substance of the information with other investigators. The lead SIU supervisor should be immediately notified. If there is any question as to whether or not information could be considered Garrity-protected, it is advisable that the information be vetted by a specifically assigned prosecutor (who will compartmentalize any Garrity statements and not be involved in any other aspect of the investigation or, in the case of criminal charges, any prosecution).

1.  ALL officers who initially responded to the scene of a critical incident will be interviewed, as will their associated supervisors (as necessary/appropriate).

2.  First responding officers will be interviewed.

3.  ALL witness officer interviews will be recorded.

4.  ALL involved officer interviews will be recorded – preferably by video, if practical.

5.  Miranda Warnings should be given when required by law or at the discretion of the special agent conducting the interview and/or special agent supervisor. At a minimum, all officers who are reasonably believed to have exercised deadly force shall be provided with the admonitions listed on the BCI Criminal Investigation Notification form.

    a)  Make sure to note the following for each officer interviewed:

    - Rank
    - Full name
    - Badge number
    - Assignment
    - Days off
    - Immediate supervisor's name
    - Shift and duty status
    - Years of experience (and time on current department)

    b)  If the incident involved a shooting, ALL witness officers who responded to the critical incident before or during the incident MUST have their firearm(s) inspected. The following should be noted for each weapon in the officer's possession as well as associated extra magazines:

    - Make
    - Model
    - Caliber
    - Serial number

Page **8**

BCI-INVEST-33
Rev. 04/21

- Maximum capacity
- Number of cartridges present

c) When necessary, have special agents photograph the witness officer's positioning at the time of an observation/action, etc.

d) Be sure to note the time that the interview begins and concludes.

e) Officers should <u>not</u> be permitted to view any video (surveillance, dash-cam, body-cam or otherwise) prior to giving an initial statement. After providing an interview based upon the officer's recollection of events and subjective interpretations of those events, the officer may, then, at the lead BCI special agent's discretion, be afforded the opportunity to review any video and add to, revise or further explain their statement.

f) After completing your assigned interviews, inform the SIU special agent supervisor/lead SIU special agent of the information obtained.

**Notification of Next of Kin:**

*Note: In most cases, BCI personnel will not be responsible for this action. Instead, such notifications should be made by personnel from the requesting agency or coroner's office.*

1. In most cases in which an officer is killed in the line of duty, the notification of next of kin is conducted by any agency other than BCI. (BCI personnel should handle such notifications only as a last resort – if, for example, the employing agency cannot or will not do it.

2. Under no circumstances should the media be advised of the identification of a decedent prior to the next-of-kin notification.

3. Notification should be made in person by the SIU special agent supervisor/lead SIU special agent as soon as possible after the identity of the decedent has been established. An attempt to notify the closest adult relative will be made first.

4. Notification by telephone will not be made, except in the most extreme circumstances.

5. If the next of kin lives in a foreign jurisdiction or outside Ohio, the law enforcement agency of that jurisdiction may be contacted and requested to make the notification. Sufficient information to answer immediate questions of the family will be provided to the agency – including the name and phone number of the special agent supervisor/lead special agent.

6. If an interview of the next of kin is necessary, the notification will be made by a special agent.

7. During the next-of-kin interview, obtain information regarding the decedent's background, family, friends/acquaintances, employment, last time spoken to/seen, etc.

8. Whenever possible, assistance should be sought from clergy, relatives or close friends.

Page **9**

BCI-INVEST-33
Rev. 04/21

**Cyber Crime Response to Officer-Involved Critical Incidents:**

*Note: Not all duties and responsibilities are covered here because each case involves a distinct set of circumstances.*

1. Once the scene is triaged by Crime Scene and SIU, a determination will be made to contact the Cyber Crimes supervisor if cyber resources are needed.

2. The Cyber Crimes supervisor will determine the number of required personnel and dispatch the appropriate staff.

3. A lead Cyber special agent will be identified and ensure that facts of the case are disseminated to additional Cyber staff members.

4. The lead Cyber special agent should document the time that he/she was called and the time she/she arrived at the scene.

5. The lead Cyber special agent and/or a designee will evaluate all cyber-related evidence.

6. Under most circumstances, the Cyber Crime special agent will be responsible for obtaining all necessary legal documents pertaining to Cyber Crimes (e.g. search warrants or consents relating to any electronic devices of evidentiary value).

7. Cyber personnel, when circumstances allow, will conduct a preliminary review/analysis of cyber-related evidence on the scene.

8. If a more in-depth analysis is required, the lead Cyber special agent will take the pertinent evidence to the laboratory for further examination.

9. The lead Cyber special agent will maintain continual communication with the Cyber supervisor and lead SIU special agent regarding the findings and status of the analysis. The lead Cyber special agent will keep the Cyber supervisor advised of any/all pertinent information during the course of the investigation.

10. The Cyber Crimes supervisor will ensure that the special agent in charge is briefed on all pertinent cyber-related facts.

**Crime Scene Special Agents:**

*The following information serves as a guideline only, as each case presents a unique set of circumstances. Not all duties and responsibilities are covered. Crime Scene agents may deviate from these guidelines if necessary to properly collect and preserve evidence.*

*All scene processing, methods and terminology used by BCI Crime Scene agents should be in accordance with the BCI Crime Scene Unit Recommended Operating Guideline Manual and the Field Reference Manual for the CSU agent.*

1. When practical, a minimum of three CSU special agents will be assigned to officer-involved critical incidents.

Page **10**

BCI-INVEST-33
Rev. 04/21

2.  The Crime Scene SAS will designate a lead CSU special agent for the case.

3.  The lead CSU and SIU special agents should make contact as soon as practical to discuss the scope of the request and the location of scenes and to identify any exigent issues related to scene processing.

4.  Upon arriving at the scene, CSU special agents will determine whether the scene perimeter/security is sufficient. Expand the scene as needed, and determine whether secondary scenes exist.

5.  Photograph the entire scene(s). Locate the positions of all participants and/or witnesses, and photograph the view each had of the area where the incident occurred. Photograph ALL recovered items.

6.  When applicable, obtain a perspective view of the scene by deploying a UAV to document the location of evidence and artifacts with the onboard camera systems.

7.  Conduct a thorough search of the entire scene, including rooftops, attics, trash cans, dumpsters, sewers, vehicles and other sites where weapons or other evidence might be found.

8.  Obtain detailed measurements and complete a sketch/diagram or 3D scan of each scene related to the incident.

9.  Preserve and package all evidence in accordance with BCI laboratory protocol.

10. Accompany the lead SIU special agent and the involved officer(s) on the scene walk-through when deemed appropriate by the CSU agent in charge of the scene. This should be only done when loss of evidence and/or scene contamination is no longer a concern.

11. A detailed investigative report shall be completed detailing scene observations and processing efforts. Examples of pertinent scene information may include but is not limited to:

    - Weather conditions and temperature.
    - Lighting conditions.
    - Scene address and description of scene location.
    - Detailed description of each item of collected evidence.
    - Description of clothing of person(s) involved.
    - Description of vehicles involved, including VINs and license-plate numbers.
    - Position and orientation of bodies (deceased) if still on scene.

12. If, during the course of the scene processing, it is determined that Shooting Incident Reconstruction (SIR) or Bloodstain Pattern Analysis (BPA) is needed, the lead CSU special agent will perform the function, ONLY if internally authorized by BCI to do so. If the lead CSU special agent is not authorized to do so, the CSU SAS will be notified immediately to determine whether an authorized SIR or BPA special agent is available to respond.

13. If an internally authorized SIR or BPA agent is unavailable, the examining agent must photograph, document and measure the available patterns and flight paths sufficiently for reconstruction at a later time.

BCI-INVEST-33
Rev. 04/21

**<u>Documentation of Law Enforcement Officers and Cruisers:</u>**

1.  Complete the processing of the involved officer(s) and the retrieval of his/her weapons(s) when applicable. If possible, this should NOT be performed at the original crime scene. A local police agency or fire department are examples of appropriate locations to process the officer.

2.  If available, photograph the involved officer(s) dressed as he/she was at the time of the incident, (i.e. if the officer was not wearing his/her hat, the officer should not be photographed in it). The photos should be taken of the officer(s) on all sides and should document the condition of the officer's clothing at the time of inspection, including any damage, injuries, tears and gear and/or the lack of damage, injury or evidence of and altercation as stated by the involved parties.

3.  Explain to the officer(s) that if his/her injuries become more visible as time progresses, he/she should contact the photographing agent to have additional photographs taken.

4.  Remove the officer's firearm, and, if used during the incident, take possession of it as well as all spare magazines. Be sure to render the weapon safe and note any accessories (weapon light, laser, etc.). Ensure that photographs are taken of the weapon, its serial number, magazine(s) and all remaining cartridges. Documenting the condition of the firearm and any observed malfunctions is vital.

5.  Officers are to be asked about other weapons, such as backup handguns, rifles or shotguns. Any such weapons should also be thoroughly documented. If it is uncertain whether these weapons were used during the incident, they should be collected as evidence.

6.  Crime Scene agents will be familiar with the BCI Public Safety Statement form (BCI- INVEST-38). In the event that additional information is needed from the officer for purposes of scene processing, this form will be completed. The officer's participation is voluntary. The lead SIU agent should be consulted prior to this process.

7.  Document the presence of less-lethal devices, such as OC spray, Tasers, batons, etc. If they were used during the incident, collect them as evidence.

8.  At a minimum, inventory and photograph the weapons of all involved "non-shooting" officers who were present at the time of the shooting. If discrepancies exist, or if an officer is uncertain whether he/she fired a shot, his/her weapons are to be collected.

9.  If relevant, collect DNA standards from the involved officer(s) (BD 9.06 (A.4). A BCI Consent to Collect Biological Samples form must be completed with the officer(s). If consent is not granted, discuss obtaining a search warrant with the lead SIU special agent.

10. Involved cruisers are to be thoroughly searched and photographed. Obtain a search warrant if circumstances require one before starting the search. The need for search warrants should be discussed with the lead SIU special agent.

11. Photograph, document and collect any evidence within the cruiser.

12. If a cruiser camera, body camera and/or any other video recording device is present, the assigned BCI Cyber Crime agent should be notified. If no BCI Cyber Crime special agent is assigned, the lead SIU agent will be notified so that arrangements can be made to preserve video evidence.

**Documentation of Injured or Deceased Person/Officers:**

1. Any subject injured as the result of an OICI should be identified by the Crime Scene agent. The person and all injuries will be documented and photographed when possible. Collect DNA standards and any other applicable evidence from the person.

2. No agent will alter or move any deceased person without permission of the coroner or his/her designee. The CSU agent will function as a liaison between the coroner's office and BCI. The Crime Scene agent will work in conjunction with the coroner's office when dealing with the deceased.

3. CSU agents are to document and photograph any visible injuries, or the lack of injuries, along with tattoos and jewelry of the decedent. When appropriate, notations can also be made regarding post-mortem body changes (rigor or livor mortis, etc.).

4. Any or all clothing of the decedent will be collected with permission of the coroner. Also with the coroner's permission, the contents of clothing pockets should be photographed and collected.

5. If a firearm is found on the deceased person, the CSU agent shall request permission from the coroner to collect the firearm. The condition of the firearm, along with any accessories (holster, magazine, etc.) should also be photographed and collected. The firearm must be rendered safe prior to packaging.

6. The decedent should be placed into a sealed body bag prior to transport for autopsy. Efforts to preserve trace evidence must be followed when applicable (bagging hands, removal of clothing, etc.)

7. The CSU special agent will obtain the date, time and location of the autopsy and request that a member of BCI be permitted to attend the autopsy. This information will be relayed to the lead SIU special agent, and coordination will be made to determine who will attend the autopsy. The lead CSU agent is the preferred person to attend the autopsy.

8. All relevant evidence – such as clothing, recovered projectiles and DNA standards – will be requested and collected from the coroner's office.

**Post-Scene Procedures:**

1. Prior to leaving the scene, the lead CSU and SIU special agents will debrief and discuss the evidence recovered. A final scene walk-through will be conducted with all necessary BCI personnel to ensure that no additional processing is needed and no evidence remains to be collected.

2. If the critical incident being investigated happened during the execution of a search warrant by the requesting agency, the agency needs to be informed that the scene processing for the OICI is complete. At that point, if approved by the lead SIU agent, the requesting agency may continue with the execution of their search warrant and the collection of any evidence named in the warrant.

3. The lead CSU and SIU special agents will discuss and determine what evidence will be submitted to the laboratory and what testing is needed. Contact should be made with the appropriate lab personnel to discuss the facts of the case and the requested testing. The lead CSU special agent will function as a liaison between the laboratory and BCI SIU personnel assigned to the case. The lead CSU special agent should be consulted about any additional laboratory requests after the initial laboratory submission.

Page **13**

BCI-INVEST-33
Rev. 04/21

4.  As soon as practical, the lead CSU special agent will provide the lead SIU special agent a copy of all photographs taken and a list of all evidence collected during the investigation.

5.  All evidence not submitted to the laboratory for testing will be submitted to the appropriate BCI Evidence Room. The lead CSU agent will consult with the lead SIU special agent prior to the release of evidence to an outside agency.

6.  Once all crime-scene investigative reports are approved and finalized by the CSU supervisor, the lead CSU special agent will notify the lead SIU special agent. Any outside requests for CSU reports, photographs or laboratory findings are to be forwarded to the lead SIU special agent.

**Reporting Mandates:**

Investigations should normally be completed and presented to the prosecuting attorney or his/her designee within 60 days of the initial request. Due to the special or extraordinary nature of some cases, however, additional time may be granted by the supervising special agent of the primary unit.

Page **14**

BCI-INVEST-33
Rev. 04/21

*189*

Attachment 3
324 of 389

Appendix E
## Supervisor Checklist

| Initial Request for Service |
| --- |
| Requesting Agency: |
| Point of Contact: |
| Contact Number: |
| Units Requested:  ☐ CSU    ☐ SIU    ☐ CIU    ☐ CCU |
| Matrix Case Number: |
| CIU Assignment:                    CCU Assignment: |

| CSU Assignments |
| --- |
| Lead CSU Agent: |
| Assisting CSU Agent: |
| Secondary Scene: |
| Assisting Secondary: |
| Hospital (Evidence Matters): |
| Autopsy: |
| Primary Officer Documentation: |
| Witnessing Officer Documentation: |
| Other: |

## Scene Information

Primary Scene:

Secondary Scene:

Hospital:

Staging Location:

Witness Location:

CJIS Notified: ☐          BCI PIO Notified: ☐

## SIU Assignments

Lead SIU Agent:

Assisting SIU Agent:

Primary Scene Agent:

Assisting Primary Scene Agent:

Secondary Scene Agent:

Assisting Secondary Scene Agent:

Videos/Audio Control Agent:

Hospital (Interview Matters):

Civilian Witnesses:

Witnesses Officers:

Primary Officers:

Canvass Team Leader:

Assisting Canvass Team:

Appendix F
## Investigator On-Scene Checklist

### Initial Request for Service

Establish communication with the lead CSU Agent: ☐

Establish communications with agency's Point of Contact: ☐

Ensure separation of involved officers: ☐

Coordinate media release Point of Contact: ☐

Matrix Case Number Identified: [_____] Role Clearly Defined: ☐

Prosecutor Notified: ☐ Coroner Notified: ☐ Next of Kin Notification Arranged: ☐

### Initial Scene Management

First, and foremost, command your scene: ☐

Identify yourself to the agency scene commander, explain protocols, give OIS booklet: ☐

Ensure adequate scene security is present: ☐

Identify staging area or command post location and communicate to staff: ☐

Identify media staging area: ☐

Identify involved officers remaining at the scene: ☐

Separate any involved officers remaining at the scene: ☐

Identify civilian witnesses remaining at the scene: ☐

Separate civilian witnesses remaining at the scene: ☐

Clear scene of onlookers, including nonessential officers: ☐

If involved officer(s) are on scene, identify yourself and your role to them: ☐

Arrange secondary staging location for involved officers, if necessary: ☐

Ensure canvass team leader is briefed and assembled: ☐

Ensure civilian witness team leader is briefed and assembled: ☐

Ensure witness officer(s) team leader is briefed and assembled: ☐

192

## Legal Considerations

| | |
|---|:---:|
| Determine the necessity of any warrants: | ☐ |
| Determine if the officers require testing of breath or blood: | ☐ |
| Determine if a victim advocate is required: | ☐ |
| Identify and prepare the judge for warrant signatures: | ☐ |
| Determine the need for a chaplain: | ☐ |
| Other: | |

## Scene Management

| | |
|---|:---:|
| Continue to coordinate and command your investigation: | ☐ |
| Coordinate with CIU any letters of preservation: | ☐ |
| Coordinate with cyber crimes any letters of preservation: | ☐ |
| Ensure all known video/audio/photo files of the incident are collected: | ☐ |
| Ensure photographs are taken from the perspective of witnesses/officers: | ☐ |
| Determine if any scene photographs/video were taken prior to BCI's arrival: | ☐ |
| Collect neighborhood canvass forms: | ☐ |
| Determine the need for any immediate follow-up from the canvass forms: | ☐ |
| From the canvass forms, identify persons/properties that have video files: | ☐ |
| Conduct final walk-through of the crime scene: | ☐ |
| With the lead CSU agent, determine when the scene can be released: | ☐ |
| Does the requesting agency still have a pending search warrant for the scene: | ☐ |
| Other tasks: | ☐ |
| Other tasks: | ☐ |

Appendix G
## Investigator Post-Scene Checklist

### Ongoing Case Management

| | |
|---|---|
| Ensure warrant returns have been clerked and filed with the court: | ☐ |
| Ensure SIU is set as the primary unit in Matrix: | ☐ |
| Continue ongoing communication with the assigned prosecuting attorney: | ☐ |
| Continue communication with the subject or his/her representative: | ☐ |
| Continue ongoing communication with the officers or his/her representative: | ☐ |
| Continue ongoing communication with the agency's liaison: | ☐ |

### Post-Scene Management

| | |
|---|---|
| Obtain written letter of request: | ☐ |
| Conduct formal, recorded, interviews: | ☐ |
| Interview EMS personnel: | ☐ |
| Interview attending physician, if appropriate: | ☐ |
| Interview family members, if appropriate: | ☐ |
| Run NCIC check and ATF gun trace on non-law enforcement involved firearms: | ☐ |
| Obtain department use-of-force policy: | ☐ |
| Obtain 911 and/or dispatch recordings (CAD): | ☐ |
| Obtain radio traffic recordings: | ☐ |
| Obtain mobile data terminal (MDT) entries and instant messages: | ☐ |
| Obtain the police department's reports on the incident: | ☐ |
| Obtain any witness statements collected by the police department: | ☐ |
| Obtain copies of the police department's scene log: | ☐ |
| Obtain copies of the police department's use-of-force report: | ☐ |
| Obtain the police department's reports/records of previsous contact with the subject: | ☐ |

*194*

## Extended Case Management

Complete case within 60 days or ask for an extension from supervising agent: ☐

Complete prosecutor's summary: ☐

Ensure all evidence is accounted for and properly held and packaged: ☐

Review all evidence to ensure necessary laboratory testings has been completed: ☐

Notify SAS when CEO Notification Template can be sent: ☐

Consider the need for additional media releases through BCI's PIO: ☐

## Post-Scene Management

Obtain LEADS/CCH/OHLEG/OLLESIN/ DFacts reports on subject(s): ☐

Obtain personnel/disciplinary/commendation files of involved officers: ☐

Obtain training records for involved officers: ☐

Obtain OPOTA certifications and updates: ☐

Firearm qualification records: ☐

Firearms and use-of-force training records: ☐

Obtain laboratory reports: ☐

Obtain EMS/hospital/emergency room records: ☐

Obtain autopsy records: ☐

Obtain death certificate, if applicable: ☐

Obtain photographs of any injured parties 24-48 hours after the incident: ☐

Request CIU to monitor news accounts for civilian video footage: ☐

Request CIU conduct social-media canvass of involved subjects for critical information: ☐

Exclude any potential Garrity-derived statements (items excluded documented below): ☐

Appendix H
## Crime-Scene Checklist

### Initial Request for Service

Establish communication with the lead SIU Agent: ☐

Text ETA to requesting agency's Point of Contact: ☐

Establish communications with responding CSU personnel: ☐

Confirm assignments: ☐

Matrix Case Number Identified: [＿＿＿＿]    Role Clearly Defined: ☐

Coordinate response with the county coroner: ☐

### Scene Management

First, and foremost, command your scene: ☐

Ensure adequate scene security is present and control the scene: ☐

Identify transient evidence - protect, document, and preserve: ☐

Remove unnecessary personnel from the scene: ☐

Create CrimePad case and create scene assignments for each agent: ☐

Establish entry/exit point path for the scene: ☐

Establish equipment staging area: ☐

Establish a crime-scene log for BCI personnel in CrimePad: ☐

Scan the scene with Faro scanners, if appropriate: ☐

Document the scene through photography: ☐

Sketch and measure evidence as appropriate: ☐

Collect and preserve all evidence: ☐

Scene reconstruction or documentation sufficient for reconstruction: ☐

Inventory all evidence and establish chain of custody: ☐

Other: [＿＿＿＿] ☐

*196*

## Officer Management:

Confirm CrimePad Scene Number: ☐

Identify each officer examined: ☐

Photograph each officer as dressed at the time of the incident: ☐

Photograph any injuries, lack of injuries, or damaged equipment/clothing: ☐

Collect and identify any firearm used in a shooting: ☐

Document the condition and count the cartridges in each firearm collected: ☐

Collect clothing or other evidence, including DNA standards, as necessary: ☐

## Hospital/Autopsy Management:

Confirm CrimePad Scene Number: ☐

Confirm the identity of injured or deceased persons: ☐

If the person is deceased, ensure consent of the coroner prior to processing: ☐

Photograph the injured or deceased thoroughly: ☐

Photograph the lack of injuries as necessary: ☐

If deceased, collect trace evidence from the hands and body: ☐

If deceased, collect major case prints in duplicate: ☐

Collect DNA standards: ☐

Ensure all items of evidence are packed separately, especially hospital evidence: ☐

Identify items of evidence that need air-dried: ☐

Collect and preserve all evidence: ☐

Inventory all evidence and establish chain of custody: ☐

Other tasks: ☐

## Appendix I
# Crime-Scene Processing Outline

**Crime-Scene Investigation**

**1. Initial Response**

a. Minimum two crime-scene investigators, preferably more

b. Must be trained (minimum)

  i. Photography

  ii. Crime-scene processing

    1. Searching for evidence

    2. Diagramming

      a. Laser scanner

      b. Total station

  iii. Evidence collection

    1. DNA

    2. Ballistic evidence

  iv. Other (preferred)

    1. Shooting Incident Reconstruction (SIR)

    2. Bloodstain Pattern Analysis (BPA)

**2. Primary Scene**

a. Personal Protective Equipment (PPE)

  i. Gloves

  ii. Face mask

  iii. Tyvek® suit

  iv. Shoe covers

b. Establish the size and scope of the crime scene

c. Make larger than necessary, if possible

  i. Inner perimeter

    1. Crime-scene log

    2. Essential personnel

  ii. Outer perimeter

    1. Non-essential personnel

  iii. Media staging area

d. Legal authority

  i. Search warrant

  ii. Consent

    1. Written/recorded preferred

e. Photograph

  i. As it was found by you

  ii. Overall

  iii. Evidence establishing

  iv. Close up

    1. With and without scale

f. Notes

  i. Weather conditions

  ii. Traffic conditions

  iii. First aid provided

  iv. Items reportedly moved prior to arrival

  v. Involved parties/witnesses

g. Diagram

  i. Rough sketch (at the scene)

  ii. Finished diagram

    1. "Clean"

      a. Without identifiers/evidence placards

      b. For officer/subject/witness interviews

    2. With detail

      a. Identifiers/evidence placards

      b. For court purposes

**3. Officer Documentation**

a. Determine location of officer

i. Scene

ii. Station

iii. Hospital

iv. Other

b. In uniform, if applicable

i. Uniform: photograph condition of dress from the front, back, left and right

1. Clothing

a. Photograph

i. Overall

ii. Evidence establishing

iii. Close up

1. With and without scale

b. Package in paper

c. If wet/damp allow to dry in a secure area

d. Keep handling to a minimum

2. Plain clothes: similar procedure

ii. Boots

iii. Gloves

iv. Condition of duty belt, etc.

v. Vest

vi. Outer carrier

vii. Weapon(s) involved

1. Keep handling to a minimum

2. Make

3. Model

4. Serial number

5. Condition

a. Loaded/unloaded

b. Cartridge in chamber

c. Magazine

i. Seated/not seated

ii. Number of cartridges in magazine

d. Malfunction (i.e. stovepipe, etc.)

c. Backup weapon (if carrying)

d. Injuries

**4. Subject Documentation**

a. Determine location of subject

i. Scene

ii. Station

iii. Hospital

b. Clothing

i. Photograph

1. Overall

2. Evidence establishing

3. Close up

a. With and without scale

ii. Package in paper

iii. If wet/damp, allow to dry in secure area

iv. Keep handling to a minimum

c. Injuries

  i. Overall

  ii. Evidence establishing

  iii. Close up

    1. With and without scale

d. Weapon(s) involved

  i. Keep handling to a minimum

  ii. Make

  iii. Model

  iv. Serial number

  v. Condition

    1. Loaded/unloaded

    2. Cartridge in chamber

    3. Magazine

      a. Seated/not seated

      b. Number of cartridge in magazine

    4. Malfunction (i.e. stovepipe, etc.)

**5. Vehicle Documentation**

a. Location/position within the scene

b. Condition

  i. Doors open/closed etc.

c. Photograph

  i. Overall

    1. Document suspected ballistic events/impacts

      a. Overall

      b. Evidence establishing

      c. Close up

        i. With and without scale

  ii. Evidence establishing

  iii. Close up

    1. Vehicle Identification Number (VIN)

    2. License plate

d. Secure/impound (if necessary)

  i. Processed by original crime-scene investigators

  ii. Obtain search warrant or consent

  iii. Complete processing

    1. DNA evidence

    2. Ballistic evidence/documentation

**6. Evidence Collection**

a. Photograph (as it was found)

  i. Overall

  ii. Evidence establishing

  iii. Close up

    1. With and without scale

b. Use evidence placards

  i. Stay in sequence

    1. 1, 2, 3……

    2. A, B, C…..

c. Collection

  i. Paper or cardboard

  ii. No plastic

    1. Exception would be for temporary transport from one location (i.e. hospital) to police station

  iii. Be cognizant of potential sources of DNA and latent fingerprints

d. Laboratory submission

  i. Assist with laboratory submission (if allowed)

**7. Bodies on Scene**

  a. Photograph location/position within the scene

    i. Overall

      1. Head

      2. Hands

      3. Feet

      4. Tattoos

      5. Overhead

    ii. Evidence establishing

    iii. Close up

  b. Signs of first aid

  c. Confirm notification of medical examiner/coroner

    i. Request that the hands get bagged

    ii. Photograph body bag seal

    iii. Attend autopsy

      1. Take custody of evidence collected, if appropriate

**8. Ballistic Documentation**

  a. Photograph location/position within the scene

    i. Overall

    ii. Evidence establishing

    iii. Close up

      1. With and without scale

  b. Documentation

    i. Label ballistic events/impacts

    1. Sticky scales

    2. BE/BI 1.0, 2.0, 3.0…

      a. Related BE/BI

    i. Entry/exit

      ii. BE/BI 1.0, 1.1, 2.0, 2.1……

    ii. Measure location within scene

      1. Measuring tape

      2. Laser measuring tool

      3. Laser scanner

      4. Total station

    iii. Angles of impact

      1. Equipment

        a. Trajectory rod

        b. Angle finder

        c. Protractor

        d. String

        e. Laser

    iv. Terminology

      1. Use common terminology

**9. Report Writing**

  a. Separate report for each activity

  b. Accurate

  c. Thorough

  d. Use common terminology

  e. No opinions

    i. Exceptions

      1. Technical reports

      2. Peer-reviewed

        a. Shooting Incident Reconstruction (SIR)

        b. Bloodstain Pattern Analysis (BPA)

Attachment 3
336 of 389

Appendix J
## Crime-Scene Access Log

# Crime-Scene Access Log

**Date:** _____   **Location:**_____

**Completed By:** _____

| Name | Agency | Reason | Time In | Time Out |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Page ___ of ____**

Appendix K
## Neighborhood Canvass

 

Bureau of Criminal Investigation
Office (330) 659-4600
Fax (330) 659-0681

**Officer-Involved Critical Incident Neighborhood Canvass Form**

Case Number: _____ Agent: _____ Date/Time: _____

Address: _____

1. Does this location require additional follow-up?    Yes   /    No

2. Does this location have any video surveillance, including doorbell cameras?   Yes   /    No

3. Vehicle descriptions and registration numbers:

4. Is the scene location visible from this location?     Yes   /    No

5. Is the scene location within earshot of this location?        Yes   /    No

6. Anyone home?    Yes   /    No        Door hanger or business card left?    Yes   /    No

7. Interviewee information

    Full name:
    Date of birth:
    Phone number(s):
    Address (if different from the canvass location):
    Best time to contact:
    Employer:

8.  Do you know the victim or the victim's family?    Yes   /    No     If so, how?

9.  Tell me what you know of the victim/family:

10. Were you at home during the date/time of the incident?   Yes   /   No

11. What did you see and hear on that/those date or dates? Where did you observe this from?

12. What activity did you see or hear, even if not out of the ordinary, at or near the scene?

13. What people did you see in the neighborhood on (event date)?

14. What is the usual daily activity in this area (day and night)?

4055 Highlander Parkway | Richfield, OH | 44286
www.OhioAttorneyGeneral.gov

15. Describe the normal vehicle/pedestrian traffic in the area, including service/delivery vehicles.

16. Describe the normal vehicle/pedestrian traffic in the area on (event day).

17. Who usually arrives in or leaves the area at night (including people who work odd shifts)?

18. What unusual activity has occurred in this area in the past? Have you had anything unusual happen at your residence in the past (including prowlers, vandalism, missing items, indications of trespass or entry)?

19. Names and ages of ALL occupants and visitors, including relatives, at home during the date(s) in question:

20. Are you aware of anyone who may have information or evidence relating to this incident?

21. Do you have any video or are you aware of any video of the incident (cellphone, social media, surveillance cameras, doorbell cameras, etc.)?

22. Do you have any other information about this incident that you feel is important?

23. Is there anything else that you would like to tell us?

*If subject witnessed incident, a formal, recorded statement should be taken. It is important to document answers even when they are in the negative or the answer is not known. Additional information to consider seeking:*

24. A complete description of events leading up to the incident, noting dates and times.

25. A complete description of events during and after the incident, noting dates and times.

26. Description of available light.

27. Direction, movements and dialogue of subject and officer(s) prior to, during and after the incident. Who fired first?

28. A witness sketch of scene, noting locations or positions. A witness description of his/her exact location.

29. Witness's reason for being at the scene.

30. Whether the subject was armed – and, if so, the type of weapon.

    a. How many shots the subject fired

    b. Which hand weapon was in

c. Distance between officer and subject

d. Elapsed time between shots

e. Commands or dialogue between subject and officer

f. Movements, directions or actions by the subject

g. Resistance by subject

31. Force and weapons used by officer(s):

    a. How many shots the officer fired

    b. Which hand weapon was in

    c. Distance between officer and subject

    d. Elapsed time between shots

    e. Commands or dialogue between subject and officer

    f. Movements, directions or actions by officer

32. The officer's dress, identification (was it displayed or verbally provided?), vehicle, and emergency warnings (if applicable)?

33. If officer used force (physical, Taser, pepper spray, etc.) prior to the shooting, describe the kind, amount and relative weapon information. How many times used? What was the result of the use of force?

34. How the subject was handcuffed or restrained.

35. What the officer(s) did to care for the subject after the use of force. The approximate elapsed time between the use of force and the treatment.

36. The position the subject was in when transported.

37. Whether the subject advised the officer(s) of any medical problems or injuries – and, if so, what was done.

38. Whether the witness feels there was anything else he/she was not asked about. Whether there is anything else the witness would like to say or provide.

39. Whether the witness knows of any additional witnesses.

Appendix L
## Officer Statement





Bureau of Criminal Investigation
Office (330) 659-4600
Fax (330) 659-0681

## BCI

### OFFICER-INVOLVED CRITICAL INCIDENT RESPONSE TEAM STATEMENTS OF FACT

**I.    Procedures:**

*Note: Miranda Warnings should be given when required by law or at the discretion of the special agent conducting the interview and/or special agent supervisor. BCI **NEVER** provides Garrity. At a minimum, all officers who are reasonably believed to have exercised deadly force should be provided with the admonitions listed on the BCI Criminal Investigation Notification form.*

1.  If the involved officer wishes to make a formal statement prior to obtaining an attorney, one will be taken.

2.  If the involved officer does not wish to be interviewed at time of questioning, the interview will be terminated.

3.  Involved officers will be scheduled for a formal statement within 14 calendar days when logistically possible.

4.  ALL formal statements from involved officers should be taken by the lead BCI SIU special agent and a secondary BCI special agent (or assigned outside law enforcement officer/detective).

5.  ALL statements will be audiotaped (and videotaped when at all possible).

**II.    Format for Statement:**

*Note: ALL formal statements should be audio-recorded at least, with the preference being video-recorded. The lead SIU special agent should bring to this interview the sketch of the scene, without evidence markings. The following is an example of a format that can be used to collect information during a formal statement.*

4055 Highlander Parkway | Richfield, OH | 44286
www.OhioAttorneyGeneral.gov

Attachment 3
341 of 389

It is **(Time of Interview)** on **(Date of Interview)**. This interview is being conducted at **(Location of interview)**. Present for this interview are **(Agency)** Officer/other rank **(Full Name)**; his/her attorney, **(Full Name)**; **(Full Name of anyone else present)**; and lead BCI Special Agent **(Full Name)**.

Officer, on **(Date of Critical Incident and Shift)**, BCI Special Agent **(Full Name)** conducted an initial interview with you concerning the incident that occurred at **(Location of Critical Incident)**. At that time, you declined to make a statement concerning the incident under investigation.

I understand that you have conferred with an attorney since that time and that you are now prepared to give a statement concerning your involvement in and/or knowledge of the incident. Is that correct?

On **(Date Formal Typed Statement Was Received from Attorney)**, I received a written statement from attorney **(Last Name)** on your behalf. Is the statement that you have before you the same as the one sent to me? Have there been any changes, additions or deletions to that statement since the time that it was sent to me?

Is this voluntary statement a true and accurate description of the facts of the incident of which you are personally aware?

Would you please sign this statement in our presence with today's date?

Let the record reflect that this written statement will become a permanent part of this case package.

Do you wish to voluntarily answer the follow-up questions that we have at this time?

For the record, your attorney is present with you and you are represented by his/her counsel at this time. Is that correct?

1. What is your full name?

2. What is your age?

3. What is your badge number?

4. What is your radio call sign?

5. What is your current assignment?

6. What are your normal duty hours?

7. What are your days off on your current assignment?

*207*

8. On this date, what were your duty hours? (If in conflict with No. 6, ask for an explanation, i.e., time trade, vacation, overtime, special duty, etc.)

9. Were you on duty, working special duty, or off duty at the time of this incident?

10. Had you worked any extra duty details, overtime shifts or second jobs within 48 hours prior to the incident?

11. Were you in uniform, plain clothes or tactical? (Describe)

12. What equipment/less lethal options were you carrying on your person/duty belt at the time of the incident?

13. In what condition do you carry your firearm(s)? Extra magazines? Filled to capacity?

14. What vehicle were you driving at the time of the incident?

    a. Vehicle number and description
    b. Marked cruiser / unmarked car
    c. Occupants
    d. Positioning of occupants – who was driving
    e. In-car camera present / operable / utilized
    f. Spotlight present / operable / utilized
    g. Emergency lights present / operable / utilized
    h. Siren present / operable / utilized
    i. Radio channel utilized
    j. Mobile data terminal present / operable / utilized

15. Were you working with a partner? If so, who?

16. Were you carrying/using any other audio- or video-recording device (departmental or personal)?

17. Are you injured in any way?

18. What training or areas of specialty do you possess?

    a. SWAT, instructor certifications, defensive tactics, sharpshooter, etc.
    b. Military experience/training
    c. Use-of-force training
    d. Current OPOTC peace officer certification

19. What was your date of appointment to the respective law enforcement agency?

20. Do you wear glasses, contact lenses or a hearing aid? If yes, were you wearing them/it on the date of the incident?

21. Do you have any physical disabilities?

22. Were you well-rested at the time of the incident?

23. Are you currently on any prescription or over-the-counter medication that would impair your duties? Were you at the time of the incident?

24. Have you consumed alcohol in the past 24 hours? When had you last consumed alcohol prior to the incident?

25. Have you had any prior involvement in shooting incidents?

26. What prior discipline have you received? Have you had prior use-of-force complaints filed against you? If so, what was the result of those investigations?

**(At this point, the interviewing BCI special agent will ask any follow-up questions that were derived from the written statement and knowledge of the investigation.) BE CAREFUL TO ASK <u>NO LEADING QUESTIONS</u>!**

The following is a list of potential questions to ask and areas of concern to be covered. (This is not all-inclusive; questions will be dictated by the circumstances of the incident.)

- How were you notified of the incident?
- What radio traffic did you hear? What radio traffic did you transmit?
- What was the time of your arrival?
- How did you get to the location?
- What did you observe upon your arrival?
- Who was present at the scene upon your arrival?
- Would you describe the suspect?
- When did you first become aware of the sex and race of the suspect?
- What were the positions of others in relation to the suspect (approximate distance, etc.)? (Be specific.)
- What were the actions of the suspect prior to your use of deadly force?
- Did the suspect fire a weapon? If so, how many shots? From where? Toward what?
- Who was the first to shoot?
- Did you observe any object being discarded?
- What were the actions of others present?
- What were the lighting and weather conditions (natural/artificial light, rain, snow, clear, cloudy, etc.)?
- What was the approximate distance between you and the suspect at the time this shooting occurred?

- What was your exact position when this shooting occurred (standing, kneeling, lying, bent over, facing the suspect, etc.)?
- Where was the suspect in relation to you when you fired your weapon? *(Note: This question should clarify exactly where the suspect was as far as approximate distance, background, suspect's ability to harm the officer, etc. This question should be answered for each shot fired by the officer.)*
- Was the suspect armed with a weapon?
- What happened to the suspect's weapon after the suspect was shot?
- Did you say anything or issue any verbal commands prior to firing your weapon?
- Did the suspect say anything?
- Did the suspect fall (distance fell from door, officer, building or whatever is applicable)?
- In what position, or direction, was the suspect lying?
- How many shots did you fire?
- In what direction did you fire your weapon (north, south, east, west, etc., upward, downward, etc.)?
- Where were your shots being directed (point of aim)?
- Where do you believe your rounds hit?
- Did you have an opportunity to give a warning prior to using your weapon?
- Did you fire a warning shot?
- Why did you fire your weapon?
- At the time of the shooting, did you perceive any other option other than the use of deadly force?
- Did you exhaust those means?
- Did you fear for your safety or the safety of others? Describe.
- Do you believe your actions were consistent with your training?
- Do you believe the actions of all other involved officers were consistent with training?
- What actions did you take after the shooting (moving objects, checking weapon, reloading, making phone calls, taking photographs, etc.)?
- What statements were made by other officers after the incident?
- To whom have you spoken about the incident?
- Which officers involved in the incident have you discussed the case with?
- Have you had departmental weapons training in the past year?
- Was your city-issued weapon fired?
- Were you carrying a second weapon, or more?
- Has it been approved by the range?
- Did you fire your second weapon?
- Was the chopper overhead at the time you fired your weapon?
- Was medical treatment summoned for the suspect? By whom? When?
- Did anyone attempt to administer first aid to the suspect?
- Have you had any prior contact, personal or professional, with the suspect?
- Has anyone asked you to lie or to otherwise try to influence your statement to us?

After asking all of the questions deemed appropriate, the lead BCI SIU special agent will check with the secondary BCI special agent to see whether he/she has any further questions to ask.

The lead BCI SIU special agent will then review the sketch of the crime scene with the involved officer. The lead BCI SIU special agent will (at a minimum) have the involved officer mark an "X" where he/she was positioned when he/she fired the weapon. (Use a red ink pen if available). The involved officer will place an "S" where the suspect was at the time that the officer fired the weapon. If there was movement involved, "X1," "X2," "S1," "S2," etc. may be utilized to show the sequence of events. The BCI special agents must be cognizant of the fact that the audio recorder (if not video-recorded) cannot "see" the actions of the officer; therefore, the lead BCI SIU special agent must articulate what the officer is describing on the sketch. When the BCI special agents are satisfied with the involved officer's explanation, they will have the officer affix his/her signature, badge number and date at the bottom of the sketch.

If video of the incident exists, at the lead BCI special agent's discretion, the video(s) may be shown to the interviewee at this point with the officer being provided the opportunity to add any information to his/her statement that the video assisted in the recall of, explain any discrepancies between his/her memory of the incident and what is depicted in the video, or otherwise provide additional information relative to the incident.

The statement will then be concluded by asking the following:

> Is this statement true to the best of your knowledge?
>
> Do you wish to add or change anything in this statement at this time?
>
> This will conclude this interview.
>
> The time is now **(Time of Conclusion of the Formal Statement).**

At this time, the audio recorder is shut off.

# About the author



A longtime special agent supervisor for the Ohio Attorney General's Bureau of Criminal Investigation (BCI), Mark Kollar was recently named statewide coordinator for officer-involved critical incident (OICI) investigations. In this newly created role, he will oversee the training of investigators, quality control, policy review and development, task force creation and the implementation of memorandums of understanding with law enforcement agencies in an effort to standardize the OICI investigation process throughout Ohio.

Kollar previously led BCI's Special Investigations Unit, Company B, made up of the northeast quarter of the state. The special agents he supervised conduct high-profile criminal investigations, including those centered on officer-involved shootings, homicides, serial crimes, public official corruption, sexual assaults and large-scale financial crimes.

During a law enforcement career that has spanned nearly three decades, Kollar has served in multiple capacities, including stints in patrol, narcotics, crime scene and the detective bureau as well as various supervisory roles. He also assisted in the formation the Major Case Response Team and the Northeast Regional Critical Incident Response Task Force, both of which he leads.

Kollar has an associate degree from Hocking College and a bachelor's of science in criminal justice from Ohio University. He has written several books and contributes regularly to PoliceOne and other law enforcement publications. He also serves as a national instructor for the Public Agency Training Council, primarily focusing on courses related to officer-involved shooting and use-of-force investigations.

The Ohio Peace Officer Training Commission has awarded Kollar the designations of Master Criminal Investigator and Master Evidence Technician, based on the completion of specialized courses of study in those areas. Additionally, he has received multiple commendations and honors for the cases he has been involved with, including, on multiple occasions, the Ohio Attorney General's Distinguished Law Enforcement Group Achievement Award. He has lectured extensively to audiences from eight countries in the areas of officer-involved shooting and homicide investigation; public corruption; and, during an FBI National Academy Associates retrainer, topics such as Management of Multi-Fatality Crimes Scenes.



# About Dave Yost

Dave Yost, Ohio's 51st attorney general, assumed the statewide office in January 2019 with a strong record of public accountability.

Yost began his professional career as a reporter for the Columbus Citizen-Journal before turning to public service. He was elected county auditor and prosecutor in Delaware County before twice being elected state auditor, an office he held from 2011 to 2018. In that role, he made the fight against public corruption a top priority, helping to convict 170 public officials who had stolen and misspent millions of taxpayer dollars.

As attorney general, Yost is the chief law officer of Ohio and has been unequivocal in his support of law enforcement as the first task of government. At the same time, he is an advocate for officer accountability.

Attorney General Yost directs his staff to hold accountable those who violate the public's trust at all levels, and challenges his team daily to "do big good" for the state of Ohio.



# Officer-Involved Shootings

## A Guide for Law Enforcement Leaders



COPS
Community Oriented Policing Services
U.S. Department of Justice

INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE
POLICE
SINCE 1893

Attachment 3
349 of 389

# Officer-Involved Shootings
## A Guide for Law Enforcement Leaders



COPS
Community Oriented Policing Services
U.S. Department of Justice

INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE
POLICE
SINCE 1893

This project was supported by cooperative agreement / grant number 2013-CK-WX-K018 awarded by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author(s) and do not necessarily represent the official position or policies of the U.S. Department of Justice. References to specific agencies, companies, products, or services should not be considered an endorsement by the author(s) or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The Internet references cited in this publication were valid as of the date of publication. Given that URLs and websites are in constant flux, neither the author(s) nor the COPS Office can vouch for their current validity.

Recommended citation:
International Association of Chiefs of Police. 2016. *Officer-Involved Shootings: A Guide for Law Enforcement Leaders.* Washington, DC: Office of Community Oriented Policing Services.

Published 2016

# Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Pre-Incident Preparations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Policies, procedures, and training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    Prepare officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    Appoint response teams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    Develop relationships with appropriate agencies. . . . . . . . . . . . . . . . . . . . . . . . .4

    Mental health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    Small agency options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

II. Incident Scene Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Use of deadly force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    Involved officer responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    Incident command responsibilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

III. Post-Incident Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    Incident scene responsibilities of the criminal investigator . . . . . . . . . . . . . . . . . . .15

    Administrative investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    Investigator's responsibilities during criminal investigations . . . . . . . . . . . . . . . . . .18

    Interviewing officers who were at the scene. . . . . . . . . . . . . . . . . . . . . . . . . . .20

    Appropriateness of the use of force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    Force review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

IV. Officer Mental Health and Wellness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

    Officer reactions to the incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

    Problematic recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

    Recommended responses following an officer-involved shooting . . . . . . . . . . . . . . . .25

V. Media Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

    Social media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

    Post-incident media considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

IACP Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

**Appendix. Community Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**33**

Citizens police academies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Citizen advisory groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

VIPS (Volunteers in Police Service) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

Business roundtables/coffee clubs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

Neighborhood Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

Faith-based organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

**About the International Association of Chiefs of Police** . . . . . . . . . . . . . . . . . . . . . . .**37**

**About the COPS Office** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**38**

# Introduction

Though few officers will be directly involved in a hostile shooting situation during their careers, many more may experience the impact of one; the effects of such events touch not only the officer involved, but the department and the community as well. Because of the gravity of officer-involved shootings, it is vitally important to ensure that the agency and its officers are prepared in advance for such an event. This guide is intended to provide guidance for preparing officers and departments prior to an officer-involved shooting, suggested incident scene actions and procedures, recommended procedures for conducting criminal and administrative investigations, suggestions for working with the media, and mental health and wellness considerations and procedures.

# I. Pre-Incident Preparations

Officer-involved shootings (OIS) are emotionally charged events. These incidents require rapid response, leaving little time for deliberation. Therefore, it is important for a law enforcement agency (LEA) to prepare police officers in advance for the physical and emotional reactions they may experience in such an incident, so that they will be better prepared to handle the situation. Officers should also be familiar with standard post-shooting investigative protocols so that they will be equipped to assist in these efforts.

In addition to training individual officers, LEAs should also be prepared at an agency level to address community inquiries and potential concerns that may arise following OIS events. Such preparations should ensure the agency's transparency during the investigation and demonstrate its commitment to conduct and report, in a timely manner, the outcome of a complete and professionally conducted inquiry.

## Policies, procedures, and training

LEAs can design policies, procedures, and training to ensure that personnel know exactly how to respond when a shooting incident occurs. Clear and concise policies and procedures relating to the use of force, officer-involved shootings, video evidence, post-incident leave, and mental health and wellness, among other issues, should be documented, updated regularly, and presented to all officers through recruit and in-service training. LEAs should fully train all staff on the contents of these policies and procedures to ensure they understand what is required of them and the steps that the department will take. On-scene checklists are particularly helpful for those responding to officer-involved shootings. These same policies should be made available to the public, to the degree reasonably possible, as part of the department's efforts to promote transparency of departmental operations within the community.

## Prepare officers

Officers should be familiar not only with agency policies and procedures, but with their individual rights, including the Law Enforcement Officers' Bill of Rights (if applicable) and departmental rights and privileges that may be conferred. It is also important that officers understand the differences between criminal and administrative investigations and their rights during each of these processes.

The LEA should maintain an up-to-date list of the names and contact information of family members and significant others who should be notified in the event of an on-duty injury or other emergency. Officers should also identify, in order of preference, two or three fellow officers whom they would like contacted to assist their family or significant others, in the event they are unable to do so themselves.

## Appoint response teams

Officer-involved shootings require rapid department response and thorough investigation. These undertakings can be complex, and accurate and complete investigations require agency planning and following established protocols. The first step in the planning process is the designation of an investigative team. The team may be comprised of officers from units such as Internal Affairs, Homicide, Special Investigations units, Force Investigation units, or other entities. Once the team is identified, all members must be fully trained and prepared to handle multiple scene requirements, including those at the shooting site, the department, and potentially at an emergency medical care facility. The investigative

team should also receive additional training in the science of human performance factors that influence all human behavior during high-stress, time-pressured deadly force confrontations. A designated and trained agency response team can conduct the investigation both thoroughly and promptly, which benefits both the community and those involved in the incident.

In some cases, particularly in smaller departments with limited personnel, organizational leaders may call upon outside LEAs or state investigative agencies to investigate shootings, particularly those that cause death or serious bodily harm or that garner broad media and community attention. Agencies must make these arrangements in advance to ensure that all parties agree to established protocols and responsibilities.

If the department wants to develop peer support counselors to assist involved officers, it should organize these individuals and train them in crisis intervention and the rules of confidentiality.

## Develop relationships with appropriate agencies

Many outside agencies can play a role in addressing officer-involved shootings and assisting the LEA in investigating the event. It is advantageous to formulate relationships with potential support groups and other criminal justice agencies, which can help ensure a smooth, thorough, unbiased, and impartial investigation.

It is also important to establish a relationship with one or more qualified, licensed mental health professionals, experienced with law enforcement culture and critical incident debriefings. These individuals are indispensable in helping involved officers work through the emotions and potential trauma associated with shooting incidents.

## Mental health

Personnel should be aware of specific mental health and wellness services that are available to them following an incident. The department should train its members in the residual emotional, psychological, and behavioral effects often associated with officer-involved shootings and other potentially distressing critical incidents. Agencies are encouraged to train all personnel in both normal and problematic post-traumatic reactions and in appropriate responses to employees who have been involved in a shooting or other traumatic incident. See Section IV on page 23 for a detailed discussion of mental health and wellness.

## Media

A public information officer (PIO) or other designated staff should be prepared to address critical incidents involving the department. Staff assigned to this role should be aware of the considerable sensitivities surrounding an officer-involved shooting and be prepared to provide consistent messaging throughout the incident and in its aftermath. See Section III on page 15 for a detailed discussion of media considerations.

## Small agency options

The International Association of Chiefs of Police (IACP) and the U.S. Department of Justice, Office of Community Oriented Policing Services (COPS Office), are sensitive to the needs of small agencies and those working with budget constraints. It is important to know that the best practices outlined in this guide are applicable to all departments, although small agencies may achieve them differently. To ensure thorough, complete, and unbiased investigations, small agencies may benefit from partnerships with larger agencies, including, as appropriate, sheriffs' departments, state police, and state criminal investigative agencies. Agencies can formalize these partnerships through memoranda of understanding that outline the ways in which the agencies will work together and share resources. These partnerships are consistent with the findings of the Presidents' Task Force on 21st Century Policing (the Task Force), which recommends the use of outside investigative agencies "in cases of police use of force resulting in injury or death, or in-custody deaths."[1]  It should be mentioned that the use of outside agencies to conduct or assist in OIS investigations is not limited to smaller LEAs. To ensure and demonstrate an LEA's commitment to a fair and impartial investigation, some medium and larger sized agencies call upon others to conduct or assist in investigations to help demonstrate integrity and impartiality.

---

1.    President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (Washington DC: COPS Office, 2015). http://www.cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

# II. Incident Scene Procedures

## Use of deadly force

A 2011 Bureau of Justice Statistics study estimated that police in the United States make 63 million face-to-face contacts with the public annually.[2] Only one percent of these citizens report that the police subjected them to the threat or use of force, and the majority of those cases involve levels of force at the lower end of the spectrum.

Officers need to be provided with the training and equipment that will allow them to choose from response options, rather than having to resort to higher levels of force. Officers who use command presence, verbal direction, and persuasion, and whom agencies train in de-escalation techniques, are better prepared and equipped to avoid the use of higher level of force. To determine the most appropriate policies, equipment, and training on use of force for a given LEA and its community, the LEA can benefit from a comprehensive review and analysis of each use of force incident. Such a review may illuminate patterns in these incidents, or reveal officer behaviors that have important implications for the development or refinement of policies, procedures, and training to reduce or mitigate use of force incidents.

While police use of deadly force is a relatively infrequent occurrence, its impact in some situations resonates throughout the community. If managed improperly, the post-event investigation can even exacerbate officer trauma and misinformation. Aside from the possible physical and emotional ramifications of the police shooting itself, a police officer who improperly or excessively employed force also faces the prospect of criminal liability. Family members, as well as some community groups, may challenge the officer's decision to use deadly force, and in some cases may initiate civil litigation directed at the officer, LEA, governing jurisdiction, or all of these entities. Therefore, it is imperative that officers thoroughly understand their responsibilities, rights, and limitations regarding the use of force. The department should review these issues with each officer in conjunction with scheduled firearms qualifications, or at another appropriate juncture, at least annually.

When an incident of deadly force occurs, civil disturbance or unrest is possible, especially when there is a perception of excessive use of force or injustice. The incident itself and the events that follow can form a continuum of potential flash points or triggering incidents that may lead to civil unrest or disorder. These flash points include the incident itself, the investigation, the release of the investigation results, decisions of grand juries or courts, and overall reaction of LEAs to civil disorder. LEAs should release timely updates regarding active investigations, as long as releasing the information is legally permissible. In doing so, LEAs can help dispel misinformation and potentially mitigate unrest.

Several variables may influence the type or degree of public response, including the following:

- Pre-existing conditions: the overall quality of police-community relations, including those of trust and LEA transparency

- The nature of the incident itself: the type and nature of force used, especially if it was deadly force or was excessive by community standards

---

2.  Office of Justice Programs. Bureau of Justice Statistics, *Police Behavior During Traffic and Street Stops*. (Washington, DC: Office of Justice Programs, 2011). http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4779.

- The circumstances surrounding the incident: the age and mental condition of the victim, the race of the officer and the victim, and the reaction of witnesses

- The concurrent police action: the actions of the other police officers at the scene and the actions taken or statements made by the department

- The accuracy of media reporting on the incident

- City leadership actions: what the elected officials and other community leaders say or do

- Initial community response: whether there is an immediate community reaction or escalating racial tensions

Members of the community, including the media, can benefit from information regarding police procedures, protocols, and human performance factors related to police use of force, especially OIS encounters. However, disseminating this information cannot wait until a high-profile incident occurs; rather, it should be part of an ongoing program of LEA transparency through police-community interaction and communication. Such a program should provide, at minimum, information about officer safety issues, citizens' rights, relevant laws, and police policies and procedures, through a variety of mediums such as community meetings, civic associations, citizen advisory groups, citizens police academies, community newsletters, local government access cable television programming, websites, bulletin boards, social media, and LEA webpages. Further, the Task Force report recommends that LEAs make OIS and the use of deadly force incident data available to the public on a routine basis.

Following an incident, it is important that LEAs provide the community with as much information as possible on a timely basis. The LEAs spokesperson must ensure that information released by the agency is factual and will not serve to jeopardize the investigation or provide the basis for establishment of premature conclusions. LEAs should not feel compelled to dispel every rumor that may arise within the community, but should ensure that enough information is available to overcome untruths, exaggerations, and stories that are known to be factually incorrect. Developing a strong working relationship with the media, community leaders, and other prominent agencies before an incident is vital to this effort.

## Involved officer responsibilities

The initial responses of involved officers at the scene, and the steps taken and decisions made thereafter by first responders, supervisors, and investigative personnel, often determine whether an accurate and complete investigation occurs. As such, it is critical to have protocols in place that agencies can immediately activate should an OIS, other deadly force, or in-custody death incident occur.

Despite the incredibly stressful nature of an officer-involved shooting event, it is important for officers involved to take initial steps to protect their safety and the safety of others, preserve evidence, and when possible, to perform those actions that will help the investigation of the incident. If the officer is physically capable and circumstances permit, there are four areas of concern which require immediate attention after the confrontation has ended.

### *Welfare of the officers and others at the scene*

The safety and well-being of the involved officer(s) and innocent bystanders is the first priority. On-scene personnel should ensure that the subject is not a threat, to include disarming, handcuffing, or otherwise securing the person. An officer should never assume that because a subject has been shot or otherwise incapacitated, he or she is unable to take aggressive action. Officers should render medical aid as circumstances allow and to the degree reasonably possible, pending the arrival of trained medical personnel. Officers should handcuff all suspects, unless doing so would hinder the performing of emergency life-saving activities; in this event, an armed officer must be present at all times. Officers must secure in place all firearms and other weapons in the vicinity. If an officer must physically secure a weapon, its exact position should be marked. Officers must secure in place all firearms and other weapons in the vicinity, marking their exact positions.

If the primary officer has not already done so, on-scene personnel should summon emergency service providers, regardless of whether or not any officer or subject is injured. Injuries may not always be apparent, and the rush of adrenaline under these circumstances can mask them. Additionally, the stress of such an incident creates severe elevations in blood pressure, pulse rate, respiration, and body temperature, all of which can be dangerous.

### *Apprehension of suspects*

In general, it is better for the officer to remain at the incident scene than leave it to pursue suspects, unless the officer can apprehend the subject readily. Even if the officer was not injured, actions such as foot pursuits are taxing and inherently dangerous, especially when compounded by the stress of the incident. By remaining at the scene, the officer can summon backup, await emergency medical assistance, assist the injured, protect evidence, and identify witnesses. Instead of pursuing the subject, the officer should provide the agency's communication center with information on any subject or suspicious persons who may have left the area, including their physical description, mode and direction of travel, and whether they were armed.

### *Preservation of evidence and protection of the incident scene*

After an incident, many, if not most officers, will experience a period of mental confusion and disorientation. Under such conditions, it is often unreasonable to expect an officer to perform all but the most essential of duties required. Therefore, to the degree reasonably possible and appropriate, the officer should attempt to focus on just a few key matters. For example, he or she should note immediate surroundings and conditions, such as lighting; persons and vehicles present or recently departed from the scene; potential witnesses, suspects, or accomplices; and other factors. When possible, the involved officer should protect the scene from incursion by bystanders and secure in place or mentally note items of evidentiary value. The involved officer should also be aware of emergency medical personnel and firefighters as they arrive, as they who may unknowingly move or even inadvertently destroy evidence while performing their duties.

Principal among evidentiary items are firearms. The officer should ensure the safety and securing of his or her firearm until investigators examine it. The firearm should not be moved if dropped, nor removed if holstered, nor opened, reloaded, or tampered with in any manner. Ideally, officers should ensure that all weapons and expended cartridge casings remain in place undisturbed.

### Identification of witnesses

When possible, the officer should identify potential eyewitnesses, separate them, and ask them to remain present to provide a brief statement. If a witness wishes to leave, the officer should obtain contact information for future communications, or provide their supervisor's contact information and request that they contact him or her. If capable of doing so, assisting officers may use photographic or video recordings to document any onlookers present for possible future identification and questioning, should they leave the incident scene.

## Incident command responsibilities

If capable, the officer involved in the shooting should assume the responsibility of incident commander (IC) until relieved by a senior officer at the scene or a senior responding officer, supervisor, or investigator. The ICs job is to initiate the incident command system, a strategy employed to deal with situations requiring performance of multiple and often simultaneous tasks. Where necessary, the IC should assign individual responsibility for the completion of tasks.

The involved officer, acting as the IC, should, where possible, begin taking actions outlined below. Upon arrival of a senior officer or ranking supervisor, the officer will turn over IC responsibilities to that individual, who will take responsibility for performing or assigning responsibilities for these actions.  The first task of the IC is to assess the situation and ensure the safety and security of officers and others at the scene. The IC must eliminate potential threats from assailants, ensure the arrest or detention of suspects, and secure identified evidence. If not already done, the IC should summon emergency personnel and necessary backup and equipment.

It is the responsibility of the IC to complete the tasks not handled by other officers and to ensure that actions taken prior to his or her arrival were adequately completed. The IC is also accountable for ensuring that all necessary department notifications occur. These may typically include some or all of the following depending on the significance of the shooting: the chief of police or sheriff, watch commander, patrol commander, homicide shooting team, internal affairs, evidence technicians, public information officer, coroner or medical examiner, police legal advisor, assistant district attorney, department chaplain, police union representative, and peer support program coordinator.

### Securing the scene

The IC should take measures to secure the incident scene and maintain its integrity until the investigation team arrives. As personnel arrive and the IC makes assignments, the perimeter should be clearly marked and protected. Senior command staff and other officers who are concerned or have self-initiated a response will often arrive at such critical incidents. The response of some officers may be important or even essential, but the IC should direct these personnel to the command post for

assignment of a specific duty or task, rather than allowing them unrestricted entry to the crime scene. The IC should assign available officers to control the perimeter and record the identities of all officer(s) and other emergency responders who enter. This should be accompanied by assignment of an event recorder who is responsible for documentation of actions taken at the crime or incident scene. This can be difficult in situations where the crime scene is not contained to a singular or small area. However, on-scene personnel should make every effort to safeguard potential evidence and actions taken by responsible personnel. For example, in the event that emergency fire or medical responders need to move persons or items in order to administer medical assistance or perform other emergency functions, the original position and condition of evidence should be marked and recorded.

To assist with evidence preservation and crime scene reconstruction, when time permits and whenever possible, the IC should ensure that the crime scene is photographed and videotaped. As noted, photography or videotaping of any onlookers may also be valuable in later identification of witnesses or possible accomplices. Additionally, it can help to capture other factors such as the weather, lighting, and related conditions and surroundings. Finally, it is important to take complete color photographs of the involved officer, including physical appearance, wounds, and injuries, if he or she is still at the scene. These photographs provide evidence of the nature and impact of the incident, and may prove useful at a future juncture. If not done at the scene, investigators should take photographs at the hospital or other emergency medical facility.

### Witness statements

It is important for the IC to be mindful of potential witnesses. When possible, the IC, in conjunction with the officer involved, should identify persons who may have been at or within close proximity to the incident scene. The IC should facilitate the separation of potential witnesses, so that statements obtained regarding their personal perceptions do not influence the opinions and observations of others. The IC should, where possible, ensure collection of the names, addresses, and phone numbers of witnesses and others who may have been in the vicinity at the time of the shooting. Investigators should collect this information from those at the scene even if they claim that they did not see anything. Investigators should ask witnesses to remain on hand until they provide a preliminary statement. Investigators should record all interviews whenever reasonably possible. In addition, some witnesses may not want to provide statements in a public space for fear of retribution or the perception that they are collaborating with the police. In these instances, investigators should contact these persons following the incident to get a statement.

### Public safety statement

If the law, collective bargaining agreement, or agency policy do not prohibit it, the officer involved should provide a brief *public safety statement* to the officer in charge at the incident scene. The public safety statement is intended to establish the level of danger that may still exist, aid the initial operational response to locate suspects, and focus the initial stage of the investigation. If allowed, and if the officer is still on the scene and is physically and emotionally capable of providing it, investigators

should collect this information as soon as possible. If the officer has been removed from the scene due to injury or related reasons, other officers or witnesses who were present may be able to provide some or all of the pertinent public safety statement information. Questions to elicit this information should be straightforward and limited to details of the incident, including:

- The type of force used by the officer and threat presented by other involved parties

- The direction and number of shots fired by involved parties

- The location of any unsecured weapons

- The location of injured persons

- A description of at-large suspects and their mode and direction of travel, time elapsed since they fled, and weapons that were available to them

- A description and location of known victims or witnesses

- Any information that would help ensure officer and public safety and assist in the apprehension of suspects.

### Incident scene walkthrough

Again, depending on the officer's physical and emotional condition, the IC should ensure that a preliminary basic walkthrough of the incident scene is conducted with the involved officer to help gather the foregoing information, if not prohibited by law, collective bargaining agreement, or department policy. As soon as possible, the lead criminal investigator should replace the patrol supervisor or other officer as the IC. From that point on, all police personnel at the scene, including supervisory officers, should answer to the lead investigator/scene IC. The role of the criminal investigator is to determine ultimately whether the actions of the involved officer(s) were in compliance with the law.

The initial walkthrough should normally be conducted by criminal investigative personnel (who, depending upon the completion of other incident scene tasks, may assume the role of the IC) to collect very basic information. Investigators should not confuse this with information solicited later in a formal statement of the incident. If a walkthrough is conducted with the involved officer, he or she may be accompanied by a union representative or an attorney, depending on local law, agreements, or agency policy. Investigators should not solicit or record any formal statement from the involved officer at this point of the investigation. Agencies should exercise caution in reference to videotaping or audio recording initial walkthroughs, as the physical or emotional status of the officer may not be optimal; at this stage, the officer may be unable to recall events fully or accurately. In addition, if investigators videotape the walkthrough, the recording is discoverable at trial and could be introduced and used to impeach officer testimony, formal reports, statements or depositions. As the officer's memory becomes clearer and more detailed, information provided during the initial walkthrough may conflict with recollections documented in later statements.

*Medical evaluation*

Where available, a trained peer counselor should be summoned to the scene to provide the involved officer with emotional support. If multiple officers were involved, they should be separated, and a companion or peer counselor should be assigned to each. Agencies should direct all involved officers not to discuss any aspects of the shooting with fellow officers, their peer counselor, or anyone other than their attorney, qualified mental health professionals, or authorized investigative personnel. When the involved officer has provided responders or investigators with a public safety statement and any other relevant information, he or she should be taken to a hospital or other emergency care facility and accompanied by the peer counselor where available. Peer support should be ancillary to and not used in place of a qualified mental health provider.

Even if the involved officer does not have obvious injuries, it is good practice to transport any involved officer to an emergency medical facility. Medical personnel can then evaluate and monitor the officer(s) for delayed physical or emotional reactions that may require medical attention. At the same time, investigators should ensure that testing is performed to document whether alcohol or drugs are in the officer's system, if such testing is not prohibited by law or union contract. Some agencies do not require testing for drugs or alcohol without reasonable suspicion; some contend this is an overt or subjectively accusatory action, which conveys the agency's lack of trust in in the officer or suspicion of wrongdoing. These are legitimate concerns. However, medical personnel can perform tests for alcohol and drugs easily, and these tests are a part of any thorough investigation of an officer-involved shooting. Additionally, the results can serve to counter any contention that such substances impaired the officer's judgment.

At the hospital, the companion officer should provide all reasonable support to the involved officer and act as a liaison between the officer and the hospital. If the officer is injured and not capable of contacting his or her family, the IC should assign this responsibility to the individual the officer has designated; if the officer has not made such a designation, the officer's supervisor should find the best person to perform this duty.

The individual contacting the family should provide them with information on the officer's status and well-being. Even if the officer is uninjured, a designated person should contact family members to alleviate their concerns. If the officer has sustained an injury or has been taken to the hospital for medical examination and testing, the IC should designate an officer who was not involved in the shooting to transport immediate family members to the hospital. In the event of an officer's injury, the officer's supervisor may provide the family with this information. In the case of an officer's death, the chief, sheriff, or in their absence another police executive, should make contact with the family in person. Death notifications by officers in these situations are often best delivered with additional support as appropriate from clergy, an officer who is close to the family, or other support personnel. Any notifications should conform to the department's death notification policy. In the event the involved officer is injured or killed, an officer or peer support counselor should also be assigned to the officer's family to provide security, emotional support, and assistance in handling visitors, media inquiries, and steps that need to be taken both in preparation for and following a funeral.

*Other duties*

For agencies that have not adopted and implemented the Incident Command System (ICS), the fore-going and the following activities and tasks must still be undertaken. Use of ICS provides agencies with a full array of necessary steps, systematically organized and managed, to address a wide array of critical incidents and enhances their ability to manage officer-involved shootings efficiently comprehensively. For example, when it appears that on-scene investigative activities will take an extended period of time, it may be necessary to establish a command center to better coordinate the personnel involved. For events of this complexity, it is a good idea to appoint an on-scene recorder—someone who will docu-ment the event and maintain a chronological record of activities and actions taken. If significant media attention is expected, it is also advisable for the IC to designate a staging area. In most cases however, the IC should postpone statements to the media until investigators have verified the facts surrounding the shooting and prepared properly for release of this information. Sometimes it is sufficient to indicate simply that the incident is under investigation and that investigators will provide details as soon as possible. This publication includes additional media procedures and considerations in a later section.

# III. Post-Incident Investigation

Investigations of officer-involved shootings are critically important; the results affect not only the involved officers, but also the department and the community. The findings of the investigation inform any criminal charges or administrative discipline that may ensue, as well as liability that may attach to the officers, the department, or the parent jurisdiction. Ultimately, the impact of the investigation extends well beyond the single incident, affecting department-wide risk management strategies.

The persons responsible for investigations of officer-involved shootings vary by department. If department capability permits, investigations may occur internally. As previously noted, teams may comprise officers from Homicide, Internal Affairs, Special Investigations, or other divisions or units. Veteran homicide detectives make ideal investigators for officer-involved shootings, as their experience allows them to skillfully identify, organize, and evaluate relevant details. Regardless of their primary assignment, the department must designate and specially train investigators in advance of an incident.

If needed, it is appropriate to elicit the assistance of, or turn the investigation over to, an outside agency, such as the state police, state criminal investigation authority, or county sheriff's department. Some departments also conduct investigations in cooperation with the local prosecutor's office. It is important to note that regardless of who conducts the investigation, the initial burden for evidence preservation and protection of the incident scene is the responsibility of the involved officer, the IC, and the first responders. Therefore, it is essential that all officers understand the importance of taking appropriate initial actions.

## Incident scene responsibilities of the criminal investigator

Accurate and complete OIS investigations require agencies to follow established protocols when an incident occurs. The careful collection and examination of evidence, in conjunction with witness statements, will help piece together the full picture.

The investigator should be briefed and then ensure that all previously mentioned on-scene tasks have been or are being completed and that all essential details of the shooting have been or are being documented, including the following:

- the nature of the call to which the officer responded;

- the time it was received and dispatched, the time of arrival, and the times of dispatch and arrival of backup officers;

- whether the officers were in uniform or, if in plainclothes, whether they were identifiable as police officers at the time of the shooting;

- the general circumstances in which the subjects were encountered, including the time of day of the incident and the weather and lighting conditions;

- the full identities and assignments of all involved officers;

- the identities of all persons who had access to the shooting scene, including emergency medical services (EMS) personnel and firefighters;

- the types of vehicles on the scene, including those of officers and suspects;

- the identities and backgrounds of all suspects, witnesses, and others involved in the shooting if available.

If someone on-scene has not already done so, the IC should ensure collection and replacement of the firearm of the officer involved. In some cases however, it may not be advisable to replace the officer's firearm, particularly if the officer is injured and transported to an emergency room, or is of such an emotional or physical state that it would not be safe to rearm the officer at that time. Investigators should inspect the primary and backup firearms of all officers at the scene during the incident to determine whether they have been discharged. When appropriate, investigators should record the serial number, make, model, and caliber of all officer and suspect weapons found at the scene.

The IC should ensure full recording and documentation of the shooting scene and the surrounding area. Investigators should manually diagram or map the entire scene using surveying or mapping equipment, indicating the location and relative distances between key points and items of evidence. After the manual diagram is completed, investigators should photograph and, where possible, make a video recording of the scene and all evidence. It is important to record both video and still images, because video evidence provides added perspective and dimension that photographs cannot capture. The IC or a designated individual should also determine if video recordings were made by in-car cameras, electronic control weapons, public or private surveillance cameras, or body-worn cameras, and, if so, secure them as evidence as soon as reasonably possible.

The investigator should ensure the collection of the clothing worn by persons shot, including officers. Clothing can often provide critical information about the shooting, and preservation is important. Often the shooting victim's clothes can provide evidence of the shooter's proximity to the victim, the position of the victim's arms (either up or down), the distance and trajectory of the shots fired, or the entrance and exit points.

## Administrative investigations

Unlike a criminal investigation, an administrative investigation intends to determine whether the involved officer's actions were justified, in accordance with agency policy, procedures, rules, and training. Investigators or a force review board may use this information to make recommendations for changes in these areas. While an administrative investigation may lead to disciplinary charges based on breaches of LEA policies, it does not intend to delve into potential criminal behavior. Questions in an administrative investigation are specifically addressed to an officer's actions or inactions based on the agency's administrative rules and regulations.

The rights of officers subject to an administrative investigation may vary according to state and local law, or the terms of a collective bargaining agreement. Several states have also enacted legislation known as the Law Enforcement Officers' Bill of Rights (LEOBR), enumerating the rights guaranteed to law enforcement officers during their employment, including while under investigation. These statutes may provide, for example, a right to counsel during questioning. Given the variability among states, agencies should consult with local counsel for details.

During an administrative investigation, the department may grant an officer *Garrity* use immunity rights.[3] Though officers have protections during an administrative investigation, the ultimate goal is to uncover the truth of what happened. As such, departments retain the right to question employees about matters relating to possible misconduct while on duty.[4] Law enforcement officers are required to answer such questions when they are germane to an administrative investigation. However, in answering these questions, officers may make statements or admissions that could result in termination of their employment. Using such compelled testimony in a criminal investigation is a violation of the Fifth Amendment. By conferring *Garrity* rights, the agency can compel the officer to truthfully answer questions, so long as they are specifically, directly, and narrowly tailored to the performance of his or her duties.

The officer's statement is a critical component of an OIS investigation, but, by conferring immunity from self-incrimination, a department that provides *Garrity* rights becomes unable to use any evidence from that statement during a subsequent criminal investigation. However, granting use immunity under *Garrity* is not required, and departments should offer it on a case-by-case basis, and only after deliberating with the prosecuting attorney.

Agencies need not grant *Garrity* use immunity automatically, since responding to questions and providing any statement are part of an officer's routine job duties, just as is the filing of an incident, arrest, or other report. In addition, whether verbal or written, there is a presumption of voluntariness and truthfulness associated with officer statements. If it is demonstrated during the investigation that statements were not truthful, an officer is subject to discipline up to and including termination. The intent of an administrative investigation does not relate to gathering evidence of criminal acts. Therefore, automatic invocation of *Garrity* warnings is not necessary in many cases. Criminal prosecutions of officers for actions taken during shooting incidents are not a commonly anticipated outcome, and automatic provision of *Garrity* rights may not be needed.

Departments must ensure that administrative and criminal investigations occur separately from each other. The internal affairs authority normally conducts the administrative investigation, while criminal investigators conduct the criminal investigation; the investigations are not comingled.

The complexity of OIS incidents dictates, to some degree, the length for completion of the investigations. Some agencies place time limits on these investigations, but such restrictions can potentially impose an obstacle to completion of a full and accurate investigation.

---

3.   *Garrity* v. *New Jersey*, 385 U.S. 493 (1967).
4.   Kruger, Karen J., "When Public Duty and Individual Rights Collide in Use-of-Force Cases," *The Police Chief*, vol. LXXVI, no. 2, February 2009 citing *Aguilera* v. *Baca*, 210 F. 3d 1161 (9th Cir. 2007).

## Investigator's responsibilities during criminal investigations

The investigator's responsibilities begin at the scene and continue until the investigation of officers involved in the OIS is complete. There is considerable information beyond the physical evidence that can inform the investigation.

Law enforcement officers subject to criminal investigation have the same legal protections as persons who are not in law enforcement. These protections, provided by the U.S. Constitution, include provisions of the Fourth Amendment (addressing unreasonable search and seizure), the Fifth Amendment (protecting against compelled self-incrimination), the Sixth Amendment (providing the right to counsel), and the Fourteenth Amendment (ensuring procedural due process). Unlike its administrative counterpart, in a criminal investigation, investigators should precede all officer questioning by *Miranda* rights. Officers invoking those rights may not be disciplined for doing so. Upon completion of the criminal investigation, investigators should submit findings to the department's chief executive officers and, subsequently, to the office of the prosecuting attorney or similar agency.

Voice transmissions can provide important information and potentially serve as evidence. Investigators should secure and review all data and voice transmissions associated with the incident, including logs or information from mobile data terminals and video and audio recordings captured by in-car cameras, electronic control weapons, body-worn cameras, and commercial or governmental surveillance cameras.

Witness interviews are a key way to obtain information regarding the shooting. The investigator should contact the individuals identified on-scene in an attempt to uncover as much information as possible about the incident. Interviews should be audio and video recorded where possible. Investigators should, however, be mindful that memory and perception are fragile and may be influenced, particularly if witnesses have had an opportunity to confer with each other about the incident. As a result, eyewitness accounts may be inaccurate or contradictory. Though lying is one potential cause, it is important for investigators to be aware that myriad factors can color and influence perception and memory, including an individual's background, experiences, and predispositions, as well as the turmoil and emotional impact of a shooting incident. There is ample research demonstrating the contribution of all these factors to the unreliability of eyewitness accounts. To avoid influencing eyewitness accounts, investigators must remain completely neutral and impartial during interviews and focus on gathering, verifying, and corroborating eyewitness statements. Investigators should never share their opinions or disclose investigative information in an effort to elicit responses or statements from witnesses.

When obtaining statements during the course of the investigation, investigators should identify and interview the complaint taker and dispatcher if there is reason to believe that they can share important information. Investigators should also solicit information and observations made by emergency medical personnel. Often, these individuals are the first responders to the scene and deal directly with the officers and other involved parties immediately following the shooting. Their initial impressions concerning the circumstances of the incident upon their arrival, what those involved may have said, actions taken at the scene, and other matters, can be valuable to the investigation.

When time permits, investigators should follow up on leads and additional points of contact. Investigators should obtain all information relevant to all involved parties, including prior criminal records and parole or probation history. Investigators should obtain search warrants for suspect residences, vehicles, containers, or any other areas potentially housing evidence.

In the event of the death of a suspect, bystander, or officer, it is important to work closely with the coroner or medical examiner's office, including attending autopsies. During the autopsy, investigators can make several important determinations, such as entrance and exit wounds, estimates of shooter positions, and the presence of controlled substances in the decedent's blood.

As soon as the preliminary results of the investigation are established, the lead investigator should brief the agency chief executive. With the chief executive's approval, the investigator should then prepare a staff memorandum that provides the general facts of the incident. The department should post or distribute this memo to all personnel as soon as possible; as long as it will not jeopardize the investigation, it should also provide this information to the media. In this way, the department can keep staff rumors to a minimum, resolve concerns over unknown circumstances of the event before speculation supplants fact, and provide the public with the knowledge that the agency is actively pursuing the investigation and is forthcoming about what it has found.

In addition to the agency's chief executive, investigators should brief the prosecutor's office in a timely manner following the incident. In some instances, a member of the prosecutor's office will respond to an officer-involved shooting as a matter of policy. The police agency should continue to work closely with that office throughout the investigation.

The issue of when to release the name of the officer(s) involved in a shooting has been widely debated without providing a definitive answer. It is clear however, that a police shooting, particularly when the death of a civilian or officer is involved, garners intense interest and scrutiny among the media and the public. In addition, the longer the law enforcement agency withholds this information, the greater the appearance that the agency is protecting its own personnel at the expense of transparency within the community. Some departments have come under serious criticism for failure to release the names of officers in OIS incidents. Other agencies have implemented standard release policies, such as 48 hours following the incident—sufficient time to notify the shooting subject's next of kin, and allow officers enough time to notify their families and make arrangements for secure accommodations if they fear threats or retaliation.[5] Failure to release officer names risks criticism and public dissent. At the same time, release of an officer's name in this time of heightened police scrutiny and public dissent has also become a matter of greater concern for officer safety.[6]

While the law enforcement community has not reached consensus on this issue, the timely release of an officer's name following an OIS incident serves to enhance public trust in the investigative process, and adds to the transparency and perceived integrity of the investigation. Nevertheless, the agency

---

5.    Drew J. Tracy, "Handling Officer-Involved Shootings," *The Police Chief* 77, no 10 (2010). http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=2213&issue_id=102010.
6.    Tristan Hallman, "Dallas Police Association wants department to stop releasing officers' names after shootings," *Dallas Morning News*, September 8, 2015, http://crimeblog.dallasnews.com/2015/09/dallas-police-association-wants-department-to-stop-releasing-officers-names-after-shootings.html/.

must weigh this decision on a case-by-case basis against the need to shield involved officers and their families from dangers of threats and reprisals. Officers' names will become public eventually, so it is a matter of when, not if, an agency should release officer names.

## Interviewing officers who were at the scene

Interviews with other officers who were at the shooting incident but who may not have discharged their firearms are integral to both the administrative and criminal investigations. At a point following the incident, investigators should conduct an interview with each involved officer. Some LEAs require these interviews to be conducted as soon as is practical. The IACP Police Psychological Services Section recommends delaying personal interviews from 48 to 72 hours in order to provide the officer with sufficient recovery time to help enhance recall. This interval is particularly recommended for officers who were directly involved in the shooting, but it may also be necessary for officers who witnessed the incident but did not discharge their firearms.

It is important to obtain individual statements as opposed to group interviews. Group dynamics may negatively influence individual recall and judgment. Individual officers may also not be inclined to offer opinions that differ from the majority of the officers present.

Upon providing a statement, each involved officer must file a use of force report detailing the incident. The investigator should then prepare a separate overall use of force report, which, along with the individual reports, will be part of the investigative report provided to the agency's chief executive.

More than one investigator may conduct administrative interviews, but interviewers should designate one person as the lead; this person will conduct the questioning, while the other is primarily responsible for note-taking. Although some departments permit questioning by more than one investigator, this practice risks taking on the appearance of an adversarial interrogation, rather than a non-confrontational effort to elicit the facts surrounding the shooting.

The department should allow an officer to bring a personal representative into an administrative interview, subject to state law and any union contract that addresses the issue. The personal representative may be an attorney, union representative, supervisor, or other person chosen by the officer, as long as the person has no connection with the incident under investigation in any way. The role of the interviewee's representative is that of observer; the interviewer should advise the observer not to intervene unless the interviewer or employee requests them to, or if the interview leads to issues of criminal activity. Legal representation of officers during the criminal investigation is essential. For the record, all persons present during questioning should be documented.

All interviews, whether administrative or criminal, should be audio, and when possible, video recorded in their entirety. If there is a break taken during the interview, the interviewer should make a notation, including the time of the break, who requested it, and the time at which the interview resumed.

The issue of whether to permit officers to view videotape of shooting incidents, and if so, whether this should occur before or after providing a verbal statement or filing a report, remains unresolved. Some argue that allowing an officer to view a videotape *before* making a statement may allow him or her to adjust the statement to conform to the video. Others contend that this process enhances an officer's memory and allows the officer to better recall actions or events that took place. Agencies that allow

viewing prior to making a statement may make exceptions in some circumstances. For example, if a video indicates that an officer appeared to commit a violation of department policy or law knowingly and willingly, the department should provide the video following the statement, in order to solicit a response or clarification from the officer.

Videotapes shown following a statement or report, avoid to some degree, the perception that the officer adjusted his or her statement to fit the video recording. An officer who has already given a statement can use the video to clarify discrepancies and to elaborate, where necessary, on actions taken and recorded. Departments should also remember that video recordings have inherent limitations. They generally have a narrow field of view and may vary in quality. In addition, a video recording cannot capture all of the events, actions, and surrounding circumstances of which an officer may have been aware; they cannot record all that an officer knew, or reasonably believed, at the time of the shooting. The department should apply any legal analysis or assessment of an officer's actions under this "reasonableness" standard enunciated by the U.S. Supreme Court in *Graham* v. *Connor*,[7] in which the court made it clear that judgment of the reasonableness of a particular use of force must rely on the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight. Further, they stated that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." Situational factors, as discussed in the following section, enter into the judgment of what was reasonable or unreasonable when investigators are comparing officer statements with video recordings or similar evidence and making conclusions about officer actions.

## Appropriateness of the use of force

As noted above, in determining the appropriateness of a shooting, both criminal and administrative investigations should explore situational factors. These factors may include the following:

- The conduct and behavior of the subject at the time of the incident

- The relative age, size, strength, and physical capability of the officer compared to the subject

- Any opportunities for, and attempts by, the officer to de-escalate the situation

- Force options available to the officer

- The experience of the involved officer, including years of service, types of assignments, and training

- Number of officers present

- Presence (or likely presence) of drugs or alcohol used by the subject

- Mental status of the subject if known or if probable

- Weapons in possession, or within reach of the subject, and threats of violence (if any) made by the subject

- Seriousness of crimes suspected to have been committed by the subject

- Subject's criminal history if known

---

7.   *Graham* v. *Connor*, 490 U.S. 386 (1989).

- Whether it was reasonable to believe that the subject was, or would present, a danger to the public if he or she escaped, and the risk of escape

- Manner and degree in which the subject resisted arrest or otherwise used force against the officer

- Types of restraints used on the subject

## Force review

Once the investigation is complete, some agencies present the results to a Force Review Committee, Shooting Review Committee, Board of Inquiry, or similar entity that convenes on an ad hoc basis to review such findings. This approach is strongly recommended, as it adds an additional level of review. The committee should be comprised of command-level officers, personnel at the supervisory level who were not involved in the incident or investigation, and any other agency specialists who can provide insight. Some LEAs also include citizen representation on these review boards. These forums intend to bring together all elements of the investigation in a risk management context to determine whether they have potential implications for the department's training, policies, and procedures. Their ultimate aim is to improve the agency's response to such critical incidents and to make any corrections needed in the agency's policies, procedures, training, supervision, and discipline that will help avoid identified problems in the future.

# IV. Officer Mental Health and Wellness

An officer-involved shooting is perhaps the most traumatic event an officer will encounter during service. Such incidents trigger complex psychological and emotional effects; all too often, the normal coping strategies employed by individuals are inadequate for such an extreme event. Law enforcement officers are human, and react to such traumatic events in different ways. A simple formula cannot express the impact of circumstances on a specific individual. Accordingly, in helping officers navigate this incredibly difficult time, it is critically important that staff, especially supervisors, understand and recognize possible reactions, and that they are prepared to refer officers to the appropriate assistance. This section describes some common responses to critical incident; however, supervisors and other personnel must realize that each individual manifests stress differently. There is no one right way to react.

## Officer reactions to the incident

An officer-involved shooting affects many people beyond the officer directly involved. Agencies should be mindful that officers who were at the scene and did not or could not fire their weapon are often strongly impacted and may experience intense emotional reactions. Additionally, personnel not at the scene, such as dispatchers or investigators, may be affected to some degree.

Officers involved in critical incidents, including shootings, may experience a multitude of physical, cognitive, emotional, and behavioral responses in the immediate aftermath and in the weeks and months to follow. The following information and recommendations are drawn from research compiled by medical and mental health practitioners of the IACP Police Psychological Services Section.[8]

### Immediate reactions

Immediate responses to a critical incident are physiological, and may include muscle tremors, nausea, chills, vomiting, rapid heart rate, hyperventilation, faintness, crying, or sweating. All of these responses represent the body's attempt to mobilize for extreme stress. Physical reactions are the body's way of mitigating or coping with the stress triggered by a high-impact situation. These reactions are not a sign of weakness. If not acknowledged or dealt with in a healthy manner, these reactions can become problematic for the officer. Some physical reactions are delayed and may manifest in several days or sometimes even weeks following the incident. Delayed physical reactions may include increased thirst, fatigue, twitches, chest pains, dizziness, elevated blood pressure, profuse sweating, headaches, stomachaches, indigestion, diarrhea, sore muscles, and an increase in the occurrence of colds and flu.

### Cognitive and emotional reactions

Initially, an involved officer may be dazed and upset and have feelings of disbelief. The officer may have difficulty comprehending the reality or significance of the critical incident. From a few hours to a few days later, he or she may show signs of depression, tension, agitation, irritability, and fatigue. This may cause the officer to sleep too much and have less energy; the officer may become withdrawn as a result.

---

8.    "Officer-Involved Shooting Guidelines," IACP Police Psychological Services Section (Philadelphia, 2013). http://www.theiacp.org/portals/0/documents/pdfs/Psych-OfficerInvolvedShooting.pdf.

There is also a shock reaction period where the emotions concerning the incident become blunted. Psychological defenses, such as denial, automatically intervene to temporarily shield the individual from thoughts and feelings that might otherwise be overwhelming. The involved officer may feel emotionally detached and numb, but also experience occasional anxiety attacks. The officer may feel that he or she is just going through the motions. Additional emotional reactions may include confusion, impaired decision making, loss of judgment, and slowness of thought.

Typically within several days of the incident, the full emotional impact of the situation is realized, though this can be delayed by as much as six months to a year or more. The involved officer will typically experience an emotional and physical letdown. The individual may have feelings of vulnerability and helplessness stemming from a perceived lack of control over the incident. Generally, the more vulnerable the officer felt during the incident, the greater the emotional impact of the situation.

At this stage the involved officer may experience many kinds of cognitive or emotional reactions that, although normal human reactions, make him or her feel they are losing emotional control. Some of the more common reactions are fear, anxiety, anger, rage, or blaming those responsible for the outcome of the critical incident. There are also other ways the individual might signal he or she is having a difficult time processing the critical incident; for example, some may describe reliving the event over and over. It is not uncommon for an officer to feel sorrow, guilt or remorse if they know or believe their actions caused injury or death. Departmental training in this area will help personnel realize that these are normal reactions to an abnormal situation, not signs of mental illness.

### Behavioral reactions

The involved officer may obsess about the shooting and seem to talk about nothing else. The officer may make poor decisions or show signs of inattention which were not previously exhibited. Supervisors may notice an increase in absenteeism or a drop in work productivity. It is not unusual for coworkers to notice increases in aggression in situations resembling the critical incident. Family or relationship problems may suddenly develop. Substance abuse problems are a clear sign of an officer in distress and need to be handled delicately and with compassion. Sleep difficulties—whether oversleeping or undersleeping—may begin when the individual attempts to avoid emotional reactions to the shooting. The officer may also exhibit restlessness, confusion, sudden changes in hobbies or activities, short-fused anger, and excessive behaviors.

These reactions usually last several days, but may last a week or longer depending upon the individual. For this reason, it is important to evaluate personnel in order to ensure that they can safely and effectively return to their typical work duties. Individuals determined to be experiencing extreme stress reactions should be placed on administrative leave and not be allowed to return directly to normal duty assignments, even if they express a desire to do so. An officer experiencing a denial of emotion should not be on active duty, particularly in a street enforcement capacity, during these periods.

*Acceptance resolution*

At some point an officer generally begins to understand, work through, and come to terms with the emotional impact of the incident. It may take longer depending on the incident, the legal or adminis- trative aftermath, the amount of peer and family support, and the officer's coping skills. Once achieved, the officer understands and accepts what happened. Even after an officer has reached this point, it is normal to have the occasional nightmare, flashback, and anxiety attack, particularly when triggered by situational reminders.

Supervisors should also be aware that not all officers experience a serious or even moderate reaction following a shooting. This does not suggest that they are uncaring or insensitive.

## Problematic recovery

All of the reactions described above are completely normal human responses for anyone who ex- periences a highly tramatic incident. In a normal recovery, the officer eventually returns to a healthy and balanced emotional state, understands the reactions he or she has been experiencing, and learns productive ways to handle them. However, some officers do not progress normally and become stuck in the process. Supervisors should be aware of the signs of stalled recovery, including the following:

- Continuation and intensification of post-incident symptoms

- Excessive stress and anxiety reactions

- Continued obsession with the incident

- Increased absenteeism, burnout, and decreased productivity

- Increased anger and irritability

- Underreaction

- Risk taking

- Increase in family/relationship problems

- Alcohol/drug abuse

- Inordinate amount of focus on critical comments made by coworkers

- Uncertainty, suspiciousness, and poor problem solving

- Poor attention

 On becoming aware of these problems, a supervisor should refer the officer to an appropriate mental health provider.

## Recommended responses following an officer-involved shooting

In order to reduce the likelihood of problematic recovery and debilitating long-term effects, depart- ments should take immediate steps to ensure the well-being of the officer. Though this report previ- ously noted some of the steps described below, here we revisit the concepts, with added explanation, from a mental health perspective.

*At the scene and immediately following*

Immediately following the incident, the department should provide physical and psychological first aid to involved personnel, including assignment of a companion officer or peer counselor. This focus of this support should be on calming stress and reinforcing the officers' sense of safety.

Upon providing a statement about potential outstanding threats, the department should transport officers directly involved to a safe and supportive environment along with the companion officer, chaplain, or a supportive peer; this ensures the officer is not isolated. Often the best support person is a fellow officer trained in peer support, or one who has also experienced an officer-involved shooting. If the involved officer needs to talk about the incident, he or she should be encouraged to do so only with individuals who have privileged communication, including attorneys, chaplains, licensed mental health providers, and, in some states, trained peer support personnel.

Officers may feel vulnerable if unarmed. Since the department must collect the officer's firearm as part of the investigation, the department should replace it promptly, as a sign of support, confidence, and trust. If there is an articulable basis for deviating from the procedure, the department may do so, but the department should provide security for the officer while on scene, and keep the officer informed as to when they will get their weapon, or a replacement weapon, back. In training, the department should inform officers that during an officer-involved shooting incident, their firearm becomes a piece of evidence, and will be taken as a matter of policy.

Officers involved in an OIS should have the opportunity to contact their families as soon as possible after the incident. This may reduce the likelihood of families receiving incomplete or inaccurate information from other sources, such as the media. The conversation should be limited to their well-being, and not the facts of the incident. If the officer cannot personally make the call, someone should do so on his or her behalf, preferably someone that knows the family, someone the officer previously chose, or someone serving as the companion officer.

The investigative process and potential consequences can be the most stressful aspects of the incident for involved officers, and the first few hours after an incident are often emotional and confusing. When practicable, the department should inform the officer of the investigation protocol and of any potential actions by the grand jury or review board, as well as potential media inquiries. Again, these aspects of an OIS or similar investigation should be part of officer training so that officers know in advance what to expect.

Following a shooting, it is helpful to provide officers and their significant others with written information that explains the physical and psychological reactions they may be experiencing. The materials should provide guidance on how to support each other, coping strategies, resiliency strategies, and whom to contact for further assistance.

*Investigative period*

In the immediate aftermath of a shooting, the department should place any involved officer on administrative leave pending counseling by an agency-designated mental health provider. This meeting and any subsequent meetings that may be deemed necessary are not an evaluation of fitness for duty, but a conversation regarding the officer's mental wellness. Agencies should have a policy addressing mandatory leave, crafted in a way that accounts for variation in officer reactions. While some officers

may need an extended period of leave, others will find it unnecessary or even counterproductive. Waiting for days to tell one's story of the shooting can be psychologically harmful for some officers. In such cases, agencies may want to make allowances in policy, whereby an officer may make a statement after he or she has consulted with and retained counsel. Agencies should also be mindful of officers who were at the scene but did not discharge their weapon. In some instances, the incident may emotionally affect these officers, and they may benefit from a period of administrative leave, particularly if they witnessed a serious injury or death. It is important for officers and the public to understand that administrative leave is a routine procedure and not a disciplinary action.

It can also be very helpful for an involved officer to speak with a trained peer counselor who has been through a similar experience. Often such individuals respond immediately to the scene to provide support and psychological first aid. Family members of involved officers, particularly those who have previously been involved in a shooting or other life-threatening event, may also benefit from contact with a mental health professional or peer support counselor. In high-profile shootings, the department should prepare officers for the possibility of inaccurate, negative or inflammatory comments in social or mass media, and from within the community. The department should establish peer support and outreach teams before an event occurs, especially since only those who have received specialized training in crisis intervention and the rules of confidentiality should fulfill this role.

High-ranking administrators can provide an extra measure of support to involved officers through timely conveyance of their personal concern via telephone or in person. A show of concern is the objective; it is not necessary to comment on the situation or departmental resolution of the investigation.

### *Post-shooting interventions*

The initial post-shooting debriefing should occur within one week of the incident, with the initial goals of reducing stress, assessing and normalizing any problematic post-incident reactions, and providing education regarding the management of reactions. The debriefing should focus particular attention on maintaining healthy sleep habits, assessing social support, and avoiding excessive alcohol use.

Only qualified mental health professionals trained and experienced in working with law enforcement, and familiar with officer-involved shootings in particular, should conduct post-shooting psychological debriefings. In selecting such persons, the department should take care to ensure that the mental health professional is knowledgeable about the full range of human reactions to critical incidents and is competent in the treatment of trauma in a law enforcement environment.

Given the choice, some officers would opt out of participation in a post-shooting debriefing with a mental health professional. Some may be unaware of the potential impact of the shooting on their mental health, and some may be hesitant because of the potential stigma of such a meeting. However, in agencies that require such debriefings, many officers find them to be very helpful. As such, best practices suggest that officers be required to participate in one post-shooting debriefing with a qualified mental health professional. At the very least, this meeting will provide the officer with basic education and coping skills to better manage his or her reactions and help minimize worry, anxiety, and negative self-assessment. Any participation beyond the initial session, while encouraged, should be at the officer's discretion.

Because delayed reactions may occur, all officers receiving an initial post-shooting debriefing should receive follow-up contact from the mental health professional, via phone or email, within one month following the incident, and then again at four months. The mental health practitioner should make a third and final contact just prior to the one-year anniversary of the event.

The department should make it clear to the officer that the post-shooting debriefing is a confidential communication between the officer and the mental health professional. The mental health practitioner may not release any information about the content of these sessions without the written consent of the officer. Prior to the debriefing, the mental health provider should include an informed consent process that includes a description of the possible benefits and risks of counseling. In the case of an agency-required debriefing, the informed consent should include a limited release so that the mental health professional can verify the officer's attendance and confirm the officer's readiness for return to work.

Department members and leaders should not question an officer's fitness for duty solely on the basis of involvement in a shooting. Although the department may request a fitness-for-duty evaluation, based on an objective concern about an officer's ability to perform his or her duties, it is separate and distinct from any post-shooting interventions. In the event that the department requires a fitness-for-duty evaluation, the mental health professional who provided the post-shooting intervention should not conduct it.

A shooting incident has the potential to greatly impact not only the involved officer, but also his or her family and significant others. Since these individuals often provide valuable support following an incident, it can be beneficial to involve them in the intervention process. If these individuals are included, mental health professionals should be sensitive to the officer's concerns and preferences for individual or joint sessions.

Group psychological interventions may be beneficial following incidents involving multiple personnel, though all officers should still receive an initial individual session before the group is convened. Qualified mental health providers can jointly facilitate group sessions. Participation should be limited to those involved in the incident, and attendance should be encouraged, but voluntary. Agencies should also consider the impact of deadly force incidents on other involved emergency personnel, including dispatchers and first responders, and provide appropriate interventions if necessary. The department should ensure and respect the confidentiality of these group sessions. Some jurisdictions provide a degree of legal privilege to sanctioned peer support groups. Regardless of local laws, the risk of breach of confidentiality increases in a group setting.

# V. Media Relations

It is vital for every law enforcement agency to have an established media-relations function and a written policy governing the agency's media relations. A written policy is critical to ensuring that all agency employees understand the importance of good media relations and the importance of the role they play. Effective media relations will help build positive community relations, which will translate into public support for the agency. The development and adoption of procedures for addressing an incident with the aid of the media cannot wait until an incident occurs that garners widespread public attention. The history of a law enforcement agency within the community will also determine, to a large degree, how the public reacts to a single incident. Mitigation of negative effects of an officer-involved shooting must begin far in advance of the incident by establishment of positive police-community relations in partnership with sources of community influence such as the media.

The media can be one of an agency's greatest assets, thanks to its ability to reach a large audience; for example, media coverage can increase a department's ability to solve crimes by publicizing information about suspects or other wanted persons. For media outlets, law enforcement agencies are important sources of news, and should expect to come under scrutiny. Positive media relations can help make reporting fairer and more accurate, and the media will be much more willing to help an agency when there is a history of cooperation and a positive relationship between them.

It is advisable for the agency and local news media to work together in advance of an incident, to create an agreement establishing voluntary guidelines for coverage of critical incidents. The agreement can stipulate, for example, that the media will refrain from showing live pictures and broadcasting certain information about these events when it is reasonable to assume that a suspect or suspects may have access to such coverage. In return, law enforcement can offer close access to the scene, taking into account the safety of all parties, and timely dissemination of information.

Multi-agency investigations can be a special challenge during officer-involved shootings. When multiple agencies are involved, they must speak with one voice. If this does not happen, the media will likely report the discrepancy, thus increasing the likelihood of premature release of information or misinformation that could compromise the investigation. Once the lead agency is determined, that agency should choose the spokesperson(s). Selection of a spokesperson does not preclude other agency heads from participating in news conferences or other media opportunities as long as they provide other involved LEAs the same courtesy. Likewise, PIOs from the other agencies can provide support.

## Social media

Social media allows for valuable information to be shared directly and quickly between the police and citizens. During the chaos and terror of the Boston Marathon bombing event, the Boston Police Department used Twitter to provide citizens with accurate and up-to-date information. The citizens referred to the police department's tweets over the media's coverage of the event, as much of the media's information was inaccurate.[9] This shows the level of trust that can be attained between a police department and its community through effective use of social media. In the case of an officer-involved shooting incident, in order for social media to truly assist both the police and the public, it needs to be responsive and current. False or incorrect statements made via social media can be very damaging.[10] Departments should prohibit involved officers from referring to the incident on social media venues such as Facebook and Twitter while the investigation remains active and should ensure all information comes from the official spokesperson for the agency. The department should also remind officers of the potential risks of merely viewing social media, as there is likely to be negative commentary, which may complicate post-incident thoughts and emotions.

## Post-incident media considerations

Given the amount of media attention an officer-involved shooting is likely to garner, it may be sensible to set up a media staging area at the scene. The agency's PIO should remain at the staging area to manage media representatives and provide them with information as available and appropriate. All information should flow from this person. If the agency does not have a PIO, the IC should designate an officer or spokesperson at the scene to fulfill this role. The department should provide basic information regarding the incident to the press as soon as practicable, assuming it will not inhibit or undermine the investigation. Doing so will discourage the press from speculation or uninformed commentary that could be detrimental to the involved officer and the agency alike. However, it is important to exercise caution in releasing any information at the scene prior to a full investigation.

---

9.    Edward F. Davis III, Alejandro A. Alves, and David Alan Sklansky, *Social Media and Police Leadership: Lessons from Boston*, New Perspectives on Policing (Washington, DC: National Institute of Justice, 2014). http://www.hks.harvard.edu/content/download/67536/1242954/version/1/file/SocialMediaandPoliceLeadership-03-14.pdf.

10.   President's Task Force on 21st Century Policing, *Final Report*.

31

# IACP Resources

The IACP Police Psychological Services Section's 2013 *Officer-Involved Shooting Guidelines* are available at http://www.theiacp.org/portals/0/documents/pdfs/Psych-OfficerInvolvedShooting.pdf.

For more in-depth information on the topics discussed in this report, the IACP have compiled the following resources. IACP members may access these via the IACP website: http://www.iacp.org/Model-Policy-List.

*Critical Incident Stress Management: Concepts and Issues Paper*

*Investigation of Employee Misconduct: Concepts and Issues Paper*

*Officer-Involved Shootings, In-Custody Deaths, and Serious Uses of Force: Concepts and Issues Paper*

*Officer-Involved Shootings, In-Custody Deaths, and Serious Uses of Force: Model Policy*

*Police-Media Relations: Concepts and Issues Paper*

*Post-Shooting Personnel Support: Concepts and Issues Paper*

*Post-Shooting Personnel Support: Model Policy*

# Appendix. Community Resources

Acts of crime disrupt and destabilize life in communities daily. Just as law enforcement's role is to prevent crime, each community resident also has a responsibility to contribute to community safety. The community's role in crime prevention is enhanced by the development of trust between the community and law enforcement. Getting law enforcement organizations and community organizations to talk with each other is a good starting point, but the day-to-day relationships law enforcement forges in the field are among the most important factors for success. A cohesive community has healthy relationships with law enforcement  based on individual interactions, be that officers talking with people on the streets, residents attending citizen police academies, or both groups coming together to celebrate National Night Out.

Consider the following questions when you think about your own community:

- What programs does the department have that assist officers in understanding the community and vice versa?

- Do officers engage in interactive meetings with community groups and leaders?

- Does each officer consider himself or herself responsible for building police-community trust?

- Are there existing mechanisms for "taking the pulse" of the community on key issues involving police-community relations?

- Does the department periodically schedule formal meetings with community groups and leaders to review the issue of police-community relations?

These questions can help identify areas or concerns that should be addressed in managing police-community relations and partnerships. The management of these partnerships will, to some extent, dictate the degree of success the police department can expect.

Here are some recommendations for being active partners with the community:

- Organize public meetings that include local community organizations, faith groups, businesses, and civic associations and discuss how law enforcement can work together with them. This allows community members to get to know their local officers and learn about problems facing their communities.

- Conduct information sharing sessions.

- Participate in local speaking opportunities—at the local school, at neighborhood association meetings, and allow time for questions and discussion from community members.

- Use social media as a tool to engage and inform the community.

Following are several examples of programs that bring law enforcement and community together.

## Citizens police academies

The role of law enforcement has always been of interest to the average citizen. The television media has capitalized upon this curiosity with shows such as *Cops, CSI,* and *Law and Order*. Numerous police agencies have also benefited from the curiosity that citizens have about the police by forming Citizens Police Academies (CPA) as an expansion of their community-based efforts.

CPA programs open the lines of communication between the community and the police department. To the citizen, it may frequently appear that the police are not doing their job or are exceeding their boundaries. By allowing citizens a firsthand look at what rules, regulations, and policies the police follow, some of these misunderstandings may be alleviated.

The objective of the CPA is not to train individuals to be "reserve police officers" but to produce informed citizens. Citizens and police officers meet each other face-to-face in a neutral, friendly setting, and each becomes a person to the other. In the past, citizens have simply seen a uniform, but with CPAs they develop an understanding about the person behind the badge.

More information about CPAs is available from the National Citizens Police Academy Association, http://ncpaa.us/.

## Citizen advisory groups

Members of the community selected to serve on Citizen Advisory Groups (CAGs) function as liaisons between the police department and community. The group mediates problems or conflicts and serves as an advocate for programs, ideas, and methods to improve the relationship between the police and community.

CAGs enhance communication between residents and the police department and offer residents a chance to talk with members of their local police departments. Community members are kept informed about significant safety matters in their neighborhoods and are encouraged to bring any issues or questions to the attention of local police commanders.

CAGs may do any of the following:

- Provide feedback regarding community interests and opinions

- Aid the staff on tasks and requests

- Serve as a positive representative for the department in community relations

- Make recommendations on public safety issues and delivery of service and provide feedback on whether the police department is meeting the community's expectations

- Serve as a community advocate for department outreach to all citizens

- Volunteer in a variety of different areas of expertise to assist in meeting the goal of exceeding community expectations

- Participate in specialized training

## VIPS (Volunteers in Police Service)

Volunteers can be an important part of any organization and are proven to be a valuable asset to law enforcement agencies. Volunteers help to increase police responsiveness, service delivery, and information input, and they provide new program opportunities. In addition, volunteers can bring new skills and expertise to the job and prompt new enthusiasm. Police departments use qualified volunteers for specified tasks and duties in order to create efficiencies for the department and improve services to the community. Volunteers are intended to supplement and support, rather than supplant, sworn officers and civilian personnel.

Police volunteers perform services for the department without promise, expectation, or receipt of compensation for services rendered. This may include unpaid chaplains, unpaid reserve officers, interns, and persons providing administrative support.

The Volunteers in Public Service program (VIPS) provides support to agencies and citizen interested in starting or maintaining police volunteer programs. It is jointly managed by the IACP and the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice. More information can be found at the IACP website, www.theiacp.org/VIPS.

## Business roundtables/coffee clubs

Coffee clubs are a great way for the citizens of the community to get to know local officers. Usually set in a casual environment, often with beverages and snacks provided, these gatherings encourage citizens to ask questions and become familiar with the officers who serve their community. Events can be held either monthly or weekly and are sponsored or hosted by local businesses.

## Neighborhood Watch

Neighborhood Watch is one of the oldest and best-known crime prevention concepts in history. While the modern day concept of neighborhood watch came into prominence in the late 1960s, its roots in America can actually be traced all the way back to the days of colonial settlements when night watchmen patrolled the streets.

Since 1972, the Neighborhood Watch Programs have united law enforcement agencies, private organizations, and individual citizens in a nation-wide effort to reduce crime and improve local communities. Originally devoted to disseminating information on how to secure residential property and make it less vulnerable to break-ins, the program has evolved into promoting the establishment of ongoing local Neighborhood Watch groups where citizens work in conjunction with their law enforcement agencies in an effort to reduce burglaries and other neighborhood crimes. The success of the program has established Neighborhood Watch as the nation's premier crime prevention and community mobilization program. Visible signs of the program are seen throughout America in street signs, window decals, community block parties and service projects.

Through its website, Neighborhood Watch provides training, technical support and resources to local law enforcement agencies and the citizens they serve.

## Faith-based organizations

Law enforcement agencies are now experienced in, or at least open to, working with faith-based orga-nizations (FBO) and other groups to jointly address crime prevention and related issues. FBOs offer an anchoring community force, an extensive understanding of social issues that underlie crime, estab-lished infrastructure for addressing human needs, and a voice of moral and secular authority. Many faith leaders today can rally their congregations to work toward lasting solutions to problems related to crime and violence.

## About the International Association of Chiefs of Police

The International Association of Chiefs of Police (IACP) is a nonprofit membership organization that supports law enforcement leaders around the world. With more than 25,000 members in over 120 countries, the IACP serves chief executives and law enforcement professionals of all ranks at the state, local, tribal, municipal, and federal level, as well as non-sworn leaders across the criminal justice system. As the largest and longest-standing law enforcement leadership association, IACP continues to launch historically acclaimed programs, conduct ground breaking research, and speak out on law enforcement issues.

Today, the IACP continues to be recognized as a leader in law enforcement program development through the efforts of its divisions, sections, committees, and professional staff. The IACP supports law enforcement through advocacy, training, research, and professional services, and enhances communication and collaboration through various specialized forums including the IACP Annual Conference and Exposition. By engaging in strategic partnerships across the public safety spectrum, the IACP provides members with the tools and resources they need to educate the public on the role of law enforcement and help build sustainable community relationships.

Learn more at www.theiacp.org.

# About the COPS Office

The **Office of Community Oriented Policing Services (COPS Office)** is the component of the U.S. Department of Justice responsible for advancing the practice of community policing by the nation's state, local, territorial, and tribal law enforcement agencies through information and grant resources.

Community policing begins with a commitment to building trust and mutual respect between police and communities. It supports public safety by encouraging all stakeholders to work together to address our nation's crime challenges. When police and communities collaborate, they more effectively address underlying issues, change negative behavioral patterns, and allocate resources.

Rather than simply responding to crime, community policing focuses on preventing it through strategic problem solving approaches based on collaboration. The COPS Office awards grants to hire community police and support the development and testing of innovative policing strategies. COPS Office funding also provides training and technical assistance to community members and local government leaders, as well as all levels of law enforcement.

Another source of COPS Office assistance is the Collaborative Reform Initiative for Technical Assistance (CRI-TA). Developed to advance community policing and ensure constitutional practices, CRI-TA is an independent, objective process for organizational transformation. It provides recommendations based on expert analysis of policies, practices, traini  xng, tactics, and accountability methods related to issues of concern.

Since 1994, the COPS Office has invested more than $14 billion to add community policing officers to the nation's streets, enhance crime fighting technology, support crime prevention initiatives, and provide training and technical assistance to help advance community policing.

- To date, the COPS Office has funded the hiring of approximately 127,000 additional officers by more than 13,000 of the nation's 18,000 law enforcement agencies in both small and large jurisdictions.

- Nearly 700,000 law enforcement personnel, community members, and government leaders have been trained through COPS Office-funded training organizations.

- To date, the COPS Office has distributed more than eight million topic-specific publications, training curricula, white papers, and resource CDs.

- The COPS Office also sponsors conferences, roundtables, and other forums focused on issues critical to law enforcement.

The COPS Office information resources, covering a wide range of community policing topics—from school and campus safety to gang violence—can be downloaded at www.cops.usdoj.gov. This website is also the grant application portal, providing access to online application forms.

As the authors of this guide note, an Officer-Involved Shooting (OIS) is probably the most traumatic event a police officer will ever experience in his or her career. If the reaction to such an event is not handled properly, it can not only take an emotional toll on the individuals involved, but spark anger in the community and create negative fallout for the rest of the department.

To provide practical guidance for handling the wide range of challenges that follow an OIS, the International Association of Chiefs of Police (IACP) and the COPS Office collaborated to produce this detailed report. A must-read for all law enforcement agencies, it provides incident command and investigation procedures, guidance for selecting mental health professionals for post-shooting debriefings, suggestions for familiarizing officers with their rights, recommendations for working with the media, and expert advice in many other areas.





U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street NE
Washington, DC 20530

To obtain details on COPS Office programs,
call the COPS Office Response Center at 800-421-6770.

Visit the COPS Office online at **www.cops.usdoj.gov**.

International Association of Chiefs of Police

44 Canal Center Plaza
Suite 200
Alexandria, VA 22314

**http://www.iacp.org/**

e051602754
Published 2016