IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


MISTY L. CASTILLO, as Personal )No. 6:22-CV-00684-MK

Representative of the ESTATE OF)

ARCADIO CASTILLO, III,          )

                Plaintiff,       )

     v.                          )

NATHAN BUSH and CITY OF SALEM, )

a municipal corporation,         )

                Defendants.      )


DEPOSITION OF NATHAN BUSH

May 29, 2023

Monday

10:00 A.M.


THE VIDEO-RECORDED DEPOSITION OF NATHAN BUSH was taken at Montoya Law, LLC, 350 Mission Street SE, Suite 202, Salem, Oregon, before Sara Fahey Wilson, CSR/CCR Certified Shorthand Reporter in and for the State of Oregon and Washington.

APPEARANCES

For the Plaintiff:

Mr. James M. Healy

GATTI LAW FIRM

235 Front Street SE

Salem, Oregon 97302

503-363-3443

jhealy@gattilaw.com

Mr. David D. Park

ELLIOTT & PARK, PC

324 SW Abernethy Street

Portland, Oregon 97239

503-227-1690

dave@elliott-park.com

For the Defendants:

Mr. Kenneth Scott Montoya

MONTOYA LAW, LLC

350 Mission Street SE, Suite 202

Salem, Oregon 97302

503-580-3389

kenny@montoyalaw.org

APPEARANCES (Continued)


Video-Recorded By:

    David McGinnis


Reported by:

    Sara Fahey Wilson, CSR, CCR

Nathan Bush

INDEX

WITNESS.......................................PAGE

NATHAN BUSH

    BY MR. PARK                                          6


EXHIBITS......................................PAGE

Exhibit 1        Officer-Involved Shooting       10
                 Statement

Exhibit 2        Google Image                    13

Exhibit 3        Map                             13

Exhibit 4A       Photograph                      18

Exhibit 4B       Photograph                      18

Exhibit 4C       Photograph                      18

Exhibit 4D       Photograph                      18

Exhibit 4E       Photograph                      18

Exhibit 4F       Photograph                      18

Exhibit 5        Salem Police Department         32
                 Response Report

Exhibit 6        Response Transaction Report     32

Exhibit 7        Directive 7.15                 109

Exhibit 8        City of Salem Police Officer   115
                 Performance Appraisal

Exhibit 24       Map of Property                 50

THE VIDEOGRAPHER:  Good morning. Today's date is May 29th, 2023.  The time is 10:00 a.m.  Our location is 350 Mission Street, Salem, Oregon.

This is the time and place set for the video deposition of Nathan Bush in the matter of Misty Castillo versus Nathan Bush, Civil Action Number 6:22-CV-00684-MK, in the United States District Court for the District of Oregon.

Ask if the court reporter would please swear in the witness.

NATHAN BUSH,

having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE VIDEOGRAPHER:  Counsel may proceed.

EXAMINATION

BY MR. PARK:

    Q.    Thank you.

Officer Bush, would you please begin by stating your complete name for us.

Nathan Bush

████  ████  ███████

████████  █████████

██████  ███████████

████████

Q.    Officer Bush, you've had an opportunity to read through the statement that's been marked Exhibit 1 in this case?

A.    Yes.

Q.    Okay.

Is that the statement that you gave to the Oregon State Police detectives that were investigating the shooting of Arcadio Castillo, III?

A.    Yes.

Q.    Okay.

When you gave that statement were you giving truthful responses?

A.    Yes.

Q.    Okay.

And were you trying to give the most complete responses that you could at the time?

A.    Yes.

Q.    Okay.

The interview was dated July 14th, which is five days after the event that led to Castillo, III's, death.  Correct?

Nathan Bush

11

A.      Yes.

Q.      Okay.

So were you rested for this interview?

A.      Yes.

Q.      Okay.

Had plenty of sleep?

A.      Yes.

Q.      You had an attorney present for it?

A.      Yes.

█████   █████   ████████████████████████████████

█████   ███████████

█████   █████   ████

█████   █████   ██████

You had an opportunity to meet with an attorney before giving the interview.  Is that correct?

A.      Yes.

█████   █████   ██████████████████████████████

█████   ██████████████████████████████████████████

█████   ███████████████████████████████

█████   █████   ████████████████████████████

█████   █████   █████

Does the statement -- the transcript of the statement that you gave accurately reflect what you told the detectives on July 14th, 2021?

Nathan Bush

12

A.    To the best of my recollection, yes.

Q.    Okay.

After reading that this morning, do you have any changes or additions that you wish to make to that statement?

A.    No.

Q.    Okay.

After reading that statement, are there any additional facts about the event that came to your mind that you didn't share with the detectives at that time?

A.    No, not that I recall.

Nathan Bush

16



Would you agree with me that your memory on July 14th, 2021, of the events that occurred is probably better -- it was probably better than your memory of those events is today?

A.    Yes.

Q.    I'm handing you some photos that were taken of you on the day -- or the morning after,

Nathan Bush

38

██  ██  ████████████████████████████████

██  ██  ████  ████████

So you don't actually hear the statement that "Reporting party reports that her adult son is mentally ill and assaulting family members" -- you don't hear that; you see that on your mobile data screen?

A.    I don't recall hearing it.

Q.    Okay.

Do you recall hearing any information about this call from -- over your radio before you get out of your patrol car on June Avenue and approach the Castillo home?

A.    I don't recall that, no.

██  ██  ████

██    ████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████

██  ██  ████

██  ██  ████

██    ████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████  ██████████████

And then before you arrived at the Castillo residence on June Avenue you see the name of the subject, Arcadio Castillo, and his date of birth, is intoxicated and under the influence of marijuana and is armed with a knife?  Do you see that on your mobile data screen?

A.    Yes.

Q.    Okay.

Is there any information that comes to you over the radio or from any other source between those two entries appearing on your mobile data screen?

A.    I don't recall.

Nathan Bush

41

So back to Exhibit 5, before you arrive would you have seen (as read):  Caller is outside.  Subject is inside.  Caller's husband is inside the house?

Would you have seen that before you get out of your car?

A.    Yes.

Q.    Okay.

And then would you have seen (as read):  Could hear female saying "get away from me"?  Male voice in the background.  Female screaming.  And line disconnected?

A.    Yes.

Q.    Okay.

Is that basically the sum total of the information you had before you got out of your car?

A.    Yes.

Q.    Okay.

Before you got out of your car did you hear -- did you audibly hear on your own any screaming?

A.    No.

Nathan Bush

44



At the moment that you get out of your car do you know that Officer Gould has been dispatched to respond to the scene also?

A.    I knew that he was dispatched on the call, yes.

Nathan Bush

45

And is the same true of Officer Skelton? Did you know that he had also been dispatched on the call?

A.    Yes.

Q.    Okay.

So when you get out of car you know other officers are on their way?

A.    Yes.

Did you -- when you get out of your car, do you have any sense of how close to arrival on scene either Officer Gould or Officer Skelton were?

A.    Yes.

Q.    Okay.

What was your sense at the time?

A.    Within one or two minutes.

Nathan Bush

51



What's the next -- after you see her in the driveway, what's the next thing you remember?

A.   I remember Arcadio Castillo standing on the porch in front of the house.

Nathan Bush

Can you tell what he's wearing?

A.    I can tell you he's wearing shorts and no shirt.

Q.    Okay.

And when you see him the first time does he see you?

A.    I believe so.

Q.    Okay.

The moment you see him are any words exchanged?

A.    Yes.

Q.    Okay.

Tell me what happens there.

A.    I slow down, I looked over to him and I just said, "Hey, what's going on?"

Q.    Okay.

And did he look back at you?

A.    Yes.

Q.    Okay.

So there was a recognition that you were there?

A.    It appeared so, yes.

Q.    Okay.

What happens next?

Nathan Bush

53

A.    He turned around and began walking towards the front door.

Q.    Okay.

In this exchange did you see anything in Castillo's hands?

A.    I couldn't -- I didn't see his hands at all.



When you first saw him you already knew that someone had -- that the caller had reported that he had a knife.  Correct?

A.    Yes.

Q.    So weren't you looking for a knife at that time to see if he had one?

A.    Yes.

Q.    And you didn't see one?

A.    I didn't see one.

Q.    Okay.

Did Arcadio Castillo, III -- he said nothing in response to you.  Correct?

A.    I don't recall him saying any words.

Q.    Okay.

When he turned to go back in the house, did you -- was there anything about his bodily movements that suggested to you that he was angry?

A.    I don't know.

Q.    Okay.

You didn't form the opinion -- as you sit here today, nothing in your mind says, When I saw him I could recognize that he was angry?

A.    No.

Nathan Bush

56



When you observed him turn and walk back into the house was it a rushed motion or was it just a turn and walk back into the house like somebody would?

A.    It's a walk.

Q.    Just a walk?

Nathan Bush

58



As you're talking with Misty Castillo in the driveway of the home where you've indicated on Exhibit 24, can you hear any sound coming from inside the house?

Nathan Bush

59

A.    Not that I recall, no.





When you approached the front of the house, the front door, did you walk right up to it, or did you take your time and, you know -- and see what was in the area surrounding the front door?

A.    I tried to look through the windows, and then I walked right up to the door to listen.

Q.    Okay.

When you tried to look through the

██    ██        ████████████████████████████████

██    ██████████████████████████████████

██    ██    ████    ████████████████████████████████████

██    ████    ██████████████████

██    ████    ████████    ████████████

And when you returned your attention after that moment to the house, tell me what you were thinking at the time.  So what were you planning to do?

A.    I was planning to listen for more knowledge on what needed to be done next.

Q.    Okay.

And you had -- before you got up -- before you climbed the steps, however many there were to the porch, were you able to hear anything outside that was going on inside?

A.    I don't recall at what point I began hearing things inside.

Q.    Okay.

At some point you started to be able to hear some voices.  Correct?

A.    Yes.

Q.    Okay.

Were you ever -- when you heard those voices, was it like a continuous, or were there

pauses, or -- initially you can't understand the words. Correct?

A. Correct.

Q. You can just hear men talking?

A. Correct.

Q. And does it seem like our tone of voice right now, like people talking, or is there yelling going on?

A. It was more talking.

Q. Okay.

No sound of violence?

A. No.

Q. Okay.

No elevated voices or threats?

A. Not to begin with, no.

Q. Okay.

No -- and so you say "not to begin with." Okay.

So at some point is there -- before you're able to open the door and see inside, is there some point that there's an elevated voice or threat?

A. Yes.

Q. Okay.

When is that?

A. It increases as I'm listening through the

Nathan Bush

67

door.

Q.    Okay.

What increases?

A.    The voices.  One of the voices that I hear, it begins to raise and it sounds aggravated.

Q.    Okay.

And can you tell what's being said?

A.    Partially.

Q.    Okay.

What do you hear?

A.    I hear "tell them to leave," or "go away." something to that effect.  I don't remember the exact words.

Q.    Okay.

Is there a response to that?

A.    I can hear another male's voice, but it's calmer and quieter, and I can't make out what he was saying.

Q.    Okay.

So you -- is that the last sound or statement that you're able to hear, "Tell them to leave"?

A.    I believe so.

Q.    Okay.

Do you hear any motion, movement, foot,

feet, pacing, anything like that going on inside?

A.    I don't recall.

Q.    Okay.

      Any pounding?

A.    No.

Q.    How long have you been listening at this point?

A.    I don't know the time frame that I was at the door.

Q.    Matter of seconds, or do you think a minute, or where would you put it in that time frame?

A.    I don't think it was a minute.

Q.    Okay.

      Less than a minute?

A.    Less.

Q.    Okay.

      And as you are approaching -- well, let me back up a step.

      Before you've gotten on the porch have you ever drawn your weapon?

A.    Yes.

Q.    Okay.

      When did you first draw your weapon?

A.    When I exited my car on my initial

approach to the house.

Q.    Okay.

Why did you do that?

A.    Because I thought Misty was being stabbed, potentially.

Q.    Okay.

And when you saw her standing in the driveway did you put your weapon away?

A.    Yes.

Q.    Okay.

So when you approached her initially you didn't have your gun out?

A.    When I approached all the way up to her, no.

Q.    Right.

When you went to talk to her --

A.    No, I did not.

Q.    -- you had put your gun away?

A.    Yes.

Q.    Okay.

And then do you take your gun out again?

A.    Yes.

Q.    When do you do that?

A.    When I approach the door.

Nathan Bush

70



Q.    When you decided to -- when you moved towards the front door after talking with Misty, why did you take your gun out and not your Taser out?

A.    Because it was reported he was armed with a deadly weapon and had another innocent person in the house who was a potential victim.

Q.    But you hadn't see a weapon -- you had seen him but not seen a weapon in his hands. Correct?

A.    Correct.

Q.    Okay.

At this point in time do you know that -- well, let me withdraw that question.

Would you agree with me that once you're -- you have your firearm out it's highly unlikely that you would be able to transition to an

Nathan Bush

71

alternative weapon?

A.    No.

Q.    Okay.

If something sudden occurs or surprises you, it takes time to transition from your handgun to a Taser, doesn't it?

A.    Yes.

Q.    It takes time to transition to virtually any other option, doesn't it?

A.    Yes.

Q.    Right?

So by taking your gun out, you've limited your options, haven't you?

MR. MONTOYA:  Object to the form of the question.

BY MR. PARK:

Q.    Would you agree with that?

A.    Yes.

Nathan Bush

72



So a Taser is an option for a person armed with an edged weapon, isn't it?

A.    An option, yes.

Nathan Bush

74



Q.    Did you knock on the front door?

A.    No.

Q.    Did you call out to anyone inside the house?

A.    At what point?

Q.    While you were at the front door.

A.    I don't recall calling out to anybody, no.

Q.    Why didn't you do that?  Why didn't you say, "Mr. Castillo, can you come outside?"

A.    I was concerned that this could turn into a hostage situation, and I was -- I was waiting for my backup to arrive.  I knew they were very close.

Q.    Okay.

So -- but you didn't wait for backup to arrive.  Correct?

A.    No.

And when you heard the audible click, what did you do with -- did you just immediately push the door open?

A.    Yes.

Q.    Okay.

And when you did that, did you say anything?

A.    I said "Salem Police."

Nathan Bush

77



Q.    Do you recall saying, "Salem Police," or you're just assuming that you did that because it's your habit?

A.    No.  I recall saying it.

Q.    Do you recall having specific thoughts before you opened the door about calling to the people inside and saying, "Salem Police, Mr. Castillo.  Can you come out?"

Do you recall having a conversation with yourself about whether you should do that or whether

Nathan Bush

78

you should just try and enter?

    A.    I don't recall my internal dialogue at that point.

    Q.    Okay.

        That would be a thought process that would be appropriate for you to have before entering the house.  Correct?

    A.    Yes.

Nathan Bush

79



When the door opens, what can you see on the inside?

A.   As it opens, the first thing I saw was Arcadio Castillo, Junior, off to my left, and then I opened farther and I saw Castillo, III, in front of me.

Nathan Bush

81

████  ██  ████████████████████████████████

██  ██████████████████████████████████████

██  █████████████████████████████████  ████

██  ██  ████████████████████████████

██  ██  ██████

And so at the moment you know the door is unlocked why not wait for the cover officers if they are seconds away?

A.    Because it's my perception they knew I was there and I wanted to get eyes on the problem before it got worse.

Q.    Well, did you consider the fact that you might make it worse by entering unannounced without cover?

A.    Potentially, yes.

Q.    Before -- well, when you were talking with Misty Castillo -- so you get up to the driveway. You're talking with Misty Castillo -- do you know at that point in time that Arcadio Castillo, Junior [sic], has -- in addition to being intoxicated -- on some substances marijuana, and alcohol, has emotional problems, mental health issues?  Has that come across to you?

A.    I'm sorry, you said Junior or the third.

Q.    The third.  I'm sorry.

A.    All I knew that he had -- it was reported that he had mental illness.

Q.    It was reported to you?  That thought was in your head, he's -- EDP is what they write on here, but I think that stands for mental health issues, emotionally disturbed person.

A.    Yes.

Q.    So that was a fact in your awareness?

A.    Yes.

Q.    Okay.

Did you have training as of that time that when you're approaching an emotionally disturbed person that there should be a cover officer present? Is that part of your training?

A.    Depends on the situation.  Potentially, yes.

Q.    Well, when you have the opportunity to wait for cover, you're trained to wait for cover?

A.    Yes.

Nathan Bush



So you're -- as that door swings open you see Arcadio, III.  Describe what you see.

A.    He was standing in front of me directly at the other end, essentially, of the couch, and he was standing facing me and he was holding a large knife in his right hand.

Q.    Okay.

Nathan Bush

86

So facing you, that means -- are shoulders square to you?

A.   Yes.

Q.   Okay.

And the large knife in his right hand? Okay.  Did he have anything in his left hand?

A.   No.

Q.   Okay.

Can you tell me anything about the knife in his right hand other than it was large?  Was there a color to it?  Is it a -- is there a handle? Is there anything notable about it that sticks out other than its size?

A.   I don't recall the color of it, no.

Q.   So in the moment that you see Arcadio standing there shoulders square to you facing the front door, what happens next?

A.   I point my gun at him.  Confront him. Tell him to, "Drop the knife."

Q.   Okay.

And do you say, Could you put the knife down, please?  Or do you use your command voice and say, "Drop the knife.  Drop the knife"?

A.   I use command voice.

Q.   Okay.

Nathan Bush

87

And the knife in his right hand, is it pointed down at the ground?  Is it up at his waist?  Is it in front of him?  What's he doing with it?

A.    At initial contact it was down by his side.

Q.    So just holding it?

A.    Yes.

Q.    Okay.

It wasn't being waved around?  He was just still?  He was facing the door?

A.    At that time, yes.

Q.    Okay.

Would you agree with me that if Arcadio, III, was just holding the knife and not doing anything with it, just standing there, you'd have no right to shoot him?

A.    Yes.

Q.    Okay.

And would you agree with me that after you command him to drop the knife if he just continued to stay there with it at his side you would still have no right to shoot him?

A.    Yes.

Q.    Okay.

So you would agree you can't shoot him

Nathan Bush

88

just because he disobeys your order not to "drop the knife"?

A.     Yes.

Q.     Other than "drop the knife," did you make any other statements to Arcadio, III?

A.     No.

Q.     After the door opens, is it correct that Arcadio, III, never says anything to you?

A.     Not that I recall.

Q.     Okay.

Is it -- would you agree that when you open the door Arcadio, III, is not threatening his father?

A.     Not at that exact moment, no.

Q.   What caused you to point your gun at Arcadio, III, was the fact that he was holding a knife.  Correct?

A.   And I had probable cause to arrest him for a felony.

Q.   So you would have pointed your gun at him anyway even if he didn't have a knife in his hand?

A.   No.

Q.   Okay.

So what caused you to point your gun at him is the fact that you saw the knife in his hand?

A.   Yes.

MR. MONTOYA:  Objection.  It's been asked and answered.

BY MR. PARK:

Q.   So can you describe the actions of Arcadio, III, after the door opened that caused you to shoot him?

A.   Yes.

Q.   Okay.  Please describe those for me.

A.   Initially when I told him to "drop the knife," he began walking towards me, took approximately two steps, a couple feet towards me, and then stopped, turned around, and started walking away.  I stopped talking to him hoping he would walk

back into the house, because my goal at that point was to get his dad out of the house.  I took one step through the doorway, and I took my left hand off my pistol.  I reached out towards Arcadio, Junior, to try to tell him to come to me so I could pull him out of the house so he could get away from the problem, and then at that point Arcadio, III, spun to his left, his weight shifted forward, and he charged at me with the knife raised near his right shoulder.

Q.    So you stepped inside the house?

A.    I stepped into the threshold.

Q.    Okay.

So there's like a linoleum little square entrance?

A.    I don't recall what's on the floor.

Q.    When you stepped through the threshold, that's -- you'd come up a step from the porch. Correct?

A.    A small step, yes.

Q.    Right.  Like a half step?

A.    I believe so.

Q.    Right.

So did you get both feet inside the house?

A.    No.

Nathan Bush

91

Q.    Okay.

So when you say you stepped in, what are you describing your motion to be?

A.    I put my left foot up into the door threshold so I can lean forward and signal to Arcadio, Junior, to come towards me.

And so I understand what you mean by that, when you say "spun to his left," he has already turned to walk away from you.  Correct?

A.    Yes.

Q.    And so when you say spin to his left, he

continues to turn to bring that left arm around to face you again. Is that what you're describing? I want to understand what you mean by "spun to his left"?

A. He was walking away from me. He turned to his -- towards his left with the knife in his right hand until he did another 180 to face me before he ran at me.

And so when he spins to his left and turns -- does the 180 to face you -- is he squared up to you again, to the front door?

A. He's running directly towards me.

Q. Right. He -- he spun and he has the knife where?

A. He has the knife up and pointed towards me.

Q. Like this (indicating)?

A. Up, like, in a stabbing motion. Like, his thumb side, the knife is up and he's leaning forward and he runs straight towards me.

Q. Okay.

So that arm is up out to his right?

A. It's out to his right, yes.

Nathan Bush

93

Q.    Okay.

It's not over his head like this (indicating)?

A.    No.

Q.    It's out this way (indicating)?

A.    Yes.

Q.    Okay.

Q.    Maybe you could stand up and just demonstrate that so we get that body position.

A.    When he turned to his left, his arm came up like this (indicating), and his weight was forward and he was running straight towards me like this.

BY MR. PARK:

Q.    Okay.  Thank you.

Nathan Bush

94

And is it -- is it at the point of that spin that you fire your first shot?

A.    No.

Q.    Okay.

When do you fire your first shot?

A.    Shortly after he starts running towards me.

Q.    So as his weight shifts forward, is that when you're firing?

A.    Yes.

Q.    Okay.

You already have your gun up and pointed at him after he's turned around and walked away? Correct?

A.    It wasn't pointed at him the whole time.

Q.    Okay.

So describe the -- what you do with your firearm in this process where he turns and walks away from you.  What happens?

A.    I kept in one -- I was holding it with one hand.  As I lean forward to signal Arcadio, Junior, and it was down at the low ready here (indicating), as he spun and began running towards me, I step back and fire with one hand as he closed the distance on me.

Q.    Okay.

And when you step back, does that put you back on the porch -- all of you back on the porch?

A.    Yes.

Q.    Okay.

And did you take one step back as you fired, or did you continue to move backwards as you fire?

A.    I don't recall how many steps I took at that point backwards.

Q.    Okay.

When you stopped firing where were you?

A.    On the patio -- on the porch directly in front of the door.

Q.    Still on the porch?  You hadn't gotten off the porch?

A.    No.

Nathan Bush

97



What do you remember Arcadio Castillo, III's, reaction to have been -- to being shot?  How did he physically move or react to that event?

A.   He collapsed, and then he stood straight back up and just stared at me for a moment, and then he leaned forward, started bleeding heavily.  He was given a command to get on the ground, and then he collapsed.

Q.   Okay.

A.   He stumbled and collapsed.

Q.   So the first collapse, did he go all the way down?

A.   I don't know.

Q.   Okay.

Nathan Bush

Do you remember him grabbing onto the edge of the door, or to the couch, or to some piece of furniture, or anything?

A.    I don't.

████   ███   █████

████████████████████████████████████

███████████████████████████████████████████████

████   ██   █████████████

████   ██   ███████████████████████████

██████████████████████████

██   ██   ████████████████████████████

Q.    Did -- was there any audible response from Arcadio, Junior, when the shooting occurred?

A.    Afterwards, yes.

Q.    What was that?

A.    After Arcadio, III, was incapacitated and down, I began focusing moving towards him and I heard Arcadio, Junior, say something along the lines of, "What did you do?  What did you do?"

Q.    Did you respond to that?

A.    I responded to his actions, not his words.

Q.    Okay.

And what were his actions at that time?

A.    He began moving towards me slowly.

Q.    Okay.

Nathan Bush

And how did you respond?

A.   At that time I was trying to render aid to Arcadio, III, and I stood up and I pointed at him and I yelled for him to stay back.

Q.   Okay.

At that point in time had any other officers arrived yet?

A.   At that moment, no.

Q.   Okay.

When other officers arrived were you still addressing Arcadio, Junior?

A.   Yes.

Q.   Okay.

So at the time other officers have arrived have you been able to render any aid to Arcadio, III?

A.   Prior to any officers entering the house?

Q.   Correct.

A.   No.

Q.   Okay.

So when other officers enter the house for the first time you're addressing Junior.  Is that correct?

A.   Yes.

Q.   Okay.

Nathan Bush

100

Q.    When you shoot Arcadio, III, do you see what happens to the knife?

A.    No.



Nathan Bush

103



Are there any of Arcadio Castillo, III's, actions prior to the shooting that we haven't discussed yet?

A.   I don't believe so.

Q.   Okay.

Let's change topics for a second.

Nathan Bush



Q.    Officer Bush, before we leave the shooting circumstance, when -- after the shots are fired and Arcadio, III, initially goes down and then you say he stands right back up again, does he still have the knife then?

A.    I didn't know at the time, no.

Q.    No?  Or you don't know?

A.    Not to my -- I don't know.

Q.    After the shooting did any of your sergeants sit down with you and discuss your tactical decision-making that led to the shooting?

A.    No.

Q.    How about any of your lieutenants?

A.    Directly after the shooting?

Q.    At any time since the shooting have any of your sergeants sat down and gone through with you your tactical decision-making, your thought process behind opening the door, your thought process behind your approach, your thought -- you know, debrief you on what your actions were that day?

A.    There were debriefs.  I don't recall exactly those conversations.

Q.    Okay.

████ ████████████████████████████████████████████████

████ ██████████    ████████████████████████████████████████

I'm talking about sitting down with a defensive tactics training sergeant, or your supervising sergeant at the time, or a lieutenant, or the chief, and discuss -- having them discuss with you what was your thinking when you decided to open the door; what was your thinking about whether you needed a warrant or not to open that door; what was your thinking.

So anyone ever do that with you?

A.    I don't recall any in depth conversations --

Q.    With anyone about that?

A.    Not in depth to that level, no.

Q.    Okay.

So did anyone have conversations with you about your actions and Arcadio, III's, actions?

A.    There were conversations about the incident, yes.

Q.    Okay.

MR. MONTOYA:   Other than me.

BY MR. PARK:

Q.    Yeah.  I'm not asking for your lawyer. I'm asking about your supervisors at the Salem

Nathan Bush

107



Did any of your supervisors, command staff at Salem PD, discuss with you your decision to approach the door -- the front door with your firearm drawn rather than a Taser?

A.    I don't recall those conversations, no.

Q.    Okay.

Did Sergeant Juan (phonetic) discuss -- have any discussion with you about the shooting?

A.    I don't -- I don't remember or recall.

Q.    Okay.

Did Sergeant Smith have any discussions with you about the shooting?

A.    I don't have recollection.

Q.    Did Sergeant Johnson have any discussions with you about the shooting?

A.    I don't have recollection.

Nathan Bush

108

█    █        █████
               ██████████████████
                 ██████████████
                  ████████████████
                 ████████    ██████████
                 ███████    ██████    ████████
                 ████████    █████████████████
                 ███████    ████████████
█████████

Q.    Officer Bush, are you familiar with -- and this is called a directive.  It's the Salem Police Department policy on contact with emotionally disturbed persons.  Correct?

A.    I'm familiar with it, yes.

Q.    Were you trained on this prior to your response to the Arcadio Castillo, III, call?

A.    Yes.

Q.    Okay.

How frequently does Salem PD train on interaction with emotionally disturbed persons?

A.    At least one time a year, and then there's always upkeep, random trainings that we have.

Q.    Okay.

Did you -- when you were approaching the door and before the door was opened, you've talked

Nathan Bush

109

to Misty, you know it's an emotionally disturbed person call, are you thinking to yourself as you are approaching the door, What opportunities for de-escalation in this event are available to me?

A.    I was trying to think through all the contingencies, yes.

Q.    Okay.

Did you make any efforts at de-escalation before opening the door?

A.    No.

Q.    When the door opened and you saw Mr. Castillo, III, holding the knife, did you attempt any de-escalation technique?

A.    At that moment, no.

Nathan Bush

112



Did you provide information or statements to any sergeant or command level personnel at the Salem Police Department who was performing an internal administrative review of your shooting?

A.    I don't think so, no.

Q.    Okay.

Other than giving your statement to the

113

Oregon State Police detectives back in July of 2021, have you ever given any other statements to anyone within the Salem Police Department of a similar nature about the shooting?

A.    Given any statements?

Q.    Right.  Sat down and had somebody -- not a lawyer -- but a command staff level person ask you questions like I'm asking you questions about what happened and what you did?

A.    No.