*Trevor Womack*

*In re: Estate of Arcadio Castillo, III v Bush, et al.*

*July 24, 2023*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


MISTY L. CASTILLO, as Personal)

Representative of the ESTATE  )

OF ARCADIO CASTILLO, III,     )

          Plaintiff,          )

     v.                       ) No. 6:22-CV-00684-MK

NATHAN BUSH and CITY OF SALEM,)

a municipal corporation,      )

          Defendants.         )


DEPOSITION OF TREVOR WOMACK

July 24, 2023

Monday

11:51 A.M.


THE VIDEO-RECORDED DEPOSITION OF TREVOR WOMACK was taken at the Salem Police Station, 333 Division Street NE, Salem, Oregon, before Christine Oljace, CSR, RPR, CRC, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For the Plaintiff:

ELLIOTT & PARK PC

324 SW Abernethy Street

Portland, Oregon 97239

503/227-1690

BY:  MR. DAVID D. PARK

dave@elliott-park.com

-- and --

THE GATTI LAW FIRM

235 Front Street SE, Suite 200

Salem, Oregon 97302

503/363-3443

BY:  MR. JAMES M. HEALY

jhealy@gattilaw.com


For the Defendant:

CITY OF SALEM

555 Liberty Street SE, Suite 205

Salem, Oregon 97301

503/588-6003

BY:  MR. SEBASTIAN TAPIA

stapia@cityofsalem.net


Video-recorded by David McGinnis

INDEX

WITNESS....................................................PAGE

TREVOR WOMACK

        BY MR. PARK                                        5

EXHIBITS...................................................PAGE

Exhibit 23    Operational Assessment                       51

Exhibit 50    Memorandum 1/7/2022;                         45

                COS 000935 - 000937

THE VIDEOGRAPHER:  Good morning. Today's date is July 24th, 2023.  The time is 11:51 a.m.  Our location is 333 Division Street Northeast, Salem, Oregon.

This is the time and place set for the video deposition of Chief Trevor Womack in the matter of Misty Castillo versus Nathan Bush in United States District Court for the District of Oregon, Eugene Division, Case Number 6:22-CV-00684-MK.

I ask if counsel present would please identify yourself.

MR. PARK:  David Park appearing on behalf of the plaintiff.

MR. HEALY:  James Healy on behalf of the plaintiff as well.

MR. TAPIA:  Sebastian Tapia on behalf of the defendants.

TREVOR WOMACK, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

///

///

Trevor Womack

25



Having become chief, do you regard yourself or are you the chief policy maker now for the City of Portland -- I mean the City of Salem Police Department?

A.    For Salem.

Q.    Yeah.

Trevol Womack

26

A.    I do think that's the role of the chief of police is that I am the policy maker for the organization.  Of course, I rely heavily upon staff to bring forward recommendations and help me through with that, but ultimately it's my signature on the policy.

Q.    The buck stops with you?

A.    That's right.

Q.    Do you agree that accountability and transparency are essential tools for building community trust in policing?

A.    I absolutely believe that, but when I talk about transparency, I have to preface it because there are so many restrictions regarding transparency.  So the general public believes that I, as the chief of police, can talk about anything and I have awareness of everything that goes on when in fact there is multiple restrictions to what we can share and can provide to our community, so transparency within the confines of the legal restrictions and other restrictions that exist.

So, yes, transparency is important balanced against -- there is other interests too. Privacy interests, active criminal investigations, things like that are sometimes counter to this idea

of transparency in some sorts --

Q.    Uh-huh.

A.    -- so I have to make sure I talk about it in that way.

Q.    Sure.  And accountability is essential for building community trust?

A.    Absolutely.

Q.    Protecting life is the highest priority for a police department.  Would you agree with that?

A.    Yes.

Q.    Do you agree with the statement that the taking of life by a police officer should be subjected to the strictest scrutiny?

A.    Yes.

Q.    Do you agree that an agency conducting an administrative review of a deadly force event should approach that task with careful attention to detail?

A.    Yes.

Q.    Do you agree that the agency should thoroughly review all available evidence surrounding an officer's use of deadly force?

A.    Yes.

Q.    Okay.  Do you agree that as part of that review, the agency should assess whether the physical evidence supports or contradicts the

shooting officer's explanation for his or her use of deadly force?

A.    Yes.  And the unique -- another unique situation here in Oregon was the SP 111 protocols that exist.  So in California within the county where I worked, it was a different process than we have here of course.

I believe there is pros and cons to both, but I believe it's stronger here in Oregon because of the requirement that an outside agency conduct the investigation.  So that evidence that is collected and all the information that we are going to use initially is done by, in this case, OSP.  Typically, that is the agency that gets involved in handling our officer-involved shootings.  I think that is a good thing.

I think it's good that an independent outside law enforcement agency does all the interviews and collects all that evidence up front, and then we, during our administrative process later, can use their investigation to conduct that review.

Q.    Do you agree that if the review of evidence discloses that circumstances known and presented to the shooting officer did not warrant

Trevor Womack

29

the use of deadly force, the agency should acknowledge that fact and take appropriate corrective action?

    A.    Generally?  You are starting to speak in hypothetical terms.

    Q.    Right.

    A.    But I think you are right. Hypothetically, if there was a difference or a conflict that was recognized during administrative review, then that would want to be addressed or called out, yes.

    Q.    Do you -- before becoming chief of police

Trevor Womack

30

for the City of Salem, did you research their deadly force data, use of deadly force data?

A.    I researched as much as I could find on the website and publicly available information.

Q.    Okay.

A.    So I don't recall if I looked at a use of force report or the number of officer-involved shootings, anything like that at the time, because I was just googling things --

Q.    Sure.

A.    -- finding what came up publicly available.

Q.    After you became chief, did you make inquiry about that data?

A.    Yes.  So the annual use of force reports are what captures all of this type of stuff, and so we were taking a fresh look at how we compile that report, put it together.  And I think the best example of that couple years' worth of work is the last use of force report that we just put out.  So it's kind of a refreshed, updated format for the report.  But, again, I can't speak to the way it was handled before I arrived.

Q.    So my version of googling that information resulted in locating approximately 21

Trevor Womack

31

officer-involved shootings in the last 12 years. Does that comport with your knowledge by the City of Salem Police Department?

A.    I really don't know.

Q.    You don't know what the stat is?

A.    For that many of years, no.

Q.    Okay.  Well, do you have a stat, let's say, for the last five years?

A.    My sense was that on average -- even my research when I first was seeking this position, it appeared there was three to five officer-involved shootings a year on average, so I guess that probably lines up with the number you are saying, but I didn't specifically tally all the numbers for the past 12 years.

[REDACTED]

Q.    Chief Womack, have you seen Exhibit 49 before?

A.    Yes.  I signed off on the front page there.

Q.    Right.

And what does -- you wrote "Concur" in your handwriting, and then you signed it and dated it.  Correct?

A.    Correct.

Q.    What does concur mean in the context of this critical incident review board summary of OIS 21-14570?

A.    When I write concur there and sign it, to me that means that the summary information contained therein, the recommendations and the steps moving forward I generally concur with.  So I am agreeing that, yes, this is what we should do or this is a -- was -- I agreed with the review that was conducted within this document.

Q.    This document concludes that Officer



Q.     Would you expect that the physical blood spatter evidence at the scene would have been evaluated before accepting Officer Bush's statement about how the shooting occurred?

A.     I would expect the investigating agency to collect all appropriate evidence, and if that was collected and documented, then that should have been part of the review.

Q.     Should have been evaluated.  Correct?

A.     If it was collected by the investigating agency, then it should have been evaluated.