Jeffrey Barratt

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


MISTY L. CASTILLO, as Personal)

Representative of the ESTATE  )

OF ARCADIO CASTILLO, III,     )

        Plaintiff,            )

    v.                        ) No. 6:22-CV-00684-MK

NATHAN BUSH and CITY OF SALEM,)

a municipal corporation,      )

        Defendants.           )



DEPOSITION OF JEFFREY BARRATT

July 24, 2023

Monday

9:23 A.M.



    THE DEPOSITION OF JEFFREY BARRATT was taken at the Salem Police Station, 333 Division Street NE, Salem, Oregon, before Christine Oljace, CSR, RPR, CRC, Certified Shorthand Reporter in and for the State of Oregon.

Jeffrey Barratt

2

APPEARANCES

For the Plaintiff:

ELLIOTT & PARK PC

324 SW Abernethy Street

Portland, Oregon 97239

503/227-1690

BY:  MR. DAVID D. PARK

dave@elliott-park.com

        -- and --

THE GATTI LAW FIRM

235 Front Street SE, Suite 200

Salem, Oregon 97302

503/363-3443

BY:  MR. JAMES M. HEALY

jhealy@gattilaw.com

For the Defendant:

CITY OF SALEM

555 Liberty Street SE, Suite 205

Salem, Oregon 97301

503/588-6003

BY:  MR. SEBASTIAN TAPIA

stapia@cityofsalem.net

Reported by:    CHRISTINE OLJACE, CSR, RPR, CRC

INDEX


WITNESS........................................PAGE

JEFFREY BARRATT

     BY MR. PARK                                      4




EXHIBITS.......................................PAGE

Exhibit 13    Memorandum 9/17/21;              70
              CITY 000846 - 000853

Exhibit 16    Memorandum 9/22/21;              35
              CITY 000298 - 000303

Exhibit 17    Memorandum 12/17/21;             53
              CITY 000232 - 000237

Exhibit 44    AIM Report; COS 000933 - 000934    23

Exhibit 45    List of People for Officer Bush;   75
              COS 001899

Exhibit 46    Script for meeting;               81
              COS 1906 - 1908

Exhibit 47    Photograph                         85

Exhibit 48    Photograph                         86

Exhibit 49    Memorandum 12/27/2021;             88
              COS 001864 - 001870

Jeffrey Barratt

4

JEFFREY BARRATT,

having been first duly sworn to testify the truth,

the whole truth, and nothing but the truth, was

examined and testified as follows:


EXAMINATION

BY MR. PARK:

Q.   Lieutenant Barratt, my name is Dave Park.
I am -- I represent the plaintiff in Castillo --
Misty Castillo versus Nathan Bush and the City of
Salem.  I am here to talk about your role in the
internal administrative process that reviewed Nathan
Bush's actions in connection with Arcadio Castillo,
III's, death.

A.   Yes, sir.

Q.   Okay.  And both -- and Arcadio Castillo,
III, and Arcadio Castillo, Jr., have similar names,
father and son, so when I say Arcadio in this case,
I am referring to the decedent?

A.   Okay.

Q.   And that will keep the record simple.

A.   That makes sense.

Q.   Have you had your deposition taken before?

A.   One other case, yes.

Q.   Okay.  You are doing well by answering

Jeffrey Barratt

35



MR. PARK:  Okay.  This is previously marked Exhibit 16.  I have made an extra copy for you, Sebastian.  I know you haven't -- I am not sure what you do and don't have on the case so --

MR. TAPIA:  Thanks.

BY MR. PARK:

36

Q.    Lieutenant Barratt, you have seen this document before.  It's addressed to you.  Correct?

A.    Yes, sir.

Q.    What were your expectations for the quality of Lieutenant Diede's review?  That's what I am going to be asking you about here.  Did you have an expectation that he would -- before doing -- completing his professional standards review, that he would obtain all available relevant information concerning this shooting?

A.    Yes.

Q.    Okay.  Did you have an expectation that he would assess the thoroughness of the evidence gathered by the Oregon State Police criminal detectives and crime scene investigators?

A.    I don't know that that is necessarily true.  We don't have any control over the state police in their investigation, and it's been my experience that there is stuff that we might want to have in their investigation that they don't deem to be pertinent so they don't collect it, but we don't have any ability to ask them to change anything.

Q.    Would your expectation be that if he saw something that was missing that he would have preferred or liked to see for his review, that he

Jeffrey Barratt

37

would note that in his report?

A.   It would depend on the importance of that particular piece.  If it was something minor that he would just like to see, maybe not.  If it was something really important that had a real material bearing on it, then probably.

Q.   Okay.  That's fair.

Would you have an expectation that Lieutenant Diede would thoroughly review all the evidence related to the shooting before forming any opinions or conclusions whether Officer Bush complied with Salem's policies and procedures?

A.   Well, I would expect he would review everything that was made available to us.  As far as all evidence, there is no guarantee we got all evidence from the state police.  So I would say I would expect him to review everything that he was given.

Q.   And would you have an expectation that he would accurately summarize the evidence he relied on for his opinions and conclusions?

A.   Yes.  Yes.

Jeffrey Barratt

39



Q.    Okay.  And would you agree with me that Lieutenant Diede concluded that Bush's use of deadly force complied with Salem's use of force policy?

A.    Yes.  That's what he wrote.

Q.    Okay.  And would you agree with me that the factual circumstance that Arcadio charged at Officer Bush with knife being held in a position to stab using an overhead motion with the pointed end directed at Officer Bush must be accurate for Bush's use of force to be within policy?

A.    No.

Q.    Why is that?

A.    Well, if that is the circumstance that existed, then I believe his use of force would have been within policy, but there are other circumstances that could have played out here where his use of force still would have been within policy.  To say that that's the only circumstance within which his use of force would have been within policy I don't believe is accurate.

Q.    Well, that is -- would you agree that that is the factual circumstance relied upon by Lieutenant Diede for his conclusion that Bush's use of deadly force was within policy?

MR. TAPIA:  Objection.  Speculation.

BY MR. PARK:

Q.    You can go ahead and answer.

A.    I am sorry.  Could you repeat that, sir?

Q.    Yeah.  I will try.

A.    I am sorry.  I am not trying to be difficult.

Q.    Yeah.  No.  No.

Would you agree with me that that factual circumstance is the circumstance relied upon by Lieutenant Diede for his conclusion that Nathan Bush's use of deadly force was within policy?

Jeffrey Barratt

41

A.    Okay.  In order to answer that question accurately, I am going to need to read that particular section of his document --

Q.    Please do.

A.    -- so if I can have a second.

Q.    Absolutely.  I realize it's been a year and a half since you last read it.

A.    I have read many, many documents since then.

Yes, sir.  Based on what is on page 6 of Lieutenant Diede's documents, that appears to be the circumstance that he believes existed at the time that justified the use of deadly force.

Jeffrey Barratt

43



Q.   All right.  And what Officer Bush articulated in this case as his justification for using deadly force was that Arcadio was charging him with knife raised.  Correct?

A.   Correct.  That's my understanding, but we were answering your hypothetical question.

Jeffrey Barratt

44



QUESTION:  And so going back to the
hypothetical, if Arcadio is not charging
with knife raised and is not presenting any
objectively articulable threat to another,
would you agree with me that using deadly
force against him would be contrary to Salem
PD's policy?

   A.    Yes.

Jeffrey Barratt

58



Q.    Can you give me your best estimate of the amount of time that you spent reviewing Officer Bush's use of deadly force against Arcadio?

A.    Days.  I mean, I couldn't give you an hour count, but it's a lot of reading and cross-checking and --

Q.    Right.

A.    -- looking into the OSP investigation if there are some things that aren't clear to me --

Q.    Uh-huh.

Jeffrey Barratt

59

     A.    -- that happened, so it's a lengthy process.



Jeffrey Barratt

60

█████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████    ██████████████

███    ██████████

███    █████████████    █████████████████

Do you follow a similar or do you have your own process for collecting the information you need to write your review?

A.    Usually what I will do is I will get all the reviews from the discipline leads, read them through, and I will look at the conclusions that they came to, see if there is any -- anything I can -- that jumps out at me as a real mistake of fact in anybody's summarization of what happened -- pardon me -- and then kind of recreate, start the timeline in my head trying to reconstruct what happened so I have an idea.  Some of them will go through and very briefly summarize what happened, some go into great detail, and obviously some will pick some things as more pertinent than others will.

So I will look at their conclusions.  I will go through and read what happened.  And then a lot of times I will go to the OSP investigation, look at the crime scene, look at the interviews, particularly of the involved officer.  If there is

Jeffrey Barratt

61

questions I have about -- well, if there is substantial witnesses, usually I will read their transcript of their interviews, look at the pictures of the physical evidence, and just make sure that everything lines up correctly.

Unfortunately, I don't get to do this process in a vacuum. I am a patrol lieutenant, so there is always people coming in my office and other things that need to be dealt with, so a lot of times that train of thought is broken and I have to go back. But that is generally what I will do is I will start out reading the discipline leads' evals. And a lot of times the professional standards eval is late. It's one of the last things I usually get. Throw that in there and go through the OSP investigation.

I don't go through every little bit of the OSP investigation because I don't have time, and that is supposed to have been done for me already by the discipline leads. And then I will collate things into the report, and if there is things I am not clear on, again, I will dip back into the OSP investigation and clarify what they say happened.

Jeffrey Barratt

64



Q.    Okay.  Do you have a memory of evaluating whether the paths of the bullets through Arcadio's body supported or refuted Bush's statement that Arcadio was charging him at the time he shot him?

A.    Well, that is a little bit outside my professional purview because I am not a medical examiner.  I do have some informal training in how -- in terminal ballistics of rounds, but in my experience, that is -- that is supposed to be done by the criminal investigators.  And I don't recall seeing anything where there was an evaluation

65

prepared of the trajectory of those rounds through the body and whether or not that supported Officer Bush's version of events, so it's difficult for me looking at pictures of a body in a morgue to tell which round was fired from where.

How the bullets impact the body depends on the position of the body at the time the bullet impacted it. Right? So if I'm -- well, I probably shouldn't go there.

Body positions change upon impact of projectiles to the body, so what the body was doing at the time a particular round hit it is not something I can really determine from looking at photographs sitting in my office.

Q. Would it be important to your determination whether Officer Bush's use of deadly force against Arcadio was within policy to know whether the physical evidence supported or refuted his description of the reason he used deadly force?

A. If I have access to that information, I would like to have it.

Q. Okay. And if you don't have access to the information, would you like an explanation for why not?

A. Well, I know the explanation for why not.

Q.    What is that?

A.    Well, actually, I can look back at previous incidents of this.  The investigations we get from OSP are not always consistent in the information they think is pertinent when they are doing their criminal investigation.  So I might very well want to know exactly what the body was doing when each round struck it.  They may not.  They may just say, okay, well, here is the distance.  There is the knife.  This is the statements.  This all matches up.  They may not take the body and try and determine where each round impacted.

If they don't do it -- yeah, I would like to have that information, but I can't go to them and say I want you to recreate this, because the autopsy has been done.  By the time it gets to me, Mr. Castillo's body is gone.  So it's difficult for me to ask them to recreate that.

That is kind of what happened on that incident I spoke with you about where the number of rounds fired and the weights of the bullet didn't match up.

Jeffrey Barratt

67



Q.    Would it be correct from your responses that no -- that neither yourself nor any other member of the Salem Police Department determined whether or not the bullet paths through Arcadio's body supported or refuted Officer Bush's description of events?

A.    Well, I can't say definitively that nobody did, but I don't believe anybody did, no.

Jeffrey Barratt

69

███  ███  ███████

███  ███  ██████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

███  ███  ████████

Q.    Okay.  The last two paragraphs I think are summarizing your assessment of Officer Bush's use of force within Salem policy.  And you write (as read):

    Officer Bush tried to remove the -- this is

    second-to-the-last paragraph -- remove the

    father from the residence without using

    force on Castillo, III, but had no choice

    when Castillo, III, charged him with the

    knife.

A.    That's correct.  That's what I wrote.

Q.    All right.  And so you would agree that your finding that his use of deadly force was within policy is wholly dependent upon the accuracy of whether or not he was being charged as he stated?

A.    Well, that has a lot to do with it.  I wouldn't say wholly dependent because if the reality was that Arcadio was coming at him in a fast walk as opposed to charging, it would still be a justified use of deadly force.  So there is room in there for Officer Bush's perceptions versus objective

Jeffrey Barratt

70

reality -- right? -- because those perceptions can become skewed in the moment of that adrenaline dump of a deadly force incident.

So I will agree with you that his perception that Arcadio was charging him with a knife was a very large portion of his justification for his use of deadly force.

Jeffrey Barratt

71



Q.    Did any portion of Sergeant Smith's report raise a flag that critical information about the shooting might be absent or unknown?

A.    Well, he references the autopsy report that he didn't have.

Q.    Did you ask him whether he had attempted to obtain the autopsy report?

A.    I don't recall.

Q.    If he could have obtained that report on request, would you have expected him to do so?

A.    Probably.

Jeffrey Barratt

73

Would you agree with me that the paths of bullets through the body cannot be reliably determined by photographs of the gunshot wounds?

A.     Yes.

Jeffrey Barratt

85



Q.    I am going to hand you Exhibit 47.  Do you recognize that photograph?

Jeffrey Barratt

86

A.    It appears to be the front door of the Castillos' house.

Q.    Is there anything notable about the picture?

A.    There is a hole above the dead bolt and there is some splintering of the door itself.

Q.    Does that indicate to you that a bullet passed through that doorjamb?

A.    I don't know.

Q.    Okay.  Had you ever seen any report discussing the significance of this piece of evidence?

A.    No, not that I can recall.

Q.    Did this raise any questions in your mind about how this damage to the doorjamb came to be?

A.    It did.

Q.    Okay.  Did you obtain answers to those questions?

A.    I did not.