Andrew D. Campbell, OSB #022647
Email: andrew@heltzel.com
Heltzel Williams PC
PO Box 1048
Salem, OR 97308
Phone: (503) 585-4422
Fax: (503) 370-4302
        Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **MISTY CASTILLO**, as Personal Representative of the **ESTATE OF ARCADIO CASTILLO, III**, <br><br> Plaintiff, <br><br> v. <br><br> **NATHAN BUSH** and **CITY OF SALEM**, a municipal corporation, <br><br> Defendants. | ) Case No. 6:22-cv-00684-MTK <br> ) <br> ) **DEFENDANTS' RESPONSE TO** <br> ) **PLAINTIFF'S MOTIONS *IN LIMINE*** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Defendants respectfully offer the following responses to Plaintiff's Motions *in Limine* (ECF# 164).

1.      Motion One: Juror Rehabilitation

Defendants oppose this motion because it would restrict the questions that the parties and the Court may pose to potential jurors. The precise contours of Plaintiff's position are not stated, further compromising the motion. If a prospective juror says something that gives counsel or the Court pause about their ability to be fair, put very

1 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

simply, the parties (and the Court) have a right to ask follow up questions. As long as the purpose of the questions are to probe the qualifications of the juror–as opposed to argue the case or harass the juror–the parties must be allowed that freedom. Exploring whether a particular juror might be qualified, even though he or she is candid enough to explain misgivings or some kind of pre-existing presumptions, is at the heart of the jury selection process.

Defendants do not disagree that there are times that jurors make troubling statements but then reverse themselves, perhaps under silent pressure from their peers, as discussed in *State v. Villeda*, 372 Or 108, 117-18, 546 P3d 268, 274-75 (2024) (en banc). But this is precisely why the jury selection process exists in the first place. Plaintiff seeks to sanitize the messy work of pressing jurors on implicit bias and preconceived notions about court proceedings and the parties.

In sum, if the Court concludes that a juror should be bumped for cause, the Court is capable of making appropriate inquiry and arriving at that decision. This motion curtails Defendants' right to press potential jurors–under the watchful eye of the Court, of course–and is therefore improper and should be denied.

2.      Motion Two: Exclude 911 Call and Misty Castillo's Screams

First, Plaintiff has waved her argument that her screams, as heard on her own exhibit, should be excluded. As Plaintiff concedes, her Exhibit 1 contains these screams. Plaintiff filed an Exhibit List along with Exhibit 1weeks ago. This list was due before Defendants arranged and filed their own exhibits. *See*, Trial Management Order. Observing that Plaintiff offered Exhibit 1, Defendants did not offer evidence of the

recorded screams of Ms. Castillo. Now, Plaintiff seeks to backtrack and digitally "modify" Exhibit 1 to eliminate the screams. Such tactics undermine the orderly process set forth in the Trial Management Order; that Order does not exist to bait one party into withholding an exhibit by first proffering an exhibit only to, at the last minute, withdraw it (or, as here, "modify" it.)

Second, Plaintiff's Exhibit 1, with the screams, is relevant in piecing together the fast-paced sequence of events in this case. On Exhibit 1, Ms. Castillo's final audible scream occurs at approximately 32 seconds into the animation. Officer Bush's patrol vehicle can be observed arriving at approximately 37 seconds into the animation. The jury can therefore see how fresh the domestic violence scene was when Officer Bush arrived. This is relevant to the urgency that Officer Bush recognized upon contacting Ms. Castillo and corroborates Officer Bush's testimony that Ms. Castillo was frightened and in an excited state and that she implored Officer Bush to "help" because she was worried about her husband who was at that moment, stuck inside the house with an armed and violent Castillo III.  This evidence is probative because it sets the stage as a fast-moving, dynamic domestic violence scene where Ms. Castillo presented herself to the officer scared and telling him, in essence, to go rescue her husband. Officer Bush was not approaching a quiet and calm scene, instead what he saw was a potential maelstrom.

Plaintiff's assertion that the 911 call–the reason police were summoned to the Castillo house in the first place–is not relevant is unpersuasive. Defendants agree that "it is important to review all the information Defendant Bush knew prior to his use of lethal force against Arcadio Castillo III." *Plaintiff's Objections to Defendants' Exhibits* (ECF#

3 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

161), at 2. The 911 call paints a vivid picture of Misty Castillo and her level of fright from Arcadio Castillo III. In trial, Plaintiff will seek to minimize how frightening Castillo III was that night and how scared Misty Castillo was of him. Plaintiff's case-in-chief will attempt to paint Castillo III not as a violent, aggressive, scary person who was out of control with a butcher knife, but a harmless and confused young man. In this vein, Plaintiff will seek to paint Officer Bush as the person who escalated tensions that night and the 911 call rebuts such argument.

This will be a central point of contention in the trial. The 911 call and Ms. Castillo's audible screams makes it clear that even those closest to Arcadio Castillo III were terrified of him, and that evidence corroborates Officer Bush's testimony that he, too, was scared of Arcadio Castillo III. Setting aside Officer Bush's subjective perceptions, it also objectively corroborates Officer Bush's version of what happened July 9, 2021: that Castillo III was out of control, violent and unpredictable; and when he approached Ms. Castillo, she was scared and begged him for help.

Additionally, the 911 call is actual real-time evidence of the commission of a crime: Interfering With Making a Report (ORS 165.572), which is classified as a "person's crime" under state law. One of the scenarios that the Court will instruct the jury on in deciding the §1983 claim against Officer Bush is whether a crime had been committed.[1] Officer Bush will testify that his in-car computer advised him that dispatch heard Ms. Castillo say "get away from me!" while on the phone with the 911 operator,

---

[1] Model Instruction 9.25 ¶ 1, as requested by both parties in this case.

then the he read that the operator heard a scream and the line disconnect. Hence, upon arrival Officer Bush knew, or a minimum had probable cause, that the crime of Interfering With Making a Report had taken place. Again, whether the officer knew a crime had been committed is one of the elements that the Court will instruct the jury it must weigh in deciding this case. Hence, this 911 call, the actual audible, real-time, recording of the crime in progress–which Officer Bush knew about as he pulled up in his patrol car–is directly relevant to the §1983 claim.

Evidence Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Evidence Rule 402 provides that relevant evidence is admissible unless another rule or federal law provides otherwise. Given that the 911 call and Misty Castillo's screams tend to make Castillo III's volatile, unpredictable and frightening behavior more likely–even incrementally–it is clearly relevant and it is admissible. *See Crawford v. City of Bakersfield,* 944 F.3d 1070, 1077 (9th Cir. 2019) (Rule 401's "basic standard of relevance ... is a liberal one."); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also United States v. Whitehead*, 200 F.3d 634, 640 (9th Cir. 2000) (citing Rule 401 for the proposition that relevance is a "minimal requirement"); *United States v. Curtis*, 568 F.2d 643, 645 (9th Cir. 1978) ("Rule 401 ... contains a very expansive definition of relevant evidence.")

Indeed, Plaintiff concedes that the in-vehicle computer that Officer Bush read as he arrived at the Castillo home indicated "female screaming." *Plaintiff's Objections to*

5 − DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**

*Defendants' Exhibits* (ECF# 161), at 3. As any moviegoer knows, there are "screams" and there are "*screams*." In hearing Misty Castillo's screams for themselves, the jury will understand that she was, frankly, terrified and as a result, she *screamed*. Even setting aside the nature of the scream, which as noted is highly relevant and very compelling, the audio of the scream serves another admissible purpose: it objectively corroborates what Officer Bush read in his patrol car as he arrived. The call-taker noted "female screaming" and the jury will hear a female screaming, thereby proving that the City of Salem (that is charged with negligence in this case) was passing along accurate information to Officer Bush. Hence, this evidence meets the "minimal" threshold as relevant evidence for multiple reasons.

The probative value of this evidence is not outweighed by any danger of unfair prejudice. For her part, Plaintiff states that the audio of the scream is "visceral." *Plaintiff's Objections to Defendants' Exhibits* (ECF# 161), at 6. Respectfully, Plaintiff's own proffered exhibits includes stacks of photographs from an autopsy and the blood-spattered scene of a fatal shooting; it is not clear why a few seconds of Misty Castillo screaming, in the context of this particular case, is so inflammatory that it will unfairly sway a jury. Moreover, as explained above, the fact that Ms. Castillo's scream is so emotional (viz., visceral) is what makes the exhibit so relevant.

Plaintiff's reliance on *U.S. v. Layton,* 767 F.2d 549 (9th Cir. 1985) is not availing. In an effort to stretch precedent to serve her ill-conceived argument, she badly misstates *Layton*. In that case, the court found that the underlying tape recording was, at best, minimally probative. *Id.,* 555 ("the probative value of the Tape is weak.") Of course, this

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**

is very different than the case at bar, where the underlying recordings are highly probative for several reasons that are central to the factual dispute amongst the parties. Plaintiff omits this important part of the court's decision; that it was weighing an exhibit that barely met the minimal relevancy threshold. Returning to *Layton*, the court found that the inflammatory nature was overwhelming because, contrary to Plaintiff's attempt to recast the background noise as mere "screaming," what as <u>actually</u> audible on that tape was a "discussion of the impending mass suicide set against the background cacophony of innocent children who have apparently already been given poison" and the sounds of "innocent infants crying (and presumably dying)…" *Id.,* 556. Hence, *Layton* was not a case that involved some mere "screaming" on a recording. Why would Plaintiff misstate *Layton*? Because there is no case law that would support the exclusion of Misty Castillo's own screams or her own voice on the 911 call in this case; evidence that Misty Castillo herself has offered but now seeks to excise from the record. This evidence is probative and it is not unfairly prejudicial.

   3. <u>Misty Castillo's interview with OSP and testimony before the Grand Jury</u>

    <u>& Arcadio Castillo, Jr.'s interview with OSP and testimony before the Grand Jury</u>

  Plaintiff raises pure relevancy objections to these proffered exhibits. As these exhibits contain eye witness accounts of the moments leading up to and the shooting of Arcadio Castillo III, it is difficult to understand the rationale. In fact, Arcadio Castillo, Jr., was present in the room at the time of the shooting and Defendants' anticipate that Misty Castillo will attempt to persuade the jury that she, herself, could somehow see into the house, as well.

7 — DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**

Plaintiff appears to argue that because Officer Bush was not aware of the details that Misty Castillo and Arcadio Castillo, Jr., saw/heard, it is automatically inadmissible. But this evidence explains <u>why</u> Misty Castillo called 911, which was the triggering event for Officer Bush's presence at the home. Moreover, as explained above, it is relevant to corroborating that Arcadio Castillo III was violent, unpredictable and frightening that evening; points the Plaintiff will seek to minimize. This eye witness, first-hand account meets the minimum requirement of relevant evidence because it tends to make a fact at issue (that Castillo III was unpredictable, out of control and a danger to those around him) in the case more likely.

Critically, Plaintiff agrees. Misty Castillo will testify in her case-in-chief about the hours leading up to Officer Bush's arrival. *See, Plaintiff's Witness List*, (ECF# 136), at 3. Therefore, all parties agree that what happened in the afternoon/evening hours of July 9, 2021 is relevant and admissible. However, Plaintiff's position seems to be that the evidence is only relevant when <u>she</u> offers this evidence, but somehow becomes <u>not</u> relevant when Defendant offers the same evidence. Thus, any argument that the Castillo's recounting of what lead up to shooting is not relevant undercut by Plaintiff's own pre-trial filings in this very case.

In addition, as explained above, one of the elements of the §1983 claim the jury will be instructed to examine is whether Arcadio Castillo III committed a crime or whether Officer Bush had probable cause to believe he had committed a crime. Clearly, the eye witness accounts of the Castillo parents about Arcadio Castillo III hitting them, kicking them, interfering with their ability to make a 911 call and ultimately brandishing

8 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**

a butcher knife at them are relevant to whether a crime was committed. In other words, it is evidence of the actual elements of the §1983 claim.

Plaintiff also asserts that the transcripts and audio recordings are cumulative. This position is without merit. "Rule 403's cumulative evidence provision does not prohibit the introduction of cumulative evidence; rather, it merely permits courts to exclude cumulative evidence when it has little incremental value." *U.S. v. Miguel,* 87 Fed.Appx. 67, *1 (9th Cir. 2004). Reading the black-and-white pages of an interview is one thing, following along while hearing the speaker is an entirely different experience. While listening, the jurors will hear Misty Castillo giggle and other phrasing that may be telling. Although a transcript of a conversation and the audio of the same conversation are "cumulative" in the most literal sense, that does mean they are vulnerable to a cumulative objection. *Lindsey v. U.S.,* 332 F.2d 668, 691-92 (9th Cir. 1964) ("Of course, the recording itself was the most accurate rendition of the conversation between appellant and the complaining witness. *** [T]heoretically the recording itself was cumulative to her testimony. Yet that did not make the recording inadmissible") *citing, McClure v. United States*, 332 F.2d 19 (9th Cir. 1964). The reality is that transcripts of conversations are useful but the most accurate way to review a conversation is the actual recorded version; and the two combined (transcript and recording) eliminate any room for error or argument that a party has embellished what was said. In other words, it is not cumulative, it is persuasive.

Last, Plaintiff also asserts that the grand jury testimony somehow subverts the Court's Trial Management Order because the Court included a process for handling

9 — DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

deposition designations pursuant to Fed. R. Civ. P. 32. There is nothing in the order about prior testimony that was not taken in this case or requested by counsel in this case, i.e., non-deposition testimony. It is unclear how admitting prior statements–whether under oath or not–that the parties made about the underlying facts of this case undermines any rule or order.

4.      Motion Four: Exclude Arcadio Castillo III's prior criminal history

Plaintiff seeks to white-wash Arcadio Castillo III's life in this wrongful death trial by withholding critically important information about him. In this case, like all wrongful death cases, the parties will ask a jury to value–for lack of a better word–the decedent's life which was lost. The earning capacity and the affectionate company of a child who is repeatedly incarcerated, particularly for committing violence against his own family, is different than the earning capacity and affectionate company of a child who is not. In fact, a jury may conclude that an adult child who physically and emotionally abuses household members, and is in and out of jail for it, may contribute very little positive and instead, be a constant source of emotional and financial difficulty for the Castillo household. In short, how Arcadio Castillo III lived his life and the trajectory of that life is directly relevant to damages, if any are to be awarded, in this case. Such evidence is not character or impeachment evidence. It is evidence that militates against an award of damages in this case. Liability and damages are not bifurcated in this case, the issues will be tried together. Hence, Plaintiff will put on evidence about the value of Arcadio Castillo III's life and how much he contributed the Castillo home and Defendants will introduce evidence to the contrary. That is standard evidence in a wrongful death case.

HELTZEL WILLIAMS PC
P.O. BOX 1048 ■ SALEM, OREGON 97308-1048
TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302

In addition, on the night of July 9, 2021 shortly before Officer Bush arrived, there will be evidence that Arcadio Castillo III said that he will not go back to jail and that if anyone attempted to remove him from the home he will stab that person. That, of course, is precisely what Officer Bush will testify happened. In this way, Castillo III's history of incarceration is also evidence of his motive, plan and then existing state if mind. It corroborates Officer Bush's version of events that night and it is clearly relevant to explaining the tragic events that night. But that comment is out of context and non-sensical without the knowledge that Castillo III had, in fact, been to jail before.

5.      Motion Five: Exclude Misty Castillo's restraining order filings

For reasons already stated, this evidence is relevant to damages and relevant to corroborate and explain why Arcadio Castillo III may have attacked Officer Bush.

6.      Motion Six: Exclude Arcadio Castillo III's use of slurs

For reasons stated above, such evidence is relevant to damages and Arcadio Castillo III's state of mind on July 9, 2021. Defendants agree that gratuitously revisiting such language in court is not appropriate and will present the evidence accordingly. That said, the evidence–unpleasant though it may be–is relevant and given the subject matter of this case, it will not be so inflammatory as risk unfair prejudice.

7.      Motion Seven: Exclude legal conclusions about grand jury determination

Defendants note that Plaintiffs plan to open the door to discussion about the grand jury and its role in our system through the proffered testimony of former Deputy District Attorney Matthew Kemmy. The cross exam of Mr. Kemmy will be dependent on the direct.

With that much acknowledged, Defendants have never contended that the grand jury proceedings have a preclusive effect on this proceeding and have no plans to change course at trial.

   8.      Motion Eight: Renaming grand jury

Again, Defendants note that Plaintiffs plan to call a witness to describe the grand jury process and purpose, making this motion moot. In any event, Defendants do not, in theory, object to simply referring to the grand jury testimony as prior sworn testimony about this event or a similar phrase designed to omit "grand jury."

   9.      Motion Nine: Exclude evidence that knives are dangerous

This motion is without merit. Officer Bush should be able to testify about his training and experience related to edged weapons because that is part of how an objectively reasonable officer would have made his or her decisions. As noted in *Defendants' Objections to Plaintiff's* Special Instruction No. 2, (ECF# 160) the central legal premise of Plaintiff's position is flawed.[2] *See, Napouk v. Law Vegas Metro. Pol. Dept.,* 123 F.4th 906, 917 (9th Cir. 2024) *citing approvingly Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) which held that lethal force was justified because the decedent "could have raised the hatchet in another second or two and struck [the officer] with it. **Whether the hatchet was at [his] side, behind his back, or above his head doesn't change that fact**." (Emphasis added). Lethal force may very well be justified by a person "merely" holding an edged weapon, if a jury finds that the force was objectively

---

[2] That is, that "merely" holding a knife at one's side can never justify in a lethal application of force by police.

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ▪ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ▪FACSIMILE (503) 370-4302**

reasonable. Plaintiff's reliance on Officer Bush's response to a hypothetical question during a discovery deposition does not constitute legal precedent or doctrine and is unpersuasive. If Officer Bush had training that is consistent with police best practices generally, and that training justified his actions, a jury must be allowed to consider that evidence.[3] This is so because, as the parties agree, the jury will evaluate Officer Bush's response from the perspective of an objectively reasonable officer at the time/place of the shooting. Plaintiff is free to cross examine Officer Bush about his conduct and training, but it is imminently relevant.

Such training and police best practices will likely include mention of a 21-foot rule because that is standard, nationally recognized officer safety training. Courts in excessive force cases involving knives have routinely received, and discussed prominently, the 21-foot rule. *See, e.g., Buchanan v. City of San Jose,* 782 Fed.Appx. 589, 592 (9th Cir. 2019) ("The 21-foot rule provides that a person at a distance of 21 feet or less <u>may</u> pose a threat to the safety of an officer") (emphasis in original). Defendants have no intent to argue that the 21-foot rule provides some kind of doctrine that overrules the "objective reasonableness" inquiry in this case. However, the 21-foot rule is a nationally recognized and trained police defensive tactic–even acknowledge by the Ninth Circuit. Officer Bush was trained on it, it applies where a subject holds a knife (like

---

[3] Consider the opposite: consider that there was evidence that Officer Bush violated his training or police best practices. Under such circumstances, Plaintiff would certainly argue that the violation is relevant to the objective un-reasonableness of his conduct. The exact same reasoning obtains if Officer Bush acted consistently with his training – it is relevant to the objective reasonableness of his use of force.

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**

here), and it is directly relevant to deciding whether an objectively reasonable officer in Officer Bush's place would have responded the way that he did. Plaintiff is free to cross examine Officer Bush on the efficacy of the 21-foot rule, punch holes in the underlying training, call an expert to criticize it, etc. But these trainings are relevant to evaluating whether an objectively reasonable officer would have made the same decision that Officer Bush did, and <u>that</u> is the heart of this case.

10.     <u>Motion Ten: Exclude photos of the Castillo home that are not relevant</u>

Defendants do not contest this motion.

11.     <u>Motion Eleven: Exclude toxicology report</u>

With Plaintiff's stipulation that Arcadio Castillo III was intoxicated on alcohol and marijuana the night he was shot, Defendants do not contest this motion.

12.     <u>Motion Twelve: Exclude testimony that Officer Bush acted "reasonably" or that his testimony is "accurate"</u>

Defendants agree that, with very few exceptions not applicable in this case, no expert may opine on a witness's truthfulness during their testimony, as a matter of black letter law. This concession should not be read to limit experts' opinions about other matters (like whether Officer Bush's conduct was consistent with national best practice standards for police, whether the forensic evidence was consistent with his explanation, etc.), but to Plaintiff's point, Defendants agree that experts should not offer an opinion about who is lying and who is telling the truth.

13.     <u>Motion Thirteen: Exclude evidence of awards</u>

Defendants do not contest this motion.

14 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

**HELTZEL WILLIAMS PC**
P.O. BOX 1048 ■ SALEM, OREGON 97308-1048
TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302

14.     Motion Fourteen: Exclude evidence of dangers of police work

Defendants have no plans to offer evidence of past injuries or incidents about Officer Bush, which moots the majority of Plaintiff's motion. Some evidence of the dangers police are trained to confront will be offered in the form of issues already briefed (like the 21-foot rule), but Defendants have no plans to offer specific prior events where Officer Bush was exposed to violence.

15.     Motion Fifteen: Exclude evidence about Officer Bush's finances

Defendants do not contest this motion, as written. Defendants note that Plaintiff is suing Officer Bush in his individual capacity and the jury will be instructed on as much; it is the law that applies to this case. As such, argument that a jury is being asked to hold him individually accountable are appropriate and fair because that is, in fact, what the trial is about. Defendants do agree, however, arguing that a particular verdict will have a particular effect on Officer Bush's personal finances, etc., are not helpful, are inaccurate and Defendants do not plan to make such arguments.

16.     Motion Sixteen: Exclude argument about burdens on taxpayers

Defendants do not contest this motion.

17.     Motion Seventeen: Exclude reason Officer Bush joined police

This motion aims to de-humanize Officer Bush. While Defendants agree that lengthy examination about Officer Bush's decision to choose law enforcement as a career is not relevant, Defendants are entitled to introduce the defendant, who is named in the caption, to the jury in a way that is fair and balanced; Officer Bush is a human being. Certainly, part of that fair introduction is who Officer Bush is, what he does for a living,

HELTZEL WILLIAMS PC
P.O. BOX 1048 ■ SALEM, OREGON 97308-1048
TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302

and why he does it. Officer Bush's role as a police officer is central to this entire case; it is not as though Defendants seek leave to make inquiry about Officer Bush's parents or siblings or volunteerism or church activities. Defendants agree that such lines of questions more designed to garner sympathy (like extended questions about Officer Bush's family, or some other sympathetic story from him past) and are not relevant or helpful. But a relatively quick introduction, including how/why Officer Bush is a police officer is fair, if kept circumspect it is not prejudicial and it is relevant to the trial and his role as a police officer.

18.     <u>Motion Eighteen: Exclude evidence of sympathy to Castillo family</u>

Every party to this case, including Defendants, believe that the death of Arcadio Castillo III is tragic. While the parties have different positions about culpability, all agree that the loss of life is tragic. Plaintiff's position that the defense (*but not the Plaintiff*), should be barred from expressing those sentiments out loud at trial has no basis in the law. At the risk of cynicism, this motion is an attempt to inaccurately and unfairly portray the defense as heartless before the jury by obtaining an order (that the jury will never know about) forbidding the defense from simply acknowledging the tragedy of the loss of life in this case. This way, Defendants are barred from saying anything cordial or sympathetic about the loss of life throughout the trial while Plaintiff enjoys free reign. Undoubtedly, Plaintiff would capitalize on this uneven playing field by waiting until the end of the case and then pointing out in closing remarks the "outrageous callousness" of Defendants. A mirage of callousness created artificially by a pre-trial ruling. Even if Plaintiff's counsel remains silent, the freedom of one party to make sympathetic

HELTZEL WILLIAMS PC
P.O. BOX 1048 ■ SALEM, OREGON 97308-1048
TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302

comments while the other is forbidden from doing so and must, instead, sit stone-faced, creates an unfair risk.

There is no legal justification for this motion. If the Court detects a party attempting to ingratiate themselves to the jury, to the extent that it appears aimed purely at swaying the jury's sympathies, the Court is more than capable of stepping in at that point either *sua sponte* or upon an objection.

19.    Motion Nineteen: Exclude Brian Kennedy's testimony to the extent it "bolsters" another expert

At the outset, Plaintiff appears to complain about issues that she has invited. She has decided to forego expert depositions, yet she complains that she does not understand certain passages and references in Mr. Kennedy's report. Eliminating such questions about the technicalities of an expert's report is a chief purpose for taking an expert's deposition, a process Plaintiff has–for her own reasons–waved. But that does not provide a legal basis to exclude an expert's opinion.[4]

In addition, there is nothing improper about Mr. Kennedy examining, and even relying on, Mr. Englert's expert report. "An expert opinion may be based in part 'on what a different expert believes on the basis of expert knowledge not possessed by the first expert[,]' and 'this is common in technical fields.'" *Johnson v. Natural Gas Fuel*

---

[4] Plaintiff also complains that when uploaded, the animations were technically associated with experts Edwards and Heider. Candidly, defense is unsure how this uploading process works – if it was clerical issue on the filing side or a clerical issue on the court's side. Either way, Plaintiff <u>clearly</u> received the animations in a timely fashion and <u>clearly</u> associated them with the work of Kennedy and Englert. *See*, Plaintiff's Motions *in Limine* (ECF# 164), at 15 ("Assuming Mr. Kennedy was referencing the animations…")

17 – DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*
ADC:mom/W:\CLIENTS\BU20705\001\01206945.DOCX

*Systems, Inc.,* 2024 WL 3718097, at *16 (E.D. Cal. August 8, 2024) *citing, In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F.Supp.2d 1053, 1066 (C.D. Cal. 2013). Hence, there is nothing improper about Mr. Kennedy's examination, and even use of, Mr. Englert's work, as long as it is called out in the report (which it was).

Mr. Kennedy independently reviewed Mr. Englert's work, found that work reliable and, on his own, reached the same conclusions. Defendants agree that Mr. Kennedy may not testify as to the truthfulness or believability of Mr. Englert or anyone else; meaning, Mr. Kennedy <u>may not</u> and <u>will not</u> vouch for Mr. Englert (and *vice versa*). However, Mr. Kennedy <u>may</u> testify that he independently reviewed Englert's work, found no flaw in it and found it consistent with best practices in his field. Indeed, Defendants have reason to believe that Plaintiff will seek to undermine and impeach Mr. Englert. *See, Id.,* *16 n.9 (acknowledging that the "art of cross-examination" and redirect will affect the scope of the expert's testimony at trial and that the trial court is well within its skill and discretion to handle such matters as they arrive during trial.) Hence, the second opinion of an independent expert is admissible and relevant.

While it is true that no expert may testify that a particular witness or party is believable or not (*United States v. Binder*, 769 F.2d 595, 601 (9th Cir.1985)), it is also true that an expert may testify generally about their expertise in a manner that "bolsters" the offering party's case. *United States v. Hadley,* 918 F.2d 848, 852 (9th Cir. 1990) (in a child abuse case where the child's credibility is at issue, the expert could testify about the

**HELTZEL WILLIAMS PC**
P.O. BOX 1048 ■ SALEM, OREGON 97308-1048
TELEPHONE (503) 585-4422 ■ FACSIMILE (503) 370-4302

behavior of "children who have been abused" even though that "bolstered" the child's version of events.)

Neither Mr. Kennedy nor any other defense expert in this case will offer an opinion about who is telling the truth or whose testimony should be believed. Mr. Kennedy will testify that he scrutinized Mr. Englert's work and found that it was consistent with best practices and that, independently, he reached his own conclusions that happen to match Englert's. At bottom, there is nothing improper or inadmissible about two experts simply because they reach the same conclusion.

20.    <u>Motion Twenty: Exclude evidence of decedent's benefits during life</u>

Defendants do not contest this motion.

21.    <u>Motion Twenty-One: Exclude evidence of Officer Bush's emotional distress</u>

Defendants do not contest this motion.

22.    <u>Motion Twenty-Two: Exclude "war on cops"</u>

Defendants do not contest this motion.

Dated this 27th day of January, 2025.

HELTZEL WILLIAMS PC

s/ Andrew D. Campbell
Andrew D. Campbell, OSB #022647
Attorney for Defendants
PO Box 1048, Salem, OR 97308
Phone No. (503) 585-4422
Fax No. (503) 540-6534
Email: andrew@heltzel.com

## CERTIFICATE OF SERVICE

I hereby certify that I served the attached **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*** on:

James M. Healy
Ronnie Lynn Sayer
The Gatti Law Firm
235 Front Street SE, Suite 200
Salem, OR 97301
Email: jhealy@gattilaw.com
      rsayer@gattilaw.com
Attorney for Plaintiff

Daniel B. Atchison
City of Salem, Legal Dept
555 Liberty Street SE
Salem, OR 97301
Email: datchison@cityofsalem.net
Attorney for Defendants

☐ By mailing to said attorney(s) a full and correct copy therefor, contained in a sealed envelope, with postage paid, addressed to said attorney(s) as stated above and deposited in the United States Post Office at Salem, Oregon.

☐ By hand delivering to said attorney(s) a true copy thereof.

☑ By emailing to said attorney(s) at their above listed email address(es) a true copy thereof.

☑ By electronic filing with the District Court's CM/ECF system.  The CM/ECF system generated Notice of Electronic Filing constitutes proof of service upon a Filing User in accordance with Fed. R. Civ. P. 5(d).

Dated this 27th day of January, 2025.

HELTZEL WILLIAMS PC


s/ Andrew D. Campbell
Andrew D. Campbell, OSB #022647
Attorney for Defendants
PO Box 1048
Salem, OR 97308
Phone: (503) 585-4422
Fax: (503) 370-4302
Email: Andrew@heltzel.com

**HELTZEL WILLIAMS PC**
**P.O. BOX 1048 ■ SALEM, OREGON 97308-1048**
**TELEPHONE (503) 585-4422 ■FACSIMILE (503) 370-4302**